UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| WILLARD L. SLOAN, EUGENE J. WINNINGHAM, and JAMES L. KELLEY, | |
| Plaintiffs, | |
| v. | Case 2:09-cv-10918-PDB-MKM |
| BORGWARNER INC., BORGWARNER DIVERSIFIED TRANSMISSION PRODUCTS INC., and BORGWARNER FLEXIBLE BENEFITS PLANS, | U.S. District Judge Paul D. Borman |
| | U.S. Magistrate Judge Mona K. Majzoub |
| Defendants. | |

## BORGWARNER'S MOTION FOR SUMMARY JUDGMENT

BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and BorgWarner Flexible Benefits Plans—referred to collectively as "BorgWarner" for convenience—request summary judgment on Plaintiffs' claims that BorgWarner is obligated to provide them with vested, lifetime, inalterable retiree health care benefits and that changes made to their benefits on May 1, 2009, breach that obligation. *See* Fed. R. Civ. P. 56(a). As explained more fully in the following brief in support, there are no material facts in dispute and BorgWarner is entitled to judgment as a matter of law on Plaintiffs' claims. Most importantly, Plaintiffs cannot prevail on their claims because they cannot demonstrate that BorgWarner DTP and their union agreed to provide them with vested benefits. *See, e.g., Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983) (requiring an agreement to vest for retiree health care benefits to be vested). Alternatively, the undisputed evidence demonstrates that the changes BorgWarner DTP made to Plaintiffs' health care benefits on May 1, 2009, were reasonable and permissible, even if the benefits were vested. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 324–27 (6th Cir. 2009) (holding

that vested benefits could be reasonably altered but not discontinued). If nothing else,

BorgWarner is entitled to partial summary judgment on Plaintiffs' claims for class-wide money

damages. Under the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, class-

wide damages are unavailable to this plaintiff class, which was certified under Federal Rule of

Civil Procedure 23(b)(1) and (b)(2) and *not* Rule 23(b)(3). 131 S. Ct. 2541, 2557 (2011).

In accordance with Eastern District of Michigan Rule of Civil Procedure 7.1(a), counsel

for BorgWarner conferred by telephone with counsel for Plaintiffs on May 14 regarding this

motion, explaining its legal and factual basis. Plaintiffs do not concur in BorgWarner's motion.

Dated: May 14, 2012                                   Respectfully submitted,

                                                      s/Bobby R. Burchfield
                                                      Bobby R. Burchfield
Elisa Angeli Palizzi (P52088)                         (bburchfield@mwe.com)
(angeli@millercanfield.com)                           Joshua David Rogaczewski
Miller, Canfield, Paddock and Stone, P.L.C.           (jrogaczewski@mwe.com)
150 West Jefferson, Suite 2500                        McDermott Will & Emery LLP
Detroit, Michigan 48226                               600 13th Street, Northwest
313.496.7635                                          Washington, D.C. 20005
313.963.6420 fax                                      202.756.8000
                                                      202.756.8087 fax

*Attorneys for BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and*
*BorgWarner Flexible Benefits Plans*

ii

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| WILLARD L. SLOAN, EUGENE J. WINNINGHAM, and JAMES L. KELLEY, | |
| Plaintiffs, | |
| v. | Case 2:09-cv-10918-PDB-MKM |
| BORGWARNER INC., BORGWARNER DIVERSIFIED TRANSMISSION PRODUCTS INC., and BORGWARNER FLEXIBLE BENEFITS PLANS, | U.S. District Judge Paul D. Borman |
| | U.S. Magistrate Judge Mona K. Majzoub |
| Defendants. | |

**BORGWARNER'S BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Elisa Angeli Palizzi (P52088)
(angeli@millercanfield.com)
Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
313.496.7635
313.963.6420 fax

Bobby R. Burchfield
(bburchfield@mwe.com)
Joshua David Rogaczewski
(jrogaczewski@mwe.com)
McDermott Will & Emery LLP
600 13th Street, Northwest
Washington, D.C. 20005
202.756.8000
202.756.8087 fax

*Attorneys for BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and BorgWarner Flexible Benefits Plans*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ v

CONCISE STATEMENT OF THE ISSUES PRESENTED ............................... vi

CONTROLLING AUTHORITY FOR THE RELIEF SOUGHT ......................... vii

INTRODUCTION ...................................................................................... 1

BACKGROUND ......................................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 4

ARGUMENT ............................................................................................. 11

I.     BORGWARNER DTP DID NOT AGREE WITH THE UAW AND
       LOCAL 287 TO VEST RETIREE HEALTH CARE BENEFITS ................ 12

       A.     The Agreements Between BorgWarner DTP, the UAW, and Local 287
              Expressly Acknowledge the Lack of an Agreement on Vesting. .......... 13

       B.     Plaintiffs' Retiree Health Care Benefits Expired with the Health Insurance
              Agreement Unless Renewed in a Subsequent Agreement. .................. 14

       C.     By Agreeing to Changes in Current Retirees' Health Care Benefits, the
              Parties Confirmed that the Benefits Were Not Vested. ...................... 15

II.    EVEN IF PLAINTIFFS' HEALTH CARE BENEFITS ARE VESTED,
       BORGWARNER DTP'S CHANGES TO THEM ARE PERMISSIBLE ........ 16

       A.     After the 2009 Changes, Plaintiffs' Health Care Benefits Were
              "Reasonably Commensurate" with Their Previous Benefits. .............. 16

       B.     The 2009 Changes to Plaintiffs' Health Care Benefits Were "Reasonable in
              Light of Changes in Health Care." ..................................................... 17

       C.     Plaintiffs' Current Benefits Are "Roughly Consistent" with Those
              Provided to BorgWarner's Salaried Employees and the Marketplace
              Generally. ........................................................................................ 18

