BorgWarner's Appendix of Summary Judgment Exhibits


Exhibit 21


1 Deposition of International Union, United Automotive, Aerospace & Agricultural Implement Workers of America (Dec. 16, 2011) (Michael Ailes)

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

```
------------------------------------:
WILLARD L. SLOAN, EUGENE J.         :     ORIGINAL
WINNINGHAM, JAMES L. KELLEY, on     :
behalf of themselves and a          :
similarly situated class,           :
                                    :
            Plaintiffs,             :
                                    :
       vs.                          :  Case No.: 09-cv-10918
                                    :
BORGWARNER, INC., BORGWARNER        :
FLEXIBLE BENEFITS PLANS and         :
BORGWARNER DIVERSIFIED TRANSMISSION :
PRODUCTS, INC.                      :
            Defendants.             :
------------------------------------:
```

Detroit, Michigan

Monday, December 16, 2011

        The Deposition of MICHAEL AILES, called by
the Defendant for examination, taken pursuant to the
provisions of the Code of Civil Procedure and the Rules of
the United States District Court, Eastern District of
Michigan, Southern Division to the taking of depositions,
taken before QUENTINA R. SNOWDEN, CSR-5519, Notary Public
for the County of Genesee, Acting within the County of
Wayne, State of Michigan, Certified Shorthand Reporter
within and for the State of Michigan, at Miller, Canfield,
Paddock and Stone, PLC, 150 W. Jefferson Avenue, Suite
2500, Detroit, Michigan 48226 on the 16th day of December
2011 at 9:49 a.m.

2

```
 1                  A P P E A R A N C E S

 2

 3    MACEY, SWANSON AND ALLMAN

 4    BY:   BARRY A. MACEY, ESQUIRE

 5    445 N. Pennsylvania Street

 6    Suite 401

 7    Indianapolis, Indiana 46204

 8    (317) 637-2369

 9    E-mail: bmacey@maceylaw.com

10        Appeared on behalf of the Plaintiffs.

11

12    KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, P.C.

13    BY:   DAVID R. RADTKE, ESQUIRE

14    400 Galleria Officentre

15    Suite 117

16    Southfield, Michigan 48034-8460

17    (248) 354-9650

18    E-mail: dradtke@kmsmc.com

19        Appeared on behalf of the Plaintiffs.

20

21

22

23

24

25
```

3

1               A P P E A R A N C E S (cont.)

2

3  McDERMOTT, WILL & EMERY

4  BY:   BOBBY R. BURCHFIELD, ESQUIRE

5  BY:   SARAH M. PREIS, ESQUIRE

6  600 Thirteenth Street, NW

7  Washington, District of Columbia 20005-3096

8  (202) 756-8003

9  E-mail:  bburchfield@mwe.com

10       Appeared on behalf of the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Capital Reporting Company
Ailes, Michael  12-16-2011

4

1                        I N D E X

2  WITNESS:                                    PAGE:

3

4  MICHAEL AILES

5       By Mr. Burchfield                        8

6

7                      E X H I B I T S

8  NO.   DESCRIPTION                 MARKED/REFERRED TO

9  1     DOCUMENT ENTITLED, A                   17

10        SUBPOENA TO PRODUCE DOCUMENTS

11  2     SUBPOENA TO TESTIFY                    22

12  3     A DECLARATION SUBMITTED BY             26

13        MR. AILES DATED APRIL 15TH, 2009

14  4     DOCUMENT ENTITLED, ANSWERS TO          35

15        DEFENDANT'S FIRST SET OF

16        INTERROGATORIES TO CLASS PLAINTIFFS

17  5     A LETTER FROM MR. REISING              45

18        TO MR. DULANEY DATED AUGUST 14, 1989

19  6     A LETTER DATED AUGUST 30, 1989         47

20        TO MR. REISING FROM MR. SHERRICK

21  7     A LETTER FROM MR. CHARLES FREEMAN      48

22        TO MR. SHERRICK DATED

23        SEPTEMBER 12, 1989

24  8     A SET OF NOTES TYPEWRITTEN             48

25        NOTES DATED MARCH 17, 1992

Capital Reporting Company
Ailes, Michael  12-16-2011

5

```
 1                        E X H I B I T S

 2   NO.   DESCRIPTION                 MARKED/REFERRED TO

 3   9     A MEMORANDUM FROM LAURA HESS        53

 4         DATED AUGUST 5, 1996

 5   10    A DOCUMENT ENTITLED,               59

 6         NEGOTIATIONS UPDATE 12/8/09

 7   11    DOCUMENT ENTITLED, HEALTH INSURANCE    62

 8         BOOKLET OCTOBER 27, 1989

 9         AGREEMENT FINAL DRAFT 11/15/91

10   12    DOCUMENT ENTITLED, AN AGREEMENT        66

11         ON MODIFICATION AND EXTENSION OF

12         EXISTING LABOR CONTRACT

13   13    DOCUMENT ENTITLED, HEALTH             69

14         INSURANCE AGREEMENT

15   14    HANDWRITTEN NOTES DATED               90

16         AUGUST 27, 1999

17   15    E-MAIL DATED MARCH 26TH, 2001 TO      93

18         CHARLENE GILES FROM RICHARD NUERGE

19   16    HEALTH INSURANCE AGREEMENT BETWEEN    107

20         BORGWARNER AUTOMOTIVE DIVERSIFIED

21         TRANSMISSION CORPORATION MUNCIE

22         PLANT AND INTERNATIONAL UNION UAW

23

24

25
```

Capital Reporting Company
Ailes, Michael  12-16-2011

6

```
1                     E X H I B I T S

2   NO.   DESCRIPTION                  MARKED/REFERRED TO

3   17    DOCUMENT ENTITLED, BORGWARNER         119

4         AUTOMOTIVE DIVERSIFIED TRANSMISSION

5         PRODUCTS CORPORATION, MUNCIE PLANT

6         AND LOCAL 287 UAW INSURANCE

7         HIGHLIGHTS OF THE 1998 NEGOTIATIONS

8   18    A DOCUMENT ENTITLED, TENTATIVE        123

9         AGREEMENT NOVEMBER 28, 2000

10  19    DOCUMENT ENTITLED, CLARIFICATIONS     129

11        OF TENTATIVE AGREEMENT REACHED

12        BETWEEN BWTPC AND UAW LOCAL 287,

13        DATED APRIL 8, 2005

14  20    SHUTDOWN AGREEMENT                    130

15  21    LETTER DATED NOVEMBER 23, 1992        134

16        FROM LAURA HESS TO JOHN DAFFARA

17  22    LETTER FROM MR. REFFETT TO            137

18        MR. REISING DATED OCTOBER 22, 1990

19  23    MEMORANDUM FROM LAURA HESS            137

20        TO SOCIAL SECURITY STAFF

21        DATED AUGUST 17, 1992

22  24    DOCUMENT ENTITLED, RETIREMENT         142

23        INCOME PROGRAM GUIDE BOOKLET

24        DATED OCTOBER 27 1989

25
```

7

```
 1                    E X H I B I T S

 2  NO.   DESCRIPTION              MARKED/REFERRED TO

 3  25    DOCUMENT ENTITLED, GENERAL SUMMARY    142

 4        OF OFTEN ASKED OR EMPHASIZED ITEMS

 5        COVERED WITH EMPLOYEES UPON

 6        APPLICATION FOR RETIREMENT

 7  26    DOCUMENT ENTITLED, RETIREMENT         145

 8        INCOME PROGRAM GUIDE BOOKLET

 9        DATED MARCH 12, 1995

10  27    DOCUMENT ENTITLED, GENERAL SUMMARY    145

11        OF OFTEN ASKED OR EMPHASIZED ITEMS

12        COVERED WITH EMPLOYEES OF ONE

13        APPLICATION FOR RETIREMENT

14  28    DOCUMENT DATED APRIL 23, 1984         159

15  29    DOCUMENT ENTITLED, 2002 NATIONAL      172

16        RETIREE AND ACTIVE HEALTH CARE

17        AGREEMENT BETWEEN THE UAW AND THE

18        BARNES GROUP

19

20

21            (Exhibits bound separately.)

22

23

24

25
```

Capital Reporting Company
Ailes, Michael  12-16-2011

8

1                  P R O C E E D I N G S

2                     MICHAEL AILES

3       called as a witness, and having been first duly

4       sworn, was examined and testified as follows:

5            EXAMINATION BY COUNSEL FOR DEFENDANT

6   BY MR. BURCHFIELD:

7   Q    Would you please state your name.

8   A    Michael Ailes.

9   Q    And what is your current business address,

10       Mr. Ailes?

11  A    5850 Fortune Circle West, Indianapolis, Indiana.

12  Q    And is your residence address in that same area?

13  A    No.

14  Q    Where do you reside?

15  A    I reside in Muncie, Indiana.

16  Q    And what's your address in Muncie?

17  A    3809 West County Road, 1275 North, Muncie, Indiana.

18  Q    Okay.  And what's your educational background?

19  A    High school.

20  Q    Could you just briefly describe your work history

21       since high school?

22  A    I've had a variety of things from working in

23       concrete, to factory work when I started with

24       BorgWarner.  I've done everything from cut gears,

25       machining, to trucking, to labor.  I guess my --

9

```
 1        also as a union official for the local union.

 2  Q     When did you start with BorgWarner?

 3  A     1983, September 19th.

 4  Q     And were you working at the Muncie Plant?

 5  A     Correct, yes.

 6  Q     What was your first position there?

 7  A     As material handling, taking material in and out of

 8        different departments that were done with

 9        production.

10  Q     How long did you continue working full-time for

11        BorgWarner working in Muncie?

12  A     Until 2000.

13  Q     What happened in 2000?

14  A     I was asked to become International rep for Region 3

15        UAW.

16  Q     Okay.  And do you remain with the UAW today?

17  A     Yes.

18  Q     What's your current position with the UAW?

19  A     I'm assistant director of Region 3.

20  Q     What is the geography that Region 3 covers?

21  A     It covers Indiana and Kentucky.

22  Q     Who do you report to at the UAW?

23  A     Director Mo Davison.

24  Q     Prior to going to the International Union, did you

25        hold positions with Local 287?
```

Capital Reporting Company
Ailes, Michael  12-16-2011

10

1   A      Yes, I did.

2   Q      And what positions did you hold with Local 287?

3   A      I was steward, committeeman, recording secretary for

4          the committee and chairman of the Bargaining

5          Committee.

6   Q      Can you give me some time frames associated with

7          each of those starting with steward?

8   A      I started steward in 1990.  I was elected to

9          committeeman in May of 1991.  I become -- I was also

10         a committeeman from '92, plus recording secretary

11         from '92 to '93.  In '93 I become chairman of the

12         Bargaining Committee for the Local.  I served in

13         that capacity until '97.  '97, I was out for a year

14         organizing for the UAW on a temporary basis.  I come

15         back in '98, was reelected to bargaining chair

16         position.  I served in that position until I left in

17         2000.

18  Q      Which collective bargaining cycles at BorgWarner did

19         you serve as chairman of the Bargaining Committee

20         during?

21  A      '95 --  '95 as the chairman.  I was in the others,

22         but not as chairman.

23  Q      Okay.  But not '98?

24  A      No.  '98 was when I was on my temporary organizing.

25  Q      Okay.  What is the current status of Local 270 --

11

1      Local 287?

2  A    It's no longer there.  The plant closed, and with

3      that so did the Local.

4  Q    Okay.  And there is I think a Local 270 (sic)

5      Retired Workers' Chapter, are you familiar with

6      that?

7  A    Not with 270.  Now there's a 287 Retiree Chapter.

8  Q    Okay.  So there's a Local 287 Retiree Chapter.

9      What's the status of that?

10  A    It's still functioning.

11  Q    Okay.  And what is the -- and what is the function

12      of a Retired Workers' Chapter?

13  A    A variety of things.  I guess it's a kind of a

14      social gathering for retirees.  Sometimes they'll

15      put on programs.  They may have somebody come in

16      like for dental with toothbrushes, or they may have

17      somebody come in to say -- put on a little program

18      about, you know, what to look out for for heart

19      attack and strokes and informational sharing.

20  Q    Okay.  Does it have -- what is it, its level of

21      affiliation with the International UAW?

22  A    Well, not -- I guess not really much.  I mean, it --

23      I guess I don't -- I know that exact -- they don't

24      report to the International or nothing, but they're

25      still bound by -- their bylaws is usually in

Capital Reporting Company
Ailes, Michael  12-16-2011

12

1       conjunction with.

2   Q   Do they -- do they receive any funding from the

3       International, to your knowledge?

4   A   No.

5   Q   Do they pay -- do the members of the Local Chapter,

6       Retired Workers' Chapter pay dues to the Local

7       chapter, if you know?

8   A   Some of them do.  It's on a voluntary basis.  It's a

9       reduced amount.  But yes, that does happen.

10  Q   They pay dues to Local chapter or to the

11      International?

12  A   I believe it goes to the International.  I'm not

13      real familiar with that piece of it, because that's

14      the administrative part of it, and I've never really

15      been in administration.  I've always been

16      bargaining.

17  Q   Okay.  Could you just describe for me what your

18      current responsibilities are as assistant director

19      for Region 3?

20  A   Well, I oversee clerical at the regional office.  I

21      assist servicing reps in their daily assignments.  I

22      assist the director on various tasks.  Sometimes I'm

23      called to go in and finish up bargaining on a

24      contract.  I guess a variety -- I mean --

25  Q   Do you participate in collective bargaining?

13

1   A      At times I have, yeah.

2   Q      And are there circumstances that do define when you

3          do participate in a collective bargaining versus

4          when you do not?

5   A      Yes.  A lot of times it's at the request of the rep

6          or it may be depending on where they're at in

7          bargaining, where they need the assistant director

8          in, particularly if it's -- looks like it's going to

9          go to a strike, they would call me in on that; or if

10         it's a plant closing, they would call me in; or if

11         one of the reps, heaven forbid have a heart attack,

12         they would call me to go finish that up or go in and

13         take care of that.

14  Q      On an annual basis, about how many times would you

15         say you personally participate in collective

16         bargaining negotiations today?

17  A      Maybe six, eight times.

18  Q      Okay.  And all of those are within the Indiana,

19         Kentucky area?

20  A      Correct.

21  Q      And is the -- is the Region 3 office at the address

22         in Indianapolis that you gave us earlier?

23  A      That's correct.

24  Q      And what -- do you -- does -- I think you said your

25         direct boss is Mr. Davidson (sic).  Is he also in

Capital Reporting Company
Ailes, Michael  12-16-2011

14

1        Indianapolis?

2    A   Yes.  Davison, D-A-V-I-S-O-N.

3    Q   Okay.  Thank you for that clarification.  And to

4        whom does -- does -- well, let me start again.

5            Does Region 3 report to someone here in

6        Detroit at Solidarity House?

7    A   Yeah, the director would report, I'm assuming, to

8        Bob King, the president of International.

9    Q   Okay.  And what ongoing responsibilities, reporting

10       responsibilities, do you have into Detroit, if any?

11   A   Not as much.  I mean, it may be if -- depending on

12       if a vice president needs a name, or if they were

13       going to call somebody out of a Local, it would be

14       my job to report that, who that person is, has that

15       person been okay'ed to go out, that kind of thing.

16   Q   Okay.  But on a day-to-day, week-to-week basis, you

17       report to Mr. Davison and you stay pretty much

18       within the organizational structural of Region 3?

19   A   For the most part, yes.

20   Q   And who makes the decision as to when you become

21       involved in collective bargaining negotiations?

22   A   Well, that varies I guess.  Normally it would be the

23       director, or he tells me -- if someone was to call

24       me, a rep would call me, I would make that decision

25       on my own to go in.

Capital Reporting Company
Ailes, Michael  12-16-2011

15

1  Q    But that decision is also made within -- within

2       District 3, Region 3?

3  A    That's correct.  Now, from time to time there are

4       requests made from Detroit, but that's not real,

5       real often, depending on what the circumstances

6       are.

7  Q    And what would be a circumstance in which a decision

8       like that would be made from Detroit, as opposed to

9       within the Region?

10 A    If they had a new Local and it reported to one of

11      the vice presidents, they may ask to have me go in

12      or maybe even the director to go in, to initially

13      sit down and see -- get going in the right

14      direction, I guess.

15 Q    Okay.  Now, since you've been with the International

16      UAW -- and I think you said that was in 2000?

17 A    Correct.

18 Q    -- has the International UAW paid your salary?

19 A    Yeah, that would be correct.

20 Q    And your benefits?

21 A    That's correct.

22 Q    Do you currently received any salary or benefit

23      payments of any type from BorgWarner?

24 A    No.

25 Q    Do you participate in any BorgWarner health plans

Capital Reporting Company
Ailes, Michael  12-16-2011

16

1     now?

2  A   No.

3  Q   When was the last time that you participated in a

4     BorgWarner plan?

5  A   Probably when I left the plant in 2000.

6  Q   Okay.  Are you -- do you consider yourself eligible

7     to participate in any BorgWarner retirement plans?

8  A   Since the plant closed?

9  Q   Yes.

10 A   I would say no, because they done closed that

11    agreement that prohibits me from doing that now.

12 Q   Do you consider yourself eligible at any point to

13    participate in any BorgWarner health plans?

14 A   Not at this point, no.

15 Q   Within the last year, what collective bargaining

16    negotiations have you participated in personally?

17 A   Kentucky, there was a close-out agreement that I

18    participated in and finished up.

19 Q   I'm sorry, in where?

20 A   In Kentucky.

21 Q   Yep.  In Kentucky.  And what -- who was the

22    employer?

23 A   Oh, you'd ask me that.  I think it was 3047.  I

24    think it was in -- it was a Danville plant, I

25    believe.  I mean, I'm involved in so many different

Capital Reporting Company
Ailes, Michael  12-16-2011

17

```
 1        ones, it's hard to keep them all track (sic), to be

 2        honest with you.

 3   Q    Well, which ones do you -- which employers were you

 4        involved with collective bargaining negotiations

 5        with, to the degree you can recall the names of

 6        employers?

 7   A    AM General, South Mint (ph), the one I just

 8        mentioned.  Probably -- maybe Johnson Controls to --

 9        to a point.  Let's see, probably Coupled Products

10        somewhat, more by phone than being at the bargaining

11        table with them, but by phone.  That may be it at

12        this point.  I mean what I can remember of them.

13                  MR. BURCHFIELD:  Okay.  Let me ask the

14        reporter to mark as Ailes Exhibit 1 a document

15        entitled "A subpoena to produce documents."

16                  (Ailes Deposition Exhibit Number 1 was

17                  marked for identification.)

18   BY MR. BURCHFIELD:

19   Q    Mr. Ailes, this is the version of that document the

20        reporter has marked.  And let me just hand it to you

21        and ask you if you've seen that document before?

22   A    Yes.

23   Q    And can you describe the circumstance in which you

24        saw that document?

25   A    It was mailed to me.  I received it in the mail.
```

Capital Reporting Company
Ailes, Michael  12-16-2011

18

1   Q    Okay.  Did you have any role in the -- in the effort

2        by the UAW, International UAW to comply with the

3        document requests specified in that subpoena?

4   A    I guess I -- I guess I don't understand what you're

5        asking me there, I guess.

6   Q    Okay.  Bad question.  I'll rephrase.  And if at any

7        point you don't understand my question, and that

8        will happen throughout the day, just say so and I'll

9        try to rephrase it.

10            Did you have any responsibility for

11       collecting documents in response to this subpoena?

12  A    I was asked did I have any documents.

13  Q    Okay.

14  A    Okay.  But I believe those had already been turned

15       over, as far as I know.

16  Q    And were you asked if you knew where documents

17       formerly held by Local 287 were located?

18  A    Yeah.

19  Q    And do you know where Local 287 documents are

20       currently stored?

21  A    Well, right now the only documents that they really

22       have would have been from the closeout.  Any

23       documents beyond that, would have been kept -- some

24       were kept in the plant, some were kept at the hall.

25       But I don't know where it went from there.

19

1  Q    Any -- who -- if you were looking for those

2       documents, who would you ask?

3  A    I guess I'd try to figure out who the -- depending

4       on what time period, who the recording secretary was

5       and where they might have them kept.

6  Q    Insofar as documents produced from the International

7       UAW, were -- to your knowledge, were there any

8       searches for documents made at the Region 3 offices

9       in Indianapolis?

10 A    Yes, there was.

11 Q    And who was primarily involved in that search?

12 A    Me.

13 Q    Okay.  And what -- can you describe what you did in

14      connection with that search?

15 A    I went to a file now that they call -- they got an

16      area where they go, closed Locals, and they had a

17      box marked 287, and I opened it up and seen what was

18      inside.

19 Q    Okay.  Were there -- did you send those documents to

20      someone to review?

21 A    No.

22 Q    Was there anything in there that you found

23      responsive to this subpoena?

24 A    No.

25 Q    Can you describe what was in that box, what type of

20

1       documents were in that box?

2    A  There was some contracts, books from previous years,

3       like I think there might have been -- I know there

4       was a '95 agreement in there.  There might have been

5       an '89 agreement in there.  Might have even been

6       some old grievances, but that was about it.

7    Q  Were there notes from the collective bargaining

8       negotiations?

9    A  No, there were not.

10   Q  Any correspondence of any type, letters back and

11      forth?

12   A  Not that box, not the box I looked at, at the

13      Regional office.

14   Q  To the best of your knowledge, are there any other

15      documents related to Local 287 there in the

16      Indianapolis office?

17   A  Not that I'm aware of.

18   Q  Okay.  And did you -- did you make sufficient

19      inquiry to reach a high level of confidence that

20      there are no other documents there?

21   A  Yes, sir.  Yeah, absolutely.

22   Q  And so, you're able to testify today that to the

23      best of your knowledge there aren't any other

24      documents related to Local 287 there in the office

25      other than that one box?

Capital Reporting Company
Ailes, Michael  12-16-2011

21

1   A     That would be correct.

2   Q     With respect to documents relating to -- that were

3         requested by the subpoena that might be in Detroit,

4         did you have any involvement in the search for those

5         documents?

6   A     No.  No.

7   Q     Do you know who did?

8   A     No, I don't.

9   Q     How are -- how are documents kept -- how are they

10        filed at the Region 3 headquarters?  Are they filed

11        by Local, are they filed by --

12  A     By Local.

13  Q     Okay.  And for -- in situations like 287 where the

14        plant is no longer open, is there a policy about

15        whether or not to keep documents from plants that

16        are no longer open?

17  A     There's a policy.  What you run into is sometimes

18        there's not documents forwarded to the Regional

19        office from a particular Local, whether it be 287 or

20        any other Local.

21  Q     And if the Region headquarters has documents from a

22        closed -- from a Local involving a closed plant, are

23        those documents disposed of or are they just kept

24        indefinitely?

25  A     They're kept.  They're kept.  I mean, for a period

Capital Reporting Company
Ailes, Michael  12-16-2011

22

1          of time, you know, especially if there is a

2          financial -- especially if there is any financial

3          records.

4                    MR. BURCHFIELD:  Let me ask the reporter to

5          mark as Ailes Exhibit 2 another subpoena.  This one

6          is a subpoena to testify.

7                    (Ailes Deposition Exhibit Number 2 was

8                    marked for identification.)

9   BY MR. BURCHFIELD:

10  Q     Mr. Ailes, I'm handing you Ailes Exhibit 2.  Have

11        you seen that document before?

12  A     Yes.

13  Q     And in what context did you see that document?

14  A     I can't remember if this was mailed to me.  I just

15        remember I know I've seen it, so -- but I can't

16        exactly tell you whether it was mailed to my home,

17        mailed to the office.

18  Q     Let me ask you to look at the last page of that

19        document, which has the heading at the top

20        "attachment."

21  A     Uh-huh.

22  Q     And that it has nine categories, numbered categories

23        there.  Do you see those?

