BorgWarner's Appendix of Summary Judgment Exhibits


Exhibit 22


2 Deposition of International Union, United Automotive, Aerospace & Agricultural Implement Workers of America (Feb. 1, 2012) (Richard Isaacson)

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - x
                         :

**ORIGINAL**

WILLARD L. SLOAN, EUGENE    :  Case
J. WINNINGHAM, and          :  2:09-cv-10918-PDB-MKM
JAMES L. KELLEY,           :
                         :
          Plaintiffs,   :  U.S. District Judge
                         :  Paul D. Borman
    v.                   :
                         :  U.S. Mag. Judge
BORGWARNER, INC., BORGWARNER :  Mona K. Majzoub
DIVERSIFIED TRANSMISSION    :
PRODUCTS INC., and BORGWARNER :
FLEXIBLE BENEFITS PLANS,     :
                         :
          Defendants.   :
- - - - - - - - - - - - - - - x

Detroit, Michigan

Wednesday, February 1, 2012

Deposition of

      RICHARD ISAACSON, VOLUME II

a witness of lawful age, taken on behalf of the

Defendant in the above-entitled action, before Gail R.

McLeod, RPR, CSR 2901, at 8000 East Jefferson Avenue,

commencing at 12:50 p.m.

      Diversified Reporting Services, Inc.
             (202) 467-9200

APPEARANCES:


Appearing on behalf of the Plaintiffs:

     DAVID R. RADTKE, ESQ.
     Klimist, McKnight, Sale, McClow & Canzano, P.C.
     400 Galleria Officentre, Suite 117
     Southfield, Michigan  48034
     (248) 354-9650
     dradtke@kmsmc.com


Appearing on behalf of the Defendants:

     JOSHUA D. ROGACZEWSKI, ESQ.
     McDermott, Will & Emery, L.L.P.
     600 Thirteenth Street, N.W.
     Washington, D.C.  20005-3096
     jrogaczewski@mwe.com


Appearing on behalf of the Witness:

     BARRY A. MACEY, ESQ.
     Macey, Swanson and Allman
     445 N. Pennsylvania Street, Suite 401
     Indianapolis, Indiana  46204
     (317) 637-2345
     bmacey@maceylaw.com

Page 3

30    Health Care Resolution                      17

31    E-mail from Linda Ewing                      23

32    National Health Care Resolution             25

33    Benefits Overview                            28

34    Power Point Presentation                     32

35    Health Care Document                         37

36    January 2006 Report                          61

37    March 16, 2004 Report                        66

38    February 2005 Report                         69

39    GM Benchmarked to Toyota                     91

40    Post-Retirement Benefits                     92

41    A Comparison of Benefits, Draft              94
         (Exhibits attached to transcript)

Page 4

1                    P R O C E E D I N G S

2            Whereupon,

3                        RICHARD ISAACSON

4            having first been duly sworn, was examined and

5    testified as follows:

6                            EXAMINATION

7            BY MR. ROGACZEWSKI:

8        Q    **Good afternoon.  How are you today?**

9        A    Fine.  Thank you.

10       Q    **Can you state and spell your name for the**

11   **record?**

12       A    My name is Richard Allen, A-L-L-E-N, Isaacson,

13   I-S-A-A-C-S-O-N.

14       Q    **Are you feeling well this afternoon, Mr.**

15   **Isaacson?**

16       A    Yeah.

17       Q    **Have you taken any prescription medication in**

18   **the last 24 hours?**

19       A    No.

20       Q    **Have you taken any non-prescription medication**

21   **in the last 24 hours?**

22       A    Yes.

Page 5

1      Q      Would that medication affect your memory?

2      A      No.

3      Q      Would taking that medication affect your

4    ability to provide testimony today on behalf of the

5    UAW?

6      A      I don't believe so.

7             MR. ROGACZEWSKI:  This is a previously marked

8    exhibit from the first part of the deposition.

9             BY MR. ROGACZEWSKI:

10     Q      Mr. Isaacson, I'm showing you what was marked

11   in the first part of the deposition of the UAW as

12   Exhibit 2 which is a subpoena to testify in a

13   deposition in a civil action.  Are you familiar with

14   this document?

15     A      Yes.

16     Q      How are you familiar with this document?

17     A      I was shown it by Counsel.

18     Q      What is this document?

19     A      My understanding, it's a subpoena.  That's the

20   reason I'm here today.

21     Q      Did the UAW ask you to testify today on its

22   behalf?

Page 6

1      A    Yes.

2      **Q    Did the UAW ask you to testify about specific**

3   **topics?**

4      A    They told me that I was going to be asked some

5   questions about retiree health care and they told me it

6   had something to do with BorgWarner.

7      **Q    Do you recall specifically what topic about**

8   **which the UAW asked you to testify?**

9      A    No.

10     **Q    Exhibit 2 has an attachment with a numbered**

11  **list, the last page of the exhibit.  The 9th item of**

12  **the list reads, "The level of post-retirement health**

13  **benefits demanded currently by the UAW in collective**

14  **bargaining negotiations."  Did the UAW ask you to**

15  **testify about this topic?**

16     A    Yes.

17     **Q    Did the UAW ask you to testify about any other**

18  **topic on the list?**

19     A    No.

20     **Q    What is the basis for your knowledge about**

21  **topic nine?**

22     A    I'm an international representative for the

1  UAW which as part of my responsibility is negotiating

2  labor agreements.

3      **Q     For what region are you an international**

4  **representative?**

5      A    I'm an international rep for the international

6  union.  I don't belong to any specific region.

7      **Q     I need you to help me understand that.  As an**

8  **international representative, what areas of the UAW do**

9  **you have responsibility for?**

10     A     IPS, independents and parts supplier sectors.

11  I'm actually an administrative assistant is my actual

12  title, but I'm known as an international

13  representative.  Everybody that works for the

14  international union has the title of international

15  representative.  We just some of us have different

16  subtitles.  Like we have vice presidents.  We have

17  presidents.  We have lawyers -- well, none of these

18  guys, but we have lawyers.  They're called

19  international reps.

20          I happen to be an administrative assistant.  I

21  oversee the national IPS department for the UAW and my

22  boss is the vice president.  She actually is the

Page 8

1    director and I work for her.

2        Q    Who is your boss?

3        A    Vice President Cindy Estrada is my direct

4    supervisor or my vice president.  We really don't like

5    the boss term, but she tells me what to do.  She's my

6    leader.

7        Q    I understand.  Ms. Estrada, is she -- it's my

8    understanding that some vice presidents have

9    responsibility for certain areas of industries or

10   employers that the UAW represent employees at.  Does

11   Ms. Estrada have a particular area for which she's

12   responsible?

13       A    Yes.  She's the director of the national IPS

14   department, as well as the director of the women's

15   department, as well as the director of health care

16   servicing.  She also oversees the state workers, State

17   of Michigan.

18       Q    How long have you been an assistant to Ms.

19   Estrada?

20       A    Since she became vice president in 2010, June

21   of 2010.

22       Q    Were you employed by the UAW before that?

Page 9

1      A     Yes, I was.

2      Q     **What was your position at the UAW before that?**

3      A     I was the administrative assistant over the

4   international IPS department for then Vice President

5   Bob King.

6      Q     **For how long did you assist Mr. King?**

7      A     As his administrative assistant for four

8   years.  The previous years before that, I was his

9   assistant director.  So I worked for Bob for eight

10  years, two different roles.

11     Q     **From 2002 to 2010 when you were working with**

12  **Mr. King, your area of responsibility was the national**

13  **IPS department?**

14     A     Yeah.  I just wasn't the administrative

15  assistant for all eight.

16     Q     **Were you employed by the UAW prior to 2002?**

17     A     Yes, I was.

18     Q     **And what was your job at the UAW prior to**

19  **2002?**

20     A     I was an assistant director in the national

21  IPS department for then Vice President Elizabeth Bunn.

22     Q     **Is that B-O-N-N?**

1       A    B-U-N-N.

2       **Q    How long have you been either an**

3  **administrative assistant or an assistant director to**

4  **the director of the national IPS department?**

5       A    Since -- to the best of my recollection, since

6  probably February of 2000 I think is when I got

7  promoted to AD.

8       **Q    Were you in the national IPS department before**

9  **then?**

10      A    Just for a very short period of time as an

11  international rep.  I came down to Detroit in December

12  of 1999 to Solidarity House.

13      **Q    In your role as either an assistant director**

14  **or as an administrative assistant in the national IPS**

15  **department, what sorts of things would you do to**

16  **educate yourself on the issues of retiree health care**

17  **benefits?**

18      A    Read contracts I guess.

19      **Q    Would you attend any outside seminars?**

20      A    No.

21      **Q    Did the UAW have a practice of offering any**

22  **internal seminars on retiree health care benefits?**

Page 11

1      A    No.

2      Q    Did you subscribe to any magazines or journals

3   that dealt specifically with the issue?

4      A    No.

5      Q    Would you read contracts after they were

6   entered or as part of the negotiation process?

7      A    As part of the negotiation process.

8      Q    So sometimes would you read draft contracts?

9      A    I'm not sure if you would call them draft

10   contracts, but draft language as a result of being in

11   negotiations, yeah.

12      Q    Would you consult on a regular basis with the

13   Social Security department about retiree health care

14   benefits?

15      A    I don't believe so.  I mean I'm not sure what

16   you mean by regular.  Have I had conversations with

17   them before?  Yes.

18      Q    Outside of your personal experience as a

19   long-term international rep for the national IPS

20   department, is there any other basis today for

21   the -- basis for the testimony that you're going to

22   provide today?

Page 12

1       A       I don't believe so.

2       Q       **Outside of your counsel, did you interview**

3       **anyone?**

4       A       Interview anyone pertaining to what?

5       Q       **To the testimony, to get information, to be**

6       **able to testify today?**

7       A       I talked to one of our in-house attorneys.

8       Q       **I'm not interested in your conversations with**

9       **either the UAW's in-house or outside counsel.  I'm just**

10      **trying to understand what the sources of knowledge are**

11      **in addition to your personal experience.**

12      A       I don't believe there is any other than my

13      personal experience.  I've done this job for many

14      years.

15      Q       **I didn't mean to suggest that your experience**

16      **wasn't substantial.**

17      A       I'm not indicating that you did.  I just --

18      Q       **Did you bring your curriculum vitae with you**

19      **today?**

20      A       I don't understand.

21      Q       **Okay.  Did you bring your CV or resume with**

22      **you?**

Page 13

1       A    No.

2       **Q    Okay.**

3       A    What's a CV?

4       **Q    It's a two-letter abbreviation for curriculum**

5    **vitae.**

6       A    No.

7       **Q    Fancy Latin term.  Where did you attend**

8    **secondary school?**

9       A    Secondary school as in college?

10      **Q    High school.**

11      A    High school.  Clawson High School.

12      **Q    That's C-L-A-U --**

13      A    No, C-L-A-W-S-O-N.  That's in Michigan.

14      **Q    In what city is Clawson High School?**

15      A    In Clawson.

16      **Q    When did you complete your education at**

17   **Clawson High School?**

18      A    I graduated in 1975.

19      **Q    Did you attend any other school after Clawson?**

20      A    Yeah.  I've taken some classes at Oakland

21   Community College.

22      **Q    Have you received a degree from Oakland**

Page 14

1   Community College?

2       A    No.

3       Q    In what area or areas were the classes that

4   you took?

