**1476**          **716 FEDERAL REPORTER, 2d SERIES**

*Conclusion*

The judgment of the district court in favor of appellees Cunningham, Fritcher, Hairell, Robertson and Esparza on the Section 404 and 406 claims is REVERSED, and the cause is REMANDED for the district court in its discretion to determine the appropriate relief to be afforded the Secretary. The judgment in favor of appellees Carter and Perrin is VACATED and the cause is REMANDED for further proceedings consistent with this opinion. The award of attorneys' fees to the appellees is REVERSED. The award of attorneys' fees to Allied Bank is AFFIRMED.



**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), and Local 134, UAW, Plaintiffs-Appellees,**

v.

**YARD–MAN, INCORPORATED, Defendant-Appellant.**

**No. 81–1718.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 3, 1982.

Decided Sept. 9, 1983.

Certiorari Denied Jan. 23, 1984.
See 104 S.Ct. 1002.

Employer appealed order of the United States District Court for the Eastern District of Michigan, Ralph M. Freeman, J., granting summary judgment that employer breached collective bargaining agreement by terminating life and health insurance benefits of retired employees at expiration of collective bargaining agreement and in substituting payment of present cash value for its bargained obligation to purchase an-

agreements executed by MCS and Cunning-

nuities to fund supplemental pensions. The Court of Appeals, Cornelia G. Kennedy, Circuit Judge, held that: (1) collective bargaining agreement did not unequivocally entitle company to terminate those insureds' benefits when benefits of all active employees were terminated upon plant closure, and (2) genuine issues of material fact existed with respect to whether affirmative defense of accord and satisfaction was available to employer, precluding summary judgment.

Affirmed in part and reversed and remanded in part.

Holschuh, District Judge for the Southern District of Ohio, sitting by designation, filed an opinion concurring in part and dissenting in part.

**1. Labor Relations ⇐131.4**

Whether retiree insurance benefits continue beyond expiration of collective bargaining agreement depends upon intent of parties.

**2. Labor Relations ⇐261**

Parties to a collective bargaining agreement may provide for rights which will survive termination of their collective bargaining relationship.

**3. Labor Relations ⇐131.4**

Parties may provide for retiree insurance benefits which survive expiration of collective bargaining agreement.

**4. Federal Courts ⇐421**
   **Labor Relations ⇐257**

Enforcement and interpretation of collective bargaining agreements is governed by substantive federal law; however, traditional rules of contractual interpretation are applied as long as their application is consistent with federal labor policies. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**5. Labor Relations ⇐257**

In discerning parties' intent in collective bargaining agreement, trial court should first look to explicit language of

ham. *See* 541 F.Supp. at 289–90.

collective bargaining agreement for clear manifestations of intent.

**6. Labor Relations ⬌257**

In discerning parties' intent in collective bargaining agreements, trial court should interpret each provision in question as part of an integrated whole and if possible, each provision should be construed consistently with entire document and relative positions and purposes of parties.

**7. Labor Relations ⬌257**

As in all contracts, collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.

**8. Labor Relations ⬌257**

Where ambiguities in collective bargaining agreement exist, trial court may look to other words and phrases in agreement for guidance in discerning parties' intent.

**9. Labor Relations ⬌257**

In discerning intent of parties in collective bargaining agreement, trial court should review interpretation ultimately derived from its examination of language, context and other indicia of intent for consistency with federal labor law.

**10. Labor Relations ⬌131.4**

Collective bargaining agreement providing that company would provide insurance benefits equal to active group benefits for retirees did not unequivocally entitle company to terminate those insurance benefits when benefits of all active employees were terminated upon plant closure.

**11. Labor Relations ⬌131.1**

Retirees may, consistent with federal labor law, settle their contractual disputes over benefits directly with former employer by means of accord and satisfaction without notice to or consent of union.

**12. Labor Relations ⬌131.1**

Direct settlements between retirees and former employer entered into without notice or consent of union are not precluded when union undertakes legal representation of retirees in litigation. Labor Management Relations Act, 1947, § 301(a), 29 U.S.C.A. § 185(a).

**13. Labor Relations ⬌178**

Benefits for retired workers are not a mandatory but only a permissive subject of collective bargaining.

**14. Labor Relations ⬌218**

The union has no duty to represent retirees with employer although it may choose to do so.

**15. Federal Courts ⬌412**

It is federal substantive law which controls resolution of contractual dispute between retirees and employer and whether there has been an accord and satisfaction of the contractual obligations to the retirees, but in the absence of controlling federal law principles, the trial court may look for guidance to general common-law principles including substantive law of state in which contract arose.

**16. Accord and Satisfaction ⬌1**

Under affirmative defense of accord and satisfaction, there must have been a disputed claim, substituted performance agreed upon and accomplished, and valuable consideration.

**17. Federal Civil Procedure ⬌2497**

In action in which it was alleged that employer breached collective bargaining agreement with union by terminating life and health insurance benefits of retired employees at the expiration of collective bargaining agreement and in presenting payment of present cash value for its bargained obligation to purchase annuities to fund supplemental pensions, genuine issues of material fact existed with respect to whether defense of accord and satisfaction was available to employer, precluding summary judgment.

———————

Joseph Kochis, Garan, Lucow, Miller, Seward, Cooper & Becker, Mark R. Bendure (argued), Gromek, Bendure & Thomas, Detroit, Mich., for defendant-appellant.

Nancy J. Schiffer, Detroit, Mich., Leonard Page (argued), UAW Intern. Union, Detroit, Mich., for plaintiffs-appellees.

Before KENNEDY, Circuit Judge, BROWN, Senior Circuit Judge, and HOLSCHUH, District Judge.[*]

CORNELIA G. KENNEDY, Circuit Judge.

Yard-Man appeals the District Court's grant of summary judgment that it breached its collective bargaining agreement with appellees, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW or Union) and its Local 134, UAW, by terminating the life and health insurance benefits of Yard-Man's retired employees at the expiration of the collective bargaining agreement and in substituting the payment of present cash value for its bargained obligation to purchase annuities to fund its supplemental pensions. We affirm the District Court's holding that the retirees are entitled to continued insurance benefits but reverse its holding that Yard-Man could not, even with the consent of its pensioners, substitute cash value for annuities.

In August 1974, Yard-Man and the UAW entered into a collective bargaining agreement covering employees at Yard-Man's Jackson, Michigan, plant. The contract bore a stated expiration date of June 1, 1977. Less than a year after the signing of the contract the plant closed.

In April 1977, Yard-Man notified its Jackson retirees that existing health and life insurance benefits would terminate upon the collective bargaining agreement's expiration. Soon thereafter, the UAW filed grievances claiming that Yard-Man's unilateral action in terminating the retirees' life and health insurance violated that agreement. When Yard-Man refused to arbitrate, the UAW filed this action under § 301(a) of the National Labor Management Relations Act of 1947, 29 U.S.C. § 185

(1976), seeking to compel arbitration. Alternatively, it sought on behalf of the retirees specific performance of Yard-Man's obligation to provide health and life insurance benefits beyond the term of the collective bargaining agreement. It also sought damages to compensate retirees who had paid insurance premiums or medical expenses since the expiration of the collective bargaining agreement.

In a second count, the UAW requested specific performance of Yard-Man's acknowledged obligation under the collective bargaining agreement to purchase annuities to fund its supplemental pension plan. After this suit was filed, and without notice or consultation with the UAW, Yard-Man distributed lump sum payments of the present value of the supplemental pension rights directly to each retiree.

The UAW waived its demand for arbitration and the parties filed cross-motions for summary judgment. Relying solely upon the language of the collective bargaining agreement, the District Court found that Yard-Man breached its contractual obligations when it cancelled the retirees' insurance upon expiration of that agreement. Yard-Man was ordered to provide health and life insurance for its retirees and their dependents, and to reimburse employers for losses due to termination of this insurance. The District Court also found that Yard-Man had failed to purchase annuities to fund the supplemental pension plan. It rejected Yard-Man's claim that it had performed this obligation by paying the cash value of the annuities to individual employees. The court ordered Yard-Man to purchase the collectively bargained annuities upon repayment by retirees of the lump sum distributions theretofore made. Damage questions were reserved.

The District Court certified its judgment under 28 U.S.C. § 1292(b) as a decision involving a controlling question of law as to which there is substantial ground for difference of opinion. This court permitted

---

[*] The Honorable John D. Holschuh, United States District Court for the Southern District of Ohio, sitting by designation.

Yard-Man's appeal from the summary judgment, granting specific performance on both counts, and the UAW's cross-appeal from that portion of the District Court's judgment requiring repayment of the cash distribution made in lieu of supplemental pension annuities, as a condition of receiving such an annuity.

Resolution of the UAW's claim of lifelong insurance benefits for retirees requires interpretation of key contractual language in the collective bargaining agreement. The Union's second claim, the undisputed failure by Yard-Man to purchase the annuities called for in the collective bargaining agreement, requires evaluation of Yard-Man's affirmative defense of substituted performance and the legitimacy of offering such performance directly to the retirees after suit had been filed and without notice to the union.

