MAURER v. JOY TECHNOLOGIES, INC.     **907**
Cite as 212 F.3d 907 (6th Cir. 2000)

Fifth Circuit has applied the *Lauritzen–Rhoditis* factors to cases where neither the seaman nor the vessel was engaged in traditional, blue-water maritime activities crossing through waters of competing nations. *See Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1019 (5th Cir.1981), *overruled on other grounds, In re Air Crash Disaster,* 821 F.2d 1147, 1163 n. 25 (5th Cir.1987). In *Chiazor,* the plaintiff brought suit to recover damages resulting from an accident which occurred on a submersible drilling rig off the Nigerian coast. *See id.* at 1016. Given the permanent location of the rig, we determined that "such factors as place of wrongful act, allegiance or domicile of the injured and place of contract, which may be less substantial in the shipping context, tend to take on added significance under the present circumstances." *Id.* at 1019. In sifting through the factors and determining how to weigh them in a case involving a fixed drilling platform, we relied on the Ninth Circuit opinion in *Phillips v. Amoco Trinidad Oil Co.,* 632 F.2d 82 (9th Cir. 1980). Like *Chiazor, Phillips* concerned an action for damages for personal injuries occurring on a drilling platform in Trinidad's territorial waters. *See id.* at 83–84. *Phillips* held that the law of the flag should not be accorded controlling weight and the allegiance of the defendant shipowner had diminished importance, while the place of the wrongful act, the allegiance and domicile of the plaintiff workers and the place of contract should be given greater weight. *See id.* at 87.

[6, 7]  We conclude that the facts of this case are more analogous to an injury occurring on a fixed drilling platform than on a vessel in traditional maritime commerce. For that reason, we find that the district court erred in the weight it accorded the *Lauritzen-Rhoditis* factors in this case. When we discount the law of the flag and allegiance of the defendants factors which favor application of United States law, and accord more weight to the Plaintiffs' citizenship and residence, the place of the employment contracts and the place of injury, all of which were in Nicaragua, it is clear that the calculus ultimately dictates application of Nicaraguan law. We note, further, that the district court's assumption that the application of United States law would allow the Plaintiffs a more generous recovery, while almost certainly correct, was not a valid consideration in its choice-of-law analysis. "The fact that the law of another forum may be more or less favorable to a plaintiff, however, does not determine choice of law." *Fogleman,* 920 F.2d at 284.

## CONCLUSION

For the foregoing reasons, we reverse the district court's choice of law determination and remand this case for further proceedings consistent with this opinion.

REVERSED and REMANDED.



Donald H. MAURER; Leslie T. Johnson; Warren H. Rees; William Pompey; Floyd F. Gladman; United Steelworkers of America, Plaintiffs–Appellees/Cross–Appellants,

v.

JOY TECHNOLOGIES, INC., Defendant–Appellant/Cross–Appellee.

Nos. 98–3964, 98–4029.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 15, 1999

Decided and Filed May 12, 2000

Union and retirees brought class action against employer under Labor-Management Relations Act (LMRA), Employee

Retirement Income Security Act (ERISA), and doctrine of promissory estoppel, alleging that employer illegally altered their vested retiree health benefits. The United States District Court for the Northern District of Ohio, Patricia A. Gaughan, J., entered summary judgment as to retirees who had retired before employer sent letter to retirees stating that it reserved right to make changes to retirement plans, entered summary judgment for employer as to retirees who had retired after issuance of letter, and denied retirees and union attorney fees. Union, retirees, and employer appealed. The Court of Appeals, Alan E. Norris, Circuit Judge, held that: (1) retiree health benefits extended beyond durational terms of collective bargaining agreements (CBA) in effect prior to employer's explicit reservation of right to amend such benefits, and (2) District Court did not abuse its discretion in declining to award attorney fees.

Affirmed.

**1. Federal Courts ⬅776**

A district court's order of summary judgment is reviewed de novo. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**2. Federal Courts ⬅776**

Contract interpretation is a question of law subject to de novo review.

**3. Federal Courts ⬅202**

The LMRA gives jurisdiction to federal courts over claims alleging the breach of collective bargaining agreements (CBA). Labor Management Relations Act, 1947, § 301(a), 29 U.S.C.A. § 185(a).

**4. Pensions ⬅62**

A retiree health insurance benefit plan is a "welfare benefit plan" under ERISA, and thus, unlike a pension plan, is not subject to mandatory vesting requirements. Employee Retirement Income Se-

curity Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Pensions ⬅62**

There is no statutory right under ERISA to vested retiree health benefits, and the parties must agree to vest a welfare benefit plan. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**6. Labor Relations ⬅264**
**Pensions ⬅62**

If the parties intend to vest retiree health benefits and the collective bargaining agreement (CBA) establishing this is breached, there is an ERISA violation as well as a LMRA violation. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

**7. Pensions ⬅62**

Courts can find that rights to retiree health benefits have vested under a collective bargaining agreement (CBA) even if the intent to vest has not been explicitly set out in the CBA.

