Page relies above, the district court confirmed that Page understood the rights he would be giving up, including the right to a jury trial, the right to an attorney, and the right to confront witnesses at the trial.

Most importantly, the district court instructed the government to "articulate for the record the summary of the evidence if this case went to trial." Following the district court's instruction, the government read into the record the facts, summarized at the beginning of this opinion, detailing Page's alleged involvement in the scheme to import cocaine into the United States. The district court then asked Page if he understood the evidence that the government planned to prove at trial against him, to which Page answered in the affirmative. The district court asked Page if he had anything else to add, to which Page's attorney offered a small correction to the facts read by the government. Only after this factual basis was determined, and only after ensuring that Page understood the rights he was giving up and the charge against him, did the district court accept Page's plea of guilty pursuant to the plea agreement.

While less than a model of clarity, the totality of the record supports the government's argument that the district court established a factual basis for Page's guilty plea, and that Page understood the nature of the charge to which he pled guilty. Accordingly, we find that Page has failed to meet the high burden required by the plain-error standard of review governing this case.

### III.

Based on the foregoing, we AFFIRM Page's conviction.



Julius NOE; Ray Reynolds; Anna Mae Wilder; Russell Bowman; Nancy Hood; William Duncan, Plaintiffs–Appellants,

v.

POLYONE CORPORATION, Defendant–Appellee.

No. 07–5068.

United States Court of Appeals, Sixth Circuit.

Argued: Sept. 13, 2007.

Decided and Filed: March 19, 2008.

Rehearing and Rehearing En Banc Denied June 2, 2008.

**Background:** Retirees sued employer, alleging that employer's unilateral changes to retiree health benefit plans violated the governing collective bargaining agreements (CBAs) and violated Labor Management Relations Act (LMRA). The United States District Court for the Western District of Kentucky, John G. Heyburn, II, Chief Judge, 2006 WL 3759601, granted summary judgment for employer, and retirees appealed.

**Holdings:** The Court of Appeals, McKeague, Circuit Judge, held that:

(1) memorandum of understanding (MOA) executed by employer and union served to incorporate retiree health benefits plan in effect for employees at employer's other plants;

(2) general durational language in MOA did not preclude parties' intent that retiree health benefits vest;

(3) durational language in text of employee health benefit plans likewise did not preclude intent that retiree health benefits vest;

(4) language in employee health benefit plans tying eligibility for retiree health

benefits to eligibility for pension weighed in favor of finding intent to vest;

(5) promise of lifetime special Medicare benefit weighed in favor of finding intent to vest; and

(6) absence of explicit vesting language concerning retiree health benefits did not preclude intent to vest.

Vacated and remanded.

Sutton, Circuit Judge, filed opinion concurring in part and dissenting in part.

**1. Labor and Employment ⟐548, 549(1)**

While pension plans are subject to mandatory vesting, welfare benefit plans are not.

**2. Labor and Employment ⟐426, 549(1)**

Retiree health benefit plans are welfare benefit plans; thus, vesting only occurs if parties so intended when they executed applicable labor agreements.

**3. Labor and Employment ⟐549(1)**

Court may find vested rights to health benefit plan under collective bargaining agreement (CBA) even if intent to vest has not been explicitly set out in agreement.

**4. Labor and Employment ⟐450**

If employees' rights to health coverage have vested, employer's unilateral termination of coverage violates LMRA; however, employer is free to terminate any unvested welfare benefits upon expiration of relevant collective bargaining agreement (CBA). Labor Management Relations Act, § 301, 29 U.S.C.A. § 185.

**5. Labor and Employment ⟐450, 549(1)**

There is inference that retiree health benefits were intended to vest, i.e. survive expiration of governing collective bargaining agreement (CBA), if context and other available evidence indicate such intent;

however, there is no legal presumption that retiree benefits are interminable.

**6. Labor and Employment ⟐549(1)**

When ambiguity exists in provisions of collective bargaining agreement (CBA) regarding vesting of retiree health benefits, resort to extrinsic evidence may be had to ascertain whether parties intended vesting.

**7. Labor and Employment ⟐1280**

As to collective bargaining agreement (CBA) that did not specifically address retiree health benefits, memorandum of understanding (MOA) executed by employer and union, stating generally that employee health benefit plan "presently in effect for the majority of [employer's] production and maintenance employees" would henceforth be in effect for employees covered by CBA, served to incorporate, via parties' course of conduct, retiree health benefits plan in effect for employees at employer's other plants who were covered by other CBAs; employees covered by MOA began to receive health benefits conferred by other CBAs and continued to receive them after retirement.

**8. Labor and Employment ⟐549(1)**

Durational language in memorandum of understanding (MOA) between employer and union, that employee health benefits plan incorporated by reference from other collective bargaining agreements (CBAs) would be "in effect for the life of this agreement," did not preclude finding of parties' intent that retiree health benefits vest, and in turn did not preclude retirees' LMRA suit against employer challenging employer's unilateral actions concerning benefits; language was generic and did not specifically state that retiree health benefits would expire upon agreement's termination. Labor Management Relations Act, § 301, 29 U.S.C.A. § 185.

**9. Labor and Employment** ⇔**549(1)**

Durational language in text of employee health benefit plans, stating that "[e]ffective as of [date] and for the duration of this agreement, [employer] will provide the following plan . . .", did not preclude finding of parties' intent that retiree health benefits vest, and in turn did not preclude retirees' LMRA suit against employer challenging employer's unilateral actions concerning benefits; language was general and did not specifically refer to retiree benefits.   Labor Management Relations Act, § 301, 29 U.S.C.A. § 185.

**10. Labor and Employment** ⇔**549(1)**

Language in text of employee health benefit plans tying eligibility for retiree health benefits to eligibility for pension, e.g. " [e]mployees who retire and who are eligible under [governing] agreement for a pension . . . shall receive the benefits described," weighed in favor of finding intent that retiree health benefits vest, as required to support retirees' LMRA suit against employer challenging employer's unilateral actions concerning benefits.   Labor Management Relations Act, § 301, 29 U.S.C.A. § 185.

**11. Labor and Employment** ⇔**549(1)**

Language in text of employee health benefit plans promising that once retiree reached age 65 he or she would receive special Medicare benefit until death, and that upon death, retiree's surviving spouse would continue to receive same benefit until his or her death or remarriage, weighed in favor of finding intent that retiree health benefits vest, as required to support retirees' LMRA suit against employer challenging employer's unilateral actions concerning benefits.   Labor Management Relations Act, § 301, 29 U.S.C.A. § 185.

**12. Labor and Employment** ⇔**549(1)**

Absence in text of employee health benefit plans of explicit vesting language concerning retiree health benefits, in contrast to presence of such language in relation to pension benefits, did not, by itself, preclude finding of parties' intent that retiree health benefits vest, and in turn did not preclude retirees' LMRA suit against employer challenging employer's unilateral actions concerning benefits.   Labor Management Relations Act, § 301, 29 U.S.C.A. § 185.

———————

**ARGUED:** Thomas J. Schulz, Priddy, Cutler, Miller & Meade, Louisville, Kentucky, for Appellants.   Jack F. Fuchs, Thompson Hine, Cincinnati, Ohio, for Appellee.   **ON BRIEF:** Thomas J. Schulz, Alton D. Priddy, Priddy, Cutler, Miller & Meade, Louisville, Kentucky, for Appellants.   Jack F. Fuchs, Eric S. Clark, Stephen L. Richey, Thompson Hine, Cincinnati, Ohio, for Appellee.

Before: SUTTON and McKEAGUE, Circuit Judges; FORESTER, District Judge.*

McKEAGUE, J., delivered the opinion of the court, in which FORESTER, D.J., joined, SUTTON, J., (pp. 564–69), delivered a separate opinion concurring in part and dissenting in part.

**OPINION**

McKEAGUE, Circuit Judge.

This is a retiree health benefits case, in which the court is asked to determine

* The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

whether the parties to various labor agreements intended for retiree health benefits to vest such that any termination of those benefits constitutes a violation of § 301 of the Labor Management Relations Act ("LMRA"). The district court granted summary judgment for defendant-employer PolyOne Corp. after concluding that the labor agreements in question were unambiguous and established no intent to vest retiree health benefits. Having conducted a thorough review of the record and the applicable law, we arrive at a different conclusion and **VACATE** the district court's judgment.

