not intend for the courthouse doors to be slammed shut, in such a wholesale fashion, with respect to determining arbitrability. Indeed, this Court cannot create artificial jurisdictional limitations. *Cf. Jones v. Bock*, —— U.S. ——, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007) (bluntly reminding this Court that we cannot depart from usual practice on the basis of "perceived policy concerns").

The issue of arbitrability simply cannot be insulated from judicial review where not justified by the law, the particular circumstances of the dispute, or the parties' arbitration agreement. Again, the outcome of this case broadly insulates arbitration decisions from judicial adjudication even in the absence of any appropriate legal justification. This outcome is particularly troublesome because this Court has so sweepingly overruled *Moog* that parties' express intent with respect to arbitration will often be rendered meaningless. Under the majority's formulation, arbitration will be ordered so long as a party to the dispute can point to the existence of an arbitration agreement and demand arbitration even though the dispute at issue is not remotely covered by the express terms of the arbitration provision in the parties' contract. Furthermore, under the majority's approach, the arbitrator himself gets to decide the issue of arbitrability as a threshold matter—with little or no likelihood of judicial review or correction—even when the parties' dispute is not one which is even arguably covered by the arbitration agreement.

## CONCLUSION

The parties in this case did not agree to submit a dispute concerning timeliness to an arbitrator. The majority improperly compels the Defendant company to arbitrate where nothing in the collective bargaining agreement suggests that the parties intended an arbitrator to determine the arbitrability of the underlying dispute. For the foregoing reasons, I would affirm the district court's decision. I therefore respectfully dissent.



**James I. PRATER et al., Plaintiffs–Appellants,**

**v.**

**OHIO EDUCATION ASSOCIATION, Defendant–Appellee.**

No. 06–4393.

United States Court of Appeals, Sixth Circuit.

Argued: Sept. 13, 2007.

Decided and Filed: Oct. 3, 2007.

**Background:** Retirees filed class action under Labor Management Relations Act (LMRA) alleging that employer had violated collective bargaining agreements (CBA) by unilaterally terminating their health benefits. The United States District Court for the Southern District of Ohio, Edmund A. Sargus, Jr., J., 2006 WL 2815142, entered summary judgment in employer's favor, and denied retirees' motion for leave to amend complaint. Retirees appealed.

**Holdings:** The Court of Appeals, Sutton, Circuit Judge, held that:

(1) fact issues remained CBAs committed employer to provide medical benefits to retirees;

(2) reservation-of-rights language in summary plan descriptions (SPD) provided by employer could not supersede CBAs' amendment provisions; and

(3) district court did not abuse its discretion in denying retirees' motion to amend.

Affirmed in part, reversed in part, and remanded.

**1. Labor and Employment ⚖1272, 1273**

In interpreting collective bargaining agreement, court considers agreement's language, context in which that language appears, and other traditional canons of construction, but if, after applying those rules of interpretation, contract remains ambiguous, court may permit parties to introduce extrinsic evidence about their original understanding of contract's terms.

**2. Federal Civil Procedure ⚖2497.1**

Genuine issue of material fact as to whether explicit limitation in collective bargaining agreement (CBA) of healthcare benefits for retirees to "major-medical" indicated that employer did not commit to provide lifetime prescription drug coverage as well precluded summary judgment in retirees' class action alleging that employer violated CBA by unilaterally terminating their prescription drug benefits.

**3. Federal Civil Procedure ⚖2497.1**

Genuine issue of material fact as to whether collective bargaining agreement (CBA) terminated employer's duty to provide medical benefits to retirees after age sixty-five precluded summary judgment in retirees' class action alleging that employer violated CBA by unilaterally terminating their benefits.

**4. Contracts ⚖236**

As general rule, existing contract cannot be unilaterally modified.

**5. Labor and Employment ⚖549(2)**

Reservation-of-rights language in summary plan descriptions (SPD) provided by employer to its employees to explain medical plans it provided pursuant to collective bargaining agreements (CBA) could not supersede CBAs' amendment provisions, where SPDs did not explicitly renounce CBAs or represent to retirees that existing medical treatment could be cut off, and CBAs agreements stated that they represented full commitments between parties and could not be amended without signed, mutual consent.

