**REESE v. CNH AMERICA LLC**     315
Cite as 574 F.3d 315 (6th Cir. 2009)

the firearm. Nor does it appear that an exception to fruits analysis such as the independent-source rule or inevitable-discovery doctrine applies to make suppression unwarranted. *United States v. Davis,* 430 F.3d 345, 358 (6th Cir.2005) (citing *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), and *Nix v. Williams,* 467 U.S. 431, 443–44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). Accordingly, the district court erred when it denied See's motion to suppress.

### III. CONCLUSION

Because we conclude that the initial *Terry* stop was not supported by reasonable suspicion, we **REVERSE** the district court's denial of See's motion to suppress and **REMAND** for proceedings consistent with this opinion.

RONALD LEE GILMAN, Circuit Judge, concurring.

I concur in the lead opinion, but write separately to emphasize my view that this is an extremely close case. I believe that the totality of the circumstances would have provided Officer Williams with reasonable suspicion to conduct a *Terry* stop if, for example, Officer Williams had been responding to a complaint, if he had acted on a tip, if he had seen the men doing anything potentially criminal, or if the men had tried to flee as Williams approached.

But because Officer Williams observed the men only for a moment before blocking their exit and had not seen them do anything other than sitting in See's vehicle, I cannot say that there were "articulable facts that criminal activity 'may be afoot,'" *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), or that the officer had anything more than an "ill-defined hunch[ ]." *See United States v. Urrieta,* 520 F.3d 569, 578 (6th Cir.2008). Officer Williams had every right to investigate further, but he should have simply parked his patrol car alongside See's vehicle to carry out the investigation in a consensual manner. Instead, he parked his patrol car in such a way so as to block in See's vehicle, thus transforming the encounter into a *Terry* stop. I therefore concur, although barely so, in the conclusion that the stop was not supported by reasonable suspicion.



**Jack REESE, Frances Elaine Pidde, James Cichanofsky, Roger Miller, and George Nowlin, Plaintiffs–Appellees/Cross–Appellants,**

v.

**CNH AMERICA LLC (f/k/a Case Corporation) and CNH Global N.V., Defendants–Appellants/Cross–Appellees.**

Nos. 08–1234, 08–1302, 08–1912.

United States Court of Appeals, Sixth Circuit.

Argued: March 3, 2009.

Decided and Filed: July 27, 2009.

**Background:** Retirees brought action against employer, seeking a declaration that they were entitled to lifetime health-care benefits, an injunction requiring employer to maintain the level of retiree health-care benefits then in effect, and damages for injuries the retirees might sustain if the benefits were terminated. The United States District Court for the Eastern District of Michigan, Patrick J.

Duggan, J., 2007 WL 2484989, granted summary judgment in favor of retirees and awarded attorney's fees to retirees, 2008 WL 2546936. Employer appealed.

**Holdings:** The Court of Appeals, Sutton, Circuit Judge, held that:

(1) District Court did not abuse its discretion by refusing to transfer case;

(2) retirees were entitled to lifetime health-care benefits; but

(3) employer was entitled to reasonably alter health-care benefits; and

(4) retirees did not have a Seventh Amendment right to a jury trial.

Affirmed in part, reversed in part, and remanded.

**1. Labor and Employment ⚖︎677**

District court in Michigan did not abuse its discretion by refusing to transfer retirees' suit against employer, which sought a declaration that retirees were entitled to lifetime health-care benefits under a collective bargaining agreement (CBA), to district court in Wisconsin, even though employer was headquartered in Wisconsin, CBA negotiations took place there, employer administered the health-care plans there, and most of the retirees lived in Wisconsin, where case was assigned to same Michigan trial judge who had handled parallel lawsuit involving same types of claims under different CBAs against successors in interest to employer. 28 U.S.C.A. § 1404(a).

**2. Federal Courts ⚖︎103, 819**

District courts have broad discretion to determine when party convenience or the interest of justice make a transfer appropriate; only when the district court clearly abuses its discretion in balancing these considerations will the Court of Appeals reverse. 28 U.S.C.A. § 1404(a).

**3. Labor and Employment ⚖︎426**

While ERISA heavily regulates promises to provide pension benefits, health benefits are purely a matter of contract—permitting a company to guarantee health benefits for life or to make them changeable, or even terminable, at the will of the company. Employee Retirement Income Security Act of 1974, §§ 201(1), 203(a), 29 U.S.C.A. §§ 1051(1), 1053(a).

**4. Labor and Employment ⚖︎549(1)**

When a health plan was not collectively bargained, the court will require a clear statement before it will infer that an employer meant to promise health benefits for life.

**5. Labor and Employment ⚖︎549(1)**

Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language.

**6. Labor and Employment ⚖︎549(1)**

When a health plan stems from a collective bargaining agreement (CBA), the court applies ordinary principles of contract interpretation to determine whether benefits have vested, and to the extent it puts a thumb on the scales in this setting, it favors vesting.

