# CORBIN ON CONTRACTS

By

**ARTHUR LINTON CORBIN**
Late Professor of Law Emeritus
Yale University Law School

## Volume 1

### Revised Edition

By

**JOSEPH M. PERILLO**
Alpin J. Cameron Professor of Law
Fordham University School of Law

§§ 1.1–4.14

ST. PAUL, MINN.
WEST PUBLISHING CO.
1993

tive elements. To illustrate, in *Cox Broadcasting Corp. v. National Collegiate Athletic Ass'n*,[12] ABC and Cox intended when signing the contract for programming rights that the contract would preclude the NCAA from allowing WTBS (Turner Broadcasting's Superstation) to broadcast a "supplemental series" of NCAA games. Contrariwise, the NCAA intended to allow WTBS to broadcast this series. At the time the contract was signed both ABC and Cox on one side and the NCAA on the other knew the other's intention. Each side asserted that the document they were about to sign effectuated its intention. Each side vigorously resisted the other's attempt to clarify the writing. They agreed that the writing would "speak for itself." Later, ABC and Cox sought to enjoin the NCAA from permitting broadcasts by WTBS of the supplemental series' games. The court used some 19th century language about "meeting of the minds," but then qualified it by saying that "courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent."[13] With this as a premise, the court concludes that ABC and Cox had no contract right to enjoin the NCAA from dealing with WTBS because they were aware that the NCAA's interpretation of the writing differed from theirs on this point. This is an unsound approach. Here, as so often happens when negotiating parties are at loggerheads on a specific point, but want to proceed with the deal, they buried the issue. There was neither a subjective meeting of the minds nor an objective understanding that either of the two contentions was correct. There was, however, consent to the terms of a written contract. Each party had the reasonable expectation that the writing would be interpreted by an independent judicial mind. Their expectations were not met. Under the approach suggested here, the parties' subjective understandings are considered, at least to the extent that there is external evidence of it, and each of their objective understandings of the other party's position is also considered, all of which must be considered in the light of the understanding and professional background of the court, and, in a proper case, of the jurors.

## § 4.13　Mutual Assent—"Meeting of the Minds"

It takes two to make a "bargain," although there are some "unilateral" contracts that can be made without any expression of

12. 250 Ga. 391, 297 S.E.2d 733 (1982).　　13. 297 S.E.2d at 737.

assent by the promisee.[1] The great majority of contracts are bargaining contracts, the purpose of which is to effect an exchange of promises or of performances. To attain this purpose, there must be mutual expressions of assent to the exchange. These expressions must be in agreement, but it is not necessary that they shall consist of identical words or identical acts. Their words and acts are called "expressions" because they are external symbols of the thoughts and intentions of one party, symbols that convey these thoughts and intentions to the mind of the other party. The symbols so used by one party may be ill-chosen, or the experience and intelligence of the other party may be so variant from that of the first that the understanding of the second is materially different from that of the first. When this is the case, it cannot be said that there has been a "meeting of the minds" or that the parties are in "agreement," in the sense in which those terms are usually understood.[2]

### § 4.13

1. The text refers primarily to those unilateral contracts, such as a promise under seal, that are effective unless the promisee expresses dissent. If, however, the offer looks to a performance by the offeree and the offeree performs the requested return, this conduct acts as an expression of assent to the offered terms. Multicare Medical Center v. Department of Social and Health Services, 114 Wash.2d 572, 790 P.2d 124 (1990), en banc. The court states: "The Hospitals are not entitled to perform the contract and then argue that there was no mutual intention that the contract establishes the payment rates." 790 P.2d at 133.

2. Section 1.9 is quoted on the subject discussed here, in Kitzke v. Turnidge, 209 Or. 563, 307 P.2d 522, 527 (1957), the plaintiff occupied the defendant's land as tenant, also doing extensive work as a carpenter in reconstruction of an old house thereon. There was no agreement in writing. The plaintiff testified that the work as a carpenter was done under a separate agreement and for a compensation other than that promised as payment for his work as a tenant. The defendant testified to the contrary and that the carpenter work was included in the agreement of tenancy and in return for a single promised compensation. A verdict for plaintiff was sustained, holding that it would have been error to instruct the jury that the plaintiff could not recover unless there was an actual "meeting of the minds." See also § 538.

This section is cited in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 88, 75 A.L.R.2d 1 (1960), holding the limitation of liability provision used by all the members of the Automobile Manufacturers Association to be unconscionable and against public policy. The case is discussed in the text of § 128 and § 1472, and is noted under § 2.12, § 607 and § 1377.

In J.H. Milner & Son v. Percy Bilton, Ltd., 2 All E.R. 895 (Q.B.1966), a firm of solicitors which had represented one of the parties in a real estate development deal wrote to the subsequently formed development company stating that there was an understanding that all of the legal work connected with development and leasing of the property would be placed with the firm. The development company denied such an understanding but agreed to the proposition. Subsequently the leasing work was done by the company's house counsel. Solicitors sued for breach. Held there was no contract for the leasing. Plaintiffs employed the vague term "understanding" in their offer in a deliberate attempt to induce agreement to uncertain terms and later benefit thereby.

