UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, and JAMES L. KELLEY,
on behalf of themselves and a similarly
situated class,

                Plaintiffs,

v.

BORGWARNER, INC., BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

                Defendants.

Case No. 09-cv-10918
Hon. Paul D. Borman
Magistrate Mona K. Majzoub

**Class Action**

David R. Radtke (P47016)
Roger J. McClow (P27170)
Patrick J. Rorai (P65091)
KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI 48034
248-354-9650; fax 248-354-9656
dradtke@kmsmc.com
rmcclow@kmsmc.com
prorai@kmsmc.com

Bobby R. Burchfield
Joshua D. Rogaczewski
McDERMOTT WILL & EMERY
Attorneys for Defendants
600 Thirteenth St., N.W.
Washington, D.C. 20005
202-756-8000; fax 202-756-8087
bburchfield@mwe.com
jrogaczewski@mwe.com

Elisa Angeli Palizzi (P52088)
MILLER, CANFIELD, PADDOCK
& STONE, P.L.C.
Attorneys for Defendants
150 W. Jefferson Avenue, Suite 2500
Detroit, MI 48226
313-496-7635; fax 313-963-6420
angeli@millercanfield.com

**PLAINTIFFS' MOTION FOR
<u>SUMMARY JUDGMENT AS TO LIABILITY</u>**

Plaintiffs, by their attorneys, KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, P.C., move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to liability. In support of the Motion, Plaintiffs state as follows:

1.     This is an action for retiree health care benefits under Section 301 of the Labor Management Relations Act, 29 U.S.C. §185 and Section 502 of the Employee Retirement Income Security Act, 29 U.S.C. §1132.

2.     The relevant language in the collectively bargained Health Insurance Agreements which confers health care benefits on retirees and their surviving spouses clearly and unambiguously promises lifetime health care benefits for those retirees and surviving spouses who are eligible for or are receiving a pension.

3.     On May 1, 2009, Defendants unilaterally reduced and/or eliminated retiree health care benefits for the Class.

4.     Because Defendants promised to provide lifetime health care benefits under the Health Insurance Agreements, all of the Class Members are entitled to summary judgment as to liability.

5.     There is no genuine issue of material fact to be decided.

6.     Plaintiffs have sought and were denied the concurrence by Defendants' counsel in the relief sought in this Motion on May 14, 2012.

2

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter summary judgment as to liability in their favor.

Respectfully submitted,

KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.


By: /s/ David R. Radtke
    DAVID R. RADTKE (P47016)
    ROGER J. McCLOW (P27170)
    PATRICK J. RORAI (P65091)
    Attorneys for Plaintiffs
    400 Galleria Officentre, Suite 117
    Southfield, MI  48034
    (248) 354-9650
    dradtke@kmsmc.com
    rmcclow@kmsmc.com
    prorai@kmsmc.com

Dated:        May 14, 2012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, and JAMES L. KELLEY,
on behalf of themselves and a similarly
situated class,

                Plaintiffs,

v.

BORGWARNER, INC., BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

                Defendants.

Case No. 09-cv-10918
Hon. Paul D. Borman
Magistrate Mona K. Majzoub

**Class Action**

David R. Radtke (P47016)
Roger J. McClow (P27170)
Patrick J. Rorai (P65091)
KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI 48034
248-354-9650; fax 248-354-9656
dradtke@kmsmc.com
rmcclow@kmsmc.com
prorai@kmsmc.com

Bobby R. Burchfield
Joshua D. Rogaczewski
McDERMOTT WILL & EMERY
Attorneys for Defendants
600 Thirteenth St., N.W.
Washington, D.C. 20005
202-756-8000; fax 202-756-8087
bburchfield@mwe.com
jrogaczewski@mwe.com

Elisa Angeli Palizzi (P52088)
MILLER, CANFIELD, PADDOCK
& STONE, P.L.C.
Attorneys for Defendants
150 W. Jefferson Avenue, Suite 2500
Detroit, MI 48226
313-496-7635; fax 313-963-6420
angeli@millercanfield.com

**BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT
AS TO LIABILITY**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

STATEMENT OF ISSUE PRESENTED ..... iv

I. INTRODUCTION ..... 1

II. FACTS ..... 1

III. ARGUMENT ..... 9

A. Plaintiffs are Entitled to Summary Judgment as to Liability. ..... 9

1. The Applicable Law ..... 9

a. Section 301 of the Labor Management Relations Act ..... 9

b. Section 502 of ERISA ..... 11

2. The Group Benefit Plans Unambiguously Provide for Lifetime Retiree Health Care Benefits. ..... 11

a. Retiree Health Care Benefits Are Tied to a Lifetime Pension. ..... 12

b. Specific Limitations on Other Benefits ..... 14

c. Category B Retirees and the Grandfathered Employees ..... 15

d. Written Proof of the Lifetime Intent ..... 17

IV. CONCLUSION ..... 20

## TABLE OF AUTHORITIES

*Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bender v. Newell Window Furnishings*, 2012 U.S. App. LEXIS
(6th Cir. May 3, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15, 16, 17

*Cole v. ArvinMeritor*, 549 F.3d 1064 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 10, 13, 14, 15

*Golden v. Kelsey-Hayes, Co.*, 73 F.3d 648 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . 9, 11, 13, 15

*Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173 (E.D. Mich. 1997) . . . . . . . . . . . . . . . . . . . . . 13

*Jensen v. S.I.P.C.O., Inc.*, 38 F.3d 945 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Maurer v. Joy Technologies*, 212 F.3d 970 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 9, 11, 17, 18

*McCoy v. Meridian Automobile Systems, Inc.*, 390 F.3d 417 (6th Cir. 2004) . . . . . . . . . 10, 16, 17

*McCoy v. Meridian Automotive Systems*, Inc., C.A. No. 03-74613,
2004 U.S. Dist. LEXIS 29219 *2 (E.D. Mich., Feb. 6, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McCoy v. Meridian Automotive Systems, Inc.*,
2005 U.S. Dist. LEXIS 40129 (E.D. Mich. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S. Ct. 2380 (1985) . . . . . . . . . 11

*Oddie v. Ross Gear & Tool Co.*, 305 F.2d 143 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Policy v. Powell Pressed Steel Co.*, 770 F.2d 609 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . 12, 19

*Prater v. Ohio Educ. Ass'n.*, 505 F.3d 437 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 17

*UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) . . . . . . . . . . . . . . . . 9, 10, 11, 15, 19, 20

*UAW Local 540 v. BVR Liquidating, Inc.*, 190 F.3d 768 (6th Cir. 1999) . . . . . . . . . . . 9, 10, 12

*Wood v. Detroit Diesel Corp.*, 607 F.3d 427 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006) . . . . . . . . . . . . . . 10, 11

29 U.S.C. §1102(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

29 U.S.C. §1132(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## <u>STATEMENT OF ISSUE PRESENTED</u>

Are Plaintiffs entitled to summary judgment as to liability that BorgWarner Diversified Transmission Products, Inc. is obligated to provide fully-paid, lifetime health care benefits to members of the Class?

