UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, and JAMES L. KELLEY,
on behalf of themselves and a similarly
situated class,

                Plaintiffs,

v.

BORGWARNER, INC., BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

                Defendants.

Case No. 09-cv-10918
Hon. Paul D. Borman
Magistrate Mona K. Majzoub

**Class Action**

_____/

# EXHIBIT 11

# TO

# PLAINTIFFS' MOTION
# FOR SUMMARY JUDGMENT
# AS TO LIABILITY

GEORGE TURCZYNOWSKI
November 16, 2011

1                   UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF MICHIGAN

2                        SOUTHERN DIVISION

3

    WILLIAM L. SLOAN, EUGENE J.        )

4   WINNINGHAM, JAMES L. KELLEY,       )

    on behalf of themselves and a      )

5   similarly situated class,          )

                                       )

6              Plaintiffs,             )

                                       )

7        -vs-                          ) No. 09-cv-10918

                                       )

8   BORGWARNER, INC., BORGWARNER       )

    FLEXIBLE BENEFITS PLANS, and       )

9   BORGWARNER DIVERSIFIED             )

    TRANSMISSION PRODUCTS, INC.,       )

10                                     )

               Defendants.             )

11

12        Deposition of GEORGE TURCZYNOWSKY, taken before

13   DONNA L. POLICICCHIO, C.S.R., and Notary Public, pursuant

14   to the Federal Rules of Civil Procedure for the United

15   States District Courts pertaining to the taking of

16   depositions, at 18335 LaGrange Road, Tinley Park,

17   Illinois, commencing at 9:36 a.m., on the 16th day of

18   November, 2011.

19

20

21

22

23

24

25



GEORGE TURCZYNOWSKI
November 16, 2011

```
 1          There were present at the taking of this deposition
 2     the following counsel:
 3          KLIMIST, McKNIGHT, SALE,
            McCLOW & CANZANO, P.C. by
 4          MR. DAVID R. RADTKE
            400 Galleria Officentre
 5          Suite 117
            Southfield, MMichigan  48034-8460
 6          (248) 354-9650
            dradtke@kmsmc.com
 7
               on behalf of the Plaintiffs;
 8
            McDERMOTT WILL & EMERY LLP by
 9          MR. BOBBY R. BURCHFIELD and
            MR. JOSHUA D. ROGACZEWSKI
10          600 Thirteenth Street, N.W.
            Washington, D.C.  20005-3096
11          (202) 756-8000
            bburchfield@mwe.com
12          jrogaczewski@mwe.com
13             on behalf of the Defendants.
14     ALSO PRESENT:  MS. MARLENE D. FISCHER
15                    * * * * * *
16
17
18
19
20
21
22
23
24
25
```



GEORGE TURCZYNOWSKI
November 16, 2011

Page 3

```
 1                    DEPOSITION OF
                    GEORGE TURCZYNOWSKY
 2                  November 16,, 2011
 3      EXAMINATION BY:                      PAGE
 4      Mr. Radtke                            4
 5                   * * * * * *
 6                     EXHIBITS
 7                                           PAGE
 8      Exhibit 49   Document Bates labeled
                     UAW 000001 - UAW 000063   36
 9
        Exhibit 50   Hourly Group Insurance Program,
10                   effective 4/1/83           37
11      Exhibit 51   Retired Group Insurance Program,
                     effective 1/1/85           38
12
        Exhibit 52   Position Statement         40
13
        Exhibit 53   Letter dated 8/7/86 from
14                   Mr. Boyle to Mr. Smith     41
15      Exhibit 54   Letter dated 12/8/89 from
                     Mr. Burghgraef to Mr. Botsford  50
16
        Exhibit 55   Fax dated 2/14/89 from Mr. Nuerge
17                   to Mr. Turczynowsky        60
18      Exhibit 56   Cover page titled UAW Local 287's
                     Appendix in Support of its Motion
19                   for Summary Judgment, etc.; memo
                     dated 3/24/87; draft insurance
20                   booklet                    62
21      Exhibit 57   Document dated 9/14/92 to
                     Mr. Turczynowski           87
22
        Exhibit 58   Memo dated 6/24/93 from
23                   Mr. Turczynowski to Mr. Nuerge  91
24                          (Cont'd)
25
```



GEORGE TURCZYNOWSKI
November 16, 2011

Page 4

1    EXHIBITS (Cont'd):

2                                                         PAGE

3    Exhibit 59    Memo dated 9/14/93 from
                   Mr. Turczynowski to Mr. Nuerge        93

4
     Exhibit 60    Memo dated 12/5/96 from Mr. Nuerge
5                  to Mr. Turczynowsky                   99

6    Exhibit 61    E-mail from Mr. Nuerge to
                   Mr. Turczynowsy re draft of 1998
7                  hourly insurance highlights           104

8    Exhibit 62    Fax dated 11/10/00 from Mr. Nuerge
                   to Mr. Turczynowsky                   105

9
     Exhibit 63    Excerpts from the "Agreement on
10                 Insurances and Pensions," 11/28/00    107

11   Exhibit 64    Handwritten notes dated 3/19/01       108

12   Exhibit 65    Base Plan/Major Medical Benefits
                   for Muncie Hourly Retirees,
13                 December 1989                         110

14   Exhibit 66    Letter dated 12/18/95 from
                   Mr. Turczynowsky to Mr. Dandelske
15                 with attachment                       111

16   Exhibit 67    Letter dated 12/16/96 from
                   Mr. Turczynowsky to Mr. Dandelske
17                 with attachment                       112

18   Exhibit 68    Letter dated 11/17/97 from
                   Mr. Turczynowsky to Mr. Dandelske
19                 with attachments                      114

20   Exhibit 69    Letter dated 11/13/98 from
                   Mr. Turczynowsky to Mr. Dandelske
21                 with attachment                       115

22   Exhibit 70    Letter dated 12/9/99 from
                   Mr. Studlow to Mr. Arquette with
23                 attachment                            115

24                              (Cont'd)

25



GEORGE TURCZYNOWSKI
November 16, 2011

Page 5

 1    EXHIBITS (Cont'd):

 2                                                        PAGE

 3    Exhibit 71   Letter dated 11/7/00 from
                   Mr. Turczynowsky to Mr. Arquette
 4                 with attachments                        116

 5    Exhibit 72   Letter dated 11/27/01 from
                   Mr. Turczynowsky to Mr. Arquette
 6                 with attachments                        116

 7    Exhibit 73   Letter dated 11/26/02 from
                   Mr. Turczynowsky to Mr. Arquette
 8                 with attachment                         117

 9    Exhibit 74   Letter dated 10/2/03 from
                   Mr. Turczynowsky to Mr. Arquette
10                 with attachments                        118

11    Exhibit 75   E-mail dated 11/1/04 from
                   Mr. Turczynowsky to Mr. Arquette
12                 with attachments                        118

13                       * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 6

```
 1                    GEORGE TURCZYNOWSKY,

 2    called as a witness herein, having been first duly sworn,

 3    was examined upon oral interrogatories and testified as

 4    follows:

 5                        EXAMINATION

 6    BY MR. RADTKE:

 7        Q    Good morning.

 8        A    Good morning.

 9        Q    Mr. Turczynowsky --

10        A    Yes.

11        Q    -- am I pronouncing it correctly?

12        A    That's correct.

13        Q    My name is David Radtke.  We met briefly.

14    You're here pursuant to a subpoena.  I appreciate

15    your patience and your willingness to come.

16            I'm going to ask you a series of questions.

17    If I ask you a question that's confusing or you don't

18    understand, please let me know and I'll try to

19    rephrase it in a way that we both understand.  If you

20    would like to take a break, please feel free to let

21    me know.  We can take a break whenever you would like

22    to, okay?

23        A    Thank you.

24        Q    I represent a group of retirees and surviving

25    spouses of retirees who were hourly employees who
```


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1    worked at the BorgWarner plant in Muncie, Indiana.

2    They retired between October 27, 1989, and early

3    2009, just so that you know the time frame that I'm

4    talking about and who I represent.

5         Could you state your current address,

6    please?

7    A    19810 Telluride, T-E-L-E-R-U-D-E, only one R,

8    Lane, Telluride Lane, Mokena, M-O-K-E-N-A,

9    Illinois 60448.

10   Q    Are you currently employed?

11   A    No.

12   Q    Could you give me your educational

13   background, Mr. Turczynowsky?

14   A    I graduated from the University of Illinois,

15   Chicago, in 1971 with a degree in electrical

16   engineering.

17   Q    Do you have any other education beyond that?

18   A    No.

19   Q    You were employed for BorgWarner, is that

20   accurate?

21   A    I was employed at BorgWarner?

22   Q    Yes.

23   A    Yes.

24   Q    What was the exact name of the entity you

25   were employed by, if you remember?



GEORGE TURCZYNOWSKI
November 16, 2011

Page 8

1       A    What time frame are we talking about?

2       Q    Let's start when you started.

3       A    BorgWarner Corporation in 1972.

4       Q    After you graduated from University of

5  Illinois, was BorgWarner the first place that you

6  worked?

7       A    No.

8       Q    Where did you work between your graduation

9  and your employment at BorgWarner?

10      A    Factory Insurance Association, also known as

11 Industrial Risk Insurers.

12      Q    When did you work there?

13      A    Following graduation through September

14 of 1972.

15      Q    How long did you work for BorgWarner

16 Corporation?

17      A    As a legal entity?

18      Q    Yeah.

19      MR. BURCHFIELD:  Objection to form and

20 foundation.  Go ahead, you may answer.

21      A    From 1972 through 1987.

22 BY MR. RADTKE:

23      Q    Between 1972 and 1987, what was your job

24 title or titles?

25      A    Initially I was responsible in the Risk



GEORGE TURCZYNOWSKI
November 16, 2011

Page 9

1    Management Department of BorgWarner for plant and

2    employee safety, property protection programs.  In

3    1978, I was promoted to manager of group insurance in

4    the Employee Benefits Department.  Subsequent to

5    that, I also assumed on or about 1985 responsibility

6    for pension plans.  That carries you through 1987.

7         Q    And your title was manager?

8         A    Manager of group insurance and pensions.

9         Q    What happened with respect to BorgWarner

10   Corporation in 1987?

11        A    The company went through a leveraged buyout.

12        Q    And did another entity or another -- was

13   there a name change?  What was the result -- let me

14   just stop and rephrase.

15             What was the result of the leveraged buyout?

16   MR. BURCHFIELD:  Object to form.

17   THE WITNESS:  I'm sorry.

18   MR. BURCHFIELD:  You may answer.

19        A    The surviving companies became BorgWarner

20   Protective Services and BorgWarner Automotive.

21   BY MR. RADTKE:

22        Q    Did you retain your employment?

23        A    I did.

24        Q    With which entity?

25        A    Protective Services.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1       Q    What was your job with BorgWarner Protective

2   Services?

3       A    Manager, group insurance and pensions.

4       Q    What type of business was BorgWarner

5   Protective Services in?

6       A    They were involved with alarm services and

7   security services, guard services.

8       Q    Did BorgWarner Protective Services have any

9   relationship with the plant in Muncie, Indiana?

10      MR. BURCHFIELD:   Object to form and foundation.

11  You may answer.   Unless I specifically tell you not

12  to answer, you should answer the question.   These are

13  objections for the record.

14      A    Please repeat the question.

15      MR. RADTKE:   Could you --

16          (From the record above, the reporter read

17          the following:

18              "Q    Did BorgWarner Protective

19          Services have any relationship with the

20          plant in Muncie, Indiana?")

21      THE WITNESS:   No.

22  BY MR. RADTKE:

23      Q    How long did you work for BorgWarner

24  Protective Services?

25      A    I believe it was through 1993.



GEORGE TURCZYNOWSKI
November 16, 2011

```
 1        Q    In 1993 did your employer change?

 2        A    Yes.

 3        Q    And who did you become employed by?

 4        A    BorgWarner Automotive.

 5        Q    What was your job title at BorgWarner

 6   Automotive?

 7        A    Manager of employee benefits.

 8        Q    How long did you hold that position?

 9        A    Approximately three years.  I beg your

10   pardon.  Approximately five years.

11        Q    Until approximately 1998?

12        A    Approximately.

13        Q    Did you move to another position within

14   BorgWarner Automotive?

15        A    Yes.

16        Q    What was that position?

17        A    Director of group benefits and pensions.

18        Q    How long did you hold that position?

19        A    Approximately two years.

20        Q    Did your employment change?

21        A    Yes.

22        Q    And what did your job title become?

23        A    Director of employee benefits in about the

24   year 2000.

25        Q    How long did you hold that position?
```



GEORGE TURCZYNOWSKI
November 16, 2011

1      A    Through my retirement date in July of 2005.

2      Q    Going back to the split after the leveraged

3  buyout between BorgWarner Protective Services and

4  BorgWarner Automotive, was the Muncie plant part of

5  BorgWarner Automotive?

6      A    It was a subsidiary of Diversified

7  Transmission Products; that is to say, Diversified

8  Transmission Products was a subsidiary of BorgWarner

9  Automotive.

10     Q    Do you know how long the Muncie plant was a

11  subsidiary of BorgWarner Automotive?

12     A    I do not.

13     Q    During your employment at BorgWarner

14  Corporation and then the subsequent employment that

15  you had through July of 2005, did you have any

16  relationship with benefits provided to employees and

17  retirees of the BorgWarner plant in Muncie, Indiana?

18     A    Clarify what you mean by "benefits provided."

19     Q    Health care benefits or pension benefits.

20     A    Did I personally have any responsibility?

21     Q    Yes.

22     A    No.

23     Q    Were you ever involved in collective

24  bargaining between BorgWarner DTP and the UAW for the

25  Muncie hourly employees?



GEORGE TURCZYNOWSKI
November 16, 2011

1       A    Yes.

2       Q    In what years were you involved in collective

3   bargaining?

4       A    1992, 1995, 1998, and 2000 approximately.

5       Q    Did the bargaining occur approximately in the

6   year 2000?

7       A    Yes.

8       Q    During your employment with BorgWarner

9   Protective Services between 1987 and 1993, were you

10  involved in collective bargaining regarding the

11  Muncie plant and the UAW?

12      A    I was not present at the bargaining sessions

13  between 1987 and 1989.

14      Q    Did you have any responsibility with respect

15  to the benefits that were negotiated between the UAW

16  and BorgWarner between 1987 and 1989?

17      A    Clarify "responsible."

18      Q    Did you have any role with respect to health

19  care benefits or pension benefits?

20      MR. BURCHFIELD:  Object to form.

21      A    To the extent that benefits that were

22  negotiated were then distributed to the various and

23  sundry administrative bodies that were going to be

24  responsible for managing those programs,

25  administering those programs.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 14

1    BY MR. RADTKE:

2        Q    You had responsibility with respect to

3    dispersing those contents?

4        A    Yes, dispersing them, making the insurance

5    companies who are the administrators available, what

6    the benefit levels are going to be, making the

7    trustees aware of what the new benefits levels are

8    with respect to the pension programs.

9        Q    And that continued even when you were

10   employed at BorgWarner Protective Services?

11       A    That's correct.

12       Q    And during your employment at BorgWarner

13   Protective Services, the Muncie plant was part of

14   BorgWarner Automotive?

15       A    I believe so.

16       Q    So you had a role that crossed between

17   BorgWarner Protective Services and BorgWarner

18   Automotive?

19       MR. BURCHFIELD:   Objection to form and

20   foundation.

21       A    A service bureau role, yes.

22   BY MR. RADTKE:

23       Q    Could you explain what a service bureau role

24   means?

25       A    We provided certain expertise relating to



GEORGE TURCZYNOWSKI
November 16, 2011

1     employee benefit matters for both Protective Services

2     as well as BorgWarner Automotive.

3          Q    Did BorgWarner Automotive also have a

4     benefits department between 1987 and 1993?

5          A    Where?  Specifically where?

6          Q    Did they in Muncie?

7          A    They had a local manager of benefits in

8     Muncie.

9          Q    And where were you employed physically?  What

10    was your location when you worked for all of the

11    BorgWarner entities between 1972 and 2005?

12         A    Chicago.

13         Q    What was located in Chicago as it relates to

14    BorgWarner?

15         A    Corporate headquarters.

16         Q    What was corporate headquarters'

17    responsibility as it related to health care benefits

18    for the BorgWarner hourly employees at Muncie,

19    Indiana?

20         A    I can't speak to that.

21         Q    What role did you have with respect to the

22    hourly employees' health care benefits that worked in

23    Muncie, Indiana?

24         A    As I previously stated, we had a

25    responsibility for making sure that whatever benefits



GEORGE TURCZYNOWSKI
November 16, 2011

1   were provided by Muncie, DTP Muncie, were going to be

2   property administered by the various and sundry

3   administrative organizations that were the

4   responsibility of corporate, my responsibility, to

5   provide for various units, including Muncie.