III.   AT A MINIMUM, PLAINTIFFS CANNOT RECOVER CLASS-WIDE
       DAMAGES IN THIS CLASS ACTION. ................................................. 19

CONCLUSION .......................................................................................... 20

iv

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................12

*Bauer v. Kraft Foods Global, Inc.*, 277 F.R.D. 558 (W.D. Wis. 2012) ..........................20

*BorgWarner Diversified Transmission Prods. Inc. v. UAW, Local No. 287*, No. 1:06-cv-058-LJM-TAB, 2008 WL 4274476, at *1 (S.D. Ind. Sept. 12, 2008) ..............................5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..............................................................12

*Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064 (6th Cir. 2008) ...........................................15

*Cox v. Ky. Dep't of Transp.*, 53 F.3d 146 (6th Cir. 1995) .............................................11

*Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir. 1996) ................................................17

*Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173 (E.D. Mich. 1997) ......................11, 12

*Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510 (1997)....................................................................................................................12

*Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) ............................. i, vii, 12, 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................11

*Maurer v. Joy Techs., Inc.*, 212 F.3d 907 (6th Cir. 2000)............................................12

*Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008) ...................................................12

*Prater v. Ohio Educ. Ass'n*, 505 F.3d 437 (6th Cir. 2007) ...........................................15

*Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009)......................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ................................ ii, vii, 2, 20

**Statutes and Rules**

ERISA § 201, 29 U.S.C. § 1051 (2006)..........................................................................12

Fed. R. Civ. P. 56............................................................................................. i, vii, 11

**Other Authorities**

1 Joseph M. Perillo, *Corbin on Contracts* § 4.13 (rev. ed. 1993) ..................................12

## CONCISE STATEMENT OF THE ISSUES PRESENTED

1.      Are Plaintiffs' retiree health care benefits lifetime, vested, and inalterable if the agreements providing them acknowledged the lack of an agreement to vest the benefits, had specific durational clauses, and made adverse changes to existing retirees' benefits?

2.      Did BorgWarner DTP breach any obligation to Plaintiffs when on May 1, 2009, it changed Plaintiffs' retiree health care benefits to provide them with benefits that were (a) reasonably commensurate with what they had before, (b) modified to reflect changes in health care, and (c) mirrored the benefits provided to other BorgWarner employees and in the market generally?

3.      Can the plaintiff class—which was certified pursuant Federal Rule of Civil Procedure 23(b)(1) and (b)(2) but not Rule 23(b)(3)—recover class-wide damages to compensate them for their individualized injuries?

## CONTROLLING AUTHORITY FOR THE RELIEF SOUGHT

Federal Rule of Civil Procedure 56

*Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) (first issue)

*Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009) (second issue)

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) (third issue)

**INTRODUCTION**

Unlike pension benefits, retiree health care benefits are not statutorily vested for life. Rather, retiree health care benefits become vested if and only if the employer and union *agree* that those benefits will be lifetime vested. Although the Sixth Circuit has construed certain ambiguous collective bargaining agreements to infer an agreement to vest retiree health care benefits, the bedrock rule is that the absence of an agreement undermines a claim for vested benefits. In this case, the parties not only failed to reach an agreement to vest benefits; they wrote into their collectively bargained agreements a provision confirming their *disagreement* about the issue. Such an unambiguous "agreement to disagree" is the antithesis of an agreement to vest, and requires summary judgment for BorgWarner[1] on Plaintiffs' claim for lifetime, inalterable vested benefits.

For three reasons, the unambiguous language of the collective bargaining agreements here demonstrates the *absence* of an agreement to vest and defeats Plaintiffs' claims. *First*, the parties *twice*—in 1990 at the beginning of the class period and in 2009 at the end of the class period—executed agreements confirming the *lack* of an agreement to vest retiree health care benefits. These "agreements to disagree" on vesting defeat *any* claim for vesting in this case. *Second*, the Health Insurance Agreements, which provided Plaintiffs with retiree health care benefits, contained specific termination dates on which all health care benefits—including those

---

[1] "BorgWarner" refers for convenience to three distinct defendants: (a) BorgWarner Diversified Transmission Products Inc., from which Plaintiffs Willard Sloan, Eugene Winningham, and James Kelley retired; (b) BorgWarner Inc., the indirect parent of BorgWarner DTP; and (c) BorgWarner Flexible Benefits Plans, the welfare benefit plan responsible for Plaintiffs' retiree health care benefits. Plaintiffs represent a class of union-represented employees who retired from BorgWarner DTP between October 27, 1989, and February 22, 2009, and their surviving spouses. (R. 56, Op. & Order 2, 13.) Plaintiffs were represented in collective bargaining by the International Union, United Automotive, Aerospace and Agricultural Implement Workers of America and its Local 287.

provided to retirees—would terminate if not extended. The most recent HIA terminated without a replacement in April 2009. As a result Plaintiffs' contractual right to benefits ended, and they now receive benefits solely at the discretion of BorgWarner DTP. *Finally*, the parties agreed on several occasions to reduce health care benefits available to existing retirees, showing that the parties understood retiree health care benefits were *not* vested.

Even if Plaintiffs' health care benefits were vested, BorgWarner would be entitled to summary judgment. On May 1, 2009, BorgWarner DTP made changes to Plaintiffs' health care benefits that complied with the Sixth Circuit's three criteria for changes to vested benefits:

> That is why the CBA—unless it says otherwise—should be construed to permit modifications to benefit plans that are [1] "reasonably commensurate" with the benefits provided in [the CBA], [2] "reasonable in light of changes in health care" and [3] roughly consistent with the kinds of benefits provided to current employees.

*Reese v. CNH Am. LLC*, 574 F.3d 315, 326 (6th Cir. 2009).