24  A     Yes.

25  Q     Now, it is my understanding that you are appearing

23

```
 1        today on behalf of the International UAW as a

 2        witness to testify about those nine categories of

 3        information.

 4   A    Uh-huh.

 5   Q    Is that your understanding as well?

 6   A    Yes.

 7             MR. MACEY:  Excuse me, may I interrupt at

 8        this point?

 9             MR. BURCHFIELD:  Sure.

10             MR. MACEY:  And just for the record, I've

11        had conversations with your partner Mr. Rogaczewski

12        about this document, and in those conversations, Mr.

13        Rogaczewski indicated that with respect to request

14        one, although that is generally framed, it really

15        was intended to apply only to BorgWarner, not to

16        other employers.

17             And with respect to question nine, I've

18        advised Mr. Rogaczewski that Mr. Ailes is -- is

19        not -- we are not presenting him with respect to

20        nine.  That we are producing documents that have

21        been gathered from the Detroit offices, and if based

22        on the review of those documents you want a witness

23        produced, we'll make another witness available.  I

24        just wanted to qualify that -- the general.

25             MR. BURCHFIELD:  Okay.  Well, we -- we
```

24

```
 1        would like a witness with regard to number nine, and

 2        so, we don't have to talk about the scheduling now,

 3        but at some point we should.

 4              MR. MACEY:  Okay.  That's fine.  That's

 5        fine.

 6  BY MR. BURCHFIELD:

 7  Q    So Mr. Ailes, are you today prepared and willing to

 8        testify about specification one insofar as your

 9        Counsel has described it, as well as categories two

10        through eight of these specifications?

11  A    Yeah, to the best of my ability, yes.

12  Q    Okay.  And what have you done, prior to the

13        deposition today, to prepare to testify about those

14        categories?

15              MR. MACEY:  I'm going to object to that

16        request -- or that question on the grounds that

17        it's -- would infringe the work product and

18        attorney/client privilege.

19  BY MR. BURCHFIELD:

20  Q    Let me ask the question slightly differently.  What

21        have you personally done to assure yourself that

22        you're ready to testify with regard to categories

23        one through eight?

24              MR. MACEY:  You can answer to the extent

25        that you don't reveal any conversations that you've
```

25

1       had with counsel.

2                   THE WITNESS:  I guess just going through my

3       mind the times that I was involved in these -- the

4       different negotiations, and I probably -- I looked

5       over the '92 agreement, because I had a copy of that

6       at home.

7  BY MR. BURCHFIELD:

8  Q    Other than the '92 agreement, did you review any

9       documents in preparation for the deposition today?

10                  MR. MACEY:  I'm going to lodge an objection

11      here on the grounds that it would invade the

12      attorney/client privilege and the work product

13      privilege.  You don't have to answer that.

14                  MR. BURCHFIELD:  Well, in a 30(b)(6)

15      context I think that's an unusual objection.  I've

16      never heard it before, but we don't need to debate

17      that today.

18  BY MR. BURCHFIELD:

19  Q    Well, Mr. Ailes, I'm going to ask you questions

20      about these categories, and you understand that the

21      testimony you give today is binding on the UAW as --

22      with respect to those categories, right?

23  A    Uh-huh.  Yes.

24                  MR. BURCHFIELD:  I'd ask the reporter to

25      mark as Ailes Exhibit 3 a declaration submitted by

26

```
 1          Mr. Ailes in this case dated April 15th, 2009.

 2               (Ailes Deposition Exhibit Number 3 was

 3               marked for identification.)

 4  BY MR. BURCHFIELD:

 5  Q    Mr. Ailes, I'm handing you Deposition Exhibit 3.

 6       And do you recognize the document -- there's a cover

 7       page on there which you may not have seen before,

 8       but do you recognize the document under that cover

 9       page as a declaration that you executed in April of

10       2009?

11  A    I believe so.

12  Q    Okay.  And this -- and in reviewing this declaration

13       today, is there anything in it that you would like

14       to change in any way?

15  A    Let me read it here.

16  Q    Okay.

17  A    (Reviewing.)

18  Q    Have you now had a chance to review Exhibit 3?

19  A    Yeah, I'm just about done.  Yeah, I'm all right.

20  Q    And again, is this -- does this remain true and

21       accurate to the best of your knowledge?

22  A    Yeah, to the best of my knowledge.

23  Q    This reports in paragraph five that you were

24       involved in the negotiation with BorgWarner in 1992,

25       1995, 2000, 2005 and 2008; is that correct?
```

Capital Reporting Company
Ailes, Michael  12-16-2011

27

1  A    That's correct.

2  Q    Okay.  And you -- you indicate that the main

3       bargainer in '92 and '95 was Laura Hess for the UAW,

4       correct?

5  A    Uh-huh.

6  Q    And for BorgWarner in '92 and '95 was George

7       Turczynowsky?

8  A    Yeah, the best I can remember, yes.

9  Q    Is it your recollection that Mr. Turczynowsky was at

10      the bargaining table in '92 and '95?

11 A    Yeah.  He wasn't there every day.

12 Q    Was he -- was he doing the negotiating or was he

13      serving as an advisor?  If you recall?

14 A    Well, I guess that's kind of a toss-up, because

15      the -- I think he did a little bit of both, whether

16      he meant to or not.

17 Q    Was Ms. Hess there every day?

18 A    '92, I believe -- any day that we were meeting with

19      the company, I believe she was.  I mean, that was

20      1992, but I believe so.

21 Q    How about in '95?

22 A    In '95, not every day, but most days, yes.

23 Q    And did she actively participate as a speaker during

24      the negotiations?

25 A    Yes.

Capital Reporting Company
Ailes, Michael  12-16-2011

28

1  Q    During -- at the table?

2  A    Yes, she had, yes.

3  Q    Do you recall whether Mr. Turczynowsky actively

4       participated as a speaker during the negotiations?

5  A    I believe he did.  I believe he did.

6  Q    Do you -- do you have a clear recollection one way

7       or the other?

8  A    Well, I mean, he spoke, but I don't know what

9       capacity, it's just like anything when you get a

10      group of people and somebody says something, I mean,

11      that happens sometimes when they're not supposed to.

12 Q    Who was the lead negotiator on the Union's side

13      during the '92 negotiations?

14 A    For the Local would have been LaRue Cross.

15 Q    And he was -- LaRue Cross was for Local or --

16 A    The Local.  He was the chairman for the bargaining

17      committee.

18 Q    Right.  And then the International, who would have

19      been the lead?

20 A    That would have been Laura Hess.

21 Q    Okay.  And how about BorgWarner, who was lead

22      negotiator in '92?

23 A    I guess John Daffara.

24 Q    In '95, who was the lead -- who were the lead

25      negotiators for the Union side, Local and

Capital Reporting Company
Ailes, Michael  12-16-2011

29

1         International?

2    A    '95 actually I was with the help of Laura.  And for

3         BorgWarner would have been John Daffara.

4    Q    In paragraph nine, you say, during the 2000

5         negotiations the persons who were most involved in

6         bargaining over benefits issues were Mr.

7         Turczynowsky and Tony Behrman.  Who were the lead

8         negotiators for the Union in 2000?

9    A    That would have been probably LaRue Cross for the

10        Local.

11   Q    And for the International?

12   A    It had to have been Laura, I would think.  I'm not

13        for sure.

14   Q    And how about for BorgWarner?

15   A    In 2 -- probably would have been Tony Behrman.

16   Q    Do you have a clear recollection that Ms. Hess was

17        involved in the 2000 negotiations on benefits

18        issues?

19   A    I believe she did, but I mean, I don't have -- I

20        can't tell you exact dates.  Just she would have

21        been the go-to person for LaRue.

22   Q    What about in 2005, who was the lead negotiator for

23        the Local in 2005?

24   A    That would have been -- I think Jeff Fallis.  He was

25        the chair of the bargaining committee at the time.

30

1   Q     And can you, for the reporter's benefit, spell the
2         name?
3   A     The last name?
4   Q     Yes.
5   A     F-A-L-L-I-S, I believe.
6   Q     Okay.  And who was the lead negotiator in 2005 for
7         BorgWarner?
8   A     That's -- well, I guess it would end up being -- if
9         you want to call them that, I guess it would have
10        been Dave Campbell.
11  Q     Who was the lead negotiator for the International in
12        2005?
13  A     Probably been myself.
14  Q     Modesty is not required here.
15  A     Oh, well -- I'm just trying to be truthful, I mean.
16  Q     That's the point.  Okay.  And in 2008, who was the
17        lead negotiator for the Local?
18  A     To be honest with you, I'm trying to think who that
19        was in 2008.  It's -- because I'm thinking Fallis
20        was gone.  I can't remember if it was Dick Thomas
21        who was the chair along with myself, because it run
22        together.  Might have been -- at one time they
23        changed chairmans (sic), so that's why it's kind of
24        hard for me to remember who -- like we went from one
25        chairman to another chairman during that time.

Capital Reporting Company
Ailes, Michael  12-16-2011

31

| | | |
|---|---|---|
| 1 | | Because that would have been the close-out |
| 2 | | agreement, I'm assuming.  I was involved in it, Dick |
| 3 | | Thomas was at one time and possibility of a guy |
| 4 | | named Gardner (ph) might have been, Todd Gardner. |
| 5 | Q | Who -- I'm sorry, say that again. |
| 6 | A | Todd Gardner. |
| 7 | Q | Todd Gardner.  Okay.  And who was the lead |
| 8 | | negotiator for BorgWarner on the 2008 negotiations? |
| 9 | A | It might have been -- probably Czerwonka, I think. |
| 10 | | At one time they shuffled people in and out quite a |
| 11 | | bit, so -- |
| 12 | Q | And the 2008 negotiations were looking toward |
| 13 | | closing the plant? |
| 14 | A | Yeah.  I think that's -- because they already made |
| 15 | | the announcement, so I believe that's when -- |
| 16 | | because that was a long, drawn-out process, ended up |
| 17 | | being a long, drawn-out process. |
| 18 | Q | You -- you say in paragraph four of your affidavit |
| 19 | | in the last sentence, "I am on Union leave from |
| 20 | | BorgWarner"? |
| 21 | A | Correct. |
| 22 | Q | And what is the significance of that, in your view? |
| 23 | A | It just means that -- they're not going to fire me |
| 24 | | from being absent from the plant.  We have a |
| 25 | | provision in the contract that allows me to be on |

Capital Reporting Company
Ailes, Michael  12-16-2011

32

```
1        Union leave to do this job, and my seniority carried

2        on.

3   Q    Is it -- and I understand this is somewhat

4        hypothetical.  But is it your understanding that if

5        you were to decide to leave your position at the

6        UAW, you would have a job waiting for you at

7        BorgWarner at this point?

8   A    Well, there's no BorgWarner there right now.  I

9        mean, if you're talking hypothetically, I guess if

10       the plant was still there, absolutely.  But now that

11       the plant is gone, no, there's nowhere to go to.

12  Q    In paragraph 12 of your declaration, you say, "The

13       work that was performed at the Muncie Plant will be

14       done at BorgWarner's plant in North Carolina or at

15       its plant in China."

16            Do you see that?

17  A    Yeah.

18  Q    And what's the basis for your -- for those

19       statements?

20  A    Because that's what the company indicated to us.

21  Q    Did it say North Carolina or South Carolina?

22  A    They had a plant in Seneca, so I don't know if it

23       was -- so I'm assuming it was North Carolina, but

24       I'm not -- I mean, I don't know.

25  Q    Did you understand they were sending the work to the
```

Capital Reporting Company
Ailes, Michael  12-16-2011

33

1      Seneca plant?

2  A   Part of it, was my understanding.

3  Q   And then in paragraph 13, you say, "There will be no

4      facilities, no management representatives and no

5      benefits office."

6          Do you know the current status of the

7      benefits office in Muncie?

8  A   Yeah, I think they still have it going.

9  Q   Okay.  Are you aware of any announced closure of the

10     benefits office in Muncie for BorgWarner?

11 A   They've not announced it.  It was my understanding

12     that it would go for a little bit and then they was

13     going to do away with it.  But I'm not -- nobody's

14     informed me that's gone.

15 Q   Who told you that the benefits office would be --

16     would be closed?  What's the basis for the statement

17     there in paragraph 13?

18 A   Based on the negotiations when we was doing the

19     plant closing agreement.  That was stated by

20     Czerwonka or one of -- on their side of the table.

21 Q   And then in paragraph 18, you say "Appearing in

22     southeastern Michigan is not an inconvenience to

23     me."  Are you -- you understand that one of the

24     purposes of this affidavit -- of this declaration

25     was to support the Class Plaintiffs' filing of a

34

1        lawsuit here in Detroit?

2    A   Okay.

3    Q   As opposed to in Indiana?

4    A   Okay.  I mean, I -- I guess I don't understand your

5        question.  You're asking me do I know --

6        understanding I come up here quite a bit, that's

7        what the basis of this statement, because from time

8        to time I have to come up into Detroit.

9    Q   Okay.  And you know the case is currently pending

10       here in Detroit?

11   A   Yes, I do know that.

12   Q   And are you willing to come to Detroit to testify if

13       that becomes necessary?

14   A   Yes.

15   Q   In court?

16   A   Yes.

17   Q   Okay.

18               THE WITNESS:  Can we take a break for a

19       minute?  I need to respond to this.  Someone's

20       trying to get ahold of me real bad.

21               MR. BURCHFIELD:  Sure.

22               THE WITNESS:  Sorry about that.

23               (Off the record at 10:31 a.m.)

24               (Back on the record at 10:39 a.m.)

25               MR. BURCHFIELD:  Okay.  Let me ask the

Capital Reporting Company
Ailes, Michael  12-16-2011

35

1        reporter to mark as Ailes Exhibit 4 a document

2        entitled "Answers to Defendant's First Set of

3        Interrogatories to Class Plaintiffs."

4                    (Ailes Deposition Exhibit Number 4 was

5                    marked for identification.)

6   BY MR. BURCHFIELD:

7   Q    Mr. Ailes, you have in front of you now Ailes

8        Exhibit 4.  Could you take a second and just thumb

9        through this and let me just know if you've ever

10       seen it before?

11  A    (Reviewing.)  I don't know that I have.  I don't

12       know if I have seen this or not.

13  Q    Okay.  And let me ask you to look at -- I didn't

14       know whether you had or not, so I have -- I don't

15       have any reason to suspect that you have.  Let me

16       ask you to look at the bottom of page 3, the answer

17       to interrogatory 2.  And you'll see there, at the

18       very bottom of the page, single-spaced in the first

19       line you'll see your name listed as a person who

20       supplied information in response to these

21       interrogatories.  Do you see your name there?

22  A    Yeah.

23  Q    Do you recall some time around the early part of

24       2010, being asked some questions related to this

25       lawsuit by one of the attorneys, Mr. Radtke or one

Capital Reporting Company
Ailes, Michael  12-16-2011

36

1          of his colleagues?

2    A     I'm sure I was.  About the time frame, I mean --

3    Q     Okay.  Do you recall anything -- do you recall any

4          details about information that you may have provided

5          to -- to Mr. Radtke during those discussions?

6    A     Well, if I would have been it probably would have

7          been related to my involvement with the

8          negotiations, particularly '92, '95, and the ones I

9          was at the table at.

10   Q     Do you recall anything more specific about those

11         discussions?

12   A     I mean, that's a broad -- that's pretty broad.  I

13         mean, I don't know what you're trying to narrow it

14         down to.

15   Q     Well, let me ask it more precisely.

16   A     Okay.

17   Q     Do you recall discussions with Mr. Radtke about --

18         about the substance of negotiations in 1992

19         concerning health benefits?

20              MR. MACEY:  I'm going to object to the

21         question, because in this case there's a common

22         interest privilege between the UAW and the Plaintiff

23         Class.  And so, any communications between Mr. Ailes

24         and Mr. Radtke would be privileged.

25              MR. BURCHFIELD:  Even for purposes of

37

1      providing information in response to

2      interrogatories?

3              MR. MACEY:  Well --

4              MR. BURCHFIELD:  If there were a privilege,

5      it's waived by the fact that the information has

6      been provided in response to interrogatories.

7              MR. MACEY:  Well, except that you don't

8      know what the substance of the communication was.

9      In other words, Mr. Radtke talked, as the

10     interrogatory indicates and --

11             MR. BURCHFIELD:  I don't think you can use

12     the privilege quite that way.  You can't -- you

13     can't use it in responding to -- you can't interview

14     witnesses and respond to interrogatories and then

15     claim privilege for anything that the witness says

16     during that investigation.  That just -- that would

17     be very odd.

18             MR. RADTKE:  I assert the same objection.

19     And the interrogatories answer the questions that

20     were asked of the Class Plaintiff.  How that -- but

21     I can have a discussion with someone, with Mr.

22     Ailes, and it's not discloseable except as in

23     response to interrogatories that you've asked him or

24     about the facts that you've -- that you are able to

25     ask him questions about.

38

```
1                    MR. BURCHFIELD:  Well, we don't -- we're
2         probably not going to resolve this here today, but I
3         just want to make sure I understand your position.
4                    Your position is that whenever Mr. Ailes,
5         not a client of yours, has a conversation with you
6         or anyone from your office, that you have -- that
7         you can assert a common interest attorney/client
8         privilege with regard to that conversation?
9                    MR. RADTKE:  Yes.
10                   MR. BURCHFIELD:  Is that your position?
11                   MR. RADTKE:  That's correct.
12   BY MR. BURCHFIELD:
13   Q    Mr. Ailes, in -- could you turn, please, to page 11
14        of these interrogatories?  And I'm looking at
15        interrogatory number 7 and the question there which
16        you can read.  But just for the record it says, "Do
17        you claim that BorgWarner or its employees or its
18        representatives, either with or without personal
19        knowledge, made any admission with respect to the
20        matters alleged in your amended complaint."
21                   And then it says if so, and requests some
22        detail.  Do you see that?
23   A    Uh-huh.
24   Q    I'm sorry, you'll have to answer --
25   A    Yes.
```

Capital Reporting Company
Ailes, Michael  12-16-2011

39

1  Q    Okay.  Thank you.  And then the answer -- the answer

2       it refers to interrogatory four and then it says,

3       "In the 1995 contract negotiations --" and you were

4       involved in the 1995 contract negotiations, right?

5  A    Yes.

6  Q    It says, "Director of labor relations Glen Eckelman

7       told Union negotiators that retirees knew what their

8       benefits were when they retired and they were not

9       going to be changed."

10  A   Uh-huh.

11  Q   "The witness to Mr. Eckelman's admission were

12       members of the company and the Union negotiation

13       teams in 1995."

14            Do you see that?

15  A   Yes.

16  Q   Do you recall Mr. Eckelman saying such a thing?

17  A   Yes.  He said it quite a bit.

18  Q   Okay.  Can you tell me -- can you tell me the first

19       time you heard Mr. Eckelman say that?

20  A   Probably at his office at the plant.

21  Q   And what specifically did he say?

22  A   He said that retirees know what they got when they

23       go out, everybody knows that.  And that's what they

24       have.  That's what he said.

25  Q   Did he use the term "vested"?

Capital Reporting Company
Ailes, Michael  12-16-2011

40

1    A    I don't know if he used the term vested, to be

2         honest with you.  He implied it, but I don't know

3         that he used that specific word, to be honest with

4         you.

5    Q    Did he use the term "lifetime guarantee?"

6    A    It doesn't sound like Glen to use that, but it was

7         implied for sure.  I mean, that's the culture we

8         grew up in.  When I say "grow up" from -- you know,

9         I mean -- I've been in that plant, you know, my

10        father, my grandfather.  I mean, so I've been around

11        that plant for a lot of years and that was just a

12        well known fact.

13   Q    And I'm interested, Mr. Ailes, in the precise words

14        Mr. Eckelman -- you heard Mr. Eckelman use.

15   A    Okay.

16   Q    And I take it that you don't recall him specifically

17        using the term "vested"?

18   A    If you're asking me did he use the term vested, I

19        cannot equivocally say yes, he used that

20        terminology.

21   Q    And you can't also -- also can't unequivocally say

22        that he used the terminology "lifetime guarantee"?

23   A    No, I guess I can't say that neither.

24   Q    Did he use the term "inalterable benefits"?

25   A    No, I don't believe he said that.

Capital Reporting Company
Ailes, Michael  12-16-2011

41

1   Q    Other than your recollection of him saying that when
2        retirees retire they know what they've got, do you
3        recall him saying anything else?
4   A    Well, you're just picking up a piece of it, because
5        the talk was talking about retiree benefits, okay?
6        The retirees was always wanting something done.
7        That's why in that context Glen said -- Glen
8        Eckelman says, they know what they got when they go
9        out of here, and that's what they live with, and
10       that's it.
11  Q    Okay.  And that's --
12  A    As far as I can recall.
13  Q    And is that a paraphrase of what he said or is that
14       pretty much exactly what he said?
15  A    You're asking me to go back.  I mean -- maybe I -- I
16       can't tell you.  I can't answer that.  I mean, my
17       recollection of it, what he was talking about is the
18       benefits they had when they retire and when they
19       retire that's what they live with.  Now, can I
20       remember back his exact terminology during that
21       period of time, no, because I've had several
22       conversations with Glen over the years, and -- about
23       benefits, and -- whether it be retiree benefits or
24       active benefits, I mean --
25  Q    Do you recall Mr. Eckelman, in any of those

Capital Reporting Company
Ailes, Michael  12-16-2011

42

```
 1        conversations over the years, ever using the term
 2        "vested"?
 3   A    Well, that's -- if you're asking me has he ever used
 4        the word vested during -- I'm going to have to say
 5        yes to answer that.  Now to what context --
 6   Q    Can you -- are you -- can you recall any instance in
 7        which Mr. Eckelman used the term "vested" in
 8        reference to retiree health benefits?
 9   A    Well, I'm going to have to say yes, but I don't -- I
10        can't tell you -- pinpoint the time.  I mean, we had
11        so many damn -- dang conversations about -- watch my
12        language.  We had so many conversations about
13        benefits, what it related to retirees, I mean, the
14        ongoing health care situation.  I mean, that's what
15        led up to the 19 negotiations.
16   Q    Let me ask you to look at the next subparagraph.  It
17        says -- and by the way, do you -- did you ever get
18        that from Mr. Eckelman in writing?
19   A    No.
20   Q    Do you know of any place where the company has
21        written down that retiree health care benefits were
22        lifetime vested?
23   A    Absolutely.  They used to give it out to them in a
24        pamphlet.
25   Q    Okay.  We'll look at some of those in a few minutes.
```

Capital Reporting Company
Ailes, Michael  12-16-2011

43

| 1 | | But you recall it being clearly stated in the |
|---|---|---|

1          But you recall it being clearly stated in the

2          pamphlets that the retiree benefits were lifetime?

3   A      Oh, absolutely.

4   Q      Pension benefits or health care benefits?

5   A      Health care benefits.

6   Q      Okay.  We'll look at those.  In the next paragraph

7          here it says, "In the 2000 contract negotiations

8          with Local 287, Mr. Eckelman told Union negotiators

9          that retirees knew what their benefits were when

10         they retired and they were not going to be changed";

11         in other words, the same wording used for the 1995

12         negotiations.  Did you -- are you also a witness to

13         that statement?

14  A      Yes.

15  Q      And do you recall the context in which he said it in

16         the 2000 negotiations?

17  A      Talking about, again, retiree benefits.  And I

18         believe it was -- every contract retirees always

19         wanted you to try to do something.  And when that

20         issue was brought up, they made that statement.  And

21         then from that point forward, we didn't talk about

22         the current retirees as far as those benefits.

23  Q      Other than the 2000 negotiations and the 1995

24         negotiations, did you ever hear Mr. Eckelman make

25         such a statement?

Capital Reporting Company
Ailes, Michael  12-16-2011

44

```
 1   A      In the plant.  I mean, when it was me and him
 2          talking, or if we was in his office talking about
 3          something, because whenever a retiree would go out,
 4          you know, or where we were getting ready to go into
 5          negotiations, the issue always come up.  I mean, the
 6          retirees -- because Glen been around -- Glen, he
 7          knew some of these guys retiring even though they
 8          was on the bargaining unit.  I mean, they was
 9          considered his friend.  I felt like he considered
10          them friends, so they would call him directly.  And
11          he would call me, you know, so and so called me --
12          and I can't recall a particular name.  And it --
13          once again, he said they know what they got when
14          they go out, that's just the way it is.
15   Q      Did anyone else from BorgWarner tell you that
16          benefits were -- that retiree health benefits were
17          effectively vested?
18   A      I don't know that terminology that anybody else
19          did.
20   Q      Did anybody else in the company tell you -- say
21          something that -- that -- that was in substance the
22          same as what Mr. Eckelman had told you?
23   A      I guess, in my opinion, inferred it.  Like I go back
24          to the '92 -- that's why the '92 was there.  I mean,
25          that was to get rid of the FASB liability for
```

Capital Reporting Company
Ailes, Michael  12-16-2011

45

```
 1        anybody hiring up to '93, that's what the whole

 2        thing was about.  I mean, you're asking me to -- and

 3        I don't mean to -- I just grew up in that culture,

 4        and that plant, we knew this is how it was.  When I

 5        retired, this is what I go out with, and this is

 6        what I got.  I mean, that's just -- I don't know how

 7        to explain in any other way, to be honest with you.

 8   Q    Okay.  Well, and I -- obviously there is a -- there

 9        is a dispute about that issue --

10   A    And I understand that.  I understand that.

11   Q    But I'm more -- I'm interested right now in who from

12        the company specifically told you that.  You

13        mentioned Mr. Eckelman.  Anyone else?

14   A    Like I said, I don't know the exact terminology.

15        But in my opinion, it was definitely implied,

16        especially after '92.

17             MR. BURCHFIELD:  Okay.  Let me ask the

18        reporter to mark as Ailes Exhibit 5, a letter from

19        Mr. Reising of BorgWarner to Mr. Dulaney, chairman

20        of the UAW Local 287 negotiating committee dated

21        August 14, 1989.

22             (Ailes Deposition Exhibit Number 5 was

23             marked for identification.)

24   BY MR. BURCHFIELD:

25   Q    Mr. Ailes, I'm handing you what's been marked as
```

Capital Reporting Company
Ailes, Michael  12-16-2011

46

1        Ailes Exhibit 5.  Have you seen this document

2        before?