5       A    Mostly basic, but some business.

6       Q    Basic?

7       A    Fundamentals, math, English.

8       Q    Not computer programming?

9       A    No.  Actually, I did take one computer

10  programming class, you know, basic, back when they

11  wrote with floppy disks.  This is going back a while.

12      Q    I actually remember the computer language

13  Basic.

14      A    We had to write something about an ice cream

15  place and figured out if they sold 75 sundaes, how much

16  ice cream they used, basic programming.

17      Q    Have you attended any other classes?

18      A    No.

19      Q    Because your testimony is being recorded, it's

20  important that you try not to interrupt or speak over

21  myself, Mr. Macey or Mr. Radtke.  Do you understand

22  that?

Page 15

1        A     Yes.

2        Q     For similar reasons, you have to provide

3    verbal responses.  Nodding your head or shaking your

4    head or saying uh-huh or um-hmm won't register very

5    well with the court reporter.  Do you understand that?

6        A     Yes.

7        Q     If you want a break, let me know, but I ask

8    that you answer any question that is pending before

9    breaking.  Do you understand that?

10       A     Yes.

11       Q     And finally, if you do not understand a

12   question, please let me know and I will do my best to

13   ask the question better if I can do so.  Do you

14   understand that?

15       A     Yes.

16       Q     Mr. Isaacson, does the UAW have any internal

17   policies regarding the negotiation of retiree health

18   care benefits?

19       A     No.

20       Q     Does it have any guidance that it provides to

21   negotiators about retiree health care benefits?

22       A     No.

1      **Q      So would it be correct to say that negotiators**

2  **dealing with employers are guided by their own**

3  **experiences and background in negotiating retiree**

4  **health care benefits?**

5      A      In most cases, but we have different

6  departments that, you know, when things are outside our

7  expertise we might lean on.  Like you mentioned the

8  Social Security department.  If I'm in bargaining and

9  somebody wants to change some provider list, you know,

10  I might go to the Social Security department to give me

11  a disruption report, you know, things that are beyond

12  my expertise that I don't have the ability to get.

13      **Q      Does the Social Security department ever**

14  **provide any, not specific to that negotiation perhaps,**

15  **but any overarching guidance about retiree health care**

16  **benefits?**

17      A      No.

18      **Q      Is there anything else that a union**

19  **negotiating team would have to guide it in negotiating**

20  **retiree health care benefits?**

21      A      No.

22  //

1                              (Exhibit No. 30 was marked for

2                              identification.)

3        **Q     Handing you what's been marked as Exhibit 30,**

4   **which is titled at the top Health Care Resolution 2007**

5   **Skilled Trades Conference, are you familiar with this**

6   **document?**

7        A    No.  Explain to me what you mean by familiar.

8        **Q    Have you seen it before?**

9        A    Not this particular document, no.

10       **Q    Are you suggesting that you've seen --**

11       A    I've seen health care resolutions made for our

12   conferences before.

13       **Q    This references a skilled trades conference?**

14       A    Yes.

15       **Q    How often does the skilled trades conference**

16   **convene?**

17       A    They used to convene every year, but somewhat

18   less than that now.

19       **Q    Skilled trades are recognized as an area**

20   **that's often negotiated separately that has very**

21   **specific rules and things like that.  Are there other**

22   **conferences in which a health care resolution would be**

1    made?

2         A    At our constitutional convention.

3         Q    Is there a similar conference for benefits?

4         A    No.

5         Q    Okay.  On page five of this resolution,

6    there's a list of what the focus in this round of

7    bargaining should be.  Do you have any idea what the

8    round of bargaining would be that's being referred to

9    in the resolution?

10        A    I don't know specifically, but I would assume

11   it was Big Three bargaining possibly.

12        Q    The skilled trades -- have you attended

13   skilled trades conferences before?

14        A    Yes.

15        Q    Do they deal with employers other than the Big

16   Three?

17        A    Yes.

18        Q    Okay.  The items of focus include rejecting

19   employers' attempts to eliminate or reduce retiree

20   health care coverage.  Do you see that?

21        A    Yes.

22        Q    In your experience, what consideration does

1    the economic climate play in achieving that focus?

2        A    I'd say it has a lot to do with it.

3        Q    How so?

4        A    Well, if an employer doesn't have any money,

5    then they might have to talk about future retiree

6    health care.

7        Q    You understand this to be describing

8    elimination or reduction of future retiree health care

9    coverage?

10       A    I don't know that.

11       Q    Your last answer said sometimes you would have

12   to talk about --

13       A    Yeah, because --

14       Q    Right.  Are there situations in which the

15   economic climate could be such that you would discuss

16   current retirees' benefits?

17       A    Yes.

18       Q    What sort of situations would generate, would

19   counsel a negotiator to discuss current retiree health

20   care benefits?

21       A    Bankruptcy.

22       Q    Anything else?

Page 20

1      A    No.

2      **Q    Are there considerations besides economic ones**

3   **that affect the focus of rejecting attempts to**

4   **eliminate or reduce retiree health care coverage?**

5      A    In general?

6      **Q    Yes.**

7      A    I believe so.

8      **Q    What are those?**

9      A    I think contract language.

10     **Q    How does contract language affect a**

11  **negotiator's attempts to reject employers' attempts to**

12  **eliminate or reduce health care coverage?**

13     A    I guess the contract language, if it's -- I

14  guess it comes down to whether it's a vested benefit or

15  not.

16     **Q    And what would you look -- what does a**

17  **negotiator look at to make that assessment?**

18     A    Contract language, pension plans, health care

19  agreements.

20     **Q    The prior contracts?**

21     A    Possibly prior contracts.  I mean mostly the

22  one you're currently dealing with.

Page 21

1    **Q    When you say the one you're dealing with, you**

2    **mean the one immediately prior to the one you're**

3    **negotiating?**

4    A    No.  If you're negotiating your agreement,

5    there's an agreement in effect at that point in time.

6    **Q    I think I understand.  I think we're saying**

7    **the same thing.**

8    A    Okay.

9    **Q    Because the one, when you're negotiating the**

10   **next contract, you're operating under the current**

11   **contract?**

12   A    Yes.

13   **Q    Got it.  One of the other items in the list of**

14   **what the focus should be is providing continued health**

15   **care coverage in the event of full or partial plant**

16   **closings.  Are there situations in which a plant**

17   **closing might not result in continuation of the health**

18   **care benefits?**

19   A    Yeah.  If there's a plant closing and you've

20   terminated the agreement as a result of that plant

21   closing and there's no agreement to do any continuation

22   of health care for the active employees, yeah.

1      Q     So the goal might be to continue it, but there

2   might be factors that cut against the UAW's ability to

3   achieve the goal?

4      A     Yes.

5      Q     The last item of focus that I wanted to ask

6   you about is the second to last one which says updating

7   and expanding coverage to include new and appropriate

8   medical procedures and technologies.   When trying to

9   achieve that focus in bargaining, what role does the

10  cost of those new procedures or technologies play?

11     A     I guess a pretty big role.   I mean when you're

12  negotiating a contract, you're negotiating an entire

13  agreement, so every piece of that has something to do

14  with another piece.   In other words, if you want to

15  improve -- let's say you want to add doctor's office

16  calls.   If that's going to be -- the cost of adding a

17  doctor office call to the health care plan is going to

18  make it so you don't get a wage increase because

19  there's no money left for a wage increase, then you're

20  going to have to make a judgment call based on what the

21  membership's priorities are.

22     Q     So sometimes negotiators have to make choices

1    **about the economic components of the agreement they're**

2    **negotiating?**

3         A    Well, negotiators and memberships.  I mean our

4    contracts are ratified by our members, so they have the

5    ultimate decision.

6              MR. MACEY:  Excuse me, Josh, what number was

7    this document?

8              MR. ROGACZEWSKI:  30.

9              MR. MACEY:  30.

10                        (Exhibit No. 31 was marked for

11                             identification.)

12             BY MR. ROGACZEWSKI:

13        **Q    You're being handed what's been marked as**

14   **Exhibit 31, which is a February 2nd, 2006 E-mail from**

15   **Linda Ewing to Paul Krell and Alan Reuther.  Are you**

16   **familiar with this document?**

17        A    No.

18        **Q    Who is Linda Ewing?**

19        A    Linda Ewing is the director of the UAW

20   research department.

21        **Q    Who's Paul Krell?**

22        A    Paul Krell used to work for the UAW public

Page 24

1    relations department.  I believe he was the director,

2    emphasis on I believe.

3         Q    I understand.  Who is Alan Reuther?

4         A    Alan Reuther was the legislative director for

5    the UAW.  Again, I'm not sure if his actual title was

6    director but --

7         Q    There's a cc listed at the bottom, Chuck

8    Gayney.  Who is Mr. Gayney?

9         A    Chuck Gayney was the director of the UAW

10   Social Security department.

11        Q    The third paragraph of Ms. Ewing's E-mail

12   makes this observation.  "To me, this" -- she's writing

13   about a decision that Nissan has made regarding health

14   care benefits and she observes, "To me, this reinforces

15   the point that legacy costs aren't a matter of union

16   versus nonunion or the lumbering, inefficient," quote,

17   "irrelevant," unquote, "Big Three versus the nimble

18   transplants or any of that crap.  It's about new

19   entrants versus older firms and as the new entrants

20   age, it's becoming an issue for them, too.  Hence the

21   need for a policy response."

22             Do you know when she uses the word entrants,

Page 25

1      to what she's referring?

2          A     No, I don't.

3          Q     Is that a term of art used within the UAW?

4          A     I've never heard it before.

5          Q     Okay.  She mentions the need for a policy

6      response.  Does the term policy response have a

7      particular meaning within the UAW?

8          A     No.

9          Q     You're not aware of any policies regarding

10     retiree health care benefits?

11         A     No.

12                              (Exhibit No. 32 was marked for

13                               identification.)

14         Q     You've been handed what's been marked Exhibit

15     32 which appears to be a resolution at a convention,

16     offered at a convention in 2006 entitled National

17     Health Care.  Are you familiar with this document?

18         A     I'm not familiar with this particular

19     document, no.

20         Q     Do you know what convention this was offered

21     at?

22         A     Well, based on what I'm looking at, I'm

Page 26

1    assuming it was for the 2006 convention.