I. The Parties Intended to Create Lifelong Vested Insurance Benefits for the Yard-Man Retirees

[1–3]  The District Court properly recognized that whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties. Clearly the parties to a collective bargaining agreement may provide for rights which will survive termination of their collective bargaining relationship. *John Wiley & Sons v. Livingston,* 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964). The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement. *Upholsterer's International Union v. American Pad & Textile Co.,* 372 F.2d 427, 428 (6th Cir.1967); *International Union, UAW, Local 784 v. Cadillac Malleable Iron Co., Inc.,* No. G82–75–CA1 (W.D.Mich. April 20, 1982); *American Standard, Inc.,* 57 Lab.Arb. (BNA) 698 (1971) (Warns, Arb.); *Roxbury Carpet Co. and Textile Workers of America, AFL–CIO,* 73–2 Lab.Arb. Awards (CCH) ¶ 8521 (1973) (Summers, Arb.). Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement. *See John*

*Wiley & Sons, supra,* 376 U.S. at 550, 555, 84 S.Ct. at 914, 917; *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971); *Local 1251, International Union, UAW v. Robertshaw Controls Co.,* 405 F.2d 29, 33 (2d Cir.1968); *American Pad, supra,* 372 F.2d at 427–28.

[4]  The enforcement and interpretation of collective bargaining agreements under § 301 is governed by substantive federal law. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies. *Id.* at 457, 77 S.Ct. at 918. *See John Wiley, supra,* 376 U.S. at 548, 84 S.Ct. at 913; *Transportation-Communication Employees Union v. Union Pacific R.R.,* 385 U.S. 157, 160–61, 87 S.Ct. 369, 371–72, 17 L.Ed.2d 264 (1966); *Kellogg Company v. NLRB,* 457 F.2d 519, 524 (6th Cir.1972).

[5–9]  Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. *Kellogg Co., supra,* 457 F.2d at 524. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. *See Randall v. Lodge No. 1076, International Ass'n of Machinists and Aerospace Workers, AFL–CIO,* 648 F.2d 462 (7th Cir.1981); *Forrest Industries, Inc. v. Local Union No. 3–436, International Woodworkers of America, AFL–CIO,* 381 F.2d 144, 146 (9th Cir.1967); *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 570, 80 S.Ct. 1343, 1364, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring). The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the par-

**1480**          **716 FEDERAL REPORTER, 2d SERIES**

ties. *Kellogg Co., supra,* 457 F.2d at 524. *See Randall, supra,* 648 F.2d at 466; *Florida Canada Corp. v. Union Carbide & Carbon Corp.,* 280 F.2d 193 (6th Cir.1960). As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. *See Cordovan Associates, Inc. v. Dayton Rubber Company,* 290 F.2d 858, 861 (6th Cir.1961). Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. *See American Pad, supra,* 372 F.2d at 427–28; *Kellogg Co., supra,* 457 F.2d at 524. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

[10] Application of these basic rules of construction to the present case demonstrates the correctness of the District Court's conclusion that the parties intended to create nonterminating lifelong insurance benefits for the Yard-Man retirees.[1]

The key provision of the collective bargaining agreement, Article XVII, Section 4, states:

> When the former employee has attained the age of 65 years then:
>
> (1) *The Company will provide insurance benefits equal to the active group*

> *benefits . . . for the former employee and his spouse.*

(Emphasis added.)

Appellant Yard-Man asserts that this provision is plain and unambiguous on its face. Under Article XVII, Section 1 of the agreement, active employee benefits expressly terminate one month after an employee's "layoff." The benefits of all active employees thus terminated upon plant closure. Yard-Man argues that since the insurance benefits of former employees are defined as "equal" to active employee benefits, those benefits must be equivalent in all respects *including duration.* Retiree benefits could then also be terminated at plant closure or, as actually occurred, with the expiration of the collective bargaining agreement.

We agree with the District Court that the key provision of the collective bargaining agreement is ambiguous. The language "will provide insurance benefits equal to the active group" could reasonably be construed, if read in isolation, as either solely a reference to the nature of retiree benefits or as an incorporation of some durational limitation as well. This phrase is no less ambiguous as to intended duration than language construed as creating continuing benefits in the various cases and arbitration decisions cited by the parties. *See, e.g., American Pad, supra,* 372 F.2d at 427 ("will continue to provide"); *Cadillac Malleable Iron Co., supra,* slip op. at 8 ("will pay the cost . . . for retired employees"); *Roxbury Carpet, supra,* 73–2 Lab.Arb. Awards ¶ 8521 ("shall continue to receive"); *Wellman Dynamics and UAW, Loc. No. 804.,* Amer.Arb. Assoc. Case No. 54–30–0505–72 (1973) (Herman, Arb.) ("shall provide").

This ambiguity requires that we look to other provisions of the collective bargaining agreement for evidence of intent and an interpretation which is harmonious with the entire document. This examination per-

---

1. The parties presented no extrinsic evidence of intent in this case and elected to rely exclusively on the terms of their collective bargaining agreement. The issues on appeal, therefore, are purely issues of law and not subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). *See Industrial Equip-* *ment Co. v. Emerson Electric Co.,* 554 F.2d 276, 284 (6th Cir.1977). On appeal Yard-Man has raised arguments based on economic considerations which were not part of the record before the District Court. These do not, therefore, constitute any part of our analysis.

suades us that Yard-Man and the Union intended to create vesting insurance benefits in the Yard-Man retirees which continue beyond the life of the collective bargaining agreement.[2]

First, termination of insurance benefits for active employees was explicitly and clearly set out and yet under conditions—the layoff of seniority employees—typically inapplicable to retirees.[3] Moreover, there are variations in the duration of insurance benefits available to active employees dependent upon their seniority.[4] These variations and the impracticality of hinging retiree benefits to events as unpredictable and unstable as active worker layoffs make it improbable that retiree benefits were intended to depend in duration upon the fortunes of the active employees. Yard-Man's own course of conduct in continuing retiree insurance benefits after plant closure beyond the point as which insurance benefits could have been terminated for active employees indicates that it did not consider retiree benefits to be tied to the durational limitations of that active group.[5]

Second, the insurance provisions limit health insurance coverage for a retiree's spouse and dependent children in case of the retiree's death to expiration of the collective bargaining agreement.[6] While this limitation does not preclude an intent to also terminate the retiree's benefits with the expiration of the collective bargaining agreement in any event, it is more reasonable to infer that the spouse-dependent child provision was meant as an exception to the anticipated continuation of benefits beyond the life of the collective bargaining agreement.

Third, the retiree insurance provisions, Article XVII, Section 1, contain a promise that the company will pay an early retiree's insurance upon such retiree reaching age 65 but that the retiree must bear the cost of company insurance until that time. Since an employee is entitled under the collective bargaining agreement to retire at 55, the company's promise could remain outstanding for a ten-year period. If retiree insurance benefits were terminated at the end of the collective bargaining agreement's three-year term, this promise is completely illusory for many early retirees under age 62.

Fourth, the inclusion of specific durational limitations in other provisions of the current collective bargaining agreement suggests that retiree benefits, not so specifical-

2. We agree with Yard-Man that traditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation. *See, e.g., Kellogg Co., supra,* 457 F.2d at 524. We do not agree, however, that the duration of the benefit once clearly conferred is subject to this stricture.

3. Although the inappropriateness as to retirees of the language used to limit the duration of benefits available to the active group might indicate that the parties never considered or perhaps never resolved the issue of whether retiree benefits would continue after plant closure, it seems unlikely that retiree insurance benefits were meant to be tied to the layoff of active employees. As a practical matter layoff would be an inappropriate measure of retiree benefits, since typically only part of the work force would be laid off at any one time. A partial layoff of the work force rather than plant closure was more probably the contemplated purpose of the duration limitations created for active employees.

4. Article XVII, Section 1, of the collective bargaining agreement provides that for seniority employees with one year or more seniority the cost of continuing insurance would be paid for out of the company's "Supplemental Unemployment Benefits Fund" while funds were available and thereafter at the employee's cost. For seniority employees with less than one year's seniority, insurance was to be continued for one month after layoff and then made available at their cost.

5. The record is silent as to whether Yard-Man terminated benefits to its active employees at plant closure in accordance with the explicit terms of the collective bargaining agreement. Therefore, we consider only Yard-Man's failure to actually terminate retiree benefits at the point it now claims controls the duration of those benefits and not Yard-Man's treatment of the active group as well. Yard-Man's actual conduct is, in any case, inconsistent with the interpretation of the agreement it now urges upon this Court.

6. Article XVII, Section 4, states: "In the event of death of the retiree who is age 65, the Company will continue to insure the surviving spouse and dependent children of the retiree until 6/1/77."

**1482**          **716 FEDERAL REPORTER, 2d SERIES**

ly limited, were intended to survive the expiration of successive agreements in the parties' contemplated long term relationship. Article XIX, for example, provides that "savings and pension plan programs" continue only for the duration of the collective bargaining agreement. No such specific limitation was provided to similarly restrict payment of retiree insurance benefits to the life of the collective bargaining agreement.[7]

Finally, examination of the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for retirees were intended. Benefits for retirees are only permissive not mandatory subjects of collective bargaining. *Pittsburgh Plate Glass Co., supra*, 404 U.S. at 181–82, 92 S.Ct. at 398–99. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations. *See, e.g., Cadillac Malleable Iron, supra*, slip op. at 12–13; *Cantor v. Berkshire Life Ins. Co.*, 171 Ohio 405, 171 N.E.2d 518 (1960); *Roxbury Carpet, supra*, 73–2 Lab.Arb. Awards ¶ 8521, p. 4940. The employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees. If they forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements. Contrary to Yard-Man's assertions, the finding of an intent to create interminable rights to retiree insurance benefits in the absence of

explicit language, is not, in any discernible way, inconsistent with federal labor law.[8]

Further, retiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree. This is not to say that retiree insurance benefits are necessarily interminable by their nature. Nor does any federal labor policy identified to this Court presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent. Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent. Standing alone, this factor would be insufficient to find an intent to create interminable benefits. In the present case, however, this contextual factor buttresses the already sufficient evidence of such intent in the language of this agreement itself.