**8. Pensions ⬅62**

Collective bargaining agreements (CBA) may contain implied terms, and the parties' practice, usage, and custom can be considered in determining whether rights to retiree health benefits have vested under a CBA.

**9. Labor Relations ⬅257.1**

Retiree benefits are in a sense status benefits which, as such, carry with them an inference, for purposes of LMRA claim for such benefits, that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree; this is because benefits for retirees are only permissive not mandatory subjects of collective bargaining, and it is unlikely that such benefits would be left to the contingencies

of future negotiations. Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

**10. Pensions ⟐62, 86**

Although there is an inference that the parties to a collective bargaining agreement (CBA) intended for retiree benefits to vest, the burden of proof does not shift to the employer, and it is not required that specific anti-vesting language be used before a court can find that the parties did not intend benefits to vest.

**11. Labor Relations ⟐257.1**

In interpreting a collective bargaining agreement (CBA), a court must discern the intent of both parties.

**12. Labor Relations ⟐777.1**
**Pensions ⟐86**

In invoking inference in LMRA and ERISA action that retiree benefits specified in collective bargaining agreement (CBA) were meant to vest, district court did not improperly shift burden of proof to employer; district court acknowledged in its opinion that there was no legal presumption that benefits vested and that burden of proof rested on retirees seeking benefits. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

**13. Labor Relations ⟐393**
**Pensions ⟐62, 65**

Retiree health benefits extended beyond durational terms of collective bargaining agreements (CBA) in effect prior to employer's explicit reservation of right to amend such benefits, and employer's alteration of such benefits thus violated LMRA and ERISA, inasmuch as CBAs' durational provisions were general in nature, referring only to agreements between parties, not to benefits created by agreements, and CBAs' promise to retirees as young as age 55 of Medicare Supplement at age 65 would have been illusory absent vesting. Employee Retirement In-

come Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

**14. Pensions ⟐62, 65**

The termination of a collective bargaining agreement (CBA) does not indicate the termination of retiree benefits created by it, if the benefits are intended to vest; if benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees.

**15. Pensions ⟐65**

Language of insurance plan booklet reserving employer's right to alter retiree health benefits provided under collective bargaining agreement (CBA) was not effective as to retirees to whom booklet was never distributed, and thus did preclude recovery on their LMRA and ERISA claims challenging alteration of benefits; plan booklet specified that retiree benefits were contained in separate booklet, but no separate booklet was created. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

**16. Labor Relations ⟐393**
**Pensions ⟐65**

Language of insurance plan booklet insert reserving employer's right to alter retiree health benefits precluded claims of employees who retired after such insert was issued that employer violated LMRA and ERISA by altering their benefits, notwithstanding their argument that insert was unilateral modification of their agreement; union was obligated to grieve or enter suit over reservation of rights clause, as it was conspicuously contained in insert, but did not do so until approximately three years after insert was issued. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

**17. Federal Courts ⟷830**

A denial of a motion for attorney fees is reviewed for an abuse of discretion.

**18. Pensions ⟷88**

A district court is given broad discretion in awarding attorney fees in an ERISA action. Employee Retirement Income Security Act of 1974, § 502(g), 29 U.S.C.A. § 1132(g).

**19. Pensions ⟷88**

Following factors are relevant to decision whether to award attorney fees under ERISA: (1) degree of opposing party's culpability or bad faith; (2) opposing party's ability to satisfy award of attorney fees; (3) deterrent effect of award on other persons under similar circumstances; (4) whether party requesting fees sought to confer common benefit on all participants and beneficiaries of ERISA plan or resolve significant legal questions regarding ERISA; and (5) relative merits of parties' positions. Employee Retirement Income Security Act of 1974, § 502(g), 29 U.S.C.A. § 1132(g).

**20. Pensions ⟷88**

An abuse of discretion exists with respect to the denial of attorney fees in an ERISA action only when the court has the definite and firm conviction that the district court made a clear error of judgment in its conclusion upon weighing relevant factors. Employee Retirement Income Security Act of 1974, § 502(g), 29 U.S.C.A. § 1132(g).

**21. Pensions ⟷88**

No single factor is determinative as to whether attorney fees should be awarded in an ERISA action. Employee Retirement Income Security Act of 1974, § 502(g), 29 U.S.C.A. § 1132(g).

**22. Pensions ⟷88**

There is no presumption that attorney fees will be awarded in an ERISA action.

Employee Retirement Income Security Act of 1974, § 502(g), 29 U.S.C.A. § 1132(g).

**23. Pensions ⟷88**

District court did not abuse its discretion in declining to award attorney fees to retirees upon determining that employer violated ERISA by altering their vested retiree health benefits; district court considered all of relevant factors, found no bad faith on employer's part, determined that attorney fees would not act as deterrent to other employers, and indicated that no significant ERISA legal questions were resolved. Employee Retirement Income Security Act of 1974, § 502(g), 29 U.S.C.A. § 1132(g).