## I. BACKGROUND

Russell Bowman, William Duncan, Nancy Hood, Julius Noe, Ray Reynolds, and Anna May Wilder, ("Plaintiffs") are all retirees or the surviving spouse of a retiree from B.F. Goodrich Co.'s Geon Vinyl Division ("BFG"), which through a series of transactions became PolyOne Corp., the defendant in this case ("PolyOne"). Plaintiffs or their deceased spouses all retired between 1979 and 1990 from BFG's Louisville, Kentucky, facility. While employed with BFG, Plaintiffs were represented in the collective bargaining process primarily by the Distillery, Rectifying, Wine and Allied Workers' International Union of America, Local No. 72 ("Union"). During this time period, the Union and BFG entered into various collective bargaining agreements, none of which specifically addressed the issue of health benefits. Also during this period, BFG negotiated a series of agreements with other unions that represented employees working at facilities outside of Kentucky. These other agreements, which were entitled "Agreements on Employee Benefit Programs" ("EBAs"), provided employee and retiree health benefits to the applicable group of employees. Per the terms of the EBAs, retirees were not required to contribute to

their health insurance premiums, they were reimbursed for Medicare Part B, and they paid $1.00 for each prescription medication.

Plaintiffs maintain that the health benefits provided by the EBAs were extended to them via a Memorandum of Agreement ("MOA") entered into by Plaintiffs' union and BFG. Effective in 1988, BFG replaced the EBAs with a Flexible Benefit Program ("Flex Program"). The Flex Program slightly changed the health care coverage available for active employees and those who retired after August 1988. It is undisputed that Plaintiffs received the health benefits described in the EBAs or the Flex Program until March 2006, when PolyOne ceased reimbursing Plaintiffs' Medicare Part B premiums, began requiring Plaintiffs to contribute towards their insurance premiums, and instituted much higher prescription drug co-pays. Believing that PolyOne's conduct violated the EBAs and the Flex Program, Plaintiffs filed the instant action under § 301 of the LMRA. Finding that the EBAs and the Flex Program did not manifest an intent to vest retiree health benefits, the district court granted summary judgment for PolyOne. Plaintiffs timely appealed.

## II. ANALYSIS

### A. Standard of Review and Applicable Law

This court reviews a district court's grant of summary judgment de novo. *Nichols v. Moore,* 477 F.3d 396, 398 (6th Cir.2007). Likewise, de novo review applies to questions of contract interpretation. *Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 577 (6th Cir.), *cert. denied,* —— U.S. ——, 127 S.Ct. 554, 166 L.Ed.2d 410, *and,* 127 S.Ct. 555, 166 L.Ed.2d 410 (2006).

**552**                    **520 FEDERAL REPORTER, 3d SERIES**

**[1–4]** There are two types of employee benefit plans: pension plans and welfare benefit plans. *Id.* at 578. While pension plans are subject to mandatory vesting, welfare benefit plans are not. *Maurer v. Joy Technologies, Inc.,* 212 F.3d 907, 914 (6th Cir.2000). Retiree health benefit plans, such as those involved here, are welfare benefit plans; thus, vesting only occurs if the parties so intended when they executed the applicable labor agreements. *Id.* A court may find vested rights "under a CBA even if the intent to vest has not been explicitly set out in the agreement." *Id.* at 915. If the rights to health coverage have vested, then the unilateral termination of the coverage violates § 301 of the LMRA. *Yolton,* 435 F.3d at 578. On the other hand, an employer is free to terminate any unvested welfare benefits upon the expiration of the relevant CBA. *Id.*

**[5]** The seminal case for determining whether the parties to a CBA intended benefits to vest is *UAW v. Yard–Man,* 716 F.2d 1476, 1479 (6th Cir.1983). Under *Yard–Man,* basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest. *Id.* Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. Our decision in *Yard–Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference ... that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482. With regard to the "*Yard–Man* inference," later decisions of this court have clarified that *Yard–Man* does not create a legal presumption that retiree benefits are

interminable. *Yolton,* 435 F.3d at 579. Rather, *Yard–Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id.*

**[6]** When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest. *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.,* 190 F.3d 768, 774 (6th Cir.1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.,* 330 F.3d 740, 744 (6th Cir.2003). Having provided the broad analytical framework, we now turn to the task of parsing the language of the various agreements involved in this case.

With the exception of Plaintiff Hood, all of the retirees involved in this case received the health benefits provided by the various EBAs. Although Plaintiffs retired under several different EBAs, we refer to the EBAs collectively because each agreement contains the same language regarding the issues involved in this appeal. As for Plaintiff Hood, the merits of her claim will be discussed separately because the Flex Program governs her retiree health benefits.

**B. Incorporation of the EBAs by the MOA**

**[7]** As a threshold matter, it is necessary to determine if the MOA incorporates the health benefits provisions of the EBAs to Plaintiffs. In the absence of incorporation, Plaintiffs' claim fails because the collective bargaining agreements negotiated between Plaintiffs and BFG are silent

as to health benefits.  The MOA states in pertinent part:

The following Article is hereby included in the current Collective Bargaining Agreement:

The Pension Plan, including the requirement for compulsory retirement at age seventy, the Hospitalization, Surgical and Medical Expense Insurance Program . . ., and the Prescription Drug Program presently in effect for the majority of The BFGoodrich Company's production and maintenance employees shall be in effect for the life of this Agreement.

JA at 646.  According to the district court, while "the MOA is far from clear, the parties appear to have intended that this general reference incorporate the EBA health benefit provisions."  *Noe v. PolyOne Corp.*, No. 3:06–CV–170H, 2006 WL 3759601, at *3 (W.D.Ky. Dec. 19, 2006). Disagreeing with the district court's determination on this issue, PolyOne argues that Plaintiffs have failed to offer any evidence—aside from anecdotes and hearsay—showing that the MOA incorporated the EBAs to Plaintiffs.  In response, Plaintiffs argue that the parties' course of conduct illustrates that they intended for the MOA to provide employees and retirees of BFG's Louisville facility with the health benefits found in the EBAs.

Based on our review of the MOA and the conduct of the parties, the district court correctly held that the MOA incorporated the EBAs to Plaintiffs.  Because the MOA itself is unclear on this issue, the district court properly looked to extrinsic evidence and the course of performance between the parties in determining that the MOA incorporated the EBAs. As the district court recognized, the most telling of this extrinsic evidence is the fact that "[e]veryone agrees that [Plaintiffs] actually received the benefits described in the EBAs and continued to receive them after

retirement."  *Id.* at *2.  Although the terms of the MOA undoubtedly could have been more precise, the evidence establishes that it was intended by the parties to apply the EBAs to Plaintiffs.  Therefore, we proceed to analyze the EBA provisions themselves to determine whether the district court properly found that Plaintiffs' retiree health benefits have not vested.

**C.  The Vesting Determination**

The district court held that the retiree health benefits provisions in the EBAs clearly and unambiguously established that the parties did not intend for Plaintiffs' health benefits to vest.  Having examined the language of the MOA and the EBAs, this court finds that the district court improperly granted summary judgment in favor of PolyOne for numerous reasons. First, PolyOne's argument that the MOA's language indicates that Plaintiffs' health benefits were not intended to vest fails. Second, the durational provisions relied on by PolyOne and the district court are general in nature and do not preclude a finding that the parties intended Plaintiffs' benefits to vest.  Third, provisions in the EBAs expressly tie eligibility for retiree health benefits to eligibility for a pension, which we have repeatedly held evinces an intent to vest.  Fourth, adopting the interpretation urged by PolyOne and accepted by the district court would render several promises made in the EBAs illusory, a result in violation of our precedent.  Fifth, the presence of specific vesting language in the pension benefits portion of the EBAs does not lead to the conclusion that Plaintiffs' health benefits have not vested.