**6. Contracts ⚖238(2)**

When contract contains formal procedures requiring mutual, written assent to amend, that language preempts future unilateral termination of rights.

**7. Federal Civil Procedure ⚖840, 1938.1**

District court did not abuse its discretion, in retirees' action under Labor Management Relations Act (LMRA) challenging employer's unilateral termination of medical benefits, in denying retirees' motion to amend complaint to assert ERISA violations, where retirees did not move to amend until nine months after amendment deadline created by magistrate judge's pretrial order, parties had fully briefed summary judgment motions and exchanged substantial number of documents through discovery, and retirees had sufficient information to bring ERISA claims long before they filed their motion. Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

---

**ARGUED:** David M. Cook, Cook, Portune & Logothetis, Cincinnati, Ohio, for Appellants. Rodger L. Eckelberry, Baker & Hostetler, Columbus, Ohio, for Appellee. **ON BRIEF:** David M. Cook, Robert E. Rickey, Stephen A. Simon, Cook, Portune

& Logothetis, Cincinnati, Ohio, for Appellant. Rodger L. Eckelberry, Manuel Jose Asensio III, Baker & Hostetler, Columbus, Ohio, for Appellee. Michael F. Saggau, Daniel W. Sherrick, Associate General Counsel, Detroit, Michigan, Lisa M. Smith, Samuel C. McKnight, Klimist, McKnight, Sale, McClow & Canzano, Southfield, Michigan, for Amici Curiae.

Before: SUTTON and McKEAGUE, Circuit Judges; FORESTER, District Judge.*

**OPINION**

SUTTON, Circuit Judge.

James Prater and several other retired employees of the Ohio Education Association ("OEA") claim that OEA improperly terminated their health benefits, which (they say) had become vested and irreducible through a series of collective bargaining agreements. Relying in part on our decision in *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907 (6th Cir.2000), the district court rejected the claims as a matter of law. Because we conclude that *Maurer* does not apply here, because after-the-fact unilateral summary plan descriptions cannot supercede the amendment provisions in a collective bargaining agreement and because the contracts are otherwise ambiguous about whether they promise lifetime, irreducible health benefits to employees upon their retirement, we reverse.

**I.**

In its capacity as a union, OEA represents teaching professionals throughout Ohio. Unions are employers too, however, and, in its capacity as an employer, OEA employs numerous individuals who are represented by two other unions: the Professional Staff Union ("PSU") and the Ohio Associate Staff Union ("OASU"). OEA has negotiated several collective bargaining agreements with these unions, and these agreements have provided for retiree healthcare benefits since 1978 for PSU retirees and since 1981 for OASU retirees. Plaintiffs Montgomery and Whaley, former associate staff employees of OEA, retired in 1999 and 2000, and they seek to represent a class of OASU retirees. Plaintiffs Thorley, Prater and Westfall, former professional employees of OEA, retired between 1984 and 1994, and they seek to represent a class of PSU retirees.

*The OASU Agreements.* When Montgomery and Whaley retired, the collective bargaining agreement for OASU employees said that it represented "the full and complete commitments between both parties and [could] be altered . . . only through the voluntary, mutual consent of the parties in a written and signed amendment." JA 1101. The agreement provided active employees with medical insurance covering "hospitalization; surgical; major-medical; out-patient X-ray; EKG; laboratory; prescription drug; dental; and optical." JA 1080. Retirees, the agreement said, "shall be included in the Association group in regard to: hospitalization; surgical; out-patient; and major-medical coverage," but, "[a]fter the retiree reaches age 65, the Association is required to provide only major-medical coverage." JA 1086. The collective bargaining agreement also required the company to give each employee "an individual contract guaranteeing the retiree health benefits at the time of retirement." *Id.*

*The PSU Agreements.* Like the OASU contract, the PSU collective bargaining

---

* The Honorable Karl S. Forester, Senior District Judge for the Eastern District of Kentucky, sitting by designation.