**7. Labor and Employment ⚖︎694**

Although courts reviewing a health plan that stems from a collective bargaining agreement (CBA) do not apply a legal presumption that benefits vest, and although they require plaintiffs to bear the burden of proving that vesting has occurred, they apply an inference that it is unlikely that welfare benefits would be left to the contingencies of future negotiations, so long as they can find either explicit contractual language or extrinsic evidence indicating an intent to vest benefits.

**8. Labor and Employment** ⚖=549(1)

Employees were entitled to lifetime health-care benefits upon retirement pursuant to collective bargaining agreement (CBA) which provided that employees who retired under employer's pension plan were eligible to receive health-care benefits, though summary plan descriptions (SPDs) distributed after effective date of CBA warned that amendment or termination of benefit plans might affect coverage; health-care benefits provision of CBA did not contain a specific durational clause while other benefits provisions contained such clauses, eligibility for health-care benefits was tied to eligibility for pension, and SPDs indicated that official plan documents were controlling.

**9. Labor and Employment** ⚖=483(2), 547

If an employer includes unqualified reservation-of-rights language in a summary plan description (SPD) to the effect that the employer has a unilateral right to terminate coverage, and if a union fails to grieve or object to such language, then such reservation-of-rights language prevents retiree benefits from vesting even if the SPD was distributed after the effective date of the collective bargaining agreement (CBA); however, no divesting occurs when the SPD contains language reminding readers that the contracts represent the full commitments between the parties because a union cannot fairly be expected to protest when the SPD makes it clear that the CBA, not the SPD, controls a conflict.

**10. Labor and Employment** ⚖=445, 549(1)

Employer was entitled to reasonably alter health-care benefits for retirees, even though employer could not terminate the benefits because the retirees' right to lifetime benefits vested upon retirement pursuant to collective bargaining agreement (CBA) which provided that employees who retired under employer's pension plan were eligible to receive health-care benefits; parties had a history of altering the benefits, including entering CBAs that created changes for past and future retirees by imposing managed care on all of them, and nothing in text of CBA stated that health-care coverage would be fixed and irreducible.

**11. Labor and Employment** ⚖=1295(1)

A union does not represent retired employees when it bargains a new contract for its employees.

**12. Jury** ⚖=14(1.4)

Retirees did not have Seventh Amendment right to a jury trial on their claims for declaratory and injunctive relief under ERISA and LMRA. U.S.C.A. Const. Amend. 7; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

**13. Labor and Employment** ⚖=549(1)

The *Yard–Man* test, which provides for an inference of vesting of welfare plan benefits in close cases, applies to claims for benefits that arise out of a collective bargaining agreement (CBA), and the *Sprague* standard, which requires that the intent to vest must be stated in clear and express language, is limited to cases in which an employer unilaterally instituted a benefit program.

---

**ARGUED:** Bobby R. Burchfield, McDermott, Will & Emery LLP, Washington, D.C., for Appellants. Roger J. McClow, Klimist, McKnight, Sale, McClow & Canzano, P.C., Southfield, Michigan, for Appellees. **ON BRIEF:** Bobby R. Burch-

field, Jason Alan Levine, McDermott, Will & Emery LLP, Washington, D.C., Norman C. Ankers, Honigman Miller Schwartz and Cohn LLP, Detroit, Michigan, for Appellants. Roger J. McClow, Klimist, McKnight, Sale, McClow & Canzano, P.C., Southfield, Michigan, for Appellees.

Before: RYAN, GIBBONS, and SUTTON, Circuit Judges.

**OPINION**

SUTTON, Circuit Judge.

At stake in this appeal is whether a collective bargaining agreement (CBA) grants retirees *lifetime* health-care benefits upon retirement. Consistent with our precedents in this area, we hold that it does so. That conclusion, however, does not resolve the *scope* of those benefits. Because the CBA and related documents do not say anything about subsequent modifications to these benefits and because the application of the relevant CBA provisions suggests that the parties contemplated reasonable modifications, we remand the case to the district court to determine what types of changes are permitted.

I.

The Parties. CNH America LLC, formerly known as Case Corporation, makes construction and agricultural equipment in Racine, Wisconsin. It was once a wholly owned subsidiary of Tenneco, *Yolton v. El Paso Tenn. Pipeline Co.*, 318 F.Supp.2d 455, 459 (E.D.Mich.2003), but as part of a corporate restructuring, Tenneco sold its interest in the company in a public offering in June 1994. *Id.* at 459–60.

The plaintiffs represent a class of retired Case employees and their spouses (who retired from July 1, 1994 through November 12, 1999) and CNH employees and their spouses (who retired from November 12, 1999 through November 1, 2004). Each employee retired after the Tenneco reorganization in July 1994 but before November 1, 2004.

*The 1998 CBA.* In 1971, Case entered into a CBA with the United Automobile, Aerospace and Agricultural Workers of America ("UAW"), in which Case agreed to provide health-care insurance to its retired employees and their spouses who were "receiving a J I Case Pension [or] a Spouse's Pension." JA 144. From 1974 through 1995, each CBA (in three- or four-year terms) renewed this commitment in "substantially unchanged" form, JA 91, and each CBA provided that employees did not have to pay premiums in order to receive coverage.