It has already been shown, and it will appear at many places in this treatise, that a "meeting of the minds" is not an unvarying prerequisite to an enforceable contract. But if it is made clear that there has in fact been no such "meeting of the minds," the court will not hold a party bound by a contract varying from the party's own understanding unless this party's words and conduct were in a context giving the party reason to know that the other party would be and was in fact misled. This is discussed, in a manner that is not altogether consistent with very frequently recurring statements, in the chapter on Interpretation. In determining whether a party had reason to know the other party's understanding, the party must be judged in relation to the usage and understanding of other people, but in determining whether a party did in fact know the other party's understanding, much more direct and cogent evidence (such as statements made to and by this party) may be available.

There is no actual "meeting of the minds," even though the terms of the bargain are reduced to writing and signed by both parties, if one of them did not in fact read or understand the written terms. Yet the signatory is generally bound.[3] In modern

---

**This section is cited** in Prince v. Western Empire Life Ins. Co., 19 Utah 2d 174, 428 P.2d 163 (1967), holding enforceable a life insurance policy binder which stated that it would be effective from the date of application if the applicant subsequently was shown to have been insurable on that date. There was no evidence to the contrary and insurer had delayed issuing the policy prior to the applicant's accidental death.

This section as well as § 4.12 is cited in Rasmussen v. Freehling, 159 Colo. 414, 412 P.2d 217 (1966), holding that plaintiff in an accident case is entitled to try the issue of fraud in the procuring of a release.

3. Ill.—Midland Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill.2d 306, 113 Ill.Dec. 252, 515 N.E.2d 61 (1987). For a consideration, the defendant agreed to display plaintiff's address and phone number in "appropriate listings" under "appropriate headings" in the Chicago Visitors Guide and Downtown Directory published by defendant. The defendant did not list plaintiff under "Hotels." The defendant maintains that there was no "meeting of the minds" as it understood that it was to provide only a back-page advertisement. "The jury found that the defendant promised 'appropriate listings' and whether this promise accurately reflected the defendant's subjective intention is simply irrelevant."

Computer Network, Ltd. v. Purcell Tire & Rubber Co., 747 S.W.2d 669 (Mo. App.1988). The defendant's comptroller signed a letter agreement expressing consent to the purchase of 21 computers over the next twelve months. At the end of twelve months, the defendant had ordered for delivery only 12 computers. The comptroller denies any intent to purchase 21 computers. Clearly, if there was no such intent, the seller was misled by the expression of assent that was in writing in plain English. The court states: "An actual mental reservation does not prevent a contract from being formed if there is a manifestation of assent and nothing in Section 2–204 [of the U.C.C.] changes this approach." 747 S.W.2d at 675.

N.H.—Kilroe v. Troast, 117 N.H. 598, 376 A.2d 131 (1977), noted at § 4.9 above.

Utah—John Call Engineering, Inc. v. Manti City Corp., 743 P.2d 1205 (Utah

business life there are innumerable "standardized" contract forms, such as are found in insurance, transportation, sales of goods, and distribution agencies, prepared by one party for recurrent use in many transactions. They may contain many provisions, often in fine print, the purpose of which is to limit obligations and to avoid risks that the party preparing the form would otherwise have to bear. It may be presented to the other party, often much less well informed or advised, on the basis of "accept this or get nothing," well knowing that the other party does not know or understand.[4] In these cases, the requirement of an actual "meeting of the minds" may well be made effective against the party in the superior position.[5] Even if the other party knew and understood, provisions have sometimes been refused enforcement as "unconscionable."

Prevailing opinion as to justice and sound policy may require more than this, leading to legislative regulation of business transactions. In some lines, as in insurance and transportation, the "standardized" contract is in a form prepared by the legislature or by a public commission and presented to both contracting parties on the basis of "use this or make no contract," or even on the more stringent basis of "use this." In such cases the traditional "freedom of contract" is much restricted.

### § 4.14  Auction Sales—Offers to Sell and to Buy

The public auction sale has long been an established institution with customs and usages generally well known in the community. These customs and usages vary in different regions. They vary also in relation to the subject matter of the sale. The customs of a regularly established auction mart must be consid-

---

1987), appeal after remand 795 P.2d 678 (Utah App.). Engineer presented City with a proposed contract for the planning and completing of a sewer project. The Mayor and Council apparently believed it was a proposal for a preliminary study. The Council approved it and the Mayor signed it. There was no misrepresentation or duress. The agreement was in plain English. It was a binding contract.

Wash.—Sherman v. Lunsford, 44 Wash.App. 858, 723 P.2d 1176 (1986). "Absent fraud, deceit or coercion, a voluntary signator is bound to a signed contract even if ignorant of its terms." 723 P.2d at 1178.

4. See § 1.4 above, as to contracts of adhesion.

5. See Weaver v. American Oil Co., 257 Ind. 458, 276 N.E.2d 144, 49 A.L.R.3d 306 (1971), failure to explain provision radically shifting the normal risks of negligence.

State Bank of Hamburg v. Stoeckmann, 417 N.W.2d 113 (Minn.App. 1987), failure to disclose that documents being signed constituted a mortgage, with the amount of indebtedness left blank.