## I.      **INTRODUCTION**

The pertinent language of the collectively bargained Health Insurance Agreements ("HIAs") clearly and unambiguously tie eligibility for fully-paid health care benefits to eligibility for a lifetime pension benefits.  The HIAs also set forth the exact benefits that were contractually required to be provided.  The Sixth Circuit and this District Court have ruled on numerous occasions the tie between pension benefits and retiree health care benefits is clear evidence that the benefits are lifetime and unalterable.

On May 1, 2009, BorgWarner Diversified Transmission Products, Inc. ("DTP") unilaterally reduced benefits for the Class.  The reductions violate the contractual promises that were made to these retirees in return for their years of service.

## II.     **FACTS**

### A.      **Background Facts**

DTP operated a plant in Muncie, Indiana which manufactured transfer cases for four wheel drive vehicles for the automotive industry.[1]  (Ex. 1 Nuerge Tr. 9)  For decades, its hourly employees were represented by the International UAW and Local 287 (hereinafter collectively referred to as "UAW").  (Ex. 1 Nuerge Tr. 9)  DTP closed the Muncie plant in April 2009.  (Dkt. #58 ¶27)

Through 1995, DTP and the UAW negotiated and prepared a number of separate and complete agreements after each set of negotiations: (1) a collective bargaining agreement; (2) an HIA which set forth the agreed-upon terms governing insurance benefits provided for active employees and retirees; and (3) a Retirement Income Program, which set forth the agree-upon terms for pension benefits.  (Ex. 1 Nuerge Tr. 12)  The 1989 HIA was the last signed, completed HIA.  (Ex. 2 PL Ex.

---

[1] On January 31, 2012, the parties entered into a Stipulated Order resolving Plaintiffs' claims against BorgWarner, Inc.  (Dkt. #92)  Because of that Stipulation, Plaintiffs' Motion for Summary Judgment will not address the alter ego claims against BorgWarner, Inc.

7 p. 16)

The 1992 and 1995 HIA were drafted and included all of the provisions of the agreement, but were never signed.  (Ex. 1 Nuerge Tr. 70-72, 75-76) In subsequent negotiations in 1998, 2000 and 2005, the parties memorialized negotiated changes to the insurance provisions, but never put together a complete HIA.  (Ex. 1 Nuerge Tr. 78-79, 105-06)  Instead, the 1995 HIA was carried forward as amended by the subsequent changes.  (Ex. 3 French Dep. Ex. 8 ¶¶11, 39)

**The 1989 HIA**  -- Article VIII of the 1989 HIA sets forth the parties' agreement on health care benefits for retirees and surviving spouses of retirees.  (Ex. 2 PL Ex. 7 pp. 7-11)

Article VIII.  Section 1.

A.      Presently retired employees and an employee *who retires under the Retirement Income Program Agreement on or after December 1, 1989 . . . shall be entitled* to the life insurance, Managed Care, basic hospitalization/surgical/medical, prescription drug, major medical, substance abuse, vision, human organ/tissue transplant, and Medical Case Management coverages and procedures *as set forth in Exhibits A, C, D, E, F and H,* but shall not be entitled to the coverages and procedures under Exhibits B, G, I, J, and K.

B.      An employee who terminates employment with the Company *on or after January 1, 1991 while participating in the Muncie Retirement Savings Plan shall be entitled* to the . . . Managed Care, hospitalization/surgical/medical, prescription drug, major medical, substance abuse, vision human organ transplant and Medical Case Management coverages and procedures *as set forth in Exhibits A, C, D, E, F and H . . . .*

* * *

Section 2.  Employees presently or hereafter *retired under the Total and Permanent Disability provisions of the Retirement Income Program Agreement . . . shall be entitled* to the coverages and procedures *set forth under the provisions of Exhibits A, C, D, E, F and H.*

Section 3.  The Company *will provide* the medical coverages and procedures set forth under the provisions of Exhibits A ..., C, D, E, F and H and *will pay the monthly premium for such coverage for:*

A.      A surviving spouse and the eligible dependent(s) of a retired employee . . . *who is receiving a monthly retirement benefit* under Article Eight, Section 3, of the Retirement Income Program Agreement, and,

-2-

B.      *An Eligible surviving spouse* . . . and the eligible dependent(s) of *an employee who terminated employment with the Company while participating in the Muncie Retirement Savings Plan* and who, at the time of such termination, met one of the conditions set forth in Article VIII, Section 1 B above.

* * *

C.      The surviving spouse and the eligible dependents of an employee *who was eligible to retire at the time of death under either Article Six Section 1, Article Six Section 2 or Article Six Section 3 of the Retirement Income Program Agreement* or the Eligible Surviving spouse and the eligible dependents of an active employee *participating in the Muncie Retirement Savings Plan who at the time of death*, except for the fact that his/her termination of employment with the Company had not occurred, met one of the conditions of Article VIII, Section 1 B above; . . .

In the event of a claim by such a surviving spouse or the Eligible Surviving spouse after the attainment of the age of sixty-five (65) years, or such earlier age when eligibility for "Medicare" begins, the Insurance Company will pay such claim as if such surviving spouse or Eligible Surviving spouse has a "Voluntary Coverage" under Medicare. . . . *The medical coverages and procedure provided under this Article VIII, Section 3 shall terminate if the surviving spouse or Eligible surviving spouse remarries*.  (Ex. 2 PL Ex. 7 pp. 7-9)

**The 1992 and 1995 HIA** -- In November 1992, the parties negotiated a new HIA, which included a Preferred Provider Organization (PPO) plan applicable for new hires, active employees and future retirees hired before January 1, 1993.[2]  (Ex. 4 PL Ex. 18) Article VIII of the 1992 HIA also provided for two categories of retirees:[3]  (Ex. 5 PL Ex. 19 pp. 5-10)  Category A retirees were those future retirees who were *hired prior* to January 1, 1993; and Category B retirees were future retirees who were *hired after* December 31, 1992.   (Ex. 5 PL Ex. 19 pp. 5, 9)

The specific language conferring insurance benefits on Category A retirees appears in Article VIII, Section 1.A. of the 1992 (and 1995) HIA and divides Category A retirees into three subgroups -- (1) Pre-1993 Retirees; (2) Elective Retirees; and (3) Post-3/11/95 Retirees.  (Ex. 5 PL Ex. 19 p. 5; Ex. 6 PL Ex. 23 p. 5)  Article VIII confers the insurance benefits on "any employee . . . who

---

[2] Article VIII of the 1995 HIA is nearly identical to Article VIII in the 1992 HIA.