6       Q   What other units did you provide services for

7   that were part of BorgWarner Automotive?

8       A   All units that were part of BorgWarner

9   Protective as well as BorgWarner Automotive during

10  that time period of '87 through about 1993.

11      Q   BorgWarner Automotive had other plants and

12  facilities other than Muncie, Indiana, during that

13  time frame of '87 to '93?

14      A   Yes.

15      Q   Where else did they have plants and

16  facilities?

17      MR. BURCHFIELD:   Objection.   Foundation.

18      A   Michigan, New York, Illinois.   There were

19  numerous locations.   I just do not recall them all at

20  this point.

21  BY MR. RADTKE:

22      Q   In 1993 when you became employed at

23  BorgWarner Automotive, did you leave your employment

24  at BorgWarner Protective Services?

25      A   Yes.



GEORGE TURCZYNOWSKI
November 16, 2011

1      Q    Did BorgWarner Protective Services continue

2    to operate after you left?

3      A    Yes.

4      Q    Did you continue to have responsibilities

5    with respect to the administration of health care

6    benefits for BorgWarner Protective Services

7    employees?

8      A    No.

9      Q    Did you have any responsibility for

10   employees' benefits -- I'm going to withdraw that

11   question.

12          When you went to BorgWarner in 1993,

13   BorgWarner Automotive, to clarify, what was your --

14   what were your job duties as the manager of employee

15   benefits?

16     A    Essentially the same as they were in the

17   period between '87 and '93.

18     Q    And what were they?

19     A    To provide strategic planning, guidance,

20   administrative protocols with respect to -- and

21   analysis -- financial analysis of the various and

22   sundry benefit programs for the company.

23     Q    Including those programs that were in place

24   in the BorgWarner facility in Muncie, Indiana?

25     A    Yes.



GEORGE TURCZYNOWSKI
November 16, 2011

1       Q   You testified earlier that you were involved

2    in the contract negotiations with the UAW and its

3    Local 287 in Muncie, Indiana, in 1992, 1995, 1998,

4    and approximately 2000, correct?

5       A   Yes.

6       Q   Were you actually physically at negotiations

7    during each one of those years?

8       A   On an as-needed basis.  I was not there at

9    all times.

10      Q   When were you present during negotiations?

11   Was there a certain subject matter that you were

12   present for negotiations?

13      A   Yes.

14      Q   What subject matter or matters were they?

15      A   Employee benefit related matters.

16      Q   Does that include health insurance?

17      A   Yes.

18      Q   Pension?

19      A   Yes.

20      Q   Life insurance?

21      A   Yes.

22      Q   Were you involved in negotiating the health

23   insurance agreement between the UAW and BorgWarner at

24   the Muncie plant during the years that you mentioned?

25      A   The direct responsibility for negotiations



GEORGE TURCZYNOWSKI
November 16, 2011

Page 19

1     always rested with the HR -- senior HR representative

2     at the location during those time periods.  I was

3     there to provide consultative advice and guidance

4     with respect to those matters.

5          Q   So you were involved in negotiations of those

6     matters --

7          MR. BURCHFIELD:  Objection to form.

8     BY MR. RADTKE:

9          Q   -- by being present?

10         MR. BURCHFIELD:  Objection to form.

11         A   I was present.

12    BY MR. RADTKE:

13         Q   Did BorgWarner DTP management at the Muncie

14    plant have the authority to make agreements without

15    approval of BorgWarner Automotive?

16         MR. BURCHFIELD:  Object to foundation.

17         A   I believe that changes, programs probably

18    were a collaborative effort with respect to local

19    management, subsidiary management, and whatever the

20    protocols called for with regard to the chain of

21    command within the organization.

22    BY MR. RADTKE:

23         Q   When you say changes and I think you said

24    programs, what are you referring to?

25         A   Any benefits that would have been negotiated


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1    or tentatively agreed to, any programs relating to

2    employee benefit matters.

3        Q    If the employee benefit matters were

4    negotiated in Muncie by company management officials

5    that were based in Muncie, would they be sent to

6    BorgWarner headquarters for review?

7        MR. BURCHFIELD:  Object to form and foundation.

8        A    I could only state what I said earlier, and

9    that is that there was a collaborative effort, I'm

10   sure, with regard to local management, the subsidiary

11   management, and presumably at some point corporate

12   management with regard to the programs that were

13   tentatively agreed to.

14   BY MR. RADTKE:

15       Q    Did BorgWarner Automotive have a role in

16   deciding who bargained on behalf of BorgWarner DTP in

17   their negotiations with the UAW?

18       A    Not to my knowledge.

19       Q    Other than yourself as an employee of

20   BorgWarner Automotive, were there any other employees

21   of BorgWarner Automotive that were participants in

22   the negotiations with the UAW over the Muncie plant?

23       MR. BURCHFIELD:  Object to form.

24       A    Clarify for me, please, the time period that

25   you're talking about.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 21

1    BY MR. RADTKE:

2        Q    Let's say from 1992 through 2000.

3        A    Not to my knowledge.

4        Q    What about prior to 1992?

5    MR. BURCHFIELD:  Object to foundation.

6        A    Again, not to my knowledge.

7    BY MR. RADTKE:

8        Q    Did your responsibilities change in 1998 when

9    you became the director of group benefits and

10   pensions as it relates to the BorgWarner facility in

11   Muncie, Indiana?

12       A    The duties remained essentially the same.

13   They were somewhat broadened to include other

14   elements of the employee benefit programs.

15       Q    What other elements were added?

16       A    Such as a retirement savings plan, a/k/a

17   401(k) plan.

18       Q    Did your duties change in 1998 when you

19   became the director of group benefits and pensions at

20   BorgWarner overall?

21       A    No.

22       Q    What about in 2000 when you became the

23   director of employee benefits, did your role or

24   responsibilities change during that period of time?

25       A    Yes, to include the broader benefit that I



GEORGE TURCZYNOWSKI
November 16, 2011

Page 22

1    mentioned, the 401(k) programs.

2        Q    Between 1993 and 1998, who did you report to?

3        A    The vice-president of human resources,

4    Geraldine Kinsella.

5        Q    Who did Ms. Kinsella work for?

6        A    BorgWarner Automotive.

7        Q    Between 1998 and 2000, did you continue to

8    report to Ms. Kinsella?

9        A    Yes.

10       Q    And what about between 2000 and 2005, who did

11   you report to?

12       A    I continued to report to Ms. Kinsella up

13   until about 2002 when she retired.

14       Q    Then who did you report to?

15       A    A new vice-president of human resources,

16   Ms. Kimberly Dickens, through about late 2004.

17       Q    Then who did you report to?

18       A    To the new vice-president of human resources,

19   Ms. Angela Daversa, until my retirement in July

20   of 2005.

21       Q    With respect to Ms. Kinsella and Ms. Daversa,

22   they also worked for BorgWarner Automotive, is that

23   accurate?

24       A    Yes.

25       Q    Did you ever work -- or I'm sorry -- report



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1      to anyone at BorgWarner Diversified Transmission

2      Products?

3          A    Report?

4          Q    Yes.

5          A    No.

6          Q    Between 1987 and 1993, who did you report to?

7          A    1987 and --

8          Q    1993.  I believe you testified that was the

9      time you were employed by BorgWarner Protective

10     Services.

11         A    Mr. Andrew Ruff, the director of risk

12     management and employee benefits.

13         Q    And who did he work for, Mr. Ruff?

14         A    He reported to the vice-president of human

15     resources, Mr. John O'Brien.

16         Q    What was the name of the employer that

17     Mr. Ruff worked for?

18         MR. BURCHFIELD:  Object to foundation.

19         A    I believe it was Protective Services.

20     BY MR. RADTKE:

21         Q    What about Mr. O'Brien, who was he employed

22     by?

23         A    I can't say with certainty.

24         Q    Would it have been either BorgWarner

25     Protective Services or BorgWarner Automotive?



GEORGE TURCZYNOWSKI
November 16, 2011

1        A    Yes.

2        Q    When you were employed by BorgWarner

3    Automotive, what was your role with respect to

4    third-party administrators and health care benefits

5    that were provided to the Muncie employees?

6        A    We had the responsibility to secure those

7    administrators in the most cost-effective way

8    possible to provide those services to the Muncie

9    unit.

10       Q    So BorgWarner Automotive would decide which

11   third-party administrator would administer the health

12   care benefits?

13       A    Generally speaking, that was the case where

14   practicable.

15       Q    Were there times when it wasn't practicable?

16       A    That's correct.

17       Q    In what instances was it not practicable?

18       A    Where there were no particular programs in

19   place or administrators that lent themselves to the

20   overall umbrella programs that we had or

21   administrators that we had, so then we would on rare

22   occasions do something on an as-needed basis or

23   interim basis locally.

24       Q    So on those rare occasions that you just

25   referenced the BorgWarner local management would



GEORGE TURCZYNOWSKI
November 16, 2011

Page 25

1    engage a third-party administrator?

2       A    In Muncie?

3       Q    Yes.

4       A    No.

5       Q    What would happen in those rare instances?

6       A    Not in Muncie.

7       Q    What would happen?  So you were referring to

8    more globally?

9       A    More globally.

10      Q    In Muncie, BorgWarner Automotive was always

11   able to secure a third-party administrator for the

12   benefits that were negotiated?

13      A    BorgWarner Muncie with assistance from my

14   area.

15      Q    I'll give you an example.  CIGNA at some

16   point in time was a third-party administrator for the

17   health care benefits provided to the hourly

18   employees?

19      A    Yes.

20      Q    Who decided to use CIGNA as the third-party

21   administrator?

22      A    That became an issue under my venue, my

23   purview.

24      Q    You decided?

25      A    Yes, yes.  I mean, based on analysis and



GEORGE TURCZYNOWSKI
November 16, 2011

Page 26

1    whatnot, yes.

2        Q    And at some point in time CIGNA was not used

3    as the health care third-party administrator for the

4    Muncie employees, is that accurate?

5        A    I don't know that to be the case.

6        Q    If there was a change in administrators with

7    respect to health care benefits for the Muncie

8    employees, would that have also been your

9    responsibility?

10       A    Yes.

11       Q    One of your responsibilities was related to

12   the pension that was negotiated for the hourly

13   employees at the Muncie plant, correct?

14       A    For the administration of the programs, yes.

15       Q    What did you do with -- what was your job

16   with respect to administrating that program?

17       A    Primarily to make sure that that information

18   was disseminated to the actuaries who would then

19   perform the necessary evaluations of the programs and

20   to identify the implications of those programs and

21   then ultimately to the trustee to make sure that the

22   benefit levels were going to be consistently paid out

23   to prospective retirees when they made application

24   for retirement through the local people in Muncie.

25       Q    Who were the trustees of the pension plan?



GEORGE TURCZYNOWSKI
November 16, 2011

Page 27

1       A    During the time frame of --

2       Q    Between 1993 and 2005.

3       A    Northern Trust.

4       Q    Did they have -- were they the trustees for

5    more than just the pension plan that was negotiated

6    at the BorgWarner facility for hourly employees?

7       A    Yes.

8       Q    Who else were they the trustees for?

9       MR. BURCHFIELD:  Objection.  Foundation and form.

10      A    Other hourly pension plans that were in

11   existence in BorgWarner at that time.

12   BY MR. RADTKE:

13      Q    Was there a single hourly pension plan?

14      A    No.

15      Q    What other -- explain to me the makeup of the

16   pension plan during the time period.

17      A    Which makeup?

18      Q    Well, was there a single plan?

19      A    No.

20      Q    Was there a separate plan for each facility?

21      A    Yes.

22      Q    And Northern Trust was the trustee for all of

23   these separate hourly pension plans at the different

24   facilities of BorgWarner Automotive?

25      A    Yes, the investment trustee.  That's what I



GEORGE TURCZYNOWSKI
November 16, 2011

1    mean by trust.

2         Q   Do you know a Regis Trenda?

3         A   I do.

4         Q   Did you ever work with Mr. Trenda?

5         A   I did.

6         Q   Where did you work with Mr. Trenda?

7         A   He was headquartered in the same offices that

8    I was in Chicago.

9         Q   What was his job?

10       A   He was a compliance officer with respect to

11   legislative matters relating to employee benefit

12   plans.

13       Q   Was he a lawyer?

14       A   He was an attorney.

15       Q   Did he work in the BorgWarner Automotive

16   Legal Department?

17       A   Yes, he did.

18       Q   Do you know how long Mr. Trenda worked for

19   BorgWarner Automotive?

20       A   Beginning in 19 -- I'm going to say around

21   1989 or 1990, somewhat earlier than my transfer to

22   BorgWarner Automotive in 1993.

23       Q   And how long did he continue to work for

24   BorgWarner Automotive?

25       A   It was at least through 2005.  I can't speak



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1    to exactly what happened after I retired in 2005 and

2    how long he was there.

3        Q    Do you know whether Mr. Trenda was ever

4    present during contract negotiations for the Muncie

5    employees?

6        A    At the negotiating table?

7        Q    Yes.

8        A    Not to my knowledge.

9        Q    Did he have any responsibility with respect

10    to those contract negotiations away from the table?

11        A    He performed a review function to make sure

12    that the various and sundry documents and programs

13    were in compliance with ERISA and various other

14    legislative issues such as HIPAA, the other

15    legislation that was passed, and again, I do not

16    recall them all off the top of my head but, again, to

17    make sure that we were in compliance.

18        Q    When a collective bargaining agreement was

19    reached between the UAW and BorgWarner at the Muncie

20    facility, who was responsible for drafting the

21    contract?

22        A    It was a joint responsibility.  It was -- the

23    input was provided locally into either an existing

24    document or, if necessary, a new document, which then

25    was reviewed by the appropriate officials within the



GEORGE TURCZYNOWSKI
November 16, 2011

1    UAW organization as well as here in Chicago.

2        Q    So once a tentative agreement was reached in

3    Muncie, the company officials that were involved in

4    negotiations drafted an agreement that reflected the

5    agreements reached at the bargaining table, is that

6    correct?

7        MR. BURCHFIELD:  Object to form.

8        A    The local management would start that

9    process, yes.

10   BY MR. RADTKE:

11       Q    And then their work would be reviewed by

12   BorgWarner corporate headquarters?

13       A    It would be reviewed by the appropriate

14   people that had some level of expertise or

15   responsibility with regard to the contents of that

16   document.

17       Q    I'm sorry.  I didn't mean to cut you off.

18            One of those was Mr. Trenda.  You mentioned

19   that, right?

20       A    Yes.

21       Q    And one of them was you, is that correct?

22       A    Yes.

23       Q    And then at some point that document would be

24   provided to the UAW, correct?

25       A    It could have been a simultaneous matter that



GEORGE TURCZYNOWSKI
November 16, 2011

1    it was sent to us for review as well as to the UAW

2    folks in Michigan to review or whatever local process

3    that they had within the organization to take care of

4    those matters.

5        Q    Okay.  I'm going to talk a little bit about

6    what was actually negotiated in Muncie, okay?

7        A    Uh-huh.

8        Q    Is it your recollection there was a health

9    insurance agreement that was negotiated as a document

10   in Muncie?

11       A    Yes.

12       Q    And there was a retirement income program

13   that was negotiated for the employees of Muncie?

14       A    Yes.

15       Q    And then there was a collective bargaining

16   agreement that related to working conditions and

17   wages for the employees at Muncie, correct?

18       A    Yes.  Now, please, again, before we go any

19   further, what time period are we talking about?

20       Q    During your time that --

21       A    At any time between '93 and '98?

22       Q    Right.

23       A    Yes.

24       Q    And 2000, correct?

25       A    Yes.



GEORGE TURCZYNOWSKI
November 16, 2011

1      Q    Not all of them may have been negotiated at

2    the same time.

3      A    Correct.

4      Q    I'm talking more globally.  There were

5    separate documents that were generated as a result of

6    contract negotiations?

7      A    Not always.

8      Q    We'll talk about that.  But there were -- at

9    some period of time there was a retirement income

10   document, correct?