Finally, BorgWarner is entitled to partial summary judgment on Plaintiffs' claim for class-wide money damages. In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court held (unanimously on this point) that classes certified under Federal Rule of Civil Procedure 23(b)(1) and (b)(2), like this one, may *not* collect individualized damages. 131 S. Ct. 2541, 2557 (2011). Accordingly, Plaintiffs may not use this class action to collect the difference between their individual out-of-pocket costs since May 1, 2009, and the costs they would have incurred had the benefits not been changed.

## BACKGROUND

For many years, BorgWarner provided health care benefits to the UAW-represented hourly employees at and retirees from its "Diversified Transmission Products" plant in Muncie, Indiana. A dispute about these benefits for those groups led to a seven week strike in 1989. During the strike, BorgWarner negotiated with the UAW and its Local 287, and the strike was

resolved with a new CBA and a new Health Insurance Agreement. Both agreements had an explicit termination date of September 12, 1992. Both sides fulfilled their obligations throughout the term of these agreements, but the HIA was not actually executed until December 10, 1992.

Meanwhile, on September 27, 1990, the parties negotiated and executed an Agreement on Modification and Extension of Existing Labor Contract (the "ACME Contract"), which extended the 1989 CBA and HIA until March 11, 1995. The ACME Contract addressed vesting of retiree health care benefits as follows:

> This agreement does not prejudice the union's position that current retirees *have* life-time vested benefits nor the DTP Muncie Plant's position that current retirees *do not have* lifetime vested benefits.

(Ex. 2, 1990 ACME Contract Ex. 3 at 1 (emphasis added).)[2] This "agreement to disagree" set aside a contentious issue and allowed the parties to enjoy two more decades of labor peace.

The parties again extended the HIA on December 10, 1992, and then negotiated and effectuated changes to the HIA (but did not execute contractual documents) in March 1995, March 1998, December 2000, and April 2005. Importantly, none of these subsequent agreements:

- included any agreement deeming retiree health care benefits vested;
- altered the termination language (except to extend the termination date); or
- abandoned the "agree to disagree" language.

On February 26, 2009, the parties executed a Plant Shutdown Agreement, permanently closing the Muncie plant for economic reasons. Like the 1990 ACME Contract, the Plant Shutdown Agreement states:

> The Company and the Union *have a dispute* with respect to the nature of the Company's obligation to provide post-retirement health care benefits to

---

[2] All exhibits can be found in the accompanying BorgWarner's Appendix of Summary Judgment Exhibits.

employees who retired prior to February 23, 2009 and their dependents. *Nothing in this Plant Shutdown Agreement affects the parties' rights or positions with regard to that dispute.*

(Ex. 11, Plant Shutdown Agmt. art. 9, § B(2) (emphasis added).)

On May 1, 2009, BorgWarner unilaterally implemented modifications to the health care benefits of all persons who had retired from the Muncie plant after October 27, 1989, the effective date of the 1989 HIA. These modifications bring Plaintiffs' benefits into line with those provided to BorgWarner's salaried employees. Plaintiffs brought this action on behalf of all such post-October 1989 retirees, seeking a declaration that the modifications were improper because their health care benefits are lifetime vested and inalterable. Plaintiffs also seek damages in the amount of the out-of-pocket payments made as a result of the modifications.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     On October 27, 1989, BorgWarner DTP, the UAW, and Local 287 entered into a Health Insurance Agreement that provided health care benefits to eligible retirees and would "continue in full force and effect until September 12, 1992," at which point the HIA could "be terminated, modified, changed or continued in the same manner as provided in Article Sixteen of the . . . Collective Bargaining Agreement between the parties hereto." (Ex. 1, 1989 HIA art. 12; Ex. 24, Nuerge Dep. 32:25–33:17.) Article Sixteen of the CBA stated:

> This agreement shall remain in full force and effent [sic] until September 12, 1992 and thereafter from year to year, unless either party shall give notice in writing at least sixty (60) days in advance of September 12, 1992, or any anniversary thereafter of its desire to terminate the Agreement.

(Ex. 15 Ex. 1, 1989 CBA art. 16, § 1; Ex. 15, Behrman Decl. ¶ 3.) Although the HIA was not executed until December 10, 1992, both sides complied with the 1989 HIA throughout its term.

4

2.      Termination of the 1989 HIA would have resulted in the termination of health care benefits. (*E.g.*, Ex. 1, 1989 HIA app. A Ex. A § 2(M)(2).) The termination provisions applied equally to active employees and retirees. (*See id.*)

3.      The 1989 HIA contained an agreed "Summary Description Information," which explains the "Future of the Plan":

> Although [BorgWarner DTP] expects and intends to continue the Plan indefinitely, it reserves the right to modify, amend, suspend or terminate the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement.
>
> An individual's insurance coverage terminates when that person is no longer eligible or when the Group Insurance Policies terminate, whichever happens first. Additional information regarding termination of insurance policies and individual insurance coverage is provided in the Health Insurance Agreement.

(*Id.* at 121.)

4.      Each CBA subsequent to the 1989 CBA contained the same provision allowing termination on its expiration date with sixty days' notice. (Ex. 15 Ex. 2, 1995 CBA art. 16, § 1; Ex. 15 Ex. 3, 1998 CBA art. 16, § 1; Ex. 15 Ex. 4, 2000 CBA art. 16, § 1; Ex. 15 Ex. 5, 2005 CBA art. 15, § 1; Ex. 15, Behrman Decl. ¶¶ 4–7.)

5.      At no time did the parties negotiate changes to the HIA's durational clause (except for updating the termination date), termination provisions, or "Future of the Plan" language and, accordingly, each provision survived through the 2005 HIA. *See BorgWarner Diversified Transmission Prods. Inc. v. UAW, Local No. 287*, No. 1:06-cv-058-LJM-TAB, 2008 WL 4274476, at *2, *3 (S.D. Ind. Sept. 12, 2008).[3]

---

[3] BorgWarner DTP assembled an updated HIA in 1992 and 1995, neither of which was signed by the UAW or Local 287, but there is no dispute that BorgWarner DTP performed its obligations as described in the unsigned documents. (Ex. 24, Nuerge Dep. 72:1–5, 76:15–21.) After the 1998 negotiations, BorgWarner DTP compiled a summary of the 1998 HIA and distributed it to employees and retirees. (*Id.* at 90:12–25.)