3    A   I might have seen it.  I mean -- because I come on

4        in '91.  I might have seen it then.

5    Q   If you look, please, at the second page of the

6        document, under numbered point 2, retired employees

7        and their dependents?

8    A   Okay.

9    Q   Do you see that?  And it says, "The company is not

10       obligated to continue health insurance coverage for

11       retirees and their dependents."

12            Do you see that?

13   A   Yep.

14   Q   And then the next paragraph it says, "Effective

15       October 1, 1989, the company will discontinue

16       retiree coverage entirely."  Do you see that?

17   A   Yes.

18   Q   Do you read that as being consistent with your

19       understanding of what Mr. Eckelman told you in 1992

20       and 1995?

21   A   I guess I don't understand what you're saying,

22       because this appears to say that they don't have to,

23       and that's not what I took out of my conversations

24       with Mr. Eckelman.

25   Q   So this -- this statement, as you read it, would be

Capital Reporting Company
Ailes, Michael  12-16-2011

47

```
 1        inconsistent with --

 2   A    If I'm reading this right, it appears it's saying

 3        they don't have to do it.

 4             MR. BURCHFIELD:  Let me ask the reporter to

 5        mark as Ailes Exhibit 6, a letter dated August 30,

 6        1989 to Mr. Reising from Mr. Sherrick of the UAW.

 7             (Ailes Deposition Exhibit Number 6 was

 8             marked for identification.)

 9   BY MR. BURCHFIELD:

10   Q    Mr. Ailes, I'm handing you Exhibit 6.  Have you seen

11        this document before?

12   A    I can't say that I have.

13   Q    If I could refer you to the fourth paragraph of this

14        letter, it says, "Please be advised that it is the

15        UAW's position that the retiree health coverage for

16        UAW represented former employees of the company is a

17        lifetime benefit which may not be unilaterally

18        eliminated or discontinued."

19             Do you see that?

20   A    Yes.

21   Q    And that's consistent with your understanding of the

22        UAW position's then and now, right?

23   A    Correct.

24             MR. BURCHFIELD:  Okay.  Let me ask the

25        reporter to mark as Ailes Exhibit 7, a letter from
```

Capital Reporting Company
Ailes, Michael  12-16-2011

48

```
 1        Mr. Charles Freeman to Mr. Sherrick dated September

 2        12, 1989.

 3               (Ailes Deposition Exhibit Number 7 was

 4               marked for identification.)

 5   BY MR. BURCHFIELD:

 6   Q    Mr. Ailes, I'm handing you Ailes Exhibit 7.  In the

 7        second paragraph it says, "We have concluded that

 8        the company has the right to discontinue retiree

 9        health insurance coverage upon expiration of the

10        collective bargaining agreement."

11               Do you see that?

12   A    Yes.

13   Q    And that is, at least as written here, that's

14        inconsistent with the UAW's position that you just

15        previously read, right?

16   A    That's correct.

17   Q    And this statement is inconsistent with your

18        recollection of what Mr. Eckelman told you, correct?

19   A    That's correct.

20               MR. BURCHFIELD:  Let me ask the reporter to

21        mark as Ailes Exhibit 8 a set of notes, typewritten

22        notes dated March 17, 1992.

23               (Ailes Deposition Exhibit Number 8 was

24               marked for identification.)

25   BY MR. BURCHFIELD:
```

Capital Reporting Company
Ailes, Michael  12-16-2011

49

1   Q     Mr. Ailes, I've handed you Ailes Exhibit 8, which is

2         a set of handwritten (sic) notes dated March 17,

3         1992 produced from the files of the United Auto

4         Workers.  And I would ask you if you've seen these

5         notes before?

6               MR. MACEY:  One clarification.  You

7         indicated in your question they're handwritten

8         notes.  They're in fact typewritten notes.

9               MR. BURCHFIELD:  I thought I said

10        typewritten, but you're right, they're

11        typewritten.

12              THE WITNESS:  Have I seen it?  Probably say

13        yes, I probably have at one time.

14  BY MR. BURCHFIELD:

15  Q     Let me ask you to look at the bottom of the second

16        page which bears the last three Bates numbers 585.

17        The last paragraph says, "This is a copy of Bill

18        Leonard's notes."

19              Who is Bill Leonard?

20  A     He was a committeeman at one time.

21  Q     For the Local?

22  A     Yes, for Local 287.

23  Q     "This is a copy of Bill Leonard's notes.  It's not

24        been verified by any BorgWarner official.  These

25        notes are for the PRB Committee's use only as they

Capital Reporting Company
Ailes, Michael  12-16-2011

50

1        continue to investigate."

2                Do you see that?

3   A    Yeah.  I want to clarify that I don't know that he

4        was on the committee at this particular time,

5        because they had a PRB committee going and he might

6        have been -- I'm sure he might have been part of

7        that, and that may be -- maybe he done it for that

8        study group, I'm not sure.

9   Q    Let me ask you to look at the entry on the first

10       page.  It's number 3 at the very bottom there.  It

11       says, quote "The Union and company still disagree on

12       PRB's as being a life-long benefit", unquote.

13               Do you see that?

14  A    Wait a minute.  Where are you at?

15  Q    Very last entry on the page that --

16  A    Oh, okay.  I got you.

17  Q    Quote "The Union and company still disagree on PRBs

18       --" post retirement benefits, right?

19  A    Uh-huh.

20  Q    "As being a life-long benefit", right?

21  A    That's what that says, yes.

22  Q    And this -- these notes are apparently recording

23       that the company and the Union disagreed about

24       whether retiree health care benefits were a lifetime

25       benefit, correct?

Capital Reporting Company
Ailes, Michael  12-16-2011

51

1   A      I don't know that.  I mean, I don't know what -- if

2          it was just a committee.  The reason I say this,

3          those committees that were formed out of the 1990

4          ACME agreement to study various things, retirement

5          benefits was just one of them, it's clear that they

6          were not to do any negotiating, they was not to --

7          they didn't have the authority to state any

8          positions.  So I don't know if he was doing it in

9          that -- I mean, I don't know what context he was

10         taking them notes.  That's what I'm trying to say.

11         If it would have been as part of that committee,

12         then, you know, just to be real honest, it don't

13         mean much to me because at the time he's not

14         speaking for UAW, you know, he's not speaking for

15         the 287.  He was maybe speaking as a person on that

16         committee.  I don't know if somebody said that to

17         him in that committee, because it was joint.  They

18         had company representatives and Union

19         representatives to form these committees to study

20         various -- well, gainsharing is one of them, for

21         example.

22  Q      Well, let me ask you this question:  You understood

23         Mr. Eckelman to say that when retirees retire, they

24         knew what they got?

25  A      Yes.

52

| | | |
|---|---|---|
| 1 | Q | Did you ever hear anyone from BorgWarner say that |
| 2 | | BorgWarner believed retiree health benefits were not |
| 3 | | lifetime vested and could be changed? |
| 4 | A | There could have been somebody say it from time to |
| 5 | | time.  I mean, depending on who was resolving up in |
| 6 | | HR.  I mean the people take different positions when |
| 7 | | they first come there any way on various things, |
| 8 | | whether it be that or whether it be how overtime is |
| 9 | | worked. |
| 10 | | So I mean, I can't sit here and say did |
| 11 | | anybody not say that, well, I'm sure probably |
| 12 | | somebody did at one time say that. |
| 13 | Q | In your recollection, did BorgWarner officials say |
| 14 | | more often that the benefits were not vested, or |
| 15 | | more often that retirees when they retired know what |
| 16 | | they've got? |
| 17 | A | If you're asking me, it was more the latter.  I |
| 18 | | mean, I -- I can't recall somebody specifically |
| 19 | | looking at me and saying, you guys know it's not a |
| 20 | | lifetime benefit.  Now in saying that, I'm not |
| 21 | | saying in a meeting somewhere somebody couldn't have |
| 22 | | said that.  But nobody ever give me here's |
| 23 | | officially what I'm saying to you is that we don't |
| 24 | | think it's a lifetime benefit.  I mean, I know |
| 25 | | that's what they end up believing or saying, but I |

Capital Reporting Company
Ailes, Michael  12-16-2011

53

1        don't know depending on what time frame you're

2        looking at, I can't specifically remember that

3        piece.

4                MR. BURCHFIELD:  Well, let me ask the

5        reporter to mark as Ailes Exhibit 9 a memorandum to

6        you from Laura Hess dated August 5, 1996, subject

7        health insurance agreement with -- with an

8        attachment.

9                THE WITNESS:  Okay.

10               (Ailes Deposition Exhibit Number 9 was

11               marked for identification.)

12   BY MR. BURCHFIELD:

13   Q    Mr. Ailes, you now have in front of you Ailes

14        Exhibit 9.  Do you recall this document?

15   A    Yeah.

16   Q    When was the last time you saw this document?

17   A    I can't answer -- I don't recall.  I mean --

18   Q    Have you seen it, say, within the last month?

19   A    No.

20   Q    Okay.  What is this document, as best you recall it?

21   A    Health -- or insurance booklet -- or health

22        insurance agreement.

23   Q    And in particular, I take it it contains Laura

24        Hess's markup of BorgWarner's draft of the health

25        insurance agreement; is that right?

54

1   A      It's what it looks like, I mean --

2   Q      And this -- this is addressed to you as a bargaining

3          unit chair Local 287?

4   A      Uh-huh.

5   Q      Do you see that?

6   A      Yes.

7   Q      And that is in fact the position you held during

8          the '95 negotiations, correct?

9   A      That's correct.  That's correct.

10  Q      And would it have been the normal process for you

11         to have forwarded BorgWarner's draft agreement to

12         Laura Hess for her review?

13  A      I might have.  I'm not for sure, and the reason I

14         say that, because there was a lot of going back and

15         forth on trying to get health insurance agreements

16         from both sides.  I mean at one time it was argument

17         does corporate have it, is it at the International

18         kind of thing.  So, I'm assuming I sent her a copy

19         of something up there, okay, but I can't tell you

20         that maybe the company didn't too.  I don't know

21         that for a fact.

22  Q      Okay.  But does this -- does this particular

23         document refresh your recollection that you were

24         having communications with Ms. Hess in 1996

25         regarding the draft health insurance agreement?

55

1  A     I'm sure it was -- I probably was, yes.

2  Q     Okay.  Let me ask you to look at the page with the

3        last three Bates numbers.  Those little numbers you

4        see there in the corner.

5  A     Okay.

6  Q     It has 1021, last four digits.  And it's a little

7        bit confusing.  There are two numbers on each page.

8        One of them will be 1004 always, and then there are

9        others that are -- that have -- that go

10       sequentially.  Do you have the page that has 1021 on

11       it?

12 A     Yeah, UAW 001021?

13 Q     Yes, exactly.  You see there at the bottom of

14       that -- of that page you see Section 2 is circled in

15       dark black pen and the question is written, "What

16       does this mean"; do you see that?

17 A     Uh-huh.

18 Q     Is that a "yes"?

19 A     Yes.  I'm sorry.

20 Q     Okay.  Thank you.  And Section 2 there says, "Any

21       provision in this agreement or any exhibit attached

22       hereto relating to deductibles and stop loss limits

23       shall survive termination of this agreement.  Such

24       provision shall terminate on December 31, 2002

25       unless previously modified and/or extended."

56

1          Do you see that?

2    A    Yes.

3    Q    Do you recall discussions during the 1995 collective

4         bargaining negotiations about a -- about

5         continuation of an escalator for deductibles and

6         stop losses?

7    A    Well, that's -- was it mentioned in '95?  It might

8         have been.

9    Q    It was agreed to in '92?

10   A    Correct.  In '92 it was agreed to for a ten-year

11        period.

12   Q    And in your view, why was it necessary -- why would

13        it have been necessary to state that a provision

14        relating to deductibles and stop loss for the health

15        insurance agreement survive the termination of the

16        agreement?

17   A    I guess I'm not understanding your question.  I

18        mean, why did it extend out past that?

19   Q    Yes.

20   A    Is that what you're saying?

21   Q    Yes.

22   A    Because it's what was agreed to in '92.  Because

23        when we looked at it in '92, you got to understand

24        we was trying to -- we was trying to fix some

25        things.  We was trying to make best benefits we

Capital Reporting Company
Ailes, Michael  12-16-2011

57

1          could for the active people and future retirees,

2          because we weren't worried as much about the ones

3          that was already out.  So it was agreed to go ten

4          years.  And we looked at that and we costed it out

5          to see how we would be in ten years.  It's that

6          simple.

7   Q      Let me ask you to look at the paragraph just below

8          that --

9   A      Okay.

10  Q      -- which says, On March 12, 1998, this agreement may

11         be terminated, modified, changed, or continued in

12         the same manner as provided in Article 16 of the

13         aforesaid collective bargaining agreement between

14         the parties hereto dated October 27, 1989, as

15         modified by the 1992 agreement."

16                 Do you see that?

17  A      Yeah.  Yes.

18  Q      Was it your understanding, having participated in

19         those negotiations, that the health insurance

20         agreement could be terminated, modified, changed or

21         continued as of March 12, 1998?

22  A      I guess I don't understand the question because I

23         wasn't there in '98, of course.

24  Q      Right.  But in '95 -- in the '95 negotiations, at

25         least according to this paragraph, the health

Capital Reporting Company
Ailes, Michael  12-16-2011

58

| | | |
|---|---|---|
| 1 | | insurance agreement could be terminated, modified or |
| 2 | | changed as -- in three years.  Was that your |
| 3 | | understanding? |
| 4 | A | No.  And I don't know who wrote this or who put this |
| 5 | | piece here saying that, you know, that last one that |
| 6 | | you're talking about. |
| 7 | Q | Do you know -- do you have any explanation for why |
| 8 | | Ms. Hess would not have flagged that as an |
| 9 | | unacceptable provision? |
| 10 | A | No, I -- no, I don't know.  I mean, I can't speak |
| 11 | | for her. |
| 12 | Q | Did you know that that provision that I just read to |
| 13 | | you appears in the final agreement? |
| 14 | A | Based on if you're telling me, I've got no reason to |
| 15 | | doubt that, but I can't tell you why it wasn't |
| 16 | | flagged. |
| 17 | Q | We'll look at that in a minute.  Would you look, |
| 18 | | please, at the page UAW 1139 later in this same |
| 19 | | document, Exhibit 9. |
| 20 | A | Okay. |
| 21 | Q | Under the heading, "Future of the plan." |
| 22 | A | Yeah.  Okay.  I see it. |
| 23 | Q | And it says -- and here there's a big "no", triple |
| 24 | | underlined beside the provision and it says -- and |
| 25 | | it says -- and that provision is marked through. |

Capital Reporting Company
Ailes, Michael  12-16-2011

59

1                    Do you see that?

2   A    Yes.

3   Q    And it seems -- I can barely read it, but it seems

4        to say, the part that's marked through, "Although

5        BorgWarner Diversified Transmission Products

6        Corporation Muncie Plant expects and intends to

7        continue the plant indefinitely --" and this is

8        where it gets tough to read, "-- it reserves the

9        right to modify, amend, suspend or terminate the

10       plan or the group policies therein in accordance

11       with the provisions of the health insurance

12       agreement."

13                   Do you see that?

14  A    Yes.

15  Q    Is that provision, as you understand it, consistent

16       with what you understood Mr. Eckelman to be telling

17       you?

18  A    I'd say no.

19            MR. BURCHFIELD:  Let me ask the reporter to

20       mark as Ailes Exhibit 10, a document entitled

21       "negotiations update 12/8/09."

22            (Ailes Deposition Exhibit Number 10 was

23            marked for identification.)

24  BY MR. BURCHFIELD:

25  Q    Mr. Ailes, you now have in front of you Exhibit 10.

60

```
 1        Do you recall this document?

 2   A    Yeah, I guess I do.

 3   Q    You participated in the 2008, 2009 negotiations that

 4        led to the closure of the plant, right?

 5   A    Correct.  Well -- yeah, for the most part, yeah.

 6   Q    Let me ask you to look at the second page of this

 7        document and there is a question there in about the

 8        middle of the page that says, "What benefits will I

 9        get if I retire today?"

10            Do you see that?

11   A    Uh-huh.

12   Q    And then in the answer portion, it says, "If you

13        retire before closing agreement is reached, you will

14        not be entitled to any benefits provided by that

15        agreement, but the company will continue to provide

16        the retiree benefits that were in place before

17        January 2006."

18            Do you see that?

19   A    Yes.

20   Q    And then it says, "BorgWarner has informed us that

21        after the contract expires, retiree insurance

22        benefits will be reduced.  The company takes the

23        position that it is entitled to reduce or eliminate

24        benefits at any time.  We disagree and will defend

25        our position vigorously in court."
```

Capital Reporting Company
Ailes, Michael  12-16-2011

61

1                    Let me stop there.  Do you see that?

2    A    Yes.

3    Q    And do you recall BorgWarner taking that position

4         during the shutdown negotiations?

5    A    I'm sure they probably did.  Yeah, that's why it's

6         there.

7    Q    Do you understand that -- that that position is

8         inconsistent with the statement you recall Mr.

9         Eckelman making to you back in 1992 and '95?

10   A    Yeah.

11   Q    Okay.  And then it says, "There is, however, a

12        substantial risk that we will not prevail.  In that

13        event, retiree insurance benefits could be reduced

14        or eliminated at the company's sole discretion."

15                    Do you see that?

16   A    Yes.

17   Q    So, is it -- would it be fair to say, Mr. Ailes,

18        that -- that based upon these documents, you do

19        recall the company taking the position that retiree

20        health care benefits at its Muncie Plant were not

21        lifetime vested and guaranteed?

22   A    Well, I know they took that position, but earlier

23        you asked me had somebody told me that.  In this,

24        they did take that position here, that's correct.

25   Q    Do you recall being in the room at any point where

62

```
 1        the company or company officials --

 2   A    During these negotiations, yeah, absolutely, yeah.

 3   Q    How about during prior negotiations?

 4   A    Prior negotiations, I can't recall them saying what

 5        this is saying.

 6              MR. BURCHFIELD:  Let me ask the reporter to

 7        mark as Ailes Exhibit 11 a document entitled,

 8        "Health Insurance Booklet October 27, 1989

 9        Agreement, Final Draft 11/15/91."

10              (Ailes Deposition Exhibit Number 11 was

11              marked for identification.)

12   BY MR. BURCHFIELD:

13   Q    Mr. Ailes, I'm handing you Ailes Exhibit 11 and you

14        can take whatever time you want to look at this.  I

15        would call your attention to the page with the last

16        three digits at the bottom 305 and 306.

17   A    (Reviewing.)

18   Q    And are you on page 305?

19   A    Yeah, 305.

20   Q    Do you see your signature there?

21   A    Yeah.

22   Q    That is your signature?

23   A    Yes.

24   Q    Then on page 306, you also see your signature there?

25   A    Yes.
```

63

1   Q    And am I correct that you -- you signed this

2        document in your capacity as a member of the -- of

3        the Local 287 negotiating committee?

4   A    Yes.

5   Q    And at the time you signed this, was it consistent

6        with what the Local had believed it had agreed to in

7        the 1989, 1990 negotiations?

8   A    Since I wasn't a party of that, I'd have to rely on

9        somebody else, I'm assuming.  But yeah, I mean they

10       signed it in '92, but I don't know why it was signed

11       in '92.  I can't answer that question because

12       it's -- you're talking about 11/15 of '91.  Coming

13       out of '89 negotiations I'm assuming -- I don't know

14       why it got to this point, I had just got to be a

15       committeeman at that point in time, or I hadn't been

16       on very long.

17  Q    Well, did you sign it in reliance on other people at

18       the Local who confirmed that this was the deal they

19       had made?

20  A    That's probably a true statement.

21  Q    Okay.  Let me ask you to look at the page with the

22       last three digits 304 at the bottom.

23  A    Okay.  (Reviewing.)

24  Q    And in Article 10, XII.  Do you see there?

25  A    Yes.

Capital Reporting Company
Ailes, Michael  12-16-2011

64

1  Q    It says, in the first sentence, "This agreement and

2       the plan embodied herein shall become effective as

3       of October 27, 1989 and continue in full force and

4       effect until September 12, 1992.

5             Do you see that?

6  A    Yes.

7  Q    And then skipping to the next paragraph it says, "On

8       September 12, 1992 this agreement may be terminated,

9       modified, changed or continued in the same manner as

10      provided in Article 16 of the aforesaid collective

11      bargaining agreement between the parties hereto

12      dated October 27, 1989."  Do you see that?

13 A    Uh-huh.

14 Q    Do you view that as being consistent or inconsistent

15      with your recollection of what Mr. Eckelman told

16      you?

17 A    Inconsistent.

18 Q    Would you agree that the -- that the appearance of

19      this provision in a written contract signed by the

20      UAW would trump whatever Mr. Eckelman told you?

21            MR. MACEY:  Objection.  Calls for a legal

22      conclusion.

23 BY MR. BURCHFIELD:

24 Q    You can answer.

25            MR. MACEY:  You can answer.

Capital Reporting Company
Ailes, Michael  12-16-2011

65

```
 1              THE WITNESS:  It's inconsistent with what
 2       he said, but I mean I guess the answer would have to
 3       be yes based on what I'm reading there.
 4  BY MR. BURCHFIELD:
 5  Q     I'm sorry?
 6  A     Yes, based on what I'm reading there, but it's
 7        inconsistent with my understanding of it.
 8  Q     Okay.  Let me ask, you recall that there was --
 9        there was an agreement called the ACME agreement
10        that was executed at some point?
11  A     Yes.
12  Q     And that was the agreement on contract modification
13        and extension?
14  A     Correct.
15  Q     It's like a Washington term, we try to turn
16        everything into a fancy little acronym, but you --
17  A     I wasn't part of that, by the way.  I didn't come up
18        with that acronym.
19  Q     I thought it was kind of clever.
20  A     I didn't care for it.
21  Q     Did you participate in any of the -- in any of the
22        task forces that were created by the ACME agreement?
23  A     No, I did not, because the time they got really
24        going I was part of the committee.  And I wasn't
25        part of that little study group they had.
```

66

1   Q     Okay.  Did you -- do you remember reviewing any of

2         the reports from the committees?

3   A     Well, I'm sure we did.

4               MR. BURCHFIELD:  Let me ask the reporter to

5         mark as Ailes Exhibit 12 an agreement on

6         modification and extension of existing labor

7         contract.

8               MR. MACEY:  Can we take like three minutes?

9               MR. BURCHFIELD:  Let me do this exhibit

10        first, then we'll -- maybe we'll take a couple

11        minutes.

12              (Ailes Deposition Exhibit Number 12 was

13              marked for identification.)

14  BY MR. BURCHFIELD:

15  Q     Mr. Ailes, I'm handing you Ailes Exhibit 12.  And if

16        you'd like, at the page with the last three digits

17        424, you'll see this agreement was executed, Muncie,

18        Indiana, this 27th day of September 1990.  And there

19        are a bunch of signatures there, including Mr.