2         Q    Was it a particular type of convention?

3         A    I'm assuming it was the 2006 constitutional

4    convention, but it's a pure assumption on my part.

5         Q    Was there a constitutional convention in 2006?

6         A    I think there was.

7         Q    Did you attend the constitutional convention

8    in 2006?

9         A    Yes.

10        Q    Do you recall a resolution at that convention

11   on national health care?

12        A    I'm sure there was.  Usually at every

13   convention we do a resolution on national health care,

14   something we believe in in our organization.

15        Q    How would you characterize the organization's

16   beliefs regarding national health care?

17        A    We believe it's important, Walter Reuther,

18   going back that far.

19        Q    When you talk about national health care, to

20   what are you referring?

21        A    Personally, I'm referring to single payer.

22        Q    Is that the UAW's position?

Page 27

1      A    No, I think the UAW's position is that

2    everybody in this country should have health care.  It

3    should be a right, not a privilege.

4      **Q    On page seven, which is the second page of**

5    **this document, the resolution states in the first**

6    **paragraph under retiree health care, "An increasing**

7    **number of employers are reneging on career long**

8    **promises by reducing or eliminating retirees' benefits.**

9    **For example between 1988 and 2004, the number of large**

10   **employers (more than 200 employees) offering retiree**

11   **health care declined from 66 percent to 36 percent."**

12          **How does that trend impact the UAW's**

13   **bargaining for retiree health care benefits?**

14     A    It makes it more difficult.

15     **Q    Why?**

16     A    Because less people are offering it.

17     **Q    Does it impact the UAW's -- does it impact the**

18   **UAW's bargaining regarding, if any, regarding current**

19   **retiree health care benefits?**

20     A    I don't believe so.

21     **Q    Is that statistic dropping from 66 percent to**

22   **36 percent, is that a statistic that was well known**

Page 28

1    within the UAW in that time frame?

2        A    I'm not sure if the statistic was well known.

3    The event was well known.

4        Q    The event, you mean -- do you mean the trend?

5        A    The trend.

6        Q    Of employers, the number of employers wanting

7    to provide retiree health care benefits dropping?

8        A    I think that was known in the UAW.

9        Q    Does that trend persist today?

10       A    Yes.

11                              (Exhibit No. 33 was marked for

12                               identification.)

13       Q    You've been handed what's been marked as

14   Exhibit 33 which is a two-page document entitled

15   Benefits Overview.  Are you familiar with this

16   document?

17       A    No.

18       Q    Does this look like a document created by the

19   UAW?

20       A    Yeah, it looks like it.

21       Q    What makes you say that it looks like a

22   document created by the UAW?

1      A      Well, because one, a benefits overview; I see

2    a name down here, Jim Shake of the Social Security

3    department staff.  He's a UAW guy, works in our Social

4    Security department, so that's why I gave you that

5    answer.  And then again, International UAW on the

6    bottom.

7      **Q      Outside of the Bates number at the bottom,**

8    **what about this document -- is there anything else**

9    **about this document that suggests --**

10     A      No.  The page that says benefits overview

11   because I've seen similar type documents not on

12   benefits, but just on overviews and things of that

13   nature and again, as I said, Jim Shake's name on there.

14   So I'm assuming it's got something to do with us

15   because he's an employee of the international union.

16     **Q      What about the use of the subtitles in the**

17   **left hand column, is that a style employed by the UAW**

18   **or any one of the departments?**

19     A      This here you mean?

20     **Q      Yes.**

21     A      No, I've never seen that.  That's the

22   only -- no, I'm not used to that.

1      Q      This is part of -- appears to be a part of a

2  larger document.  Page seven, the second page -- the

3  page numbered seven, the second page of the document

4  has a series of bullet points with data from the Segal

5  Health Plan Cost Trend Survey.  Do you know what the

6  2000 -- do you know what the Segal Health Plan Cost

7  Trend Survey is?

8      A      No, but I'm assuming it's -- no, I don't.  I'm

9  assuming it's something Segal did.

10     Q      Do you know who Segal is?

11     A      Yes.

12     Q      Who is Segal?

13     A      An actuarial firm.

14     Q      Is Segal an actuarial firm engaged by the UAW?

15     A      I don't know if they're engaged today.  I'm

16  assuming we probably have used them in the past.  We've

17  used several different actuarial firms, outside

18  consultants.

19     Q      Do you recall instances in which the UAW has

20  used the Segal firm?

21     A      Not specifically, no.

22     Q      Each of these bullet points suggests that the

Page 31

1    costs of medical benefits is increasing and it

2    addresses it for overall plan costs, prescription drug

3    costs, the annual cost of providing the coverage, a

4    specific bullet about retirees and health care as a

5    share of GDP.  Was it well understood within the UAW

6    the issue in this time frame, sort of 2009 and to the

7    present, that the costs of health care benefits was

8    increasing significantly enough that it was an issue in

9    bargaining?

10        A    Yeah.

11        Q    How does the increasing cost of health care

12   benefits affect the bargainers and what they demand

13   about retiree health care benefits in negotiations?

14        A    I think it's like any other bargaining topic.

15   You know, when you're bargaining a labor agreement,

16   there's some amount of money the employer is willing to

17   put towards that contract and as a union, we would like

18   that -- call it the pie -- we would like the pie to be

19   as big as possible and our goal is to make sure

20   we -- as a bargainer, your goal is to understand how

21   big that pie is and then of course to split it up

22   according to the wishes of the membership.

Page 32

1                    (Exhibit No. 34 was marked for

2                         identification.)

3          (Short recess.)

4          BY MR. ROGACZEWSKI:

5      Q    You've been handed what's been marked as

6  Exhibit 34 which is a power point presentation entitled

7  The Patient Protection and Affordable Care Act:

8  Education and Resources for International

9  Representatives.  Are you familiar with this document?

10     A    No.

11     Q    Do you recall a presentation by the Social

12  Security department in December of 2010 about PPACA?

13     A    No.

14     Q    As an international representative, were you

15  provided with any resource material about PPACA?

16     A    No.

17     Q    Who is Sara Doyle?

18     A    She is a senior benefit consultant in the UAW

19  Social Security department.

20     Q    She's currently with the UAW?

21     A    Yes.

22     Q    On the fifth slide, which is labeled General

1  **Content -- I should make clear when I use the**

2  **abbreviation PPACA, do you understand to what I'm**

3  **referring?**

4      A    I'm assuming you're referring to the pension

5  or the whatever you just said it was on here, Patient

6  Protection and Affordable Care Act.

7      Q    **Do you know what the Patient Protection and**

8  **Affordable Care Act is?**

9      A    I'm assuming it's health care reform.

10     Q    **It's sometimes referred to as Obama care?**

11     A    Yeah, health care reform.  We don't use that

12 term but --

13     Q    **I just want to make sure we're on the same**

14 **page.  On the slide that's labeled General Content, the**

15 **presentation states suggested bargaining**

16 **tips/strategies.  Do you recall any suggested**

17 **bargaining tips or strategies that the UAW provided in**

18 **light of PPACA?**

19     A    Well, I know there's a lot of discussion about

20 companies have concerns over how PPACA is going to

21 affect their health care plans that they provide for

22 the employees.  So I know there's been discussion and

1   there's some suggested contract language about language

2   you put in, how you will deal with national health care

3   if it affects the current plans.

4        **Q       What do you understand the employers' concerns**

5   **to be?**

6        A       Well, if they start -- let's say the federal

7   government gets smart all of a sudden and starts

8   providing health care to all its citizens like they do

9   in Canada.  I don't think the employers would still

10  want to be on the hook for thousands of dollars of

11  coverage.

12           You know, and I'll give another one that comes

13  to mind is they extended how long people -- it used to

14  be you could only keep your kids insured until age 21

15  and they had to be in school.  So that changed as a

16  result of Obama care.  Now we get them until they're

17  age 26.  So I think employers -- you know, some

18  contracts had to be changed to deal with that because

19  if the language said, you know, under SPD or health

20  care provision said something like you're only going to

21  be insured until 21, again, now it's illegal.  So

22  that's contrary to what the law is, so the contract

Page 35

1    would have to be changed to address those types of

2    things.

3         **Q    Does the UAW have preferred positions on the**

4    **first issue, which I'm going to call coordination for**

5    **lack of a better word, between any national health care**

6    **plan that is devised and the existing employer provided**

7    **plan?  Does the UAW have a preferred position on how**

8    **that coordination occurs?**

9         A    Well, our preferred position is no loss, no

10    gain.

11        **Q    What do you mean by that?**

12        A    We mean that if there's something that's

13    changed as a result of the health care reform, it

14    shouldn't be a windfall for either party as a result of

15    that change.

16        **Q    Do you have an understanding of -- in your**

17    **experience, how have employers negotiated this issue?**

18        A    What issue?

19        **Q    The issue of coordination.**

20        A    They usually propose some type of language

21    that addresses national health care, some generic

22    version or some language that talks about it.

1     Q     Do employers negotiate from a no loss, no gain

2     position?

3     A     Well, you would hope that's where you end up,

4     yeah.  I mean employers do a lot of different things,

5     you know.  I mean they say, "We're not going to offer

6     prescription drugs because there's a part D."  I mean

7     that -- God only knows what employers are going to do.

8     But again, I guess if you're looking at an overall

9     position, no loss, no gain is probably the best way to

10    resolve it we believe.  I mean there's a lot of

11    unknowns.

12    Q     Did the no loss, no gain position predate

13    PPACA?

14    A     I don't believe so.  That's my -- that's not a

15    position of the UAW I don't think.  That's more kind of

16    like our concept.  I mean that's the way we do it or at

17    least I do it when I'm in bargaining.  So does it

18    predate PPACA?  Yeah, it predated in a lot of different

19    areas, but health care was -- this health care reform

20    was the first time that there's been any significant

21    changes in health care law in this country that I know

22    of.  I don't recall any significant changes other than

1    that.

2        Q    You don't recall any specific reference

3    material about the Health Care Reform Act being

4    provided to international reps?

5        A    No.  It's -- the answer is no.

6                         (Exhibit No. 35 was marked for

7                          identification.)

8        Q    You've been handed what's been marked as

9    Exhibit 35 which is a -- it appears to be a draft of

10   some sort.  It's labeled health care at the top.  Are

11   you familiar with this document?

12       A    No, I'm not.

13       Q    Do you happen to recognize the handwriting on

14   the document?

15       A    No, I don't.

16       Q    On page six of the document, in the section

17   titled Legacy Health Care Costs, near the bottom, the

18   beginning of the last paragraph, the document reads,

19   "During the coming year, the UAW will be working with

20   other unions and older manufacturing companies in

21   support of proposals that would provide some relief

22   for," quote, "legacy," unquote, "health care costs."