Yard-Man urges that a general durational clause which provided that the collective bargaining agreement should remain in force until June 1, 1977 demonstrates an intent that all benefits described in the agreement also terminate at that date. We do not agree. The clause does not specifically refer to the duration of benefits. The persuasive considerations we have discussed demonstrate that retiree benefits were in-

---

7.   We acknowledge that the collective bargaining agreement specifically provides a method for continuation of supplemental pension benefits beyond the agreement's duration by requiring the purchase of annuities in the event of plant closure, and yet, fails to provide a mechanism for funding retiree benefits. However, this failure does not necessarily imply that retiree benefits were not intended to survive the agreement. The survival of the pension benefits is not dependent on the existence of an annuities provision. Even though the agreement does not explicitly so provide, these benefits undoubtedly would have survived independent of any such mechanism. The mechanism

itself merely confirms and provides the means of their survival.

8.   The appellants misapprehend the meaning of *Pittsburgh Plate Glass* insofar as vested retiree benefits are concerned. Clearly, the union may choose to forego such benefits in future negotiations in favor of more immediate compensation. It may not, however, bargain away retiree benefits which have already vested in particular individuals. Such rights, once vested upon the employee's retirement, are interminable and the employer's failure to provide them actionable under § 301 by the retiree. 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20.

INTERN. U., UNITED AUTO., AERO., ETC. v. YARD–MAN          **1483**

Cite as 716 F.2d 1476 (1983)

tended to outlive the collective bargaining agreement's life and outweigh any contrary implications derived from a routine duration clause terminating the agreement generally. Such an intent takes precedence over a non-specific, general clause.

## II. The Purchase of Annuities

Yard–Man agreed in the collective bargaining agreement to purchase annuities to fund its supplemental pension plan in the event of business failure. It is undisputed that Yard–Man has failed to do so. Instead, after the commencement of this suit, Yard–Man distributed directly to the individual retirees lump sum payments of the present value of these pension benefits.[9] The UAW was neither consulted or notified prior to this distribution. Noting that the required annuities were available but not purchased

because they would be uneconomical for Yard–Man, the District Court found Yard–Man in breach of its contractual obligations and ordered specific performance.[10]

Yard–Man asserts two defenses to liability which were rejected without discussion by the District Court: accord and satisfaction (substituted performance) and estoppel. Yard–Man argues that its offer of substituted performance in the form of lump sum distribution checks was accepted and the distribution retained by the retirees, thereby discharging its original obligation. Moreover, Yard–Man contends that since it could not invest or utilize those funds after the retirees accepted them, the retirees and the union which is suing on their behalf are estopped from seeking specific performance by virtue of Yard–Man's detrimental reliance.[11] The UAW in response asserts that

---

**9.** Yard–Man also sent the retirees notice explaining the reasons for this substituted performance. While the amount of the lump sum distribution was solely determined by Yard–Man, there is no dispute as to its adequacy *as a cash distribution.* The Union's disagreement is whether *any* lump sum distribution could constitute an adequate substitute for the bargained for annuity.

**10.** The District Court excused specific performance with respect to monthly benefits which were so small that it was not reasonably possible to purchase annuities.

**11.** As pointed out by the dissent, Yard–Man is precluded from raising the defense of estoppel here on appeal because it failed to present such a defense or its equivalent in any form to the District Court.

We cannot agree, however, with the dissent's view that Yard–Man should also be precluded from maintaining a defense of accord and satisfaction or substituted performance by virtue of its failure to amend its answer and plead the defense affirmatively. Both sides in this dispute have argued on appeal over whether Yard–Man's substituted performance of providing lump sum cash distribution instead of purchasing annuities constituted a legitimate defense to the retirees' contract action. Before the trial court Yard–Man contended "that performance of the literal language of Article XVIII, Section 1, was impossible and that *a reasonable alternative form of compliance was adopted.*" Yard–Man also asserted that its substituted performance "constitute[d] substantial compliance with the contract provision." Yard–Man's arguments essentially raised, albeit in a confused fashion, three contract defenses; substantial

compliance, substituted performance and impossibility. (The District Court ruled only on impossibility.) As is generally true under contract law, there is no essential difference between the defense of substituted performance as raised below and accord and satisfaction. 6 Corbin on Contracts, § 1276, p. 115; § 1278, p. 124. The arguments presented on appeal by Yard–Man are essentially the same as those it presented to the District Court; that is, that it has substantially complied with its contractual obligations *by virtue of offering an alternative means of performance which was accepted by the retirees.* The only difference, and one which is apparently deemed of paramount significance by the dissent, is that the words "accord and satisfaction" were never utilized before the District Court and the defendant's answer never amended to reflect its asserted defense. We believe that this defense, although unartfully presented, was placed before the trial court and fully addressed by the parties. Moreover, under the circumstances of this case, we do not deem Yard–Man's failure to amend its answer to affirmatively and formally plead the defense as dispositive of whether we can review this issue now. The Union, although fully aware of the nature of the defense, has never challenged Yard–Man's position on such procedural grounds. Indeed, if the Union had so challenged Yard–Man's reliance on the defense, Yard–Man would undoubtedly have been granted leave to amend. The case was still in a pretrial posture when the defense arose. Refusal to allow amendment to allege a defense which came into being after the answer had been filed might well have been an abuse of the trial court's discretion. Since the substance of the defense was raised before the trial

neither defense can be effective in the present case because Yard-Man failed to notify the retirees' legal representative, the UAW, of the proposed substituted performance.

**[11, 12]** The contentions of the parties raise two related legal issues. First, whether retirees may, consistent with federal labor law, settle their contractual disputes over benefits directly with their former employer by means of accord and satisfaction without notice to or the consent of their union? Second, even if they may, are such direct settlements between retirees and the former employer, entered into without notice to or consent of the union, precluded once the union undertakes the legal representation of the retirees in a § 301(a) litigation?

The prime consideration in resolving the initial question must be whether direct settlement between retirees and their former employer without notice to or the consent of the union is in any fashion inconsistent with the national labor statutes and their primary purpose of promoting industrial peace. *Lincoln Mills,* 353 U.S. at 457, 77 S.Ct. at 918. *See United Ass'n of Journeymen, Plumbers & Pipefitters v. Local 334, United Ass'n of Journeymen, Plumbers & Pipefitters,* 452 U.S. 615, 636–37, 101 S.Ct. 2546, 2557–58, 69 L.Ed.2d 280 (1981) (Stevens, J., dissenting). *See generally* 29 U.S.C. § 151 (1976).

Initially, a distinction must be recognized between retiree contractual benefits under a collective bargaining agreement and the terms and conditions of employment created by that agreement for active employees. In the case of active employees, Congress has spoken directly on the issue of settlements between employer and employee. Title 29 U.S.C. § 159(a) specifically permits "adjustments" between employer and employee without intervention of the union so long as the agreement is not inconsistent with the terms of the bargaining agreement

and the union has been given an opportunity to be present.

**[13, 14]** In *Pittsburgh Plate Glass Co.,* 404 U.S. at 176–82, 92 S.Ct. at 396–99, the United States Supreme Court held that employers are under no obligation to bargain with unions over benefits for already retired workers. The Court reasoned that retired workers were neither "employees" under federal labor law nor properly members of the appropriate bargaining unit. As such, benefits for retired workers are not a mandatory but rather only a permissive subject of collective bargaining. Id. at 170, 180–82, 92 S.Ct. at 393, 398–99. Similarly, the union has no duty to represent retirees with the employer, although it may choose to do so. *Id.* at 181 n. 20, 92 S.Ct. at 398 n. 20. Thus, since retirees are not employees under the Act, § 159(a) itself clearly does not apply.

There is no provision parallel to § 159(a) relating to settlements between retirees and former employers. Nor would creation of a § 159(a) type notice by analogy be appropriate. Section 159(a) represents a policy favoring settlements while protecting the union's interest in the integrity of the collective bargaining agreement and the *terms and conditions of employment of the active employees.* The statute requires notification to the union prior to employer settlements with active employees out of recognition of the union's status as the active employee's sole bargaining representative. In the case of retirees, who are not employees or members of the bargaining unit and whose relationship to the employer and union is not directly controlled by the labor statutes, this primary rationale for notification no longer exists. While the union may have bargained for and received benefits for retirees, it does not have the same interest in the enforcement of those contractual rights on the behalf of individual retirees that it has in the terms and conditions of employment of active employees. Unlike the active employees, retirees

court in conjunction with the summary judgment motions and litigated by the parties without assertion of procedural error, it would be

unfair to now, *sua sponte,* foreclose Yard-Man's legitimate defense.

face no restrictions whatever in seeking fulfillment of contractual benefits directly from their former employer. *See Rehmar v. Smith*, 555 F.2d 1362, 1370 n. 6 (9th Cir.1976); 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20. *See also Smith v. Evening News Ass'n*, 371 U.S. 195, 200–201, 83 S.Ct. 267, 270–271, 9 L.Ed.2d 246 (1962). Similarly, the union is under no obligation to seek enforcement of such rights. *See, e.g., Nedd v. United Mine Workers of America*, 556 F.2d 190, 200 (3d Cir.1977).

While a collective bargaining agreement is not simply an ordinary contract, *see, e.g., Hendricks v. Airline Pilots Association, International*, 696 F.2d 673, 676 (9th Cir.1983), the vested rights of a retiree are essentially contractual in nature. *Cf.* 404 U.S. at 181 n. 20, 188, 92 S.Ct. at 398 n. 20, 402. Thus, the relationship of retiree and employer is unadorned with those special considerations peculiar to the relationship between an active employee, his union and the employer which justified creation of those minimal notice requirements that do exist for active employees under the national labor laws.[12] In settling a claim for vested benefits, the retiree does not modify the collective bargaining agreement. Nor can the retiree affect the terms and conditions of employment by doing so, as an active employee might upon direct settlement of a grievance with the employer. A direct settlement between an active employee and the employer which is inconsistent with the terms of the collective bargaining agreement might, for example, result in an unfair labor practice. This is not the case for retirees who are free to settle their differences with the former employer on whatever terms desired, including a compromise over disputed contractual benefits.