———————

Melvin P. Stein (argued and briefed), United Steelworkers of America, Pittsburgh, PA, for Plaintiffs–Appellees/Cross–Appellants.

David P. Bertsch (briefed), Buckingham, Doolittle & Burroughs, Akron, OH, Chris J. Trebatoski (argued and briefed), Mitchell W. Quick (briefed), Michael, Best & Friedrich, Milwaukee, WI, for Defendant–Appellant/Cross–Appellee.

Before: RYAN and NORRIS, Circuit Judges; FEIKENS, District Judge.*

## OPINION

ALAN E. NORRIS, Circuit Judge.

Plaintiffs are the United Steelworkers of America union and several retirees formerly employed by defendant, Joy Technologies, Inc. ("Joy"). After Joy changed plaintiffs' retiree health benefit plans, plaintiffs filed suit alleging violations of § 301 of the Labor–Management Relations Act of 1947 ("LMRA"), 29 U.S.C.A. § 185 (West 1998), § 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A.

* The Honorable John Feikens, United States District Judge for the Eastern District of

Michigan, sitting by designation.

§ 1132(a)(1)(B) and (a)(3) (West 1999), and the doctrine of promissory estoppel. Plaintiffs' complaint was based on their claim that their benefits were vested and could not unilaterally be altered by Joy. The district court granted summary judgment to those plaintiffs that had retired prior to August 19, 1991, on the LMRA and ERISA claims. Summary judgment was granted to Joy against those plaintiffs retiring after August 19, 1991, under the LMRA, ERISA, and promissory estoppel claims. Plaintiffs' motion for attorneys' fees was denied. On appeal, Joy challenges the judgment against it on the LMRA and ERISA claims. On cross-appeal, plaintiffs challenge the summary judgment against those plaintiffs retiring after August 19, 1991, and the district court's denial of attorneys' fees. For the following reasons, the district court is affirmed.

## I.

Joy operates an industrial fan manufacturing plant in New Philadelphia, Ohio. Plaintiffs are former Joy employees who were represented by the United Steelworkers of America union ("the union") while active employees. The union served as the collective bargaining representative for the production and maintenance ("P & M") and clerical employees. The employment terms of these groups of workers were jointly negotiated (and the employee units were merged in 1980), but separate agreements were produced. The parties agree that the P & M and clerical units were given the same benefits under the collective bargaining agreements ("CBAs"); therefore, this court will discuss the CBAs for both units as if they were one.

Every three years, the parties negotiated a new CBA. One of the features of the CBAs was a provision for retiree benefits. The question in this case is whether, in the CBAs, the parties intended the retirement benefits either to vest as lifetime benefits or to terminate at the end of the three-year term of the CBA granting the benefits. The relevant provisions are as follows:

### 1974

In 1974, the CBA contained the following relevant provisions:

**Pensions, Group Insurance and Supplemental Unemployment Benefits** . . . .

A group insurance agreement is contained in a separate document.

.        .        .        .        .

For pensioners and spouses, age 65 or over, who are now covered by the Group Insurance Program, the Company will make available a Medicare Supplemental Insurance Program. The cost is to be paid entirely by the pensioner and will be deducted from his pension check upon submission of an appropriate written authorization.

For pensioners and spouses under age 65, the retiree Group Insurance Programs in effect on September 1, 1974 will be continued until replaced by a new program on September 1, 1975.

.        .        .        .        .

**Previous Agreements.** This [CBA] when signed shall supersede all previous supplements and agreements made between the parties except as provided for under the terms of this [CBA].

.        .        .        .        .

**Termination Date.** The basic [CBA], the Pension Agreement, the Group Insurance Agreement, and the Supplemental Unemployment Benefit Agreement, shall remain in full force and effect until midnight August 31, 1977.

At least (60) days prior to August 31, 1977, either party may give notice to the other party of its desire to negotiate with respect to the terms and conditions of a new Agreement, including the terms and conditions of new Pension, Insurance, and Supplemental Unemployment Benefit Agreements. If the parties

shall not agree on the terms and conditions of such new agreements by midnight August 31, 1977, either party may thereafter resort to strike or lockout. . . .

A Memorandum of Agreement was also executed by the parties in 1974. It contains the following pertinent language:

**Retiree's Insurance.** 1. Effective September 1, 1975, for employees who retire on or after August 31, 1974 . . .

a. The Company will establish a group insurance program to provide hospital benefits and physicians' service benefits coverage . . . for pensioners (and their eligible dependents) who are not eligible for Medicare. . . .

c. The Company will pay the cost of such program coverage.

d. Participation in such program in the case of pensioner . . . shall terminate when such person first becomes eligible for Medicare.

Finally, the 1974 Insurance Certificate contains the following relevant provisions:

**Section 13. Insurance after Retirement.**

.     .     .     .     .