**1.  The MOA Language does not Preclude a Finding that Plaintiffs' Health Benefits were Intended to Vest**

[8]  PolyOne argues that the MOA itself establishes that the parties never in-

tended for Plaintiffs' health benefits to vest. PolyOne believes that the MOA negates any intent to vest because it limits benefits to the duration of the agreement and provides that the agreement may be changed by subsequent negotiations.

The MOA states in pertinent part:

The Pension Plan, including the requirement for compulsory retirement at age seventy, the Hospitalization, Surgical and Medical Expense Insurance Program . . . , and the Prescription Drug Program presently in effect for the majority of The BFGoodrich Company's production and maintenance employees *shall be in effect for the life of this Agreement; provided that if during the term of this Agreement the Plan or Programs are changed for such majority, such changes shall be made effective on the same date they are made effective for the majority* of The BFGoodrich production and maintenance employees and remain in effect for the life of this Agreement.

JA at 646 (emphasis added). PolyOne first asserts that the italicized phrase "shall be in effect for the life of this Agreement" is a specific durational clause that precludes a finding that Plaintiffs' health benefits have vested. Plaintiffs counter by arguing that the provision is a general durational clause and is insufficient to demonstrate that retiree health benefits have not vested. With regard to this issue, the district court agreed with Plaintiffs that the MOA's durational clause was general in nature. *See Noe*, 2006 WL 3759601, at *3 n. 7.

As explained in *Yolton*, "[a]bsent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Yolton*, 435 F.3d at 581. In *Yolton*, the court concluded that a provision stating that the "group insurance plan will . . . run concurrently with this Agreement" was a general durational clause and did not preclude a finding that retiree health benefits had vested. *Id.* Like the agreement in *Yolton*, there is no language in the MOA specifically stating that retiree health benefits expire upon the termination of the agreement. It speaks generically of all benefits for all employees; language that does not constitute a specific durational clause under our precedent. *See id.; see also Maurer*, 212 F.3d at 917–18 (finding that a CBA termination clause was not a specific durational clause because it did not specifically reference retiree benefits).

PolyOne's reliance on *Linville v. Teamsters Misc. & Indus. Workers Union, Local 284*, 206 F.3d 648, 650 (6th Cir.2000), for the proposition that the MOA language is a specific durational clause is misplaced. In *Linville*, the clause at issue expressly stated that health insurance under the company's plan "ceases when the individual reaches age sixty-five." *Linville*, 206 F.3d at 649. No such language is present in this case, and there is no discussion in *Linville* regarding whether a clause such as that contained in the MOA is a general or specific durational provision. *Linville* is also distinguishable because the agreement there stated that no individuals were to receive health benefits after attaining age sixty-five. *Id.* Instead, as in *Yard–Man* and *Maurer*, the opposite is true in this case; the EBAs actually contain language indicating that certain health benefits *start* at age sixty-five and last until death. *See* § 12.15(h), JA at 185. Because the MOA language is analogous to that used in *Yolton*, and *Linville* does not apply, we reject PolyOne's argument and find that the MOA provision is a general durational clause that does not preclude a finding that Plaintiffs' health benefits have vested.

PolyOne next argues that the MOA's statement that "if during the term of this Agreement the Plan or Programs are changed for such majority, such changes shall be made effective on the same date they are made effective for the majority" of BFGoodrich employees at other facilities, precludes a finding that Plaintiffs' health benefits have vested. According to PolyOne, this language authorizes it to alter Plaintiffs' health benefits at any time; therefore, such benefits have not vested.

While construing the MOA in this manner has some merit on the surface, a close examination of the entirety of the MOA highlights the error in such an interpretation. The MOA provision at issue begins with the words "[t]he *Pension Plan*, including … the Hospitalization, Surgical and Medical Expense Insurance Program …, and the Prescription Drug Program." JA at 646 (emphasis added). Looking to the specific language relied on by PolyOne, the MOA states "provided that if during the term of this Agreement the *Plan* or *Programs* are changed for such majority, such changes shall be made effective" for Plaintiffs. It is apparent that the use of the word "Plan" in the latter sentence refers back to the phrase "Pension Plan" in the former sentence, while the word "Program" in the latter sentence refers back to the former phrase "Hospitalization, Surgical and Medical Expense Insurance Program … and the Prescription Drug Program." Adopting PolyOne's construction that by permitting the company to make changes to the agreements, the MOA language negates any intent to vest retiree health benefits, would necessarily lead to the conclusion that the benefits provided by the pension plan are subject to change and not vested.

According to *Yolton*, such an argument fails "because the same language was used regarding pensions and health benefits …

[g]iven the defendant's logic, because its pension plan was incorporated into the collective bargaining agreement, its obligation to provide pensions ended with the expiration of the agreement." *Yolton*, 435 F.3d at 581 n. 7 (quoting to the district court's opinion in *Golden*). As *Yolton* seems to have implicitly recognized, such a result is forbidden by ERISA, which requires that pension benefits automatically vest. *See Yolton*, 435 F.3d at 580–81; *see also Maurer*, 212 F.3d at 914 (stating that pension plans are subject to mandatory vesting under ERISA). Given that pension benefit plans cannot be changed in the manner PolyOne's interpretation would suggest, it follows that the MOA language at issue does not establish that Plaintiffs' health benefits under the "Program" were not intended to vest.

### 2. Sections 12.1 and 16.4 of the EBAs are General Durational Clauses

[9] Similar to its MOA arguments, PolyOne's primary assertion as it relates to the EBAs is that language found in § 12.1 and § 16.4 of the EBAs specifically limits the availability of retiree health benefits to the duration of the EBAs. Unlike the district court—which adopted this line of reasoning—we are not persuaded. As previously explained with regard to the MOA durational clause, "[a]bsent specific durational language referring to retiree benefits themselves" a general durational clause says nothing about the vesting of retiree benefits. *Yolton*, 435 F.3d at 581. According to our opinion in *Yolton*, such general

durational language only affects *future* retirees—that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA. Thus, the retirement package available to someone contemplating re-

tirement will change with the expiration and adoption of CBAs, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself. *Id.* at 581; *see also Maurer,* 212 F.3d at 917–18 (explaining that "general durational provisions . . . are not clearly meant to include retiree benefits").

In an unpublished case involving language virtually identical to that found in § 12.1 of the EBAs, we concluded that the provision was general in nature and did not preclude a finding that retiree benefits had vested. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Loral Corp.,* 107 F.3d 11, 1997 WL 49077, at *3 (6th Cir.1997) (unpublished table decision). The CBA at issue in *Loral* contained an introductory clause in the benefits portion of the agreement, which stated: "Effective August 12, 1988, and for the duration of this Agreement thereafter, the Employer will provide the following Program of hospital benefits, hospital-medical benefits, surgical benefits and prescription drug benefits." *Id.* There, as here, the employer argued that the introductory clause limited its obligation to provide retiree benefits to the duration of the CBA. *Id.* And there, as here, we were not persuaded. According to the *Loral* court, the introductory clause was a general durational provision that did not limit retiree health benefits to the duration of the CBA. *See id.* at *3.

Similarly, in *Weimer v. Kurz–Kasch, Inc.,* 773 F.2d 669, 675–76 (6th Cir.1985), this court analyzed a durational provision stating that "this Agreement and all terms and conditions hereof shall terminate as of the end of the term." The *Weimer* court held that the quoted language constituted a "general termination clause [that] does not support a finding that retiree benefits

ended when the agreements expired." *Id.* at 676; *see also BVR Liquidating, Inc.,* 190 F.3d at 774 (finding that retiree health benefits vested notwithstanding an introductory clause stating that benefits would be provided "at no cost to the Employees or retirees for the term of this Agreement").

In this case, § 12.1 of the EBAs states: "Effective as of April 21, 1979 and for the duration of this Agreement, the Company will provide the following plan of hospital expense benefits, hospital-medical benefits, surgical benefits, prescription drug benefits, dental benefits and major medical benefits. . . ." JA at 172. According to PolyOne, this language "specifically limit[s] the duration of retiree health benefits to the term of the EBAs." PolyOne's argument fails, however, because § 12.1's language is indistinguishable from the language we held to be a general durational provision in *Loral* and is analogous to that involved in *Weimer.* As with the durational clauses held to be general in *Yolton, Loral, BVR,* and *Weimer,* the language in § 12.1 does not specifically refer to retiree benefits; rather, it refers generically to the benefits available for all employees as well as retirees. Hence, the district court incorrectly held that § 12.1 indicates an intent not to vest retiree health benefits.