agreements in force when Prater, Thorley and Westfall retired provided that changes could be made "only by an amendment properly signed and ratified by each party." JA 1387, 1501, 1566. The first provision for retiree benefits, in a subsection entitled "Continuation of Benefits," said that "[t]he Association shall continue to provide all benefits provided by Sections 11.0112 and 11.0113 of this Contract for each retired employee to age sixty-five." JA 1357 (Thorley); JA 1468 (Prater); *see also* JA 1547–48 (Westfall). The next subsection, entitled "Reimbursement for Cost of Medicare," said that OEA "shall reimburse each retired employee over age sixty-five . . . for the cost of Medicare Part B." *Id.* And under the next subsection, entitled "Supplement to Medicare," the agreement said that OEA "shall supplement the benefits of Medicare Parts A and B to provide benefits at a level equal to those benefits provided by Sections 11.0112 and 11.0113 of this Contract for each retired employee to age sixty-five." *Id.*

*The Summary Plan Descriptions.* OEA, like other employers, distributes summary plan descriptions to its employees to assist them in understanding the more detailed, complex and formal plan documents. Each of the summaries distributed to the plaintiffs contained reservation-of-rights clauses.

The summary distributed to the OASU retirees provided: "Retired employees may continue coverage, in accordance with the collective bargaining agreement. . . . While the employer expects retiree coverage to continue, the employer reserves the right to modify or discontinue retiree coverage at any time." JA 1832. Elsewhere the OASU summary said that OEA "may modify or amend the Plan from time to time in accordance with the provision of the collective bargaining agreement." JA 1851.

The reservation-of-rights clauses in the PSU summaries did not say that any modifications to benefits must be in accordance with the bargaining agreements. "The Plan Administrator," they said, "may change or eliminate benefits under the plan and may terminate the entire plan or any portion of it." JA 1934 (Thorley); JA 1976 (Prater); *see also* JA 2045 (Westfall).

*The Dispute.* For two decades, OEA provided most of its retirees with insurance to supplement Medicare after they reached 65. On March 1, 2004, OEA sent a letter to PSU employees informing them that OEA would honor its "contractual commitment[ ]" to reimburse retirees for Medicare Part B but would no longer pay for the "optional, supplemental coverage" it had been providing. JA 98. That same day, OEA sent a similar letter to OASU retirees, informing them that "OEA's obligation to provide coverage ceases" when each retiree reaches the age of 65. JA 138. On August 31, 2004, OEA terminated the retirees' supplemental coverage.

The OASU and PSU retirees filed this class action under Section 301 of the Labor Management Relations Act, claiming that the union had violated the collective bargaining agreements. OEA moved for summary judgment on the PSU retirees' claims for post–65 supplemental insurance, and it moved for summary judgment or partial summary judgment on the OASU retirees' claims for prescription drug, surgical, hospitalization and outpatient coverage. After the parties had filed their summary judgment papers, the retirees sought leave to amend their complaint to add several ERISA claims.

The district court held that the contracts unambiguously excluded the sought-after coverage. It reasoned that the "to age 65" clause in the PSU agreement "indicates a

limitation on coverage available and is not at all ambiguous." D. Ct. Op. at 11. And it reasoned that the OASU agreement contained a "limitation on coverage [that] could not be more clear or unambiguous." *Id.* at 12. The court also held that the plan summaries reserved to OEA an unqualified right to alter or terminate the retirement benefits under *Maurer*, 212 F.3d at 919, and ultimately granted OEA's motion for summary judgment on all claims. D. Ct. Op. at 15–16. The court denied the retirees' motion for leave to amend because the litigation was at an advanced stage.