Case and the UAW entered into the CBA that prompted this lawsuit in 1998, and it lasted until May 2, 2004. Under the 1998 CBA, Case agreed that:

> Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group benefits as described in the following paragraphs.

JA 1288; *see also* JA 1213 (noting that "[t]he group insurance plan agreed to between the parties ... is hereby made a part of this Agreement"). The next paragraphs listed "Medical" and "Prescription Drug" benefits available to all classes of covered retirees regardless of the duration of their service before retirement. JA 1288–91. The CBA does not spell out what "Medical" benefits are included; it just says that "[e]ligibility for specific coverage [will be] based on each plan's eligibility requirements." JA 1290. "No contributions," the CBA adds, "are required for the Health Care Plans...." JA 1291.

A Letter of Understanding concerning the "[c]ost of [h]ealthcare [c]overage" supplemented the 1998 CBA. JA 1304. "[O]ver the term of the 1998 labor agreement," it said, "employees and retirees who are enrolled in a Company offered HMO, PPO or other plan will not have to pay any additional employee contributions above those which may be required for enrollment in the Case Network Plan (if any)." *Id.* The letter added that Case was "responsible for the retention of HMOs, PPOs and other health care delivery mechanisms during the [CBA's] term," and that Case could "terminate" a provider giving inadequate coverage and adopt a "replacement plan [that] will provide comparable benefits and access to the type of plan it replaces," provided that the new plan satisfied "the UAW's standards regarding access and quality." *Id.*

*The Wisconsin case.* On February 11, 2004, CNH filed a declaratory judgment action against the UAW in the United States District Court for the Eastern District of Wisconsin. It sought a declaration that the post-reorganization retirees were not entitled to lifetime health-care benefits under the 1998 CBA and that it could "modify or terminate" the retirees' benefits "at its discretion" at the end of the CBA. JA 1513. The district court dismissed the action in August 2004 because ERISA does not give a plan fiduciary the right to seek an order clarifying its plan obligations and because the Labor–Management Relations Act, 29 U.S.C. § 141 *et seq.*, does not create a cause of action in the absence of a claim that a CBA has been violated.

*The Reese case.* On February 18, 2004, a group of former employees, who retired from the company between 1994 and 2004, as well as spouses of such employees, filed the present case in the Eastern District of Michigan, seeking a declaration that they were entitled to lifetime health-care benefits, an injunction requiring CNH to "maintain the level of retiree health care benefits currently in effect" and damages for injuries the retirees might sustain if the benefits were terminated. JA 1533. In February 2005, the district court denied CNH's motion to transfer the case to the Eastern District of Wisconsin.

In August 2007, the district court granted the retirees' motion for summary judgment, concluding that the 1998 CBA unambiguously granted lifetime health-care benefits to the retirees. In a separate opinion filed the same day, the district court granted CNH's motion to strike the retirees' demand for a jury trial, concluding that there is no Seventh Amendment right to a jury trial for ERISA or LMRA claims. The district court also awarded $1.4 million in attorney's fees to the retirees. *See* 29 U.S.C. § 1132(g); *Reese v. CNH Global N.V.*, No. 04–70592, 2008 WL 2546936, at *5 (E.D.Mich. June 20, 2008).

*The Yolton case.* One more layer of complication exists: There is a parallel lawsuit involving the same types of claims under different CBAs against two successors in interest to CNH—CNH America and El Paso Tennessee Pipeline Co. *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 574 (6th Cir.2006). In December 2002, a group of former employees of Tenneco and Case, all of whom had retired before July 1, 1994, filed a class action against CNH America and El Paso. *Yolton*, 318 F.Supp.2d at 459–60, 464. In December 2003, the United States District Court for the Eastern District of Michigan issued a preliminary injunction, reasoning that the retirees were likely to succeed on the merits of their claim that the 1990 CBA gave them a right to lifetime health-care benefits. *Id.* at 471, 476. The court thus ordered the employer to continue to provide the benefits during the litigation.

*Id.* at 460, 471, 473. In 2006, the Sixth Circuit upheld the preliminary injunction, *Yolton,* 435 F.3d at 585, and the case is currently pending in front of Judge Duggan, the same judge who is handling the present dispute.

## II.

**[1, 2]** CNH first challenges the district court's refusal to transfer the case to the Eastern District of Wisconsin. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). As the permissive language of the transfer statute suggests, district courts have "broad discretion" to determine when party "convenience" or "the interest of justice" make a transfer appropriate. Only when the district court "clearly abuse[s] its discretion" in balancing these considerations will we reverse. *Phelps v. McClellan,* 30 F.3d 658, 663 (6th Cir.1994).