[3] Category B retirees are not part of this lawsuit or the certified Class.

retired under the Retirement Income Program Agreement prior to January 1, 1993" or "on or after January 1, 1993 and prior to March 12, 1995" or "on or after March 12, 1995." (Ex. 5 PL Ex. 19 pp. 5-7; Ex. 6 PL Ex. 23 pp. 5-7) Each subgroup of Category A retirees was entitled to the benefits described for that group in Exhibits A, C, D, E, F and H of the 1992 (and 1995) HIA. (Ex. 5 PL Ex. 19 pp. 5-7; Ex. 6 PL Ex. 23 pp. 5-7)

The distinction among the subclasses of Category A retirees relates to whether the retirees participate in the PPO program which became effective on January 1, 1993. (Ex. 5 PL Ex. 19 pp. 5-6; Ex. 6 PL Ex. 23 pp. 5-6) Under Article VIII, Section 1.A., retirees who retired before January 1, 1993 were *not* covered by the PPO because they retired before the PPO came into existence. (Ex. 5 PL Ex. 19 p. 5; Ex. 6 PL Ex. 23 p. 5) Under Article VIII, Section 1.B., retirees who retired between January 1, 1993 and March 11, 1995 were given the option of either electing the PPO or electing the same coverage as the Pre-1993 Retirees. (Ex. 5 PL Ex. 19 p. 5; Ex. 6 PL Ex. 23 p. 5) Under Article VIII, Section 1.C., all Post- 3/11/1995 Retirees were covered by the PPO (hereinafter Category A Retirees in the PPO will be referred to as "Category A PPO Retirees" and Category A Retirees not in the PPO as "Category A Non-PPO Retirees"). (Ex. 5 PL Ex. 19 p. 5; Ex. 6 PL Ex. 23 p. 5) Article VIII, Section 3 of the 1992 HIA and the 1995 HIA required DTP to pay the full cost of insurance coverage for Category A retirees. (Ex. 5 PL Ex. 19 p. 6; Ex. 6 PL Ex. 23 p. 6)

The operative entitlement language in Article VIII in the 1989 HIA was continued in the 1992 HIA, the 1995 HIA and the subsequent agreements without change. (Ex. 2 PL Ex. 7 pp. 7-11; Ex. 5 PL Ex. 19 pp. 5-10; Ex. 6 PL Ex. 23 pp. 5-9) Under Article VIII, Section 3, the *only* durational limitation on entitlement to fully paid health care benefits applied to surviving spouses whose benefits terminated upon remarriage.[4] (Ex. 2 PL Ex. 7 pp. 9-10; Ex. 5 PL Ex. 19 p. 7; Ex. 6 PL Ex.

---

[4] Deferred vested retirees and surviving spouses of deferred vested retirees were specifically excluded from the entitlement to retiree healthcare by the parties.

23 p. 7)

**Annual Deductibles and Stop-Loss Under the 1992 and 1995 HIAs** -- Under the 1992 HIA, the parties negotiated an annual 5% escalator for Category A PPO Retirees for annual deductibles and stop-loss limits until December 31, 2002. (Ex. 5 PL Ex. 19 pp. 65, 80; Ex. 6 PL Ex. 23 pp. 66-67, 82) Category A Non-PPO Retirees had an annual cash deductible of $200 which did not increase. (Ex. 5 PL Ex. 19 pp. 65-66, 76, 80; Ex. 6 PL Ex. 23 p. 67) The parties agreed the deductibles and stop-loss amounts survived the March 12, 1998 termination of the 1992 and 1995 HIAs and terminated on December 31, 2002 unless, before that date, the parties extended or modified these amounts. (Ex. 5 PL Ex. 19 pp. 65, 80; Ex. 6 PL Ex. 23 pp. 66-67, 82)

**Prescription Drug Benefits Under the 1992 and 1995 HIAs** -- Category A Non-PPO Retirees had a generic drug deductible of $4 and a non-generic drug deductible of $7. (Ex. 2 PL Ex. 7 p. 62; Ex. 5 PL Ex. 19 p. 68; Ex. 6 PL Ex. 23 p. 70) These deductibles stayed the same for this group until DTP's 2006 changes. (Ex. 2 PL Ex. 75 DTP 012940, 012945) For Category A PPO Retirees, the prescription deductible increased by set amounts on dates certain that were negotiated by the parties. (Ex. 5 PL Ex. 19 p. 68; Ex. 6 PL Ex. 23 p. 70)

**Employees Hired After December 31, 1992** -- Under Article III, Section 2 and Article VIII, Section 8 of the 1992 HIA and the 1995 HIA, DTP has no liability for retiree health expenses for Category B Retirees hired after December 31, 1992 (except for employees on layoff status). (Ex. 5 PL Ex. 19 pp. 2-3, 9-10; Ex. 6 PL Ex. 23 pp. 2, 8-9) Instead, these future employees would have a Retiree Health Account ("RHA") to which DTP made negotiated hourly contributions. (Ex. 5 PL Ex. 19 pp. 2-3, 9-10; Ex. 6 PL Ex. 23 pp. 2, 8-9) DTP did not guarantee that the amount in the RHA would pay the full cost of health care coverage. (Ex. 5 PL Ex. 19 pp. 2-3, 9-10; Ex. 6 PL Ex. 23 pp. 2, 8-9)

Article VIII, Section B.1. required DTP to make available one plan to Category B Retirees that would contain the same terms and conditions as the PPO Plan in Exhibits A, C, D, E, F and H of the 1992 HIA.  (Ex. 5 PL Ex. 19 p. 9; Ex. 6 PL Ex. 23 p. 9)[5]

**The 1998 HIA** -- In 1998, BorgWarner and the UAW negotiated new agreements, but did not draft a new HIA.[6]  (Ex. 3 French Ex. 8 ¶¶ 22, 23)  The parties agreed to an improved drug plan for active employees and retirees.  (Ex. 3 French Dep. Ex. 8; Exs. A, D; Ex. 8 PL Ex. 27 p. 3)  There was no change in the prescription deductible for Category A Non-PPO Retirees.[7]  (Ex. 8 PL Ex. 27 p. 3)  The language in Article VIII of the prior HIAs as to entitlement for health care benefits for retirees and surviving spouses or retirees was unchanged.  (Ex. 3 French Dep. Ex. 8 ¶22)