11     A    Yes.

12     Q    There was a separate collective bargaining

13   agreement?

14     A    Yes.

15     Q    There was a separate health insurance

16   agreement?

17     A    Yes.

18     Q    I believe there was also a separate sub-plan

19   agreement?

20     A    Yes.

21     Q    Before we mark this, I want to see if you can

22   identify it.  If you can, then I'll -- I'll read the

23   document number into the record, and I apologize for

24   the poor quality of it.  It's LOC 000448.

25          Mr. Turczynowsky, could you review this



GEORGE TURCZYNOWSKI
November 16, 2011

Page 33

1    document?

2        A    Please tell me what the date on this document

3    is.

4        Q    I believe it is March 14, 1980.

5        A    I have never seen this document to the best

6    of my knowledge.

7        Q    Then I'm going to take it back.

8             In 1980 you were the manager of group

9    insurance and employee benefits for BorgWarner

10   Corporation, correct?

11       A    No.

12       Q    What was your title?

13       A    In 1980?

14       Q    Yes.

15       A    Manager of group insurance.

16       Q    Did you have any role in collective

17   bargaining as it related to the Muncie facility at

18   that time?

19       A    No.

20       Q    When was the first time you had any role with

21   respect to collective bargaining at the Muncie

22   facility?

23       A    Direct contact at the table?

24       Q    You mentioned -- you stated there was a lot

25   of contact at the table time periods.  I'm asking you



GEORGE TURCZYNOWSKI
November 16, 2011

1    outside of direct contact.

2        A    About 1985.

3        Q    There were contract negotiations in 1985 and

4    '86?

5        A    I believe in 1986.

6        Q    And with respect to 1986, what was your role

7    in the 1986 negotiations?

8        A    To provide some assistance and guidance to

9    local management with respect to the benefit issues

10   and programs.

11       Q    Including health care benefits?

12       A    Including health care benefits.

13       Q    Did you play a similar role in 1989?

14       A    Similar, but limited.

15       Q    What was your role in 1989?

16       A    To provide some general information to local

17   management with respect to health care and employee

18   benefit matters.

19       Q    The first time you ever were at the

20   bargaining table was 1992 with respect to the Muncie

21   group?

22       A    Yes.

23       Q    Had you ever been involved in collective

24   bargaining negotiations prior to 1992 in any other

25   setting?



GEORGE TURCZYNOWSKI
November 16, 2011

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Where? |
| 3 | A | Michigan. |
| 4 | Q | At what facility were you involved in |

5   negotiations?

| | | |
|---|---|---|
| 6 | A | Sterling heights facility. |
| 7 | Q | What negotiations were you involved in with |

8   respect to the Sterling Heights facility, what years?

| | | |
|---|---|---|
| 9 | A | I can't say with certainty. |
| 10 | Q | In the 1980s? |
| 11 | A | 1980s, mid to late 1980s. |
| 12 | Q | Was that your only other prior experience in |

13   contract negotiations with the union?

| | | |
|---|---|---|
| 14 | A | No. |
| 15 | Q | What other negotiations were you involved in? |
| 16 | A | Rockford, Illinois. |
| 17 | Q | What entity was located in Rockford, |

18   Illinois, that you were involved in contract

19   negotiations?

| | | |
|---|---|---|
| 20 | A | At that time it was known as Rockford Clutch. |
| 21 | Q | It was a subsidiary of BorgWarner Automotive |

22   or BorgWarner, Inc.?

23      MR. BURCHFIELD:  Object to form, foundation.

| | | |
|---|---|---|
| 24 | A | I can't speak to the exact legal entity of |

25   that particular group.



GEORGE TURCZYNOWSKI
November 16, 2011

1    BY MR. RADTKE:

2        Q    It was related in some way to BorgWarner?

3        A    In some way.

4        Q    What years were you involved in contract

5    negotiations in Rockford, Illinois?

6        A    Mid to late 1980s.

7        Q    Any other contract negotiations prior to 1992

8    that you were involved in?

9        A    Chicago, Illinois.

10       Q    What facility were you involved in contract

11   negotiations in Chicago, Illinois?

12       A    Borg & Beck clutch facility.

13       Q    Do you recall when you were involved in

14   contract negotiations there?

15       A    Again, mid to late '80s.  I don't have

16   specific dates that I can recall.

17       Q    Any other contract negotiations?

18       A    There may be others, but I just don't recall

19   them off the top of my head.

20            (Exhibit 49 marked as requested.)

21   BY MR. RADTKE:

22       Q    Mr. Turczynowsky, you've been handed a

23   document that's been marked as Exhibit 49.

24            Have you ever seen this document before?

25       A    What is the date of this document?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1      Q   There are a number of dates in this document.

2    Parts of it are from 1980.  Parts of it are from

3    prior to that time.

4      A   I cannot say for certainty that I've ever

5    seen this document one way or another.

6      Q   Have you ever seen -- what was Warner Gear?

7    Was it related in any way to BorgWarner Corporation?

8      A   To the best of my recollection, Warner Gear

9    was the prior entity for DTP Muncie.

10     Q   Do you recall when Warner Gear became DTP

11   Muncie?

12     A   No.

13          (Exhibit 50 marked as requested.)

14   BY MR. RADTKE:

15     Q   You've been handed a document that's been

16   marked as Exhibit 50.  It's an April 1, 1983, Hourly

17   Group Insurance Program covering employees in the

18   bargaining unit represented by the UAW and its

19   Local 287.

20          Have you ever seen this document?

21     A   I may have.

22     Q   Where would you have seen this document?

23     A   In the files that may have been maintained or

24   were maintained either at the plant or in Chicago in

25   the administrative files.



GEORGE TURCZYNOWSKI
November 16, 2011

1    Q   Did you ever have any role with respect to

2  the benefits that are described in this document?

3    MR. BURCHFIELD:  Object to form.

4    A   To the best of my knowledge, no.

5         (Exhibit 51 marked as requested.)

6  BY MR. RADTKE:

7    Q   Mr. Turczynowsky, you've been handed what's

8  been marked as Exhibit 51.  It's a document that says

9  effective January 1, 1985.  It says Retired Group

10  Insurance Program.

11       Have you ever seen this document before?

12    A   It's possible, but I can't say with

13  certainty.

14    Q   Do you know who this Retired Group Insurance

15  Program was applicable to?

16    A   No.

17    Q   You testified that BorgWarner Automotive came

18  into existence in about 1987, is that correct?

19    A   Approximately.

20    Q   You'll notice that the title of this document

21  is BorgWarner Automotive.

22    A   Okay.

23    Q   So is it your recollection that on January 1,

24  1985, BorgWarner Automotive was not in existence?

25    MR. BURCHFIELD:  Object to form.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 39

1       A    I can't speak to that.  This was not my area

2    of expertise, and so therefore I can't make an

3    intelligent response to that question.  Sorry.

4    BY MR. RADTKE:

5       Q    That's okay.

6            I'm going to ask you to turn to Page 26 of

7    this document.  If you look at the bottom, it says

8    the plan identification number.

9       A    Yes.

10      Q    It says Plan Number 581.

11           Do you have any familiarity with that plan

12   number?

13      A    Not off the top of my head.

14      Q    Were there different plan numbers for

15   insurance programs that were provided to employees

16   and retirees at the Muncie plant?

17      A    I think there were different plan numbers.

18      Q    And were there some plan numbers that covered

19   salaried employees and retirees and some plan numbers

20   that covered hourly plan members and retirees?

21      A    I think that's an accurate statement.

22      Q    So at this point you don't know whether Plan

23   Number 581 was an hourly plan or a salary plan?

24      A    I do not.

25      Q    On the last page -- I think it's the very



GEORGE TURCZYNOWSKI
November 16, 2011

1    next page.  This page right here, sir.  One more.

2         MR. BURCHFIELD:  The one headed Accident and

3    Health Insurance?

4         MR. RADTKE:  Yes.

5    BY MR. RADTKE:

6         Q    On the bottom it says PF 26003 and then in

7    parenthesis 3.1.

8              Do you recognize that as -- that numbering?

9         A    No.

10        MR. RADTKE:  Thank you.

11             (Exhibit 52 marked as requested.)

12   BY MR. RADTKE:

13        Q    Was there something you wanted to point out

14   there, Mr. Turczynowsky?

15        A    In the interest of accuracy, I said I had no

16   idea what a Plan 581 was.

17        Q    Yes.

18        A    However, on Page 29 at the top of the page,

19   Certificate of Insurance, that particular policy

20   number, if memory serves me, suggests this is a

21   salary plan.

22        Q    Thank you.

23             I think you've been handed a document that's

24   been marked as Exhibit 52.

25        A    Yes, I have.



GEORGE TURCZYNOWSKI
November 16, 2011

1      Q   It's a position statement.  There is some

2   handwriting that suggests that it's from 1986, if you

3   look at the bottom of the first page, and there is

4   references to 1986 and 1987.

5          Have you ever seen this document before?

6      A   I cannot say with certainty one way or

7   another.

8      Q   Do you know -- have you ever seen a similar

9   document that was entitled Position Statement?

10     A   I can't say for certain.

11     Q   Were you ever involved in drafting position

12   statements for BorgWarner?

13     A   Similar to this?

14     Q   Similar to this.

15     A   No.

16     Q   Do you know anyone who was involved in

17   drafting position statements that were similar to

18   this?

19     A   No.

20     MR. RADTKE:   Thank you.

21          (Exhibit 53 marked as requested.)

22   BY MR. RADTKE:

23     Q   Mr. Turczynowsky, you've been handed a

24   document that's been marked as Exhibit 53.  It's an

25   August 7, 1986, letter from Dean Boyle to Charles



GEORGE TURCZYNOWSKI
November 16, 2011

Page 42

1    Smith.

2              Have you ever seen this document before?

3        A   I'm not sure.

4        Q   You testified earlier that you were involved

5    in the 1986 negotiations away from the table,

6    correct?

7        A   That is correct.

8        Q   And in 1986 there were contract negotiations

9    between the UAW and BorgWarner at the Muncie

10   facility, correct?

11       A   I think so.

12       Q   And was there a threat of a strike in 1986,

13   if you remember?

14       A   I do not recall.

15       Q   Who was Dean Boyle?

16       A   He was the human resources -- senior human

17   resources manager at the Muncie facility at that

18   time.

19       Q   He was a participant in bargaining with the

20   UAW in 1986?

21       A   Yes, I believe that's correct.

22       Q   Were you consulted in 1986 about whether

23   retiree health care coverage would be provided if

24   there was a strike?

25       A   No.



GEORGE TURCZYNOWSKI
November 16, 2011

1      Q    I'm going to hand you what's been marked

2    previously as Exhibit 5, which is an October 27,

3    1989, BorgWarner Automotive and UAW Local 287

4    Tentative Agreement.

5           Have you ever seen this document before,

6    Mr. Turczynowsky?

7      A    I believe I have.  This looks familiar.  May

8    I ask you what's the date of this, aside from the

9    10/26/89, when this was published, do you know?

10     Q    I don't know.  I can only tell you that

11   that's the date on the top of it.

12     A    Okay.  Fair enough.

13     Q    Do you recall whether you would have seen

14   this document around the time of October 1989?

15     A    I can't say for certain.

16     Q    How would you have seen this document?

17     A    It would have been distributed to us for

18   administrative purposes to make sure that all the

19   various and sundry changes were properly incorporated

20   into documents, to advise the administrators of the

21   programs, you know, what the levels were going to be

22   and so on and so forth.  It was an informational

23   document.

24     Q    So this would be the sort of document that

25   you would receive so that you could inform the



GEORGE TURCZYNOWSKI
November 16, 2011

Page 44

1    third-party administrator that brand name drugs

2    deductible went up to seven dollars, correct?

3        A    Yes.

4        Q    And I'm looking at the second page, Item

5    Number 10.  And that, for example, Number 11, that

6    pre-strike coverage continued in effect plus a

7    $400,000 major medical lifetime maximum and calendar

8    year deductible, correct?

9        A    Yes.

10       Q    So you would have communicated that to

11   whoever the third-party administrator was that

12   according to what was reached -- the contract reached

13   at the table that the major medical maximum increased

14   as a result of negotiations?

15       A    Yes.

16       Q    On Item Number 20 there is a reference to

17   managed care.

18           Do you recall that the parties negotiated a

19   managed care program for active employees and

20   pre-Medicare retirees in 1989?

21       MR. BURCHFIELD:  Objection to form, foundation.

22       A    I believe that's correct.

23   BY MR. RADTKE:

24       Q    And could you describe what a managed care

25   program was as it relates to this group of employees?



GEORGE TURCZYNOWSKI
November 16, 2011

1       A    Generally speaking, it would require

2    employees and pre-Medicare retirees to seek

3    authorization or concurrence for the medical

4    necessity related to a planned nonemergency inpatient

5    confinement, a surgical procedure, the length of stay

6    authorization based on the admission protocols,

7    generally a program that would provide for some

8    intervention by a third party to review what is

9    planned by the attending physicians with respect to

10   an individual's care.

11      Q    Was that a different program that was in

12   place for the Muncie facility than what was in place

13   prior to 1989?

14      A    I believe this was a new procedure.

15      Q    And do you know what the procedure was prior

16   to 1989?

17      A    I believe it contained none of these

18   provisions, that it was based on the employee and the

19   attending physicians that would work directly without

20   any kind of intervention and no ability on anyone's

21   part -- or requirement on anyone's part, I should

22   say, to review what those procedures might be.

23      Q    Okay.  If you go back to Number 11 where it

24   says health care, hospital, medical, surgical, major

25   medical, current retirees, and then it says



GEORGE TURCZYNOWSKI
November 16, 2011

1    pre-strike coverage, do you know whether the current

2    retirees as of October 27, 1989, were put into the

3    managed care program or not?

4        MR. BURCHFIELD:   Could you read that question

5    back, please?

6                (From the record above, the reporter read

7                the following:

8                    "Q   Okay.   If you go back to Number

9                11 where it says health care, hospital,

10               medical, surgical, major medical, current

11               retirees, and then it says pre-strike

12               coverage, do you know whether the current

13               retirees as of October 27, 1989, were put

14               into the managed care program or not?")

15       MR. BURCHFIELD:   Object to form and foundation.

16       A   I don't think so.

17   BY MR. RADTKE:

18       Q   Do you recall in 1989 that there was a strike

19   at the Muncie facility?

20       A   I do.

21       Q   And then that strike concluded with this

22   tentative agreement that I showed you and has been

23   marked previously as Exhibit 5?

24       A   I believe that to be correct.

25       Q   Is it your understanding that the retiree



GEORGE TURCZYNOWSKI
November 16, 2011

Page 47

1    health care benefits provided to retirees as of

2    October 27, 1989, stayed the same except for the

3    increase of the major medical lifetime maximum and

4    that the deductible now went on a calendar year?

5         MR. BURCHFIELD:  Object to form and foundation.

6         A    I don't recall that level of detail, but I

7    have to assume that this document is correct.

8    BY MR. RADTKE:

9         Q    In Item Number 13 it talks about health care

10   benefits for future retirees.

11             Do you see that?

12        A    I do.

13        Q    And then it refers to Attachment Number 3,

14   which is attached actually to this document.

15        A    I see it.

16        Q    Is it your recollection that hourly employees

17   who retired effective December 1, 1989, through March

18   of -- I'm sorry -- March of 1995 continued to have

19   the health care benefits that are set forth in

20   Attachment Number 3 up until the time of your

21   retirement in 2005?

22        A    I can't say that.

23        Q    You don't recall?

24        A    No.

25        Q    In looking at this tentative settlement that



GEORGE TURCZYNOWSKI
November 16, 2011

1    is Exhibit 5, are you aware of any changes that were

2    negotiated by the parties as it relates to the

3    eligibility or duration of retiree health care

4    benefits?

5        A    In this 1989 agreement?

6        Q    Yes.

7        MR. BURCHFIELD:   Object to form and foundation.

8        A    My only recollection related to retiree

9    benefits was a provision in the agreements that

10   stated that the company reserved the right to change,

11   amend, suspend, terminate programs at any time

12   subject to whatever collective bargaining provisions

13   there were in place.

14   BY MR. RADTKE:

15       Q    And what agreement was that statement that

16   you just referenced?

17       A    There, I believe, were health insurance

18   agreements that dated back to 1989, 1992 where that

19   particular language -- again, if my memory is

20   correct -- was included in those documents.