6.     On September 27, 1990, BorgWarner DTP, the UAW, and Local 287 executed the ACME Contract extending the 1989 CBA and HIA until March 11, 1995, and acknowledged that the parties disagreed on whether retiree health care benefits were vested: "This agreement does not prejudice the union's position that current retirees *have* life-time vested benefits nor the DTP Muncie Plant's position that current retirees *do not have* lifetime vested benefits." (Ex. 2, 1990 ACME Contract Ex. 3 at 1 (emphasis added); Ex. 24, Nuerge Dep. 47:4–7, 47:22–48:19.)

7.     In 1992, the contracting parties entered into a new HIA with a term until March 11, 1998. (Ex. 3, 1992 Tent. Health Agmt. §§ 2, 4; Ex. 24, Nuerge Dep. 62:7–63:9; Ex. 4, 1992 HIA art. 12 §§ 1, 2; Ex. 21, 1 UAW Dep. 69:25–70:10 (Ailes).) Among other things, the 1992 HIA established a network plan under which the deductibles and stop-loss amounts would increase annually through 2002 by five percent for participants. (Ex. 3, 1992 Tent. Health Agmt. Ex. A at 9.) Class representatives Winningham and Kelley were subject as retirees to these annual increases. (Ex. 23, Kelley Dep. 11:17–20 (retired in 2001); Ex. 25, Winningham Dep. 9:18–20 (retired in 1996).) During the 2000 negotiations, BorgWarner DTP and the union agreed to continue this annual escalation. (Ex. 8, 2000 Tent. Agmt. 2; Ex. 19, Champagne Dep. 109:9–23.)

8.     In 1995, the contracting parties entered into a new CBA with a term until March 12, 1998. (Ex. 15 Ex. 2, 1995 CBA art. 16, § 1.) In 1998, they entered into a new CBA and HIA with terms until March 12, 2001. (Ex. 15 Ex. 3, 1998 CBA art. 16, § 1; Ex. 6, 1998 Tent. HPW Agmt. 1–3; Ex. 19, Champagne Dep. 99:15–100:7.) The 1998 HIA increased certain existing retirees' co-payments for prescription drugs by forty percent for generic drugs and twenty percent for branded ones. (Ex. 6, 1998 Tent. HPW Agmt. 1; Ex. 7, 1998 Health Bens. Summ. 3; Ex. 24, Nuerge Dep. 89:24–90:25.) Mr. Winningham, an existing retiree, was subject to this increase. (Ex. 25, Winningham Dep. 9:18–20 (retired in 1996).) In 2000, they entered into

6

a new CBA and HIA with terms until March 12, 2006. (Ex. 15 Ex. 4, 2000 CBA art. 16, § 1;

Ex. 8, 2000 Tent. Agmt. 1–2.) In 2005, they entered into the most recent CBA and HIA, which

expired on April 24, 2009. (Ex. 15 Ex. 5, 2005 CBA art. 15, § 1; Ex. 9, 2005 Tent. Agmt. 1;

Ex. 10, 2005 Tent. Agmt. Clarifications 1–2; Ex. 18, Campbell Dep. 48:23–50:14, 63:7–64:1.)

9.     On February 26, 2009, BorgWarner DTP, the UAW, and Local 287 agreed to terms

under which BorgWarner DTP would permanently close its Muncie plant and terminate the

parties' CBA and HIA on April 24, 2009. (Ex. 11, Plant Shutdown Agmt. art. 1, § A; Ex. 21, 1

UAW Dep. 130:15–131:22 (Ailes).) Echoing the 1990 ACME Contract, the parties agreed:

> The Company and the Union have a dispute with respect to the nature of the
> Company's obligation to provide post-retirement health care benefits to
> employees who retired prior to February 23, 2009 and their dependents. Nothing
> in this Plant Shutdown Agreement affects the parties' rights or positions with
> regard to that dispute.

(Ex. 11, Plant Shutdown Agmt. art. 9, § B(2).)

10.     In February 2009, BorgWarner DTP notified members of the plaintiff class that

their health care benefits would change as of May 1, 2009. (Ex. 12, Health Care Travel Guide 1;

Ex. 20, DuFour Dep. 35:13–36:5.)

11.     By February 2009, most pre-Medicare class members participated in network

plans, with deductibles, co-insurance requirements, and stop-loss limits. (Ex. 16, DuFour Decl.

¶ 4.) A small number participated in a non-network plan, but they also had deductibles, co-

insurance requirements, and stop-loss limits. (*Id.* ¶ 5.) Pre-Medicare class members' prescription

drugs required copayments, which were higher for branded drugs. (*Id.* ¶ 6.)

12.     Most Medicare-eligible class members used Medicare as their primary carrier and,

as supplemental insurance, a company-provided non-network plan with deductibles, co-

insurance requirements, and stop-loss limits. (*Id.* ¶ 7.) Other Medicare-eligible class members

had a company-provided supplemental plan that provided first-dollar coverage for base services

7

and deductibles, co-insurance requirements, and stop-loss limits for major medical services. (*Id.* ¶ 8.) Medicare-eligible class members' drug co-payments were higher for branded drugs, unless they were ordered by mail, in which case they were equal to those for generic drugs. (*Id.* ¶ 9.)