20        Eckelman.

21              Do you see that?

22  A     Yes.

23  Q     And I do not see your signature here.

24  A     No.

25  Q     In your recollection, do you recall having seen this

Capital Reporting Company
Ailes, Michael  12-16-2011

67

```
 1        document before?

 2   A    Oh, I'm sure I've seen the document.

 3   Q    Let me ask you to look at Exhibit 3 to that

 4        document, with the last three digits 427 at the

 5        bottom.

 6   A    Go ahead.

 7   Q    And it says, "Joint letter of agreement on

 8        post-retirement benefit liabilities" at the top.

 9        Are you on that page with me?

10   A    Yes.

11   Q    At the bottom it says, "This agreement does not

12        prejudice the Union's position that current retirees

13        have lifetime vested benefits."

14             Let me stop there.  That was the Union's

15        position, right?

16   A    That's correct.

17   Q    "Nor the DTP Muncie Plant's position that current

18        retirees do not have lifetime vested benefits."  Do

19        you see that?

20   A    Yes.

21   Q    And that statement of the Muncie Plant's position,

22        is that consistent or inconsistent with what you

23        understood Mr. Eckelman to have said to you?

24   A    It would be inconsistent.

25             MR. BURCHFIELD:  Want to take a break?
```

Capital Reporting Company
Ailes, Michael  12-16-2011

68

1              (Off the record at 11:29 a.m.)

2              (Back on the record at 11:39 a.m.)

3  BY MR. BURCHFIELD:

4  Q    Mr. Ailes, still on Ailes Exhibit 12, which is the

5       agreement on modification and extension of existing

6       labor contract, do you have any -- do you have any

7       explanation for why Mr. Eckelman would be a

8       signatory of this document which contains the

9       statement that the DTE Muncie Plant's position is

10      that the current retirees do not have lifetime

11      vested benefits, while he would tell you something

12      that you think is inconsistent with that?

13  A    Well, I don't know why he signed it, if that's what

14      you're asking me.

15  Q    Is it possible you misunderstood what he told you?

16  A    No.

17  Q    When you saw this document, did you raise with

18      anyone at the UAW your concern that what -- that the

19      Muncie Plant's position as stated here was

20      inconsistent with what Mr. Eckelman told you?

21  A    Well, I'm sure I probably did.  I mean, but I

22      don't -- I mean, I can't tell you exactly who.  I'm

23      sure it was Muncie committee starting off, because

24      in them days or this time I was a committeeman, I

25      wasn't chairman, I wasn't a president.

Capital Reporting Company
Ailes, Michael  12-16-2011

69

1   Q      Well, would you -- would you have -- do you know who
2          you would have brought that concern to, if it had --
3          if you did bring it to someone?
4   A      To be honest -- I mean, I don't -- I'm assuming it
5          would have been the chairman, but I can't tell you
6          that for sure.  It could have been who I was in the
7          office with.  I mean, I just don't recall in 1991.
8          I mean --
9   Q      Would it have been important to you, to have sought
10         a change in this agreement, if you had seen it at
11         that point?
12  A      I guess I don't know how to answer that.  I mean,
13         because there have been benefits that clearly went
14         beyond that, so I -- I mean, that was their
15         position, I guess, and we had our position.  So I
16         mean, I don't know what --
17  Q      You --
18  A      And we had the '92 agreement, so -- you know, if
19         there was any question or doubt, the '92 agreement
20         took care of all that.
21  Q      Okay.  Well, let's look at the '92 agreement.
22                  (Ailes Deposition Exhibit Number 13 was
23                   marked for identification.)
24  BY MR. BURCHFIELD:
25  Q      Mr. Ailes, I'm handing you what's been marked as

Capital Reporting Company
Ailes, Michael  12-16-2011

70

1      Ailes Exhibit 13.  It's entitled, "Health insurance

2      agreement."  And at the bottom it says, "This

3      booklet is intended to reflect the 1992 changes to

4      the health insurance agreement of October 27, 1989

5      represented in Exhibit A of December 11, 1992

6      contract negotiations agreement."

7   A    Okay.

8   Q    And once you've had a chance to look at that, would

9      you confirm that that is the 1992 health agreement?

10  A    I mean, it appears to be.

11  Q    Let me ask you to look back at Ailes Exhibit 9,

12      which is the memorandum from Ms. Hess to you dated

13      August 5, 1996, the thick document there, with the

14      attached -- her attached markup of an agreement.

15          MS. PREIS:  Flip that one over.  I believe

16      that's it.

17  BY MR. BURCHFIELD:

18  Q    That's it.  And if you look at the front page of

19      this document -- I won't ask you to look at the

20      whole thing, but it contains, does it not, the

21      same --

22  A    Yeah.

23  Q    -- wording?

24  A    Yeah.

25  Q    Okay.  Now you will recall, if you look at -- at

71

```
 1        page 1139 of Exhibit 9, the one with Ms. Hess's

 2        comments, that she had marked out the provision

 3        under future of the plan.  Do you see that?

 4   A    Uh-huh.

 5   Q    Well, let me first ask you, could you confirm on

 6        page 598 of Ailes Exhibit 13, that that is your

 7        signature on that document?  It's on the very back

 8        page.

 9   A    Yeah, that's my signature.

10   Q    And you see Mr. Eckelman signed it?

11   A    Uh-huh.

12   Q    And a number of other people from BorgWarner signed

13        it, Mr. Daffara Mr. Nuerge, Mr. Cruea?

14   A    Cruea.

15   Q    -- Alan Straub --

16   A    Straub.

17   Q    -- and then a number of people from the Local 287

18        including you, right?

19   A    Uh-huh, yes.

20   Q    In your position as recording secretary?

21   A    Yes.

22   Q    Okay.  And what duties did the recording secretary

23        have?

24   A    Just took notes during the bargaining sessions.

25   Q    And when the -- when the draft agreement was
```

72

1       circulated, did -- was it part of the recording

2       secretary's responsibility to go through the draft

3       agreement and confirm that the draft agreement was

4       consistent with what had been agreed to?

5  A    That would have been -- probably rest on the

6       chairman.

7  Q    Okay.  Did he -- did the chairman consult with the

8       recording secretary, I mean, and review the

9       secretary's notes?

10  A    Not per se.  I mean, it more probably would be --

11       with Laura saying I found a problem here, I found a

12       problem there, or whoever the benefits person was at

13       the time.

14  Q    Okay.  For this 1992 agreement, the chairman of the

15       negotiating committee was Mr. Cross; is that right?

16  A    That's correct.

17  Q    And whatever discussions would have been had with

18       Ms. Hess about this agreement would have been by

19       Mr. Cross?

20  A    Probably, yes.

21  Q    Okay.  Well, let me -- let me ask you to look at the

22       page with the last three digits 586.  It's -- the --

23  A    I'll get there.

24  Q    If the typewritten numbers are easier to find, it's

25       page 130.

73

1  A    I see it.

2  Q    Okay.  You there?

3  A    Yep.

4  Q    It has under the heading "Future of the plan"?

5  A    Uh-huh.

6  Q    It says, "Although BorgWarner Automotive Diversified

7       Transmission Products Corporation Muncie Plant

8       expects and intends to continue the plant

9       indefinitely, it reserves the right to modify,

10      amend, suspend or terminate the plan or the group

11      policies therein in accordance with the provisions

12      of the health insurance agreement."

13           Do you see that?

14  A    Yes.

15  Q    And then it says, "An individual's insurance

16      coverage terminates when that person is no longer

17      eligible or when the group insurance policies

18      terminate, whichever happens first."

19           Do you see that?

20  A    Yes.

21  Q    And that is -- am I correct that that's the language

22      that Ms. Hess objected to when this agreement came

23      up for renewal in 1996?

24           MR. RADTKE:  I object.  That's a

25      mischaracterization of the documents, but --

Capital Reporting Company
Ailes, Michael  12-16-2011

74

1  BY MR. BURCHFIELD:

2  Q     You may answer.

3  A     I mean, I can't speak for her.  I mean, I don't know

4        how -- what you're --

5  Q     Well, you see -- you see in Exhibit -- in Exhibit 9,

6        which is Ms. Hess's markup of this document attached

7        to her memo to you dated August 5, 1996, that in the

8        corresponding language that I just read, Ms. Hess

9        has marked through it and written "no"?

10 A     Uh-huh.

11 Q     Do you see that?

12 A     Yes, I see that.

13 Q     Okay.  Insofar as you could tell, it's the same

14        language?

15 A     I mean, if you're asking me is this and this the

16        same, I guess it looks like it is, but I can't

17        really read all that.

18 Q     Okay.  It's a little hard to read because of the

19        markup.  But that appears to be the provision that

20        Ms. Hess objected to in 1996, right?

21 A     Appears to be, but like I said, you have to ask her.

22 Q     And if you look at page 468 of Exhibit -- of Exhibit

23        13, the 1992 agreement --

24 A     We need to take a time-out.  I need to speak with

25        Barry.

Capital Reporting Company
Ailes, Michael  12-16-2011

75

```
 1              MR. BURCHFIELD:  Okay.  Let's take a break

 2        then, if you need to take a break.

 3              (Off the record at 11:50 a.m.)

 4              (Back on the record at 11:51 a.m.)

 5              THE WITNESS:  I need to point something out

 6        to you though.  These signatures, this document,

 7        wasn't one single document when the signatures were

 8        signed.  You can look at the -- if you look at this,

 9        this is what was signed.  I'm talking 139, okay?

10        When we come out of that, this was signed.  It was

11        not attached to this whole big document.  That's why

12        you're seeing -- the big document apparently went up

13        to Laura, that's why you're seeing this '96 compared

14        to this back then.

15              So when we signed it, we didn't have this

16        whole big document in front of us, that I recall, it

17        was just this piece here.  That's why you see the

18        signatures like you did on this piece of paper

19        here.

20  BY MR. BURCHFIELD:

21  Q     Well, let me -- let me follow up on that.  You see

22        at the bottom of the signature page that you -- that

23        you just referred to, where your signature appears?

24  A     139?

25  Q     It says --
```

Capital Reporting Company
Ailes, Michael  12-16-2011

76

1   A      140 is where the signatures are.

2   Q      140, correct.

3   A      Right.

4   Q      You see the document is consecutively paginated from

5          the very first coverage page which says, "Health

6          insurance agreement --"

7   A      I understand that.  I'm just telling you my

8          recollection of this thing was this was not attached

9          to this whole document, because you're looking at

10         when we signed this in '92, and this is still at

11         '96, they're still looking at the verbiage.  That's

12         my whole point.

13  Q      Well, isn't it the case, Mr. Ailes, that the -- that

14         the agreement that Ms. Hess reviewed in 1996, which

15         we marked as Ailes Exhibit 9, was intended to

16         reflect changes coming out of the '95 negotiations

17         and those changes were simply being made as markups

18         on the existing 1992 contract?

19  A      There were very few changes in '95.

20  Q      That's exactly right.

21  A      I'm just telling you, I just want to clarify my

22         recollection that this was not attached to this

23         document, is my only point.

24  Q      Okay.  So, would it -- signing -- signing an

25         agreement in your capacity as a member of the

77

```
 1        bargaining committee for Local 287 was a pretty

 2        significant event, wasn't it?

 3   A    I understand that.

 4   Q    And as recording secretary, you understood that you

 5        had responsibilities to your -- to the members of

 6        the Local, right?

 7   A    I understand my responsibilities to the members.

 8   Q    And would it -- would it be odd for you to sign a

 9        two-page document with pagination 139 and 140 at the

10        bottom of it?

11   A    And I -- to be honest, I don't recall the numbers

12        down here like that.  I don't recall that.  I'm just

13        telling you I know it wasn't attached to this piece.

14        That's my only point.  I didn't want to go saying --

15        having you think they handed me this document, we

16        went through this document and then we signed it.

17        That didn't happen like that.

18   Q    Okay.  Well, you would -- you will agree with me,

19        won't you, that if we look at page 468 of Ailes

20        Exhibit 13, Article 12 of Section 2 says, "Any

21        provision in this agreement or any exhibit attached

22        hereto relating to deductibles and stop loss limits

23        shall survive termination of this agreement, such

24        provisions terminate on December 31, 2002 unless

25        previously modified and/or extended."
```

78

```
 1                    Do you see that?

 2   A    Which one are you talking about?  Yes.

 3   Q    And then in the next paragraph it says, and by the

 4        way, you -- does that language accurately reflect

 5        what you understood the agreement to be concerning

 6        deductibles and stop loss limits, that the agreement

 7        would continue through December 31, 2002?

 8   A    That -- that would carry on, you're talking about

 9        the table?

10   Q    Yes.

11   A    Yeah, that it would go past the collective

12        bargaining -- yes.

13   Q    And then the next paragraph says, "On March 12,

14        1998, this agreement may be terminated, modified or

15        changed or continued in the same manner as provided

16        in Article 16 of the aforesaid collective bargaining

17        agreement between the parties hereto dated October

18        27, 1995, as modified by the 1992 agreement."

19                    Do you see that?

20   A    I see it.

21   Q    And was that part of the agreement reached in 199 --

22        in 1992?

23   A    Well, the reason I'm thinking about it is because

24        there was several things that surpassed the

25        collective bargaining agreement itself, and those
```

Capital Reporting Company
Ailes, Michael  12-16-2011

79

1    deductible stop losses was one of them.  And I don't

2    know if this piece was reviewed by someone else

3    other than the bargaining committee, what you're

4    talking about there.  That's why I'm saying the

5    whole thing was being back and forth at the time.

6    That's why you see from '92 to '96.  And I can't

7    speak for if that's the exact right verbiage or not.

8  Q    Well, is it your recollection that there was a

9    different agreement, health insurance agreement

10    signed between the company and the Union covering

11    the 1992 changes?

12         MR. RADTKE:  I'm going to object as to

13    form.  You can answer.

14         THE WITNESS:  I guess I don't understand

15    what you're saying.  It was changes made in '92.

16  BY MR. BURCHFIELD:

17  Q    Right.

18  A    Okay.  And some of those changes, if you're talking

19    about the table, went to 2002.  So I guess -- I'm

20    not understanding what your question is, I guess.

21  Q    Well, there was -- there was -- you participated in

22    -- you did not participate in the '92

23    negotiations?

24  A    Yes, I did.

25  Q    You did.  Okay.  And as I understand it, retiree

Capital Reporting Company
Ailes, Michael  12-16-2011

80

1    health care benefits -- health care benefits and

2    retiree health care benefits were significant

3    aspects of the '92 negotiations; is that right?

4  A  Post-retirement benefits was talked about when we

5    talked about it in the context of the active people

6    and future retirees.

7  Q  Was the agreement -- and there was an agreement

8    reached in 1992 concerning those issues, right?

9    Those issues and other issues?

10  A  That's correct, for active and future retirees,

11    you're absolutely right.  That's what come up with

12    401(h).

13  Q  And do you recall that there was -- was or was not a

14    health insurance agreement executed by the Union in

15    1992?

16  A  That, I can't tell you because that's what I'm

17    trying to say, during that time, we had the '92,

18    they was still coming back after the '89, you got

19    into the '90 ACME -- or ACME, whatever you want to

20    call that agreement that made up those study

21    committees, all right.  So this statement, as you

22    can see in '96, they're still talking about this

23    same agreement.  Meanwhile, we've had a '95

24    agreement.  So I mean, I don't know how -- I'm not

25    trying to be elusive, I just don't know how to

81

1    answer what you're asking me, I guess.

2            We did have an agreement in 1992.  1992 was

3    set up so that from anybody hired in after that --

4    that's what the whole -- that's what the whole deal

5    was about in 1992, the FASB liabilities that the

6    company was after for future people.  And that was

7    anybody hired in after -- I think January of '93 to

8    be precise, but don't hold me to the exact date.

9            And we talked about going from this point,

10   we got active that's going to be retiring, future

11   retirees, what their benefits are.  And then after a

12   certain point, those people hired in after that

13   point, that's when 401(h) kicked in.  That's why it

14   was like, we saved the day.  This is the guru of all

15   gurus, and we've taken the -- there's no argument.

16   There's no argument.  I mean, I don't know how else

17   to say it.  That's my recollection of it.

18           So I don't -- when you start looking at

19   these different documents it gets confusing because

20   they was still -- I mean, not even necessarily

21   through us, through BorgWarner attorneys and our

22   International, you know, the gurus that check --

23   guru is probably not a good -- but people that look

24   at these things.  That's why it's hard for me to

25   say, yeah, why did she -- I don't know, I mean I

Capital Reporting Company
Ailes, Michael  12-16-2011

82

```
 1         can't tell you why that's marked out outside of the

 2         fact that maybe she didn't -- I'm just speculating

 3         to say why she marked that particular thing out.  I

 4         don't know.

 5   Q     Well, let me -- let me back up and try to -- and

 6         maybe we can try to clarify this a little bit.

 7   A     Okay.

 8   Q     It was my understanding that from collective

 9         bargaining cycle -- from one collective bargaining

10         cycle to another, that the terms of the health

11         insurance agreement remained the same unless they

12         were specifically changed from one cycle to the

13         next?

14   A     That's probably a true statement, but some of them

15         even surpassed that.  I mean, there were some things

16         contained in the health agreement that surpassed the

17         collective bargaining agreement, regardless of what

18         happened --

19   Q     Such as the deductible escalator we talked about?

20   A     Well, and there's also -- there's a clause in there

21         I believe about if someone passes, there's a

22         nine-month window.  I mean, don't -- I can't get you

23         the exact, but there's other things that surpassed

24         that, you know, and they would just go on.

25               So just for instance, plant closed and
```

Capital Reporting Company
Ailes, Michael 12-16-2011

83

1     under the agreement some of those people would go

2     for nine months, I think one of them calls for

3     nine-month window, that's what I'm saying.

4  Q   So if there -- so, if there was -- are you saying if

5     there was an intention for provisions of the

6     agreement to go beyond the expiration date of the

7     health insurance agreement, of the collective

8     bargaining agreement, that that would be explicitly

9     stated in the --

10  A   That's not what I'm saying. I'm just saying you got

11     to understand during this time when it comes to

12     these agreements, you're correct -- and when we go

13     into negotiations, we would negotiate some changes.

14     Sometimes there were no changes, sometimes there

15     were minor changes, okay? But, when you start

16     comparing this one here and this one here, I can't

17     tell you why -- if this language was okay or not

18     okay, because we weren't -- we didn't have a copy

19     that says here's somebody's -- it's been blessed by

20     both sides of it and everybody says yeah, this is

21     exactly what it says. I guess that's what I'm

22     trying to say.

23  Q   Well, it was my understanding, Mr. Ailes, that --

24     that the Union did not get around to executing --

25     and we'll talk about why -- but did not get around

Capital Reporting Company
Ailes, Michael  12-16-2011

84

1       to executing the '95 and '98 agreements, but that it

2       did execute the '92 agreement.  Am I wrong about

3       that?

4   A   You've lost me then I guess, on what you're saying.

5       Didn't execute the '95 agreement?  You're talking

6       about the collective bargaining agreement or are you

7       talking about -- because collective bargaining

8       agreement absolutely was executed and signed.

9   Q   Was there a decision made by the Union not to

10      execute a health insurance agreement?

11              MR. MACEY:  May I ask for a clarification

12      on the word "execute"; are you talking signed or are

13      you --

14              MR. BURCHFIELD:  Signed.

15              THE WITNESS:  We would not sign until the

16      gurus told us, yeah, this is -- this is good to go.

17      We didn't sign it.  I mean, that's just -- what you

18      end up having, you have several years there where

19      you had -- it just kept going, even if it was a

20      minor change, while somebody was looking at it or

21      making sure it was okay, that's why I guess I have a

22      hard time when you say "execute", because we

23      definitely execute, we done the agreement in 1992, I

24      realize what we did there.  '95, the agreement --

25      the bargaining agreement was executed.  I believe

85

```
 1          the bargaining agreement was executed again in '98.

 2          I wasn't part of that so -- but I'm pretty sure it

 3          was.  So I'm confused as to what you're saying.  I'm

 4          not trying to --

 5   BY MR. BURCHFIELD:

 6   Q    Do you recall whether or not the Union executed,

 7          signed, a health insurance agreement in 1992?  Do

 8          you recall one way or the other?

 9   A    The agreement itself, I don't think so.  The

10          health -- the -- it was in two parts.  I mean, you

11          had -- we went through the negotiations of the --

12          the ten years and all that kind of stuff, okay?  And

13          we signed that P7, but that was just a small piece

14          of the bigger booklet that was being reviewed by

15          both sides.

16   Q    And do you recall -- well, do you recall whether the

17          Union executed, signed, a health insurance agreement

18          after the '95 negotiation?

19   A    I don't know.  I can't recall that.  Because here we

20          are in '96, I mean according to you in '96 and I --

21          she's still looking at it.  So I can't see us

22          signing that particular agreement unless she's

23          already done her review and get it back saying, hey,

24          this is good.

25   Q    Do you recall, one way or the other, whether there
```

Capital Reporting Company
Ailes, Michael  12-16-2011

86

1       was one executed?

2   A   That's what I just said, I don't.

3   Q   And how about -- how about '98?  Do you recall --

4   A   I wasn't there in '98.  I was just coming back from

5       being on a leave for organizing.  And I didn't come

6       back in May of '98.  So, no, I'm not sure about

7       that.  Because I wasn't involved in the collective

8       bargaining agreement in '98.

9   Q   Do you recall any discussions within the Union,

10      within the Local, between the Local and the

11      International, or at the International level, any

12      discussion within the entire UAW organization?

13  A   The only discussion --

14  Q   -- about -- about whether -- whether to sign or not

15      to sign the '92 health insurance agreement?

16  A   The only thing I can say to that is, at the Local

17      level, we did not sign until it was okay'd through,

18      in this case would have been Laura, that they had

19      reviewed and was okay'd with this booklet.  But -- I

20      mean, that's all I can tell you.  I don't recall did

21      we -- did we finally get one back.  Because at one

22      time both sides were frustrated because it was kind

23      of out of the Local's hands, both the Local and

24      Local management because somebody had this -- they

25      was looking at and we're wondering yeah or nay.  So

Capital Reporting Company
Ailes, Michael  12-16-2011

87

1       I can't tell you if somebody said, okay on the

2       health, here it goes, here's the signature.  I can't

3       tell you that.

4   Q   Do you recall there being a specific provision that

5       was in dispute between the Union and the company

6       that was holding up execution, signing of the

7       agreement?

8   A   I don't know if there was any one thing.  I don't

9       know that to be a fact.  I mean, some of the

10      discussions I was not privy to, as far as I wasn't

11      involved in who was talking to who, because

12      sometimes this level was talking to these people at

13      this level, and you know, you got the BorgWarner --

14      when I say you got BorgWarner over here and you got

15      International over here, and these people, they was

16      exchanging and they was talking, but it wouldn't

17      have floated down to us unless they had a question

18      say, they're saying "this" on this particular

19      language, should say "the" instead -- I mean, I know

20      I'm not making much sense on it, but that's just my

21      recollection of how that went back and forth, that's

22      why I can't give you --

23  Q   Well, let me make sure I understand your

24      understanding of what we marked as -- as Ailes

25      Exhibit 13, which is the -- which is the document

Capital Reporting Company
Ailes, Michael  12-16-2011

88

```
1        that your signature appears on on page 140 of.  Do

2        you have that in front of you?

3   A    Yeah, right here.

4   Q    Okay.  Now, is it your -- is it your understanding

5        that the first 138 pages of this document were not

6        signed off on, executed, agreed to by the UAW?

7   A    That's my understanding, but I don't -- all I can

8        tell you is this signature page was not attached to

9        this and it was still going through the agreement at

10       a different level than what I was at.

11  Q    Okay.  Well, let me -- I understand -- I understand

12       your recollection on that.  Do you -- do you recall

13       any instance in which BorgWarner agreed to remove

14       the language we looked at previously on page 586 of

15       Ailes Exhibit 13?  That language being --

16  A    I don't know if they did or they didn't.  I wouldn't

17       know that.

18  Q    Just to make sure we're clear, on page 586, the

19       language I'm referring to is under the heading

20       "Future of the plan.  Although BorgWarner Automotive

21       Diversified Transmission Products Corporation Muncie

22       Plant expects and intends to continue the plant

23       indefinitely, it reserves the right to modify,

24       amend, suspend or terminate the plan or the group

25       policies therein in accordance with the provisions
```

89

1      of the health insurance agreement."

2          And my question for you is:  Do you recall

3      any indication from BorgWarner that it was willing

4      to delete that provision from the insurance

5      agreement?

6  A   The only occasion I would have had is in the '92

7      agreement.  That's what the damn thing was about.  I

8      mean, nobody had any conversation with me one way or

9      the other on that piece.  If you're asking did they

10     say, hey, we're -- I mean, I can't answer that.

11  Q   And then on page 468 of that same document, the last

12     paragraph on that page says on March 12, 1998, "This

13     agreement may be terminated, modified, changed

14     or --"

15  A   Hold on.  I'm sorry.

16  Q   Oh, I'm sorry.

17  A   That's all right.  I went to the wrong page.

18  Q   Page 468 is -- the typescript number at the bottom

19     is 14, if that's a little easier for you.