1          **Do you have an understanding of what legacy**

2    **health care costs are?**

3          A     Yes.

4          **Q     What is your understanding of the term legacy**

5    **health care costs?**

6          A     Retiree health care.

7          **Q     Current retiree health care costs or future**

8    **retiree health care costs?**

9          A     Could be both.

10         **Q     Okay.**

11         A     I mean if it's future, I don't think it's

12   legacy yet.

13         **Q     Is it referring to current?**

14         A     Yeah, current.  Well, again, it's going to be

15   futures as current so -- I mean eventually, everybody

16   is going to retire.

17         **Q     Okay.  In your experience, what kind of**

18   **proposals does the UAW deploy to provide relief for**

19   **legacy health care costs?**

20         A     I'm not sure there's a whole lot of proposals

21   we do in that type of area.  I'm not sure what they're

22   referring to when they say companies in support of

Page 39

1  proposals that would provide relief.  I'm not sure what

2  proposals they're referring to.

3      Q    Frankly, I'm not either.  I'm asking in your

4  experience.  In your experience, have you dealt with,

5  in bargaining, legacy health care costs?

6      A    Yes.

7      Q    And in your experience, has the union made

8  proposals that would provide relief for those costs?

9      A    Yes.

10     Q    What kind of proposals are we talking about?

11     A    We might do -- there might be some caps.  I'm

12  not sure if you're familiar with health care caps,

13  different things, cost containment measures.  I mean

14  there's a lot.  It depends on the environment that

15  you're negotiating in.

16     Q    What about the environment counsels one way or

17  the other?

18     A    I'm not following that question.

19     Q    What factors in the environment are considered

20  in determining how you attack the legacy costs?

21     A    The contract itself.

22     Q    You said the first type of proposal you

Page 40

1    mentioned was health care caps.  Would those be caps on

2    existing retirees?

3         A    I think it varies based on the contract.

4    There's no one size fits all.

5         Q    So these proposals can impact, depending

6    on -- I mean every negotiation is different.  I

7    understand that.  But in some negotiations, dealing

8    with legacy health care costs could involve negotiating

9    something for current retirees?

10        A    Yes.

11        Q    The same for cost containment issues?

12        A    Yes.

13        Q    Are there any other types of proposals that in

14   your experience are used to address legacy retiree

15   health care costs?

16        A    Not right off the top of my head, no.

17        Q    In your experience, are those proposals

18   successful?

19        A    Again, it depends on the contract that you're

20   dealing with at that time.  That really dictates what

21   you can or can't do when it comes to retiree health

22   care.

Page 41

1      Q    And when you say the contract, you mean the

2    one that's still in place while you're negotiating the

3    next one?

4      A    Well, it could be past ones.  It could be the

5    contract the people retired under.  I mean again, one

6    size doesn't fit all when you're talking retiree health

7    care.

8      Q    What other things go into the calculus besides

9    the contract?

10      A    Well, the first question that I look at is is

11    it a vested benefit or not.

12      Q    What if it is?

13      A    Then I don't make changes.

14      Q    What if you conclude that it's not?

15      A    If I conclude that it's not a vested benefit,

16    then you take a look at what the changes are, what the

17    rationale is, does it make sense to do it, you know,

18    all the things that you -- all the things you think

19    about or use to determine like any other contract

20    change, you know, is it in the best interest of the

21    membership, is it in the best interest of the retirees,

22    is it in the best interest of the corporation.  There's

Page 42

1    a whole host of decision making that goes on.

2         Q    And I'm trying to understand that

3    decision-making process.

4         A    Sure.

5         Q    Is there any -- I'll ask that a little later.

6              On the next page of this document, it says in

7    the middle of that paragraph where it says finally, it

8    says finally, and this is --

9         A    Middle of the first paragraph?

10        Q    The paragraph that's continuing from the page

11   before.

12        A    Are we talking about right there, finally?

13        Q    Yes.  "Finally, the UAW supports proposals to

14   provide retiree health legacy cost relief to companies

15   in exchange for commitments to invest in the domestic

16   production of advanced technology vehicles and their

17   key components."  Do you have an understanding of what

18   that sentence means?

19        A    No, I do not.

20        Q    Sometimes in bargaining, if you've concluded

21   that it's not a vested benefit and you have to consider

22   the myriad of factors, do you consider what's best for

Page 43

1    **the retirees separately from what's best for the**

2    **members?**

3            MR. MACEY:  Let me interpose an objection just

4    to keep the record straight.  To the extent that your

5    question is predicated on the assumption that the word

6    proposal in this document relates to bargaining

7    proposal, I'm going to object because I think it's

8    inconsistent with the language of the document.  To the

9    extent you're just asking him about bargaining

10   proposals, I don't have a problem.  So does your

11   question -- is your question predicated on the

12   assumption that this document is using proposals in the

13   sense of bargaining proposals as opposed to legislative

14   proposals?

15           MR. ROGACZEWSKI:  I don't think it presupposes

16   one way or the other.  At this point, I've broadened it

17   sort of away from the document.

18           MR. MACEY:  Away from the document.

19           MR. ROGACZEWSKI:  Because he didn't know what

20   the sentence meant.  So --

21           MR. MACEY:  That's fine.

22           THE WITNESS:  Okay.  Ask me again, please.

Page 44

1          BY MR. ROGACZEWSKI:

2      **Q    In evaluating a bargaining proposal that would**

3   **impact -- that would provide relief for legacy retiree**

4   **health care costs, do you consider separately the**

5   **interests of the retirees and the interests of the**

6   **members or do you consider those interests at the same**

7   **time?**

8      A    And you qualified this and said it wasn't a

9   vested benefit, correct?

10     **Q    Yes.**

11     A    If it's not a vested benefit, I look at the

12  entire group, what it means to the retirees, what it

13  means to the actives and also what it means to the

14  company.  There are multiple parties involved in

15  negotiations.

16     **Q    So in your experience, there are occasions in**

17  **which a bargainer trades gains in one area or for one**

18  **set of constituents for relief in others?**

19     A    I'm not sure it's one set of constituents,

20  because as I said, you would hope everybody would be a

21  retiree at some point in time.  So what affects this

22  group of retirees today could be affecting you tomorrow

Page 45

1   because you're a retiree tomorrow.  So we look at it as

2   a whole and yes, there's always some people, you ask

3   our membership, there's always somebody that doesn't

4   like something about a contract.  We very rarely ratify

5   100 percent.  So I'm sure somebody doesn't agree with

6   something.  But as a bargainer, yeah, I look at the

7   entire package and try to make the best decision

8   possible.

9        Q    And if you're doing that, you only do that

10   when it's not a vested benefit?

11        A    If it's a vested benefit, your ability to make

12   changes and stuff are limited.

13        Q    Do you have an understanding of how it's

14   limited?

15        A    I don't make changes if it's a vested benefit.

16   I just don't.  I just don't do it.

17        Q    Do you have an understanding of what a health

18   retirement account is?

19        A    HRA, yes.

20        Q    What do you understand an HRA to be?

21        A    Well, actually an HRA is a health

22   reimbursement account, but a health retirement account,

Page 46

1    I'm assuming that's when somebody puts money away to

2    provide retiree health care.  That's what I'm assuming

3    it is.

4        **Q    Does the UAW oppose the use of HRAs in company**

5    **health care plans?**

6        A    If we're talking about a health retirement

7    account to provide retiree health care, I don't think

8    we oppose it.  We don't think it's the best vehicle,

9    but if that's the only vehicle.  Like the plan I come

10   from, we didn't have health retirement accounts, but

11   the company paid money as a stipend towards your

12   retiree health care.  Now, we wanted them to pay for

13   retiree health care.  We just weren't successful.  Now,

14   when you say do I support it, well, yeah, I support it

15   because I agreed to it.

16       **Q    I'm asking you as the UAW's designee.**

17       A    So I guess the answer is depending on the

18   situation, would the UAW support it?  As I stated

19   earlier, we would like health care to not be an issue

20   in collective bargaining.  That's the UAW's position.

21       **Q    What about if the HRA is in conjunction with a**

22   **high deductible health care plan?**

Page 47

1      A      Now I think you're talking about a health

2    reimbursement account.  I think those go with the high

3    deductible plans and again, I'm not an expert on the

4    acronyms, but I believe if you have a high deductible

5    plan, you can have employers and employees can put

6    money in that can be used to pay for the deductibles

7    and the co-pays and the co-insurances, yes.

8      **Q      And does the UAW have a position on the use of**

9    **that instrument?**

10     A      We're not in favor of them, but we don't have

11   a staunch written position saying we're totally opposed

12   to them.  Again, it's every bargaining.  We would

13   rather not do it, but with most bargaining, again if

14   that's what the terms and conditions dictate you have

15   to do, then you do it.  We have contracts that have

16   high deductible plans in them.

17     **Q      Does it matter if the high deductible plan is**

18   **one of at least two choices for a participant?**

19     A      Again, it's not a steadfast rule.  I think

20   that would be something you would take a look at, but

21   again, I'm not going to say because the international

22   doesn't come out with an administrative letter or

1    anything like that that says, "Here's the position and

2    if you do something different than this, you're going

3    to be fired."  We don't work that way.  But if there's

4    a high deductible plan and a traditional plan, I would

5    personally as a negotiator be opposed to it because I

6    believe it drives adverse selection.

7        Q    **What do you mean by it driving adverse**

8    **selection?**

9        A    I mean the people that are healthy that don't

10   care about the deductible being $1500 a year will flock

11   to that plan.  They will choose that option because it

12   probably has less of a premium share or maybe it's free

13   and they would stay away from the plan that let's call

14   it a low deductible plan.  And so in other words, the

15   sick folks go into the low deductible plan or the

16   people that need insurance and then the adverse

17   selection is the plan with all the people that need the

18   insurance.  We'll call them sick folks.  Premiums go up

19   exponentially.  Where all the healthy folks are in

20   here, you get a bad risk rate.

21       Q    **In your experience, are there situations in**

22   **which you would recommend the use of a health**

Page 49

1    reimbursement account?

2        A    I would recommend -- there are situations

3    where I would recommend a contract where that was a

4    component of it.

5        **Q    You would never recommend it as the only**

6    **option?**

7        A    I might as the only option.  By a component of

8    it, I mean if I had to put a health reimbursement

9    account in, a high deductible plan in order to get

10   workers a raise, I might do that.

11       **Q    And the factors that you would consider -- is**

12   **the calculus that you would undertake to determine**

13   **whether or not to recommend an HRA in that situation**

14   **similar to what you've mentioned several times today,**

15   **just sort of balancing the overall -- the complicated**

16   **package that is a contract?**

17       A    Yes.

18       **Q    I'm trying to find a simple way to say it.**

19       A    I understand.  You can't look at a

20   negotiation -- you can't focus on any one single piece

21   and I guess you could, but I don't think that's good

22   bargaining.  I believe that if you're doing your job

Page 50

1     right, you're looking at the contract in its entirety.