Active union members need their joint common strength to bargain most effectively for improvements in wages, hours and working conditions. That need is explicitly recognized in the federal labor statutes. 29 U.S.C. §§ 151, 157, 159. *See also Pittsburgh Plate Glass*, 404 U.S. at 174–75, 175 n. 15, 92 S.Ct. at 395–96 n. 15. As retirees, however, former employees do not need that joint common strength to enforce their vested contractual rights against their former employer. *See* 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20. *See also id.* at 172–73, 92 S.Ct. at 393–95; *Pittsburgh Plate Glass Co., Chemical Div. v. NLRB*, 427 F.2d 936, 942 n. 9, 946 (6th Cir.1970), *aff'd* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). Each retiree has an undisputable and effective remedy against the employer for a breach of contract under § 301(a).[13] *See* 404 U.S. at 176, 188, 92 S.Ct. at 396, 402. The retiree, no longer a member of the union, may not want the union to be notified of what the retiree wishes or intends to do. This Court is unable to discern any policy basis in federal labor law which would be served by rejecting application of the well-established principle of accord and satisfaction to disputes over retiree benefits merely because they were created in collective bargaining agreements. Such a rejection would not in any fashion promote labor peace or the interests of the individual retirees.

The case for creating such a notice rule in the narrow circumstances in which a union has actually undertaken representation of the retirees in a § 301(a) litigation is somewhat more compelling. Under these circumstances the union has clearly manifested its interest in the preservation of the disputed benefits and presumably believes

---

12. The principle of accord and satisfaction has actually already been applied to the claims of an active employee in a context distinct from those at bar. *See Keppard v. International Harvester Co. and International Union, UAW*, 581 F.2d 764 (9th Cir.1978). The Ninth Circuit in this case did not, however, explicitly analyze whether application of the principle was consistent with national labor policies.

13. Nor is a need for joint assertion of contractual rights by retirees anywhere explicitly recognized by the labor laws. Title 29 U.S.C. §§ 158(d), 159(a) (1976), cited by the UAW in support of its contention of exclusive representation of retirees, are clearly inapposite. Under the rationale of *Pittsburgh Plate Glass*, retirees are *not* employees or members of the bargaining unit and, therefore, not subject to the protections or strictures of those provisions. *See* 404 U.S. at 181–182, 92 S.Ct. at 398–399.

collective legal representation to be in the best interests of its former members. Yet, all of the reasons for not creating such a notice requirement in the absence of a union instituted § 301 suit apply with equal force when the union has undertaken such representation. Nor is there any new discernible inconsistency between direct retiree-employer settlements and national labor policies brought about by the union's active role in initiating a § 301(a) litigation.[14] Most importantly, we do not believe that the union's interest in the retirees' contractual claims is sufficient to either demand judicial creation of a procedural notice requirement or override the right of individual retirees to settle their contractual disputes directly with their former employer.

The UAW contends that there can be no meeting of the minds on a substituted performance when the legal representative of the suing party has not been contacted. Since this is not true in normal civil litigation, *see, e.g., Lewis v. S.S. Baune,* 534 F.2d 1115, 1122 (5th Cir.1976); *Cook v. Moran Atlantic Towing Corp.,* 76 F.R.D. 481 (S.D. N.Y.1977); *Krause v. Hartford A. & I. Co.,* 331 Mich. 19, 26–27, 49 N.W.2d 41 (1951), the validity of this assertion depends upon the existence of special considerations particular to federal labor law. As discussed above no such special considerations exist.

We do not suggest that the union has no standing to bring a suit on behalf of retirees. *United Steelworkers of America,*

*AFL–CIO v. Canron, Inc.,* 580 F.2d 77, 80 (3d Cir.1978). As a signatory to the contract it could bring an action for the third party beneficiary retirees. Nor do we suggest that the union is without interest in the outcome of potential settlements between the employer and the retirees. *See, e.g.,* 404 U.S. at 176 n. 17, 92 S.Ct. at 396 n. 17. *See also Toensing v. Brown,* 528 F.2d 69, 72 (9th Cir.1975); *Rosen v. Public Service Electric and Gas Company,* 477 F.2d 90, 94 n. 8 (3d Cir.1973); *UAW v. Acme Precision Products,* 515 F.Supp. 537, 539–40 (E.D. Mich.1981). Clearly the union's efforts in ensuring employer compliance with all of the terms of a collective bargaining agreement are a significant consideration for the active employees when choosing to retain the union as their exclusive bargaining representative. In this sense the union has a direct interest in maintaining the integrity of the retiree benefits created by the collective bargaining agreement.[15] *See* 404 U.S. at 176 n. 17, 92 S.Ct. at 396 n. 17. Yet, the issue here is not whether or not the union has some residual representation interest in the fate of former members of the bargaining unit.[16] Rather, the issue essentially concerns the right of individual retirees to resolve disputes over contractual benefits directly with the former employer without the union's involvement. There are simply no discernible federal labor law policies which restrict the right of individual retirees to settle their contractual disputes

---

14. The UAW does not claim that Yard-Man's legal counsel, either directly or through its client, was the actual instigator of the present settlement. Such contact is prohibited by the Code of Professional Responsibility of the American Bar Association. *See* EC 7–18; DR 7–104.

15. The Union in this case, however, has presented no evidence that settlement by individual retirees in any way compromises the rights of other retirees or interests of the Union itself as signatory to the collective bargaining agreement. We are sympathetic of the Union's distress at not being notified by Yard-Man prior to their settlement offer to the retirees. This Court will nevertheless not speculate as to the existence of some unknown harm not asserted by the parties in interest.

16. The dissent strongly implies that a union's duty to fairly represent the claims of its members extends to retirees. This proposition overlooks that the very rationale for creating a duty of fair representation—the exclusivity of contractual grievance and arbitration remedies—does not exist in the context of retirees who, without restraint, may litigate their disputes with their former employers directly under § 301. *See Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Pittsburgh Plate Glass,* 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20. However, since this issue is not squarely presented by the facts of the present case, we leave its ultimate resolution for another time.

directly with their former employer without notice to the union.

Even accepting that some minimal form of notice to the union may be desirable once the union has undertaken legal representation on the retirees' benefits, there are compelling reasons why we should not adopt a judicially mandated procedural requirement. First, it is important that in requiring notice we would be creating a procedural rule, something courts are reluctant to do, unless required by due process. There would be the problem, of defining when notice must be given. Should it be required for every settlement with every retiree? Clearly this would be inappropriate. Yet which rights or benefits are so significant that notice would be required? And by what measure do the district courts determine that question? This procedural rule would presumably be applied not only in this litigation, but in a myriad of unknown pending controversies. We cannot know its effect in those unknown cases. Without clear justification of significance beyond the special circumstances presented in the case at bar this uncertainty strongly cautions against judicial adoption of any rule.

This is particularly true where, as in this case, the law already provides protection against the harm perceived. If, on remand, the District Court determines that the retirees had been victims of overreaching, the present settlements could be set aside. *See, e.g., S.S. Braune,* 534 F.2d at 1122. Collectively bargained benefits for retirees have existed for scores of years now and so far as can be determined there has been no need for such notice. This is another prag-

matic reason for not creating such a duty now in the absence of some clear policy reason to do so.

**[15, 16]** In the present case the District Court held that, as a matter of law, Yard-Man could not provide a substituted performance in accord and satisfaction [17] of contractual obligations to the retirees. Since we have found this to be in error, it is necessary to determine what principles of accord and satisfaction should be applied. Even though essentially contractual in nature, the disputed retiree benefits in this case nevertheless arise under a collective bargaining agreement and may be, as here, the subject of a federal suit under § 301 of the National Labor Relations Act. Under these circumstances, it is clear that it is federal substantive law which controls resolution of the contractual dispute. *Lincoln Mills,* 353 U.S. at 456–57, 77 S.Ct. at 917–18. In the absence of controlling federal law principles, however, we may look for guidance to general common law principles, including the substantive law of the state in which the contract arose. These borrowed principles in this context, of course, are "absorbed as federal law" and become the federal common law of labor disputes. See id. at 457, 77 S.Ct. at 918. The principles of accord and satisfaction are well established in both the general common law and the law of Michigan where the present contract originates. The basic elements of this affirmative defense align themselves with normal contract principles of offer and acceptance. There must be a disputed claim,[18] a substituted performance agreed

---

17. The Restatement (Second) of Contracts (Revised Ed.1981) makes a distinction between the principles of substituted performance and accord and satisfaction based on the existence or not of an executory contract. *Compare* § 278 (substituted performance) *with* § 281 (accord and satisfaction). Other authorities do not seem to recognize such a distinction. *See, e.g.,* 5 Williston on Contracts § 680 at 258–61 (3d ed.1961); 6 Corbin on Contracts § 1276 (1962). Although the present settlement would appear to technically fit best into the Restatement's § 281 definition, the distinction is one without a difference under the facts of the present case. The defense raised in this case requires the same essential elements whether characterized

as substituted performance or accord and satisfaction.