**FOR EMPLOYEES WHO ELECT THE ACCIDENT AND HEALTH RETIREMENT PLAN EFFECTIVE PRIOR TO SEPTEMBER 1, 1975** . . . . A retired Employee not eligible for Medicare may continue his [hospital, surgical, laboratory and x-ray and major medical] Insurance for himself and his spouse, with the retired Employee paying the full premium for these coverages.

.     .     .     .     .

**ACCIDENT AND HEALTH PLAN FOR QUALIFIED RETIREES RETIRING ON OR AFTER SEPTEMBER 1, 1975, AND THEIR QUALIFIED DEPENDENTS.** The following shall be applicable to retired employees . . . who are not eligible for Medicare and are classified as:

1. Employees who retire on or after August 31, 1974. . . .

.     .     .     .     .

**Section 14. MEDICARE SUPPLEMENT** . . . . (2) On and after the date on which an employee or dependent becomes eligible for benefits under Medicare, he shall not be eligible or insured under this Policy for any coverage providing benefits for Hospital, Surgical, Laboratory and X–Ray Expenses or Major Medical Expense Insurance . . . . The following benefits serve as a "Medicare Supplement" . . . [at a monthly cost to the employee of $5.00].

.     .     .     .     .

**Termination.** 1. This Agreement, and the Group Insurance Plan established hereunder shall remain in effect without change until midnight, August 31, 1977.

### 1978

The 1978 CBA and Insurance Certificate were essentially the same as those of 1974. The 1978 Memorandum of Agreement did not refer to any changes in retiree health insurance benefits.

### 1980

The 1980 CBA contained the same Termination and Previous Agreements clauses. The following Pensions, Group Insurance and Supplemental Unemployment Benefits clause was also contained in the CBA:

For pensioners and spouses, age 65 and over, who are now covered by the Group Insurance Program, the Company will make available and pay for a Medicare Supplemental Insurance Program.

For pensioners and spouses under age 65, the retiree Group Insurance Programs in effect on September 1, 1975, as outlined in the Certificate of Insurance, will remain in effect.

The 1980 Memorandum of Agreement stated that Joy would pay the full Medi-

care Supplement cost for all then-current
retirees and those retiring under the 1980
CBA.

### 1983

The 1983 CBA contained relevant lan-
guage identical to the 1980 CBA. In 1983,
however, an Insurance Certificate was not
prepared.

### 1986

The 1986 CBA was identical in all rele-
vant respects to those of 1980 and 1983.
The 1986 Memorandum of Agreement indi-
cates that there would be a change in the
Medicare Supplement deductible for those
retiring after September 1, 1986. Also in
1986, an Employee Benefits Plan booklet
(formerly the Insurance Certificate) was
issued with the following provision:

**Termination of the Plan.** Joy Manufac-
turing Company reserves the right to
terminate, suspend, withdraw, amend or
modify the Group Health Care Benefits
Plan in whole or in part at any time.

The booklet contained a clause stating that
"[b]enefits provided during retirement are
described in a separate booklet." Plaintiff
presented evidence suggesting that the
booklet was not distributed to retirees and
that no separate booklet describing retire-
ment benefits was created.

### 1989

In 1989 the CBA was the same in rele-
vant respects as those of the previous
three agreements. In addition, a hand-
book was prepared entitled "Your Benefits
Handbook—Hourly and Salaried Bargain-
ing Employees." Plaintiffs presented evi-
dence that this handbook was not distrib-
uted to retirees until August 1991. It
contained the following provision:

**Amendments.** Joy reserves the right to
amend or terminate any of the plans. The
right to amend includes the right to
curtail or eliminate coverage for any
treatment, procedure, or service regard-
less of whether you are receiving treat-
ment for an injury, illness, or disease

contracted prior to the effective date of
the amendment.

A supplement entitled "Health Care Cov-
erage After Retirement," sent with a letter
dated August 19, 1991, contained the fol-
lowing language:

**Plan Changes.** This insert summarizes
your current retiree health care cover-
age. However, since no one can predict
the future, Joy reserves the right to
make changes or terminate these Plans.

In March 1993, Joy sent letters to plain-
tiff retirees (who had retired under the
1974 through the 1989 CBAs), announcing
a new cost-sharing plan to replace their
insurance programs. In response to the
changes, plaintiffs filed this suit alleging
violations of § 301 of the LMRA, 29 U.S.C.
§ 185, § 502 of ERISA, 29 U.S.C. § 1132,
and of the doctrine of promissory estoppel.
The suit was filed as a class action, with
plaintiffs purporting to sue on behalf of
themselves, their spouses, dependent chil-
dren, and other persons similarly situated.
Plaintiffs claimed that their retirement
benefits had vested under the prior CBAs,
and that Joy's unilateral alteration of their
benefits therefore breached the CBAs in
violation of the LMRA and ERISA. They
also claimed that Joy had made represen-
tations to them that the benefits were to
last for their lifetimes, and that Joy was
now estopped from altering the benefits.