Aside from the language found in § 12.1, PolyOne also asserts that the introductory statement in Article 2 and the durational language in § 16.4 foreclose Plaintiffs' claim. For largely the same reasons as those set forth above, we disagree. Section 16.4 states in pertinent part: "Upon termination, this Agreement shall terminate in all respects except that the benefits provided by it shall be extended for ninety (90) days following such termination." JA at 186. As with § 12.1, nothing in § 16.4 specifically refers to retiree benefits; instead—like the clauses held to be general

NOE v. POLYONE CORP.                    557
Cite as 520 F.3d 548 (6th Cir. 2008)

in the cases previously cited—it refers to all benefits available for all employees, active and retired. Given the lack of any specific reference to "retiree benefits themselves," *Yolton*, 435 F.3d at 581, § 16.4 is a general durational clause and does not support the district court's finding in favor of PolyOne.[1]  *See Maurer*, 212 F.3d at 917–18 (finding a CBA clause providing that benefits shall remain in effect until midnight on the CBA's expiration date to be a general durational provision because it was "not clearly meant to include retiree benefits."); *see also United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL–CIO v. Pirelli Armstrong Tire Corp.*, 873 F.Supp. 1093, 1100–01 (M.D.Tenn.1994) (holding that a clause identical in all respects to § 16.4 was a general durational provision and did not establish that retiree health benefits terminate ninety-days after the expiration of the CBA.)

Looking to the introductory language of Article 2, it is also a general durational clause.  Article 2 states in pertinent part: "This Agreement constitutes a settlement for the duration of this Agreement of all retirement, pension, insurance, survivor income benefits, supplemental workers' compensation, drugs and severance pay demands...." JA at 495.  This language from Article 2 refers to *all* benefits; it does not specifically limit the duration of retiree health benefits as required by *Yolton* and its progeny.  PolyOne's argument that this general language indicates that Plaintiffs' health benefits were not intended to vest fails.

The dissent erroneously suggests that by deeming the durational provisions to be general in nature, we have in some way turned the *Yard–Man* inference into a presumption of vesting that may only be overcome by a "clear statement" that retiree benefits were not intended to vest.  Dis. Op. at 566–67.  Such is not the case.  The dissent also fails to recognize that requiring specific language referring to retiree health benefits in order for a durational clause to be characterized as "specific" is not the same thing as requiring specific anti-vesting language in a CBA; rather, it simply means that the entire case cannot

---

1. Furthermore, a close reading of § 16.4 suggests that the purpose of the clause was not to limit the duration of retiree health benefits; rather, it was to provide active employees with health benefits for a ninety-day period in the event that the company and the union could not agree to an extension of the agreement.  Essentially, § 16.4 continues benefits for active employees on a temporary basis in the event of a strike or a situation where employees continued to work without a contract.  *See United Steel Workers of Am., AFL–CIO v. Titan Tire Corp.*, 359 F.Supp.2d 819, 822 (S.D.Iowa 2005).  In *Titan*—pursuant to the same language found in § 16.4—benefits were provided to striking employees for the specified ninety-day period.  *Id.* at 822.  Contrary to the reasoning set forth in the dissent, such a context is clearly the one in which § 16.4 was meant to apply instead of situations like that involved here.  Simply because § 16.4 uses the word "benefits"—albeit in the most generic sense of the word and in a completely different context-the dissent latches on to it as support for the proposition that this is a specific durational provision.  Dis. Op. at 566.  To say that this provision, which *never* mentions the word "retirement" or "retiree," and is not found in the portion of the EBAs addressing retiree benefits, constitutes a *specific* durational clause is a stretch of the sort that we are unwilling and unable—as a panel—to make under our precedent.  *See Weimer*, 773 F.2d at 676 (finding a durational clause that stated "all terms and conditions" of the agreement expired on the expiration of the CBA to be general because it failed "to specify that retiree insurance benefits" terminated with the CBA).  For an example of a true specific durational clause, *see Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 815 (7th Cir.1992), where the durational clause in question "explicitly provided that retiree insurance coverage would terminate" upon the expiration of the CBA.

be resolved on the basis of a durational clause that fails to reference retiree health benefits as is required by our case law. *See Yolton* 435 F.3d at 581. As this court has held time and time again when confronted with similar provisions, general durational clauses of the sort found in the EBAs do not resolve the vesting issue, and it is necessary to determine if any provisions in the agreements shed light on whether the parties intended for Plaintiffs' health benefits to vest. *See, e.g., Maurer*, 212 F.3d at 917–18; *Weimer*, 783 F.2d at 676; *Loral*, 1997 WL 49077, at *3. It is to that question that we now turn our attention.

### 3. The EBAs Indicate an Intent to Vest Plaintiffs' Health Benefits

Because the durational clauses relied on by PolyOne do not preclude a finding that Plaintiffs' health benefits have vested, we look to other provisions of the EBAs to determine whether the parties intended Plaintiffs' health benefits to vest. Contrary to the district court's holding, several provisions in the EBAs and decisions of this court support Plaintiffs' argument that their health benefits have vested.

### a. Tying Eligibility for Retiree Health Benefits to Eligibility for a Pension

[10] According to this court, language in an agreement that ties eligibility for retiree health benefits to eligibility for a

pension indicates an intent to vest the health benefits. *See McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 422 (6th Cir.2004); *see also Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996).[2] In *McCoy*, the agreement between the parties stated: "The Company shall contribute the full premium or subscription charge for Health Care . . . for (i) a retired employee (including any eligible dependents) provided such retired employee is eligible for benefits under Article II of the Company's Hourly–Rate Employees Pension Plan." *McCoy*, 390 F.3d at 419. After outlining the applicable law under *Yard–Man* and its progeny, the *McCoy* court held that because the CBA provision "ties eligibility for retirement-health benefits to eligibility for a pension . . . there is little room for debate that retirees' health benefits vested upon retirement." *Id.* at 422. Likewise, the *Golden* court found an intent to vest retiree health benefits because there were "provisions in each of the CBAs . . . which tie retiree and surviving spouse eligibility for health insurance coverage to eligibility for vested pension benefits." *Golden*, 73 F.3d at 656; *see also Yolton*, 435 F.3d at 580 (citing *Golden* for the proposition that tying eligibility for retiree health benefits to eligibility for pension benefits indicates an intent to vest).

Applying the teaching of *McCoy* and *Golden* in the present case leads inescapably to the conclusion that the district court

---

**2.** The dissent is correct that in both *Golden* and *McCoy* this court was reviewing a district court's preliminary injunction decision under the abuse of discretion standard. However, given the unequivocal nature of those decisions—especially *McCoy*—such a distinction is one without a difference. Undoubtedly, when the *McCoy* court stated that by tying "eligibility for retirement-health benefits to eligibility for a pension . . . [the parties left] little room for debate that the retiree's health benefits vested upon retirement," 390 F.3d at

422, it made a broad pronouncement of law. A pronouncement that we believe applies regardless of whether this type of case reaches us on appeal from a preliminary injunction decision or from the grant of summary judgment. It is somewhat difficult to see why such tying language would leave "little room for debate" that retiree benefits were intended to vest in *McCoy*, yet suddenly be the source of much debate here simply because we are reviewing a district court's summary judgment decision.

erred in granting summary judgment for PolyOne. Looking to the EBAs, several provisions tie eligibility for retiree health benefits directly to eligibility for pension benefits by using language that is indistinguishable from that involved in *McCoy*. Section 12.14 of the EBAs provides in pertinent part: "Employees who retire *and who are eligible under the 1979 Employee Benefit Agreement for a Pension* (other than a Deferred Vested Pension), shall receive the benefits described in this Article." JA at 184 (emphasis added). Another section of the EBAs also ties eligibility for retiree health benefits to eligibility for a pension. In § 12.7(k), the EBAs state:

> "Employees who retire *and who are eligible under this Agreement for a pension* (other than a Deferred Vested Pension), shall receive the Major Medical Benefits described in this Paragraph 12.7...." JA at 181 (emphasis added). Lending even more support to the argument that the EBAs tie retiree health benefits to pension benefits is the fact that a key retiree health provision refers to retirees covered by the provision as "Pensioners." *See* § 12.5(h), JA at 185.