## II.

At the same time that ERISA carefully regulates the vesting of pension benefits, it leaves the decision of whether employers will provide employees with healthcare benefits upon retirement to contract—a contract that may come in the form of a collective bargaining agreement, an at-will employment relationship or something in between. *See UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983); *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 400 (6th Cir.1998); *Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 579–80 (6th Cir.2006). In the past, the application of "ordinary principles of contract interpretation" to these different types of agreements, *Yolton,* 435 F.3d at 580, has raised a host of perplexing questions: What is required to establish an employer's commitment to provide lifetime benefits to retirees? What exactly are lifetime *healthcare* benefits? Does a promise of lifetime benefits mean that they cannot be reduced over the life of a retiree? What if the employer reduces health benefits for active employees or increases the cost of those benefits to active employees? What if the employer increases some health benefits for active employees but reduces others? Must the retiree take the bitter with the sweet? Or is it a ratchet—with only the improvements in health benefits available to the retiree but with no compulsion to take any reduction?

Happily for us, this case sidesteps these questions—at least for now. OEA concedes that, in the absence of a right to terminate retiree benefits under the reservation-of-rights clauses in the summary plan descriptions, a fact dispute exists over whether the retiree benefits provided for in the collective bargaining agreements survive the term of the agreements. That leaves two related but distinct disputes for us to resolve: (1) Are the retirees' claimed benefits among those enumerated in the collective bargaining agreements? (2) Did OEA's plan summaries give the union the right to terminate any health benefits provided for in the collective bargaining agreements?

### A.

**[1]** In interpreting collective bargaining agreements, we consider the language of the agreement, the context in which that language appears and other traditional canons of construction. *McCoy v. Meridian Auto. Sys.,* 390 F.3d 417, 422 (6th Cir. 2004). If, after applying these rules of interpretation, the contract remains ambiguous, we permit the parties to introduce extrinsic evidence about their original understanding of the contract's terms. *Id.*

#### 1.

At issue with respect to the OASU retirees is whether OEA committed to provide them with lifetime prescription drug benefits. In concluding that OEA made no such promise, the district court accepted the following chain of reasoning: (1) when the OASU retirees left active employment, the collective bargaining agreement said that, "[a]fter the retiree reaches age 65,

the Association is required to provide only major-medical coverage," JA 1086; (2) the benefits provided to active employees under the collective bargaining agreement at that time fell into distinct categories: "hospitalization; surgical; *major-medical;* out-patient X-ray; EKG; laboratory; *prescription drug;* dental; and optical," *id.* at 1080 (emphases added); and (3) the independent provision for "prescription drug" and "major-medical" coverage for active employees suggests that, when OEA said it would "provide only major-medical coverage" for retirees, it would not provide prescription drug coverage for them.

In one sense, we accept this chain of reasoning as well. The explicit limitation of healthcare benefits for retirees to "major-medical" plainly indicates that OEA did not commit to provide "prescription drug" coverage as well. But this limitation means only that the promise of major-medical coverage does not include the formal package of benefits provided under the "prescription drug" heading in the agreement. It does not mean that "major-medical" may never include prescription drugs. It shows only that major-medical insurance should not be interpreted to provide the retirees the *same level* of prescription drug coverage they had enjoyed prior to age 65. When retirees suffer a "major-medical" illness or injury, the contract is at least ambiguous as to whether OEA will provide the retirees with coverage for the drugs necessary to treat that condition.

**[2]** The OASU retirees have presented extrinsic evidence backing up this position. Although the retirees' summary plan description also contains a section for a "Prescription Drug Program," JA 1823, distinct from the section for "Major Medical Benefits," JA 1816, the major-medical section explicitly provides some coverage for "prescription drugs as specified in the Schedule of Benefits," JA 1820. Notes from the contract negotiations also indicate that drug and major-medical coverages overlap. In the face of this language of the agreement and this extrinsic evidence, summary judgment cannot be granted to OEA solely on the basis of the scope of benefits outlined in the collective bargaining agreement.

2.

The pertinent PSU collective bargaining agreement's provision for post–65 retiree benefits also raises material ambiguities. Here are the relevant provisions:

11.0141    *Continuation of Benefits*

The Association shall continue to provide all benefits provided [for active employees] by Sections 11.0112 and 11.0113 of this Contract for each retired employee to age sixty-five (65).