In resolving the motion, the court considered six factors: "the convenience of the parties and witnesses," the accessibility of evidence, "the availability of process" to make reluctant witnesses testify, "the costs of obtaining willing witnesses," "the practical problems of trying the case most expeditiously and inexpensively" and "the interests of justice." JA 76; *see Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 30, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Moses v. Bus. Card Express, Inc.,* 929 F.2d 1131, 1136–37 (6th Cir.1991). And it kept in mind that, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Cf. Dowling v. Richardson–Merrell, Inc.,* 727 F.2d 608, 612 (6th Cir. 1984); JA 76.

The key question is whether the district court properly applied those factors. On one side of the ledger, several considerations favored a transfer: CNH is headquartered in Wisconsin, the CBA negotiations took place there, CNH administers the health-care plans there, most of the class members live in Wisconsin and few class members live in Michigan, all of which suggests that Wisconsin is the most convenient forum for the parties and witnesses. On top of that, CNH stores its documents in Wisconsin, which means that a Wisconsin forum would make it easier to obtain access to the evidence.

On the other side of the ledger: The case was assigned to the same Michigan trial judge who had handled the *Yolton* case (and was still handling the case), giving him a leg up on the legal and factual issues presented, and suggesting that the objectives of trying the case expeditiously and inexpensively would benefit from a Michigan forum. There also is much to be said from an interests-of-justice perspective for applying the same law to both cases rather than Sixth Circuit law to one case and Seventh Circuit law to the other.

The answer to this question, as an original matter, is not self-evident. The locus of the dispute, the key parties and the location of most of the evidence favor Wisconsin. But at the same time, it makes sense to resolve the health benefits of both sets of retirees—both of whom worked in the same plant for the same effective employer—under the same circuit law and in front of the same district court judge. In the end, the issue turns on the standard of review. Compelling considerations favor both parties' positions, making it difficult to say that the district court would have abused its discretion had he picked either location as the more appropriate forum. The court, in short, had authority to keep the case.

III.

Turning to the merits, we face two questions: Did Case in the 1998 CBA agree to provide health-care benefits to retirees and their spouses for life? And, if so, does the scope of this promise permit CNH to alter these benefits in the future?

A.

In answering these questions, we have several ground rules. First, we give fresh review to the district court's summary judgment ruling—that the "plain language" of the contract conveyed an "intent to grant lifetime retiree health insurance coverage to retirees," JA 109—and we draw all factual inferences in favor of the party opposing summary judgment: CNH. *See Cline v. BWXT Y–12, LLC*, 521 F.3d 507, 509 (6th Cir.2008).

[3] Second, we assess promises to pay retirement benefits differently depending on the type of obligation involved. ERISA makes a promise to pay a covered "pension" binding at retirement, 29 U.S.C. § 1053(a), but it exempts "employee welfare benefit plans" from this requirement, *see id.* § 1051(1). Thus, while ERISA heavily regulates promises to provide pension benefits, health benefits are purely a matter of contract—permitting a company to guarantee health benefits for life or to make them changeable, or even terminable, at the will of the company. *See Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir.2008); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir.1998).

[4, 5] Third, we assess health-care-benefit promises differently depending on whether the contract stemmed from a CBA or not. When the health plan was not collectively bargained, we require a clear statement before we will infer that an employer meant to promise health benefits for life. "Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language." *Sprague*, 133 F.3d at 400 (internal quotation marks omitted).

[6, 7] When the health plan stems from a CBA, by contrast, we apply "ordinary principles of contract interpretation" to determine whether benefits have vested, *see Yolton*, 435 F.3d at 580, and to the extent we put a thumb on the scales in this setting, it favors vesting. Although we do not apply a "legal presumption that benefits vest" and although we require plaintiffs to bear the burden of proving that vesting has occurred, we apply an "inference" that "it is unlikely that [welfare benefits] would be 'left to the contingencies of future negotiations,'" so long as we can find either "explicit contractual language or extrinsic evidence indicating" an intent to vest benefits. *Yolton*, 435 F.3d at 580 (quoting *UAW v. Yard–Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir.1983)). The precise weight of the *Yard–Man* "inference," we appreciate, is elusive. "[S]tanding alone," on the one hand, this factor is "insufficient to find an intent to create interminable benefits." *Yard–Man*, 716 F.2d at 1482; *see Yolton*, 435 F.3d at 579–80; *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 917 (6th Cir.2000). But, on the other, it must mean something or else there would be no point in having it. In the end, it may come to nothing more than this: a nudge in favor of vesting in close cases. *See Yolton*, 435 F.3d at 579–80.

In applying these principles here, we face one question that is relatively straightforward under our case law (did the benefits "vest"?) and one that is not (what does vesting mean in this context?).

B.

**[8]** *Did the employees' right to lifetime health-care benefits vest upon retirement?* Past is prologue in answering this question, because one of our cases—*Yolton*—arose from a nearly identical CBA. The Yolton CBA said that "[e]mployees who retire under the Case Corporation Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible" to receive health-care benefits, JA 813, and added that "the Company shall pay the full premium cost of the above coverages," JA 815. The 1998 CBA in today's case provided that "[e]mployees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for" health-care benefits, JA 1288, and added that "[n]o contributions are required for the Health Care Plans," JA 1291.