**The 2000 HIA** -- On December 1, 2000, the parties negotiated a new HIA which expired on March 12, 2006.  (Ex. 9, 10 PL Exs. 27, 29, 63; Ex. 11 Turczynowsky Tr. 106-07) The parties did not draft a full HIA which encompassed the 2000 negotiated changes.  (Ex. 3 French Dep. Ex. 8 ¶¶29,30)[8]  The only relevant changes affecting Category A PPO Retirees was the annual deductible and stop-loss maximums increased by 5% in the years after 2002 through 2005 and DTP would provide wraparound coverage if Medicare coverage included prescription drugs.  (Ex. 9 PL Ex. 29)

---

[5] Under Article VIII, Section (8)(B)(4), if a Category B Retiree reached 100 years of age, and met certain conditions, DTP agreed to pay the cost of the health care plan for the retiree. (Ex. 5 PL Ex. 19 p. 9; Ex. 6 PL Ex. 23 p. 9)

[6] The 1998 negotiated changes to the HIA are contained in a March 11, 1998 document entitled "1998 Negotiated Revisions." (Ex. 3 French Dep. Ex. 8 ¶¶23-25; Ex. B) It also has a tentative approval stamp which bears the initials of a BorgWarner official and a UAW Local 287 official with the dates of March 11, 1998. (Ex. 3 French Dep. Ex. 8 ¶¶23-25; Ex. B)

[7] DTP and the UAW also agreed to modify the mental health and substance abuse program effective May 1, 1998 to combine the benefits into one common plan in order to comply with the Mental Health Parity Act of 1998. (Ex. 8 PL Ex. 27)

[8] The 2000 negotiated changes negotiated were incorporated in a document dated November 28, 2000 entitled "Tentative Agreement" and the "November 28, 2000 Tentative Agreement on Insurance's [sic] and Pensions." (Exs. 9, 10 PL Exs. 29, 63)

The earlier HIAs, as amended by the agreement reached in 1998, continued to govern the insurance coverage for both active employees and retirees. (Ex. 3 French Dep. Ex. 8 ¶¶29,30)

**The 2005 HIA** -- The parties reached a new agreement on April 1, 2005, which was modified and revised on April 5, 2005 and clarified on April 8, 2005. (Ex. 12, 13, 14 PL Exs. 44, 46, 47) The 2005 HIA, which expired in April 2009, included a reduction in the level of health care benefits and monthly contributions for *future* retirees. (Ex. 12, 13, 14 PL Exs. 44, 46, 47) The parties included a provision that hourly retirement eligible employees (who were hired before January 1, 1993) could retire in the 13 months between April 2005 and May 1, 2006 with the same benefits that were in the 2000 HIA -- no retiree contribution and the prior, higher benefit levels. (Ex. 13, 14 PL Exs. 46, 47)

**The 2009 Plant Closing and Changes to Retiree Health Care Benefits** -- DTP closed the Muncie plant in April 2009. (Dkt. #58 ¶27) DTP announced that it was reducing retiree healthcare benefits for hourly retirees and surviving spouses who retired after October 27, 1989.[9] (Ex. 17, 18, 19, 20 PL Exs. 88, 89, 90, 91) In early 2009, DTP and the UAW reached a Plant Shutdown Agreement which did not affect the rights of employees who retired before February 23, 2009. (Ex. 21 UAW 30(b)(6) Ex. 20) Effective May 1, 2009, DTP unilaterally implemented reductions in healthcare benefits for the Class.[10] (Ex. 17 PL Ex. 88)

---

[9] In 2006, DTP implemented significant reductions in retiree healthcare benefits for post-October 27, 1989 retirees. (Ex. 15) DTP filed an anticipatory declaratory judgment action in the District Court for the Southern District of Indiana seeking court approval of the changes. (Ex. 15) On September 12, 2008, the Indiana District Court granted the UAW's Motion for Judgment on Partial Findings. The court held that DTP's unilateral changes to retiree benefits violated the 2005 HIA. (Ex. 15) After the Order, DTP restored the benefits and reimbursed hourly retirees and surviving spouses for the additional costs incurred as a result of the changes. (Ex. 16 DuFour Tr. 53-54)

[10] For Medicare-eligible retirees and surviving spouses, DTP terminated health care benefits, including prescription drug benefits. (Ex. 17 PL Ex. 88 pp. 4-5; Ex. 18 PL Ex. 89) Instead, DTP contributed $158.34 per month for each Medicare-eligible person to a Retiree Reimbursement Account which DTP unilaterally established on behalf of the retiree and Medicare-eligible dependents. (Ex. 17 PL Ex. 88 pp. 4-5) For pre-Medicare retirees and dependents, DTP implemented two healthcare plans which required all retirees to pay a monthly contribution, depending on the retiree's years of service, and the plan they chose.

**Extrinsic Evidence of Vesting** -- The 1989 and 1995 Retirement Income Booklets directly reference retiree health care benefits.  (Ex. 22, 23 PL Exs.  8, 24)  The 1989 Booklet states:

Group Insurance at Retirement

Hospital and Medical Insurance Benefits -- Your hospital and medical expense coverage **will be continued** after your retirement pursuant to the Health Insurance Agreement between BorgWarner Automotive Diversified Transmission Products Corporation, Monthly Plant and International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) and its Local No. 287 entered into on the 27th day of October 1989 (the "Health Insurance Agreement").  **The Company pays the full cost of such coverage for "retirees and their eligible dependents" according to the terms of the Health Insurance Agreement.**  These terms are described in the Health Insurance Agreement and Group Insurance Booklet. (emphasis added.)  (Ex. 22 PL Ex. 8 p.17)[11]

In the 1980s and 1990s, DTP issued Retirement Summaries which directly tied health care benefits to retirees and surviving spouses with pension benefits.  (Ex. 24, 25, 26 PL Exs. 9, 22, 55)

An April 9, 1998 DTP memo stated that for employees that retired or terminated employment **before March 12, 1998**, benefits will be determined under the Plan as it existed at the time of retirement or termination.  (Ex. 3 French Dep. 8; Ex. A)  On September 27, 1999, DTP Benefits Manager Nuerge  wrote a memo which stated that:

employees who were **hired _before 1/1/93_** [Category A Retirees] **and transferred to the Muncie RSP and who meet the same eligibility requirements as under the DB Plan** . . . plus those who are eligible for an Extended Disability Benefit . . . would get Company provided Life & Health coverages.  (emphasis in original) (Ex. 27 PL Ex. 28)[12]

Over the years DTP sent letters to numerous surviving spouses explaining that their DTP paid

---

(Ex. 17 PL Ex. 88 pp. 3-4; Ex. 18 PL Ex. 90)  In addition, DTP reduced benefit levels and increased prescription drug co-pays for this group.  (Ex. 16 PL Ex. 88 pp. 3-4; Ex. 18 PL Ex. 90)