21       Q    Do you know whether that type of language is

22   included in agreements prior to 1989?

23       A    I do not.

24       Q    You do not know?

25       A    I do not know.  I do not recall.



GEORGE TURCZYNOWSKI
November 16, 2011

1    Q  Do you know whether the language that you're

2 referencing was negotiated at the table with the

3 union?

4    MR. BURCHFIELD:  Object to form and foundation.

5    A  I have to assume that it was, but I cannot be

6 certain.

7 BY MR. RADTKE:

8    Q  You weren't there in the 1989 negotiations?

9    A  That is correct.

10    Q  If the parties negotiated an item at the

11 table, would you agree that BorgWarner's --

12 BorgWarner Automotive, meaning its corporate office,

13 did not have the right or authority to change the

14 tentative agreements that were reached by the parties

15 at the table?

16    MR. BURCHFIELD:  I'm sorry.  Could you read that

17 back?

18          (From the record above, the reporter read

19          the following:

20           "Q  If the parties negotiated an

21          item at the table, would you agree that

22          BorgWarner's -- BorgWarner Automotive,

23          meaning its corporate office, did not have

24          the right or authority to change the

25          tentative agreements that were reached by



GEORGE TURCZYNOWSKI
November 16, 2011

Page 50

1              the parties at the table?")

2      MR. BURCHFIELD:  Object.  Foundation.  I think

3   that calls for a legal conclusion.

4      A   I can't say one way or another.

5   BY MR. RADTKE:

6      Q   Well, if the parties reached an agreement,

7   for example, that prescription drug deductibles will

8   be seven dollars at the table in BorgWarner in

9   Muncie, if that item came to you in Chicago, could

10  you say, no, we're going to make it ten dollars?

11     A   I couldn't do that.  I didn't have the

12  authority to do anything like that.

13     Q   Did anyone at BorgWarner corporate have the

14  authority to override what tentative agreements were

15  reached at the bargaining table?

16     A   I don't know.

17             (Exhibit 54 marked as requested.)

18  BY MR. RADTKE:

19     Q   Mr. Turczynowsky, have you ever seen the

20  document that's been marked as Exhibit 54, which is a

21  document dated December 8, 1989?

22     A   I believe so.

23     Q   Your name is there.

24     A   Yes.

25     Q   Do you know who Mr. Burghgraef was?



GEORGE TURCZYNOWSKI
November 16, 2011

1      A    Yes.  He was one of my colleagues.  He

2   reported to me.

3      Q    He worked in headquarters?

4      A    He did.

5      Q    What was this document?

6      A    This is, in fact, the document that I

7   referred to earlier, which gave direct and explicit

8   instructions to our third-party administrators as to

9   the exact nature of the programs that they, the

10  administrators, had to include in their systems for

11  proper administration and adjudication of prospective

12  claims.

13      MR. RADTKE:  Do you mind if we take a few minutes

14  here?

15      MR. BURCHFIELD:  Absolutely.  Let's take a break.

16          (Recess was taken.)

17   BY MR. RADTKE:

18      Q    Mr. Turczynowsky, what's a summary plan

19   description?

20      A    Typically it was a booklet or a pamphlet that

21   was produced to summarize the level of benefits for

22   employees, retirees.

23      Q    In your experience was that a document that

24   was bargained with the union?

25      MR. BURCHFIELD:  Object to form and foundation.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 52

1      A    It typically reflected what the union had

2      agreed to in collective bargaining.

3      BY MR. RADTKE:

4      Q    But it was different than a collective

5      bargaining agreement?

6      A    A summary plan description was not a legal

7      document per se.  It was a summary only and expressed

8      usually in layman's terms that they could understand

9      without all of the legalese that was typically in a

10     bargaining or a health insurance agreement.

11     Q    In your experience could a summary plan

12     description take away something that was bargained in

13     a collective bargaining agreement?

14     MR. BURCHFIELD:  Object.  Foundation.  It calls

15     for a legal conclusion.

16     A    To the best of my knowledge, no.

17     BY MR. RADTKE:

18     Q    I'm going to hand you a document that's

19     previously been marked as Exhibit 7.  It's the

20     October 27, 1989, health insurance booklet.

21         Have you ever seen this document before?

22     A    Yes.

23     Q    What is this document?

24     A    It is the comprehensive document that

25     reflects all of the provisions of the benefit



$\mathcal{B}$IENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1    programs as parties -- both parties agreed that was

2    negotiated.  It includes the operation of the plan,

3    terms and provisions, as well as the level of

4    benefits.

5        Q    I'm sorry.  Go ahead.

6        A    Just one other point, which is important.  I

7    notice in the back here it says summary description.

8    It then provides for the legal requirement

9    information related to the operation of the plant.

10       MR. BURCHFIELD:  He's on the page with the last

11   three Bates numbers 251.

12       MR. RADTKE:  Okay.

13       THE WITNESS:  And these are legally required

14   provisions that have to be included for the benefit

15   of the employees so that they will understand what

16   their rights and entitlements are across the whole

17   spectrum of not only plant operation but also the

18   process by which they can appeal claims and what

19   their entitlements are under ERISA.

20   BY MR. RADTKE:

21       Q    This document is produced -- I'm sorry.  Let

22   me re-ask that question.

23            You've been referring to the portion of

24   Exhibit 7 that begins on Page 120 where it says

25   summary description information, plan administration,



GEORGE TURCZYNOWSKI
November 16, 2011

 1    correct?

 2         A    Page 120, that is correct.

 3         Q    This is a document -- Page 120, 121,

 4    et cetera, through the end of the summary description

 5    information, this was a document that was produced

 6    and written by BorgWarner, correct?

 7         A    This was a document that was produced by DTP

 8    Muncie and reviewed by BorgWarner.

 9         Q    Okay.  And you do not -- I think you

10    testified you're not sure whether this was negotiated

11    with the union at the table?

12         A    I'm sorry.  What was?

13         Q    Whether this portion, which is the summary

14    description information, do you know whether it was

15    negotiated with the union?

16         A    I'm not sure I understand your question.  It

17    has to reflect what all parties have agreed to,

18    number one; and number two, it has to also reflect,

19    this section beginning 120, what the legal

20    requirements are relative to plan operation such as

21    who the administrator of the plan is, who they can

22    contact with respect to appealing a claim; if there

23    is a dispute, how that dispute is to be resolved.

24    These are legal portions that are required to be

25    included in every document that is made available to



GEORGE TURCZYNOWSKI
November 16, 2011

Page 55

1      employees.

2          Q    You referenced reservation of rights type

3      language previously before I showed you this

4      document.

5              Do you recall that?

6          A    I do.

7          Q    Is that language in this health insurance

8      agreement that I've handed you that's been marked as

9      Exhibit 7?

10         A    Page 121.

11         Q    What are you referring to on Page 121?

12         A    Future of the plan.

13         Q    I believe you referred to the first paragraph

14     as to the reservation of right to modify, amend,

15     suspend, or terminate?

16         A    Yes.

17         Q    Then in the second paragraph it says that --

18     it references the collectively bargained health

19     insurance agreement, correct, where it says,

20     Additional information regarding termination of

21     insurance policies and individual insurance coverage

22     is provided in the health insurance agreement.

23         A    Are you talking about the second paragraph

24     that begins with "An individual's insurance coverage

25     terminates" --



GEORGE TURCZYNOWSKI
November 16, 2011

Page 56

1      Q    Correct.

2      A    Yes.

3      Q    So it also says -- above that it says the

4    plan is maintained pursuant to a collective

5    bargaining agreement, correct?

6      A    I see that.

7      Q    So according to the summary plan description,

8    insurance coverage -- additional insurance

9    information regarding termination of insurance

10   policies and insurance coverage is provided in the

11   health insurance agreement.  So the individual who

12   received this should look to the health insurance

13   agreement to determine whether they were eligible for

14   coverage and when that coverage would terminate,

15   correct?

16     MR. BURCHFIELD:  Object to form and foundation.

17     A    That's what the document says.

18   BY MR. RADTKE:

19     Q    It looks like this document was -- the final

20   draft was dated November 15, 1991, and then it was

21   signed in 1992.  Look at Page 16.

22     A    I see it.

23     Q    You did not sign this document, correct?

24     A    I did not.

25     Q    Do you know who this document was prepared



GEORGE TURCZYNOWSKI
November 16, 2011

1    by, the health insurance booklet?

2        A    It would have been prepared by the DTP

3    management people -- that is a draft -- then

4    distributed to the union for their review, submitted

5    to us for our review, and we would then make changes

6    or incorporate language or suggestions and the union

7    would do the same, and ultimately the result is this

8    particular document.

9        Q    And then after all of that is worked out

10   then, at least in 1992, the document was signed by

11   the parties as it related to what was agreed to in

12   1989, correct?

13       A    Yes.  That's the case here.

14       Q    What was your understanding of the duration

15   of retiree health care benefits for hourly employees?

16       MR. BURCHFIELD:  Object to form.

17       A    Which hourly employees are we -- what time

18   frame are we talking about?

19   BY MR. RADTKE:

20       Q    The employees who retired, let's say, between

21   1989 and 1992.

22       A    What was the duration, my understanding of

23   it?  That it is subject to change and modification

24   and termination, et cetera, consistent with the

25   language that we see in this document that was signed



GEORGE TURCZYNOWSKI
November 16, 2011

Page 58

1    off by the union.

2        Q    Would those changes that you believe were

3    available have to be negotiated with the union?

4        MR. BURCHFIELD:  Object to form and foundation.

5        A    I think that's an open issue that I don't

6    want to address because I'm not certain.

7    BY MR. RADTKE:

8        Q    Was it your understanding that retirees who

9    retired before the 1989 contract also could have

10   their benefits changed?

11       MR. BURCHFIELD:  Object to form and foundation.

12       A    That level of detail I do not recall.

13   BY MR. RADTKE:

14       Q    I'm going to hand you what's been marked as

15   Exhibit 8.  That one is a previously marked exhibit.

16   You don't have to give it to the court reporter.

17            Have you ever seen this document before?

18       A    Yes.

19       Q    This document that I'm referring to has been

20   marked previously as Exhibit 8.  It's dated

21   October 27, 1989.

22            It's a Retirement Income Program Guide

23   Booklet, correct?

24       A    Yes.

25       Q    And when did you see this document, during



GEORGE TURCZYNOWSKI
November 16, 2011

Page 59

1      your employment at BorgWarner?

2          A    Yes.

3          Q    At some point pensions became under your

4      authority, correct?

5          A    Yes.

6          Q    And this guide booklet, this is a document

7      that's negotiated between the union and the company?

8          A    Yes.

9          Q    And Muncie, correct?

10         A    Yes.

11         Q    What's the purpose of the guide booklet?

12         A    It reflects the level of benefits and the

13     provisions and the terms and the operation of various

14     and sundry pension provisions for employees,

15     including the level of benefits.

16         Q    And it reflects the negotiated agreement that

17     was bargained by the parties, is that accurate?

18         A    Yes.

19         Q    Because the parties bargained pension

20     benefits and eligibility, correct?

21         A    Yes.

22         Q    Could you look at Page 17 of this document

23     under Highlights?  Do you see where it says Group

24     Insurance at Retirement, that provision?

25         A    Yes.



GEORGE TURCZYNOWSKI
November 16, 2011

1        Q    Who would have put together the highlights
2    that are part of Exhibit 8?
3        A    Typically it would have been a draft of
4    either an existing document or a new document done,
5    again, locally by the management at DTP Muncie.
6        Q    Would the Retirement Income Program Guide
7    Booklet be provided to employees and retirees?
8        A    My understanding was that these documents
9    were made available to employees and retirees.
10       Q    Were you aware that the group insurance
11   reference was in the pension plan?
12       A    I see it.
13            (Exhibit 55 marked as requested.)
14   BY MR. RADTKE:
15       Q    Mr. Turczynowsky, you've been handed a
16   document that's been marked as Exhibit 55.  It's a
17   fax and then an attachment to the fax.  It looks like
18   it was faxed in February of 1989 from Mr. Nuerge to
19   yourself.
20            Who is Mr. Nuerge?
21       A    He was the manager -- benefits manager at the
22   Muncie plant.
23       Q    Have you ever seen this document before?
24       A    I'm sure I did.
25       Q    You don't remember what fax you received 21



GEORGE TURCZYNOWSKI
November 16, 2011

Page 61

1    or 22 years ago?

2         A    Not at all.

3         Q    Okay.  Have you ever seen booklets or

4    documents that are similar to what the attachment is

5    to the fax, I guess Pages 2 and 3 of this exhibit?

6         A    They do look somewhat familiar.

7         Q    Did you review these summaries?

8         A    I may not have personally reviewed these

9    summaries, but certainly someone in our area would

10   have reviewed these.

11        Q    And these summaries were given to employees

12   and retirees to describe their benefits as of

13   retirement?

14        A    That is my understanding, but I cannot be

15   certain because I was not present when such an

16   activity may have taken place.

17        Q    That took place at the Muncie plant?

18        A    Yes.

19        Q    If you look at the third page where it

20   discusses health insurance with survivor option, it

21   says, If a survivor option is elected and your spouse

22   becomes eligible to receive a survivor benefit,

23   health insurance is in effect for the rest of the

24   spouse's lifetime as long as he or she does not

25   marry.  The company pays the premium.  In the case of



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 62

1    remarriage, health insurance is canceled.

2            Is that your understanding of the duration

3    of retiree health care benefits for a surviving

4    spouse of retiree?

5        MR. BURCHFIELD:  Object to form and foundation.

6        A    I don't know.

7            I think this document has been superseded.

8            (Exhibit 56 marked as requested.)

9    BY MR. RADTKE:

10       Q    I'm going -- you've been handed a document

11   that's been marked as Exhibit 56, and the cover page

12   shows that it was an exhibit in a case involving

13   BorgWarner Transmission Products and the UAW.

14   Underneath that is -- the first page is a March 24,

15   1987, letter from Bill Studlow to Dick Nuerge.

16           Do you know who Mr. Studlow is?

17       A    He was another one of my colleagues in the

18   department.

19       Q    So he worked at BorgWarner headquarters?

20       A    He did.

21       Q    Along with Marty Burghgraef?

22       A    That's correct.

23       Q    He was copied on this letter, correct?

24       A    Yes.

25       Q    And then attached to that letter is a draft



GEORGE TURCZYNOWSKI
November 16, 2011

1    of an insurance booklet for hourly retirees prior to

2    October 1, 1986.  I'm reading that off the letter

3    that Mr. Studlow wrote Mr. Nuerge.

4        A    Okay.  I see it.

5        Q    Have you ever seen the attached document

6    before?

7        A    I cannot say for certainty.

8        Q    You'll notice when you were paging through

9    this that there was handwriting throughout this

10   document.

11           Do you recognize any of the handwriting

12   that's contained in this document?

13       A    I believe it was Mr. Studlow's handwriting.

14       Q    Thank you.  You've been handed --

15       A    May I just --

16       Q    Yes.

17       A    -- go back to an exhibit that you had

18   previously provided, which was Number 55?

19       Q    Okay.

20       A    And I made the comment that I think this

21   particular document was superseded.  We noted that,

22   correct?

23       Q    We did note that.

24       A    Thank you.

25       Q    Here is a document that's been marked



GEORGE TURCZYNOWSKI
November 16, 2011

1    Exhibit 9.

2            Have you ever seen that document before?

3        A   I don't think so.

4        Q   You don't know whether the document that was

5    marked as Exhibit 9, the one that you're holding in

6    your hand, is what superseded Exhibit 55?

7        A   No, I don't.

8        Q   If you look at the last page, the very last

9    page, it says -- you got my copy, so it's

10   highlighted -- you will see it says 1-90.

11       A   I see it.

12       Q   Do you know whether that would indicate that

13   this document was produced in January of 1990?

14       A   I do not.

15       Q   I'll show you another one.  This document has

16   been marked as Exhibit 22.

17           Have you ever seen this document?

18       A   I don't recall it.

19       Q   You will notice that this document again on

20   the last page has a 5-95 in the little tiny lettering

21   on the bottom.

22       A   I see it.

23       Q   And that it also refers to under prescription

24   drugs for persons -- and that's on the last page --

25   for persons retiring on or after June 1, 1995, the



GEORGE TURCZYNOWSKI
November 16, 2011

1    drug deductible will be nine dollars for brand and

2    five dollars for generic, et cetera.