13.    On May 1, 2009, BorgWarner DTP "consolidate[ed] the variations of the [pre-Medicare-eligible class members'] health care plans to two health care plans at Anthem and Lumenos which mirror[ed] those offered to Muncie salaried employees." (Ex. 13, 2009 Pre-Med. Health Care Travel Guide 2; Ex. 20, DuFour Dep. 42:8–20.) The Anthem option was similar to the network plan many class members had, but it did have higher deductibles, co-insurance requirements, and stop-loss amounts. (*See* Ex. 13, 2009 Pre-Med. Health Care Travel Guide 4−5.) The Lumenos option was a network plan with higher deductibles and stop-loss amounts but also provided a company-funded health account, or "HRA," that could be used to cover claims and satisfy the deductible, and rolled over from year to year if not used. (*See id.* at 4.)

14.    The new prescription drug copayments for pre-Medicare class members depended on the prescription, where it was filled, and the size of the supply obtained. (*Id.* at 8.) The co-payments were higher than those required previously, with class members being asked to share more in the cost of branded and non-formulary drugs. (Ex. 16, DuFour Decl. ¶¶ 9, 13.)

15.    Both plans require monthly premiums: Pre-Medicare retirees with at least twenty-five years of service pay ten percent of the annual premium cost per member; others pay fifteen percent of the annual premium cost. (Ex. 13, 2009 Pre-Med. Health Care Travel Guide 1.) The initial monthly premiums in 2009 for the Anthem plan were $58 for retirees with at least twenty-five years of service and $87 for other retirees, and for the Lumenos plan, $30 and $45, respectively. (Ex. 16, DuFour Decl. ¶ 12.) The current monthly premiums are $69.50 and $104.25 for the Anthem plan and $35.50 and $53.25 for the Lumenos plan. (*Id.*)

16.     For Medicare-eligible retirees, BorgWarner DTP replaced the company-provided plan with Retiree Reimbursement Accounts—or "RRAs"—for them and their dependents. (Ex. 12, Health Care Travel Guide 4.) During 2009, BorgWarner DTP contributed $158.34 per month ($1,900 annually) into each RRA. (*Id.*) BorgWarner DTP's current annual contribution is $2,035. (Ex. 20, DuFour Dep. 48:25–49:1, 50:10–15.)

17.     These funds assisted Medicare-eligible retirees and participating spouses in purchasing Medicare health plans (e.g., Medicare Advantage *or* Medigap Plan *and* Part D) and in paying for eligible out-of-pocket medical and prescription expenses. (Ex. 12, Health Care Travel Guide 4; Ex. 20, DuFour Dep. 50:18–24, 51:3–6; Ex. 16, DuFour Decl. ¶ 15.) In addition, Medicare-eligible retirees receive a monthly pension supplement of approximately $90 to help pay for Medicare Part B premiums. (Ex. 16, DuFour Decl. ¶ 16.)[4] Almost half of the Medicare-eligible class members do not exhaust their RRA accounts annually. (Ex. 16, DuFour Decl. ¶ 17.)

18.     Health care benefits are dynamic and change over time. (Ex. 17, Macey Decl. ¶ 3.) New drugs, technologies, and protocols emerge, and usage patterns change, increasing significantly the costs of providing the health care benefits. (*Id.*) Plans respond by modifying the nature of the benefits they provide and requiring increased cost sharing by participants in the form of premiums and usage costs. (*Id.* ¶ 4.) Plan changes to existing retiree health programs for both union and nonunion retirees are the rule, not the exception. (*Id.* ¶ 7.)

19.     Employers commonly ask employees (including union-represented ones) to cover up to eighteen percent of the premiums associated with their health care benefits, and some employers ask employees to pay more). (*See id.* ¶ 27; *see also id.* ¶ 31 (noting long history of

_____

[4] The average monthly premiums for Medicare plans for 2012 are: $99.50 for Part B, $31.54 for Medicare Advantage (Part C), and $38 for Part D (and supplemental coverage).

*(footnote continued on next page)*

union-represented employees paying monthly premiums).) Employees' contribution rates have been increasing over time. (Ex. 17, Macey Decl. ¶ 31.)

20.     The median in-network annual deductible for family coverage is $1,200 ($600 for plans with unionized participants); the median coverage of post-deductible services is 80% for plans in general (90% for plans with union participants); the median annual stop-loss amount is $1,900 for single coverage and $4,000 for family coverage under all plans ($1,500 for single coverage and $3,000 for family coverage for plans with union members). (*Id.* ¶ 29.)

21.     The UAW has agreed to premiums, co-insurance, and higher deductibles for participants in health plans provided by General Motors and Chrysler. (*Id.* ¶¶ 15–16.) These changes resulted in retirees paying 25% of the costs of their health plans. (*Id.* ¶ 16.)

22.     Outside of the automotive industry, the UAW has agreed that companies such as Caterpillar, Deere, and Dana may transfer some of a plan's funding and other requirements from the company to a VEBA. (*Id.* ¶ 18.) In the VEBA created by Dana and the UAW, it was agreed that the VEBA could make future changes—including cutbacks—to existing retiree benefits. (*Id.*) Moreover, Caterpillar and the UAW agreed to cap the amount of costs that the company would be liable for under the retiree health plan and share the allocation of costs above that cap in a ratio of 60% by the company and 40% by participants, including existing retirees. (*Id.* ¶ 19.)

23.     Other companies have also made changes to account for the changing economic environment. In 2011, 3M announced it will terminate its health plan for Medicare-eligible retirees in 2013 and instead provide a fixed annual contribution to a HRA that retirees can use to pay the premiums for a Medicare supplement policy. (*Id.* ¶ 21.) Unilever also announced that it

---

*(continuation of footnote from previous page)*
(Ex. 17, Macey Decl. ¶ 10.)

would terminate its company plans for Medicare-eligible retirees and instead contribute toward covering the cost of Medicare supplement policies. (*Id.* ¶ 23.) Honeywell and EMBARQ have eliminated health coverage for Medicare-eligible retirees altogether. (*Id.* ¶¶ 22, 24.)