20  A   Okay.  I'm at 468.

21  Q   The provision I'm referring to here is on March 12,

22     1998.  "This agreement will be terminated, modified

23     changed or continued in the same manner as provided

24     in Article 16 of the aforesaid collective bargaining

25     agreement between the parties hereto dated October

Capital Reporting Company
Ailes, Michael  12-16-2011

90

1          27, 1989 as modified by the 1992 agreement."

2                    Do you see that?

3    A    Yes, I see it.

4    Q    And are you -- are you aware of any instance in

5          which a representative of BorgWarner explicitly said

6          BorgWarner was willing to delete that language from

7          the health insurance agreement?

8    A    I can't answer that one way or another.

9                    MR. BURCHFIELD:  Let me ask the reporter to

10         mark as Ailes Exhibit 14 a set of handwritten notes

11         dated August 27, 1999.

12                   (Ailes Deposition Exhibit Number 14 was

13                    marked for identification.)

14   BY MR. BURCHFIELD:

15   Q    Mr. Ailes, I'm handing you these handwritten notes.

16         And these appear to be the handwritten notes of Mr.

17         Nuerge recording his notes of a conversation that he

18         seems to have had with you and Jeff Fallis on that

19         date.

20                   Do you have Exhibit 14 in front of you?

21   A    Yeah.

22   Q    And it says -- it's dated August 27, 1999.  It says,

23         "I discussed the '92, '95 and '98 health insurance

24         agreements and the 1995 and 1998 pension agreement

25         status with Mike Ailes and Jeff Fallis during an

91

```
 1        informal hallway meeting this morning.  Mike is also

 2        concerned that we never got sign-offs from the

 3        International Union on any of these agreements and

 4        said he will do some more checking with the

 5        International as to how those plans can be finalized

 6        officially.  Obviously, we have been living up to

 7        the agreements as presented to the International --"

 8        et cetera.

 9              Do you see that?

10  A    Yeah.  Yes.

11  Q    And do you recall that conversation?

12  A    I'm sure we did -- I mean, I don't know if that

13        particular day, but I'm sure we had that

14        conversation because we both had talked about that.

15  Q    And do you -- what were you being told by -- do you

16        recall what you were being told by the International

17        about why it was not signing off on the -- on those

18        agreements?

19  A    Well, it depends on what point because at some time

20        they didn't even have the agreement when I checked,

21        it was still at corporate.  So corporate had not

22        sent it over.  According to -- my source would be I

23        would go to rep, which in this case was Chuck Smith.

24        He was my International representative at the time

25        that his assignment was the Local.
```

Capital Reporting Company
Ailes, Michael  12-16-2011

92

1   Q   Do you -- do you recall at any point that the

2       International submitted proposed changes or edits to

3       the company's draft to -- back to the company?

4   A   I'm sure they did.  I can't tell you the time frames

5       on it.  I mean, I wasn't privy to that.  I mean,

6       they probably may have sent us a copy.  That's why I

7       said one set was here and one set was there at

8       different points in time.  But I can't recall the

9       exact procedure or mechanism that took place.

10  Q   Well, do you recall submitting -- do you recall

11      transmitting the comments made by Ms. Hess in

12      Exhibit 9, the August 5, 1996 memorandum from Ms.

13      Hess to you, with some marked-up changes, do you

14      recall -- do you personally recall submitting those

15      changes back to the company?

16  A   I may have.  I'm just not for sure.  I mean, I don't

17      know whether I would have or she would have kind of

18      thing.  Because I know at one time, we wanted to put

19      both of them into a room and try to get the thing

20      ironed out, but I can't really recall how that --

21      the mechanism worked.  You know, I don't know did

22      she send it down to me and did I just send it or I

23      just got a courtesy copy and she sent it to them, I

24      can't answer that.

25  Q   Well, do you know, Mr. Ailes, for a fact that the --

Capital Reporting Company
Ailes, Michael  12-16-2011

93

```
 1        that changes -- that edits were ever transmitted

 2        from the International back to BorgWarner on any of

 3        these agreements?

 4   A    I think at one time it was.  But, I can't -- I don't

 5        know the time frame.  I just don't know the time

 6        frame.  I mean, that's been a long time ago.

 7   Q    Do you know which agreement it would have been

 8        relevant to?

 9   A    No, I can't tell you that because they all started

10        blending together.  I mean, when you look at -- I

11        mean, we're still dealing with '96 from '92, because

12        of the '95.  I mean, I can't accurately tell you,

13        no.

14               MR. BURCHFIELD:  Let me ask you to look at

15        what the reporter can mark as Ailes Exhibit 15, an

16        e-mail dated March 26th, 2001 to Charlene Giles,

17        again, from Mr. Nuerge.

18               (Ailes Deposition Exhibit Number 15 was

19               marked for identification.)

20   BY MR. BURCHFIELD:

21   Q    Do you have in front of you Exhibit 15, Mr. Ailes?

22   A    Yes, I do.

23   Q    And this is an e-mail with Mr. Nuerge's name at the

24        top dated March 26, 2001.  Do you see that?

25   A    Say that again.  I'm sorry.
```

94

1  Q    This is an e-mail apparently from Mr. Nuerge, to a

2       number of people, dated March 26th, 2001. Do you

3       see that?

4  A    Yes.

5  Q    And it reports "On Friday, 3/24/2001, Mike Ailes,

6       International representative, was at the BorgWarner

7       plant and briefly stopped in the insurance and

8       pension office and talked with Saundra Roark and

9       with me. While he was there, I asked about the old

10      1992 and 1995 health insurance agreement drafts that

11      we had given to Local 287, UAW and the International

12      Union. Mike related that he had so far been unable

13      to get a discussion about those plan documents with

14      Laura Hess or any other International UAW Solidarity

15      House official. Mike said he must follow a certain

16      protocol for such matters, and once he learns

17      exactly how to present the issue, we also mentioned

18      that the 1995 and 1998 hourly defined pension plans

19      have also been operating as presented to the Union,

20      but they also need to be formally signed by all

21      parties to those plans as well. He will do so."

22          Do you see that?

23  A    Yeah, I see it.

24  Q    Do you recall that discussion?

25  A    No. I mean, I might have been in that plant for

Capital Reporting Company
Ailes, Michael  12-16-2011

95

1        something.  He might have mentioned it.  But I don't

2        know in that detail, I just don't recall.

3   Q    Well, do you recall, during the period that you were

4        the International -- that you were the bargaining

5        unit chair or the International representative, do

6        you recall at any point having discussions with Ms.

7        Hess or anyone else at Solidarity House to inquire

8        about the holdup on approval of the existing drafts

9        of the health insurance agreements?

10  A    Well, as a chairman I would have went through my

11       rep, okay?  And then as International rep, I

12       probably would have went -- got permission from the

13       director to make a call to find out what the status

14       of it is.  But -- and I'm sure that probably

15       happened, but where that was at that time, I don't

16       recall.

17  Q    And just -- I just want the record to be clear on

18       this.  You -- you don't recall specifically having a

19       conversation --

20  A    Well, I mean --

21  Q    -- with the International about the status of the --

22  A    I may have had a conversation as inquiring as to

23       where we're at with it, but I can't -- I mean, I

24       don't recall whether it was -- they was still

25       waiting on information from -- I can't recall what

Capital Reporting Company
Ailes, Michael 12-16-2011

96

| | | |
|---|---|---|
| 1 | | was said back, whether we're looking at it, whether |
| 2 | | corporate's got it. I don't recall that piece of |
| 3 | | it. |
| 4 | Q | So as you sit here today, you could not testify with |
| 5 | | respect to any specific date on which you had that |
| 6 | | con -- had a conversation with the International |
| 7 | | about the status of the drafts? |
| 8 | A | I can't give you a specific day, no. |
| 9 | Q | Can you give me a specific name of someone you |
| 10 | | talked to at the International? |
| 11 | A | It would have been Laura Hess I'm sure. |
| 12 | Q | Can you give me a specific -- the specific substance |
| 13 | | of the conversation you had with Ms. Hess about -- |
| 14 | A | It'd be -- I mean, I can't tell you verbatim. It |
| 15 | | would be something like, you know, can you tell me |
| 16 | | the status of where we're at with -- |
| 17 | Q | And can you tell me specifically what she would have |
| 18 | | responded? |
| 19 | A | You know, I really don't -- I mean, I can speculate, |
| 20 | | but I don't really know for sure what -- |
| 21 | Q | In your experience with the UAW, is it unusual |
| 22 | | for -- for there to be a backlog of -- of three |
| 23 | | consecutive health insurance agreements that had |
| 24 | | been -- that had been agreed to but not executed by |
| 25 | | the parties? |

Capital Reporting Company
Ailes, Michael  12-16-2011

97

1   A   I can't answer that.  I can tell you what -- I mean,

2       it wasn't a one-sided issue.  It was two parties

3       involved in this, that was -- so it wasn't just UAW

4       waiting.  It was -- some of the blame goes to

5       corporate.

6   Q   Well, do you recall any specific points of

7       controversy or any specific points that were not

8       mutually agreed to that prevented execution of these

9       drafts?

10  A   I can't tell you.  I mean, I don't know that.  I

11      don't know what -- was there -- I don't know.  I

12      mean, did somebody say we're not going to sign this

13      or -- I don't know that.  I just don't recall that.

14  Q   So you can't -- you can't testify that the UAW

15      declined to execute these drafts because of either

16      of the provisions that I've just pointed out to you?

17  A   I don't -- I mean, I don't know if that was the only

18      reason or main reason -- I can't answer that.

19  Q   Do you know if it was -- if it was a reason?

20  A   No, I don't -- I mean, I don't know that that was

21      part of it.  I don't know.  I don't know.  I mean, I

22      just don't know how to answer that to you.

23  Q   Are you aware of any respect in which the company

24      did not fulfill its responsibilities under the 1992

25      health insurance agreement during the three years it

Capital Reporting Company
Ailes, Michael  12-16-2011

98

```
 1        was in effect?

 2   A    I guess I don't -- in what way?  I guess I don't

 3        understand.

 4   Q    In any way?

 5   A    I mean, I don't understand your question.

 6   Q    Do you recall -- do you recall any way in which

 7        BorgWarner did not fulfill the obligations it agreed

 8        to in the 1992 negotiations about health insurance?

 9   A    I can't recall off the top of my head.  I mean --

10   Q    Same question for the 1995 agreement?

11   A    I mean, I can't -- right off the top of my head, I

12        mean, we had some controversy, depending on what

13        year.  I mean, you're going back several years, so I

14        guess I can't recall at this particular time, no.

15   Q    How about '98?

16   A    Well, I wasn't involved in the '98 negotiation.  I

17        came on after that.

18   Q    Right, but did you hear from --

19   A    At one point in time there was some controversy on a

20        couple of things:  One as it related to insurance,

21        but then the company changed up on that.  But I

22        can't give you specifics at this point in time.

23   Q    Do you recall approximately what -- what period,

24        what date that controversy arose?

25   A    No, I can't.  Not right now I can't.
```

Capital Reporting Company
Ailes, Michael 12-16-2011

99

1 Q    After you became the International rep in 2000, do

2      you recall hearing from the Local that BorgWarner

3      was not fulfilling its agreements under the health

4      insurance agreements?

5 A    Once again, I can't -- there was something went on.

6      I can't give you specific dates right now in front

7      of me.  So I don't know the time frame I guess is

8      what I'm trying to say.  There were two or three

9      things that went on after the -- I guess after the

10     2000 there was -- something went on as it pertains

11     to profit-sharing.  I mean, you know, I got 18, 19,

12     sometimes 20 locals during this period of time once

13     I was rep, so -- to be specific about it, I may be

14     able to look at something and say now I recall it.

15     But I can't tell you right now, boom, you know, on

16     December 2nd, 19 -- you know, I can't do that at

17     this particular time.

18 Q   I'm interested in anything that you can -- that you

19     can tell me specifically that would contradict

20     BorgWarner's position that it fulfilled its

21     responsibilities under the agreements, health

22     insurance agreements that were negotiated and agreed

23     to in '92, '95, '98, 2000, 2005.

24 A   2005, there were several, but that's a whole

25     different ball game as it pertained to health

Capital Reporting Company
Ailes, Michael  12-16-2011

100

1       insurance, actives.  I mean, I guess I don't know

2       how to answer that question for you, because there

3       had been various things over the course of time, you

4       know.  Whether some got resolved, some didn't,

5       sometimes when they get resolved sometimes it

6       doesn't stick in your head as well.  So I guess I

7       don't know how to answer that question.

8   Q   Okay.  You say that there were some issues from time

9       to time.  Can you give me any specifics?

10  A   One of them they tried to do prescription drugs for

11      retirees, they tried to change that.  That was not

12      agreed to and they tried to change that up.  I can't

13      tell you exactly when that was.  I can tell you it

14      happened.

15          We had a thing in 2005 when it was related

16      to health care that the company took a position on

17      it, you know, and we took an opposite position.

18      They didn't fulfill -- in my opinion, fulfill what

19      was agreed to in 2005.  But I can't tell you, you

20      know -- after -- especially after the close on that

21      particular -- some of them issues, that one had to

22      go away.  I mean, it wasn't nothing there.  But I

23      can't give you time frames.  I can just tell you

24      there was discrepancies, we'd go in and say no, this

25      is not what was agreed to and they would back off of

101

1       it, or they would change up, or they would say

2       you're right.

3  Q    Do you recall any other examples?

4  A    Not sitting right here right now, no, not off the

5       top of my head.

6  Q    Is there anything you could look at that would

7       refresh your recollection on that?

8  A    I don't know, possibly.

9  Q    What would it be?

10 A    I don't know.

11 Q    You had said before, Mr. Ailes, that -- that the

12      company put in writing that retiree health care

13      benefits were lifetime vested benefits?

14 A    One time it was a pamphlet they used to give to

15      them.

16 Q    And describe that pamphlet for me.

17 A    It was -- I don't know, just a little thing, they'd

18      go out, they'd sign up and say, okay, here's your

19      benefits.  And at that time it said it was lifetime

20      benefits.

21 Q    What was -- what was the date of that,

22      approximately?

23 A    I can't tell you that.  I mean, I don't remember the

24      exact date, to be honest with you.

25 Q    Do you recall if it was after 2000?

102

1   A     That I can't tell you because I probably didn't see

2         them that much after 2000 because I wasn't in the

3         plant at that time, I was a rep at that time.

4   Q     Do you recall if it was after 1989?

5   A     I think I have.  I mean -- but I can't -- once

6         again, I'm not going to sit here and say I

7         absolutely know the date because I -- I don't.  If I

8         did, I'd tell you.

9   Q     Did you see anything in the drafts that we talked

10        about a few minutes ago, that you interpret as

11        guaranteeing lifetime vested benefits?

12  A     Well, I didn't completely go through each one of

13        those drafts, if that's what you're asking me.  I

14        rely on -- and I was indoctrinated from that plant,

15        I rely on the 1992 agreement.  I mean, that's what

16        '92 was all about, all right?  1992, was to secure

17        for the active future retirees and it was going to

18        remove a lot of the FASB liability of anybody hired

19        after a certain point in time.  I mean, we spent --

20        there was tons of time, energy, effort, money spent

21        to do that.  I mean, I don't know how else to say

22        that.  I mean --

23  Q     Well, if -- if -- let me just ask you this.  I'm

24        interested in your -- in your view on it.

25                  If the company was agreeing that retiree

103

```
1        health care benefits were lifetime vested, how do
2        you explain the statements that we've looked at
3        where the company, in one instance, in an agreement
4        that was signed by the UAW, in other instances in
5        agreements that were tendered to the UAW kept saying
6        that they didn't agree to that?
7   A    Because people take different positions when they
8        come into those positions.  I mean, you got
9        different people coming in and out from the company
10       side of it.  I mean, I can't explain it.  I can't
11       speak for them.  I don't know why they took the
12       position that they took.  I can only tell you that
13       my conversations, my understanding of it and what
14       1992 was all about.  I mean, I didn't really ever
15       think I'd be sitting here talking about retiree
16       benefits, because it's -- we clearly took care of
17       that in '92.  There's no doubt.  If there is any
18       discrepancy at all, '92 should have took care of all
19       that.  We removed the FASB liability after people
20       hire in after a certain date.
21  Q    Well, do you -- do you -- have you seen anything in
22       the 1992 -- we saw in the -- we saw in Exhibit -- in
23       Exhibit 12.  Do you have that in front of you?  It's
24       the agreement on modification and extension of
25       existing labor contract.
```

Capital Reporting Company
Ailes, Michael  12-16-2011

104

1   A   I have it in front of me now.

2   Q   Okay.  And we saw that's the one that was -- that

3       was executed on 27th date of September 1990.  And we

4       saw in there the statement that this arrangement

5       does not prejudice the Union's position that current

6       retirees have lifetime vested benefits nor the DTP

7       Muncie Plant's position that current retirees do not

8       have lifetime vested benefits.

9           Do you recall anything in writing

10      subsequently that was agreed to by the Union and the

11      company, where the company abandoned that position?

12  A   Outside of the '92 agreement that took away the FASB

13      liability.  I mean, I --

14  Q   I thought you told me --

15  A   My understanding -- my understanding of it, you're

16      not going to change my, I guess, understanding of

17      the lifetime benefit.  I mean I understand where

18      you're going with that.  I'm just telling you,

19      that's how I grew up at that plant.  That's what it

20      was all about.  I don't know why the guy -- I wasn't

21      there, I didn't sign the extension.  I know it was

22      to get these groups together so we could try to

23      tackle some of the problems it was facing, not just

24      them, but in other plants.  We just tried to be

25      proactive about it and go in and try to secure the

Capital Reporting Company
Ailes, Michael  12-16-2011

105

1         best benefits we could, to try to take care of that

2         so we could put the company in a better position,

3         just to be real honest with you.  And that's what we

4         accomplished with '92, we thought, at the time.

5         Obviously things change or the plant would still be

6         there.

7    Q    Well, I think you're -- correct me if I'm wrong, but

8         I think you had testified that the -- that the '92,

9         '95, 98 agreements were not executed.

10   A    The agreements -- if you're talking about the health

11        care -- that's what I'm --

12   Q    The health care agreements, right?

13   A    They weren't signed.  Now, whether they were -- I

14        guess never even said in the statement there that

15        they were paying out benefits so I don't know if you

16        call that execution or not.

17   Q    How do you define execution?

18               MR. RADTKE:  Objection, calls for a legal

19        conclusion.

20   BY MR. BURCHFIELD:

21   Q    How do you define --

22   A    I don't know that I would.  That's why I just said,

23        I don't know if you would call doing these things as

24        execution or does it require signature.  I don't

25        know.  I don't know.  I'm not a legal expert on

Capital Reporting Company
Ailes, Michael  12-16-2011

106

```
 1       that.

 2   Q   Well, are you aware of any signed health insurance

 3       agreement from '92 or '95 or '98?

 4   A   Outside of the agreement -- we signed saying that we

 5       did the health care agreement, but we didn't have

 6       the booklet attached to it.  So, no, I guess I

 7       don't.  I mean --

 8   Q   So you can't point me to anything after -- you can't

 9       point me to anything, I take it, after this document

10       in 1990 in which BorgWarner signed something that

11       said we agree that retiree health benefits are

12       lifetime vested?

13   A   Outside of conversation, I can't tell you what year

14       the pamphlets were.  I mean, whenever the guys would

15       go out.  I mean, I don't know what year.

16           MR. BURCHFIELD:  Okay.  Why don't we break

17       for lunch.  Let's take, what do you think, 45

18       minutes?

19           MR. MACEY:  Yeah.

20           (Whereupon, at 12:38 p.m., a luncheon

21           recess was taken.)

22               *   *   *   *   *

23           A F T E R N O O N   S E S S I O N

24                   (1:30 p.m.)

25       Whereupon,
```

107

1                    MICHAEL AILES

2        was called for continued examination, and having

3        been previously duly sworn was examined and

4        testified further as follows:

5                MR. BURCHFIELD:  I'm going to ask the

6        reporter to mark a document entitled "Health

7        insurance agreement between BorgWarner Automotive

8        Diversified Transmission Corporation Muncie Plant

9        and International Union UAW reflecting '95 changes

10       to the '92 agreement."

11               And this is Exhibit 16.

12               (Ailes Deposition Exhibit Number 16 was

13               marked for identification.)

14               RESUMED EXAMINATION BY COUNSEL FOR

15               DEFENDANT

16  BY MR. BURCHFIELD:

17  Q    Mr. Ailes, you have in front of you Exhibit 16?

18  A    Yes.

19  Q    There is a document attached at the end of this

20       which may not be a part of this agreement.  But it

21       was in the documents as I received them, the last

22       three pages of the document.  So let's just ignore

23       that for now and talk about the document that has

24       the Bates labels on it beginning at 855 through 996,

25       typescript numbers up to page 137.  Okay?

108

1   A      All right.

2   Q      And let me just ask you to look at page 873.  And

3          you see in the last paragraph of that page the

4          statement, "On March 12, 1998 this agreement may be

5          terminated, modified, changed or continued in the

6          same manner as provided in Article 16 of the

7          aforesaid collective bargaining agreement between

8          the parties hereto dated March 12, 1995."

9                 Do you see that?

10  A      Yes.

11  Q      And then also over on page 991, under "Future of the

12         plan", as before in the prior draft of the agreement

13         it says, "Although BorgWarner Automotive Diversified

14         Transmission Products Corporation Muncie Plant

15         expects and intends to continue the plan

16         indefinitely, it reserves the right to modify,

17         amend, suspend or terminate the plan or the group

18         policies therein in accordance with the provisions

19         of the health insurance agreement.  An individual's

20         insurance coverage terminates when that person is no

21         longer eligible, or when the group insurance

22         policies terminate, whichever happens first."

23                Do you see that?

24  A      Yes.

25  Q      Now, this -- this is the -- this, at least, seems to

Capital Reporting Company
Ailes, Michael  12-16-2011

109

1       be the draft of the -- of the agreement, a draft to

2       incorporate the agreement that was reached during

3       the bargaining cycle during which you served as

4       bargaining chair; is that right, '95?

5   A   It appears that way, yes.

6   Q   So do you recall receiving this draft, a draft from

7       BorgWarner that reflected its view of what happened

8       in the bargaining session?

9   A   I'm going to say I probably did get a copy of it.

10      So I guess the answer to your question would be

11      yes.

12  Q   Okay.  And what would you have done with that draft?

13  A   Well, it depends on what they did simultaneously.

14      If they was giving me the copy with the other copy

15      going to Social Security Department or the UAW, I

16      might have looked at it.  I might have marked on it

17      if there is any changes I thought, or I might have

18      called my rep to make sure that they in fact

19      received it up there or where was we at in the

20      process.

21  Q   As we discussed before lunch, it appears that --

22      that this agreement was never signed by both

23      parties; is that your understanding?

24  A   Yes.

25  Q   And my question for you is whether either of the two

110

```
1         passages that I just read to you, bore upon the

2         UAW's decision not to sign the agreement?

3    A    I don't really know that.  Once again, it was until

4         we got the okay from the Social Security Department,

5         we weren't going to sign that document.  So if they

6         had an objection, which if you look back at the --

7         because I'm assuming this is part of the '96 -- or

8         the one where it was marked up that you showed me

9         earlier, then there was more than just that passage.

10        There are different passages as she was going

11        through it.  So that -- we wouldn't have signed it

12        based on that.

13   Q    Well, would you -- do you have a view on whether, if

14        everything else in the agreement were acceptable,

15        the UAW would have executed an agreement, signed an

16        agreement with those two provisions I've just read

17        to you in it?

18   A    I can't really answer -- I can't speak for them.  I

19        mean, I'm assuming if everything was as we

20        negotiated, everything was as they seen it in the

21        final draft or document, I'm assuming they would,

22        but I can't speak for them.  Like I said, we've

23        always -- unless we get the okay from there, we're

24        not signing the thing.  We always wanted to make

25        sure we had their blessing, or they checked it out.
```

111

1  Q     Having seen some passages in these draft agreements

2        as well as the -- what we refer to as the agree to

3        disagree language from the 1992 document that was

4        signed, do you remember what I'm talking about?

5  A     Uh-huh.  Yes.  I'm sorry.

6  Q     In light of all that, do you recall any discussions

7        within the UAW about whether it should try to seek a

8        more definitive understanding with the company about

9        whether retiree health benefits were vested or not?