2     That includes every component of it and you make

3     decisions based on that.

4            A decision you make at one facility might not

5     be the same at another facility.  Unfortunately, in

6     this country the way health care is, you and I can have

7     the exact same health care plan and you're Company A

8     and I'm Company B and your health care rates are a lot

9     more expensive than mine and we're plants on the same

10    street in the same city with the same exact health care

11    plan and based on our employer makeup and the

12    experience, health care could be entirely different

13    from one to the next.  Geographic location comes into

14    play, a lot of different things.

15        **Q    If I use the term RRA or retiree reimbursement**

16    **accounts, do you have an understanding as to what that**

17    **means?**

18        A    No.

19        **Q    Are you aware of health care arrangements in**

20    **which no plan is provided, but participants get an**

21    **account in which money is placed by the employer on a**

22    **monthly basis that can be used for eligible health care**

Page 51

1    **expenses?**

2         A    Are we talking employees?

3         **Q    Retirees.**

4         A    I believe in GM, Ford or Chrysler, new hires

5    have a health care account that the corporation is

6    putting money in I believe it's every hour they work.

7    Do they actually deposit it every hour?  Probably not,

8    but you know what I'm saying.  They put so much money

9    in every hour that's going to be used for health care

10   benefits once the employee retires.

11        **Q    Do you know if in those plans, money is**

12   **continued, is deposited in those accounts after they**

13   **retire?**

14        A    I don't believe so.  I believe it's based on

15   hours worked.

16        **Q    So you're aware of no instances in which an**

17   **account would be set up at the time of retirement for**

18   **example and money placed into it?**

19        A    Personally, no.

20        **Q    With respect to the health retirement**

21   **accounts, using the Big Three example that you**

22   **referenced, how do you as a bargainer evaluate**

1   **proposals on how much is placed per hour in that**

2   **account?**

3       A    Well, since I personally didn't negotiate

4   them, I don't really know, but I can give you an

5   opinion based on being an international representative

6   of how I would do it.

7       **Q    That would be helpful.**

8       A    I would take a look at cost of the benefit,

9   available dollars in the contract and what my other

10  needs were in that set of negotiations, what other

11  needs do I have to try to fulfill and try to balance it

12  out so that as I think I've said several times, it's a

13  pie and you cut it up.  So I can't put all the money

14  into this one pot and say, "Nobody that's working is

15  going to get -- you're not going to get a raise.

16  Sorry."  So you have to take a look at the entire

17  negotiations.

18      **Q    Would you agree with an assertion that as the**

19  **amount of money that's placed in the health retirement**

20  **account goes up, your comfort as a bargainer goes up**

21  **considering that there's no plan for those individuals?**

22      A    My comfort as a bargainer as it relates to

Page 53

1    what?

2       Q    I'm not trying to mischaracterize your

3    testimony, but I think you said earlier that you would

4    prefer if the company paid for a plan rather than put

5    money in an account for you to use for health care

6    benefits.  Am I stating that fairly?

7       A    Yes.

8       Q    Okay.  What I'm suggesting is that as the

9    amount of money that's placed in that account is

10   increased, the concerns you have about not having a

11   plan are mitigated?

12      A    I think that's probably a pretty accurate

13   statement, but on the same token, I think if you put

14   too much money in, you know, going along with your

15   train of thought -- you're saying the more money you

16   put in, the more comfortable I am.  Well, there's some

17   point where if I'm putting money in this account and

18   it's like a pig and a poke to where, you know what I

19   mean, they're not going to need this much money to

20   provide a benefit, then yeah, then actually that's a

21   disservice.  I'm spending money somewhere that I don't

22   need to I guess.

Page 54

1            Again, one size doesn't fit all.  There's a

2    lot of pieces of criteria you have to look at.

3        Q    I understand.  How do you -- if someone were

4    to ask you in a bargaining situation at what point are

5    you putting too much into the health retirement

6    account, I mean how would you evaluate it?  I

7    understand you can't give me a number, but how would

8    you evaluate what that number is?

9        A    One would be the age at which an employee can

10   retire would come into play.  That might be the biggest

11   factor.

12       Q    And why would that be a factor?

13       A    Because as it relates to Medicare.

14       Q    The younger the age of the retiree, the higher

15   that number is that you would want, the higher the

16   useful number in the health retirement account?

17       A    Unfortunately, when there's no plan, you don't

18   know what number you're really talking about.  We'll go

19   back to the example of the HRA or the health

20   reimbursement account, the high deductible plan.  If an

21   employee was healthy and their spouse had good

22   insurance, I don't think you would care.  If everybody

1   in your unit had spouses that worked somewhere else

2   that had good health care, you wouldn't care if that

3   number you were putting in was small.  I mean it

4   wouldn't really matter because they're going to get

5   their health care from their wife.

6            Somebody that's healthy, they might be happy

7   with a high deductible plan.  Somebody that's got a lot

8   of kids and still got, you know, children insured and

9   has health care problems, they would probably want that

10  health reimbursement account to, you know, every nickel

11  you can possibly put in there put in there.  They might

12  be willing to do away with wage increases.  They might

13  be willing to do away with less holidays to have more

14  money in that account.  So I think there's a lot of

15  variables you have to take a look at.  In general, the

16  more money you have in an account of course is going to

17  be better.

18       **Q    Until you reach a point where it's less**

19  **likely --**

20       A    Where it's overkill, then you're talking about

21  just a savings account.  Then you're kind of like

22  throwing money in and might as well put it in a 401K.

Page 56

1    And again I guess the question would be where is that

2    money stored at?  Is it stored in a 401K vehicle?  Is

3    that where the money is being put at?  Then I guess it

4    doesn't really matter how much you put in there.

5              Now, if it's specifically earmarked to

6    reimburse for health care expenses, then you have to

7    take that into consideration.  It's not quite that

8    simple.

9        Q    I want to turn to Part D and prescription

10   drugs.

11       A    Okay.

12       Q    As --

13       A    Drugs, great topic.

14       Q    Is there -- does the UAW have any guiding

15   principles regarding the out-of-pocket costs to

16   retirees for prescription drugs?

17       A    No.

18       Q    So there's no ratio that bargainers look for?

19   I mean for example, wanting to ensure that the costs

20   don't exceed 10 percent of the pension amount or

21   something like that?

22       A    No.

1      **Q      Every negotiation has its own set of factors**

2      **and criteria?**

3      A      Yeah.  There was a time in our organization

4      where we used to do what we would call recommend health

5      care plans.  The UAW would say this is an approved plan

6      years ago.  Those days are no longer.

7      **Q      Does the UAW have a position on the use of**

8      **formularies?**

9      A      No.

10      **Q      I'm sure they're not preferred, but you don't**

11      **have them?**

12      A      I guess -- you know, you keep saying they're

13      not preferred.  I'm not sure that that's the best way

14      to put it.  What is preferred is that health care is no

15      longer an issue for the American public in the UAW's

16      position.  That's what's preferred.  Now, if we have to

17      have a formulary to keep a plan open and put a

18      formulary in for the active employees, even though we

19      don't like it, that happens to be our preference in

20      that set of negotiations.  So when you say preferred,

21      it's hard to say that is -- you know, if we preferred,

22      it's everybody in America has health care and that's

Page 58

1  the way it is.  If we could prefer anything, it would

2  be that.

3      **Q    Does your answer change if it's retirees in**

4  **formularies?**

5      A    Again, I think it depends on how the contract

6  is, you know, the components of the agreement.

7      **Q    If you conclude that a prescription drug**

8  **benefit is vested, how do you as a negotiator deal with**

9  **advances in the prescription drug marketplace?**

10     A    Well, I think everyone has to have to take a

11 look -- you know, when you say it's a vested benefit, I

12 have to look at what's vested about it.  I mean

13 depending on what the issue is, if it's a vested

14 benefit that has a list of drugs spelled out in the CBA

15 and that's what's vested and you've got drugs that are

16 available that aren't on that list, I guess you would

17 have to take that into consideration, but again, with a

18 vested benefit, I usually don't try to change anything.

19     **Q    Up or down?**

20     A    If we can improve the benefit, I'm not going

21 to say I wouldn't do it, but I don't see that happening

22 very often.

Page 59

1      Q     The answer you gave about formularies, will it

2      be the same for dispensed as written provisions?

3      A     I think so.

4      Q     That sometimes you don't reject them out of

5      hand, but --

6      A     I don't reject anything out of hand.  I'm an

7      open-minded person and I listen to it and a lot of

8      times retiree health care has an effect on active

9      employees.

10     Q     How so?

11     A     Well, just cost.  It's cost to the

12     corporation.  So I just don't ignore anything.  I look

13     at things with an open mind and I look at it as an

14     entire picture and weigh the different criteria that's

15     in play in that set of negotiations and make decisions

16     based on that.

17     Q     It's all part of the pie?

18     A     I'm not so sure that the vested benefit is

19     part of the pie, so I don't want you to characterize

20     that --

21     Q     I actually wasn't trying to.

22     A     I don't think that's the case.  But I think

Page 60

1    every set of negotiations is unique in some manner.

2    Not everything is exactly the same.  I mean you could

3    say that every contract has seniority provisions, every

4    contract has, you know, recall rights, every contract

5    has holidays, every contract has health care benefits,

6    but the magnitude of them or the extent of them are

7    different in every set of negotiations.  The

8    well-being, the financial stability of the company is

9    different in every set of negotiations.  I mean there

10   are just so many variables.

11        **Q    Is there anything in the prescription drug**

12   **space that you would never recommend as it pertains to**

13   **retiree health care benefits?**

14        A    I guess I would never recommend eliminating

15   them.  I mean again, unless you say, "Here's the

16   contract, Rick.  Take look at it," then I would have

17   to -- I could recommend a lot of stuff in retiree

18   health care based on what the agreement says.  If it's

19   a vested benefit and it's let the retiree head where

20   they're going and somebody is proposing a reduction in

21   that benefit, no, I would never recommend that.  I

22   wouldn't even address it.

Page 61

1                              (Exhibit No. 36 was marked for

2                              identification.)

3        Q    You have what's been marked as Exhibit 36

4    which is a January 2006 I'm going to call it a report.

5    It's labeled UAW International Executive Board Social

6    Security Department.  That's on the cover page at

7    least.  Are you familiar with this document?

8        A    No, I'm not.

9        Q    From time to time, does the international

10   executive board and the Social Security department put

11   out white papers?  Have you seen documents similar to

12   this in your experience as an international

13   representative?

14       A    I've seen documents similar to this because

15   what it looks like to me is a document that was

16   prepared by the Social Security department for the

17   international union executive board, that they gave a

18   report to the executive board and this is it.