18. Professor Corbin indicates that it is not necessary for the defense of accord and satisfaction that the claim is doubtful or disputed. *See* 6 Corbin on Contracts § 1278, p. 126. Whether a "dispute" is necessary or not is, however, irrelevant in the present case since a bona fide dispute was clearly created by Yard-Man's initial protestation to the union that performance of the strict terms of the collective bargaining agreement was sufficiently unreasonable to excuse literal performance. No more "dispute" than this is needed in order for the principles of

upon and accomplished, and valuable consideration. *E.g., Risk v. Wells,* 362 Mich. 414, 420, 107 N.W.2d 776 (1961); 262 (1933). *See also Keppard v. International Harvester Co.,* 581 F.2d 764 (9th Cir.1978) (applying California law); *Brock & Blevins Company v. United States,* 343 F.2d 951, 955 (Ct.Cl. 1965). *See generally* 6 Corbin on Contracts § 1276 (1962 & Kaufman, Supp.1982); 5 Williston on Contracts § 680 at 259–61 (3d Ed.1961). For the reasons already discussed we see no discernible inconsistency between these general principles and federal labor law.

[17] The factual predicates for Yard-Man's defense remain unresolved and summary judgment, therefore, is inappropriate. On remand the District Court must apply the basic elements of the affirmative defense of accord and satisfaction to determine whether such defense is viable. The court should also consider any contention that the actions of Yard-Man constituted overreaching. We affirm in part and reverse in part and remand this issue to the District Court for further proceedings consistent with this opinion.

HOLSCHUH, District Judge, concurring in Part I, dissenting in Part II.

I fully concur in the majority's holding in Part I of its opinion that Yard-Man, in terminating the life and health insurance benefits of its retired employees at the expiration of the collective bargaining agreement, breached that agreement.

However, I must respectfully dissent from the majority's holding in Part II of its opinion. I believe that the judgment of the District Court ordering specific performance of Yard-Man's contractual obligation to purchase an annuity for its retirees should be affirmed for several reasons. First, the District Court's rejection of Yard-Man's sole defense in the lower court of substantial performance is not contested on this appeal, and Yard-Man cannot raise for the first time on appeal the alleged affirmative defenses of accord and satisfaction and estoppel. Second, even if these defens-

es could be asserted for the first time on appeal, there is no evidence in this record that would support them. Third, and of great importance, even if these defenses could now be asserted for the first time, the application of these defenses under the circumstances of this case would be inconsistent with national labor policies and should not be incorporated into the substantive federal law governing this action. The majority opinion finding the defense of accord and satisfaction to be applicable in this case represents, in my view, a troublesome precedent that could encourage an employer who desires to change retirement benefits to ignore the union that won those benefits in the collective bargaining process and to deal directly with the unorganized and economically vulnerable retirees.

### I.

Under the collective bargaining agreement between Yard-Man and the UAW, employees and retirees at Yard-Man's Jackson, Michigan plant were covered by two separate pension plans—the Basic Plan, a qualified plan under the Employee Retirement Income Security Act of 1974 (ERISA), and the Improved Plan, a non-qualified plan under ERISA. With respect to the Improved Plan, Article XVIII of the agreement expressly and unequivocally required Yard-Man, in the event of a business failure, to "fund the balance of the pension benefits payable to employees then on retirement through the purchase of an annuity from a life insurance company." Yard-Man does not dispute that the closing of the Jackson plant was an event under Article XVIII that triggered Yard-Man's duty to purchase the required annuity.

Following the closing of the Jackson plant in 1975, the union brought this action in October 1977 seeking, among other forms of relief, specific performance of Yard-Man's obligation to purchase the required annuity. After this action had been commenced, Yard-Man requested from five major insurance companies bids for an annuity to cover benefits under both the Basic Plan

accord and satisfaction or substituted perform-        ance to apply.

## INTERN. U., UNITED AUTO., AERO., ETC. v. YARD–MAN   **1489**

Cite as 716 F.2d 1476 (1983)

and the Improved Plan. Three of the five companies responded with quotations. New York Life Insurance Company refused to bid on the Improved Plan because it was a non-qualified pension plan; the Travelers Insurance Company submitted a bid on the Improved Plan contingent upon the award of the annuity for the Basic Plan; and the Metropolitan Life Insurance Company submitted a bid for both plans on the assumption that the Improved Plan was a qualified pension plan. Yard–Man chose to accept Metropolitan's bid to cover the Basic Plan only, thereby rejecting Travelers' bid to cover both the Basic and Improved Plans.

Yard–Man decided that, rather than purchasing the required annuity for the Improved Plan (at considerable expense to Yard–Man), it would unilaterally, without notice to the union, terminate all further payments that the annuity would have provided and distribute instead lump sum cash payments in amounts determined by Yard–Man to be equal to the present value of the expected future payments under the Plan. Yard–Man then sent the following notice to the retirees participating in the Improved Plan:

### NOTICE TO FORMER PARTICIPANTS IN THE YARD–MAN PENSION PLAN—JACKSON

The Improved Yard–Man Pension Plan—Jackson was an arrangement by which Yard–Man Inc. made gratuitous payments out of general assets to supplement benefits provided under the Yard–Man Pension Plan—Jackson. The Improved Plan was designed to provide at least a minimum amount of benefits to participants who retired on or before July 31, 1975. Improved Plan benefits were included in with your periodic payments made under the Yard–Man Pension Plan—Jackson through October 31, 1978.

Effective November 1, 1978, each participant in the Improved Yard–Man Pension

Plan—Jackson will receive a lump sum payment equal to the present value of all his or her expected future payments (see cover letter for figures). There will be no further payments made after the lump sum distribution. This lump sum distribution is *not* being made from a qualified retirement plan.

Any overpayments made under the Yard–Man Pension Plan—Jackson will be recovered by reducing the amount of any lump sum distribution. However, if the overpayment exceeds the amount of any lump sum distribution, there will be no additional reduction in benefits. If you have any questions, please contact Yard–Man Inc., Montgomery Ward Plaza, 3N, Chicago, Il 60671.

### II.

It is undisputed that at the time this lawsuit was filed on October 5, 1977, Yard–Man had not purchased the annuity required by Article XVIII of Yard–Man's contract with the union. Accordingly, in Count II of its Complaint the union sought specific performance of Yard–Man's contractual obligation to fund by purchase of an annuity the balance of the pension benefits due under the Improved Plan.

Yard–Man's Answer to Count II was basically an admission of its obligation but a denial of the breach and a denial of the union's claimed right of arbitration (subsequently waived by agreement of the parties). Although the Answer set forth a list of affirmative Defenses, it included neither estoppel, as it is now asserted,[1] nor accord and satisfaction. It is understandable, of course, why Yard–Man initially did not plead in its Answer the affirmative defenses of accord and satisfaction and estoppel based upon receipt by retirees of the cash distributions, since no such distribution had yet been made. Yard–Man filed its Answer on February 6, 1978, and made the cash distributions on or about November 1, 1978.

---

1. Affirmative defense Number 7 asserted estoppel, but not as Yard–Man now asserts it: "plaintiffs are estopped from bringing this action because they failed to file timely griev-

ances under the labor contract and are further barred by the doctrine of laches and/or the applicable statutes of limitations."

Although Yard-Man in its Answer reserved the right "to plead such further defenses after continuing investigation and discovery pursuant to court rules," the record is clear that Yard-Man never filed any supplemental Answer raising the defenses of accord and satisfaction and estoppel arising from the cash distribution or sought to add either of those defenses to the list of affirmative defenses attached to its original Answer. The record is also clear that Yard-Man had ample opportunity subsequent to the cash distribution to raise these defenses. The union filed its motion for summary judgment in February 1979, and Yard-Man responded to that motion and filed its cross-motion for summary judgment in March 1979. The District Court held a hearing on the motions for summary judgment in April 1979—some five months after the cash distributions were made. At no time did Yard-Man assert either of the defenses it now raises as any defense to the union's motion for summary judgment or as a basis to support its own motion for summary judgment—either in the briefs filed or in the oral arguments made in the District Court.

In its trial court brief, Yard-Man contended that "the lump sum distribution constitutes substantial compliance with the contract provision and was the only viable alternative open to defendant by which the benefits of the Improved Plan could be distributed," (J.A. 81A), and that "performance of the literal language of Article XVII Section 1 was impossible and that a rea-

sonable alternative form of compliance was adopted." (J.A. 83A). In the oral argument, Yard-Man again argued that in view of "the practicalities of the situation," Yard-Man "attempted to do what was reasonable, what was fair." (J.A. 166–167A). The District Judge found neither the argument of "substantial compliance" nor that of "impossibility of performance" to be meritorious, finding, instead, that Yard-Man could have purchased the required annuity but chose to make the cash distributions simply because it was the most economical course for Yard-Man to take. (J.A. 110A).

My examination of the Joint Appendix reveals that the defenses of accord and satisfaction and estoppel were raised for the first time before this Court in the brief filed by Yard-Man.[2] Although the union responded to the appellant's arguments, I do not believe appellee's response prevents this Court from adhering to its firmly established principle of considering on appeal only questions that were presented to the District Court. *Ash v. Board of Education of Woodhaven School Dist.,* 699 F.2d 822, 827 (6th Cir.1983); *Roberts v. Berry,* 541 F.2d 607, 610 (6th Cir.1976); *Compton v. Tennessee Dept. of Public Welfare,* 532 F.2d 561, 563 n. 1 (6th Cir.1976).