In a January 17, 1997, opinion, the dis-
trict court found that retirement benefits
had vested for those retiring under the
1974, 1978, 1980, and 1983 CBAs. The
court found that, beginning in the 1986
agreement, Joy included a reservation of
rights clause and that, consequently, those
who retired under the 1986 CBA and
thereafter did not hold vested benefits.

On October 7, 1997, the district court
amended its opinion on plaintiffs' motion.
The court found that the reservation of
rights clauses were ineffective as to those
who retired between 1986 and August 19,
1991, and held that those plaintiffs retiring
prior to August 19, 1991, had vested retir-

ee benefits. The court noted that the 1986 booklets contained reservation of rights language, but were apparently only applicable to active employees since the booklets indicated that "[b]enefits provided during retirement are described in a separate booklet." Further, the court pointed to evidence that the booklets were not distributed to active employees until 1988 and were never distributed to retirees. No separate booklet dealing with retirement benefits was ever published during the 1986 CBA term. A letter containing an insert for a benefits handbook and expressly directed to retirees was distributed in 1991 (dated August 19, 1991). This insert, the court found, contained reservation of rights language applicable to retirees. For these reasons, the court held that benefits were vested for those who retired prior to August 19, 1991, but not after.

Also in its October 7, 1997, opinion, the district court granted Joy's motion for summary judgment on the promissory estoppel claims for plaintiffs who retired after August 19, 1991. The court held that any reliance by plaintiffs on Joy's representations concerning the vesting of retirement benefits was not reasonable in the face of a clear reservation of rights clause after August 19, 1991.

On March 17, 1998, Joy filed a motion to amend the judgment based on *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir.1998) (en banc), which the district court denied. Finally, on July 31, 1998, the district court awarded plaintiffs prejudgment interest, but denied attorneys' fees and costs.

Joy appeals the district court's determination that retiree benefits vested for those retiring prior to August 19, 1991, and the resulting judgment against it under the LMRA and ERISA. Plaintiffs cross-appeal the district court's determination that retiree benefits did not vest for those retiring after August 19, 1991, and the denial of attorneys' fees.

## II.

**[1, 2]** A district court's order of summary judgment is reviewed de novo. *Pope v. Central States S.E. & S.W. Areas Health & Welfare Fund*, 27 F.3d 211, 212–13 (6th Cir.1994). Contract interpretation is a question of law, also subject to de novo review. *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1003 (6th Cir.1993).

**[3–6]** Section 301(a) of the LMRA, 29 U.S.C. § 185(a), gives jurisdiction to federal courts over claims alleging the breach of CBAs. *See Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir.1991). A retiree health insurance benefit plan is a welfare benefit plan under ERISA. *Boyer*, 986 F.2d at 1005. Welfare benefit plans are not subject to mandatory vesting requirements under ERISA, unlike pension plans. *Id.* at 1004–05. Therefore, there is no statutory right to vested retiree benefits, and the parties must agree to vest a welfare benefit plan. *See id.* at 1005. If the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a LMRA violation. *See Armistead*, 944 F.2d at 1298.

**[7, 8]** The central Sixth Circuit case on CBA interpretation is *UAW v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir.1983). Sixth Circuit caselaw interpreting CBAs regularly quotes *Yard–Man* at length:

[W]hether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties. Clearly the parties to a collective bargaining agreement may provide for rights which will survive termination of their collective bargaining relationship. The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement. Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement.

**MAURER v. JOY TECHNOLOGIES, INC.**     **915**
Cite as 212 F.3d 907 (6th Cir. 2000)

The enforcement and interpretation of collective bargaining agreements under § 301 [of the LMRA] is governed by substantive federal law. However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies.

Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

*Id.* at 1479–80 (citations omitted). Courts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement. *See Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 655 (6th Cir.1996). CBAs may contain implied terms, and the parties' practice, usage, and custom can be considered. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 311, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).

**[9, 10]** Retiree benefits are "in a sense 'status' benefits which, as such, carry with them an inference ... that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *UAW v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000) (quoting *Yard–Man,* 716 F.2d at 1482). This is because "[b]enefits for retirees are only permissive not mandatory subjects of collective bargaining. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Yard–Man,* 716 F.2d at 1482 (citations omitted). Although there is an inference that the parties to a CBA intended for retiree benefits to vest, the burden of proof does not shift to the employer, and it is not required that specific anti-vesting language be used before a court can find that the parties did not intend benefits to vest. *BVR Liquidating,* 190 F.3d at 772 (quoting *Golden,* 73 F.3d at 656).