Without citing any authority, the district court disregarded the significance of this tying language because it "focuses upon an employee's eligibility for benefits rather than upon the duration of those benefits." *Noe*, 2006 WL 3759601, at \*4. Such a statement contradicts *McCoy* and *Golden*, both of which found vesting based on provisions that used the word "eligibility." *See McCoy*, 390 F.3d at 422 (explaining that there was evidence of an intent to vest "[b]ecause the Supplemental Agreement ties *eligibility* for retirement-health benefits to *eligibility* for a pension.") (emphasis added); *see also Golden*, 73 F.3d at 656 (explaining that "provisions in each of the CBAs at issue ... tie retiree and surviving spouse *eligibility* for health insurance cov-

er to *eligibility* for vested pension benefits.") (emphasis added). It is evident that the district court failed to appreciate that by tying the eligibility for retiree health benefits to the eligibility for a pension, the EBAs were actually speaking to the duration of the benefits. As we explained in *Golden*, "[s]ince retirees are eligible to receive pension benefits for life," the act of tying retiree health benefits to pension eligibility indicates "that the parties intended that the company provide lifetime health benefits as well." *Golden*, 73 F.3d at 656 (explaining why the district court in *Golden* correctly focused on the presence of tying language). Here, the EBAs undoubtedly tie eligibility for retiree health coverage to eligibility for a pension, which is evidence of an intent to vest.

**b. The EBAs' Promise of a Lifetime Special Medicare Benefit**

[11] Aside from tying eligibility for retiree health benefits to eligibility for a pension, which in and of itself suggests an intent to vest, there are other provisions in the EBAs that indicate under our case law that Plaintiffs' health benefits were intended to vest. Section 12.15(h) of the EBA states:

> Subject to the provisions of this Paragraph 12.15(h), a Special Medicare Benefit will be paid to ... (ii) a Pensioner who retires on or after April 21, 1979, or (iii) such Pensioner's or Employee's surviving spouse, if such Employee, Pensioner or surviving spouse is covered for Medical Benefits under this Article 12.
>
> (1) The Special Medicare Benefit will be equal to the standard monthly premium for Part B of Medicare ...
>
> (2) The Special Medicare Benefit will be payable *when an individual attains age sixty-five (65)* or, for an individual less than age sixty-five (65),

when he enrolls for Part B of Medicare . . .

(3) Payment shall commence on the first day of the month following (i) the month during which the individual attains age sixty-five (65) . . . The payment of such Benefit shall *continue until the individual's death* . . .

(5) Upon *the death of a Pensioner* or Employee, the Special Medicare Benefit will be paid to his surviving spouse if such spouse is eligible to receive Medical Benefits under this Article 12. Such surviving spouse shall continue to receive the Special Medicare Benefit *until such spouse remarries, dies* or is no longer eligible for Part B of Medicare.

JA at 185 (emphasis added). As the italicized language makes clear, § 12.15(h) promises that once a retiree reaches age sixty-five he or she will receive the Special Medicare Benefit until death. And upon death, the retiree's surviving spouse will continue to receive the Special Medicare Benefit until his or her death or remarriage.

When confronted with similar language in the past, we have held that it establishes an intent to vest retiree health benefits. *See Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 615 (6th Cir.1985).[3] In *Policy,* the CBA provided: "When said Pensioner reaches age 65, the Company will provide such Pensioner, at the Company's expense, supplemental medicare and major medical

benefits. The Company will continue to provide at its expense, supplemental medicare and major medical benefits for Pensioners aged 65 and over." *Id.* Reversing the district court's conclusion that the retirees' benefits were not vested, *Policy* explained that the language of the supplemental medicare provision "unambiguously confers the stated health insurance benefits for the duration of the retiree's life." *Id.* (emphasis added). The *Policy* court's determination finds support in the Seventh Circuit's decision in *Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 608 (7th Cir.1993) (en banc), where Judge Posner, writing for the en banc court, explained that a similar provision could reasonably "be thought a promise to retired employees that they and their spouses will be covered for the rest of their lives. For the provision does not say 'when they die or the collective bargaining agreement expires, whichever occurs first,' but simply when they die."

As with the provision involved in *Policy,* § 12.15(h)(3) promises to provide a Special Medicare Benefit from age sixty-five "until the individual's death." We are in agreement with *Policy,* that promising to provide a benefit until a person dies undoubtedly means that the benefit lasts for the person's life. It is likewise clear to us that § 12.15(h)(5)'s promise to provide the surviving spouse of a retiree with a Medicare supplement until he or she remarries or "dies" is a promise that the spouse of a retiree is entitled to lifetime benefits unless he or she remarries. *See generally*

---

**3.** PolyOne repeatedly cites *Policy v. Powell Pressed Steel Corp.,* 1984 WL 49075, 1984 U.S. Dist. LEXIS 18650 (N.D.Ohio March 14, 1984), in its brief as support for its argument that Plaintiffs' health benefits have not vested. *See* Appellee's Br. at 39, 41, 42. However, PolyOne neglects to ever mention that the district court's decision on which it relies so heavily was actually vacated and remanded by this court on appeal. *See Policy,* 770 F.2d at 618. Our decision in *Policy* specifically

rejected the language that PolyOne quotes in bold print at page 42 of its brief as support for the argument that the provisions in the EBAs promising certain benefits until a deceased retiree's death or remarriage did not evince an intent to vest retiree health benefits. *See id.* at 615 (finding that to construe a provision conferring health insurance benefits for the duration of the retiree's life as not providing vested benefits would render the promise ''in substantial part nugatory and illusory'').

*Loral,* 1997 WL 49077, at *3 (concluding that language providing the spouse of a deceased retiree with benefits "until death or remarriage" indicates that such benefits have vested).

Furthermore, adopting PolyOne's argument that Plaintiffs' retiree benefits have not vested would render portions of § 12.15(h) nugatory, and the promises contained therein illusory, in violation of *Yard–Man* and its progeny. *See Yard–Man,* 716 F.2d at 1480 (explaining that courts must construe CBA provisions "so as to render none nugatory and avoid illusory promises"). With regard to the analogous provision in *Policy,* this court explained that to interpret such a benefits provision as terminating at the end of the relevant CBA would create an illusory promise to those retirees who would not reach age sixty-five before the CBA's expiration. *Policy,* 770 F.2d at 615. According to *Policy,* the promise would be illusory because:

> if a sixty-two year old employee with twenty years service retired on January 1, 1982, eight months before the collective bargaining agreement expired, and if the Company were correct in contending that the retiree's health insurance benefits ceased with the August 31, 1982, expiration of such agreement, then the Company's promise to provide supplemental Medicare . . . to the retiree when he reached age sixty-five would be of no value.

*Id.; see also Bailey v. AK Steel Corp.,* No. 1:06cv468, 2006 WL 2727732, at *6 (S.D.Ohio Sept.22, 2006) (examining a similar Medicare supplement provision for retirees and concluding that the promise establishes an intent to vest because otherwise it would be illusory for many individuals who retired as young as age fifty-five). The same conclusion was reached in *Yard–Man,* where the CBA promised

to provide certain benefits to retirees when they reached age sixty-five. *Yard–Man,* 716 F.2d at 1481 (explaining that if retiree benefits expired at the end of the CBA then the promise to provide certain benefits at age sixty-five "is completely illusory for many early retirees under age 62"); *see also Maurer,* 212 F.3d at 918 (explaining that, "[b]ecause the CBAs permit retirement at age 55 and promise insurance at age 65, the promise is meaningless if it could be terminated in three years").