11.0142    *Reimbursement for Cost of Medicare*

The Association shall reimburse each retired employee over age sixty-five (65) for the cost of Medicare Part B.

11.0143    *Supplement to Medicare*

The Association shall supplement the benefits of Medicare Parts A and B to provide benefits at a level equal to those benefits provided by Sections 11.0112 and 11.0113 of this Contract for each retired employee to age sixty-five (65).

JA 1357; JA 1468; JA 1547–48.

The question, as framed by the parties, is whether the clause "to age sixty-five" in the "Supplement to Medicare" subsection cuts off coverage after age 65. As OEA sees it, the "to age sixty-five" clause in the "Continuation of Benefits" subsection plainly places a limit on liability and accordingly the same clause must be read the same way in the "Supplement to Medicare" subsection. The PSU retirees

respond that the latter half of the "Supplement to Medicare" subsection must be interpreted as a comparative clause under which OEA commits to provide retirees with coverage "equal to" that which they had been given up "to age sixty-five."

Although courts "should construe terms so as to render none nugatory and avoid illusory promises," *McCoy,* 390 F.3d at 422 (internal quotation marks omitted), the task is not always that easy: Inartful drafting sometimes leaves courts with competing interpretations that *both* render other provisions of the contract superfluous or at least awkward. This is such a case. On the one hand, the retirees' interpretation renders the same phrase—"to age sixty five"—as a limit on coverage in one subsection and almost meaningless two subsections later. On the other hand, OEA's interpretation creates problems of its own. Reading "to age sixty-five" to cut off coverage at 65 in both provisions renders the promise of a "Supplement to Medicare" meaningless because the "Continuation of Benefits" subsection already promises PSU retirees that same level of coverage up to age 65. Although OEA hypothesizes that this provision allows them to take advantage of government benefits to fulfill that duty, the "Supplement to Medicare" provision is structured as an obligation rather than something the union may do. As a general rule, moreover, only people with disabilities may receive Medicare before age 65, and OEA's interpretation renders a subsection that appears to be applicable to all retirees relevant only to a small subset of them. Also supporting the retirees' reading is the fact that all of the language following the "equal to" phrase parrots the language in the "Continuation of Benefits" subsection, suggesting that the clause has a comparative, not a restrictive, purpose to it.

[3] As we see it, then, the agreement is at least ambiguous when it comes to whether it provides post–65 supplemental insurance. The extrinsic evidence—the affidavits submitted by the retirees and OEA's consistent practice of providing supplemental insurance—sufficiently supports the PSU retirees' position to raise a material factual dispute over the meaning of the pertinent contract.

B.

The district court also held that OEA reserved the right to terminate or modify benefits through several summary plan descriptions. We disagree.

[4] As a general rule, "an existing contract cannot be unilaterally modified." *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.,* 481 F.3d 337, 350 (6th Cir.2007); *see also Nagle Heating & Air Conditioning Co. v. Heskett,* 66 Ohio App.3d 547, 585 N.E.2d 866, 868 (1990) ("A contract cannot be unilaterally modified."); 17A C.J.S. *Contracts* § 410 ("A signed contract . . . cannot be changed without the consent or subsequent agreement of the parties."). Were it otherwise, the option of either party to modify a contract unilaterally would defeat the essential purpose of reaching an agreement in the first place—to bind the parties prospectively.

This principle applies with equal force to collective-bargaining agreements, where employers are statutorily barred from effectuating "unilateral modification[s] of . . . existing collective bargaining agreement[s]." *N.L.R.B. v. Ford Bros., Inc.,* 786 F.2d 232, 233 (6th Cir.1986) (per curiam). Even when an employer enters bankruptcy, the law "prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement." *In re Unimet Corp.,* 842 F.2d 879, 884 (6th Cir.1988); *see* 11 U.S.C. § 1113.