Promise for promise, the two sets of commitments are effectively identical. That is not surprising: The Yolton CBA involved retirees who worked at the same plant as today's retirees and concerned an employer that was different in name—Case's former parent company, Tenneco—but in few other meaningful ways. We start, then, by considering how *Yolton* dealt with a similar plan.

At issue in *Yolton* was whether this court should affirm a preliminary injunction preventing the employer from terminating or significantly modifying health-care benefits for previously retired employees. The employees all took retirement before 1994 and were covered by the 1990 CBA with Tenneco. When El Paso (Tenneco's new parent company) threatened to terminate or significantly modify the health benefits of the retirees, they sought a preliminary injunction to prevent the change.

In gauging the parties' prospects on the merits, the court construed the language of the CBA as likely creating a right to lifetime health-care benefits upon retirement. *See Yolton*, 435 F.3d at 583. It first relied on the fact that the company's benefits plans tied eligibility for pension benefits to eligibility for health-care benefits. Noting that this "tying" consideration had played a "key" role in a vesting-of-health-benefits determination in an earlier case, the court reasoned that it "demonstrate[s] an intent to provide lifetime benefits." 435 F.3d at 580, 584–85; *see Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 656–57 (6th Cir.1996) (affirming a preliminary injunction based in part on a district court's conclusion that "[CBA] provisions . . . which tie retiree and surviving spouse eligibility for health insurance coverage to eligibility for vested pension benefits" demonstrate an intent to vest health benefits); *see also Noe*, 520 F.3d at 558–59; *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 422 (6th Cir.2004).

Other aspects of the 1990 CBA, *Yolton* determined, also suggested an intent to create lifetime benefits. For example, some benefits were subject to express durational limitations while retiree health benefits were not, prompting the court to conclude that "the inclusion of specific durational limitations in other provisions . . . suggests that retiree benefits, not so specifically limited, were intended to survive." *Yolton*, 435 F.3d at 582 (quoting *Yard–Man*, 716 F.2d at 1481–82). And the *Yolton* court also pointed to language in the summary plan descriptions saying that "continued coverages will be the same as those that were in effect on the day preceding your retirement." *Id.* at 583.

*Yolton* supports the district court's conclusion that the 1998 agreement granted

retirees a right to lifetime health benefits. Like *Yolton*: this case involves a CBA; it involves a health-care benefits plan with identical language concerning entitlement to benefits upon retirement; it ties eligibility for health benefits to eligibility for a pension; it does not contain a specific durational clause while other benefits provisions in the CBA contain such clauses, *see* JA 1285–86; and above all it concerns employees who worked in virtually identical circumstances (apparently making the same products in the same plant) to the *Yolton* employees before each group retired.

Yes, *Yolton* was a preliminary injunction decision, and, yes, that means only the retirees' likelihood of success on the merits was at issue, not their actual success on the merits as in the case of a decision granting summary judgment in their favor. But in view of the common language between the plans and the centrality of the tying rationale in *Yolton*'s merits determination and in cases before and since, it seems appropriate to treat these two groups of like-situated employees in like ways.

[9] In arguing that the two cases should be treated differently, CNH relies on a 2000 Summary Plan Description (SPD) of the health plan, which warned that "[a]n amendment or *termination* of the ... benefit plans may affect ... the coverage[ ]" of retirees. JA 1438 (emphasis added). A 1999 SPD was to the same effect. As CNH sees it, even if the 1998 CBA created a right to lifetime benefits, the retirees are estopped from seeking any such relief by their acceptance of the 1999 and 2000 SPDs, which described the benefits as terminable at CNH's will. There is some case law in support of this notion. If an employer includes "unqualified reservation-of-rights language" in an SPD to the effect that the employer has a "unilateral right ... to terminate coverage," and if a union fails to grieve or object to such language, then such reservation-of-rights language "prevent[s] retiree benefits from vesting" even if the SPD was distributed after the effective date of the CBA. *Prater v. Ohio Educ. Ass'n,* 505 F.3d 437, 444 (6th Cir.2007); *see Maurer,* 212 F.3d at 919. But there is an exception. No divesting occurs when the SPD contains language reminding readers that "the contracts represent the full commitments between the parties" because a union cannot fairly be expected to protest when the SPD makes it clear that the CBA, not the SPD, controls a conflict. *See Prater,* 505 F.3d at 444–45.

The exception applies. The 2000 SPD reminded readers that, "[i]f there is any variance between the contents of this handbook and the official plan documents and labor agreements, those documents or agreements will govern." JA 1438. And the 1999 SPD contains a similar warning: "Our responsibilities to you," warned the company, "as well as the conditions of your coverage with us, are defined in the documents that make up your contract." JA 1383. This qualifying language precludes CNH from maintaining that it had the unilateral right to terminate benefits.