[11] A similar Group Insurance at Retirement provision is in the 1995 Retirement Income Booklet. (Ex. 23 PL Ex. 24 p. 17)

[12] Nuerge contrasted the fact that DTP was required to provide health coverages to Category A Retirees to the Category B Retirees (who were hired **after 1/1/93**) who were not entitled to "Company provided Life or Health coverages."  (Ex. 27 PL Ex. 28)

health care would continue after the death of the retiree, unless they remarried.  (Ex. 28)

A joint Position Statement from about 1987 stated: "Retirees will of course have both income and insurance."  (Ex. 29 PL Ex. 52)  The DTP Hourly Insurance Booklet (draft) dated March 24, 1987, stated "the full cost of all health insurance is paid by the Company.".  (Ex. 30 PL Ex. 56, p. 1)[13]  The Booklet also stated that insurance continued until the retiree's death and for a surviving spouse until remarriage, if receiving a pension.  (Ex. 30 PL Ex. 56, p. 41)

DTP never changed benefits for Category A Non-PPO Retirees until the unilateral changes on May 1, 2009, even though the 1989 HIA expired in 1992.[14]  (Ex. 7, 31 PL Exs. 66, 75; Ex. 11 Turczynowsky Tr. 119-122)  The only changes for Category A PPO retirees were in accordance with the contractually negotiated step increases for deductibles, stop-loss and prescription drugs.  (Ex. 7, 31 PL Exs. 66, 75)

## III.   ARGUMENT

### A.   Plaintiffs are Entitled to Summary Judgment as to Liability.

#### 1.   The Applicable Law

##### a.   Section 301 of the Labor Management Relation Act

The standard governing the interpretation of collectively bargained retiree health care benefits was first established in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983).  The basic principles of contract interpretation set forth there are not controversial or controverted.  They have been repeatedly reaffirmed by the Sixth Circuit in *Golden v. Kelsey-Hayes*, Co., 73 F.3d 648 (6th Cir. 1996), in *UAW Local 540 v. BVR Liquidating, Inc.*, 190 F.3d 768 (6th Cir. 1999), in *Maurer v. Joy*

---

[13] Although the Booklet predates the retirement of Class Members, Article VIII of the 1986 HIA contains identical language on the duration and eligibility of retiree health care benefits as is in the 1989, 1992 and 1995 HIAs.  (Ex. 32 PL Ex. 1 pp. 4-5)

[14] The only exception were the 2006 changes that the Indiana District Court found were in violation of the HIA.

*Technologies*, 212 F.3d 970 (6th Cir. 2000), in *McCoy v. Meridian Automobile Systems, Inc.*, 390 F.3d 417 (6th Cir. 2004), in *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006), in *Cole v. ArvinMeritor*, 549 F.3d 1064 (6th Cir. 2008) and in *Bender v. Newell Window Furnishings*, 2012 U.S. App. LEXIS 9003 (6th Cir. May 3, 2012).   (Ex. 33)

The interpretation of labor contracts is governed by substantive federal law under Section 301 as is set forth in *Yard-Man* and *Yolton*.   716 F.2d at 1479-80; 435 F.3d at 579.   Variations in language used in other duration provisions may provide indicia of intent that are useful in clarifying an ambiguous provision. *Yard-Man*, 716 F.2d at 1480. A specific intent to confer lifetime benefits takes precedence over a general duration clause. *Id.* at 1482-83; *Yolton*, 435 F.3d at 581.

In *Yard-Man*, the court held that "the inclusion of specific durational limitations in other provisions . . . suggests that retiree benefits, not so specifically limited, were intended to survive" the expiration of the collective bargaining agreement. 716 F.2d at 1481-82. *Accord Yolton*, 435 F.3d at 581-82; *Bender*, Slip Op. 12.   Thus, when there are specific limitations on benefits for employees on lay off, for example, but no limitations on the duration of retiree benefits, the internal suggestion of intent is that the retiree benefits, "not so specifically limited," are vested. *Yolton*, 435 F.3d at 582.[15]

Explicit vesting language is not required to determine that the parties to a CBA  intended benefits to continue beyond the term of the agreement. 716 F.2d at 1481 n.2, 1482; *Yolton*, 435 F.3d at 578.

Extrinsic evidence is admissible to determine an intent to vest benefits when the language

---

[15] In *Yard-Man* and in subsequent cases, the Sixth Circuit has discussed the fact that health care benefits are in a sense "status" benefit which carries an inference that they are to continue as long as the beneficiary maintains the status of a retiree. 716 F.2d at 1482.  The Sixth Circuit noted in *Yolton* that this inference has generated controversy. 435 F.3d at 579. Because here, the HIAs explicitly tie retiree health care benefits to pension benefits, reliance to any such inference is entirely unnecessary.

of the collective bargaining agreement is ambiguous. *Yolton*, 435 F.3d at 579; *BVR Liquidating*, 190 F.3d at 774; *Golden*, 73 F.3d at 656-657.

### b.   Section 502 of ERISA

Plaintiffs have also asserted a claim under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1102(a)(1)(B). Section 502 provides that participants and beneficiaries of a welfare benefit plan can sue to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B). This claim is derivative and dependent on the resolution of the Section 301 claim. See *Reese v. CNH Am. LLC,* 574 F.3d 315, 328 (6th Cir. 2009); *Maurer*, 212 F.3d at 914.

As the Supreme Court stated: "[ERISA] does not regulate the substantive content of welfare benefit plans." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732, 105 S. Ct. 2380 (1985). Thus, while ERISA does not mandate the vesting of welfare benefits, the issue of whether they are vested is dependent upon the bargain struck by the parties. *Yolton*, 435 F.3d at 578. And, when that bargain is the result of collective bargaining, the federal common law of Section 301 developed in *Yard-Man* and the subsequent cases through *Yolton* provides the governing principles.

In *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991), the Sixth Circuit held that a claim by retirees for health care benefits under a collective bargaining agreement is governed by the federal common law of Section 301.

> The medical insurance plan agreed to in the CBA is a welfare benefit plan under ERISA. The terms of the benefit plan are established in the CBA. Having concluded that Vernitron had no right to terminate plaintiffs' insurance under the CBA, we must also conclude that it had no right to terminate them under ERISA.

*Accord Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 914 (6th Cir. 2002).

### 2.   The Group Benefit Plans Unambiguously Provide for Lifetime Retiree Health Care Benefits.

### a.     Retiree Health Care Benefits Are Tied to a Lifetime Pension.

The first place courts look for indicia of intent in a collective bargaining is the express language of the relevant benefit provision conferring retiree health care benefits. *BVR Liquidating*, 190 F.3d at 773; *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 611 (6th Cir. 1985); *Yard-Man*, 716 F.2d at 1480.