3          Does that refresh your recollection that

4    this could have been a document that was available in

5    1995, 1996?

6       A   Yes.

7       Q   Thank you.

8          You said that with respect to Exhibit 55

9    there was a revision of Exhibit 55.

10      A   I didn't say revision.  I said superseded.

11      Q   I'm sorry.  I wasn't trying to misspeak.

12         Exhibit 55 was at some point superseded by a

13   different document, is that accurate?

14      A   I believe so.  I don't recall seeing these

15   types of documents with any degree of certainty or

16   detail.  But I do know that certain provisions that

17   appear in this document were included in the health

18   insurance agreement that we had looked at earlier

19   with respect to -- we have -- the company has the

20   right, subject to all the provisions of the

21   bargaining agreement, et cetera, to modify, change,

22   and/or terminate the plans.

23      Q   Okay.  Do you know when those documents were

24   created?

25      A   Well, they were the ones that you had shown



GEORGE TURCZYNOWSKI
November 16, 2011

Page 66

1    me.

2         Q    No.

3         A    These here?

4         Q    Yeah.

5         A    I have no idea.  I have no idea.  They appear

6    to me to be very dated.  But I can't speak to the

7    date.  The language there from what I can see

8    suggests that it's too open-ended in many areas and

9    that we probably would not have retained that kind of

10   an approach.  I could be wrong.  I could be wrong.

11        Q    When you say too open-ended, what do you mean

12   by that?

13        A    Open-ended in the sense that it doesn't

14   provide for any disclaimers.  I don't see anything

15   here, although it does talk about refer to the

16   booklet for details.  I think there should have been

17   more specificity as to what booklet we're talking

18   about.  And, in fact, the legal document would always

19   govern as opposed to a summary written in layman's

20   terms that may have been handed out.

21        Q    But certainly that document, if that document

22   was distributed to employees or retirees, reflects

23   the company's understanding of what the benefits were

24   for the retirees, correct?

25        A    What I'm suggesting, there is language here



GEORGE TURCZYNOWSKI
November 16, 2011

Page 67

1    that probably should have been more stringent as far

2    as what governs as opposed to a handout that may have

3    been presented to someone.

4        Q   I understand, but going back to my question,

5    the company wouldn't hand out something that they

6    knew was false, right?

7        MR. BURCHFIELD:  Object to form.

8        A   Or perhaps they didn't know any better.

9    BY MR. RADTKE:

10       Q   Well, the company -- that was handed out by

11   BorgWarner DTP's pension department, correct?

12       A   I assume so.

13       Q   So that was their job to know what the

14   benefits were that retirees were going to get, right?

15       MR. BURCHFIELD:  Object to form, argumentative.

16       A   There was a level of sophistication that

17   probably, while well-intentioned, may not always have

18   been the correct approach locally.  In other words,

19   they were well-intentioned, but they didn't have the

20   legal expertise or other explicit details that should

21   have been included in some of these documents.  And,

22   again, they appear to be somewhat dated to me.  In

23   other words, they were sent on such and such a date,

24   but who knows how far back these things actually

25   went.  And the major provision should have been in



GEORGE TURCZYNOWSKI
November 16, 2011

1    there that the actual plan document will govern in

2    all situations where there was a dispute or if a

3    dispute arises.  And that language is not in here.

4    I'm sorry.  That was my only point that I was trying

5    to make.

6    BY MR. RADTKE:

7        Q    That's fine.  I'm going to hand you a

8    document that's been marked previously as Exhibit 11.

9    It's an Agreement on Modification and Extension of

10   Labor Contract, Existing Labor Contract.

11            Have you ever seen that document before?

12       A    I have.

13       Q    Do you recollect that the parties reached

14   this agreement in 1990 to extend the labor contract,

15   the health insurance agreement, the retirement income

16   program, et cetera, to 1995?

17       A    I see that.

18       Q    Do you remember that at all?

19       A    Not to that detail.

20       Q    Okay.  Do you remember that the parties were

21   going to attempt to discuss and reach agreement as it

22   related to health care cost and post-retirement

23   benefits, among other items, in 1990?

24       A    I do.

25       Q    And do you recall that there were various



GEORGE TURCZYNOWSKI
November 16, 2011

Page 69

1     committees that were formed to discuss these issues?

2         A   I do.

3         Q   Were you on any of those committees?

4         A   No.

5         Q   If you look at Exhibit 3, it's a joint letter

6     of agreement on post-retirement benefit liabilities.

7             Do you see that?

8         A   I see it.

9         Q   Now, have you ever seen another version of

10    Exhibit 3, which contained a different Paragraph 6?

11        MR. BURCHFIELD:  Paragraph 6 is the last

12    paragraph on the page?

13        MR. RADTKE:  Yeah.

14        A   I don't recall.

15    BY MR. RADTKE:

16        Q   Mr. Trenda testified in another lawsuit

17    between BorgWarner -- in that case it was against the

18    UAW -- and he recalled that Exhibit 3 -- there was a

19    prior version of Exhibit 3 in which the last

20    paragraph said that the company acknowledges and

21    agrees that post-retirement benefits are guaranteed

22    for the lifetime of the retiree.

23            Do you recall seeing a version of Exhibit 3

24    with that language?

25        MR. BURCHFIELD:  Do you have his testimony there



GEORGE TURCZYNOWSKI
November 16, 2011

Page 70

1      that I could look at?

2          MR. RADTKE:  Yeah.

3          MR. BURCHFIELD:  Thanks.  Object to the form of

4      the question and foundation.

5          A   I do not recall that.

6          MR. RADTKE:  Okay.

7          MR. BURCHFIELD:  Thanks.

8      BY MR. RADTKE:

9          Q   Mr. Trenda testified that Paragraph 6 was

10     rejected by BorgWarner corporate headquarters and

11     that he drafted the Paragraph 6 that appears at the

12     bottom of Exhibit 3 of -- that is Exhibit 11.

13             Does that refresh your recollection at all?

14         A   Mr. Trenda rewrote Paragraph 6?

15         Q   That's what he testified to.

16         A   I can't speak to his testimony, and I don't

17     recall ever seeing something other than this

18     particular language in any of the documents.

19         Q   Okay.  You understood, though, as of 1990

20     that the union's position was that current retirees

21     have lifetime vested benefits, correct?

22         A   That was the union's contention.  That was

23     not my contention.

24         Q   Otherwise we wouldn't be here, I think.

25         MR. BURCHFIELD:  Well, you never know.  I'm sure



GEORGE TURCZYNOWSKI
November 16, 2011

Page 71

1    we would find something to argue about.

2        MR. RADTKE:   You may not be involved in that.

3    BY MR. RADTKE:

4        Q    I'm going to hand you what's been marked as

5    Exhibit 16.

6            Have you ever seen that document before?

7    That might have gotten misstapled.

8        A    This section?

9        Q    Exhibit 11, which is the same as this.

10       MR. BURCHFIELD:   It's misstapled.

11       MR. RADTKE:   It's stapled incorrectly.

12       MR. BURCHFIELD:   You can take it off.

13       MR. RADTKE:   Take it off.   Thank you.

14   BY MR. RADTKE:

15       Q    Have you ever seen that document before?

16       A    Not in its entirety.   There are certain

17   components here that I recognize with respect to the

18   financials that we probably provided relating to the

19   PRB calculations, the actual values of the

20   accumulated post-retirement benefit obligations, and

21   the projected levels in accordance with the Financial

22   Accounting Standards Board.

23       Q    What about the part that is UAW 735 where it

24   talks about Health Improvement Plan?   You'll see at

25   the bottom.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 72

1      A    Health Security Plan, is that the one you're

2    referring to?

3      Q    Health Improvement Plan.

4      A    733?

5      Q    We can start there.  You're right.  Let's

6    start with Health Security Plan.

7           Do you have any recollection of seeing this

8    before?

9      A    No, no, no.

10     Q    You'll notice --

11     A    Hell no.

12     Q    Why are you upset about this?

13     A    No particular reason.

14     Q    You will notice that the characteristics of

15   the Health Security Plan would be that the current

16   retirees would be grandfathered under benefits they

17   retired with?

18     A    I see that.

19     Q    And that current employees who retire before

20   2003 are grandfathered under the benefits that they

21   retired with?

22     A    I see that.

23     Q    What is a Health Security Plan?

24     A    It was something that I think was probably

25   concocted locally as a reference to what they were



GEORGE TURCZYNOWSKI
November 16, 2011

Page 73

1     trying to accomplish.

2         Q    Okay.  You will notice under -- if you go to

3     735, there is -- this is titled Health Improvement

4     Plan.

5             Were you involved in any way with respect to

6     this document, this page?

7         A    No.

8         Q    And again --

9         A    No, no.

10        Q    Okay.  You'll notice that this also

11    references employees and current retirees as being

12    grandfathered?

13        A    I do.  I should point out that these look

14    like and they are titled proposals.

15        Q    I understand that.  There is all kinds of

16    words in there that we don't need to discuss.

17        A    Okay.

18    MR. BURCHFIELD:  How are you doing?

19    THE WITNESS:  Great.

20    MR. BURCHFIELD:  Do you need a break or anything?

21    MR. RADTKE:  I'm happy to -- I mean, if you want

22    to take a break, that's fine.

23    THE WITNESS:  What time do we have?

24    MR. BURCHFIELD:  It's a little after -- it's

25    about ten after noon, and my -- I don't know if this


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 74

1    has to be on the record or not, but it can be.  We

2    could go for another 45 minutes or an hour or so.

3         MR. RADTKE:  Why don't we go off the record.

4              (Recess was taken.)

5    BY MR. RADTKE:

6         Q    I'm going to hand you what's been marked as

7    Exhibit 18, previously marked as Exhibit 18.

8              Have you ever seen this document?

9         A    I have.

10        Q    You were involved in the 1992 negotiations,

11   correct?

12        A    I was.

13        Q    And this document is the agreements that were

14   reached in 1992 as they related to health insurance

15   and ancillary matters, is that accurate?

16        MR. BURCHFIELD:  Object to form.

17        A    It appears so.

18   BY MR. RADTKE:

19        Q    Okay.  This agreement actually was negotiated

20   in 1992 even though the parties had extended the '89

21   agreement to '95, correct?

22        A    I think that's correct.

23        Q    And this agreement was in some respects to go

24   through 1998 or expire in 1998, correct?

25        A    March -- excuse me -- January 1, '93, through



1     March 11, 1998.  And this agreement superseded the

2     previous agreement and the '89 bargaining agreement

3     and health insurance agreement.

4          Q    With respect to health insurance before 1992,

5     were there any changes in their retiree health care

6     benefits as a result of this agreement?

7          A    I don't think so.

8          Q    There was a new PPO plan that was negotiated

9     for active employees and future retirees in the 1992

10    negotiations, correct?

11         MR. BURCHFIELD:  Object to form.

12         A    For active employees and certain pre-Medicare

13    retirees.

14    BY MR. RADTKE:

15         Q    Was that past pre-Medicare retirees as well

16    or just future retirees, if you remember?

17         A    According to the document, it was the future

18    retirees.

19         Q    And how was the PPO that was negotiated

20    different than the managed care that was in place and

21    that you described previously?

22         A    The PPO provided for contracted rates; that

23    is, primarily discounts by physicians, by the

24    hospital, by other medical providers, for the benefit

25    of the employees, so it favored the employee and



GEORGE TURCZYNOWSKI
November 16, 2011

Page 76

1    retiree as well as the company.  The managed care had

2    no such discount.  Managed care was strictly to allow

3    employees to seek or secure intervention, where

4    appropriate, with regard to the medical treatment

5    independent of the costs except for the managed

6    care -- I'm sorry -- the medical case management part

7    of the program where serious certain illnesses were

8    handled differently and provided guidance for trying

9    to treat those in the most cost-effective manner

10   possible.

11       Q   So the parties bargained a participating

12   provider organization which would give discounts to

13   employees and retirees for services?

14       A   Discounts and/or fixed fees.  It was a

15   financial arrangement.

16       Q   Would those fixed fees be able to be adjusted

17   later on?

18       A   My recollection was that certain hospital

19   fees were based on Medicare DRG rates, and to the

20   extent that Medicare DRG rates changed, that would

21   also allow the hospitals to adjust those rates for

22   the PPO plan.

23       Q   Is that sometimes referred to as usual and

24   customary?

25       A   No.  An important distinction to make, that



GEORGE TURCZYNOWSKI
November 16, 2011

Page 77

1    in the past everything was usual and customary.  The

2    employee buys, the company pays whatever the

3    prevailing fee was.  Under the contracted

4    arrangement, it's quite different in that it's not

5    whatever the provider wants the charge, it's a fixed

6    fee that the provider has to live by that is either a

7    discount or some other negotiated level of cost

8    associated with the delivery of that service.

9        Q    Okay.  The parties also negotiate -- I'm

10    looking at Page -- I'll refer -- because there is a

11    lot of different page numbers, I'll refer to the DTP

12    page number -- 437.

13        A    I have that page.

14        Q    And you will see that the parties negotiated

15    a prescription drug deductible schedule for active

16    employees and future retirees as well, correct?

17        A    Yes, I see that.

18        Q    And is that your recollection?

19        A    It is.

20        Q    So let me ask you a hypothetical question.

21    I'm a current employee and I retire in 1994 and I opt

22    into the PPO plan, okay.

23        A    Uh-huh.

24        Q    At the time of my retirement, my prescription

25    drug card deductibles would be four dollars and seven



GEORGE TURCZYNOWSKI
November 16, 2011

Page 78

1     dollars, correct?

2         A    And I retired 1/1/94?

3         Q    Right.

4         A    Yes.  I think that's correct.

5         Q    On January 1, 1995, what would my

6     prescription drug deductibles be?

7         A    Five and nine.

8         Q    So if you retired in January of 1994, the

9     parties negotiated how your deductibles would

10    increase over this period?

11        A    If memory serves me, the intent was that

12    these would increase for anyone who retired on or

13    after 1993, so if you retired in '94, you would get

14    that increase in 1995, so it was an escalator and not

15    a retirement date.

16        Q    Isn't it true that employees -- current

17    employees who were employed as of 1992 had an option

18    to stay in the managed care program until March

19    of 1995 or they could go into the PPO program?

20        A    I don't --

21    MR. BURCHFIELD:  Object to form.

22    THE WITNESS:  I don't remember that provision.  I

23    don't recall it.

24    BY MR. RADTKE:

25        Q    I'll ask you to look at DTP 440, Section K.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 79

1      A    I see it.

2      Q    Does that refresh your recollection?

3      A    Yes, it does.  Thank you.

4      Q    So if I was that retiree and I retire in

5   January of 1994, I could say I want to stay in the

6   1992 plan or I could say I want to go into the PPO

7   plan, and if I went into the PPO plan, there would be

8   an escalator on prescription drug costs, stop loss,

9   and deductibles for major medical, correct?

10     A    Yes.

11     Q    If I said no, I'm going to stay in the '92

12  plan, the prescription drug costs would not increase

13  and the other stop loss and deductibles would not

14  increase, correct?

15     MR. BURCHFIELD:  Object to form.

16     A    I can't speak to the -- to your statement.  I

17  just don't have that detail at my disposal.

18  BY MR. RADTKE:

19     Q    Okay.  We know that -- I'm sorry.

20          Current employees who retired after

21  March 11, 1995, would have the insurance plan in

22  effect at the time according to Paragraph K?

23     A    I see that.

24     Q    So at that point, if I retired after

25  March 11, 1995, I wouldn't have that option?



GEORGE TURCZYNOWSKI
November 16, 2011

Page 80

1      A    Yes.  That's my recollection, yes.

2      Q    If you look at DTP 443, there is a chart with

3   deductibles and stop loss that increase by five

4   percent, correct?

5      A    Yes.

6      Q    And that was bargained by the union and the

7   company about how the deductibles and the stop losses

8   would increase?

9      A    Yes.

10     Q    And it's accurate to say that the company and

11  the union bargained deductibles and stop loss beyond

12  the term of this agreement, correct?

13     A    As a minimum.

14     Q    What does that mean?

15     A    That if nothing ever changed, it would at a

16  minimum be these amounts.

17     Q    How would they ever change?

18     A    I believe Paragraph 5 on Page 1 would allow

19  both the company and the union to make adjustments in

20  subsequent years, and that is part of -- other

21  negotiation processes would permit both the company

22  and the union to do that, and that I think in

23  reality, if memory serves me, is what happened.