24.    Plaintiffs seek damages in the amount of the difference between their individual out-of-pocket costs for health care benefits since May 1, 2009, and the amount they would have paid under the BorgWarner DTP plan in existence prior to that date. (Ex. 14, Ans. Defs.' First Set Interrs. Class Pls. 12–13.) Specifically, Plaintiffs seek damages for monthly contributions and co-insurance costs, prescription drugs, and hospital-medical-surgical benefits. (*Id.*)

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). BorgWarner must first show that there is no genuine issues of material fact; to do so, it "may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). Once BorgWarner has demonstrated that no genuine issues of material fact are in dispute, "the burden shifts to the non-moving party to present specific facts to prove that there is a genuine issue for trial." *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1182 (E.D. Mich. 1997); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (same).

Summary judgment against Plaintiffs is required if they cannot "make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiffs do *not* discharge their burden if they raise "some doubt as to the existence of a fact." *Golden*, 954 F. Supp. at 1182–83. The Court decides "whether the evidence presents a sufficient

11

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## I.   BORGWARNER DTP DID NOT AGREE WITH THE UAW AND LOCAL 287 TO VEST RETIREE HEALTH CARE BENEFITS.

Retiree health care benefits are welfare benefits under ERISA, and unlike pension benefits are not statutorily vested for life. *See* ERISA § 201(1), 29 U.S.C. § 1051(1) (2006); *see also Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 514 (1997) ("ERISA . . . specifically exempts 'employee welfare benefit plans' from its stringent vesting requirements."). These benefits can become vested only by contractual agreement between the employer and the union. Indeed, the Sixth Circuit has recognized that vested health care benefits are "purely a matter of contract." *Reese*, 574 F.3d at 321.[5]

Nothing is more basic in contract law than the need for a meeting of the minds between the parties to form a contract. *See* 1 Joseph M. Perillo, *Corbin on Contracts* § 4.13, at 635 (rev. ed. 1993) ("[T]here must be mutual expressions of assent to the exchange."). As *Yard-Man* instructs, "the court should first look to the explicit language of the collective bargaining agreement for clear manifestation of intent." 716 F.2d at 1479. A written "agreement to disagree" is the antithesis of such a meeting of the minds, and undermines any notion that the parties contracted for vested lifetime retiree health coverage.

---

[5] *See also Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983) ("[W]hether retiree insurance benefits continue beyond the expiration of a collective bargaining agreement depends upon the intent of the parties."); *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000) ("[T]he parties must agree to vest a welfare benefit plan."); *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008) ("[V]esting only occurs if the parties so intended . . . .").

A. **The Agreements Between BorgWarner DTP, the UAW, and Local 287 Expressly Acknowledge the Lack of an Agreement on Vesting.**

Exhibit 3 to the 1990 ACME Contract is a "Joint Letter of Agreement on Post-Retirement Benefit Liabilities." That letter addressed "post retirement benefit liabilities," and stated: "This agreement does not prejudice the union's position that current retirees *have* life-time vested benefits nor [BorgWarner DTP's] position that current retirees *do not have* lifetime vested benefits." (SUMF ¶ 6.) This disagreement on vesting was never resolved. In the Plant Shutdown Agreement—nearly two decades later—the parties reiterated their disagreement: "The Company and the Union have a dispute with respect to the nature of the Company's obligation to provide post-retirement health care benefits to employees who retired prior to February 23, 2009." (*Id.* ¶ 9.) BorgWarner DTP cannot be said to have agreed to vest retiree health care benefits when its contracts with the UAW and Local 287 disclaim any such agreement.

Plaintiffs may contend that the CBAs are somehow "ambiguous," and that the Court must consider other indicia of the parties' intent to find vesting. To begin with, the language quoted above is anything but ambiguous. It plainly means that the parties were not in agreement about vesting. Moreover, as shown below, the durational language of the HIAs further undermines any claim of ambiguity. And finally, Michael Ailes, the witness designated by the UAW pursuant to Federal Rule of Civil Procedure 30(b)(6) to testify about the contracts, confirmed that the "agree to disagree" language in the 1990 ACME Contract is "inconsistent" with his view that the retiree health care benefits were vested. (Ex. 21, 1 UAW Dep. 67:21–24 (Ailes).)[6] The unambiguous written agreement must prevail.

---

[6] Mr. Ailes based his claim of vesting on an oral statement by BorgWarner DTP's Director of Labor Relations Glen Eckelman that "retirees know what they got when they go out." (1 UAW Dep. 39:21–23 (Ailes).) Mr. Ailes did not recall Mr. Eckelman ever using the terms "vested," "lifetime guarantee," or "inalterable benefits," and conceded that even the ambiguous

*(footnote continued on next page)*

**B.**     **Plaintiffs' Retiree Health Care Benefits Expired with the Health Insurance Agreement Unless Renewed in a Subsequent Agreement.**

BorgWarner DTP agreed to provide health care benefits to retirees only during the term of each respective HIA, not for the rest of each retiree's life. Thus, each HIA was written so that retiree health care benefits terminated with the HIA. Each HIA contained an essentially identical provision allowing either party to terminate, modify, or continue it in the manner provided in the CBA in force. (SUMF ¶¶ 1, 5–8.) Each CBA, in turn, allowed either party to terminate the CBA upon expiration by giving sixty days' written notice; otherwise the CBA continued year to year. (*Id.* ¶¶ 1, 4.) When the 1989, 1992, 1995, 1998, and 2000 HIAs expired they were replaced with subsequent contracts that continued, with alterations, the benefits of existing retirees. (*See, e.g.*, Ex. 4, 1992 HIA art. 8, § 1(A); Ex. 5, 1995 HIA art. 8, § 1(A).) The 2005 HIA, however, was terminated in the Plant Shutdown Agreement without a replacement HIA. (SUMF ¶ 9.) Accordingly, after expiration of the 2005 HIA, no HIA prevents BorgWarner DTP from changing or eliminating Plaintiffs' health care benefits.