10 A     Our position was it was always vested, it's always

11       been that position.  And we didn't even have to --

12       the only thing that brought this I guess to where

13       we're at today, is up until they done -- don't hold

14       me to the date, 2005, 2006 because there was a

15       lawsuit put in, there was changes made that got

16       reversed back and then they got to where this is

17       today, okay, then more likely for whatever reason,

18       right, wrong or indifferent, it was a non-issue

19       because things were going as we understood it.

20       Retiree benefits were not being adversely affected.

21       They did not go into unilateral change.  So I can't

22       really speak as to, you know, going through the

23       times, once again, I didn't -- I won't sign nothing

24       until the International gives me their blessing.  We

25       never had any reason -- I mean, even with the

112

```
 1          verbiage -- I mean, companies take positions all the
 2          time.  It doesn't necessarily mean I agree with it
 3          and don't necessarily mean you get into a fight each
 4          one each time, not until our members are adversely
 5          affected.  In this case, they're adversely affected.
 6   Q      Do you think -- do you personally think that there
 7          was an agreement between BorgWarner and the UAW that
 8          retiree health benefits were lifetime vested?
 9   A      Do I think that?
10   Q      Yes.
11   A      Yes, I absolutely believe that.
12   Q      And in light of the 1992 agree to disagree language,
13          on what do you base your understanding?
14              MR. RADTKE:  I'm going to object to the
15          form.  And I believe that's a misstatement of the
16          facts.
17              MR. BURCHFIELD:  Is it 1990?
18              MR. RADTKE:  Yeah, I believe so.
19              MR. BURCHFIELD:  Yeah, okay.
20   BY MR. BURCHFIELD:
21   Q      In light of the 1990 agree to disagree language, on
22          what do you base your view that there was an
23          agreement?
24   A      One, because of how it was -- it's how I grew up in
25          the plant, for lack of better terminology.  That's
```

113

```
 1          how it was always treated.  We seen the documents
 2          that was given retirees as they went out, and
 3          especially in light of 1992 with the FASB.  I mean,
 4          I don't know any other way to say -- I know nothing
 5          different than they were lifetime benefits and they
 6          weren't challenged until 2005 or 2006, whatever --
 7          don't hold me to the dates, that we had one set they
 8          changed, got back and then where we're at today.
 9   Q      Well, Mr. Ailes, let me -- let me approach this in
10          somewhat of a different way.  There could -- there
11          could hypothetically be a written document somewhere
12          signed by both the UAW and BorgWarner that says
13          retiree health benefits are lifetime vested,
14          inalterable.  Are you aware of any such document?
15   A      Well, I guess the document I would think about is
16          it's actually under the pension, all right, where
17          there is a letter that says pension are guaranteed
18          lifetime benefits.  And as the health agreement ties
19          into you got to be eligible 30 and out, your 60/10,
20          whatever, I guess that's why I kind of base my --
21          besides growing up that way, that they're lifetime
22          benefits and never been challenged until this recent
23          -- the last two times that they have done it.
24   Q      Okay.  And I understand -- I understand that
25          position, and I suspect Mr. Radtke will be making
```

114

1       that argument down the road.  But I'm asking -- my

2       question is a little bit different; and that is:

3       Are you aware of any written document in which the

4       UAW and BorgWarner stated, in substance, that

5       retiree health benefits are lifetime vested?

6   A   I guess as such stated the way you're saying, I've

7       not seen that, I don't guess.

8   Q   Okay.  And neither have I, by the way.

9               Another possibility would be that there is

10      a --

11  A   Outside -- wait a minute, outside the pamphlets, now

12      keep in mind it was given out as a retiree went out,

13      that did say lifetime benefit.

14  Q   It said that term, is that your --

15  A   Yes.

16  Q   Okay.  And we'll -- I think we may be able to look

17      at one of those.  I'm getting one of those.  But

18      those pamphlets were not -- were not signed by both

19      parties, were they?

20  A   Well, they was given out by the company, by the

21      company's benefits people at the time that I'm

22      signing -- not me particularly, but the person is

23      signing I'm going out.  And you know -- and I don't

24      know the verbiage because I didn't set at every one

25      of them.  I didn't set at each one.  The feedback to

115

```
 1        me was, here, I've got this saying this and that's

 2        what they told me.  Then I rely back to further what

 3        we talked about Glen Eckelman's and my conversation

 4        about they know what they got when they go out.

 5   Q    Okay.  But, as you sit here and that -- that is a

 6        document, and we'll look at one of those, but you're

 7        not aware of any document that is signed by

 8        BorgWarner and the UAW that says benefits are

 9        lifetime vested guaranteed?

10   A    I don't recall.  I'm not aware of that.

11   Q    You know, another possibility would be an agreement

12        that says UAW and BorgWarner agree that benefits are

13        not lifetime vested guarantee.  I take it you're not

14        aware of such an agreement on that either?

15   A    I'm assuming if you had that you'd already show that

16        to me, so...

17   Q    That would probably be fair.

18   A    As if I had the other, I would show it to you and we

19        wouldn't be here.

20   Q    And the other possibility is that there was simply

21        no agreement between -- between the parties and they

22        could never -- they could never get it written down

23        in a way that both sides could agree to it?

24   A    I'm going to disagree with that statement.

25   Q    And why so?
```

116

1  A    Because I believe, based on the history, based on my

2       time bargaining contracts, based on this connect

3       with the pensions, based on 1992, that they in

4       fact -- and the pamphlets, they in fact are lifetime

5       benefits.  I mean, I'm never going to believe

6       nothing different.  I'm not trying to be

7       argumentative, but that's just how that is.  I mean,

8       you know, if so, then -- well, I'm not going to get

9       into it.  It's -- in my opinion then, if they felt

10      like they had that right, there's a whole lot of

11      wasted time going through a bunch of stuff in 1992

12      when the whole purpose was to try to get that FASB

13      liability off the books.  And years and years down

14      the road that in fact is probably what would happen,

15      unless they had done something different.

16  Q    Well, is it -- is it -- well, in light of that, how

17      do you explain the language in the 1990 agreement?

18  A    I mean, I wasn't there.  I can't explain that.  I

19      mean, the only -- my only conclusion to that was

20      like they did with a lot of things, I guess they

21      agreed to disagree because they didn't want to stop

22      there.  It was the company that wanted the ACME

23      agreement.  They're the ones that wanted to go

24      forward.  So I'm assuming when one took a position

25      one, we just -- I can't tell you that.  I wasn't

Capital Reporting Company
Ailes, Michael 12-16-2011

117

1    there, I don't know.

2 Q   Is it your -- is it your position speaking now on

3     behalf of the UAW that if benefits -- if retiree

4     health benefits were vested for a group of retirees

5     retiring say in the '80s, that the company can never

6     change that arrangement for people who retire in the

7     '90s?

8 A   I guess my -- I guess my answer would be, yes, I

9     don't think they can.  I believe as long as that's

10    tied as ours -- as that is, that particular

11    agreement is, and I made the qualifying, when I go

12    out I'm entitled to those benefits.  You know,

13    unless they produce a document that both parties

14    could agree that they're not, which ain't never

15    going to happen.  Why would we?  Why would we give

16    up a benefit like that?  We would not.

17         So, my answer would be, no, they can't

18    change it.  Not unilaterally change it.

19 Q   Is it your view that the company is prevented, if it

20    grants vested benefits to retirees in the '80s, is

21    it your view that it can't make changes in the

22    benefits for people who retire during the '90s?

23 A   I'm trying to make sure how to answer this, to be as

24    honest as I can.  Anybody that's out prior to our

25    negotiations, they're out, they're retirees.  Can't

Capital Reporting Company
Ailes, Michael  12-16-2011

118

1         change it, all right?  Then we go in -- all I went
2         in with the mindset, whether it was at the Local
3         Union or wherever was at, that they're vested, we're
4         going now from this point forward is this group of
5         people.  I got X amount of people in the plant, X
6         amount of people is going to retire and try to make
7         the best benefit we can for those people, okay?
8               That's why when you get into -- well, I
9         don't want to get too verbiage (sic) on it, but when
10        you start looking at plans, you know, I mean our
11        plan, just be real honest with you, probably drives
12        people crazy because of the different levels.
13        Because it all -- when you go out, here's this one;
14        when this person goes out, here's this person, and
15        so on, over the course of a long period of time.
16  Q     Is it the UAW's position that the -- that the
17        benefits of people who have already retired can't be
18        changed even if the UAW were to agree to it?
19  A     I would -- well -- I think they can be enhanced or
20        made better, but I don't think you can take that
21        basic away, whatever that may be.
22              MR. BURCHFIELD:  Let me ask the reporter to
23        mark as Ailes Exhibit 17 a document entitled,
24        "BorgWarner Automotive Diversified Transmission
25        Products Corporation, Muncie Plant and Local 287 UAW

119

1          Insurance Highlights of the 1998 Negotiations."

2                    (Ailes Deposition Exhibit Number 17 was

3                    marked for identification.)

4                    MR. MACEY:  This is 17?

5                    THE WITNESS:  Yes.

6                    MR. BURCHFIELD:  I'm glad to see I'm not

7          the only one having trouble counting.

8  BY MR. BURCHFIELD:

9   Q    Do you have in front of you Exhibit 17, Mr. Ailes?

10  A    Yes.

11  Q    This is -- this purports to be highlights of the

12        1998 contract negotiations.  Now if I understand

13        correctly, you were not involved in those

14        negotiations; is that correct?

15  A    That's correct.

16  Q    Have you ever seen this document so far as you can

17        tell?

18  A    I'm not real -- I'm going to assume I've come across

19        it some time or another during the course of time.

20  Q    And in the 1998 negotiations there was, again, not

21        an executed, mutually signed health insurance

22        agreement; is that right?

23  A    Yes.

24  Q    Let me ask you to look at a couple of passages in

25        this -- in this document.  And the first passage is

Capital Reporting Company
Ailes, Michael 12-16-2011

120

1        on the second page of the document, page 1144.

2   A    Okay.

3   Q    And the heading is, "Disclaimer notice." And it

4        says, in the first paragraph there, "For further

5        details you may refer to the official plan documents

6        including the health insurance agreement which

7        describe the provisions in more detail and solely

8        govern with respect to your eligibility and

9        participation in the health plan of the company."

10              Do you see that?

11  A    Yes.

12  Q    As we just discussed, there was not an executed

13       health insurance agreement for 1998, was there?

14  A    Not that I'm aware of.

15  Q    And then in next sentence says, "The company and

16       Union may, through the process of negotiations,

17       modify, amend, suspend or terminate these plans in

18       whole or in part."

19              Do you see that?

20  A    Yes.

21  Q    And then it also says, if you look at page 147,

22       under overview headings, the overview of the

23       insurance plan, second paragraph there, it says,

24       "The company and Union may, through the process of

25       negotiations, modify, amend, suspend or terminate

Capital Reporting Company
Ailes, Michael  12-16-2011

121

1       these plans in whole or in part."

2               Do you see that?

3   A   Yes.

4   Q   Do you -- is it the UAW's position that -- that

5       those statements I've just read to you are accurate?

6   A   I don't know that they're accurate.

7   Q   All right.  Is it the UAW's dispute that they're

8       inaccurate?

9   A   I guess if you're trying to make me say as a whole,

10      then I guess I'd say it is inaccurate then, I guess.

11  Q   Are you aware of any written objection by the UAW to

12      that language?

13  A   I don't know what transpired with this particular

14      '98 thing.  I mean, I assume the company put this

15      together.  I don't know who they give it to.  I

16      mean, I don't know if they did or not.  At that time

17      when we was given this, I don't know, I wasn't

18      there.

19  Q   Then do you see at page 1160 -- the language that we

20      looked at before, under the heading "Future of the

21      plan."

22  A   I see the language you're talking about.

23  Q   We discussed that before.  Anything -- anything to

24      add to what you previously testified about that

25      language?

Capital Reporting Company
Ailes, Michael  12-16-2011

122

1   A     Nothing left to add, I guess.  Added something to it

2         that I don't --

3   Q     What are you referring to?

4               MR. RADTKE:  I'm going to object to that

5         question because there's different language.

6   BY MR. BURCHFIELD:

7   Q     Are you talking about the provision about "By action

8         of either its board of directors or person

9         designated by resolution of such board of

10        directors"?

11  A     That's one thing that caught my eye, if that's what

12        you're asking me.

13  Q     Is there anything that you recall as being

14        different?

15  A     I didn't compare -- I guess I could get it out and

16        compare it line-by-line if you want me to.

17  Q     If you want to, you can, but, the basic point is,

18        does it remain the UAW's position that this

19        language, as stated here, is -- would be

20        objectionable to the UAW?

21  A     I would say yes.

22  Q     Okay.  And you view this language, I assume as you

23        did the earlier language, as being inconsistent with

24        the notion of lifetime vested benefits?

25  A     I still believe it's lifetime benefits.  And that's

123

1        not what this says, I guess I'll put it that way.

2   Q    So it's inconsistent?

3   A    Well, I'm not -- not going to put words in my mouth,

4        but I just -- it is what I said.

5            MR. BURCHFIELD:  Okay.  Let's look at

6        the -- let's look at a document entitled, "Tentative

7        agreement November 28, 2000.  And this will be Ailes

8        Exhibit 18.

9            (Ailes Deposition Exhibit Number 18 was

10           marked for identification.)

11  BY MR. BURCHFIELD:

12  Q    And Mr. Ailes, you were involved -- you have in

13       front of you Exhibit 18?

14  A    Yes.

15  Q    And you were involved in the 2000 negotiations; is

16       that right?

17  A    Yes.

18  Q    And am I correct that in the 2000 negotiations, the

19       earlier agreement done in -- let me start again.

20           Do you -- do you recall that in the 1992

21       negotiations there was an agreement that the

22       deductible and stop loss would increase at a rate of

23       five percent per year?

24  A    That's correct.

25  Q    And that was -- that agreement was going to last up

124

1       to 2003; is that right?  From January 1, 1993 --

2  A    December 31st of 2002.

3  Q    Okay.  So if you look on the second page of Exhibit

4       18, do you see there where it says "Increased

5       deductible stop loss five percent per year beginning

6       in 2003"?  It's about a third of the way down on the

7       page 5330.

8  A    5330.  (Reviewing.)  Am I missing this?

9  Q    Right here.

10  A    Oh, okay.  I got you.

11  Q    Okay, you see that?  Am I correct that the five

12       percent per year escalator for deductibles and stop

13       losses was renewed in 2003 for an additional period

14       of time?

15          MR. RADTKE:  Object to the form of that

16       question.

17  BY MR. BURCHFIELD:

18  Q    I can tell by the look on your face you don't

19       understand the question.  Let me rephrase it.

20       That's my fault.

21          The original agreement on the five percent

22       escalator expired December 31, 2002, right?

23  A    Correct.

24  Q    And in the 2000 negotiations, did the company -- did

25       the company and the Union agree to extend that

Capital Reporting Company
Ailes, Michael  12-16-2011

125

1       escalator beyond 2003?

2    A    Yes.

3    Q    And for how long beyond 2003?

4    A    To be real honest, I don't remember, to be honest.

5         I don't remember exact duration.  I can't remember

6         how far out it went.

7    Q    Am I correct that with regard to the -- with regard

8         to that escalator, the five percent increase in

9         deductibles and stop losses applied to all retirees

10        after 1992?

11   A    Depending on when they went out.  I mean, it's true

12        that the stop losses and deductibles increased, but

13        depending on when they went out.

14   Q    Well, if the -- if someone -- if someone retired in

15        1995, they were subject to the escalator for --

16   A    Not necessarily.

17   Q    And why not?

18   A    Well, one, there -- there was negotiated where a

19        person, depending on what year -- again, that's why

20        I can't -- they had a choice of plans, okay?  They

21        could have went prior to a certain time they had

22        this plan, all right.  Now my understanding of --

23        I'm telling you my understanding of the increases,

24        was that if it -- I went out in year 3, then I --

25        this is my stop loss and my deductible, all right.

Capital Reporting Company
Ailes, Michael  12-16-2011

126

1        And if I went out in year four, mine may be

2        different than the one that went out prior to that.

3   Q    Okay.  Your point is well taken.  The -- the

4        escalator applied only to those retirees that were

5        in the PPO, was that your understanding?

6   A    That would be correct, I think.

7   Q    Okay.

8   A    But -- see that -- that's why I'm saying there was

9        point in time where people had a choice and I don't

10       have without -- it's been awhile back to say when

11       was that cut-off.  I could have been in the PPO

12       today and I retired, but I didn't go into the PPO

13       because I had a choice.

14  Q    Right.

15  A    But I don't know exactly all that.

16  Q    Well, let me -- let me suggest to you that there

17       was -- that there was -- that there are people who

18       retired up to 1995, could elect PPO or non-PPO, and

19       then after 1995, PPO was mandatory.  Is that

20       consistent with your understanding?

21  A    That may be correct.  That could be correct.

22  Q    Something like that.  The record will show whatever

23       it does.

24  A    Right.  Right.

25  Q    Let's not get bound up in that.

127

1  A    Right.

2  Q    My question for you is, if someone retired in the

3       PPO in, say, 1996, would that person be subject to a

4       five percent escalator for every year the escalator

5       remained in effect?

6  A    That's what I'm saying.  No, I would say no.

7       Whatever they went out with.  If they went out with

8       -- that's what I was trying to say.  Let's say you

9       are in the PPO --

10 Q    Right.

11 A    -- if I went out in 1996 here's my stop loss

12      deductible.  If I went out in 1998, here's my stop

13      loss deductible.

14 Q    So in other words, whatever the stop loss was, the

15      time that I retire or you retire from the Muncie

16      Plant, that's the stop loss and deductible that you

17      have for the rest of your life?

18 A    That's my understanding.

19 Q    And then when the stop loss was -- for each -- each

20      year the stop loss and deductible was higher, so the

21      people who retire later have a lifetime stop loss

22      and deductible that is higher than the ones who

23      retired earlier?

24 A    That could happen.  I believe that could happen.

25 Q    Now, in the 2000 agreement where the escalator was

Capital Reporting Company
Ailes, Michael  12-16-2011

128

1   renewed, was it your understanding that that

2   escalator would apply only up until the time someone

3   retired and then they would have the same deductible

4   and stop loss for the rest of their lives?

5  A   You mean -- I guess I want to make sure I understand

6   what you're asking me.  We renewed it.  It was

7   renewed.  Are you asking me if somebody went out

8   after that, they would go under the stop loss and

9   deductible and then that was theirs; if you're

10   asking me if that's what I believe, yes.

11  Q   Okay.  Do you know -- do you know whether the

12   company applied it that way, that it -- that a

13   person's stop loss and deductible remained the same

14   that it was at the moment they retired and never --

15   never was changed thereafter under the '95 and 2000

16   agreements?

17  A   You mean do I know that they done it that way?

18  Q   Right.

19  A   I guess I'm not sure.  I've never had anybody

20   complain to me, so I'm assuming it was that way.

21   I'll put it that way.

22       MR. BURCHFIELD:  Give me a second.  We'll

23   find it later.  I'm going to ask the reporter to

24   mark as Ailes Exhibit 19 a document entitled,

25   "Clarifications of tentative agreement reached

129

1          between BWD -- BWTPC and UAW Local 287 April 8,

2          2005."

3                    (Ailes Deposition Exhibit Number 19 was

4                    marked for identification.)

5     BY MR. BURCHFIELD:

6     Q    And Mr. Ailes, you have in front of you Ailes

7          Exhibit 19?

8     A    I got Exhibit 19, yes.

9     Q    Okay.  You participated in the 2005 negotiations; is

10         that right?

11    A    Yes.

12    Q    As the International rep?

13    A    Yes.

14    Q    And you see item number two there is -- it says,

15         "The annual major medical increase of up to ten

16         percent can affect stop loss or deductible, but

17         cannot be more than a maximum of ten percent total

18         out-of-pocket."  Do you see that?

19    A    Yes.

20    Q    What do you understand that to mean?

21    A    That your deductible and stop loss together is not

22         going to be -- you're not going to get more out of

23         your pocket than a ten percent increase, but I don't

24         know who put this together as far as this.

25    Q    Was there a signed agreement that came out of the

Capital Reporting Company
Ailes, Michael  12-16-2011

130

1        2005 negotiations?

2   A    I think there was.  The only reason I say it,

3        because I know at one time when one of these came

4        out, there was some discrepancy and I don't know

5        which one is which, because the company had put out

6        almost identical to this, and I'm not saying this is

7        that one, I'm just saying at one time there was a

8        discrepancy on a sheet the paper looked like this.

9                MR. BURCHFIELD:  Okay.  Let me ask the

10       reporter to mark as Ailes Exhibit 20 the plant

11       shutdown agreement.

12               (Ailes Deposition Exhibit Number 20 was

13               marked for identification.)

14  BY MR. BURCHFIELD:

15  Q    Mr. Ailes, do you have in front of you Exhibit 20?

16  A    Yes.

17  Q    You participated in the negotiations of this

18       document; is that right?

19  A    Yes.

20  Q    And you signed it on page 193; is that correct?

21  A    I need to take a time-out for a minute.  I need to

22       talk to you, Barry.

23               MR. MACEY:  But answer that question while

24       the question is pending and then we'll take a

25       break.

Capital Reporting Company
Ailes, Michael  12-16-2011

131

```
 1                    THE WITNESS:  That's got to do with that,
 2         what he's asking me about, me signing this.  I can
 3         tell you I signed it.
 4                    MR. BURCHFIELD:  Okay.
 5                    MR. MACEY:  Okay.
 6                    (Off the record at 2:12 p.m.)
 7                    (Back on the record at 2:14 p.m.)
 8    BY MR. BURCHFIELD:
 9    Q     Mr. Ailes, I believe the last question I asked you
10          was whether that's your signature on page 193 of
11          Exhibit 20.  And your answer was that it is?
12    A     That's correct.
13    Q     Would you like to qualify that answer in any way?
14    A     Membership ratified it, I signed it.
15    Q     Okay.  Did you sign it under objection?
16    A     Membership ratified it, I signed it.
17    Q     That's not quite responsive to my question.  Did you
18          object to signing it?
19    A     I signed it.
20    Q     Did you have any choice whether to sign it?
21    A     I signed it.  I don't know what you want me to say.
22          I signed it.  It's my signature.
23    Q     It appears as though you're not happy about the fact
24          that you signed it?
25    A     Well, I'm not going to get into it.  I signed it.
```

132

```
1          I'm going to leave it at that.

2    Q    Is this -- do you have any reason to believe that

3          this is not a binding commitment?

4    A    I'm not saying that at all.  I think it's a -- I got

5          to take a break.  Closed that fucking plant down.  I

6          knew every one of the people in that plant.

7                   (Off the record at 2:14 p.m.)

8                   (Back on the record at 2:21 p.m.)

9    BY MR. BURCHFIELD:

10   Q    We were talking about the -- about Exhibit 20.

11   A    Correct.

12   Q    And I just wanted to ask you about the provision on

13         page 192, Mr. Ailes.  Are you there with me?

14   A    Okay.

15   Q    In paragraph 2 it says, "The company and the Union

16         have a dispute with respect to the nature of the

17         company's obligation to provide post-retirement

18         health care benefits to employees who retired prior

19         to February 23, 2009 and their dependents.  Nothing

20         in this plant shutdown agreement affects the party's

21         rights or positions with regard to that dispute."

22               Do you see that?

23   A    Yes.

24   Q    And do you recall it being discussed during the --

25         during the negotiations that led to this agreement,
```

133

```
 1        that the company -- the company and the Union did

 2        have a dispute about whether post-retirement health

 3        care benefits were vested?

 4   A    Yeah, there was a dispute.

 5   Q    And we earlier saw language, and if you could look

 6        back at Ailes Exhibit 12, which is the document

 7        executed on September 27th, 1990, and on page 427 of

 8        that document there is the statement we looked at

 9        before, "This agreement does not prejudice the

10        Union's position that current retirees have lifetime

11        vested benefits nor the DTP Muncie Plant's position

12        that current retirees do not have lifetime vested

13        benefits."

14             Do you see that?

15   A    Yes.

16   Q    Isn't -- isn't that statement in Exhibit 12 saying

17        substantially the same thing as the statement on

18        page 192 that we read in Exhibit 20?

19   A    That there's a dispute?

20   Q    Yes.

21   A    Both of them are saying that, yes.

22             MR. BURCHFIELD:  Let me ask you to look at

23        document dated November 23, 1992, which is a letter

24        from Laura Hess to John Daffara.  Here it is.

25        Great.  And this will be Ailes Exhibit Number 21.
```

134

1                    (Ailes Deposition Exhibit Number 21 was

2                    marked for identification.)