19       Q    Have you seen other reports like that?

20       A    Unfortunately, I've written a few.

21       Q    This document appears to match the format

22   of --

Page 62

1        A     Yeah, because the ones I write would say UAW

2   International Executive Board, Competitive Shop IPS

3   Department.

4        **Q     Now, on the second page of the report, it has**

5   **a heading on it, Employers Attempting to Use Part D As**

6   **a Lever to Change Retiree Health Care Coverage, and I**

7   **apologize if I've already asked this, but does the UAW**

8   **have a position on coordination between Part D benefits**

9   **and employer-provided prescription drug plans?**

10       A     If the employer provides retirees with a

11  prescription drug benefit, that's what we, and it's a

12  vested benefit, that's what we expect them to continue

13  to provide.

14       **Q     What if it's not a vested benefit?**

15       A     If it's not a vested benefit, then I guess the

16  door is open on what you're going to do.

17       **Q     Have you seen -- in your experience, are**

18  **employers coordinating their prescription drug plan**

19  **with Part D?**

20       A     In my experience, they're not coordinating

21  them -- let me back up.  I believe a lot of them are

22  just they're credible plans, so they're applying for

Page 63

1    their federal reimbursement because they're provided a

2    credible benefit.

3        Q    Credible?

4        A    Yeah, I think that's how they determine if

5    it's really -- you really need to ask somebody that

6    knows more about this than I do, but there's level of

7    prescription drug benefits that are provided.  If it's

8    similar to what the Medicare provides, then it's

9    considered credible which means the federal government

10   will help offset that cost to the employer.

11       Q    So to make sure I understand the word you're

12   using, is it creditable or credible?

13       A    Credible.

14       Q    C-R-E-D-I-B-L-E?

15       A    I believe that's the actual term.  And it

16   could be creditable, so don't hold me to it.  Like I

17   said, I'm not an expert, but I know it has to do with

18   the level of benefits as it relates to the Part D

19   benefit the federal government pays for.

20       Q    The report at the bottom says that, "In short,

21   an employer cannot terminate or modify the rights of a

22   retiree/dependent who signs up for Medicare Part D,"

Page 64

1    and with emphasis, "unless the right to do so is

2    contained in our negotiated health plan."  Do you have

3    an understanding as to what that sentence means?

4        A    I'm assuming that it means that just because

5    somebody gets -- signs up for a Medicare Part D benefit

6    and they don't understand what they're signing up for

7    doesn't mean the employer can turn around and say, "Oh,

8    look, Rick Isaacson signed up for this Part D, so he

9    must believe we don't have to provide him prescription

10   drugs no longer."  I assume that's what it means.

11       Q    Do you have an understanding as to how express

12   the health plan must be on this point?

13       A    No.

14       Q    Is it fair to say that if the benefit is not

15   vested, an employer could modify prescription drug

16   rights in the face of Part D if it's not vested?

17       A    If it's not vested, I believe yes.

18       Q    Would it be sufficient if the existing plan

19   requires coordination between itself and Part B?

20       A    I'm sorry?  Come again with that.

21       Q    If the existing plan required coordination

22   between the plan and Medicare Part B --

Page 65

1      A     The existing plan?

2      **Q     The existing health care plan.**

3      A     The existing retiree health care plan.  Okay.

4      **Q     If the existing retiree health care plan**

5  **required coordination with Medicare Part B, would that**

6  **allow the employer to require coordination with Part D?**

7            MR. MACEY:  Objection; calls for a legal

8  conclusion.

9            You can answer.

10           THE WITNESS:  I don't believe it would because

11  one is not the same as the other.

12           BY MR. ROGACZEWSKI:

13     **Q     Would it matter to you when the Medicare Part**

14  **B coordination language was agreed to?**

15     A     I don't think so.

16     **Q     So if it predated Part D, that wouldn't impact**

17  **it from your perspective?**

18     A     I don't believe so.  I think if it was going

19  to impact it, you would be smart to write language that

20  said so.

21     **Q     Is that a general principal you try to adhere**

22  **to?**

Page 66

1      A     I try to leave as much -- try to clear up as

2   many loose ends as possible, yes.  I think that's good

3   bargaining.

4                              (Exhibit No. 37 was marked for

5                               identification.)

6      Q     Before we go to the next document, do you

7   recall if any of the reports you prepared for the

8   international executive board dealt with retiree health

9   care benefits?

10      A     No.  No, thank God.

11      Q     You've been handed Exhibit 37 which is a March

12   16th, 2004 report titled Retired Workers Statewide

13   Coordinating Committee Overview of Medicare

14   Prescription Drug Improvement and Modernization Act of

15   2003.  Are you familiar with this document?

16      A     No, I'm not.

17      Q     Do you know -- do you know what the Retired

18   Workers Statewide Coordinating Committee is?

19      A     No, actually.

20      Q     Have you seen other documents in your

21   experience with the UAW that have this format?  And by

22   format, I mean has a large page number in the upper

Page 67

1   right-hand corner and in fact it doesn't really go

2   consecutively.  You see, it goes one, two, three and

3   then four appears to be three pages long and then five,

4   six, seven.  Is that a format with which you're

5   familiar?

6        A    No, I'm not.

7        Q    I'll ask you to turn to what I'm going to call

8   page 4C, the third page of document four.

9        A    Okay.  I'm there.

10       Q    Okay.  It says at the last point in this

11  document, this sub document, it says, "Subsidies

12  designed to slow the erosion of employer-provided

13  retiree health care coverage," and it's referring to

14  subsidies that are provided.  I think this relates to

15  what you were talking about, the credit, the subsidies

16  for credible prescription drug plans.

17       A    I believe so.

18       Q    "Subsidies designed to slow the erosion of

19  employer-provided retiree health coverage," bullet one,

20  "Some employers will still drop or reduce coverage,"

21  and bullet two, "Some are more likely to," quote, "stay

22  in the game."  In your experience, are there any

Page 68

1    characteristics that are shared by employers that

2    despite being provided subsidies under Part D, try to

3    drop or reduce coverage for prescription drugs?

4         A    No.

5         Q    Are there any characteristics shared by those

6    that are staying in the game?

7         A    Give me the question again as it relates to

8    this.

9         Q    Sure.  In your experience, are there any

10   characteristics that are shared by employers that to

11   use the language of this document are staying in the

12   game of prescription drug benefits despite getting a

13   subsidy?

14        A    I don't think so.

15        Q    In your experience, are you observing some

16   employers staying in the game of providing prescription

17   drug benefits and some employers reducing prescription

18   drug benefits even though they're getting a subsidy?

19        A    I've got to believe there are some out there,

20   yeah.

21        Q    Do you have a sense of which group has more

22   employers in it?

Page 69

1        A    No.  No, I don't.

2                            (Exhibit No. 38 was marked for

3                             identification.)

4        Q    You've been handed what's marked as Exhibit 38

5    which is a -- it appears to be a report provided to the

6    international executive board by the Social Security

7    department dated February of 2005 that provides updates

8    on, one, retiree health care coverage and, two, Bush

9    administration pension reform proposals.  Are you

10   familiar with this document?

11       A    No, I'm not.

12       Q    Does this appear to be similar in format,

13   though, to other reports to the international executive

14   board that you created?

15       A    Yes.

16       Q    The first page of this report references in

17   the second paragraph a Kaiser-Hewitt survey that was

18   released in December 2004.  Do you know the survey of

19   which the report is speaking?

20       A    No, I do not.

21       Q    In your role as an international

22   representative, have you consulted any surveys of

Page 70

1   **health care plans?**

2        A    I guess I'm not quite understanding your

3   question.

4        **Q    That's fair.  In your role as an international**

5   **representative, have you consulted data regarding**

6   **health care plan terms such as deductibles, premiums,**

7   **etcetera?**

8        A    Yes.

9        **Q    Do you know the sources of that data?  Let me**

10  **ask it a different away.**

11            **In what format was the data that you reviewed?**

12       A    I've reviewed data that's been provided by

13  employers that have to do with health care costs.  I've

14  reviewed data that's provided by actuaries that have to

15  do with health care costs as well as some outside

16  firms.

17       **Q    The data that you have reviewed, does it**

18  **relate specifically to the employer with which you're**

19  **negotiating at the time?**

20       A    If the employer provided it, yes.

21       **Q    What if the actuary provided it?**

22       A    It might not necessarily be from any specific

Page 71

1    employer.

2        **Q    Do the data sets include non-UAW represented**

3    **employers?**

4        A    I'm assuming some of it had to.  You know, if

5    you read a report or something, it might have some

6    non-UAW folk in there.  I don't know.

7        **Q    Do the data sets include non-represented**

8    **employees?**

9        A    Yeah, assuming they're not represented because

10   if they're not UAW, I know we aren't representing them.

11       **Q    Let me ask that a different way.  Do**

12   **the -- does the data include participants that are**

13   **non-union represented?**

14       A    I believe so.  I mean I looked at some of that

15   data that I saw back during the GM financial crisis, I

16   looked at some data that had to do with Nissan and

17   different companies like that, Toyota.

18       **Q    So it's not uncommon when engaged in**

19   **bargaining to review data about other health care**

20   **plans?**

21       A    I wouldn't say it's uncommon, no.  You always

22   look at the landscape.  I think you're doing your due

Page 72

1    diligence.

2        **Q     What are you looking for?  What's the purpose**

3    **of doing that due diligence?**

4        A     One of the things -- one of the

5    responsibilities of my job is negotiating with several

6    different companies that do similar functions.  I'll

7    give you an example.  The seating industry, we bargain

8    with four or five different large corporations that all

9    assemble seats or OEM, original equipment

10   manufacturers.  So I will look to see when I'm

11   negotiating with the Johnson Controls, I might look and

12   see what Lear Corporation is doing in their contracts

13   and it's not just health care.  It's wages, you know,

14   all the different components because health care,

15   again, the pie thing.  So as it relates to that, yeah,

16   I would look at different companies.

17       **Q     Do you have in your experience, is some data**

18   **more valuable as a comparative tool than others?**

19       A     I think so.  I guess who collected the data,

20   where it was collected from, how it was collected, you

21   know.

22       **Q     You said when you're negotiating with seating**

1   manufacturers, you're looking at data from companies

2   that do similar things.  Is that a consideration that

3   goes into whether the data is a better comparative over

4   other data sets?

5       A    I don't believe so.  I think it has more to do

6   with where the data came from.

7       Q    On page two of this report at the bottom,

8   there's a section entitled Medicare RX Coverage, the

9   first bullet point under which it says that 58 percent

10  of surveyed employers reported that they would continue

11  offering RX benefits and accept the subsidy.  To use

12  the language of the previous exhibit, they're staying

13  in the game.  Is that statistic consistent with your

14  observations as an international representative?

15      A    I don't know.

16      Q    The parenthetical says that 85 percent of that

17  group plan to retain current RX benefits, which -- is

18  that consistent with your observations as an

19  international rep?