This appeal, therefore presents a situation in which the defendant failed to raise before the trial court two defenses that are required by Fed.R.Civ.P. 8(c) to be raised as affirmative defenses and now, after judg-

---

**2.** Yard-Man's arguments in the trial court that it had substantially performed its obligation or that complete performance of its obligation was impossible do not constitute an assertion of the affirmative defenses of accord and satisfaction or estoppel. Yard-Man's arguments were simply that its conduct in sending the retirees cash payments constituted sufficient performance of its contractual duty and did not raise any issue regarding Yard-Man's intention that these payments were to be in settlement of a disputed claim or that the beneficiaries in accepting those payments intended to do so as a settlement of a disputed claim. Yard-Man's arguments concerned only the sufficiency of defendant's conduct and were based upon different factual and legal considerations than those relevant to the defenses of accord and

satisfaction or estoppel, which involve alleged conduct on the part of the plaintiffs. Yard-Man's arguments of performance could properly be made under its general denial of a breach of the agreement. Any defense based upon the beneficiaries' alleged conduct in acceptance of the cash payments, however, would avoid the question of performance and seek to escape liability on other grounds. As matters of avoidance and affirmative defenses, therefore, accord and satisfaction and estoppel were required to be set forth in defendant's pleadings, Fed.R.Civ.P. 8(c), and cannot be raised for the first time after a judgment has been rendered in favor of the plaintiff. *Cf. Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 512 (2d Cir. 1977).

ment has been rendered in favor of plaintiff, defendant raises them for the first time on appeal from that judgment. Clearly, in my view, under these circumstances an appellate court should not consider these waived defenses and belated arguments, thereby giving the defendant an undeserved "second bite of the apple." Inasmuch as the affirmative defenses were not raised in the trial court, it is incorrect to say, as the majority does, that they were "rejected without discussion by the District Court" or that "the District Court held that, as a matter of law, Yard-Man could not provide a substituted performance in accord and satisfaction of contractual obligations to the retirees." The District Court did not reject these defenses nor did it reach any conclusion regarding their applicability, simply because they were never presented to that Court. The District Judge having committed no error, the judgment below should be affirmed.[3]

### III.

Even if it is assumed that the applicability of the defenses of accord and satisfaction and estoppel is properly before the appellate court for review, then it is important, at the outset, to determine specifically what issues this case does and does not present for our consideration. In my opinion, the reasoning of the majority is based in part upon issues that are *not* involved in this case.

No dispute has ever existed in this case concerning Yard-Man's express, unambiguous promise in the collective bargaining agreement to purchase for the retirees the insurance company annuity set forth in Article XVIII of the contract. Yard-Man has never denied this obligation. Instead of fulfilling that promise, however, Yard-Man unilaterally, without any prior notice to the union or retirees and without any prior consent or agreement of the union or retirees, decided that it would *not* fulfill that promise because of the cost to Yard-Man but, instead, would terminate the Improved Plan and send lump sum cash payments, in amounts determined solely by Yard-Man, to the retirees. This attempt by Yard-Man unilaterally to modify the contract by selecting a benefit of Yard-Man's choosing for a benefit that was included in its collective bargaining agreement with the union was an obvious breach of that agreement. The issue, therefore, is more correctly stated as follows: whether an employer, having contractually bound itself in a collective bargaining agreement to provide certain vested benefits to its retirees, may unilaterally modify that contract, without notice to or consent of the union, the other contracting party, by selecting different types of benefits for the retirees and then assert, in a breach of contract action by the union, the defenses of accord and satisfaction and estoppel based upon the failure of the retirees to reject those benefits.

---

**3.** I do not deem it "of paramount significance," as the majority suggests, that the words "accord and satisfaction" were never utilized before the District Court, although it does seem to me that if Yard-Man truly intended to raise that well recognized defense in the trial court it would have referred to it by its name at some point somewhere in its briefs or in its oral argument to the trial Judge. Nor do I deem the failure of Yard-Man to amend its answer to assert this affirmative defense to be in and of itself dispositive of the question whether it can now raise that defense, although, again, it seems to me that if Yard-Man truly intended to raise that defense in the trial court it would have taken the simple step of seeking leave of the District Court to amend its Answer. Instead, I base my conclusion that Yard-Man is now foreclosed from asserting this defense on

the fact that the record simply does not show any attempt by Yard-Man—until it reached the appellate court—to rely upon this defense, to argue its applicability, to cite authority in support of the defense or to otherwise, in some manner, let the trial Judge know that it was being raised and presented to him for decision. I do not regard the few words in a single sentence in a brief, "a reasonable alternative form of compliance was adopted," as presenting to the trial court a defense of accord and satisfaction or substituted performance. Those few words appeared in the context of Yard-Man's argument that it was impossible to perform the contract as written and that the alternative chosen by Yard-Man constituted substantial performance of a contract, a defense considered and rejected by the District Court.

**1492**          **716 FEDERAL REPORTER, 2d SERIES**

While it is important to state the precise issue that is before us, it is equally important to state what is *not* before us. Contrary to the majority's statement of the issues, this case does *not* involve any "settlements" by the retirees of any disputed claims, either collectively or individually. Yard-Man never denied its contractual obligation to the retirees. This case is to be distinguished, therefore, from cases in which an employee or a retiree seeks in a § 301 action to enforce the terms of a collective bargaining contract, the employer denies any liability under the contract, and a third party is called upon to resolve a *dispute* over the interpretation or applicability of the contract.[4] The present case, to the contrary, involves an attempt by the employer to *change* the terms of a collective bargaining agreement regarding an entire class of beneficiaries. Instead of providing the benefits admittedly required by the contract, the employer, on its own initiative and without notice to or approval of the other contracting party, unilaterally chose to provide an entirely different kind of benefit. It is, purely and simply, a unilateral modification of the contract, constituting a breach of that contract, and it is my belief that under the circumstances of this case the common law defenses of accord and satisfaction and estoppel are not applicable as a matter of common law. Even if applicable as a matter of common law, the assertion of such defenses under the circumstances of this case would be contrary to firmly established policies of federal labor law.

### IV.

The majority sets forth the basic elements of the common law defense of accord and satisfaction as follows: "there must be a disputed claim, a substituted performance agreed upon and accomplished and valuable consideration." As Judge Frank noted in *Fleming v. Post,* 146 F.2d 441 (2d Cir.1944), "[a] condition precedent to a valid accord

and satisfaction is the establishment of a bona fide dispute over liability." I fail to see any "bona fide dispute over liability" in the present case. Yard-Man never denied its obligation to purchase an annuity to fund the Improved Plan; it simply tried to discharge that obligation in a manner different than that required by the contract. In other words, the dispute in this case is *not* over Yard-Man's contractual liability; the dispute is over the payments themselves, *i.e.,* did they constitute "substantial compliance" with Yard-Man's contractual duty. The payments were not in *response* to a disputed claim; they *created* a disputed claim.

Furthermore, I have difficulty in finding any evidence that "a substituted performance agreed upon and accomplished" existed under the facts of this case. Yard-Man's idea of what would be a "substituted performance" was Yard-Man's idea and no one else's. It did not discuss this possible substitution with the union; it did not discuss it with the retirees. In fact it never sought approval of anyone, other than perhaps its own attorney, to make this substitution. The majority, however, finds nothing wrong with Yard-Man's conduct in bypassing the union, citing a number of cases in which there has been a "meeting of the minds on a substituted performance when the legal representative of the suing party has not been contacted." Those cases, however, all involved actions in which parties to litigation, without the approval of their attorneys, settled their disputes. I have absolutely no quarrel with the established principle that parties have a right to settle or compromise their litigation without the knowledge or consent of their attorneys. That proposition would be applicable here if defendant Yard-Man and plaintiff union had met and reached an agreement, subject to the vested rights of the beneficiaries, to settle this litigation, even though the agreement was reached without the knowledge

---

4.  In such a case it is possible that the doctrines of accord and satisfaction and estoppel may be asserted as defenses to the individual's lawsuit. *Cf. Keppard v. International Harvester Co.,* 581

F.2d 764 (9th Cir.1978), cited by the majority in footnote 12 and discussed *infra* in this dissenting opinion.

## INTERN. U., UNITED AUTO., AERO., ETC. v. YARD–MAN   **1493**
Cite as 716 F.2d 1476 (1983)

or consent of their respective attorneys. However, I do not think the principle is applicable when the *parties* to this litigation never reached a settlement, compromise or agreement.

The plaintiff in this action was never consulted about Yard-Man's proposed substituted performance. Moreover, Yard-Man's notice to the retirees did not constitute a suggestion, a request or a choice. It was a statement of a fact accomplished— *not* an offer to be accepted or rejected by the retirees. Few, if any, elderly retirees are familiar with the subtle refinements of the doctrine of accord and satisfaction, and no basis exists for any finding that an accord and satisfaction defense could be available to Yard-Man under the circumstances of this case.

Nor, of course, could any estoppel defense be available to Yard-Man. In *Lovetri v. Vickers, Inc.,* 397 F.Supp. 293 (D.Conn. 1975), the employer, upon closing a plant, sent termination notices that gave plaintiff retirees the option of receiving a cash payment or an annuity. The plaintiffs elected the option of receiving the cash but subsequently brought suit claiming that the employees were entitled to a more favorable choice of benefits. In rejecting any estoppel defense, the court said,

> [p]laintiffs, however, cannot be estopped because they took cash "in lieu of" their pension benefits. They were not offered the cash as a liquidation of a disputed right, *Fleming v. Post,* 146 F.2d 441 (2d Cir.1944), or as a part of a plant closing agreement intended to supersede the pension plan and their rights thereunder, *cf. Craig v. Bemis Co., Inc.,* 374 F.Supp. 1251 (S.D.Ala.1974). Whatever the language used in the notice of termination of employment, plaintiffs were offered what defendant even now maintains were their rightful options under the pension plan. They did not forfeit the right to challenge the adequacy of the choice simply because they elected one or the other of the options they were given.

*Id.* at 297.