In *BVR Liquidating,* the plaintiff union filed suit against an employer that had terminated retiree health care benefits. The plaintiff argued that the benefits had vested, while the employer argued that the benefits were limited to the duration of the CBA. *Id.* at 769. The court found that a clause providing that retirees shall have health care benefits "continued for themselves, their spouses, surviving spouses and eligible dependents," considered in conjunction with a clause indicating benefits continued after retirement until death, could be interpreted as vesting lifetime

health care benefits. *Id.* at 773. The court speculated: "[i]ndeed, to what other date than the death of the retiree or the spouse could the word 'continue' apply?" *Id.* Noting that *Yard–Man* requires the agreement to be read as a whole, the court next considered the meaning of a separate clause in the agreement stating that "benefits will be provided . . . for the term of this Agreement except where the Plan specifically provides otherwise." *Id.* at 774. The court found that reading these two provisions together made the CBA ambiguous as to whether retiree benefits were intended to vest. *See id.* at 774. In light of this ambiguity, the court turned to extrinsic evidence. It found that affidavits from the plaintiff stating that there had been no discussion of altering the duration of the benefits during negotiating sessions and in conversations between company agents and retirees, along with evidence that changes from prior CBAs increased benefits, led to the conclusion that the benefits were indeed vested. *Id.* at 774–75.

*Yard–Man* also presented this court with the question of whether retirement benefits created in a CBA vested or were terminable at the end of the CBA term. The key provision in the CBA at issue stated that "[w]hen the former employee has attained the age of 65 years then: (1) *The Company will provide insurance benefits equal to the active group benefits . . . for the former employee and his spouse.*" *Yard–Man*, 716 F.2d at 1480 (omission in original). The insurance plan provision applicable to active group benefits specified that the benefits would terminate one month after an employee's layoff. *Id.* The court found the intent of the parties to be ambiguous because the "language 'will provide insurance benefits equal to the active group' could reasonably be construed, if read in isolation, as either solely a reference to the nature of retiree benefits or as an incorporation of some durational limitation as well." *Id.* As a result, the court turned to other provisions of the CBA to determine the parties' intent:

[T]ermination of insurance benefits for active employees was explicitly and clearly set out and yet under conditions—the layoff of seniority employees—typically inapplicable to retirees. Moreover, there are variations in the duration of insurance benefits available to active employees dependent upon their seniority. These variations and the impracticality of hinging retiree benefits to events as unpredictable and unstable as active worker layoffs make it improbable that retiree benefits were intended to depend in duration upon the fortunes of the active employees.

.        .        .        .        .

[T]he retiree insurance provisions . . . contain a promise that the company will pay an early retiree's insurance upon such retiree reaching age 65 but that the retiree must bear the cost of company insurance until that time. Since an employee is entitled under the collective bargaining agreement to retire at 55, the company's promise could remain outstanding for a ten-year period. If retiree insurance benefits were terminated at the end of the collective bargaining agreement's three-year term, this promise is completely illusory for many early retirees under age 62.

[T]he inclusion of specific durational limitations in other provisions of the current collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties' contemplated long term relationship.

.        .        .        .        .

Finally, examination of the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for retirees were intended. Benefits for retirees are only permissive not mandatory subjects of collective bargaining. As such, it is unlikely that such benefits, which are typically understood

**MAURER v. JOY TECHNOLOGIES, INC.**   **917**
Cite as 212 F.3d 907 (6th Cir. 2000)

as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations.

*Id.* at 1481–82 (internal citations and footnotes omitted).

Joy claims that the CBAs at issue here are not ambiguous, and that they establish that retiree benefits were not intended to extend beyond the end of the relevant CBA term. Joy's main argument is that *Sprague, supra,* implicitly overruled *Yard–Man* and established new, more stringent standards as to what language must be found in the parties' agreements in order to find vested benefits. Joy claims that, under *Sprague,* express vesting language is required before retirement benefits will vest.

**[11]** Joy's argument has been rejected by this court. In *BVR Liquidating, supra,* we indicated that *Yard–Man* is still good law and should be used by courts interpreting CBAs. *See BVR Liquidating,* 190 F.3d at 772–73. We pointed out that *Sprague* dealt with an employer that had unilaterally instituted a retiree benefit program, so that the employer had to be found to have clearly intended to vest benefits in order for employees to be entitled to lifetime benefits. *See id.* at 773. The *BVR Liquidating* court distinguished that situation from the case in front of it, which concerned a CBA. *Id.* at 772–73. In interpreting a CBA, the intent of both parties to the agreement must be discerned, making *Sprague* inapposite. The court also distinguished *Sprague* because it involved an explicit reservation of rights clause permitting the employer to amend or terminate benefits. *Id.* at 773. *BVR Liquidating* reiterated *Yard–Man's* directive that there is an inference that retirement benefits were intended to vest. *Id.* The present case involves a CBA, rather than a benefit plan unilaterally bestowed by the employer. Therefore, Joy's arguments based on *Sprague* fail under the same analysis applied in *BVR Liquidating.*

**[12]** Joy also argues that the district court erred by turning the *Yard–Man* inference that retirement benefits were meant to vest into a presumption that shifted the burden of proof to Joy. The court did not, however, shift the burden of proof to Joy; the court acknowledged in its opinion that there is no legal presumption that benefits vest and that the burden of proof rests on plaintiffs.