Similar to the provisions in *Policy, Yard–Man,* and *Maurer,* § 12.15(h) promises that upon the attainment of age sixty-five the company will begin to provide the Special Medicare Benefit to retirees. However, as in *Maurer,* employees of BFG could retire as early as age fifty-five under the company's early retirement plan. *See* § 4.2, JA at 194. For such early retirees, the promise of the Special Medicare Benefit is rendered illusory under the interpretation urged by PolyOne. *See* JA at 194, § 4.2. Likewise, § 12.15(h)'s promise to provide the spouse of a deceased retiree with the Special Medicare Benefit until his or her death or remarriage would be rendered illusory were this court to agree with the district court and PolyOne. Under PolyOne's interpretation, the spouse of an individual who retired early at age fifty-five and passed away at age fifty-seven would never receive the promised Special Medicare Benefit even though he or she remained alive and never remarried.

Looking to another provision of the EBAs, § 12.14 also promises health benefits to the surviving spouse of a retiree until the spouse's death or remarriage. According to § 12.14:

> The surviving spouse of an Employee who is retired by the Company on or after the effective date of this Agreement *shall continue to be eligible to*

*receive such benefits to the earlier of the date of death or remarriage,* provided such spouse, as of the date of death of such retired former Employee, was covered for these benefits as an eligible dependent....

JA at 184 (emphasis added). Accepting PolyOne's interpretation would require this court to rewrite § 12.14 to say that the spouse of a deceased retiree "shall continue to be eligible to receive such benefits to the earlier of the date of death or remarriage, *or the expiration of this agreement.*" No such limiting language is found in § 12.14, and courts should not add words to a contract under the guise of construing it. *See* Richard A. Lord, Williston on Contracts § 31:5 (4th ed.2007); *see also Bidlack*, 993 F.2d at 608 (explaining that such a provision does not say retiree benefits will be provided to surviving spouses " 'when they die or the collective bargaining agreement expires, whichever occurs first' but simply when they die"). As with the promises made in § 12.15(h), holding that Plaintiffs' health benefits have not vested would render § 12.14's promise of health benefits until death or remarriage illusory for the spouses of deceased retirees in violation of precedent.

### 4. Presence of Specific Vesting Language in Pension Provision

[12] Next, PolyOne argues that the fact that the EBAs used explicit vesting language with regard to pension benefits leads to the conclusion that the absence of such explicit vesting language in the retiree health benefits provisions indicates that they have not vested. The district court was persuaded by this argument, noting that Article 6 of the EBA "contains strong language stating that pension payments shall be payable monthly 'during the life of such Employee, the last payment thereof being payable for the month in which he dies.' " *Noe*, 2006 WL 3759601, at *4

(quoting § 6.1(a) of the EBA, JA at 197). According to the district court, the absence of such language in the retiree health benefits portion of the EBAs suggests that the parties did not intend for them to vest.

However, the district court neglected to notice the similarity between § 6.1(a)'s language and that found in § 12.15(h), which provides that the Special Medicare Benefit will commence when the retiree reaches age sixty-five and "[t]he payment of such Benefit shall continue until the individual's death." JA at 185. In our opinion, § 6.1(a)'s promise to pay a monthly pension "during the life of such employee" is indistinguishable from § 12.15(h)'s promise to pay the Special Medicare Benefit "until the individual's death." It is axiomatic that promising to provide a benefit for an individual's life (§ 6.1(a)) is the functional equivalent of promising to provide a benefit until an individual's death (§ 12.15(h)). Any argument to the contrary is mere semantics and defies common sense.

In the same vein, PolyOne asserts that the presence in § 8.5 of language specifically indicating that pension benefits survive the expiration of the EBAs, and the absence of such language with regard to retiree health benefits demonstrates that Plaintiffs' health benefits have not vested. Section 8.5 states: "No Pension or other benefit granted prior to the time of such termination shall be reduced, suspended or discontinued except as specifically provided in this Pension Plan." JA at 201. The force of this argument is blunted first by the provisions discussed above that under our precedent do indicate an intent to vest, and second by the existence of various provisions in the EBAs that have specific termination language, whereas the retiree health benefits provisions have none.

The presence of specific durational language in other provisions and its absence in the retiree health benefits provisions

NOE v. POLYONE CORP.    563
Cite as 520 F.3d 548 (6th Cir. 2008)

suggests an intent to vest under our case law. *See Yard–Man,* 716 F.2d at 1481–82. Here, there are several provisions that contain the specific durational provisions referred to by *Yard–Man.* First, § 12.9 explains that in the event of a layoff an employee shall receive health coverage for three months following the date of lay-off. JA at 220–21. Second, § 12.10 specifies that an employee who is terminated because of a plant closure is entitled to medical benefits under the EBAs for a twenty-four month period. *Id.* Third, § 12.11 states that an employee on an authorized leave of absence shall receive health coverage for "a period not to exceed three (3) months." *Id.* The inclusion of specific durational language "in other provisions of the current collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements." *Yard–Man,* 716 F.2d at 1481–82;

*see also Yolton,* 435 F.3d at 582 (discussing, with approval, the district court's citation of specific durational provisions in the CBAs for laid-off employees and those on maternity leave as evidence that retiree benefits vested under *Yard–Man).*

Thus, these arguments, essentially predicated on the *expressio unius est exclusio alterius* canon of interpretation, work to the benefit and detriment of each party. Accordingly, the language in § 8.5 offers little support for PolyOne's argument that Plaintiffs' health benefits were not intended to vest. This is especially true given the various provisions discussed above that indicate an intent to vest Plaintiffs' health benefits.[4]

As the foregoing analysis makes clear, there is nothing earth-shattering about our holding in this case; it is merely the straightforward application of this circuit's case law.[5] The dissent's contention that

---

4. Given our conclusion that the plain language of the EBAs indicates an intent to vest retiree health benefits, the consideration of extrinsic evidence is unnecessary. However, we pause to note that our interpretation of the EBAs finds considerable support in the available extrinsic evidence. *See, e.g.,* Affidavit of Anna May Wilder, JA at 104–05 ("When I began receiving the BFGoodrich health insurance benefits after my husband's death, I was told that it would be paid 'like it is' for my life by the woman who helped me. That person was a representative of BF Goodrich Company."); Affidavit of William Duncan, Jr., JA at 113–14 ("When I retired I spoke with Karen Hicks. She told me at that time that the only loss I would have by retiring would be a partial loss of my life insurance."); Deposition of Kimberly K. Reilly, JA at 595 (indicating that while employed in BFG's human resources department she instructed retirees consistent with her training that their health benefits would be provided for the rest of their life). This type of extrinsic evidence was held to be evidence of vesting in *Yolton. See Yolton,* 435 F.3d at 583. Looking to the extrinsic evidence relied on by PolyOne, we are unconvinced that the letter of Ms. Allison Beck, Assistant General Counsel to the Ma-

chinist's Union, casts any doubt on our conclusion that the EBAs indicate an intent to vest. As Plaintiffs point out, the letter contains a general statement of law that, unlike pension benefits, retiree health benefits may be altered upon the expiration of the applicable CBA. The letter indicates that Ms. Beck was speaking in generic terms and not on the basis of the contractual language of the EBAs involved in this case. Ms. Beck is correct that nothing in ERISA prevents an employer from terminating retiree health benefits at the end of a CBA; however, under our case law termination of health benefits is forbidden when—as here—the language of the agreements themselves indicates an intent to provide such benefits beyond the term of a particular agreement.

5. Illustrative of this point is the fact that, of the eleven most pertinent Sixth Circuit cases addressing whether retiree health benefits have vested, this court found evidence of vesting in ten. *See Yard–Man,* 716 F.2d at 1478; *Policy,* 770 F.2d at 611; *ABS Indus., Inc.,* 890 F.2d at 846; *Weimer,* 773 F.2d at 676; *Loral,* 1997 WL 49077, at *3; *Golden,* 73 F.3d at 657; *McCoy,* 390 F.3d at 422; *Maurer,* 212

we have turned *Yard–Man* into some sort of a presumption in favor of vesting is premised on a misreading of the court's opinion. One can search this opinion in vain for any indication—or even a suggestion—that we presume retiree health benefits were intended to vest absent a clear statement to the contrary. All we have done today is follow the instructions of *Yard–Man* and its progeny by examining the provisions of the EBAs and applying traditional principles of contract interpretation to ascertain whether the parties intended to vest retiree health benefits. *See Yard–Man*, 716 F.2d at 1479–80. While the dissent is correct that—beginning with *Yard–Man*—this court has approached the vesting issue differently than have many of our sister circuits, this panel is not at liberty to cast aside nearly twenty-four years of precedent in order to charter a new course, no matter how desirable that new course may be.