One of our decisions, *Maurer*, complicates matters. There, we held that a summary plan description, issued after a collective bargaining agreement had been signed, prevented retiree benefits from vesting because it reserved the right of the employer to "curtail or eliminate coverage for any treatment, procedure, or service regardless of whether [the employee is currently] receiving treatment." *Maurer*, 212 F.3d at 913. Because the reservation of rights was conspicuous and unqualified, we held, "the Union was obligated to grieve or enter suit" if it disagreed with the employer's assertion of authority—even if that assumption of authority came after the effective date of the relevant collective bargaining agreement. *Id.* at 919 (internal quotation marks omitted).

In *McCoy*, we limited *Maurer* to "unqualified reservation-of-rights language," 390 F.3d at 424, that claims a "unilateral right by the employer to terminate coverage without regard to existing or future collective bargaining agreements," *id.* at 425. Because the summary at issue in *McCoy* said that any "termination" of benefits was "subject to the provisions of any applicable collective bargaining agreement," we held that it could not "fairly . . . have prompted the union immediately to protest." *Id.* at 425 (internal quotation marks omitted). *McCoy*, we acknowledge, involved a preliminary-injunction decision and thus turned on our review of a likelihood-of-success determination, not a final merits determination. But we stand by this clarification of *Maurer* because a broad reading of the decision would run headlong into the rule that a plan summary "cannot vitiate contractually vested or bargained-for-rights." *Halliburton Co. Benefits Comm. v. Graves*, 463 F.3d 360, 378 (5th Cir.2006) ("[A] reservation-of-rights clause in a plan document, which allows a company to amend or terminate a plan at any time, cannot vitiate contractually vested *or bargained-for rights*.") (internal quotation marks omitted). To our knowledge, no court of appeals has forced unions to file grievances in the face of a summary plan description that purported to remove a promise of lifetime health benefits.

[5] As in *Maurer*, OEA's summary plan descriptions contained reservation-of-rights language. *See* JA 1832 (OASU summary stating that "[w]hile the employer expects retiree coverage to continue, the employer reserves the right to modify or discontinue retiree coverage at any time"); JA 1934 (PSU summary reserving the right to "change or eliminate benefits under the plan and . . . terminate the entire plan or any portion of it"). But unlike *Maurer*, these clauses were not sufficiently unqualified to "fairly . . . have prompted the union immediately to protest." *McCoy*, 390 F.3d at 425. As in *McCoy*, neither summary explicitly represented to the retirees that existing medical treatment could be cut off, as the summary in *Maurer* did. *See id.* at 424. And as in *McCoy*, the OASU summary explicitly claimed to be established "in accordance with a collective bargaining agreement," JA 1801, and referenced the bargaining agreement every time it mentioned potential modifications.

[6] Perhaps most importantly, both the PSU and OASU agreements say that the contracts represent the full commitments between the parties and that the agreements cannot be amended without signed, mutual consent, a clause never mentioned, much less discussed, with respect to the *Maurer* collective bargaining agreement. When a contract contains formal procedures requiring mutual, written assent to amend, that language preempts future unilateral termination of rights. *See Pleasantview Nursing Home, Inc. v. N.L.R.B.*,

351 F.3d 747, 754 (6th Cir.2003) (holding that oral modification of a collective bargaining agreement was ineffective in the presence of "an express zipper clause prohibiting modification except by written agreement"); *Martin Marietta Energy Sys., Inc. v. N.L.R.B.,* No. 87–5369, 1988 WL 24225, at *3–4 (6th Cir. Mar.17, 1998) (per curiam) (affirming NLRB's finding of unfair labor practice when an employer's "unilateral action" breached a collective bargaining agreement's formal amendment clause and rejecting an argument that the union waived its right to complain through inaction). On this record, the unions thus could not fairly be "compelled to protest the SPD language," *McCoy,* 390 F.3d at 425—at least when the summary does not explicitly renounce the collective bargaining agreement—because both sets of contracts explicitly said that their bargained-for rights could not be terminated in such a manner. The summaries instead serve as extrinsic evidence regarding the extent of the employer's promise of future healthcare benefits and whether the parties intended the benefits to vest. *See Yard–Man,* 716 F.2d at 1481–82. They cannot, however, be interpreted to permit the unilateral termination of these alleged contractual rights.