CNH next focuses on an historical feature of this case that, as best as we and the parties can tell, has no parallel in *Yolton*. The 1998 CBA purported to cover future retirees as well as retirees who had previously left the company during the 1990 and 1995 CBAs, and it made material alterations to the health benefits of these prior retirees. Why should we treat the 1998 CBA as creating vested rights, CNH points out, if the company had the right to alter the health benefits of employees who had retired under the similarly worded 1990 and 1995 CBAs and if indeed the 1998 made material alterations to their bene-

fits? This is a good question. But it does not go to vesting—at least as our cases, including *Yolton,* have used the term. It instead goes to a related, more difficult question—what does vesting mean in this setting?—a question to which we now turn.

### C.

**[10]** *What does vesting mean in this context?* Much of our case law in this area draws heavily on an analogy between pension and health-care benefits. It is a useful analogy in one sense because both settings deal with retirement benefits, both benefits often are for life and retirees legitimately depend heavily on both benefits in view of the reality that many employees, upon retirement, will not be able to supplement their retirement income in meaningful ways and will not be able to obtain other employer-related health benefits.

But it is not a perfect analogy. The value of a pension benefit, whether defined or undefined, is clear cut—a matter of concrete dollars and cents, fairly measurable as a matter of principal or income stream before retirement, at retirement or after retirement. Vested health-care benefits are another matter. Employers do not send their active or retired employees a monthly account itemizing the value of their health-care benefits. And with good reason: What would it say? What could it say?

The language of health-care provisions, as the 1998 CBA illustrates, generally does not contain the kind of precision that characterizes a pension plan. "Employees," it says, "who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for" health-care benefits. JA 1288. It is one thing to say that this kind of language, when tied to eligibility for a pension plan, prevents an employer from *terminating* the benefits—which we have held here. It is quite another to say that an employer may not *alter* the benefits in any way, particularly when the parties have a history of doing just that and when common experience suggests that health-care plans invariably change over time, if not from year to year. *See Diehl v. Twin Disc, Inc.,* 102 F.3d 301, 309 (7th Cir.1996) (distinguishing a promise to provide "lifetime insurance benefits" from "decid[ing] precisely what those benefits are").

**[11]** Which takes us to the nub of this case: Whatever these words mean, the parties' actions and a common understanding of welfare benefits confirm that the company's healthcare benefits are not akin to black-and-white pension benefits that cannot be diminished by one cent once they have vested. As CNH points out, no party to this case—the union, the employer, the retirees—viewed the benefits in this way. The 1998 CBA not only set the rules for employees who retired during the next six years of that CBA; it also *reset* the rules for employees who retired after July 1, 1994, which is inconsistent with the notion that the 1990 and 1995 CBAs (using the same language as the 1998 CBA, *compare* JA 813, 1040 *with* JA 1288) created unalterable, irreducible health benefits. The 1994–1998 retirees were not asked to consent to this change, and they did not consent to it. And as *Yard–Man* makes clear and as later cases confirm, a union does not represent retired employees when it bargains a new contract for its employees. *UAW v. Gen. Motors Corp.,* 497 F.3d 615, 626–27 (6th Cir.2007); *see Yard–Man,* 716 F.2d at 1482. Notably, *Yolton* did not deal with any of these issues when it determined that the retirees had a likelihood of success on their claimed entitlement to lifetime health benefits. *See* 435 F.3d at 578–85.

No doubt, the resetting of health-care benefits for previously retired employees might not concern anyone if each change *upgraded* the existing package of benefits. That sort of change would not break any promises to provide irreducible benefits for life. But that is not what happened here. The 1998 CBA, among other changes, created a Managed Health Care Network Plan for past and future retirees. In other words, it imposed managed care on all of them, which represented a reduction in the effective choices of coverage available for all retirees and the coverage actually provided to many, if not most, of them. Managed care plans were not popular when they were introduced because they often restricted the availability of "discretionary or elective" services. *See* Robert F. Rich & Christopher T. Erb, *The Two Faces of Managed Care Regulation & Policymaking*, 16 Stan. L. & Pol'y Rev. 233, 234–35, 237–39 (2005). Such plans usually control costs by covering only a limited network of providers, *id.* at 262, a type of limitation against which covered insureds often rebel, *see id.* at 267–68 (describing the broad adoption of state legislative reforms designed to curb restrictions on provider access), and against which the UAW had rebelled when negotiating earlier CBAs, *see, e.g.,* JA 2197.