Article VIII of the 1989, 1992 and 1995 HIAs specifically tie eligibility for fully paid health care benefits to eligibility for a lifetime pension. Article VIII, Section 1.A. provides "[A]n employee who retires under the Retirement Income Program Agreement on or after December 1, 1989 . . . shall be entitled to" health coverage as set forth in the exhibits to the HIA. Article VIII, Section 1.B. provides "An employee who terminates employment . . . while participating in the Muncie Retirement Savings Plan shall be entitled to . . ." health care benefits as set forth in the exhibits to the HIA. The "shall be entitled" to health care benefits is directly tied to retirement under the Retirement Income Program, the Retirement Savings Plan, or the Total and Permanent Disability Pension. Article VIII of the HIAs requires DTP to provide the medical coverages and procedures "set forth" in the HIA exhibits and that DTP will pay the monthly premium for the coverage. (Ex. 2 PL Ex. 7 pp. 7-8; Ex. 5 PL Ex. 19 pp. 5-6; Ex. 6 PL Ex. 23 pp. 5-6)

Surviving spouses' entitlement to healthcare is also explicitly dependent while "receiving a monthly retirement benefit" or "while participating" in the pension plan. The ***only*** durational limitation on retiree health care benefits applies to surviving spouses -- their entitlement to health care terminates upon remarriage. As long as a surviving spouse all "receive[s] a monthly retirement benefit" or is "participating" in the pension plan, DTP is contractually obligated to pay the full cost of their medical insurance coverage for life -- unless or until they remarry.[16] (Ex. 2 PL Ex. 7 pp. 8-

_____

[16] There is ***no*** similar contractual limitation on the obligation of DTP to pay for retiree coverages. Even if retirees remarry, they are entitled to continuation of DTP paid health insurance while retired.

-12-

10; Ex. 5 PL Ex. 19 pp. 6-8; Ex. 6 PL Ex. 23 pp. 6-8)

In *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1178 (E.D. Mich. 1997), the pertinent language in one of the collectively bargained Insurance Supplement relating to surviving spouse eligibility provided:

> [T]he Company shall contribute the full premium or subscription charges for Health Care . . . on behalf of a surviving spouse . . . of a retired employee, if such spouse was receiving or eligible to receive a benefit under Article II of the . . . Pension Plan.

The court of appeals affirmed the district court's analysis of the tie between retiree health care benefits and lifetime pensions. 73 F.3d at 656.[17]

In *Cole v. ArvinMeritor, Inc.*, 515 F. Supp.2d 791, 799 (E.D. Mich 2006), the district court relied on the provision in the Insurance Agreement that provided that the company would provide health care coverage for "a surviving spouse . . . of . . . a retired employee if such spouse is receiving or eligible to receive a survivor benefit under Article II of the Company's Hourly-Rated Employees Pension Plan" to grant summary judgment. Aff'd in 549 F.3d 1064 (6th Cir. 2008).[18]

Here, the HIAs provide retirees and surviving spouses shall be entitled to the coverages and procedures set forth in Exhibits A, C, D, E, F and H of the HIAs. (Ex. 2 PL Ex. 7 pp. 7-8; Ex. 5 PL

---

Because retirees will be retired under the Retirement Income Program or participating in the Retirement Savings Plan until they die, DTP is contractually and unequivocally obligated to provide fully paid health care benefits, at the negotiated benefit levels, for the life of the retiree.

[17] In *McCoy v. Meridian Automotive Systems*, Inc., C.A. No. 03-74613, 2004 U.S. Dist. LEXIS 29219 *2 (E.D. Mich., Feb. 6, 2004), the language in the Insurance Supplement similarly provided for the continuation of medical benefits for surviving spouses "if the spouse is receiving or eligible to receive a survivor benefit under Article II of the Company's Hourly-Rate Employees Pension Plan." (Ex. 34) After the Sixth Circuit affirmed the court's preliminary injunction, 390 F.3d 417 (6th Cir. 2004), the district court entered summary judgment. *McCoy v. Meridian Automotive Systems*, Inc., 2005 U.S. Dist. LEXIS 40129 (E.D. Mich. 2005). (Ex. 35)

[18] In *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 425-36 (6th Cir. 2010), the Sixth Circuit stated that, until *Cole*, it was unclear whether the *Golden-Meridian* rule was sufficient basis on which to hold that a CBA provided vested benefits. According to *Wood*, any uncertainty was fully resolved by *Cole*, that is, the tie of retiree health care benefits *is* a sufficient basis to hold, as a matter of law, that benefits vest.

Ex. 19 pp. 5-6; Ex. 6 PL Ex. 23 pp. 5-6)  The coverages and procedures to be provided to the Class Members are specific and enforceable.   (Ex. 2 PL Ex. 7 pp. 8-10; Ex. 5 PL Ex. 19 pp. 6-8; Ex. 6 PL Ex. 23 pp. 6-8)

In the 1992 HIA and 1995 HIA, the parties agreed that retiree healthcare benefits survived the duration of the agreements when they negotiated deductibles and stop-loss maximums for Category A PPO Retirees through 2002, four years beyond the 1998 termination date of the HIAs.  (Ex. 5 PL Ex. 19 p. 14; Ex. 6 PL Ex. 23 p. 14) DTP's obligation to provide retiree healthcare benefits ended when the HIAs expired in 1998, an agreement on deductibles and stop-loss maximums four years beyond their expiration would have been nonsensical.  In *Cole*, the district court found that cost-sharing increases that applied after the contract expired was evidence of vesting retiree healthcare benefits. 515 F. Supp.2d at 801; *aff'd in* 549 F.3d 1064 (6th Cir. 2008)

In *Bender*, the Sixth Circuit's most recent retiree healthcare case, the court found the retiree healthcare benefits were vested even though they were not tied to pension benefits, because no contract language specifically limited the duration of retiree healthcare benefits.  (Ex. 33) Slip Op. 10.  Here, the legal fact that the benefits are vested is much stronger than in *Bender.*  Plaintiffs are entitled to judgment on liability as a matter of law.

### b.    Specific Limitations on Other Benefits

In the HIAs, DTP and the UAW agreed to specific limitation on the duration of health care benefits for active employees on layoff or leave and for surviving spouses.