24     Q    Was that -- what the company and the union

25  could bargain later, was that related solely to the



GEORGE TURCZYNOWSKI
November 16, 2011

Page 81

1    stop loss and the deductible?

2        A    No, I believe it was the whole spectrum of

3    benefit programs and particularly health care.

4        Q    So is it your understanding that Paragraph 5

5    would allow the parties to negotiate changes in

6    retiree health care benefits in the future that would

7    affect past retirees who were in the PPO program?

8        A    Yes.

9        Q    Even beyond the term of the 1992 agreement?

10       A    Yes.

11       Q    Even beyond the term of the 2002 stop loss/

12   deductible?

13       A    Yes, I think so.  To the extent the

14   collective bargaining was permitted and the company

15   and the union desired to do that, it could never be

16   used, according to the language here, as a final

17   offer, but in fact it could be discussed and talked

18   about, and in reality it was in subsequent

19   negotiations.

20       Q    If you look at DTP 447, Exhibit C, this is a

21   health care program for employees who were hired

22   after December 31, 1992, correct?

23       A    Yes.

24       Q    So when you reached the agreement in 1992,

25   Exhibit 18, Exhibit C, Principles, did not affect



1     anyone who was currently employed as of that time,

2     correct?

3         A    It stated that it only impacted persons hired

4     after December 31, '92, except for those employees on

5     layoff status as identified in Exhibit A, correct.

6         Q    And could you explain what was negotiated as

7     set forth in Exhibit C?

8         MR. BURCHFIELD:  Could you reread that question,

9     please?

10                (From the record above, the reporter read

11                the following:

12                    "Q    And could you explain what was

13                negotiated as set forth in Exhibit C?")

14        MR. BURCHFIELD:  Object to form.

15        A    It was intended to provide a financial

16    vehicle for future hires to begin to accumulate funds

17    in an IRS-approved account so that employees can

18    accumulate monies with assistance from the company

19    with the contributions they make to accumulate monies

20    so that when they ultimately leave the company or

21    retire that those funds would be available to them to

22    be able to purchase insurances in the open market, or

23    to the extent that an insurance plan was made --

24    still available for purchase through BorgWarner, that

25    they would be able to access that particular plan.



GEORGE TURCZYNOWSKI
November 16, 2011

1    In general terms, that was the concept behind this.

2    It was the forerunner of what we now have, which are

3    retiree health accounts or health care spending

4    accounts.

5    BY MR. RADTKE:

6        Q    The program that was negotiated for future

7    employees was different than the program that was in

8    place for current employees and current retirees,

9    correct?

10       A    Very much different.  The union and the

11   company agreed that there would not be any company

12   paid or provided health care for those individuals

13   hired after 1/1 of 1993 but instead would make

14   available funds for those employees to purchase their

15   own insurances, not just upon retirement but upon

16   leaving the company.

17       Q    And the benefits under Exhibit C were vested,

18   correct?

19       A    That is correct.  It says vesting was five

20   years, that once an employee had five years of

21   continuous service, that whatever monies were

22   available in that account; that is, that -- the

23   employee monies were always vested.  It was the

24   company matching contribution that required five

25   years of vesting.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 84

1      Q    And is it true that the company's goal in the

2   1992 negotiations was to stop -- let me rephrase --

3   to reduce retiree health care benefit costs to the

4   company for future employees?

5      MR. BURCHFIELD:  Object to form.

6      A    It was the desire of the company to control

7   future costs related to post-retirement benefits.

8   BY MR. RADTKE:

9      Q    And you would agree that for future employees

10  Exhibit C was a reduction in the benefits that they

11  would be provided upon retirement?

12     A    I don't know -- I'm not sure I agree with

13  your statement.  You can't reduce something that is

14  not available.  It was not available for people hired

15  after 1/1/92, so it's not a reduction.  It was a

16  different form of accumulation of assets for those

17  new hires.

18     Q    With respect to people who were future hires,

19  if they lived to be a hundred, they would have

20  company paid retiree health care benefits, correct?

21     A    No.

22     Q    Okay.

23     A    They would have available to them a subsidy

24  by the company to continue to purchase their health

25  care benefits.  So whatever plan that they would



GEORGE TURCZYNOWSKI
November 16, 2011

1      choose at that time or whatever plan that they were

2      enrolled with the company would subsidize that on

3      their behalf.

4          Q    The company would pay the cost --

5          A    The cost, right, but not of the health plan.

6          Q    If you look at the bottom of Page 449, it

7      says, If a participant reaches 100 years of age and

8      the retiree health account has been depleted, the

9      company will pay the cost of the health plan for the

10     retiree only.

11         A    But remember that the retiree chose whatever

12     plan that they were participating in, so that could

13     have been a supplemental plan to Medicare, it could

14     have been a plan on the open market.  So we're not

15     saying that the company would provide the plan.  The

16     company would pay for the plan that the retiree was

17     enrolled in but for the retiree only.

18         Q    Going back to that stop loss/deductible chart

19     that we referenced early on.  It's on Page DTP 443.

20         A    Yes.

21         Q    So if I retired taking my same hypothetical

22     as before in January of 1994 and I opted into the PPO

23     plan, okay -- are you with me?

24         A    Yes.

25         Q    In 1999, my deductible would be $175.89 and



GEORGE TURCZYNOWSKI
November 16, 2011

Page 86

1      my stop loss would be $844.26?

2          A    Yes.

3          Q    Do you recollect any discussion during the

4      1992 negotiations where you were present where

5      Mr. Daffara stated to the union bargainers that

6      because the parties negotiated a 401(h) plan for

7      future employees that the company would no longer

8      argue that retiree health care benefits for past

9      retirees and current active employees were not

10     vested?

11         A    Please read that question back once more.

12              (From the record above, the reporter read

13              the following:

14                  "Q    Do you recollect any discussion

15              during the 1992 negotiations where you

16              were present where Mr. Daffara stated to

17              the union bargainers that because the

18              parties negotiated a 401(h) plan for

19              future employees that the company would no

20              longer argue that retiree health care

21              benefits for past retirees and current

22              active employees were not vested?")

23         THE WITNESS:  No.

24     BY MR. RADTKE:

25         Q    Do you remember any similar discussion in



GEORGE TURCZYNOWSKI
November 16, 2011

Page 87

1    1992 or 1995?

2         A    Not while I was ever present.

3         Q    Who's John Daffara?

4         A    He was the vice-president of human resources

5    at the DTP Muncie plant in 1992 through actually

6    1999 -- 1991 through 1995.  He was the lead

7    negotiator in the '92 and '95 negotiations.

8              (Exhibit 57 marked as requested.)

9    BY MR. RADTKE:

10        Q    Mr. Turczynowsky, you've been handed what's

11   been marked as Exhibit 57.  It's a one-page document

12   that is dated September 14, 1992.  It's to you.

13             Have you ever seen this document before?

14        A    There is some familiarity to this, yes.

15        Q    Do you know -- did you receive it in about

16   1992?

17        A    I don't recall.

18        Q    Do you know who wrote this document?

19        A    No.

20        Q    It says on the little -- on the bottom it

21   says JD92151.

22             Could that be John Daffara?

23        A    I don't know.

24        Q    Do you know what this document was

25   referencing?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

1    A    I don't know the complete context of this

2    document.  It looks like an excerpt of some sort from

3    somewhere, but I can't speak to it.

4    Q    You mentioned previously that there were

5    certain laid-off employees in 1992 during the

6    negotiations.  In Paragraph 3 it references the

7    laid-off employees.

8    A    Yes.

9    Q    Does that refresh your recollection?

10    A    I think that's consistent with the prior

11    document that said that new hires would be treated

12    differently except for certain laid off employees,

13    and I think that this is in reference to that.

14    Q    In the 1992 negotiations, were there two

15    pension plans that were available to hourly

16    employees?

17    A    No.

18    Q    Was there a defined benefit plan and a

19    defined contribution plan?

20    A    There was a defined benefit plan.

21    Subsequently a defined contribution plan was

22    negotiated.

23    Q    When was that negotiated?

24    A    I believe it began with the '92 negotiations.

25    Also known as a 401(k).



GEORGE TURCZYNOWSKI
November 16, 2011

Page 89

1      Q    And so in Paragraph 3 it says that laid-off

2    employees will have a choice of pension plans.

3            So would that be between the defined benefit

4    plan and the 401(k) plan?

5      A    I would agree with your interpretation of

6    that.

7      Q    Within the window period, was there a window

8    period to choose -- the employees had the ability to

9    choose between which one they wanted to go with?

10     A    Again, I don't know the specific details, but

11   it could have been a very short period of time once

12   they returned or recalled to work that they could

13   choose which plan they wanted to go into.

14     Q    And then the next statement or the next part

15   of this item says, they will be covered under the

16   company paid health care benefit plan.  And then

17   there is the Number 5 with an arrow that says,

18   Benefits are at the level at the time of retirement.

19     A    My recollection of that was to allow these

20   employees, number one, the choice of the defined

21   benefit plan or the defined contribution plan and

22   that they would also be given a choice, if they so

23   desired, to either continue in whatever

24   company-provided medical plan or health care plan was

25   available or to go into the 401(h) program, but that



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

1    was an option -- we knew that wasn't going to happen.

2    So they would be eligible to participate in whatever

3    company provided health care plan would be available

4    at the time that they retired.

5        Q    And the benefits would remain at that level

6    during the retirement?

7        A    No.   The benefits would be consistent with

8    what schedules were negotiated here, because,

9    remember, these are future retirees after 1/1/93, so

10   if they weren't retired, they would have fallen into

11   whatever category we have here that was negotiated as

12   part of the '92 program.

13       Q    So their benefit levels with respect to

14   prescription drugs and stop loss and deductible would

15   be at the time of their retirement?

16       A    Yes.

17       Q    I want to show you what's been marked as

18   Exhibit 19.   It's the 1992 health insurance

19   agreement.

20           Have you ever seen this document before?

21       A    Yes.

22       Q    Do you know whether this document was ever

23   signed?

24       A    I don't think it was, but I can't be certain.

25       Q    Okay.   Is it your recollection that the



1    company provided benefits in accordance with the

2    terms that were encompassed in the health insurance

3    agreement even though it wasn't -- even if it wasn't

4    signed?

5        A    Yes.

6        Q    Did you have any role in putting this

7    document together?

8        A    We assisted the people locally in getting

9    this thing updated, and we also had the legal

10    department at that time review this document for

11    accuracy related to current legal legislation

12    requirements.

13            (Exhibit 58 marked as requested.)

14    BY MR. RADTKE:

15        Q    You've been handed -- Mr. Turczynowsky,

16    you've been handed a document that's been marked as

17    Exhibit 58.  It's a June 24, 1993, memo from you to

18    Mr. Nuerge with an attachment -- actually, a number

19    of attachments.

20            Have you ever seen this document before?

21        A    It appears familiar.

22        Q    What is this document?

23        A    These documents attempt to capture on the

24    spreadsheets the key elements of the levels of

25    benefits for administration purposes with respect to



1    the various and sundry benefits that are being

2    provided to hourly employees and salary employees.

3        Q    If you look at the second page, there is a

4    reference to branches, Branch 65, Branch 66, Branch

5    70, Branch 71, for instance.

6        A    Yes.

7        Q    What does that mean?

8        A    Those were third-party administrator

9    notations, how they identified the various categories

10   of individuals and where they fall with respect to

11   their administrative process.  So, for example, an

12   active employee was a Branch 1; the retirees were

13   always deemed to be in the Branch 60 categories and

14   higher.  It was just intended to separate that while

15   they are part of the overall umbrella of the 15973

16   policy that there were different benefit provisions

17   within that policy depending on who these employees

18   or retirees were.

19       Q    So your benefits, if you're a retiree, were

20   different depending on when you retired?

21       A    In 1992, that's what this document reflects,

22   only in what was agreed to in 1992.

23       Q    What do you mean by that?

24       A    That's what was negotiated.  So this reflects

25   what happened with the 1992 negotiations, and it was



GEORGE TURCZYNOWSKI
November 16, 2011

1     a one-year window only.  So, in other words,

2     effective 1/1/93 through the end of the year, this

3     reflects the level of benefits for these individuals.

4     Effective 1/1/94, no doubt, you have a separate grid

5     that shows different levels of benefits for these

6     same categories of retirees and active employees,

7     both hourly and salaried.

8          Q    Okay.  This obviously is a draft in that

9     there is a number of corrections.

10         A    It is.  It's a clarification.  I'm sure you

11    have in your dockets there clean copies of the

12    ultimate grids.

13              (Exhibit 59 marked as requested.)

14    BY MR. RADTKE:

15         Q    You've been handed a document that's been

16    marked Exhibit 59.  It's a September 14, 1993,

17    memorandum from yourself to Mr. Nuerge regarding

18    health plans.  I apologize.  The attachment is not

19    attached to this document, but you reference an

20    attachment with different plan design matrixes.

21              What were you trying to convey to Mr. Nuerge

22    in this memo?

23         A    For the salaried retirees, over time there

24    were what we used to refer to as different

25    generations of retirees; in other words, the



GEORGE TURCZYNOWSKI
November 16, 2011

Page 94

1    branching.  And when changes were made, they were

2    always -- they were not always made with the idea

3    that everyone should be looking at virtually the same

4    plan of benefits, that these generations, as pointed

5    out under the salaried retiree group, created a

6    complexity that, number one, was extremely difficult

7    to administer, was inconsistent from an

8    administrative standpoint, also very costly.  So what

9    I was suggesting here for the salaried employees is

10   that you take all these plans where you might just

11   have incremental differences, consolidate them into

12   one, or at the second alternative, consolidate them

13   into two, just two plans for the retirees.

14       Q    Was your recommendation of consolidation of

15   plans for both hourly retirees and salary retirees?

16       A    (Nodding.)

17       Q    Just salary?

18       A    Salaried at this point.  September 14th,

19   1993.  I wish you had copies of the matrices and I

20   could definitively say -- well, I'm obviously saying

21   it in the plans that we're only talking about -- the

22   matrices are only talking about the salaried

23   retirees.  There is no reference here to hourly in

24   terms of the changes that I was suggesting.

25       Q    Were those changes ever carried out with



GEORGE TURCZYNOWSKI
November 16, 2011

1    respect to salaried retirees?

2        A    Yes.

3        Q    During your employment at BorgWarner, were

4    they ever carried out with respect to hourly?

5        A    What I've suggested here?

6        Q    Yes.

7        A    Not to my knowledge, not to my knowledge.

8    And I could only speak up to 2005.

9        Q    That's what I'm asking.  Only up to 2005.

10   I'm not asking you what happened after that.

11       A    Okay.

12       Q    But your recollection is up until 2005 there

13   were a number of different plans for hourly retirees

14   that -- their benefits depended on their date of

15   retirement?

16       A    Essentially that's a correct statement.

17       Q    And the company never consolidated them into

18   one or two benefit plans?

19       A    No, but -- but there were some consolidations

20   that took place for the hourly that the union agreed

21   to which were materially insignificant as far as any

22   benefit changes were concerned but only in the

23   interest of simplifying the administration and the

24   cost of that administration as well as the

25   understanding that retirees have of what their



GEORGE TURCZYNOWSKI
November 16, 2011

1    programs were.  To the best of my recollection, it

2    may have been one or two branches at most, but the

3    benefit levels themselves were not materially

4    impacted.

5        Q    Thank you.

6        A    Just to make the point that these

7    consolidations would have been for people who had

8    retired well before 1989, and if memory serves me,

9    probably before 1986.

10       Q    With respect to the salaried?

11       A    The hourly.  Those two -- but these here

12   would have covered all salaried employees regardless

13   of when they retired.

14       Q    When you were speaking about what the union

15   agreed to where there was some administrative changes

16   and whatever else you said, that was related to

17   retirees who retire before 1989?

18       A    I believe that was correct, yes.  At that

19   time that was the 1989 issue.

20   MR. RADTKE:  Can we go off the record for a

21   second?

22            (Recess was taken.)

23   BY MR. RADTKE:

24       Q    Before we broke for lunch, Mr. Turczynowsky,

25   you were talking about -- or I showed you a document



GEORGE TORCZYNOWSKI
November 16, 2011

1    about combining the salaried retiree health care plan

2    into two plans or one plan, correct?

3        A    Yes.

4        Q    Did you ever make a proposal to the union

5    about combining all of the different retiree health

6    care plans into a single plan?