Importantly, the parties agreed that when an HIA terminated, the specific health care benefits provided in it are also terminated, *including* retiree health care benefits. The HIA stated, in language unchanged from 1989 through 2009: "The coverages provided under this Exhibit A terminate on the date . . . the Agreement is terminated." (*Id.* ¶¶ 2, 6.) The termination provision applied to retirees as well active employees. (*Id.*) Because the HIAs tied the termination of retiree health care benefits to the termination of the HIA providing them, BorgWarner DTP was contractually obligated to provide retiree health care benefits under each HIA only until it

---

*(continuation of footnote from previous page)*
snippet attributed to Mr. Eckelman was a paraphrase. (1 *id.* at 39:25–41:24.) He further admitted that a written agreement would "trump" whatever was stated orally. (1 *id.* at 64:7–65:7.)

terminated. *Cf. Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1071 (6th Cir. 2008) (general durational clause must be tied to retiree health care benefits for it to limit them). Thus, Plaintiffs' contractual right to retiree health care benefits expired with the 2005 agreement in 2009.

The HIAs also stated that BorgWarner DTP "expects and intends to continue the plan indefinitely" but "reserves the right to modify, amend, suspend, or terminate the Plan or the Group Plan Policies therein in accordance with the provisions of the Health Insurance Agreement." (SUMF ¶ 3.) The UAW and Local 287 *signed* the 1989 document containing this language, demonstrating the parties' mutual understanding that retiree health care benefits were not vested and could be modified or terminated by BorgWarner DTP. Mr. Ailes, a signatory to the 1989 contract and the UAW's designated witness, agreed that this language would "trump" any oral statement suggesting benefits were vested. (Ex. 21, 1 UAW Dep. 64:7–65:7 (Ailes).) In the absence of any record evidence that the parties agreed to change this language in subsequent negotiations, it continued to be binding throughout the class period.[7]

### C.  By Agreeing to Changes in Current Retirees' Health Care Benefits, the Parties Confirmed that the Benefits Were Not Vested.

*Neither* BorgWarner DTP *nor* the union treated retiree health care benefits as vested. In several of the HIAs, the UAW and Local 287 agreed to reduce the health care benefits of existing retirees. These reductions—increased deductibles and co-pays—are inconsistent with Plaintiffs' litigation position that those benefits were vested and therefore not subject to change.[8] For

---

[7] The union's agreement to the reservation-of-rights language in the HIA distinguishes this case from ones holding that more conditional reservations of rights in summary plan descriptions do not defeat vesting claims, because unions would not be expected to object to statements in an SPD. *See, e.g.*, *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir. 2007). Here, the UAW explicitly agreed to the reservation of BorgWarner's rights in a signed contract.

[8] Though *Reese* allows changes to vested benefits, the UAW's understanding of "vested" means both lifetime *and unchangeable*. (Ex. 22, 2 UAW Dep. 41:8–42:1, 45:9–16 (Isaacson).)

*(footnote continued on next page)*

15

example, in the 1998 HIA, the parties agreed to increase prescription drug costs for existing retirees that participated in the network plan. (SUMF ¶ 8.) Similarly, in the 2000 HIA, the parties agreed to extend, for both existing and future retirees, the annual five-percent increase of network deductibles and stop-losses beyond the date agreed to in 1992. (SUMF ¶ 7.) These changes demonstrate that the parties did not view retiree health care benefits as vested.

## II.   EVEN IF PLAINTIFFS' HEALTH CARE BENEFITS ARE VESTED, BORGWARNER DTP'S CHANGES TO THEM ARE PERMISSIBLE.

Even if Plaintiffs' health care benefits were vested, the changes made by BorgWarner DTP are appropriate. As the Sixth Circuit explained in *Reese*, unless the CBA says otherwise, vested health care benefits can be altered if: (a) the modified benefits are "reasonably commensurate" with the pre-change benefits; (b) the changes are "reasonable in light of changes in health care"; and (c) the changed benefits are "roughly consistent with the kinds of benefits provided to current employees." 574 F.3d at 324–27. The undisputed evidence demonstrates that the changes made by BorgWarner DTP in 2009 satisfy these criteria. (Ex. 17, Macey Decl. ¶ 9.)

### A.   After the 2009 Changes, Plaintiffs' Health Care Benefits Were "Reasonably Commensurate" with Their Previous Benefits.

A comparison of Plaintiffs' benefits before and after the 2009 changes shows that their current benefits are "reasonably commensurate" with their previous ones. Medicare-eligible class members continue to receive Medicare as their primary coverage. (*Id.* ¶¶ 12, 17.) The 2009 changes merely altered the mechanism by which they receive supplemental medical and prescription drug coverage: from company-administered plans to a retirement reimbursement account with funds sufficient to purchase substantially the same benefits. (*Id.* ¶¶ 12, 16−17.)

---

*(continuation of footnote from previous page)*
By agreeing to increases in co-pays and deductibles for existing retirees, the union confirmed its understanding that those benefits were neither vested nor unchangeable.

Although different in appearance, the value of Medicare-eligible retirees' current benefits is reasonably commensurate to that of their prior benefits. Notably, most Medicare-eligible class members do not exhaust their RRA funds annually. (*Id.*)

The plans made available to pre-Medicare retirees on May 1, 2009, are also quite similar to the many plans that existed prior to BorgWarner DTP's changes. (*Id.* ¶¶ 11, 13–15.) To be sure, the modified plans ask retirees to share more of the costs of their benefits. But most class members were already experiencing annual five-percent increases in their out-of-pocket costs. (*Id.* ¶ 7.) The continued increase in their out-of-pocket costs—as the overall cost of their benefits increases—does not deviate from the prior plan. Accordingly, the shift to Plaintiffs of some of the cost of their benefits does not "significantly reduce[] their general level of benefits." *See Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 311 (7th Cir. 1996)..