3    BY MR. BURCHFIELD:

4    Q    Do you have in front of you Exhibit 21?

5    A    Yes.

6    Q    In the first paragraph of this letter, Ms. Hess

7         wrote at the request of Local 287, "I have reviewed

8         the 1989 draft summary plan description for

9         insurance and pension benefits.  Based on my review

10        and the changes the company has made in relationship

11        to that review, the document is now acceptable."

12                    Do you see that?

13   A    Yes.

14   Q    And then there is an attachment to it.  And this is

15        the way that it was given to me.  Do you know

16        whether that attachment relates to the letter or

17        not?

18   A    I don't know.

19   Q    Page 198 suggests that it's effective September 1,

20        1992 through March 11, 1998.  That would suggest,

21        wouldn't it, that this is not the attachment that

22        Ms. Hess is referring to?

23   A    I mean, I don't know how to answer that I guess.  I

24        don't know how to answer that.

25   Q    Do you recall in the 1992 negotiations that there

135

```
1        was a requirement imposed to use generic drugs when

2        they were available?

3   A    What year?

4   Q    1992.

5   A    Yes.  Yes.

6   Q    And am I correct that that requirement to use

7        generic drugs applied to all retirees?

8   A    Well, I think there was a qualifier with that.  I

9        can't tell you exactly what that was.

10  Q    If --

11  A    Because they had -- they had the opportunity to come

12       in with PPO when the PPO was established at that

13       time, but there was also a lot of things connected

14       with that as far as our pharmaceutical or the RX

15       plan that you didn't see in most plans.  Dispense as

16       written is one of them.  So I mean, I'm probably not

17       giving you the answer you want, but I don't know how

18       to answer specific.  Could they get generic drugs or

19       was they getting the generic drugs, yes, but that's

20       because there was some enhancements put into other

21       aspects of the plan for them, my recollection.

22  Q    Well, on the generic drug requirement, do you recall

23       that that was applicable even to people that had

24       retired before 1992?

25  A    I believe it was.  Once again, it's one of them.  I
```

136

1         think there was some qualifiers.  There was some

2         things to enhance it to encourage generic use.

3    Q    Do you have any -- and this may have been -- this

4         may be somewhat before your time, Mr. Ailes, and if

5         it is, you can say so.  But in Ms. Hess's letter,

6         the first page of Ailes Exhibit 21, it's dated

7         November 23, 1992.  And she is signing off on the

8         1989 SPD.

9              Do you -- do you know what the reasons were

10        for her signing off on it just as the next agreement

11        was about to become effective?

12   A    I don't know that.

13             MR. RADTKE:  I object to the form of that

14        question.

15             THE WITNESS:  I don't know.

16   BY MR. BURCHFIELD:

17   Q    Mr. Ailes, are you aware of situations in which

18        the -- during the collective bargaining

19        negotiations, the benefits that would otherwise have

20        gone to active employees were reduced in order to

21        provide enhanced benefits to the retirees?

22   A    I guess I don't understand what you -- are you --

23        you got a specific?

24   Q    Yeah, let me give you an example.

25             MR. BURCHFIELD:  Let me ask the reporter to

Capital Reporting Company
Ailes, Michael  12-16-2011

137

1          mark as Ailes Exhibit 22 a letter from Mr. Reffett

2          to Mr. Reising dated October 22, 1990.  And while

3          you're looking at that, I'll ask the reporter to

4          mark as Ailes Exhibit 23 a memorandum from Laura

5          Hess to Social Security staff dated August 17,

6          1992.

7                    (Ailes Deposition Exhibit Number 22 was

8                    marked for identification.)

9                    (Ailes Deposition Exhibit Number 23 was

10                   marked for identification.)

11  BY MR. BURCHFIELD:

12  Q    Mr. Ailes, let's start with Exhibit 22, which is the

13       October 22, 1990 letter from Mr. Reffett to Mr.

14       Reising.

15                   Here it says, "In light of the recent

16       discussion on the vision plan for Local 287 UAW

17       retirees, the Union's position stands that retirees

18       are to be included with active members negotiated

19       September 7th, 1989 agreement, the 97 cents paid in

20       COLA freeze was to offset this cost."

21                   Do you see that?

22  A    Yes.

23  Q    And my question for you is:  Is this an instance in

24       which benefits that would have been payable to the

25       active employees were used to obtain benefits for

Capital Reporting Company
Ailes, Michael 12-16-2011

138

1      current retirees?

2  A   I don't know that.

3  Q   Okay.  Let's look at the other document from Ms.

4      Hess.  This is Ailes Exhibit 23.  And in the first

5      paragraph it says, "In 1989 our members went on a

6      lengthy strike over the issue of health care for

7      themselves and retirees."

8              And then stop right there.  You were at

9      BorgWarner during that strike; is that correct?

10 A   That's correct.

11 Q   That was -- that strike went on for about 52 days;

12     is that right?

13 A   Something like that, yeah.

14 Q   It was -- is this correct, that it was primarily

15     about the issue of health care for actives and

16     retirees?

17 A   I believe so.  I mean, I wasn't actively involved in

18     those talks.  You know, so I only got what they

19     was -- but that's my understanding.

20 Q   Okay.  And in the next sentence says, "The strike

21     was settled with the agreement to divert 97 cents

22     COLA towards the cost of retiree health care."

23             Do you see that?

24 A   I see it, yes.

25 Q   And does that trigger any recollection about --

139

```
 1       about diversion of benefits that would have

 2       otherwise gone to the actives to fund retiree

 3       benefits?

 4   A   I remember the 97-cent diversion, but I don't know

 5       if it was limited to just retiree health care.  I

 6       mean, I don't know that.  Always my understanding it

 7       was to offset health care.

 8   Q   Okay.  But the 97 cent diversion was coming from the

 9       actives in the event, right?

10   A   That's correct.

11   Q   Because the retirees weren't subject to that --

12   A   Well, they weren't working in the plant.

13   Q   Right.  Right.  Now, are you aware of any other

14       instances in which -- with regard to the BorgWarner

15       plan, benefits such as COLA increases or -- or

16       training funds or other benefits that would have

17       gone to actives were used in the negotiations to

18       obtain enhanced benefits for retirees?

19   A   Only one I really recall is the -- we would divert

20       some COLA so retirees got a bonus every year.

21   Q   The -- a bunch of the pension?

22   A   No, it was like we would divert one cent or two

23       cent, it would go into this fund, it would

24       accumulate, and then once a year, they would give

25       eligible retirees a bonus check, you know.
```

140

1  Q   Okay.  Not specifically directed to health care

2      though?

3  A   No.  No.

4  Q   Just money that they could spend however they wanted

5      to spend it?

6  A   That's correct.

7  Q   Okay.  Anything else that you can recall about how,

8      through the negotiations benefits from the actives

9      were used in some way to enhance the situation of

10     people who had already retired?

11 A   Not really.  I mean, sometimes they would -- if --

12     just like the PPO, there was some benefits that they

13     could take advantage of.  Not necessarily that the

14     actives had to give anything up for it.  So I mean,

15     right off the top of my head I don't recall it.  The

16     COLA is the biggest one I remember.

17 Q   Do you recall anything going the other way, in which

18     the actives obtained some benefit that was the

19     result of reductions in retiree benefits?

20 A   No, I don't believe -- I don't -- I don't think so.

21     Just thinking back to the different negotiations, I

22     don't think so.  I mean --

23 Q   To your knowledge, does the UAW have a policy

24     that -- that discourages or prevents the enhancement

25     of active benefits to the detriment of the retirees?

141

1       In other words, transferring economics from the

2       retirees to the actives?

3   A   I -- I don't know if it's a policy -- me, personally

4       I've got a problem with that.  I mean --

5   Q   Are you aware of it ever happening?  Not to say that

6       it did, but I'm just asking you if you're aware of

7       any instance in which the UAW has ever enhanced the

8       economic benefits to actives by negotiated

9       reductions for current retirees?

10  A   Not off the top of my head I don't.  I mean -- I

11      don't think so.  I don't recall at this time, I

12      guess, if that happened.

13  Q   But would that be a surprise to you if that had

14      happened?

15  A   I guess it would be.  I mean --

16  Q   Are you aware of other situations in which the UAW

17      has diverted economic benefits from the actives to

18      the retirees, speaking beyond BorgWarner?

19  A   I believe there has been.  I mean, I don't know

20      specifics.  I mean, you're always trying to take

21      care of retirees.  I mean, that's where we're at is

22      because of them -- those folks.

23          MR. MACEY:  Rather than you sit here while

24      I'm thumbing through my documents, I think I'm

25      coming down the stretch, but I've got some -- I know

142

```
 1          I've got some more, but I'm not -- I don't want

 2          to have you sit here while I'm --

 3                  MR. MACEY:  Want to take five or ten?

 4                  MR. BURCHFIELD:  Why don't we take ten.

 5                  (Off the record at 2:42 p.m.)

 6                  (Back on the record at 2:59 p.m.)

 7                  MR. BURCHFIELD:  Okay.  Let me ask the

 8          reporter to mark as Exhibit 24 a document entitled,

 9          "Retirement income program guide booklet dated

10          October 27, 1989."

11                  And the last Exhibit, Ailes Exhibit 25, a

12          document entitled, "General summary of often asked

13          or emphasized items covered with employees upon

14          application for retirement", apparently from 1990.

15                  (Ailes Deposition Exhibit Number 24 was

16                  marked for identification.)

17                  (Ailes Deposition Exhibit Number 25 was

18                  marked for identification.)

19  BY MR. BURCHFIELD:

20  Q    Okay.  Mr. Ailes, do you have in front of you

21       Exhibits 8 and 9?

22  A    8 and 9 --

23  Q    I'm sorry, Exhibits 24 and 25.  Now I'm getting

24       confused.

25  A    Yes.
```

Capital Reporting Company
Ailes, Michael  12-16-2011

143

1   Q      Are these the booklets that you referred to earlier,

2          the pamphlets that you referred to earlier as

3          setting forth a right to vested lifetime retiree

4          health care?

5   A      I'm not sure.  They look -- they seem -- obviously

6          they're copies of some.

7   Q      Let me --

8   A      I'm not saying this big, I don't know without going

9          through it.

10  Q      Let me ask you to look at the page on Exhibit 24

11         with the last four digits 6311.  And you'll see a

12         heading there, "Group insurance at retirement."

13  A      Okay.

14  Q      It says, "Hospital and medical insurance benefits.

15         Your hospital and medical expense coverage will be

16         continued after your retirement pursuant to the

17         health insurance agreement."

18  A      Wait a minute.  I -- am I on the right...

19  Q      You --

20  A      You say 6331?

21  Q      6311.

22  A      Oh, my bad.

23  Q      Sorry.

24  A      Okay.  Now I think I got you.

25  Q      Okay.  It says, "Your hospital and medical expense

144

```
 1        coverage will be continued after your retirement

 2        pursuant to the health insurance agreement between

 3        BorgWarner Automotive Diversified Transmission

 4        Products Corporation Muncie Plant and International

 5        Union, United Automobile, Aerospace and Agricultural

 6        Implement Workers of America."  And it's Local

 7        Number 287, "Entered into on the 27th day of October

 8        1989, the health insurance agreement."

 9             Do you see that?

10  A     Yes.

11  Q     Is that the language that you're recalling?

12  A     No, there's some -- I've seen other language.  Put

13        it that way.  Where it actually talks about -- I've

14        seen that language that says -- I mean, it even

15        covers, I thought, spouses for the rest of their

16        life, I mean...

17  Q     Okay.  So as you sit here today, this Exhibit 24

18        does not strike you as what you're thinking about?

19  A     I don't think so, no.

20  Q     Okay.  Let's look at Exhibit 25.  And the last page

21        of that also has a heading "Health insurance", and

22        it says, "Hospital, medical, surgery, diagnostic and

23        prescription drug will convert to the retiree health

24        plan at age 65, you will be eligible for Medicare.

25        Your health agreement has auto integration with
```

145

1      Medicare.  You will continue to have the group

2      insurance, however, the Medicare payments will be

3      deducted from your normal allowances."  Is that what

4      you're thinking about?

5   A   No, sir, it's not.

6              MR. BURCHFIELD:  Well, just for

7      completeness, let's look at a couple more.  Ailes

8      Exhibit 26 will be -- Ailes Exhibit 26 will be

9      retirement income program guide booklet March 12,

10     1995.

11             (Ailes Deposition Exhibit Number 26 was

12             marked for identification.)

13             MR. BURCHFIELD:  And Ailes Exhibit 27 will

14     be a general summary of often asked or emphasized

15     items covered with employees of one application for

16     retirement apparently from 1995.

17             (Ailes Deposition Exhibit Number 27 was

18             marked for identification.)

19  BY MR. BURCHFIELD:

20  Q   And Mr. Ailes, I'm looking at on Exhibit 26, at the

21     page with the last four digits 9599.

22  A   Okay.

23  Q   And again, I'd just look at the language there,

24     where it says group insurance at retirement, I think

25     that's essentially the same language we looked at

146

```
 1        before, and let me know if -- if that is the

 2        language you're referring to?

 3   A    No, it's not what I remember seeing, so --

 4   Q    Okay.  One more.  Ailes Exhibit 27, and you look at

 5        the last page of that document at the top it says,

 6        "Health insurance" and the second paragraph under

 7        that is language similar to what we've seen before.

 8        Is that the language you're thinking of?

 9   A    That's not what I was thinking of when I talked

10        about the lifetime, so...

11   Q    Okay.  Can you describe for me, as precisely as

12        possible, the document you are thinking of; the

13        document or documents you are thinking of?

14   A    Well, it was a pamphlet form, I mean, it -- if you

15        had this in a pamphlet, but it said in it that they

16        were lifetime benefits.  And then there's another

17        portion, I read language where it talks about for

18        the rest of your life, is I think how the verbiage

19        goes.  It just says for the rest of your life, which

20        to me is lifetime benefit.  So I didn't see it in

21        neither one of these two you give me, so without

22        going through tons and tons of documents, I guess I

23        could look at that, if I ever come across it I'll

24        let somebody know, but that's what I remember

25        reading of it, so that's what I base it on.
```

Capital Reporting Company
Ailes, Michael  12-16-2011

147

1   Q     Okay.

2   A     One of the things I base my belief on.

3   Q     Other than that language, the conversations you had

4         with Mr. Eckelman, and your observation that that's

5         the way things had been handled in the past, is

6         there anything else that you're relying on for your

7         view that --

8   A     Yeah, '92 agreement.  Not just the '92 agreement and

9         the FASB, but the fact that even after we went to a

10        401(h), you know, you're going to have somebody

11        hired after 1993, they're going to work 30, 40

12        years, whatever the case may be, they get X amount

13        of dollars in this fund to pay for health care, but

14        if they live to be 100 years old, guess what?

15        You're going to convert it back over.  I mean, if

16        that ain't for lifetime, I don't know what is, just

17        to be -- I mean, I'm not trying to be smart about

18        it.  Live to be 100, God bless, I hope I'm one of

19        them.  But, you know, that's pretty lifetime to me.

20        So, you know, so it's a combination of those things.

21        That's why I believe that.  I believe that's what

22        was the whole intent in '92.  I'm convinced '92.  I

23        mean, especially '92.  I mean, shit, they had a

24        right deal, we went through a whole lot of exercise,

25        hell, for nothing.  I don't mean to expound.

Capital Reporting Company
Ailes, Michael  12-16-2011

148

1  Q    I want to make sure I understand the 401(h) point

2       that you're making.  As I understand it, there were

3       funds set aside for new employees, people who joined

4       the company after January 1, 1993?

5  A    Correct.

6  Q    Which was a 401(h) plan?

7  A    Which was a big concession for the Union to give up.

8       The reason we did that, for a couple reasons, one we

9       was looking at that FASB, because that's what the

10      company's concern -- we was trying to get the

11      company a little bit of what they wanted on that

12      particular piece, but we was also worried about how

13      much monies, because the conversation went like

14      this:  How much monies does it take for a new hire,

15      somebody that's going to work at least 30 years, or

16      I guess it could be a 60/10 or 85 points, that's a

17      whole nother avenue you get into because they got

18      less time to put money in obviously, but I won't get

19      into all that.  So how much money does it take that

20      once I'm out of there, that I can take premium;

21      because the talk at the time, the company would

22      maintain a group insurance type plan, that I could

23      take premiums out of this account, and it would pay

24      for my health insurance, okay?  But how much is

25      that -- how much is it?  Nobody knows how much money

Capital Reporting Company
Ailes, Michael 12-16-2011

149

1       that was.  So we come up with, well, if I do this,

2       and I live to be 100 years old, guess what, you're

3       going to convert me back into company health care

4       plan.  They're going to pick me up again.  And, you

5       know, you're looking 30, 40 years down the road.  I

6       mean, that -- that was our -- that's why I thought

7       the plant would still be there today.  That's why it

8       bothers me the plant is closed, besides the fact

9       it's my home plant and I know a lot of people who

10      live there and worked there, some of them died since

11      then, took their own lives, but that's another

12      story.  But that's why I believe that.

13              I truly believe, during the course of

14      negotiations over the years, you don't always get

15      what you got -- what you want, but you give and

16      take.  We got a lifetime benefit.  That's how I

17      believe.  I know your job is to try to prove we

18      don't, I understand that, that's your job.  But my

19      job is to take care of the people that entrust me to

20      take care of them, and I'm going to do that to the

21      best of my ability, and we have done that over the

22      years and we give them, so they don't have to worry

23      about it when they retire, and they're out here and

24      they don't have the best of health.

25  Q   Okay.

150

1　A　　And I'm -- I shouldn't have expanded, but I did.

2　Q　　Okay.  I appreciate that.  Let me just make sure

3　　　　that we're -- that we're precise, the record is

4　　　　clear on this 401(h) point.

5　A　　Okay.

6　Q　　The employees of the Muncie Plant who joined before

7　　　　January 1, 1993, remained eligible for health care

8　　　　when they retired?

9　A　　Correct.

10　Q　　-- under the company --

11　A　　Correct.

12　Q　　Employees who joined after January 1, 1993, were

13　　　　eligible for the 401(h) plan, and the money that we

14　　　　put into that plan would pay for their health care

15　　　　up until the time they were 100?

16　A　　Yeah, it was a matching thing.

17　Q　　Okay.  So the 401(h) program was not -- did not

18　　　　affect people who were already at the plant in --

19　A　　Well, it could have.

20　Q　　-- in 1992?

21　A　　It could have, because you could have voluntarily

22　　　　went into that thing.

23　Q　　Did many people do that?

24　A　　I'm not aware of that.  I mean, I don't know that

25　　　　anybody did, because you also got to understand I

Capital Reporting Company
Ailes, Michael 12-16-2011

151

1          don't know how many people they actually hired after

2          that point in time.  They hired a few, not for very

3          long.  You might have had a few, but nobody come to

4          me and say, hey, I joined up on that, because I

5          would have told them you're crazy.

6     Q    Now, the 401(h) arrangement, as I understand it, the

7          funds in the 401(h) account vested with the employee

8          after five years; is that right?

9     A    I believe so.  I think that's correct.

10    Q    And that was explicitly stated in the agreement?

11    A    I believe so.  I believe so, without looking at

12         them.

13    Q    Assuming that an existing employee did not opt into

14         the 401(h) plan --

15    A    Okay.

16    Q    -- did the 401(h) plan have any effect on the

17         existing employees or the current retirees at that

18         point?

19    A    I don't believe so.  I don't think so.  I mean, if I

20         stayed in this program I don't know that it would.

21         I thought -- I mean, it would help the company

22         obviously with the fact -- that was the whole point

23         of it, to secure these benefits for these people and

24         in the future -- I mean, we're not just talking

25         about right now, we're -- I'm talking about 20 years

152

```
 1        from now or 30 years from now, the whole goal in

 2        1992 is in 2050 if we're building electric flying

 3        cars, that that plant would be there producing some

 4        kind of, whether it be a transmission or trans -- or

 5        something that would make that thing fly, that was

 6        our whole goal.  And we knew by taking that FASB

 7        off, that that was a biggie.  I mean, I can remember

 8        -- you know, I can remember Daffara -- and credits

 9        to you -- credit the to bargaining committee for

10        getting that done, saying, nope, there's no more

11        argument.  There's no argument.

12   Q    Okay.  Was there any other aspect of the 1992

13        negotiations that you thought enhanced the UAW's

14        position that the retirees, the pre-1993 employees

15        who retired have lifetime vested health care?

16   A    I guess not off the top of my head.  I can only say

17        that that was our goal.  I mean, we went into that

18        knowing we had a group back here that was already

19        taken care of, and we had to take care of X amount

20        of people that was remaining in that plant, and then

21        also at the same time try to reduce that, because we

22        wanted the plant to stay open.  I mean, you'd be

23        crazy not to.  That's what we thought we was

24        achieving all that.  We thought, as Daffara,

25        win/win.  We want a win/win situation.  We thought
```

Capital Reporting Company
Ailes, Michael  12-16-2011

153

1      we created a win/win situation by taking care of

2      past retirees, because they're gone, we don't have

3      to worry about them.  Now we got this group, they're

4      taken care of, and as people come in that FASB

5      starts coming down, coming down, because that's what

6      the company wanted, they wanted that FASB liability

7      gone.  That's how I see it and that's what I

8      believe, so --

9   Q  Mr. Ailes, have you, in connection with your

10     position since 2000 as a representative of the

11     International Union, have you received any

12     instructions about -- from the International, about

13     how to negotiate retiree health care benefits?

14  A  Have I?  No, I pretty much know how to do that, I

15     thought.  I mean, I don't know per se.  They may

16     send a memo down, I may or may not pay attention to

17     it.  I mean, when I go to negotiation, I've done it

18     enough I feel like I'm going to go ahead -- and I

19     have the autonomy to go in and negotiate that

20     contract.  Now, obviously I'm not going to do

21     anything against any policies they may have, but

22     I -- that's a hard question for me to answer because

23     I don't want you to think I'm being flippant about

24     it, that -- you know, when I go into that thing, I

25     mean, that's what I do.  So depending on the plant,

154

1       depending on who owns it, depending on what kind of

2       manufacturing facility it is or if it's a public

3       facility, I mean -- you know, you got to do it

4       different.  I mean, public sector I got to do

5       different than what I do in private sector.  Hell, I

6       got a sheriff's department I go in and negotiate

7       with them, then I got to go in and negotiate with

8       commissioners.  I mean, it's just different.

9               So I don't know -- outside of looking at it

10      as vested for, you know, retirement as far as -- in

11      my plant I guess more than some of the others,

12      because some of the others are new plants, but I go

13      in with the retirees for vested, get the best

14      benefit I can for the active people and try to

15      secure their future benefits.  I do that in every

16      set of negotiations I go into; some more successful

17      than others, some are already set up prior to me

18      getting there.  You know, I may still try.  I may

19      not be successful, but some plants are just set up

20      before I got there, they're different.  They're not

21      like what plant I come out of.

22              So I just try to do the best for the people

23      that I represent.  That's what I try to do.  I know

24      that's a cliche, but that's really truly what I try

25      to do.