20      A    I have no reason to say it isn't.

21      Q    I'm just asking.

22      A    I'm just saying I can't say it is -- you know,

Page 74

1    I have no reason to say it isn't, so I guess I'm going

2    to say it is.  I just don't know.

3        **Q    The first bullet on the last page says that,**

4    **"17 percent of surveyed employers reported that they**

5    **would offer RX coverage as a supplement to the Medicare**

6    **RX plan (Medicare would be the primary payer.)"  Is**

7    **that the same as coordinating with Part D?**

8        A    Since I didn't write the document, it's hard

9    for me to say, but based on my reading, yes.

10       **Q    In terms of premium sharing for retirees, is**

11   **there a level at which you would not recommend an**

12   **agreement?  That is to say can the premium go**

13   **sufficiently high that you would not recommend agreeing**

14   **to it as it pertains to retirees?**

15       A    No, I don't believe there's a magic number.

16       **Q    Are there things that you -- in thinking**

17   **specifically about the premium term for retirees, are**

18   **there factors that you evaluate in assessing whether or**

19   **not it is a reasonable premium or not?**

20       A    I believe there is.

21       **Q    What are those factors?**

22       A    I believe some of those factors, again, would

1   have to do with whether it's a vested benefit or not.

2   So let's say that it isn't and then you take a look at

3   what the cost of the insurance is, what the retiree's

4   income is, what the pension benefit is, is there a

5   pension benefit which I'm assuming there is if you're

6   talking health care.

7       **Q    Is there a ratio on the income side?**

8       A    No, we don't use a ratio.  Nobody has ever

9   said, "Here's the ratio, Rick."  Again, it's ability to

10  pay.  Again, if yours and mine were the exact same

11  company, but you were making billions of dollars and

12  mine wasn't, your ability to pay would be a little

13  better than my ability.  So if I was bargaining against

14  both of us, I would expect you to pay more than my

15  company.

16      **Q    In your experience, are you seeing built-in**

17  **escalator clauses for premiums in agreements?**

18      A    For active employees, yes.

19      **Q    What about for retirees?**

20      A    No, not really.

21      **Q    What about for future retirees?**

22      A    In some cases, I'm sure they're out there, but

Page 76

1    I haven't personally seen them, no.

2        **Q     There's no UAW prohibition on that for future**

3    **retirees?**

4        A     No.

5        **Q     Going back to Exhibit 38 --**

6        A     How far back are we going?  That's the last

7    one?

8        **Q     Yes.**

9        A     Not too far.

10        **Q     There are a series of bullet points on the**

11    **first page that reflect average retiree contributions**

12    **both pre-Medicare and Medicare eligible.  The report**

13    **says that for new pre-65 retirees, the average retiree**

14    **contribution is $202 per month and notes it's excluding**

15    **employers that require no contributions.  For new 65**

16    **and over retirees, the average retiree contribution is**

17    **$113 per month, again noting that it's excluding**

18    **employers that require no contribution.  How do those**

19    **average figures as reported in this document compare**

20    **with monthly retiree contributions that you're seeing**

21    **in your experience as an international representative?**

22        A     I don't think they have any comparison.

Page 77

1        Q     Why is there no comparison?

2        A     Well, I guess the reason there's no comparison

3   is because I'm not sure where these numbers -- I see

4   numbers all over the board, so some are higher, some

5   are lower and again, it depends on the negotiations

6   that you're in.  So that's why I'm saying there's no

7   comparison.  I'm assuming these numbers were made by

8   Kaiser-Hewitt's survey without me reading this whole

9   thing.

10       Q     That's my assumption as well.

11       A     So their assumption based on across the

12  country, to me, that's irrelevant in bargaining what

13  the rest of the country is doing.  What's relevant is

14  the negotiations that I'm in today, not what the

15  national average is.

16       Q     But if I am correct in interpreting what you

17  said, you see some monthly contributions lower than

18  that, you see some higher than that?

19       A     Yeah.  I would suspect it's a little bit here

20  and a little bit -- again based on the ability to pay.

21       Q     Does the UAW have any guidance on the level of

22  out-of-pocket costs, not counting premiums, that a

Page 78

1    **retiree should have under a health care plan?**

2        A    No.  By guidance, as low as possible I guess

3    would be our guidance.

4        Q    **Is there a maximum --**

5        A    No.

6        Q    **-- a maximum deductible for example?**

7        A    No.  Again, it comes back to the negotiations.

8    I think I've already testified that we're not in big

9    favor of high deductible plans, but we have them.

10       Q    **Do you understand what the term stop loss**

11   **means?**

12       A    Oh, absolutely.

13       Q    **What do you understand the term stop loss to**

14   **be?**

15       A    Stop loss refers to a company that's self

16   insured is my understanding.

17       Q    **Okay.  Do you have an understanding as to how**

18   **it pertains to the terms of a particular health care**

19   **plan?**

20       A    I believe it pertains to the health care plan.

21   I think insurance companies will probably let you write

22   it just about any way you want, but again, I'm not

Page 79

1    intimately involved with that.  My understanding is you

2    have individual stop loss and group stop loss.

3        **Q    If I used the term stop loss and out of pocket**

4    **maximum interchangeably --**

5        A    I don't believe those are interchangeable

6    statements.

7        **Q    Okay.  Well, how would an individual stop loss**

8    **operate in practice?**

9        A    My understanding of stop loss is let's say

10   that you're a company and you have a self insured plan.

11   So in order to keep you from going bankrupt because

12   everybody had a heart attack, you pay for some type of

13   stop loss insurance.  Another term I use commonly is

14   known as reinsurance.  So in other words, you say that

15   we're going to pay all claims up to five million

16   dollars.  If our health care claims annually exceed

17   five million dollars, the stop loss insurance kicks in.

18         Now, you pay a premium for stop loss

19   insurance, so you as an employer, you balance out how

20   much does my premium cost for the level of stop loss.

21   So in other words, do I think I'm going to cross five

22   million?  Probably not.  So maybe I want four million

Page 80

1   in stop loss.

2           Then the next set of that criteria is the

3   individual stop loss which means we're all insured

4   under the same plan.  Any individual that exceeds

5   $250,000 in claims in a year, the stop loss would kick

6   in on that individual policy even though the five

7   million hasn't been met by everybody.

8       **Q     If I use the term out of pocket maximum, what**

9   **do you understand that to be?**

10      A    I understand that to be the amount of money a

11  covered individual is going to pay out of their pocket,

12  the maximum amount in any given year.

13      **Q     After which what happens?**

14      A    Usually in stop loss, then it becomes a 100

15  percent paid benefit by the employer.  And again, when

16  I say 100 percent paid benefit, that really depends on

17  how the plan is written and what is included in that

18  maximum out of pocket.

19      **Q     Is there a -- how does a bargainer evaluate**

20  **what an appropriate out-of-pocket maximum would be?**

21      A    I guess what plan is currently in effect and

22  what the ability to negotiate is.  I guess that's

Page 81

1    probably the simplest.

2        **Q    Same thing for deductibles?**

3        A    I believe so.  I mean utopia is first dollar

4    coverage.

5        **Q    Are you seeing a lot of first dollar coverage**

6    **being agreed to recently?**

7        A    Not necessarily.

8        **Q    Speaking about deductibles and out-of-pocket**

9    **maximums, does it matter to your calculus whether it's**

10   **an in-network or out-of-network benefit?**

11       A    I think there's usually a difference.  I mean

12   usually, there's an out-of-pocket maximum for a network

13   and an out-of-pocket maximum for out of network.

14   That's usually how the plans are written these days.

15       **Q    I agree.  Are the considerations for**

16   **evaluating what is a reasonable amount for either --**

17   **for deductibles and out-of-pocket maximum, do the**

18   **criteria change whether it's an in-network or**

19   **out-of-network benefit?**

20       A    I don't think so, but I think the only reason

21   the criteria would change is because of the fact that

22   you're trying to drive people to use in-network

1   doctors.  So your out-of-pocket maximum for out of

2   network would probably be significantly higher.

3        **Q    In your experience, are there negotiations in**

4   **which retirees, the cost of health care benefits to the**

5   **retirees increases, but they're also getting a somewhat**

6   **better benefit?**

7        A    Is that going on?

8        **Q    That's my question.**

9        A    I would assume it is.

10        **Q    Have you experienced that?**

11        A    I haven't negotiated that, no.

12        **Q    If that is what happened in a negotiation, how**

13   **do you evaluate whether to approve that bargain or not?**

14        A    Well, again, when we're talking about

15   retirees, the first thing that comes back to is whether

16   it's a vested benefit or not.  Secondly, if it's not a

17   vested benefit and if there is an ability to do that or

18   you're talking about maybe doing something different

19   for futures, again, you evaluate the entire package.

20        **Q    The entire package for the retirees or the**

21   **entire package for everyone?**

22        A    Well, if you're talking about if it's not a

Page 83

1    vested benefit, it would be the entire package for

2    everybody.  And again, it all depends on the contract

3    language that's in play and that particular agreement.

4    You have to keep coming back to that pesky little

5    contract.  They're not all the same.

6        **Q    So in the example of benefits improving with**

7    **some additional costs to the retirees, can you**

8    **determine whether for retirees it's an overall**

9    **improvement or reduction?**

10       A    I think you can give it your -- I think you

11   can come up with what your opinion is.  Again,

12   depending on who the retiree is and what the retiree's

13   condition, you know, what their particular situation is

14   is whether it's an improvement or not.

15       **Q    Each individual retiree?**

16       A    Yeah.  I'll use an example of a doctor's

17   office call.  If you increase -- we'll just for the

18   sake of argument, I don't care if they're retired or

19   active, but you're making a change and the benefit is

20   you're going to put in an office call component, but

21   you're going to charge people three more dollars a

22   month on their premium share for the office call

Page 84

1    component.  Most people would say that's an improved

2    benefit.  But if I never go to the doctor, it's not an

3    improved benefit for me.  So you tell me.  Is it an

4    improved benefit or not?

5         **Q    I'd asked you how to interpret --**

6         A    I would say it is because again, we're

7    negotiating based on the entirety.

8         **Q    So is it in the judgment of the bargainer?**

9         A    Well, eventually, it's in the judgment of the

10   membership.  They're ratifying the contract if that's

11   what the case is.  I guess it ultimately is their

12   decision if it's an improved benefit or not.  But in my

13   opinion, it would be in that example.

14        **Q    But they're voting on the entire contract?**

15        A    Yes.

16        **Q    In your experience, do negotiations result in**

17   **active members making economic sacrifices for the**

18   **benefit of retired members?**

19        A    In some cases, I'm sure they do.

20        **Q    Have you experienced that as a bargainer?**

21        A    Yes.

22        **Q    In your experience, what kind of economic**

Page 85

1    **sacrifices do actives make?**

2         A    I'm sure maybe you don't get as big a raise as

3    you might.  Maybe you don't -- you know, again, it's a

4    pie, so if you're shifting part of the pie to the

5    retiree side or to provide a benefit for retirees, then

6    you could say that the actives aren't getting as much

7    as they could have if you wouldn't have.  What that is

8    I'm not sure.  Is it an extra holiday?  Is it an extra

9    quarter an hour?  I guess it's where you spend the

10   money, but yes, there's some amount of money being

11   spent on one thing versus another.