The employer in the present case did not give the retirees *any* option; the employer

did not offer cash payments as a liquidation of a disputed right; the employer does not allege the existence of a plant closing agreement intended to supersede the collective bargaining agreement; and clearly the retirees are not estopped from demanding enforcement of their contract rights by virtue of Yard-Man's arbitrary decision to substitute something else in place of what the union bargained for. Aside from the fact that the required elements of an estoppel are nowhere present in this record insofar as the retirees are concerned, the plaintiff seeking enforcement of the contract in this action is the other signatory to the contract, the employees' union. Yard-Man does not assert—nor could it—any claim that the union has done anything that would be the basis for an estoppel defense.

### V.

Even if Yard-Man had raised accord and satisfaction and estoppel as defenses in the lower court and even if some evidence existed in this record to legitimately support such defenses, I would hold—as a matter of federal substantive law—that in suits under § 301 the assertion of such state law defenses under the circumstances of this case is incompatible with federal labor policy.

### A.

As the majority correctly notes in Part I of its opinion, it is well settled that the enforcement of collective bargaining agreements under § 301 is governed not by state law but by federal substantive law. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1956). The majority also recognizes that in the absence of express federal substantive law a federal court may look to state law in fashioning new federal substantive law. However, the *Lincoln Mills* Court cautioned that courts are to utilize state law only if it is compatible with the purposes of § 301 and only if it is "the rule that will *best* effectuate the federal policy." *Id.* at 457, 77 S.Ct. at 918 (emphasis added).

The majority has apparently concluded that the application of the Michigan law of accord and satisfaction to the facts of this case is to no extent inconsistent with national labor policies, that application of such law "will best effectuate the federal policy," and that such law is, therefore, properly absorbed as federal law. My opinion, however, is that the state law contract defense of accord and satisfaction *as applied in this case* is inconsistent with federal labor law and that this is a case in which "preoccupation with the doctrines of ordinary contract law will thwart realization of Congressional policy." *United Brotherhood of Carpenters and Joiners v. Hensel Phelps Construction Co.,* 376 F.2d 731, 735 (10th Cir.1967).

When determining whether the application of state law is compatible with federal labor policy, it is important to note that since *Lincoln Mills* the Supreme Court has repeatedly emphasized that a collective bargaining agreement is not an ordinary contract and is not governed by ordinary contract principles that govern contracts between private parties. *Trans-Communications Employees Union v. Union Pacific Railroad,* 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966); *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Accordingly, federal courts have not hesitated to depart from basic contract principles in dealing with collective bargaining agreements. For example, in *John Wiley & Sons, supra,* the Court held that under certain conditions nonparties may be bound by a collective bargaining agreement. Similarly, in *Darnel v. East,* 573 F.2d 534 (8th Cir.1978), the Eighth Circuit Court of Appeals rejected the contract defense of lack of consideration as incompatible with federal labor policy. "In dealing with such agreements courts should not be preoccupied with principles which might apply to an ordinary contract." *Hendricks v. Airline Pilots Association International,* 696 F.2d 673, 676 (9th Cir.1983), (citing *Lodge 1327, Int'l Ass'n of Machinists v. Fraser & Johnston Co.,* 454 F.2d 88, 92 (9th Cir.1971)).

**B.**

In reaching its conclusion that Yard-Man's assertion of the defense of accord and satisfaction, arising from Yard-Man's deliberate bypassing of the union and direct dealing with individual retirees, is not incompatible with federal labor policies, the majority relies heavily upon *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). That case does not, in my view, support such a conclusion.

In *Pittsburgh Plate Glass* the employer informed the union of its intention to write each retired employee, offering to pay that retiree's supplemental Medicare premium if the employee would withdraw from the negotiated health insurance plan. Despite the union's objections, the company circulated its proposal or offer to the retired employees, and 15 of the 190 retirees elected to accept it. The union filed an unfair labor practice charge against the employer, contending that the employer's conduct was a refusal to bargain collectively with the union and a unilateral mid-term modification of the contract in violation of 29 U.S.C. §§ 158(a)(5) and 158(d). The single and only issue was whether the employer had committed an unfair labor practice. The Supreme Court concluded, as a matter of statutory history and construction, that the statute requiring collective bargaining "with respect to wages, hours, and other terms and conditions of employment" included neither retirement benefits nor retirees within its scope. The Court also held that a "modification" of a collective bargaining contract is a prohibited unfair labor practice only when it changes a term that is a mandatory rather than a permissive subject of bargaining. At the same time, however, the Court pointed out that the narrow issue before it did not concern the enforceability of the contractual obligations to the retirees. *Id.* at 177 n. 17, 92 S.Ct. at 396 n. 17. The Court ended its decision with the important statement that,

[t]he remedy for a unilateral mid-term modification to a permissive term lies in

INTERN. U., UNITED AUTO., AERO., ETC. v. YARD–MAN   **1495**

Cite as 716 F.2d 1476 (1983)

an action for breach of contract, . . . not in an unfair-labor-practice proceeding.

*Id.* at 188, 92 S.Ct. at 402 (footnote omitted).

The present action is, of course, exactly the type of breach of contract action under § 301 that the Supreme Court indicated is the proper course to enforce compliance with the terms and conditions of the collective bargaining agreement. Nothing in *Pittsburgh Plate Glass* affects to the slightest degree the fundamental law that in such contract enforcement actions considerations of national labor policies override incompatible common law defenses.

Relying upon *Pittsburgh Plate Glass,* the majority concludes that 29 U.S.C. § 159(a), in particular the proviso contained therein, has no application to retirees. The proviso reads as follows:

*Provided,* that any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* that the bargaining representative has been given opportunity to be present at such adjustment.

I agree that this statute has no direct application to the retirees in this case. By its express terms it applies only to employees and only to the presentation of grievances by those employees. But the critically important aspect of this statute is its codification of one of the most fundamental principles of national labor law, *i.e.,* that collective bargaining contracts, once executed, are to be strictly enforced according to their terms. The statute in question permits the employer, after notice to the union, to adjust an employee's grievance under the contract, but it does *not* permit the employer to make any adjustment that is inconsistent with the terms of the agreement.

Just as an employer may adjust or settle an employee's individual grievance, provid-ed it is not inconsistent with the terms of the collective bargaining contract, so may an employer adjust or settle a retiree's individual claim that is in dispute. The employer's freedom to compromise and settle an individual's disputed claim is not, however, a license to change the terms of the contract itself. In the present case, the issue before us does not concern "the right of individual retirees to resolve disputes over contractual benefits directly with the former employer without the union's involvement," as the majority characterizes it. The issue before us concerns the right of an employer to instigate unilaterally a change of undisputed contractual benefits owed to all its retirees, to bypass the union in dealing directly with the retirees, and then to assert common law defenses of accord and satisfaction and estoppel based upon the retirees' failure to reject the new benefits. I believe that to permit such defenses under these circumstances does violence to (1) the equal bargaining strength concept that is the foundation of collective bargaining between employer and employees, (2) the strong policy of honoring collective bargaining agreements and the union's interest in seeing that collective bargaining contracts, once executed, are enforced according to their terms, and (3) the retirees' interest in preserving vested pension benefits during the years when the old and the infirm depend heavily upon such benefits. Each of these concerns is grounded in national labor policies that greatly overshadow an employer's interest in relying upon state law defenses of accord and satisfaction or estoppel to effectuate a modification of a collective bargaining agreement.

1.

The special protection afforded collective bargaining agreements is grounded in a basic principle of labor law:

National labor policy has been built on the premise that by pooling their economic strength and acting through a labor union freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining

for improvements in wages, hours, and working conditions.

*N.L.R.B. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967). It was by this very process of the active Yard-Man employees "pooling their economic strength" that they were able to bargain not only for their own wages, hours and working conditions but also for important economic concessions for their former fellow employees who reached retirement status. Although the employer was not required to negotiate those benefits for the retirees, *Pittsburgh Plate Glass, supra*, it nevertheless chose to do so and to make its obligations a part of the collective bargaining agreement, thereby avoiding a disruption of its business by a strike. The active employees, likewise, were not required to negotiate those benefits for the retirees, but they did so and undoubtedly at some economic sacrifice on their part. The concessions given by the employer and the benefits gained by the retirees were hammered out in the bargaining process and were the product of collective activity by labor—a federally recognized and protected activity.

The concept underlying Congressional labor policy is an attempt to place the employer and its employees in relatively equal positions of bargaining strength. The union used its collective strength in obtaining from the employer the benefits for retirees as a part of the contract negotiated by the union and the employer. The employer cannot now attempt to regain from the individual retirees what it gave up in the collective bargaining process.

I would hold that an employer seeking a modification of a collective bargaining agreement whereby it could distribute benefits different from those it had previously agreed to pay would be required to seek the union's consent to such a modification. To hold otherwise and to permit the employer to completely bypass the union and go directly to individual beneficiaries to effect a change in the contract would pit the sophistication and power of an employer against the unorganized and less sophisticated individual retirees. As this Court itself observed in the *Pittsburgh Plate Glass* case, [r]etired employees have no economic or bargaining power within this system. Their financial security derives from past economic power pragmatically and prudently exercised. Once retirement benefits have been bargained for, earned, and become payable, the employer may not recant on his contractual obligation to pay them.

*Pittsburgh Plate Glass Co. v. N.L.R.B.*, 427 F.2d 936, 946 (6th Cir.1970), *aff'd sub nom. Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

In my opinion, it would be a dilution of that "past economic power pragmatically and prudently exercised" and a destruction of the balanced power that is the keystone to collective bargaining to permit the employer to "recant on his contractual obligation," do an "end run" around the union with which it bargained, and then claim accord and satisfaction as a result of its direct dealing with the retirees.