Joy goes further and claims that there is a *"presumption* under ERISA that employee welfare benefit plans do *not* vest." However, the cases cited for this proposition, *see, e.g., Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), merely state that although ERISA does not require vesting of such benefits, parties may agree to create and vest them. Joy's arguments have already been addressed by this circuit in *Golden,* 73 F.3d at 655 ("In [*Curtiss–Wright Corp. v.*] *Schoonejongen,* [cited by defendant] ... [t]he vesting of rights through agreements such as CBAs was not at issue.... The Court simply noted that ERISA does not mandate minimum vesting requirements for welfare benefit plans, and that ERISA allows employers to adopt, modify, or terminate such plans at will. The case bears no relation to the issues in *Yard–Man.*") (citations omitted). *Curtiss–Wright,* like *Sprague,* dealt with a benefit plan unilaterally implemented by the employer, not with a CBA.

**[13, 14]** According to Joy, the CBAs' language clearly terminated retiree insurance benefits along with the rest of the CBA provisions by providing that " [t]he basic [CBA], the Pension Agreement, the Group Insurance Agreement, and the Supplemental Unemployment Benefit Agreement, shall remain in full force and effect until midnight [expiration date]," and that "[t]his [CBA] when signed shall supersede all previous supplements and agreements made between the parties except as provided for under the terms of this [CBA]." These clauses are general durational provisions for the entire agreement, and are not

clearly meant to include retiree benefits. *See Yard–Man*, 716 F.2d at 1482–83 (general durational clause not necessarily meant to include retiree benefits). Even though the clause makes clear that the insurance agreement terminates after three years, caselaw indicates that the termination of the agreement does not indicate the termination of benefits created by it, if the benefits are intended to vest. *See id.* If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees.

Joy next points to the reiteration in each CBA that "[f]or pensioners and spouses under age 65, the retiree Group Insurance Programs in effect on September 1, 1975 . . . will remain in effect." However, this provision is also subject to the interpretation that it is repeated in each CBA because it specifies what benefits are available to those who retire during the term of that CBA, and not what benefits are available for past retirees, whose rights have already vested. Therefore, this provision is not determinative.

Joy points to the clause requiring notice from either party of "its desire to negotiate with respect to the terms and conditions of a new Agreement, including . . . Insurance . . . Agreements." Again, just because an insurance agreement is ended and renegotiated does not mean benefits also end. Because active employee benefits are a subject of mandatory bargaining, and retirement benefits are not, this provision was not necessarily meant to incorporate retirement benefits.

The CBAs provide that pre-Medicare retirees receive certain benefits until Medicare eligibility at age 65. Because the CBAs permit retirement at age 55 and promise insurance at age 65, the promise is meaningless if it could be terminated in three years. The same situation was present in *Yard–Man, supra*, where the court inferred vested benefits partly from an analogous provision. In addition, the CBAs specify a termination of pre–65 benefits when the retiree "first becomes eligible for Medicare." This clause makes clear that pre–65 benefits were intended to end only when the retiree becomes Medicare-eligible, not when the CBAs expire. The CBAs also promise the continuation of dependents' benefits after the retiree reaches Medicare eligibility. A determination that retiree benefits do not vest would render these promises illusory, in contravention of *Yard–Man's* directive. There is also language in the insurance certificates that gives Joy the unilateral right to terminate benefits for employees on leave of absence, yet no similar provision was included for retiree benefits. These provisions indicate that the parties intended to vest benefits.

Therefore, although the CBAs are not models of clarity, caselaw of this circuit leads to the conclusion that they do vest retirement benefits for individuals retiring before mid–1991, when reservation of rights language applicable to retirees was distributed to plaintiffs. The durational provisions Joy cites are general in nature, and only refer to agreements between the parties, not to benefits created by the agreements. Further, the CBAs promise retirees (as young as age 55) a Medicare Supplement at age 65. An analogous provision was found to create an illusory promise unless benefits were vested in *Yard–Man. See Yard–Man*, 716 F.2d at 1481. The language of the CBAs indicates that retirement benefits were intended by the parties to vest.

[15] The district court correctly found that the reservation of rights language printed in the 1986 Insurance Plan booklet, but never distributed to retirees, was not effective as to plaintiffs. Joy claims that there is no distribution requirement, and that reservation of rights language is effective when contained in the plan itself. Joy bases these arguments on *Sprague*, where reservation of rights language was contained in the plan (unilaterally instituted by the employer), but not in all Summary Plan Descriptions distributed to ben-

eficiaries. The *Sprague* court held that because such language had always been in the plan itself, it was clear that the employer did not intend to vest the benefits when it created them. *See Sprague,* 133 F.3d at 401–02. As noted above, this case is distinguishable from *Sprague* because it concerns CBAs, which are two-party contracts, rather than a plan unilaterally implemented, and therefore unilaterally controlled, by the employer.

The reservation of rights language from 1986 was contained in an insurance booklet that specified that retiree benefits were contained in a separate booklet. Such a separate retiree booklet, however, was never created. The language in the 1986 insurance booklet directing that the booklet did not pertain to retirees, and that a separate booklet did, precludes any argument that the provisions in the existing insurance booklet (namely, the reservation of rights language) applied to retirees. Therefore, the reservation of rights clause was not applicable to retirees under the 1986 agreement.