Having addressed the EBAs and explained why the district court erred in granting summary judgment for PolyOne, we proceed now to analyze whether Plaintiff Hood's health benefits under the Flex Program have vested.

**D.  The Flex Program**

Unlike the other Plaintiffs, Plaintiff Hood's health benefits are governed by the Flex Program because her now-deceased husband retired from BFG in 1990, two years after the Flex Program replaced the EBAs. Although it is clear from our review of the record that the provisions of the Flex Program differ from those in the EBAs, the district court's opinion failed to address whether Plaintiff Hood's benefits have vested under the Flex Program. In all likelihood, the district court's failure to address this issue resulted from the parties' failure to explain to the court how

Plaintiff Hood's claim differed from that of the other Plaintiffs. Similarly—aside from PolyOne's brief mention of a reservation of rights clause found in the Flex Program's Summary Plan Description—neither party has provided this court with any analysis of the Flex Program's language or argument as to whether it evinces an intent to vest retiree benefits. Accordingly, whether Plaintiff Hood's benefits have vested under the Flex Program is an issue that the district court must consider on remand.

**III.  CONCLUSION**

We are cognizant of the overall climate in which this case reaches the court; rising healthcare costs and foreign competition have certainly placed corporations such as PolyOne in a difficult economic position. However, in the absence of impossibility of performance, it is not the prerogative of the judiciary to rewrite contracts in order to rescue parties from "their improvident commitments." *Bidlack*, 993 F.2d at 609. Because the district court erred in concluding that the EBAs do not indicate an intent to vest Plaintiffs' health benefits, we **VACATE** the district court's decision granting summary judgment for PolyOne and **REMAND** the matter for further proceedings consistent with this opinion.

SUTTON, Circuit Judge, concurring in part and dissenting in part.

Applying the *Yard–Man* line of cases to these agreements, the district court concluded as a matter of law that the claimants' healthcare benefits do not vest upon retirement. Applying the same cases to these agreements, the majority concludes as a matter of law that the claimants' healthcare benefits do vest upon retirement. They are both partly right, which is

F.3d at 917–18; *BVR Liquidating, Inc.*, 190        F.3d at 775; *Yolton*, 435 F.3d at 581–85.

why I would not rule as a matter of law for either party and which is why I respectfully concur in part and dissent in part.

My first objection to the majority's approach is its treatment of the claimants as if the employee-benefit agreements covered them directly. That is not the case. The agreements bear on this case only because a separate memorandum of understanding incorporates them. And that memorandum independently limits any expectations claimants otherwise might have about their future healthcare benefits. As agreed to by the claimants, the memorandum says that, if certain other unions representing other BFGoodrich workers change their members' retiree health benefits—in negotiations not involving the claimants' union, no less—those changes immediately will alter the benefits of the soon-to-be retirees of the claimants' union. See JA 646 ("[I]f during the term of this Agreement the Plan or Programs are changed for [the] majority [of BFGoodrich's other production and maintenance employees], such changes shall be made effective on the same date they are made effective for [that] majority . . . and remain in effect for the life of this Agreement."). That means that, if these other unions and BFGoodrich amend their plans and eliminate (or curtail) retiree health benefits, the soon-to-be-retirees of the claimants' union, even someone who planned to retire the next day and anticipated receiving health benefits for life, will be stuck with the change—at least until the next round of negotiations. That is not the kind of provision that naturally inspires a worker to believe his benefits are fixed for life.

The durational language in § 16.4 of the employee-benefit agreements likewise undercuts the claimants' argument that their benefits are immutable for life as a matter of law. It says that, "[u]pon termination, this Agreement shall terminate in all respects except that the benefits provided by it shall be extended for ninety (90) days following such termination." On its face, the agreement undermines any expectation that the healthcare benefits a worker happens to receive at retirement are the benefits he will receive throughout retirement.

Our cases, it is true, appear not to give any weight to "general" durational clauses in collective bargaining agreements when those clauses do "not specifically refer to the duration of benefits." UAW v. Yard–Man, Inc., 716 F.2d 1476, 1482 (6th Cir. 1983). In Yard–Man, we gave no weight to a durational clause providing that the CBA should remain in effect until a particular date because the clause did not "specifically refer to the duration of benefits." Id. Similarly, in Maurer v. Joy Technologies, Inc., 212 F.3d 907 (6th Cir.2000), we concluded that provisions indicating that the CBA and certain other agreements shall terminate on a particular date were "general in nature" because they "only refer[red] to agreements between the parties, not to benefits created by the agreements." Id. at 918 (emphasis added). But § 16.4 of the agreement does "specifically refer to the duration of benefits." Indeed, this language satisfies even the suggestion in Yolton that the durational clause must refer to the "retiree benefits themselves." Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 581 (6th Cir.2006). Surely one type of benefits to which the clause could be referring is retiree benefits. If the majority means to say that a durational clause means nothing unless it says that "retiree health benefits" terminate (or may be terminated) at a given point, then it must be saying what our cases (including Yolton itself) have long disclaimed saying—that the Yard–Man inference creates a presumption in favor of vesting that may be countered only by a clear statement. See id. at 579. More on that later.

Nor do I believe that the tying language in § 12.7(k) of the agreement—which says that "[e]mployees who retire and who are eligible under this Agreement for a pension . . . shall receive the Major Medical Benefits described in this Paragraph 12.7"—compels the view that claimants have unalterable benefits for life. *McCoy* and *Golden* are not the holy grails claimants say they are because those cases (like *Yolton*) reviewed preliminary injunctions granted by the district court, not a district court's resolution of summary-judgment motions. *See McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 419 (6th Cir.2004); *Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 651 (6th Cir.1996). At issue there was the abuse-of-discretion question whether the district court properly assessed plaintiffs' likelihood of success and the balancing of equities caused by an immediate termination of healthcare benefits, not the de-novo question whether the plaintiffs should prevail as a matter of law. Nor do those cases indicate whether the agreements contained benefits-specific durational language, as in this case, or whether a memorandum of understanding between the union and company limited any expectations otherwise created by the agreements. While I agree with the majority that the district court should not have disregarded the tying language, I respectfully disagree with the majority that this language "leads inescapably to the conclusion that the district court erred in granting summary judgment for PolyOne." No case, to my knowledge, holds that tying language alone suffices to permit retirees to fend off summary judgment—much less to mandate that the benefits vested as a matter of law.

That is particularly so here in view of the conspicuous inclusion of vesting language in the pension benefits section of the agreement and its conspicuous omission in the healthcare benefits section of the agreement. The pension section of the agreement says: "No Pension or other benefit granted prior to the time of [the] termination [of the Pension Plan] shall be reduced, suspended or discontinued except as specifically provided in this Pension Plan. In the event of termination or partial termination of this Pension Plan, the rights of the Employees to benefits accrued to the date of such termination, to the extent then funded, shall be nonforfeitable. . . ." Now *that* is vesting language. Yet nothing like it appears in the healthcare benefits section of the agreement. If our cases are going to rely on similarities between pension benefits and healthcare benefits (such as similar eligibility dates) in determining what has vested, they should not ignore marked differences (such as different language about vesting) in making the same inquiry. Either they both are relevant to the vesting question, or neither is.

Although §§ 12.15(h) and 12.14 of the agreement provide some support for the retirees' claim, they too do not establish unalterable benefits for life. Section 12.15(h), as the retirees emphasize, says that "a Special Medicare Benefit" will be paid to certain employees, pensioners and surviving spouses. But the retirees overlook the first sentence of that provision, which adds that those individuals will be provided with "a Special Medicare Benefit" only "*if such Employee, Pensioner or surviving spouse is covered for Medical Benefits under this Article 12.*" (emphasis added). Read together with the introductory language to Article 12—which says that the company will provide the benefits discussed in Article 12 "for the duration of this Agreement"—this provision does not unambiguously vest the retirees' health benefits. The claimants' reliance on § 12.14 suffers from a similar problem.