### III.

The retirees also challenge the district court's denial of their motion for class certification and their motion to amend their complaint. As to the first motion, the court premised its denial of the class-certification motion on its summary judgment decision. D. Ct. Op. at 16. We accordingly remand the case to the district court to address class certification in the first instance.

**[7]** As to the second motion, the district court did not abuse its discretion. *See Leary v. Daeschner,* 349 F.3d 888, 904 (6th Cir.2003) ("Denial of a motion for leave to amend is reviewed by this court for an abuse of discretion."). Leave to amend, it is true, should be "freely given when justice so requires," but it can be denied on the basis of "undue delay, bad faith or dilatory motive ... [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (internal quotation marks omitted); *see also* Fed.R.Civ.P. 15. And our court, it is also true, has required "at least some significant showing of prejudice" to deny a motion to amend based solely upon delay. *Moore v. City of Paducah,* 790 F.2d 557, 562 (6th Cir.1986) (per curiam). Taken together, however, the retirees' delay, the late stage of the case when the motion was filed and the likely futility of any amendment show that the district court acted well within its discretion.

The timing of the motion undermines plaintiffs' position. They moved for leave to amend on January 13, 2006, nine months after the amendment deadline created by the magistrate judge's pretrial order. By the time the retirees filed the motion, the parties had fully briefed the summary judgment motions and exchanged a substantial number of documents through discovery. Even if the retirees were not aware of their potential ERISA claims at the outset of the litigation, they had sufficient information to bring these claims long before they filed their motion.

The requested amendment also would have added little, if any, value to their complaint. The retirees acknowledge that their proposed ERISA claim "parallel[s]" their existing LMRA claim, Br. at 43, because the two claims rise or fall on the same contractual terms, *see Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.,* 749 F.2d 315, 317 n. 2 (6th Cir.1984) (noting that, where an obligation

arises "under the collective bargaining agreement[,] ... the inquiry relative to both the LMRA claims and ERISA claims is identical"). To the extent the retirees hope to raise distinct breach-of-fiduciary-duty claims under ERISA, that claim almost assuredly would be futile. *See Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("[A] company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan.") (quoting *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.1990)).

IV.

For these reasons, we reverse the district court's grant of summary judgment, affirm its denial of the plaintiffs' motion to amend their complaint and remand for further proceedings.



**Brenda MURPHY, Plaintiff–Appellant,**

**v.**

**Linda COCKRELL, Defendant–Appellee.**

**No. 06–5897.**

United States Court of Appeals, Sixth Circuit.

Submitted: Sept. 14, 2007.

Decided and Filed: Oct. 4, 2007.

Rehearing Denied Oct. 30, 2007.

**Background:** Former employee of county property valuation office brought action against the administrator alleging violations of the First, Fourth, and Fourteenth Amendments and wrongful discharge arising from dismissal. The United States District Court for the Eastern District of Kentucky, Karl S. Forester, J., granted summary judgment in favor of administrator. Employee appealed.

**Holdings:** The Court of Appeals, Boyce F. Martin, Jr., Circuit Judge, held that:

(1) employee engaged in protected speech when she campaigned for herself;

(2) administrator's interest in eliminating tension in office did not outweigh employee's free speech interests in campaigning for herself;

(3) deputy administrator position did not fall within political patronage exception to First Amendment protection of public employees; and

(4) employee had no protected property interest under the Fourteenth Amendment.

Affirmed in part, reversed in part, and remanded.

Ralph B. Guy, Jr., Circuit Judge, filed opinion concurring in part and dissenting in part.

**1. Constitutional Law** ⚖︎1929, 1934

To demonstrate First Amendment protection, a public employee must show (1) that the speech at issue addresses a matter of public concern, and (2) that the employer had no overriding state interest in efficient public service that would be undermined by the speech. U.S.C.A. Const.Amend. 1.

**2. Constitutional Law** ⚖︎1937
  **Taxation** ⚖︎2437

Employee of county property valuation office, who was also candidate for position of county property valuation administrator, engaged in protected speech when she campaigned for herself by calling into question current administrator's expe-