Preferred provider organization (PPO) plans—such as the ones made applicable to retirees under the 1998 CBA, *see* JA 1167—allow insureds to use out-of-network providers, but they provide lowered coverage for such care. *See* Amy B. Monahan, *The Promise and Peril of Ownership Society Health Care Policy,* 80 Tul. L.Rev. 777, 789–90 (2006). Pre–1998 retirees thus saw their coverage downgraded in at least one respect: Unlike the prior plan, under which they could choose any doctor without suffering a financial penalty, *see* Anne Maltz, *Health Insurance Fundamentals,* 774 PLI Litig. 213, 235 (2008), they generally had to pay more for choosing an out-of-plan doctor. It may be possible, to be sure, that this reduction in the end benefitted some retirees in view of other improvements to the plan. *See* JA 1167 (describing "improvements sought by the Union" that were included in the new plans, including "full coverage (after modest co-pays)" for listed services such as "MRI and CAT scans" and "[h]ospice care in approved facility"). But no evidence shows that the change favored all retirees.

Other clues support this interpretation. Consistent with the parties' practices, nothing in the text of the 1998 CBA said that health-care coverage would be fixed and irreducible into perpetuity for all employees who retired under it. At best, under our cases, it established a right to lifetime health-care benefits, but not benefits that could not change from CBA to CBA. A letter of understanding, signed by the contracting parties, points in the same direction. Addressing the "Cost of Healthcare Coverage," it said that, "over the term of the 1998 labor agreement," retirees "who enrolled in a Company offered HMO, PPO or other plan" would not be required to pay "any *additional* employee contributions above those which may be required for enrollment in the Case Network Plan." JA 1304 (emphasis added). Why ensure that no "additional" contributions would be required if the retirees' benefits were locked in by the 1998 CBA or an earlier CBA? And why limit the promise to "the term of the 1998 labor agreement" if the parties intended to create "fully paid lifetime retiree health care benefits" that could never be "reduce[d]"? JA 33.

The letter of understanding also shows that the parties, quite understandably, contemplated replacing some managed care providers with others at some point in the future. Given the realities of managed

care, in which a new plan may fail to cover providers or services that an old plan had covered, the retirees had no basis for assuming that each replacement plan would at best improve, or at worst precisely maintain, the level of care provided to each individual retiree. A plan that permits the substitution of managed care providers is one that envisions making tradeoffs in the future that may negatively impact some retirees, if not all retirees, and one that is inconsistent with unalterable and irreducible health benefits—particularly those analogized to vested pension benefits. That is why the CBA—unless it says otherwise—should be construed to permit modifications to benefits plans that are "reasonably commensurate" with the benefits provided in the 1998 CBA, "reasonable in light of changes in health care" and roughly consistent with the kinds of benefits provided to current employees. *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615, 619, 620 (7th Cir.2006); *see also Diehl,* 102 F.3d at 310 (examining a CBA creating vested benefits and concluding that "we see nothing to indicate that the Shutdown Agreement established a right to a particular insurance carrier, or even to a particular plan").

Nor do the statements of company representatives to retirees show that these benefits were unalterable as a matter of law. One retiree, indeed, was told that his health benefits may be "change[d] in a future UAW contract." JA 1450. And the statements made to other retirees do not support an unbending construction of the CBA—and certainly do not do so as a matter of law. A 1992 retiree was told that his "insurance benefits [would] remain in effect as long as [he was] living," JA 891, and a retiree's wife reports that, in 1997, a Case representative told her that if her husband were to die she "would continue to get . . . health insurance for the rest of [her] life" and that the coverage "wouldn't cost [her] anything," JA 1463. But all of this is consistent with lifetime benefits subject to reasonable changes. That the benefits "wouldn't cost anything" was true through the end of the CBA, and the representation at any rate was made during the term of the 1995 CBA. We know that the contracting parties viewed the 1995 CBA's benefits as subject to some changes because they changed them. The retirees point us to no other extrinsic evidence that is contemporaneous with the 1998 CBA and that clearly establishes a promise of lifetime benefits that can never vary.

This conclusion makes sense not only in the narrow circumstances of this case but also within the broader context of ERISA, which contemplated just this sort of flexibility. Congress chose not to impose a one-size-fits-all concept of welfare-benefit vesting, unlike the specific rules applicable to pension benefits:

> With regard to an employer's right to change medical plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans. Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs.

*Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988). For these reasons, Congress concluded that "[t]o require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose pri-

mary function is to provide retirement income." H.R.Rep. No. 93–807 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4670, 4726; S.Rep. No. 93–383 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4890, 4935. The matter, then, was left to employers, employees and unions to handle by contract.

All of this requires us to modify the district court's judgment. "Plaintiffs are entitled to vested lifetime retiree health care benefits," it concluded, "as provided for in the labor agreements in effect at the time of their or their deceased spouses' retirement." JA 111. To the extent this ruling indicates that the retirees have a vested right to receive health care benefits for life, it is consistent with *Yolton* and our other cases. But to the extent it suggests that these benefits must be maintained precisely at the level provided for in the 1998 CBA, it is not supported by the 1998 CBA, extrinsic evidence provided by the parties or common sense. CNH, in short, cannot terminate all health-care benefits for retirees, but it may reasonably alter them. With this guidance, we leave it to the district court to decide how and in what circumstances CNH may alter such benefits—and to decide whether it is a matter amenable to judgment as a matter of law or not.