- Surviving spouses receiving healthcare benefits could have their coverage terminate if they remarried.  Article VIII, Section 3.   (Ex. 2 PL Ex. 7 pp. 9-10; Ex. 5 PL Ex. 19 pp. 7; Ex. 6 PL Ex. 23 pp. 7)

- For the surviving spouse of an active employee who dies and was not eligible to retire under the pension plans, DTP paid the monthly premium costs for the first nine months following the active employee's death.  After the nine month period, the surviving spouse could pay for coverage as long as they were drawing transition or

-14-

bridge benefits or until remarriage.  Article VIII, Section 4.   (Ex. 2 PL Ex. 7 p. 10; Ex. 5 PL Ex. 19 pp. 7-8; Ex. 6 PL Ex. 23 pp. 7-8)

- Surviving spouses and their dependents were eligible for a transition survivor income benefit for 24 months.   (Ex. 2 PL Ex. 7 p. 29; Ex. 5 PL Ex. 19 p. 30; Ex. 6 PL Ex. 23 p. 29)

- If a surviving spouse met the eligibility for a bridge income benefit, the survivor received it until age 62 or remarriage.   (Ex. 2 PL Ex. 7 p. 31; Ex. 5 PL Ex. 19 pp. 31-32; Ex. 6 PL Ex. 23 p. 31)

- Surviving spouses who were not participants in the DTP pension plan(s) could continue coverage at their own expense, as long as they did not remarry.  Article VIII, Section 5.   (Ex. 2 PL Ex. 7 p. 10; Ex. 5 PL Ex. 19 p. 10; Ex. 6 PL Ex. 23 p. 8)

- An employee on layoff received up to twelve months of employer-paid health care coverage, depending on length of seniority.  Appendix A, Section 7.B.   (Ex. 2 PL Ex. 7 p. 19; Ex. 5 PL Ex. 19 pp. 18-19; Ex. 6 PL Ex. 23 p. 18)

- Under Exhibit A, Section H.5 of the HIA, an employee was eligible for the extended disability benefit program up to a maximum period equal to an employee's total length of seniority at the time of the total disability or if the employee was between 60 and 65, five years and a lesser duration as the employee's age increases at the time of their disability. (Ex. 2 PL Ex. 7 pp. 37-38; Ex. 5 PL Ex. 19 pp. 37-38; Ex. 6 PL Ex. 23 pp. 37-38)

Similar facts prompted the Sixth Circuit in *Yard-Man* to infer that retiree benefits were not intended to depend on the fortunes of active employees. 716 F.2d at 1481.  See also, *Cole*, 549 F.3d at 1071-72.  Like in *Cole, Yard-Man, Golden* and *Bender,* because retiree health care benefits under the HIAs were not subject to durational limits, the retirees "shall be entitled" to lifetime benefits after retirement.  *Id.*

### c.   Category B Retirees and the Grandfathered Employees.

Category B Retirees were not guaranteed retiree healthcare benefits.  Instead, these employees would be enrolled in an RHA program to which money was contributed, but there was no guarantee that the money in the RHA would pay the full cost of coverage.

In *Bender,* in 1993 the union and the company negotiated an end to health insurance benefits

for future retirees beginning on January 1, 1994, but included a window period where active employees could retire before January 1, 1994 and have guaranteed healthcare coverage. (Ex. 33 Slip Op. 11-12) The court found the January 1, 1994 elimination of retiree health care contrasted with the simultaneous continuation of health insurance for employees who retired prior to the change. Here, like in *Bender*, in 1992 DTP and the UAW negotiated the end of guaranteed retiree healthcare benefits for Category B Retirees, while at the same time guaranteeing retiree healthcare benefits for Category A Retirees.[19]

In 2005, the parties agreed to a 13 month window period to allow active employees to retire before May 1, 2006 and receive the better healthcare benefits provided under the 2000 HIA, rather than the reduced level of healthcare benefits negotiated in the 2005 HIA. (Exs. 13, 14, PL Exs. 46, 47) In *Jensen v. S.I.P.C.O., Inc.*, 38 F.3d 945, 951 (8th Cir. 1994), the Eighth Circuit held that providing such a window period for retirees was extrinsic evidence of the fact that the benefits were vested.

### The Summary Plan Descriptions Cannot Vitiate the Contractually Bargained, Vested Benefits.

A "reservation of rights" clause in a summary plan description cannot retroactively cancel or modify the negotiated agreements of DTP and the UAW retiree health insurance benefits. In *Bender, Reese, Prater*[20] and *McCoy*, the court of appeals set out the general rule that a plan summary

---

[19] Article VIII, Section B.1. required DTP to make available one plan to Category B Retirees would contain the same terms and conditions as the PPO Plan in Exhibits A, C, D, E, F and H of the 1992 HIA. (Ex. 5 PL Ex. 19 p. 9; Ex. 6 PL Ex. 23 p. 9) Under Article VIII, Section 8.B.4., if a Category B Retiree reached 100 years of age, and certain conditions, DTP agreed to pay the cost of the health care plan for the retiree. (Ex. 5 PL Ex. 19 p. 9; Ex. 6 PL Ex. 23 p. 9) The fact that DTP guaranteed the Category B Retirees a PPO Plan with the same benefits as described in the 1992 and 1995 HIAs' exhibits, shows that DTP understood the retiree health care benefits would continue to be the same benefits set forth in the HIAs' exhibits for Category A Retirees.

[20] *Prater v. Ohio Educ. Ass'n.*, 505 F.3d 437, 444-45 (6th Cir. 2007)

cannot extinguish contractually bargained, vested rights. An exception to that rule was found in *Maurer*, where the union failed to contest a widely distributed SPD's express reservation of the right to "curtain or limit any coverage for any treatment, procedure, or service, regardless of whether [the employee is currently] receiving treatment." 212 F.3d at 913. The *Maurer* court found that once an *unqualified* unilateral right was asserted in the SPD, the union was obligated to grieve or enter suit if it disagreed with the employer's assertion of authority.

The Sixth Circuit has, most recently in *Bender,* cautioned against reading the *Maurer* exception broadly because it would "run headlong into the rule that a plan summary 'cannot vitiate contractually vested *or bargained-for rights*.'" (Ex. 33) Slip Op. 15, citing *Prater,* 505 F.3d at 444. The *Bender* court held that the *Maurer* exception for unilateral modification was expressly limited to "'unqualified reservation-of-rights language,' that claims a 'unilateral right by the employer to terminate coverage without regard to existing or future collective bargaining agreements.'" *Id.*

Here, DTP's SPDs were specifically qualified by the parties' HIAs.[21] (Ex. 2 PL Ex. 7 p. 121; PL Ex. 19 p. 130; PL Ex. 23 p. 132)

The language in the HIAs at issue here, is nearly identical to the language in the SPDs in *Bender, Reese, Prater* and *McCoy* where the Sixth Circuit found that the reservation of rights were

---

[21]  In September 1998, DTP unilaterally issued a document entitled "Insurance Highlights of the 1998 Contract Negotiations." The cover of this document expressly states that "the details and provisions of the Health Insurance Agreement ("the Plan") will govern all coverage or exclusion provisions." The first page of the document includes a "Disclaimer Notice" which states, in relevant part:

> The following is very brief description of health benefits offered to hourly employees. For further details, you may refer to the official Plan documents (including the Health Insurance Agreement) which describe the provisions in more detail and *solely govern* with respect to your eligibility and participation in the health plan of the Company.
> * * *
> ***The details and provisions of the Health Insurance Agreement ("Plan") will govern all coverages or exclusion provisions.*** (Emphasis in original.)