7        A    Not that I recall.

8        Q    Do you recall anyone from BorgWarner's

9    management team making such a proposal to the union?

10       A    Not that I'm aware of.

11       Q    You've been handed a document that's been

12    marked as Exhibit 24.

13            Have you ever seen that document before?

14       A    Yes.

15       Q    Is this the Retirement Income Program Guide

16    Booklet from 1995?

17       A    Yes.

18       Q    You got to answer yes or no.

19       A    Yes, that's what this states.

20       Q    And this is the document that was created

21    after contract negotiations in 1995?

22       A    Yes.

23       Q    Do you know whether this document was ever

24    signed?

25       A    I do not.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 98

1      Q    There were contract negotiations in 1995?

2      A    Yes.

3      Q    And you were a participant in those contract

4      negotiations, is that accurate?

5      MR. BURCHFIELD:   Object to form.

6      A    Limited participation.

7      BY MR. RADTKE:

8      Q    And did the parties reach a new health

9      insurance agreement in 1995?

10     A    As I recall, yes.

11     Q    I'm going to show you what's been marked as

12     Exhibit 23.

13         Is that the document that was drafted as a

14     result of those contract negotiations?

15     A    I believe that's correct.

16     Q    Did you have any role in drafting that

17     exhibit that I just handed you?

18     A    We would have had a review role of whatever

19     draft was put together locally.

20     Q    Do you recall whether that document was ever

21     signed by the parties?

22     A    No, I do not.

23     Q    Do you know whether the company lived up to

24     the -- provided the benefits that are encompassed in

25     this exhibit?



GEORGE TURCZYNOWSKI
November 16, 2011

Page 99

1       A   Yes, I believe they did.

2                (Exhibit 60 marked as requested.)

3    BY MR. RADTKE:

4       Q   You've been handed a document that's been

5    marked as Exhibit 60.  It's a December 5, 1996, memo

6    from Mr. Nuerge to yourself.  Have you ever seen --

7    and there is attachments to that memorandum.

8                Have you ever seen those documents before?

9       A   I had seen this.

10      Q   If you look at the page that's marked

11   DTP 010524.

12               Do you see that page?

13      A   I do.

14      Q   And you will notice that there are different

15   deductibles and stop loss and prescription drug

16   deductibles for retirees based on their date of

17   retirement, is that accurate?

18      A   I see that, yes.

19      Q   So even as of 1997 the company continued to

20   provide benefits in line with what was negotiated

21   back in the 1980s and early 1990s, correct?

22      MR. BURCHFIELD:  Object to form and foundation.

23      A   It appears so.

24   BY MR. RADTKE:

25      Q   And if you look at the next two pages, there



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

1    are I believe what you referred to as a matrix, which

2    set forth different insurance features for different

3    active employees and retirees.

4        A    Yes.

5        Q    And the retiree insurance features vary based

6    on the date of your retirement and/or which plan you

7    operate, is that accurate?

8        A    Yes.

9        Q    Were you involved in the production of these

10   matrixes?

11       A    No.

12       Q    Who produced the matrixes?

13       A    That was done locally in Muncie.

14       Q    I'm going to hand you a document that's been

15   marked as Exhibit 25.  It's a March 23, 1998,

16   memorandum from Mr. Nuerge to yourself with the 1998

17   changes to the group insurance program and pensions.

18           Have you ever seen this document before?

19       A    I've seen this before.

20       Q    And you are a participant in the 1998

21   contract negotiations, is that correct?

22       A    I was.

23       Q    And is it your recollection that with respect

24   to health care benefits that there were some

25   modifications for retiree health care benefits that



GEORGE TURCZYNOWSKI
November 16, 2011

1    were improvements and that they're set forth on

2    Page 3?

3        MR. BURCHFIELD:   Object to form.

4        A    Please clarify for me what you're

5    specifically referring to on Page 3.

6    BY MR. RADTKE:

7        Q    It says for active employees, retirees, and

8    eligible survivors, and it says modifications to

9    improve the prescription plan.   And then underneath

10   that it says mental health and substance abuse for

11   hourly actives, retirees, and eligible survivors,

12   which increase the number of visits that the plan

13   provided for.

14       A    I see that, yes.

15       Q    Do you recall -- I'll withdraw that question.

16          If you look at DTP 22002, I guess it's the

17   last page of this document.   I'm sorry.   I got the

18   wrong one I'm referring to.   I'm referring to a

19   different copy.   I apologize.

20          I'm going to show you what's been marked as

21   Exhibit 27.

22          Have you ever seen this document before?

23       A    I have seen this document before.

24       Q    Okay.   Do you know who put this document

25   together?



GEORGE TURCZYNOWSKI
November 16, 2011

Page 102

1      A    The local Muncie management team.

2      Q    Do you remember if the front cover of this

3  was an orange document, had an orange cover?

4      A    I do not.

5      Q    If you'll turn to the second page, there is a

6  disclaimer notice.

7           Do you know who drafted the disclaimer

8  notice?

9      A    I do not.

10     Q    Have you ever seen that before today?

11     A    I don't recall.

12     Q    Do you recall whether the words in this

13  disclaimer notice were negotiated across the table in

14  1998 while you were present in negotiation?

15     A    No, I don't.

16     Q    In this disclaimer notice in the second

17  paragraph it says, The company and the union may

18  through the process of negotiations modify, amend,

19  suspend, or terminate these plans in whole or in

20  part.

21           Is that your understanding of how the plans

22  could be modified, amended, suspended, or terminated?

23     MR. BURCHFIELD:  Object to form and foundation.

24     A    I think that's one way of doing it.

25



GEORGE TURCZYNOWSKI
November 16, 2011

Page 103

```
 1    BY MR. RADTKE:
 2        Q    What's another one?
 3        A    I'm not sure and I don't want to speculate.
 4        Q    Okay.  Do you know whether the company
 5    distributed this document to anyone?
 6        A    I don't recall specifically that they did or
 7    did not.
 8        Q    If you look at Page 13 -- it begins on
 9    Page 13 and it continues through Page 15, the Hourly
10    Retiree Health Insurance Outline for 1998 Insurance
11    Review.
12        A    I see the heading.
13        Q    And then you will see that there is, again --
14    it's set forth on Page 14 and 15 -- that there were
15    different deductibles, stop loss and prescription
16    plan deductibles for retirees that were based on the
17    date of retirement, correct?
18        A    Yes.
19        Q    So even if you retired under the 1989 health
20    insurance agreement as of 1998, your stop loss, your
21    prescription drug deductible, and your deductible
22    remain the same, correct?
23        A    That's what this document states.
24        MR. BURCHFIELD:  Could you read that question
25    again?
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 104

```
 1                   (From the record above, the reporter read
 2                   the following:
 3                      "Q   So even if you retired under the
 4                   1989 health insurance agreement as of
 5                   1998, your stop loss, your prescription
 6                   drug deductible, and your deductible
 7                   remain the same, correct?")
 8          MR. BURCHFIELD:   Thank you.
 9                   (Exhibit 61 marked as requested.)
10   BY MR. RADTKE:
11       Q   You've been handed a document that's been
12   marked as Exhibit 61, and it's an e-mail from
13   Mr. Nuerge, it looks like, to yourself, among others,
14   regarding the draft of the 1998 hourly insurance
15   highlights.
16              Have you ever seen this document before?
17       A   I don't recall seeing this.
18       Q   Okay.  Do you think it's referring to the
19   document that's been marked as Exhibit 27, which is
20   also called Insurance Highlights?
21       A   I don't know.
22       Q   Do you know what document it's referring to
23   in the first line where it says, George, we
24   understand from your comments and from Peggy
25   Muensterman's comments that we cannot call this a
```



GEORGE TURCZYNOWSKI
November 16, 2011

Page 105

```
 1    true SPD even with the changes we made per your

 2    suggestions?

 3        A    I cannot.

 4             (Exhibit 62 marked as requested.)

 5    BY MR. RADTKE:

 6        Q    Exhibit 62 is a November 10, 2000, fax to

 7    yourself from Mr. Nuerge with excerpts of an old

 8    insurance booklet.

 9             Do you recall receiving this?

10        MR. BURCHFIELD:   Object to form.

11        A    I don't know.

12    BY MR. RADTKE:

13        Q    You don't know why Mr. Nuerge faxed those

14    items to you?

15        A    (Nodding.)

16        THE COURT REPORTER:   Is that a no?

17        THE WITNESS:   That's a no.

18    BY MR. RADTKE:

19        Q    Mr. Turczynowsky, you've been handed a

20    document that's been marked as Exhibit 29.

21             Have you ever seen this document before?

22        A    This document looks familiar.

23        Q    You were involved in the 2000 negotiations

24    with the union, yes?

25        A    Yes, on a limited basis.
```



GEORGE TURCZYNOWSKI
November 16, 2011

Page 106

1        Q    And there was an agreement that was reached

2    in 2000 with the union?

3        A    Yes.

4        Q    On the first page it has a section that

5    relates to health insurance, and in the last line of

6    that section it says, increase deductible/stop losses

7    five percent per year beginning in 2003.

8              Do you know what that is referring to?

9        A    One of the earlier documents we looked at

10   talked about providing for a five percent increase

11   through 2002.  This, I believe, was intended to

12   continue that beyond 2002.  In other words, this

13   became a rollover of that five percent; therefore,

14   beginning in 2003, if we noted it was the ten year,

15   that this would have picked up where the other one

16   left off.

17       Q    Was that increase of five percent with

18   respect to the deductibles and stop losses applicable

19   to people who retired before January -- I'm sorry --

20   November 28, 2000, and who were on the PPO program?

21       MR. BURCHFIELD:   Object to form.  Do you

22   understand the question?

23       A    Let's do that again, please.

24       MR. RADTKE:   Could you read that one more time?

25              (From the record above, the reporter read



GEORGE TURCZYNOWSKI
November 16, 2011

Page 107

1                 the following:

2                     "Q    Was that increase of five

3                 percent with respect to the deductibles

4                 and stop losses applicable to people who

5                 retired before January -- I'm sorry --

6                 November 28, 2000, and who were on the PPO

7                 program?")

8           THE WITNESS:   I think so.

9      BY MR. RADTKE:

10          Q    In 2000, it's true that the parties reached

11     an agreement that went from 2000 to 2005, is that

12     true?

13          A    That's my recollection.

14          Q    I'm sorry.  It went to 2006.  Do you remember

15     whether the 2000 agreement lasted until 2006?

16          A    I do not.

17          Q    Okay.  On this front page it also talks

18     about, under prescription drugs, adding a third tier

19     with a 25 dollar co-pay.

20          A    I see that.

21          Q    Do you know whether that third tier was

22     applicable to retirees?

23          A    I do not.

24                 (Exhibit 63 marked as requested.)

25



GEORGE TURCZYNOWSKI
November 16, 2011

Page 108

1    BY MR. RADTKE:

2       Q   Mr. Turczynowsky, you were handed a document

3    that's been marked Exhibit 63.  It's titled Excerpts

4    from the Agreement on Insurances and Pensions,

5    11/28/2000.

6           Have you ever seen that document before?

7       A   I don't recall seeing this document.

8       Q   If you look on the second page, there is a

9    chart that has the increases and deductibles and stop

10   losses from 2000 to 2005.

11          Have you ever seen that chart before?

12      A   I don't recall.

13      Q   That's in line with what was agreed to in

14   2000 with respect to the five percent increases for

15   deductibles and stop losses?

16   MR. BURCHFIELD:  Object to form and foundation.

17      A   I'm not certain.

18          (Exhibit 64 marked as requested.)

19   BY MR. RADTKE:

20      Q   You've been handed a document that's been

21   marked Exhibit 64.  It's March 19, 2001, notes,

22   discussion with George Turczynowsky, R.A. Nuerge.

23   They're handwritten, and they're signed by

24   Mr. Nuerge.

25          Have you ever seen these notes before?



GEORGE TURCZYNOWSKI
November 16, 2011

Page 109

```
 1      A    No.

 2      Q    Did you ever -- do you remember having a

 3    discussion with Mr. Nuerge about the subjects that

 4    are set forth in this document?

 5      A    I remember the first one.

 6      Q    Okay.  What about the fifth one?

 7      A    I don't recall that.

 8      Q    Do you know what that is referencing?

 9      A    I can't be certain.

10      Q    You're not as disappointed now?

11      A    Not nearly.

12      Q    You've been handed a document that's been

13    marked Exhibit 35.

14         MR. BURCHFIELD:  What is that?

15         MR. RADTKE:  35.

16         MR. BURCHFIELD:  Did you give me one of those?

17    35?

18         MR. RADTKE:  Yes.

19    BY MR. RADTKE:

20      Q    Does that refresh your recollection that

21    there was some kind of a controversy about whether

22    the third tier or the prescription drugs deductible

23    was applicable to retirees?