### B. The 2009 Changes to Plaintiffs' Health Care Benefits Were "Reasonable in Light of Changes in Health Care."

*Reese* correctly recognized that health care benefits are constantly changing—through advances in medical technology, government programs, and otherwise—rendering claims for inalterable lifetime benefits unrealistic even if benefits are found to be "vested." *Reese*, 574 F.3d at 326 ("In contrast [to pensions], medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation." (internal quotation marks omitted)); (SUMF ¶ 18). Moreover, the agreements here expressly account for the prospect of changes in government health programs, stating: "To the extent that coverage under this Plan may be duplicated by coverage available under any Federal Medicare Program or Plan of National Health now or later adopted, such duplicate coverage will be deleted from this Plan." (Ex. 1, 1989 HIA art. 11, § 4.) The subsequent plans did not alter this provision. Since 1989, changes in government programs have been extensive, including for

example addition of a prescription drug benefit in 2003 and the Patient Protection and Affordable Care Act in 2010. Claims that a retiree from the 1990s and later is entitled to precisely the same coverage today as what they received upon retirement are unsupportable.

Nor can Plaintiffs contend that the 2009 changes to their benefits are inappropriate. Those changes, primarily involving increased cost sharing, are appropriate in light of the improvements to and the increased cost of Plaintiffs' benefits. It is typical for employers like BorgWarner DTP to respond to the increasing costs of health care by sharing some of the added costs with the recipients of the better benefits. (SUMF ¶ 19.) Union-represented retirees have not escaped this trend: Changes to their benefits are the rule, not the exception. (*Id.* ¶¶ 18–19.) Indeed, the class members here are accustomed to annual increases in cost sharing. (*See id.* ¶ 7.)

### C.   Plaintiffs' Current Benefits Are "Roughly Consistent" with Those Provided to BorgWarner's Salaried Employees and the Marketplace Generally.

Plaintiffs are receiving health care benefits that are on par with those received by other private sector employees, including those represented by the UAW. Most importantly, Plaintiffs' current benefits mirror those provided to BorgWarner's salaried employees. (SUMF ¶ 13.)[9] The fact that Plaintiffs are being treated equally to BorgWarner's other employees is more than sufficient to establish the reasonableness of the 2009 changes under the third *Reese* criterion.

A comparison between Plaintiffs' benefits and those in the marketplace generally further supports the reasonableness of BorgWarner DTP's changes. Pre-Medicare class members pay premiums representing a smaller percentage of the plan's costs than the national average for all private-sector employees and unionized employees. (*Id.* ¶¶ 15, 19.) Plaintiffs' deductibles and co-insurance requirements are comparable to those for all plans and those with unionized

---

[9] Because the Muncie plant closed in 2009, there are no active hourly employees whose benefits can be compared to Plaintiffs' benefits.

participants. (*Id.* ¶¶ 13–14, 20.) Plaintiffs' stop-loss amounts are identical to the median figures for a plan with union participants. (*Id.* ¶¶ 13, 20.) Further, some companies have eliminated benefits for Medicare-eligible retirees, but others have done what BorgWarner DTP did, replacing company-administered plans with company-funded accounts for their participants to purchase supplemental medical and drug coverage through Medicare. (*Id.* ¶¶ 16–17, 23.)

Finally, the UAW has agreed to similar cost sharing measures on behalf of its existing retirees at other companies. (*Id.* ¶¶ 21–22.) This fact provides even further support that BorgWarner DTP's 2009 changes are reasonable.

## III.   AT A MINIMUM, PLAINTIFFS CANNOT RECOVER CLASS-WIDE DAMAGES IN THIS CLASS ACTION.

Plaintiffs requested—and obtained—certification of a plaintiff class pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2). (R. 56, Op. & Order 12.) They did not plead or seek certification as a Rule 23(b)(3) class.

As relief, however, they seek class-wide monetary damages that will require calculation for each class member of the difference in out-of-pocket costs for health care benefits paid by the class member since May 1, 2009, minus the amount each of them would have paid if BorgWarner DTP did not change their benefits. (SUMF ¶ 24.) Such complex, individualized determinations are not appropriate *except* in a Rule 23(b)(3) action. *See Wal-Mart*, 131 S. Ct. at 2557–58 (holding that "individualized monetary claims belong in 23(b)(3)," not in Rule 23(b)(2)); *Bauer v. Kraft Foods Global, Inc.*, 277 F.R.D. 558, 562–64 (W.D. Wis. 2012) (explaining that monetary relief sought by retirees for their health care costs would "necessarily be individualized" and requires Rule 23(b)(3) class certification). Because this is *not*—and could not be—a Rule 23(b)(3) class action, BorgWarner is entitled to partial summary judgment on Plaintiffs' claims for class-wide monetary damages.

19

## CONCLUSION

For the reasons set forth above, BorgWarner urges the Court to grant it summary judgment on Plaintiffs' claims or, at a minimum, partial summary judgment on Plaintiffs' claims for class-wide monetary damages.

Dated: May 14, 2012

Respectfully submitted,

s/Bobby R. Burchfield

Elisa Angeli Palizzi (P52088)
(angeli@millercanfield.com)
Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
313.496.7635
313.963.6420 fax

Bobby R. Burchfield
(bburchfield@mwe.com)
Joshua David Rogaczewski
(jrogaczewski@mwe.com)
McDermott Will & Emery LLP
600 13th Street, Northwest
Washington, D.C. 20005
202.756.8000
202.756.8087 fax

*Attorneys for BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and BorgWarner Flexible Benefits Plans*

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2012, I electronically filed the foregoing **BorgWarner's Motion for Summary Judgment** with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants.

s/Bobby R. Burchfield
Bobby R. Burchfield
(bburchfield@mwe.com)
McDermott Will & Emery LLP
600 13th Street, Northwest
Washington, D.C. 20005
202.756.8000
202.756.8087 fax