155

```
 1   Q     Is it -- is it your going-in assumption in every

 2         situation that retiree health care benefits are

 3         lifetime vested?

 4   A     Me personally, yes.  If they've got those, okay?

 5         Not every plant has -- I mean, not every plant has

 6         got that.  Depends when they were formed.  Depends

 7         on -- you know, I mean, there's a lot of -- not

 8         every plant has been around since 1937 or before,

 9         like my home plant, BorgWarner, been around before

10         1937, so it varies.  But yeah, when we go out,

11         whatever retirees got, I consider that to be vested.

12         If nothing else, I believe it for the heart, sweat

13         and tears and amount of work that they put in for

14         that company.  That's what I believe.

15   Q     Do you do anything typically, when you're going into

16         a negotiation -- let's put aside BorgWarner for a

17         minute.  When you go into a negotiation for a plant

18         that you haven't previously negotiated for, do you

19         do anything to confirm that assumption, that the

20         retiree health benefits are lifetime vested?

21   A     Well, I get their agreements and I look at them.

22         Then I converse with the Local Union.

23   Q     And what do you look for in the agreements to

24         determine whether the retiree health benefits are

25         lifetime?
```

Capital Reporting Company
Ailes, Michael  12-16-2011

156

```
 1   A    One, do they have them.  Do they have health

 2        benefits.  All right.  I look at language.  I look

 3        at how it's set up, I guess -- I'm not answering you

 4        to what you want to hear I don't guess, but I go

 5        into it -- they got to convince me it's not vested.

 6        I guess I'll put it that's the best way.  For the

 7        ones that have it, I go in thinking it's vested.

 8        And if somebody proves different, unless there's

 9        language that says we -- absolutely we can tell you

10        tomorrow, I don't know, I'm being (sic) exaggerating

11        about it, but this is how I go into it, right, wrong

12        or indifferent.

13   Q    Can you think of any instances in which people have

14        persuaded you in negotiations you've been involved

15        in, in which you've been persuaded that the retiree

16        health care benefits were not vested?

17   A    No.  To be honest with you, I really haven't had

18        to have that to the level we're at with this, I

19        guess knock on wood, I reckon, to have to have that

20        fight.

21   Q    What sort of businesses -- and obviously BorgWarner

22        is a Tier One auto supplier, what other sorts of

23        businesses do you -- are you involved with

24        negotiating with, in Region 3?

25   A    Man, it's all over the map.  I mean, insulation, gas
```

157

```
 1        lines, injection molding, bumpers, valve -- I

 2        mean -- valve covers, gasoline caps -- not so much

 3        anymore because they -- the newer vehicles don't

 4        have gasoline caps.  A lot of times I'm thinking I'm

 5        forgetting to put it on, because it's not there

 6        anymore.  Just a variety of different things.  The

 7        sheriff's department, the jail.  If you're ever in

 8        Delaware County and you get thrown in jail, give me

 9        a call, I can help you out there.

10   Q    I'll keep that in mind.

11   A    Used to know people --

12   Q    Can you do anything for me in Fairfax, Virginia?

13   A    I can't get you there, but if you're in Delaware

14        County, you run into a problem, if we can't get you

15        out, we'll make your stay a real pleasure.

16   Q    I thought I was real close the other day.  The -- do

17        you -- do you negotiate with any other Tier One auto

18        parts suppliers?

19   A    Oh, I'm sure I do.  It's been awhile.  I mean, it's

20        not my primary thing now, so -- maybe -- maybe AMCO

21        Steel, maybe.  I don't know.  BorgWarner was my

22        biggest one, so I mean -- off the top of my head, I

23        can't think of who it would be.

24   Q    And just to reiterate, I apologize if I'm repeating

25        myself, but can you think of any instance -- you say
```

158

1          you go into negotiations five or six times a year

2          personally, if I recall correctly?

3    A     Yeah.

4    Q     You've been doing this now for 11, 12 years?

5    A     Yeah.

6    Q     So that's 50 or 60 negotiations you've been involved

7          in.  That's a lot.  Can you -- can you think of any

8          instance in which you have gone in and seen

9          something that convinced you that the retiree health

10         benefits were not lifetime vested?

11   A     I can't say that I have or I can't recall it, just

12         to be honest with you.

13   Q     As you sit here today, can you think of something

14         that you could see that would persuade you that the

15         benefits are not lifetime vested?

16   A     That's hard to answer.  I mean, if I saw it, I'd try

17         to change it.  I would.

18   Q     Are you -- do you, as a matter of policy, seek

19         contractual provisions in the health agreements that

20         would make clear that the benefits are lifetime

21         vested?

22   A     Would I seek that?  Absolutely.  Absolutely.  But it

23         depends on what the language says.  I mean, it may

24         already be there.  I don't know.  It's -- I don'

25         know how to answer that question to be honest with

159

```
 1        you, because, you know, sometimes things are best

 2        left alone until you really have to take it on.

 3        Just like with this here, until this fight.  It's

 4        just the way it was.  That's the way it is.  And now

 5        we got somebody trying to say it's not.

 6                  MR. BURCHFIELD:  I'd ask the reporter to

 7        mark as Exhibit 28 a document dated April 23, 1984.

 8                  (Ailes Deposition Exhibit Number 28 was

 9                  marked for identification.)

10   BY MR. BURCHFIELD:

11   Q    Mr. Ailes, I've handed you a document dated April

12        23, 1984 from a Mr. Owen Bieber to the International

13        Executive Board.  It's been marked as Ailes Exhibit

14        28.  Take a minute and look at that document.  Let

15        me know if you've seen it before.

16   A    (Reviewing.)  I probably -- I mean, I'm assuming I

17        have, I guess.  Looks like might be some kind of

18        administrative letter -- is this an administrative

19        letter, do you know?

20   Q    I'm sorry?

21   A    I'm just trying to -- I mean, I know who it's from,

22        but I just don't know if it's in the form of an

23        administrative letter.

24   Q    Let me ask you to look at the third paragraph on the

25        first page which says, "Many of our labor agreements
```

160

1          contain ambiguous language as to the duration of

2          retiree health and life insurance benefits.  We do

3          not recommend that UAW bargaining representatives

4          attempt to clarify this language.  The potential

5          value of any clarification is not worth the risks if

6          we were unsuccessful and create bad bargaining

7          history which can be used against us at a later day.

8          Any discussion during negotiations may be evidence

9          of the party's intent as to the duration of the

10         retirees benefits."

11                   Do you see that?

12    A    Yes.

13    Q    Do you recall being instructed either orally or in

14         writing by persons at the International Union to

15         avoid efforts to obtain clear language about the

16         vesting of retiree health benefits?

17    A    I don't believe anybody told me that.  I mean, I --

18         like I said, I think I've seen this, but I don't

19         recall anybody saying specifically -- because when I

20         go into bargaining, I go into bargaining.  My word

21         is my word.  I mean, I'm not going to try to

22         bullshit anybody.  I'm going to tell you straight

23         up, if I come after something I'll tell you that.  I

24         hope they do the same to me.  I mean, it is what it

25         is, I guess.  But I don't remember anybody -- if

161

1        you're asking me did somebody specifically give me

2        instructions to do that, the answer's no.

3    Q   Okay.  Is it your intention, in collective

4        bargaining negotiations, when you're involved in

5        them, to try to increase the benefits available to

6        -- the health benefits available to retirees, if you

7        can?

8    A   Well, I guess that'd be the goal, but not always is

9        that possible.  I mean, if you can enhance

10       something, obviously you'd be crazy not to do if

11       it's not to the detriment of anybody.  But at the

12       same time I understand that -- I still keep going

13       back to -- and you'll get tired of hearing it -- at

14       least they should understand, when they go out, they

15       went out with -- I mean, somebody always wants

16       improvements; doesn't necessarily mean you can get

17       them, doesn't necessarily mean the company wants to

18       give them.  As a matter of fact, 2000 when it was

19       even brought up, everyone said, you know, if we're

20       going to talk about retirees, there's stuff we want

21       to talk about too.  And everybody decided, nope.

22       So, I mean, sometimes they get enhanced benefits by

23       what you do active, you know, whether or not it's

24       somebody opened up a clinic that wasn't there, you

25       know, and if they say come over, come over.  Excuse

162

1       me, I'm getting --

2   Q   Do you believe there is -- there is any conflict

3       between the interest of active employees and

4       retirees in the context of collective bargaining

5       negotiations; in other words, do you believe that by

6       helping one, you are going to disadvantage the

7       other?

8   A   No, I don't.

9   Q   Do you -- how -- what is -- what is the -- what is

10      the approach -- what is your approach in collective

11      bargaining negotiations with regard to retiree

12      health care, in terms of taking into account new

13      government programs like Medicare Part D?

14  A   I guess it varies from contract to contract.  I

15      guess I don't -- I guess I don't know how to answer

16      that question.

17  Q   Let me ask you it a slightly different way.

18      Medicare Part D, the prescription drug benefit,

19      became effective January 1, 2006, sound right?

20  A   Yeah, somewhere -- yeah, somewhere.

21  Q   And the -- many of the existing retirees at

22      BorgWarner, for example, if not all of them, use

23      prescription drugs on occasion?

24  A   (Gesturing.)

25  Q   Is it the UAW's position that the -- that the

163

1        retirees should take full advantage of Medicare Part

2        D?

3   A    To be honest, I don't know if I can answer that.  I

4        don't know if it's a position.  I just don't know if

5        it's a position.  I'll put it that way, I guess.

6   Q    In the agreements that you're familiar with

7        regarding retiree health coverage, does -- do -- do

8        any of them explicitly require retirees to take

9        advantage of Medicare Part D prior to seeking

10       coverage under the employer plan?

11  A    I'm sure they're out there.  I mean, but I've seen

12       it the opposite too where because the company got an

13       advantage by the employee not going that route, they

14       actually wanted them to go the other way and to go

15       to K -- or go through that plan I should say, not

16       the company, because they're not a pharmacy of

17       course.

18  Q    How would it be an advantage to the company if

19       they --

20  A    Because they got some kind of X amount of dollars,

21       and I can't -- you can't hold me to it.  I just

22       remember the talk at one time, and I think it was

23       BorgWarner.  BorgWarner was getting X amount of

24       dollars for if the retirees went under this plan,

25       under the prescription.

164

1    Q      Some sort of tax advantage?

2    A      It might have been it.  It didn't disadvantage, so

3           we weren't -- it's one, if it didn't disadvantage

4           them.  We weren't ever out to hurt the company.  So,

5           I mean, if you could help them and still not take

6           anything away from the people you're negotiating

7           for, there's nothing wrong with that.  If it makes

8           them stronger, great.  Now obviously I can get into

9           personal opinion, what I think about trying to make

10          a company stronger, sometimes I don't think it

11          matters.  But obviously that's your goal, you know.

12   Q      Do you recall if the BorgWarner plan required

13          retirees to take advantage of Medicare Part D before

14          seeking benefits under the -- under the BorgWarner

15          plan?

16   A      I don't know.  Off the top of my head, I want to say

17          it does, but I couldn't swear to it without going

18          through the documents.

19   Q      In your negotiations on behalf of UAW members, have

20          there been instances in which -- in which you have

21          agreed to -- that the -- that retirees can pay

22          premiums for their health care in some amount?

23                 MR. MACEY:  Is the question limited to

24          BorgWarner or are you talking generally?

25                 MR. BURCHFIELD:  More generally.

165

```
 1                    THE WITNESS:  Not me.  I mean, not that I
 2          can recall.
 3   BY MR. BURCHFIELD:
 4   Q    Now obviously this -- obviously you prefer to have
 5          -- presumably you prefer the employers to agree to
 6          fully pay health care for the retirees.  But have
 7          there been, in recent times, situations in which
 8          collective bargaining has led the UAW to accept the
 9          payment of pre-minimums by retirees for their health
10          care?
11   A    I guess the only one I can recall would be
12          BorgWarner in 2005 for future people.
13   Q    And you're not aware of any other group of retirees
14          that you've negotiated for that pays premiums?
15   A    Not off the top of my head I'm not.  I mean, I'm not
16          saying it's not out there, but I -- it's just not --
17          it's not coming into my head right now.
18   Q    How about co-pays, in the BorgWarner program, if
19          you're in the PPO there's a co-pay of --
20   A    Not until -- that didn't start until 2005.
21   Q    But at the present time, there -- well, at -- in
22          2005, there was a co-pay of what, ten percent for
23          the PPO?
24   A    I don't recall what that was, to be honest with
25          you.
```

166

1  Q    Whatever it was.

2  A    Whatever it was.

3  Q    And then out of network there was somewhat larger

4       percentage co-pay for medical care, do you recall

5       that?

6  A    When you're talking co-pay, you're talking -- if

7       you're talking deductibles and stop losses versus

8       premium co-pay.  I'm just trying to make sure I

9       understand the terminology.

10 Q    Yeah, I apologize.  I moved away from the issue of

11      premium.  Now I'm talking about co-pays and

12      deductibles.  You are aware that there were

13      co-pays and deductibles in the BorgWarner program?

14 A    Yes.  Like the 80/20, yeah, I understand that.

15 Q    Is that typical in current retiree health care, that

16      you -- in negotiations that you participate in?

17 A    Probably the same, probably is.

18 Q    What about -- what's the range of co-pays,

19      percentage of co-pays that you've seen in your

20      negotiations that UAW has agreed to?

21 A    I really don't have a good feel for that.  I mean,

22      it's probably all over the map depending on, once

23      again, the company, what they're manufacturing,

24      where they're located.  I mean, there's just a lot

25      of things involved in that.  So I mean, I don't want

167

1       to say I think it's between 70 or 60 or you know --

2       I just don't know.  I really don't know.

3   Q   As you sit here today, can you remember what's the

4       lowest employer percentage that you can think of; is

5       it 60?

6   A   Employer percentage or employee?

7   Q   Employer percentage.  60 for the employer, would be

8       40 percent for the retiree.

9   A   The lowest?  Probably out of network, 70.  I had a

10      lot of hundred percent.  I mean -- 100 percent

11      employer pay is what I mean.

12  Q   Yeah, what about -- what about deductibles, what is

13      the largest deductible for prescription drugs that

14      you recall at the present time?

15              MR. RADTKE:  Are you asking for retirees or

16      active?

17              MR. BURCHFIELD:  For retirees.

18              THE WITNESS:  I don't know.  Maybe $15.

19  BY MR. BURCHFIELD:

20  Q   Is that for generic or is that for branded?

21  A   Maybe 15 for brand and ten -- five for generic.  I

22      mean, it just depends on the plan.

23  Q   In your experience, has that been going up over the

24      years?

25  A   Maybe slightly.

168

1  Q    Is it -- is -- do -- are you familiar with -- with

2       health plans that require retirees to obtain their

3       prescriptions by mail?

4  A    Yes.

5  Q    Is that becoming more common?

6  A    Yes and no.  I mean, it was and then it didn't.  I

7       mean, some companies even though they got it, they

8       drop it, because there's not an advantage sometimes.

9  Q    Is the -- is the UAW willing in some circumstances

10       to accept a requirement for mail order

11       prescriptions?

12  A    Oh, I'm sure there are.  Depends on the

13       circumstances, again, I mean...

14  Q    Have you run into situations in which the UAW has

15       agreed to dollar caps on the employee -- employer

16       contributions to retiree health care?

17  A    I don't recall, I mean, off the top of my head.  I

18       want to clarify the question you had before.  If

19       it's an advantage for a retiree to get a 90-day

20       supply with a less amount of money out of pocket,

21       you're going to look at it.  I mean, you got to look

22       at it, if they're not disadvantaged.

23            See, a lot of the questions you're asking

24       me, you got to look at is it going to disadvantage

25       the person, whether it be active or is it going to

Capital Reporting Company
Ailes, Michael  12-16-2011

169

1          disadvantage the retiree.  I mean, that's what you

2          look at.  And if it doesn't, sometimes you can kill

3          two birds with one stone, I guess.

4    Q    Well, do you -- are you aware of situations in which

5          the UAW has agreed to prescription by mail programs

6          that strongly incentivize the retirees to get their

7          prescription by mail?

8    A    Well, I'm sure they're out there, yes.  I'm sure

9          they're out there.  So is the opposite way.

10   Q    Are you familiar with escalator provisions,

11         percentage escalator provisions for deductibles and

12         stop loss?

13   A    Something similar to the '92 agreement?

14   Q    Yeah.

15   A    Once again, I'm sure they're out there, but I'm

16         not -- I couldn't cite one to you right now.  The

17         only one I'm most familiar is obviously BorgWarner,

18         because that's where I came from and was part of

19         that negotiation.

20   Q    Are you aware of any retiree health programs that

21         have annual escalators for the existing retirees?

22   A    Like I said, I couldn't cite you one off the top of

23         my head.  I mean, I'm -- the questions you're asking

24         me, I'm assuming -- there's a wide range of things

25         out there.  So, I mean -- but to say that I

170

1       specifically am aware, I can't answer that to say

2       yes, I can cite this company, they do it. I

3       couldn't do that. But I don't want you to think I'm

4       trying to lie to you and say that they don't exist,

5       because I'm sure somewhere they do. I mean, just

6       like anything.

7  Q   No, I appreciate that. And I -- you know, if you

8       don't know, then -- then that's -- that's a fine

9       answer.

10       So, have you had any involvement in

11      employer proposals to do health savings accounts for

12      retirees?

13  A   I have not. BorgWarner tried it, and I wasn't for

14      that at the time.

15  Q   And just for my edification, do you distinguish

16      between the type of 401(h) plan that was agreed

17      to --

18  A   Yeah, I guess I do because I don't -- I don't --

19  Q   Okay.

20  A   I mean, I guess you could -- see, now we're going to

21      get in semantics, words, I guess. No, I understand

22      the 401(h) clearly. I mean, I guess you could look

23      at it as the health savings account, I guess. I

24      just don't look at that the same way as I do the

25      HSAs. And there's another terminology. I mean, we

Capital Reporting Company
Ailes, Michael  12-16-2011

171

1        can go through the different letters they got for

2        each one.  You know, they got 100 of them, FLEX

3        accounts.

4  Q    I got 100 health care lawyers in my law firm that

5        struggle with these issues every day, so I'm not one

6        of them.  So how do you distinguish between a health

7        savings account and a 401(h) account, just so we're

8        talking on the same plane?

9  A    Well, some of it is paper money.  With the 401(h)

10       you got definite amounts of money going into an

11       account, all right?  And they can be used for a

12       premium.  Some of these -- my understanding is the

13       other ones, like the HSAs, it's not really money is

14       going into an account, there's an allotment they

15       say.  And if you've got, let's say, a procedure

16       that's done, they write a check for that amount of

17       money, it's not like you have money in an account

18       that you can take with you upon leaving.  A 401(h)

19       you can.  401(h), like a 401(k), if I decide I work

20       ten years or five years or six years under 401(h), I

21       can leave, the money is portable, where I don't

22       believe that's that way with SH (sic) -- I'm not an

23       expert on those kind of accounts, I'll just be real

24       honest, what I've heard of them, they're shit.  But

25       that's just my opinion.

172

1   Q     And what -- and have you been in -- other than

2         BorgWarner, have you been in situations where the

3         UAW has entered agreements that gave retirees 401(h)

4         accounts?

5   A     I have not.

6   Q     Do you know of other situations in which UAW

7         negotiators have agreed to that?

8   A     Not a 401(h), I mean, not that I recall.  I mean, I

9         just don't.

10              MR. BURCHFIELD:  Okay.  Let me make -- let

11        me ask the reporter to mark as our next Exhibit,

12        which is Number 29, a document entitled, "2002

13        national retiree and active health care agreement

14        between the UAW and Barnes Group."

15              (Ailes Deposition Exhibit Number 29 was

16              marked for identification.)

17  BY MR. BURCHFIELD:

18  Q     Mr. Ailes, have you ever been involved in collective

19        bargaining negotiations with the Barnes Group?

20  A     No, sir.

21  Q     Let me ask you to look at page 6 of this agreement.

22        And I'm looking at paragraph 5.2 which says, "With

23        respect to any individual who the UAW represents or

24        represented for purposes of collective bargaining

25        and who retired or becomes retired from employment

173

1       by Barnes at Barnes' Associated Spring Plants in

2       Bristol, Connecticut; Corry, Pennsylvania; Dayton,

3       Ohio; or Saline, Michigan after January 1, 1985,

4       Barnes may not unilaterally make any material change

5       in retiree health care benefits or to the cost

6       thereof after such individual retires.  This

7       paragraph 5.2 shall survive the expiration of this

8       agreement and can only be modified by the mutual

9       agreement of Barnes and the UAW."

10              Do you see that?

11  A   Yes.

12  Q   Did the UAW propose language of that -- of

13      substantively the similar language to BorgWarner

14      during any of the negotiations you participated in?

15  A   I can't -- I don't know.  I mean, I can't say

16      absolute.

17  Q   At least as you sit here now, you don't recall

18      any?

19  A   No, I mean, didn't have to.  We already had it.

20  Q   And you testified before about where you believe

21      that language existed.  Is there anything you want

22      to add to that prior testimony right now?

23  A   I guess not right now.

24  Q   Okay.

25  A   I may think of something.

174

1    Q      Okay.  If you do, let me know.

2    A      I will do that.

3               MR. BURCHFIELD:  Okay.  Let's take five

4           minutes and I may be able to wrap up pretty quickly

5           thereafter.

6                    (Off the record at 3:56 p.m.)

7                    (Back on the record at 4:08 p.m.)

8    BY MR. BURCHFIELD:

9    Q      Okay.  Mr. Ailes, I think we're just about done.

10              The pamphlet that you required -- let me

11          ask it this way:  Does the UAW ever publish

12          pamphlets for retirees to discuss their pensions and

13          welfare benefits?

14   A      I don't know.

15   Q      Is there -- is there any possibility that the

16          document you're recalling, the pamphlet you're

17          recalling that talks about continued retiree health

18          care coverage, would have been a document that was

19          submitted to retirees by the UAW?

20   A      Absolutely not.  It was a company document.  I

21          remember it was a company document.

22   Q      Okay.  In the -- you were -- you were at the Muncie

23          Plant during 1989 when the employees went out on

24          strike, right?

25   A      That's correct.

175

1  Q    Did you -- do you have any knowledge about who paid

2       for the health care benefits of the then existing

3       retirees during that strike?

4  A    No, I don't.  I really don't know that.  I don't

5       know the answer to that.

6              MR. BURCHFIELD:  Okay.  That's -- that's

7       all I have, subject to discussion we had earlier

8       about --

9              MR. MACEY:  Number nine, a witness for

10      number nine.  Okay.

11             MR. RADTKE:  Thank you.

12             (Whereupon, at 4:10 p.m., the

13             deposition of MICHAEL AILES

14             was concluded.)

15                    *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

Capital Reporting Company
Ailes, Michael 12-16-2011

176

1              CERTIFICATE OF NOTARY PUBLIC

2          I, QUENTINA ROCHELLE SNOWDEN, the officer before

3    whom the foregoing deposition was taken, do hereby certify

4    that the witness whose testimony appears in the foregoing

5    deposition was duly sworn by me; that the testimony of

6    said witness was taken by me in stenotype and thereafter

7    reduced to typewriting under my direction; that said

8    deposition is a true record of the testimony given by said

9    witness; that I am neither counsel for, related to, nor

10   employed by any of the parties to the action in which this

11   deposition was taken; and, further, that I am not a

12   relative or employee of any counsel or attorney employed

13   by the parties hereto, nor financially or otherwise

14   interested in the outcome of this action.

15

16

17

18                    _Quentina R. Snowden_
                      QUENTINA ROCHELLE SNOWDEN, CSR
19                    Notary Public for
                      Genesee County, Michigan
20

21   My commission expires: January 4, 2012

22   CSR No.:  5519

23

24

25

177

1  Capital Reporting Company
   1821 Jefferson Place, NW
2  Washington, DC 20036
   (202) 857-3376
3

4              E R R A T A   S H E E T

5  Case Name:  WILLARD L. SLOAN, ET AL V
               BORGWARNER, INC., ET AL
6
   Witness Name:  MICHAEL AILES
7
   Deposition Date:  DECEMBER 16, 2011
8

9  Page No.   Line No.        Change/Reason for Change

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   _____        _____
25   Date                       Signature

Capital Reporting Company
Ailes, Michael  12-16-2011

178

1   A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3       I, MICHAEL AILES, do hereby acknowledge I

4   have read and examined the foregoing pages of

5   testimony, and the same is a true, correct and

6   complete transcription of the testimony given by me,

7   and any changes or corrections, if any, appear

8   in the attached errata sheet signed by me.

9

10

11

12

13

14

15

16

17

18

19

20   _____        _____

21   Date                    MICHAEL AILES

22

23

24

25

Capital Reporting Company
Ailes, Michael 12-16-2011

179

```
 1   MACEY, SWANSON AND ALLMAN
     Barry A. Macey, Esquire
 2   445 N. Pennsylvania Street
     Suite 401
 3   Indianapolis, Indiana 46204

 4   IN RE:  WILLARD L. SLOAN, ET AL V BORGWARNER, INC., ET AL

 5   Dear Mr. Macey:

 6        Enclosed please find your copy of the

 7   deposition of MICHAEL AILES, along with the

 8   errata sheet and original signature page.  As

 9   agreed, you will be responsible for contacting

10   the witness regarding signature.

11        Within 28 days of November 29, 2011, please

12   forward errata sheet and original signed signature

13   page to counsel for Plaintiff, Barry A. Macey.

14        If you have any questions, please do not

15   hesitate to call.  Thank you.

16

17   Yours,

18   Quentina R. Snowden

19   Quentina R. Snowden, CSR

20   CSR No. 5519

21   Reporter/Notary

22   cc:  Bobby R. Burchfield, Esq. and David R. Radtke, Esq.

23

24

25
```