12        Q    **As a bargainer, how do you evaluate whether**

13   **active members should make that type of sacrifice for**

14   **retirees?**

15        A    You look at the landscape.  You look at what

16   the situation is with the current active employees.

17   You look at what it takes to get a ratification vote.

18   There's a lot of different factors and they're not

19   always the same in each facility.

20        Q    **I understand.  I'm just trying to get a sense**

21   **of --**

22        A    If it's something that you have to ratify,

Page 86

1    that has a lot to do with decision making.  I've done a

2    lot of things that I personally would not do.  I've

3    accepted some lump sums before and turned down general

4    wage increases because it was easier to get the lump

5    sums ratified.  Is it right?  Probably not.  In the

6    long run, a GWI is probably better than lump sum,

7    general wage increase, but it really doesn't matter if

8    I don't ratify the contract, does it?

9         **Q    And in that example, the lump sums are going**

10   **to existing retirees?**

11        A    No, the net example might be they would be

12   going to active employees.

13        **Q    Okay.**

14        A    But logic isn't always the only factor when it

15   comes to negotiating a contract.

16        **Q    Does the fact that the retirees are retirees**

17   **and not part of the bargaining unit matter?**

18        A    I guess it has to do with what the current

19   agreement is.  If it's a vested benefit, then I don't

20   think it matters at all.  If it's not a vested benefit,

21   I think you have to take it into consideration.

22   They're members even though they're retired.

1   Q   As a bargainer, do you place their interests

2   on equal footing with actives?

3   A   I don't believe so.  Again, it depends on the

4   contract and I guess it would depend on the size of

5   the -- retirees always like to be, my experience, a

6   little bit above the actives because they've already

7   put their time in.  The actives haven't quite got

8   there.  But that's not always necessarily the case

9   because again, retirees don't vote on contract

10  ratification.

11   Q   But there are instances in which actives

12  ratify agreements that sacrifice active economic

13  benefits for retired members' benefits?

14  A   Yeah.  In most of those case, it's because

15  they're going to be a retiree at some point in time.

16  So it might be in their best interest possibly.

17   Q   Now, the negotiation of retiree health care

18  benefits, what impact does the presence of a voluntary

19  employee benefit association or VEBA, have on the way

20  you bargain retiree health care benefits?

21  A   Well, if there's a VEBA, you might not be

22  bargaining at all about retiree health care benefits.

1      Q     Why not?

2      A     If there's a VEBA in play, that might be the

3  vehicle that the retiree benefits are provided from.

4      Q     Well, does it matter who runs the VEBA?

5      A     Yeah, I think it would matter who would run

6  the VEBA, but again, the VEBAs I'm familiar with, they

7  are stand-alone VEBAs and they're run by a group of

8  trustees.  They're not run by the UAW.  So --

9      Q     Does the UAW sponsor any VEBAs?

10     A     I'm not sure what you mean by sponsor.  I

11  don't believe we do.  I believe all the VEBAs we're

12  associated with are run by a group of trustees.  Some

13  of the trustees are appointed by the UAW.

14     Q     Are you familiar with the VEBA's form for the

15  Big Three auto makers?

16     A     I'm familiar with them.  I'm not an expert on

17  those.

18     Q     Do any employers in the IPS group have VEBAs

19  associated with their health plans?

20     A     Yeah.

21     Q     And in those instances because there's a VEBA,

22  you're no longer negotiating with the employer about

Page 89

1    the health care benefits?

2        A    Not for the retirees, no.

3        Q    Do you have any experience in working with

4    VEBA trusts?

5        A    I sit on several of them.

6        Q    Do those VEBA trusts pay for retiree health

7    care benefits?

8        A    The ones I'm associated with, yes.

9        Q    Does the VEBA trust -- do the VEBA trusts, the

10   boards of which you sit on, have fixed assets?

11       A    Some of them do.  Some of them don't.

12       Q    The ones that have fixed assets, for the ones

13   that have fixed assets, are there ongoing negotiations

14   with the employer about current retiree health care

15   benefits?

16       A    No.

17       Q    The VEBA trusts with fixed assets, do you

18   take -- does the trust take steps to maximize its

19   ability to pay for the benefits?

20       A    I don't understand your question.

21       Q    Is there anything that the fixed asset VEBA

22   trust can do to make its assets last longer?

Page 90

1      A    Yes.

2      **Q    What sort of things in your experience --**

3      A    Increase retiree contributions, change plan

4    design.

5      **Q    But that's not done in the context of**

6    **negotiations with the employer?**

7      A    No.

8      **Q    Do the trusts make an assessment of whether or**

9    **not the benefits are vested?**

10          MR. MACEY:  Let me interpose an objection.

11    Josh, we're here on question nine or topic nine, which

12    is the level of post-retirement health benefits

13    demanded currently by the UAW in collective bargaining

14    negotiations.  I think you're headed out of bounds on

15    that question.  Do you envision -- is there something

16    we ought to go off the record and discuss in terms of

17    where you're headed or is this just an incidental

18    question or two?

19          MR. ROGACZEWSKI:  It's an incidental question

20    or two.  I mean we can go off the record.  I'm happy to

21    discuss it.

22          MR. MACEY:  Let's do that.

Page 91

1              (Discussion off the record.)

2                                  (Exhibit No. 39 was marked for

3                                  identification.)

4          BY MR. ROGACZEWSKI:

5      Q     You have in front of you what's been marked as

6      Exhibit 39, which is a two-page document that's titled

7      GM Benchmarked to Toyota.  Are you familiar with this

8      document?

9      A     No, I'm not.

10     Q     You've seen in your work as an international

11     representative, you've seen comparisons between

12     different health care plans though, right?

13     A     Yes.

14     Q     Are you familiar with this either abbreviation

15     or acronym T-R-A-D on the first page?

16     A     I'm assuming it's GM traditional.

17     Q     You don't know that?

18     A     No, I don't know for sure.

19     Q     What about the POS next to Toyota, is that an

20     abbreviation you've seen before?

21     A     I'm assuming it's Toyota point of the service.

22     Q     What does point of service mean in that

Page 92

1   context?

2       A    The health care plan.

3       **Q    If you know, are both of these plans UAW**

4   **negotiated?**

5       A    I don't believe so.

6       **Q    Which one do you believe is not UAW**

7   **negotiated?**

8       A    I'm assuming Toyota.

9       **Q    Does the UAW represent any locals of Toyota**

10  **workers?**

11      A    Not anymore.  Again, I'm assuming.

12      **Q    I understand.**

13      A    Well, the reason I say that is because we used

14  to represent the workers at NUMMI.

15                          (Exhibit No. 40 was marked for

16                           identification.)

17      **Q    As an international representative, have you**

18  **ever compared a UAW negotiated plan with a non-UAW**

19  **negotiated plan?**

20      A    I personally have not.

21      **Q    Is that a comparison that -- would a**

22  **comparison like that have any value to you as a**

Page 93

1    negotiator?

2         A    If I was -- going back to a like industry

3    argument, if I was looking at like industries to see

4    what the cost structure was at a non-union plant that

5    was doing the same product line as a union plant, I

6    think there would be some value.

7         Q    You have what's been marked as Exhibit 40

8    which is a six-page document that appears to compare

9    post-retirement benefits, life and health, of Honda,

10   Ford and GM.  Are you familiar with this document?

11        A    No, I'm not.

12        Q    If you know, are the three plans compared in

13   this document UAW-negotiated plans?

14        A    I don't know that.

15        Q    Are there any that you know are UAW

16   negotiated?

17        A    Ford and General Motors.

18        Q    And Honda you're not sure about?

19        A    Honda, no, I'm not sure.

20        Q    This is a pretty detailed comparison.  Is this

21   similar to -- is this level of detail useful as a

22   comparator?

Page 94

1      A    I guess to what extent you're using it as a

2  comparator for.

3      Q    If you were in negotiations and you were

4  looking at what was on the table in terms of the

5  details of the plan that's being negotiated, is this

6  level of detail something that a bargainer, that you as

7  a bargainer would find useful?

8      A    Yeah.

9                            (Exhibit No. 41 was marked for

10                            identification.)

11     Q    You have in front of you what's been marked as

12  Exhibit 41 which is a seven-page document labeled A

13  Comparison of Benefits, stamped Draft.  It appears to

14  compare various types of benefits including retiree

15  medical coverage between Nissan, Mitsubishi and NUMMI.

16  Are you familiar with this document?

17     A    No, I'm not.

18     Q    Are any of the three plans compared here

19  UAW-negotiated plans?

20     A    I'm assuming NUMMI is.

21     Q    What about Nissan and Mitsubishi?

22     A    I'm not really sure about Nissan and I'm not

Page 95

1   positive about Mitsubishi, but it might be.

2       **Q   As a negotiator, would a comparison of three**

3   **non-UAW negotiated plans be useful?**

4       A   I'm not sure.  Would it be useful for what

5   purpose?  Would it be useful to have?  Probably just to

6   see what everybody else is doing.

7       **Q   Again, it's not -- the fact -- if none of**

8   **these plans are non-UAW negotiated, it doesn't**

9   **eliminate all value it has?**

10      A   No.

11          MR. ROGACZEWSKI:  I pass the witness.

12          MR. MACEY:  I have no questions.

13          MR. RADTKE:  I have no questions.

14          (The deposition was concluded at 3:45 p.m.)

15                   *   *   *   *   *

16          I have read the foregoing pages, which are a

17   correct transcript of the answers given by me to the

18   questions therein recorded.

19

20      Deponent_____

21      Date_____

22

Page 96

1                        CERTIFICATE OF NOTARY

2        STATE OF MICHIGAN            )

3                                     ) SS

4        COUNTY OF MACOMB             )

5            I, Gail R. McLeod, Certified Shorthand Reporter, a

6        Notary Public in and for the above county and state, do

7        hereby certify that the above deposition was taken

8        before me at the time and place hereinbefore set forth;

9        that the witness was by me first duly sworn to testify

10       to the truth, and nothing but the truth, that the

11       foregoing questions asked and answers made by the

12       witness were duly recorded by me stenographically and

13       reduced to computer transcription; that this is a true,

14       full and correct transcript of my stenographic notes so

15       taken; and that I am not related to, nor of counsel to

16       either party nor interested in the event of this cause.

17

18       Gail R. McLeod, CSR 2901

19       Notary Public,

20       Macomb County, Michigan

21       My Commission expires:  September 23, 2017

22