### 2.

Once Yard-Man executed the collective bargaining agreement, strong federal policy required that it adhere to its commitments, and Congress specifically placed jurisdiction in the federal courts to enforce those obligations. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). It is Congressional policy that the administration of collective bargaining contracts be accomplished under a uniform body of federal substantive law. *Smith v. Evening News Ass'n*, 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962).

In the face of this fundamental policy that all collective bargaining contracts should be honored and enforced under a uniform body of federal law, I am at a loss to understand why this policy should be less important in cases concerning bargained for benefits for retirees than in cases concerning bargained for benefits for active employees. I simply cannot agree with the majority's statement that, "[w]hile the union may have bargained for and received

benefits for retirees, it does not have the same interest in the enforcement of those contractual rights on the behalf of individual retirees that it has in the terms and conditions of employment of active employees." I find it difficult to believe that a union, having negotiated benefits for retirees, undoubtedly at the expense of the active employees, has any less interest in requiring the employer to fulfill its obligations to the retirees under the agreement than it has in requiring the employer to fulfill other obligations contained in the agreement. As the Supreme Court said in *Pittsburgh Plate Glass,*

> [t]he Board stated that "the Union and current employees have a legitimate interest in assuring that negotiated retirement benefits are in fact paid and administered in accordance with the terms and intent of their contracts." 177 N.L.R.B., at 815. That interest is undeniable.

404 U.S. at 176 n. 17, 92 S.Ct. at 396 n. 17.

In a very recent case in our own Circuit involving a union official responsible for assisting retirees, beneficiaries and surviving spouses with benefits under pension and insurance plans, this Court said,

> [o]ne of the most sensitive functions performed by a union is the securing of benefits and the resolution of issues surrounding the rights to benefits. This is of particular concern to union officers since it provides one of the most visible means for the union to show that it is meeting the needs of its members.

*Cehaich v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America,* 710 F.2d 234 at 239 (6th Cir.1983).

Not only does the union have "a legitimate interest in protecting the rights of the retirees," but, as in the present case, when a union actually undertakes representation of the retirees some authority indicates that it has a *duty* to protect their vested rights. See *Toensing v. Brown,* 528 F.2d 69, 70 (9th Cir.1975), in which the court said,

> [i]f the union does undertake to represent retirees, its duty of fair representation requires that their vested retirement rights not be disturbed.

*See also Nedd v. United Mine Workers of America,* 556 F.2d 190, 200 (3d Cir.1977) (when union elects to enforce the employer's obligations, duty of fair representation applies). An employer's circumvention of the union and direct dealing with its retirees in an attempt to modify their contractual vested interests directly interferes with the legitimate interest of the union and its duty to the retirees it represented in the collective bargaining process.[5] To condone this, in my opinion, would be a subversion of the concept of collective bargaining and a threat to stable management-labor relationships and the "industrial peace" that is the ultimate goal of federally protected collective activity. *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967).

3.

When determining the rule of law that will best effectuate federal labor policies, the Court need not limit itself to considering only those policies that prompted passage of the Labor Management Relations Act, but should look also to other expressions of federal policy. The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* (ERISA), for example, is a strong expression of Congress' concern that retirement benefits be protected. As the Ninth Circuit Court of Appeals stated, "[o]ne of the foremost concerns of Con-

---

5. I do not mean to imply that a union is always under some general duty to fairly represent all of the employer's retirees. I suggest only that where, as in the present case, a union has actually undertaken to represent the retirees in a § 301 action to enforce their contractual rights against the employer, a duty of fair representation arises. Inasmuch as the conduct of the union in this regard is not an issue in this case, I fully agree with the majority that any

issue of fair representation is "not squarely presented" by the facts of the present case (p. 1486 n. 15). What is presented, however, is the question of whether the employer's deliberate attempt to bypass the union—the plaintiff in this case—interferes with the union's right to prosecute the action on behalf of the retirees as well as the union's assumed responsibilities to those retirees as their representative in this litigation. In my opinion, it does.

gress in enacting the Act was to assure workers that retirement benefits would be available when needed." *Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729 (9th Cir.1978). Congressional findings and declaration of policy are set forth in 29 U.S.C. § 1001(a), which provides as follows:

> Congress finds that ... the continued well-being and security of millions of employees and their dependents are directly affected by [employee benefit] plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations.

It is undisputed that ERISA does not cover the Improved Plan at issue in this case. However, even though the Act does not cover this plan, the expressed policy considerations that prompted passage of the Act have application to non-ERISA retirement plans and should be considered in determining the rule that will best effectuate federal policy. I believe that the majority's holding that under the circumstances present in this case an employer can assert the affirmative defense of accord and satisfaction is inconsistent with the Congressional concern for the protection of retirement benefits.

### C.

I would hold that when an employer initiates a modification of its retirees' vested benefits without the approval of the union that negotiated those benefits and without the *express* approval of the retirees themselves, the employer, as a matter of federal substantive law, cannot later raise accord and satisfaction or estoppel as defenses in an action to enforce the employer's obligations under the collective bargaining agreement. To hold otherwise is contrary, in my opinion, to the Supreme Court's charge that in § 301 actions courts are to utilize state law only if it is "the rule that will best effectuate the federal policy." *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1972).

Such a holding in this case would not preclude the adoption into federal substantive law of the principle of accord and satisfaction in an appropriate § 301 action. For example, the result reached in *Keppard v. International Harvester Co.*, 581 F.2d 764 (9th Cir.1978) (a case cited by the majority in support of its position), in which the Ninth Circuit Court of Appeals upheld an employer's reliance on the California law of accord and satisfaction, would not necessarily be different under the rule of law that I suggest today. In that case the employee asked his union to press a claim for back wages. The union and the employer eventually settled the claim and the employer tendered to the employee a check for the agreed upon amount. The employee, knowing that the company considered the check a full settlement of his back pay claim, accepted and cashed the check. The district court held, and the court of appeals agreed, that the employee's action completed an accord and satisfaction under California law. *International Harvester*, therefore, involved an individual employee dispute under a collective bargaining agreement in which the employee was represented by the union, a settlement of that dispute by the employer and the union with the recommendation of the union that the employee accept the settlement check, and an awareness by the employee that the check he received was in settlement of the dispute. This type of case is a far cry from one in which the employer decides to change the benefits due an entire class of beneficiaries under the collective bargaining agreement, intentionally bypasses the union representing those beneficiaries, arbitrarily sends the beneficiaries something other than required by its contract with the union, and then relies upon their silence in asserting common law defenses of accord and satisfaction or estoppel.

### VI.

While retirees, as a matter of statutory language and legislative history, do not have the protection of the unfair labor practice statutes against an employer desiring to change their benefits, they do have the protection of federal substantive law as fashioned by the federal courts in a manner consistent with national labor policies. As

the Supreme Court recently reaffirmed, quoting former Justice Goldberg in *Humphrey v. Moore,* 375 U.S. 335, 358, 84 S.Ct. 363, 376, 11 L.Ed.2d 370 (1964),

> [i]t is of the utmost importance that the law reflect the realities of industrial life and the nature of the collective bargaining process. We should not assume that doctrines evolved in other contexts will be equally well-adapted to the collective bargaining process.

*Del Costello v. International Brotherhood of Teamsters,* —— U.S. —— at ——, 103 S.Ct. 2281 at 2294, 76 L.Ed.2d 476 (1983).

Under the circumstances of this case, doctrines of accord and satisfaction and estoppel, developed in other contexts, should not enable an employer to bypass the union with which it dealt in the collective bargaining process and to modify vested pension benefits in reliance upon silent acquiescence of retirees who were presented not with an option but with an accomplished fact.

For the reasons set forth above, I respectfully dissent from Part II of the majority opinion.



**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Daniel Michael DALY, Harold Dean
Klemp, Joseph Diaz, Gene Floyd Criswell, and Michael Richard Ryan, Defendants-Appellants.**

**Nos. 81–1654, 81–1655, 81–1657,
81–1661 and 81–1731.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1982.

Decided Aug. 12, 1983.

As Modified Oct. 4, 1983.

Defendants were convicted in the United States District Court for the Central District of California, Manuel L. Real, Chief Judge, on charges arising out of their involvement in a car theft scheme, and they appealed. The Court of Appeals, Hug, Circuit Judge, held that: (1) under provision in Speedy Trial Act forbidding trial from commencing less than 30 days from date on which defendant first appears through counsel, 30–day period did not commence to run as to two of the defendants when they appeared at bail status hearing with attorneys who were not going to represent them at trial and consequently their convictions would be reversed; (2) district court did not err in declining to excuse prospective juror for cause since his former employment as policeman did not indicate he was inherently biased; (3) Nebraska motor vehicle certificates of title were "securities" under statute prohibiting interstate transportation of falsely made securities; and (4) certificates of title were "falsely made" even though authorized state official recorded false information on genuine title forms.

Convictions of two defendants reversed and remanded; convictions of other defendants affirmed.

**1. Criminal Law** ⚖577.1

Requirement of Speedy Trial Act that defendant consent in writing to commencement of trial less than 30 days from date on which defendant first appears through counsel may not be equated with waiver by silence. 18 U.S.C.A. § 3161(c)(2).

**2. Criminal Law** ⚖577.1

Language of provision in Speedy Trial Act forbidding trial from commencing less than 30 days from date on which defendant first appears through counsel indicates that, in multidefendant case, each defendant must be considered on individual basis. 18 U.S.C.A. § 3161(c)(2).

**3. Criminal Law** ⚖577.1

District court violated provision in Speedy Trial Act forbidding trial from com-