[16] The district court correctly found that the reservation of rights language in the August 19, 1991, booklet insert was effective against the retirees because "[w]hile plaintiff argues that a bilateral agreement is not subject to unilateral modification, the Union was obligated to grieve or enter suit over the reservation of rights clause as the clause was conspicuously contained in the 1991 insert and plaintiffs did not dispute it until the filing of this lawsuit in 1994." The August 19, 1991, reservation of rights clearly included retirees and was distributed to them. Therefore, those plaintiffs retiring after August 19, 1991, do not hold vested retirement benefits.

## III.

[17–22] The district court's denial of plaintiffs' motion for attorneys' fees is reviewed for an abuse of discretion. *Secretary of Dep't of Labor v. King,* 775 F.2d 666, 669 (6th Cir.1985). A district court is

given broad discretion in awarding attorneys' fees in an ERISA action under 29 U.S.C. § 1132(g). *Id.* This court adopted the following factors in *King,* 775 F.2d at 669, as relevant to the district court's determination:

(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

An abuse of discretion exists only when "the court has the definite and firm conviction that the district court made a clear error of judgment in its conclusion upon weighing relevant factors." *Id.* No single factor is determinative. *Schwartz v. Gregori,* 160 F.3d 1116, 1119 (6th Cir.1998), *cert. denied,* 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999). There is no presumption that attorneys' fees will be awarded. *See Foltice v. Guardsman Prods., Inc.,* 98 F.3d 933, 936 (6th Cir. 1996).

The district court addressed the *King* factors in its opinion:

First, there was no degree of bad faith on defendant's part and this Court cannot find a great degree of culpability given the difficulty in determining whether it was intended that benefits vested. Additionally, the Court found benefits to vest for only some of the plaintiffs. Second, defendant admits that it is able to satisfy an award of fees. Third, the Court does not consider that an award of fees would act as a deterrent to other employers under similar circumstances given that defendant did not necessarily act with bad faith. *See,* for example, *Foltice, supra,* wherein the court stated that the "deterrent effect . . . is likely to have more significance in a case where the defendant is highly culpable . . ." Fourth, while this was a

class action, plaintiffs did not seek to confer a common benefit on all participants of Joy's ERISA plan. Nor did this lawsuit seek to resolve significant ERISA legal questions inasmuch as this issue has been addressed in numerous cases as evidenced by this Court's Opinions. Fifth, the Opinions in this case reveal that both parties' positions had merit.

Plaintiffs claim that Joy "surreptitiously inserted a non-bargained provision in its insurance booklets and used this provision as the centerpiece of its justification to unlawfully alter retiree benefits.... Not to find bad faith in such conduct is an abuse of discretion." They also argue that they "sought to convey a benefit on all members of the ERISA plan affected by Joy's unlawful conduct." Finally, plaintiffs argue that retirees cannot afford to finance protracted and expensive litigation, and unions cannot afford to bring suit on behalf of all wronged retirees. They maintain that "[u]nless the expense of such litigation is shifted, more retirees will suffer a loss of all or some of their pension income or go without health insurance and/or care they otherwise should obtain."

[23]    The district court considered all of the relevant factors as instructed by *King*. The court found no bad faith on Joy's part, determined that attorneys' fees would not act as a deterrent to other employers, and indicated that no significant ERISA legal questions were resolved. The court did not abuse its discretion either in its consideration of any of the *King* factors or in its weighing of the factors to determine that fees should not be awarded. Therefore, the district court did not abuse its discretion in denying plaintiffs' request for attorneys' fees.

### IV.

The judgment of the district court is **AFFIRMED.**



---

**UNITED STATES of America,
Appellee,**

v.

**SEARCH OF MUSIC CITY
MARKETING, INC.,
Appellant.**

**No. 99–5260.**

United States Court of Appeals,
Sixth Circuit.

Argued March 7, 2000

Decided and Filed May 12, 2000

---

Owner of property that had been subject of search warrant seeking drug paraphernalia moved for return of seized property. The United States District Court for the Middle District of Tennessee, Thomas A. Higgins, J., denied motion, and owner appealed. The Court of Appeals, Kennedy, Circuit Judge, held that: (1) statute permitting seizure of drug paraphernalia was not unconstitutionally vague as applied to items of inventory seized from owner; (2) findings that various items constituted drug paraphernalia were supported by evidence; and (3) owner could not assert defense of entrapment by estoppel.

Affirmed.

---

**1. Searches and Seizures ⟊84**

Where there was no criminal indictment or proceeding pending against property owner, owner's motion for return of property seized under search warrant was in nature of a civil proceeding invoking the court's equitable powers, rather than a criminal proceeding. Fed.Rules Cr.Proc. Rule 41(e), 18 U.S.C.A.

**2. Searches and Seizures ⟊84**

Under rule permitting motions for return of property seized under search war-