Even if I were to ignore all of this, I still do not know what has vested as a matter

of law. Is it *all* retiree health benefits or just certain stated benefits? *See Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 615 (6th Cir.1985) ("The court finds that this section unambiguously confers the *stated* health insurance benefits for the duration of the retiree's life.") (emphasis added). And if it is all retiree benefits, are there any limitations? "What if the employer reduces health benefits for active employees or increases the cost of those benefits to active employees? What if the employer increases some health benefits for active employees but reduces others? Must the retiree take the bitter with the sweet? Or is it a ratchet with only the improvements in health benefits available to the retiree but with no compulsion to take any reduction?" *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 441 (6th Cir.2007). What happens if the medical insurance provider no longer offers the same medical benefits it offered for the term of the prior collective bargaining agreement? And what if the company's business takes a turn for the worse? Must it continue paying the same benefits to retirees that they received at retirement, even if the cost of those benefits means laying off current workers (and eliminating *their* health benefits) and means potentially weakening the income stream that pays for retiree benefits? How long must this continue? Until all of the values that a company brings to a community but one—irreversible retiree health benefits—are gone?

While there is no reason to think the company is heading in this direction, I fail to see how we can hold that benefits have vested as a matter of law when we do not know what has vested and on what terms. In a case like this one—where the memorandum of understanding and durational language point in the company's direction, the tying language (at least some of it) and §§ 12.14 and 12.15(h) point in the retirees' direction and the extrinsic evidence points

in both directions—I would prefer to leave these contractual ambiguities for resolution in the forum in which they belong: a jury.

One last point. The majority's conclusion to the contrary suggests that the *Yard–Man* inference has become a rebuttable presumption—one that may be overcome only by a clear-statement reservation of rights. "[A]bsent specific durational language referring to retiree benefits themselves," as the majority puts it, healthcare benefits vest as a matter of law.

The majority disclaims doing any such thing. "*Yard–Man*," it says, "does not create a legal presumption that retiree benefits are interminable" but rather "is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest." We have said the same thing before. *See, e.g., Yolton*, 435 F.3d at 580 ("[U]nder *Yard–Man*, there is no legal presumption that benefits vest and ... the burden of proof rests on plaintiffs. This Court has never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent.") (internal quotation marks, citations and alterations omitted).

But other circuits and observers, looking at what we have said *and* done in applying the *Yard–Man* inference have called it a presumption. *See, e.g., Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 543 (7th Cir. 2000) ("One case [*i.e., Yard–Man*] holds that benefits are *presumed* to vest if they are conferred by a collective bargaining agreement ....") (emphasis added); *UAW v. Skinner Engine Co.*, 188 F.3d 130, 140 (3d Cir.1999) ("We cannot agree with *Yard–Man* and its progeny that there exists a *presumption* of lifetime benefits in the context of employee welfare benefits.") (emphasis added); *Am. Fed'n of Grain*

*Millers v. Int'l Multifoods Corp.,* 116 F.3d 976, 980 n. 3 (2d Cir.1997) (citing *Yard–Man* as a case that "apparently *presum[ed]* that retiree benefits are vested") (emphasis added); Roger C. Siske et al., What's New in Employee Benefits (ALI–ABA Course of Study, July 1–5, 2002), WL SH011 ALI–ABA 59, 322 ("The Sixth Circuit *presumes* vesting and requires a clear statement of termination to prove otherwise.") (emphasis added).

I see their point. What started out as a potential inference became an omnipresent presumption and now appears to have become a clear-statement rule. Unless a company can point to explicit language in the relevant agreement stating that "retiree benefits" terminate at a particular date or do not vest, the benefits seem to vest as a matter of law. What we continually disclaim presuming we continually seem to presume.

In the majority's defense, perhaps the problem is the ineffable nature of the inference. If we were writing on a clean slate, I could imagine three straightforward approaches to the problem. One: adopt the position of several circuits and create a presumption against vesting because a company's unchangeable promise to pay healthcare benefits for life is a significant and unusual one—particularly when it arises from a three-year contract. *See Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 606–07 (7th Cir.1993) ("No doubt a court should cast a cold eye on contentions that a contract with a fixed term actually created a perpetual obligation, and should, therefore, . . . presume that a collective bargaining agreement ceases to obligate the employer when the agreement's term (invariably three years) is up."); *see also Skinner,* 188 F.3d at 139 ("[I]t must be remembered that to vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits constitutes

an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language."); *Gable v. Sweetheart Cup Co.,* 35 F.3d 851, 855 (4th Cir.1994) (same); *cf. Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d 1512, 1517 (8th Cir.1988) ("disagree[ing] with *Yard–Man* to the extent that it recognizes an inference of an intent to vest" and suggesting that "there must be a specific, if not written, expression of the employer's intent to be bound") (internal quotation marks omitted).

Two: adopt the position no circuit has yet taken that there should be a presumption in favor of vesting because retirees who lose benefits often are not in a position either to return to work or to require their union to negotiate new benefits.

Three: do not adopt any presumption because these contracts should be interpreted no differently from other collectively bargained contracts. *See generally Senior v. NSTAR Elec. & Gas Corp.,* 449 F.3d 206, 218 (1st Cir.2006) (applying the "traditional principles of labor contract interpretation" because, among other reasons, using a presumption or requiring "certain customary words" might "interfere with the correct interpretation . . . of the understanding reached by the parties" and "Congress could easily have created interpretive presumptions by statute" but chose not to).

*Yard–Man* contemplates an in-between inference—not quite a presumption in favor of vesting but not quite a straight interpretive question either. Yet I wonder whether that slices things so finely that it places the rule beyond predictable and fair application—a little like adopting a standard of review between intermediate and strict scrutiny or a level of deference between Chevron and Skidmore.

Making this particularly puzzling is that we have adopted the opposite rule—a presumption *against* vesting—in the context of employment agreements that are *not* collectively bargained. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir.1998) (en banc) ("To vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language.") (internal quotation marks omitted). One might have thought that we would apply the same rule in both settings or, if we were to put a thumb on just one of the scales, we would do so only where the employee *did not* have the benefit of a union negotiating the contract.

The salient point is that the inference, as this case well shows, has become a presumption. And we should either say that is what we are doing—and spare future panels, the district courts and litigants the confusion the inference has created—or abandon the inference altogether.



**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jose Eduardo URRIETA, Defendant–
Appellant.**

**No. 07–5431.**

United States Court of Appeals,
Sixth Circuit.

Argued: Jan. 30, 2008.

Decided and Filed: March 20, 2008.

**Background:** Defendant, who was charged with being an illegal alien in possession of firearms and possession of unlawful identification documents, filed motion to suppress the firearms, documents, and several incriminating statements. The United States District Court for the Middle District of Tennessee, Todd J. Campbell, Chief Judge, 2007 WL 208526, granted the motion to suppress certain of the statements, but denied the motion to suppress the evidence obtained in a search, and defendant appealed.

**Holding:** The Court of Appeals, Ronald Lee Gilman, Circuit Judge, held that extended detention of defendant following initial traffic stop was unlawful.

Reversed and remanded.

McKeague, Circuit Judge, filed dissenting opinion.

**1. Arrest** ⟷63.5(1)

A seizure is unlawful if an officer, without a reasonable suspicion, by means of physical force or show of authority in some way restrains the liberty of a citizen. U.S.C.A. Const.Amend. 4.

**2. Arrest** ⟷63.5(4)

Law enforcement officer may permissibly conduct an investigatory stop when he or she has a particularized and objective' suspicion that criminal activity is afoot; to meet that standard, government must point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably suggest than criminal activity has occurred or is imminent. U.S.C.A. Const.Amend. 4.

**3. Arrest** ⟷63.5(4)

Courts determine whether a reasonable suspicion exists, thus justifying an investigatory stop, by looking at the totali-