### IV.

[12] The retirees cross-appeal the district court's determination that they do not have the constitutional right to a jury trial on their claims for declaratory and injunctive relief. As they acknowledge, we have held that the Seventh Amendment does not guarantee a jury trial in ERISA and LMRA cases because the relief is equitable rather than legal, and we did so in the context of nearly identical claims to the ones filed here. *See Bittinger v. Tecumseh Prods. Co.,* 123 F.3d 877, 882–83 (6th Cir.1997); *Golden,* 73 F.3d at 660–63.

*Great–West Life & Annuity Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), the retirees respond, represents intervening authority that allows us to reconsider these decisions. But *Knudson,* first and foremost, is not a Seventh Amendment case. It dealt with whether an action "seek[ing] . . . to impose personal liability . . . for a contractual obligation to pay money-relief" falls within § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which authorizes suits for "appropriate equitable relief." *See Knudson,* 534 U.S. at 209–10, 122 S.Ct. 708. The Court's conclusion—that such claims were not covered by § 502(a)(3) because they were legal in nature, not equitable, *see id.* at 210, 220–21, 122 S.Ct. 708—does not undermine our prior decisions. *Golden,* for example, acknowledged that "a monetary award, generally, is a form of legal relief," 73 F.3d at 661, before concluding that in health-care benefits cases like this one, any backward-looking relief is at best "incidental" in comparison to the primary goal of ensuring injunctive access to health-care benefits in the future, *id.* *Knudson,* by contrast, did not involve forward-looking relief but only "reimbursement . . . *for past medical treatment,*" 534 U.S. at 208–09, 122 S.Ct. 708, leaving the Court no opportunity to say, much less hold, anything that would lead us to second guess *Golden.* What is more, the retirees offer no tenable response to CNH's argument that, because CNH continued to fund their benefits pending this lawsuit, they have no right to seek *any* damages based on its past conduct, further undermining the analogy to *Knudson.* *Golden* and *Bittinger* remain the law of this circuit and require us to reject the retirees' jury-trial argument.

V.

CNH challenges the district court's award of $1,426,948.75 in attorney's fees and $55,430.09 in costs to the retirees, *Reese*, 2008 WL 2546936, at *5, a matter that receives abuse-of-discretion review, *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 528 (6th Cir.2008). In CNH's view, the retirees may not reap the benefits of ERISA's fee-shifting provision, 29 U.S.C. § 1132(g)(1), because they "litigated (and won) this case purely on LMRA grounds," Appellant Fee Br. at 11. But, as the district court noted, the retirees have pursued their rights under the LMRA *and* ERISA. *Reese*, 2008 WL 2546936, at *2. And that is appropriate because, "[i]f the parties intended to vest benefits" and there is a breach of the agreement, "there is an ERISA violation as well as an LMRA violation." *Maurer*, 212 F.3d at 914.

[13] CNH insists that, if the retirees had filed this action solely under ERISA, the *Sprague* standard would have applied, and the retirees would have lost because they would not have been able to point to "clear and express language" in the 1998 CBA granting lifetime benefits. *Sprague*, 133 F.3d at 400. This argument begins from a false premise, however. The *Yard–Man* test applies to claims for benefits that arise out of a CBA, and *Sprague* is limited to cases in which an employer "unilaterally instituted a retiree benefit program." *Maurer*, 212 F.3d at 917. We have never suggested that we would apply *Sprague* if a plaintiff had proceeded only under an ERISA theory in claiming benefits under a CBA; nor have we ever upheld an LMRA claim while denying a parallel ERISA claim. In light of our longstanding practice of treating LMRA and ERISA claims involving CBAs in an identical manner, CNH's argument—supported only by precedents that do not involve a CBA, *see, e.g., Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 668 (6th Cir. 1998)—does not show that *Sprague* would apply had the retirees filed a stand-alone LMRA claim.

One point, however, does deserve attention on remand. The district court's award of fees relied in part on its conclusion that the retirees "prevailed on the dispositive issue in this case," *see Reese*, 2008 WL 2546936, at *3, which meant that one of the factors in the fee-shifting analysis, "the relative merits of the parties' positions," *see Gaeth*, 538 F.3d at 534, favored their fee claim. That is no longer so. While the plaintiffs have succeeded in showing that they are entitled to lifetime benefits, they have not shown that they are entitled to unchangeable benefits. *See* JA 33 (suggesting that the retirees viewed any "modif[ication]" of their benefits as a breach of the CBA). At least part of the rationale for the fee award, then, may no longer be sound. Because the decision to award fees is placed in the sound discretion of the district court, not our court, *see* 29 U.S.C. § 1132(g); *Moon v. Unum Provident Corp.*, 461 F.3d 639, 642 (6th Cir. 2006), and because it remains to be seen how the court will handle the merits issues on remand, we vacate the fee award and will allow the district court to decide in the first instance what award is appropriate in the context of its final decision.

VI.

For these reasons, we affirm in part and reverse in part and remand for further proceedings.