This same qualification was repeated in Section B entitled "Overview of the Insurance Plan -- including changes that became effective in 1998." (Ex. 8 PL Ex. 27, pp. 1, 16-17)

not sufficiently unqualified so as to be fairly expected to prompt an immediate protest by the Union. Any argument to the contrary by DTP here is without merit.

### d.    Written Proof of the Lifetime Intent

In *Smith v. ABS Industries, Inc.*, 890 F.2d 841, 846 n.1 (6th Cir. 1989), the court stated that:

> extrinsic evidence of intent -- specifically representations made to employees that their benefits would continue for their lifetime -- supports the conclusion that these retiree benefits were intended to last beyond the termination of the plan.

Here, the evidence of intent that retiree health care is a lifetime benefit is substantial. The 1989 and 1995 Retirement Income Booklets specifically provide that "Group Insurance at Retirement" will be continued and that DTP "pays the full cost of such coverage for 'retirees and their eligible dependents' according to the terms of the Health Insurance Agreement." (Exs. 22, 23, PL Ex. 8 p. 17; Ex. 24 p. 17)  This direct reference to continuing, fully paid retiree health insurance in the Retirement Income Booklets is evidence that the parties viewed pension benefits and retiree healthcare benefits as tied together.

The Retirement Summaries provided to employees upon application for retirement are replete with references to the tie between the survivor pension option and a surviving spouse's lifetime eligibility for company-paid insurance unless the surviving spouse remarries. (Exs. 24, 25, 26, PL Exs. 9, 22, 55)  The Retirement Summaries also explain that the DTP provided retiree healthcare benefits would become automatically integrated with Medicare at age 65. (Exs. 24, 25, 26 PL Exs. 9, 22, 55)  Under both the Pension Plan and the HIAs, both of which were generally three years, an employee could retire after 30 years of employment, without regard to their age, or at age 55 or 60, based on years of service.  For an employee who retired at age 55, the promise of retiree healthcare benefits at the time of Medicare eligibility, would be illusory if it did not survive the expiration of the HIA.  This very point has been resolved by the Sixth Circuit in numerous cases.  *Maurer*, 212

F.3d at 918; *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 615 (6th Cir. 1985); *Yard-Man*, 716 F.2d at 1481.

Benefit Manager Nuerge, in his memo from September 1999, specifically contrasted the difference between Category A Retirees who "would get Company provided Life & Health coverages" with Category B Retirees who were not entitled to "Company provided Life or Health coverages." (Ex. 27 PL Ex. 28) DTP's letters to surviving spouses explain that their Company-paid health care coverage will continue after the death of the hourly retiree, unless they remarry. (Ex. 28) Human Resource Director Pete Kohler's letter to retirees in 1998 stated that if an employee was retired before March 12, 1998, "benefits will be determined under the Plan as it existed at the time of retirement or termination." (Ex. 3 French Dep. Ex. 8, Ex. A)

The pre-1989 DTP documents further illuminate the fact that the benefit language in the 1989 HIA, and subsequent HIAs, provided for lifetime, unalterable benefits. Article VIII of the 1986 HIA contains identical language on the duration and eligibility of retiree healthcare benefits as the 1989, 1992 and 1995 HIAs. (Ex. 33, PL Ex. 1, pp. 4-5) Therefore, admissions by DTP about the lifetime status of retiree health care based on the 1986 HIA are evidence of the parties' intent in the HIAs under which the Class Members retired beginning in 1989. See *Gilbert v. Doehler-Jarvis*, 87 F. Supp.2d 788, 793 (E.D. Mich. 2000)

In about 1987, the parties issued a joint Position Statement that stated: "Retirees will <u>of course</u> have both income and insurance." (emphasis supplied) (Ex. 29 PL Ex. 52) A draft of a DTP Hourly Insurance Booklet from March 24, 1987 provided that the Company would pay the full cost of health insurance and that a retiree would have health insurance until their death; and that the spouse of a deceased retiree would have healthcare at no cost, as long as the spouse did not remarry

and was receiving pension benefits under the Retirement Income Program.[22]  (Ex. 30 PL Ex. 56, pp. 1, 41)

DTP's course of conduct also is evidence of a lifetime commitment to provide the same benefits to Class Members.  The 1989 HIA expired in 1992, but up until 2006 (when DTP first attempted to change retiree healthcare benefits), DTP continued to provide the exact same benefits to employees who retired under the 1989 HIA.

In *Yard-Man,* the court stated that the company's course of conduct in continuing retiree healthcare benefits indicated that it did not consider the benefits to be tied to the durational limits of active employees.  716 F.2d at 481; see also *Oddie v. Ross Gear & Tool Co.,* 305 F.2d 143, 151 (1962).  Here, DTP's actions show that the Class Members' benefits were lifetime and unalterable.

## IV.   **CONCLUSION**

For the above-stated reasons, Plaintiffs respectfully request that this Honorable Court enter summary judgment as to liability in their favor.

> Respectfully submitted,
>
> KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, P.C.
>
>
> By: /s/ David R. Radtke
>      DAVID R. RADTKE (P47016)
>      ROGER J. McCLOW (P27170)
>      PATRICK J. RORAI (P65091)
>      Attorneys for Plaintiffs
>      400 Galleria Officentre, Suite 117
>      Southfield, MI  48034
>      (248) 354-9650
>       dradtke@kmsmc.com
>       rmcclow@kmsmc.com
>       prorai@kmsmc.com

Dated: May 14, 2012

---

[22] This Booklet also referenced the impact on DTP provided health insurance coverage for the surviving spouse once they became Medicare-eligible.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 14, 2012, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will serve it upon:

Bobby R. Burchfield                                    Elisa Angeli Palizzi
Joshua D. Rogaczewski

Respectfully submitted,

KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.

By: _/s/ David R. Radtke_____
   DAVID R. RADTKE (P47016)
   ROGER J. McCLOW (P27170)
   PATRICK J. RORAI (P65091)
   Attorneys for Plaintiffs
   400 Galleria Officentre, Suite 117
   Southfield, MI 48034
   (248) 354-9650     Fax: (248) 354-9650
   dradtke@kmsmc.com
   rmcclow@kmsmc.com
   prorai@kmsmc.com

P:\RHC Cases\BorgWarner\2009 MI Lawsuit\Pleadings\SummJudgment-BRF.wpd