24      A    I have a vague recollection on this.

25      Q    What do you recall?
```



GEORGE TURCZYNOWSKI
November 16, 2011

Page 110

1      A   I remember the issue now that I've seen this

2  letter.

3      Q   And what was the issue?

4      A   Well, according to the letter, that something

5  was sent out in error to certain participants and

6  that that would be rectified with follow-up details

7  and to remedy the situation.

8      Q   And do you remember that to be that the third

9  tier was applied to retirees?

10     A   In reading this letter, I do not recall that.

11         (Exhibit 65 marked as requested.)

12  BY MR. RADTKE:

13     Q   You've been handed what's been marked as

14  Exhibit 65.  It's a document called BorgWarner, Inc.,

15  Base Plan/Major Medical Benefits for Muncie Hourly

16  Retirees, December 1989; Effective Date, January 1,

17  2004.

18         Have you ever seen this document before?

19     A   This was part of CIGNA's boilerplate version

20  of their SPDs.  They wanted to get something out to

21  the various and sundry employees and retirees.  I

22  notice the date is January 1, 2004, so -- I do recall

23  seeing this boilerplate type document.

24     Q   The part -- the UAW and BorgWarner did not

25  have contract negotiations in 2004, correct?



1      A    Not to my knowledge.

2      Q    So this was sent out by CIGNA without

3  negotiations with the UAW?

4      A    That's correct.  It was a boilerplate

5  document.  They wanted to describe what they thought

6  was their understanding of the benefits that were

7  enforced based on the retirees -- hourly retirees in

8  December of 1989.

9      Q    Do you know whether this document accurately

10  reflects the benefits for the retirees?

11     MR. BURCHFIELD:  Object to form and foundation.

12     A    You know, in looking at this without looking

13  at additional details and facts, I can't stipulate

14  that it does.

15          (Exhibit 66 marked as requested.)

16  BY MR. RADTKE:

17     Q    Mr. Turczynowsky, you were handed a document

18  that's been marked as Exhibit 66.  It's dated

19  December 18, 1995.  It's a letter from yourself to a

20  Mr. Dandelske who worked for CIGNA Health Care at the

21  time.  And there is an attachment to that letter.

22          Have you ever seen this document?

23     A    Yes.

24     Q    And what is this document?

25     A    It reflects the level of benefits for the



GEORGE TURCZYNOWSKI
November 16, 2011

Page 112

1     various categories of employees -- active employees

2     and retirees via the Muncie facility.

3          Q    And why did you send this to CIGNA Health?

4          A    As I said before, this was done on an annual

5     basis to let them know precisely what changes would

6     take place on January 1st of every year so that these

7     could be incorporated into their administrative and

8     claim adjudication systems.

9                    (Exhibit 67 marked as requested.)

10    BY MR. RADTKE:

11         Q    You've been handed a document that's marked

12    as Exhibit 67.  It's a December 16, 1996, letter from

13    yourself to Mr. Dandelske with an attachment.

14               Have you seen this document before?

15         A    Yes.

16         Q    This is another document that was sent to

17    CIGNA so that they could make the appropriate changes

18    to the health care benefits for retirees?

19         A    For all employees effective 1/1/97.

20         Q    For all employees and hourly retirees?

21         A    For all active hourly and retired employees.

22         Q    And these changes were based on what was

23    negotiated with the union?

24         A    That's correct.

25         Q    If you were to look at both -- and you're



GEORGE TURCZYNOWSKI
November 16, 2011

Page 113

1    doing it already.  If you were to look at Exhibit 66

2    and Exhibit 67 together and if you were to look at

3    the last two pages of Exhibit 67 and then the two

4    pages of Exhibit 66, these are the matrixes that you

5    described previously?

6        A    Yes.

7        Q    And you've been shown other versions of these

8    matrixes?

9        A    Yes.

10       Q    If you look at these documents and you look

11   at only the insurance features as they relate to

12   retirees -- I'm not going to include actives, okay?

13       A    Uh-huh, yes.

14       Q    Is it accurate that the only difference

15   between these two plans or these two insurance

16   feature documents is that for the Medicare BRO 72,

17   the pre-Medicare 067, and the Medicare/pre-Medicare

18   live out-of-area their stop loss and deductibles have

19   changed, in comparing the two?

20   MR. BURCHFIELD:  Object to the form and to the

21   foundation.  While he's looking at that, I note the

22   possibility of human error in making this sort of

23   comparison on this file like this.

24   MR. RADTKE:  Sure.

25       A    Now that I've had a chance to look at this,



1    would you please restate the question, repeat the

2    question?

3    BY MR. RADTKE:

4        Q    The differences between the Muncie health

5    insurance plans, insurance features effective

6    January 1, 1996, and January 1, 1997, are found in

7    Medicare BR 072, pre-Medicare BR 067, and

8    Medicare/pre-Medicare live out-of-area as it relates

9    to stop loss and deductible?

10       MR. BURCHFIELD:  Are you asking about both pages?

11       MR. RADTKE:  All three of them.  Those three are

12   all on the second page, those three categories.

13       MR. BURCHFIELD:  So you're excluding the first

14   page from the question?

15       MR. RADTKE:  I'm not excluding the first page.

16   Those are the places where I -- the only place I can

17   see where there are differences between the two

18   documents.

19       MR. BURCHFIELD:  Okay.  If you're not excluding

20   the first page, then you should look at --

21       MR. RADTKE:  I don't mean to exclude the first

22   page.

23       A    Then I agree.  I see that.

24            (Exhibit 68 marked as requested.)

25



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 115

1    BY MR. RADTKE:

2       Q   Mr. Turczynowsky, you've been a handed a

3    document that's been marked as Exhibit 68.  It's a

4    November 17, 1997, letter again from yourself to

5    Mr. Dandelske with documents attached, including a

6    matrix that is similar to the other documents that I

7    showed you.

8            Is this the same type of document?

9       A   Yes.

10           (Exhibit 69 marked as requested.)

11   BY MR. RADTKE:

12      Q   You've been handed a document that's been

13   marked as Exhibit 69.  It's a November 13, 1998,

14   document, a letter from you to Mr. Dandelske with

15   another matrix.

16      A   Yes.

17      Q   Same thing --

18      A   Yes.

19      Q   -- as the previous exhibits, correct?

20      A   Yes.

21           (Exhibit 70 marked as requested.)

22   BY MR. RADTKE:

23      Q   Mr. Turczynowsky, you've been handed a

24   document that's dated December 9, 1999.  It's another

25   letter from you with a matrix attached.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 116

1        A    Actually, it's a letter from one of my

2    colleagues, but yes, I see it.

3        Q    It's the same type of information provided to

4    CIGNA?

5        A    Yes.

6             (Exhibit 71 marked as requested.)

7    BY MR. RADTKE:

8        Q    You've been handed a document that's been

9    marked Exhibit 71.  It's a November 7, 2000, letter

10   from yourself to Mr. Arquette now at CIGNA Health

11   with matrixes attached, correct, as well as other

12   items?

13       A    Yes.

14       Q    That was sent for the same purpose as the

15   previous one?

16       A    Yes.

17             (Exhibit 72 marked as requested.)

18   BY MR. RADTKE:

19       Q    Mr. Turczynowsky, you've been handed a

20   document dated November 27, 2001.  It's been marked

21   as Exhibit 72.  It's a letter from yourself to

22   Mr. Arquette at CIGNA.

23             There is a number of pages that are

24   attached, including the last two pages are the

25   matrixes, correct?



GEORGE TURCZYNOWSKI
November 16, 2011

Page 117

1      A    Yes.

2      Q    If you look at the last page of this

3  document --

4      A    The matrix?

5      Q    Yes.  DTP 12336.

6      A    Yes.

7      Q    You will notice that this is the Muncie

8  hourly health plan effective January 1, 2002, and

9  that according to the prescription drug insurance

10  features, that group of retirees has a two-tier

11  prescription drug co-pay, is that accurate?

12      A    We're talking about Branch 071 and

13  Branch 072?

14      Q    No.  I'm actually talking about Branch 067 --

15  well, 067.

16      A    On the first page?

17      Q    No.  Pre-Medicare Branch 067.

18      A    I'm sorry.  I found it.  I see it.

19      Q    So for those retirees who retired after

20  January 1993, according to this matrix, they had a

21  two-tier prescription drug co-pay, correct?

22      A    Yes.

23           (Exhibit 73 marked as requested.)

24  BY MR. RADTKE:

25      Q    Mr. Turczynowsky, you've been handed a



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 118

1    document that's dated November 6, 2002.  It's a

2    letter from yourself to Mr. Arquette at CIGNA Health

3    Care, and it attaches a matrix, correct?

4        A    Yes.

5        Q    And this document has been marked as Exhibit

6    73.  This document was sent to CIGNA for the same

7    purpose as the other similar matrixes that I've been

8    handing you?

9        A    Yes.

10            (Exhibit 74 marked as requested.)

11   BY MR. RADTKE:

12       Q    Mr. Turczynowsky, you've been handed a

13   document that's been marked as Exhibit 74.  It's an

14   October 2, 2003, letter from yourself to Mr. Arquette

15   at CIGNA.  Attached are matrixes for the 2004 hourly

16   pension -- health care plans, correct?

17       A    Yes.

18       Q    This document was sent to CIGNA for the same

19   reasons as the previous matrixes, correct?

20       A    Yes.

21            (Exhibit 75 marked as requested.)

22   BY MR. RADTKE:

23       Q    Mr. Turczynowsky, you've been handed a

24   document which is an e-mail with attachments from

25   yourself to Mr. Arquette and matrixes attached to the



GEORGE TURCZYNOWSKI
November 16, 2011

1    e-mail, correct?

2        A    I see documents here -- matrices here

3    effective 1/1/2005 and 1/1/2004.

4        Q    And 1/1/2002 as well.  This is the documents

5    that were together in the way that I received them.

6    It may relate to -- that other spreadsheets were

7    provided to Mr. Arquette because there was some sort

8    of -- because of Ms. Bowles' reference in the e-mail.

9            Do you recall sending this to Mr. Arquette?

10       A    I certainly agree that I sent him the grids

11   effective 1/1/05, but whether I ever attached the

12   other ones for whatever reason, that's not clear to

13   me and I don't recall that.

14       Q    But with respect to the 1/1/05 changes, those

15   were sent to Mr. Arquette for the same reason as the

16   previous ones that were mailed to him, correct?

17       A    Yes.

18       Q    Now I'm going to ask you to take a look at

19   Exhibit 75 that I just handed you and Exhibit 66,

20   which is the one that's dated December 18, 1995.

21       A    Exhibit 66 and Exhibit 75.

22       Q    Correct.  In Exhibit 66, pre-Medicare before

23   December 1, 1989, were designated as BR 65, which you

24   stated previously meant Branch 65?

25       A    That's correct.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 120

1      Q    On Exhibit 75, that matrix, it has

2  pre-Medicare, retired before October 1, 1986, retired

3  before December 1, 1989, and that is called MPP02.

4          Do you know why the numbers changed or the

5  designations changed?

6      A    Pre-Medicare MPP02, retired before 10/1/86

7  and retired before 12/1/89, why that number changed,

8  why that's different than Branch 65?

9      Q    Right.

10     A    It was a CIGNA system protocol change.  They

11 changed their own internal designations from the

12 Branch 65s under their old systems, and I don't

13 recall what that was, what it was called, but they

14 did change to a new adjudication system, and

15 therefore the designation protocol changed.

16 Everything else -- everything else should have been

17 the same in those two columns.

18     Q    So it was just an insurance company change?

19     A    An insurance company change.

20     Q    And in no way related to the benefits that

21 were provided?

22     A    None whatsoever.

23     Q    And if you look at both of them, you're going

24 to see that other BRs became MPP03s and other letters

25 like MIND1 and MPP04, et cetera.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 121

1          A    Yes.

2          Q    Those are all as a result of CIGNA changing

3    its designation?

4          A    Yes.

5          Q    But that designation change did not affect

6    the benefit changing?

7          A    That's correct.

8          Q    Or did not affect the benefits?

9          A    Levels or the operation of the plan.

10         Q    So at the time you retired in 2005 the

11    benefits that were provided to hourly retirees before

12    1989 stayed the same?

13         A    That's correct.

14         Q    Also for those retirees who retired after

15    1993 and were in the PPO plan, correct, with the

16    exception of the negotiated changes in stop loss,

17    deductible, and prescription drug deductible?

18         A    Correct.

19         Q    And by 2005 there had been an '89 HIA, health

20    insurance agreement, that expired in '92, correct?

21         A    Yes.

22         Q    A '92 health insurance agreement that expired

23    in '95, correct?

24         A    Yes.

25         Q    A '95 health insurance agreement that expired



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 122

1    in '98?
2        A    Yes.
3        Q    A '98 health insurance agreement that expired
4    in 2000?
5        A    Yes.
6        Q    And a 2000 agreement that was still in place
7    at the time of your retirement?
8        A    I'm not sure about the 2001.
9        Q    You're not sure whether that had expired at
10   the time of --
11       A    Yes.  I know there was an early opener and --
12   so I don't know what, if anything, had been resolved
13   prior to July of 2005.
14       Q    Were you involved in -- that brings me to the
15   next question.  Were you involved in contract
16   negotiations in 2005?
17       A    No.
18       Q    Did you have any role away from the table, at
19   the table?
20       A    I had a role away from the table.
21       Q    What was your role away from the table?
22       A    Again, to provide guidance and financial
23   analysis and consultation and direction for the local
24   management people in developing a strategy for the
25   2005 negotiations.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

GEORGE TURCZYNOWSKI
November 16, 2011

Page 123

1      Q    Did you ever review the agreement that was

2   reached by the union and the company in 2005?

3      A    No.

4      Q    You don't know what was negotiated with

5   respect to health care benefits for that group?

6      A    No.  We were in transition.

7      Q    You were leaving the company?

8      A    Yes.

9      Q    Who took your spot?

10      A    You know, I don't recall.  Rather than

11   speculate, I'm just going to -- I don't recall

12   because there were several different people involved.

13      MR. RADTKE:  Okay.  If you guys would give me

14   about five minutes, I would just quickly go through

15   my documents and see if there is any further

16   questions I have.

17      MR. BURCHFIELD:  Sure.

18      MR. RADTKE:  Thank you.

19           (Recess was taken.)

20   BY MR. RADTKE:

21      Q    Mr. Turczynowsky, do you know why the company

22   never changed retiree health care benefits for hourly

23   retirees until after you left the company?

24      MR. BURCHFIELD:  Object to the form and

25   foundation.



GEORGE TURCZYNOWSKI
November 16, 2011

Page 124

```
 1       A   Which retirees are we talking about

 2   specifically?

 3   BY MR. RADTKE:

 4       Q   Hourly retirees who retired between 1989 and

 5   2005 when you left the company.

 6       MR. BURCHFIELD:  Same objections.

 7       A   I would be speculating.

 8   BY MR. RADTKE:

 9       Q   You don't know?

10       A   No.

11       Q   Were you aware that BorgWarner made changes

12   to retiree health care benefits for hourly retirees

13   in 2006?

14       A   I was aware of some changes made in 2006.

15       Q   Were you consulted by the company prior to

16   those changes being made?

17       A   No.

18       Q   Were you consulted afterwards?

19       A   Not by the company.

20       Q   Were you consulted by anyone?

21       A   There was an issue that came up with regard

22   to certain employees and a matter handled in the

23   courts in Indianapolis, and I was asked to respond to

24   certain issues that I may be aware of, and I was not

25   able to attend for personal reasons.
```



GEORGE TURCZYNOWSKI
November 16, 2011

Page 125

1      Q    Are you talking about a trial that occurred

2  involving the UAW and BorgWarner?

3      A    Yes.

4      Q    You performed some work related to that

5  lawsuit?

6      A    No, no work.

7      Q    You were asked to attend the trial but you

8  were unable to do so?

9      A    But I was unable to do so.

10      Q    Were you aware that in 2009 the company made

11  changes to retiree health care benefits for hourly

12  retirees and surviving spouses?

13      A    I saw perhaps inadvertently a document that

14  was presented by counsel yesterday where I happened

15  to notice something about a 2009 change, but I was

16  not -- I didn't get into details and we didn't get

17  into that because that was past my time with the

18  company.

19      Q    You just learned of it yesterday?

20      A    Yes, yes, indeed, indeed.

21      MR. RADTKE:  I don't have anything further.

22      MR. BURCHFIELD:  Okay.  I have no questions.  The

23  witness would like to read and sign the transcript.

24              (Whereupon the deposition concluded

25              at 3:24 p.m. on November 16, 2011.)



GEORGE TURCZYNOWSKI
November 16, 2011

Page 126

1    STATE OF ILLINOIS      )

                            )  ss:

2    COUNTY OF C O O K      )

3

4        The within and foregoing deposition of the

5    aforementioned witness was taken before DONNA L.

6    POLICICCHIO, C.S.R., and Notary Public, at the place,

7    date, and time aforementioned.

8        There were present during the taking of the

9    deposition the previously named counsel.

10       The said witness was first duly sworn and was then

11   examined upon oral interrogatories; the questions and

12   answers were taken down in shorthand by the undersigned,

13   acting as stenographer and Notary Public; and the within

14   and foregoing is a true, accurate, and complete record of

15   all of the questions asked of and answers made by the

16   aforementioned witness, at the time and place hereinabove

17   referred to.

18       The signature of the witness was not waived, and

19   the deposition was submitted, pursuant to

20   Rules 30(e) and 32(d) of the Rules of Civil Procedure for

21   the United States District Court, to the deponent per

22   copy of the attached letter.

23       The undersigned is not interested in the within

24   case, nor of kin or counsel to any of the parties.

25



1        Witness my official signature and seal as Notary

2    Public in and for Cook County, Illinois, on this

3    _____ day of _____, A.D. _____.

4

5                                          OFFICIAL SEAL
                              DONNA L POLICICCHIO
                  NOTARY PUBLIC - STATE OF ILLINOIS

6                      MY COMMISSION EXPIRES:02/02/13

7

8    *Donna L. Policicchio*

    DONNA L. POLICICCHIO, C.S.R.

9        License No. 084-003740

    Notary Public

10       311 South Wacker Drive

    Suite 300

11       Chicago, Illinois  60606

    Phone:  (312) 386-2000

12

13

14

15

16

17

18

19

20

21

22

23

24

GEORGE TURCZYNOWSKI
November 16, 2011

Page 128

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF MICHIGAN
                             SOUTHERN DIVISION
 3
 4   WILLIAM L. SLOAN, EUGENE J.        )
     WINNINGHAM, JAMES L. KELLEY,       )
 5   on behalf of themselves and a      )
     similarly situated class,          )
 6                                      )
                     Plaintiffs,        )
 7                                      )
         -vs-                           ) No. 09-cv-10918
 8                                      )
     BORGWARNER, INC., BORGWARNER       )
 9   FLEXIBLE BENEFITS PLANS, and       )
     BORGWARNER DIVERSIFIED             )
10   TRANSMISSION PRODUCTS, INC.,       )
                                        )
11                   Defendants.        )
12
13       I, GEORGE TURCZYNOWSKY, being first duly sworn, on
14   oath say that I am the deponent in the aforesaid
15   deposition taken on November 16, 2011; that I have read
16   the foregoing transcript of my deposition, consisting of
17   Pages 1 through 128, inclusive, and affix my signature to
18   same.
19
20             _____
                     GEORGE TURCZYNOWSKY
21
22   Subscribed and sworn to
     before me this _____ day
23   of _____, _____.
24
     _____
25   Notary Public
```



GEORGE TURCZYNOWSKI
November 16, 2011

Page 129

CASE:  Sloan v. BorgWarner          DATE TAKEN: 11/16/11

DEPONENT:  George Turczynowsky

PAGE        LINE                    ERRATA SHEET

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

_____      _____      REASON:  _____

_____      _____      CHANGE:  _____

SIGNED _____    DATE _____


Reporter:  Donna L. Policicchio

