UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, and JAMES L. KELLEY,
on behalf of themselves and a similarly
situated class,

                  Plaintiffs,

v.

BORGWARNER, INC., BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

                  Defendants.

Case No. 09-cv-10918
Hon. Paul D. Borman
Magistrate Mona K. Majzoub

**Class Action**

# EXHIBIT 16

## TO

## PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT
## AS TO LIABILITY

# In The Matter Of:

*Sloan, et al vs.*

*Borgwarner, Inc., et al*

---

*Michelle DuFour*

*January 12, 2012*

---



**BIENENSTOCK**

NATIONWIDE COURT REPORTING & VIDEO

www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**

Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File 120112md.txt*

*Min-U-Script® with Word Index*

**Michelle DuFour - January 12, 2012**

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MICHIGAN

3            SOUTHERN DIVISION

4

5  WILLARD L. SLOAN, EUGENE J.

6  WINNINGHAM, JAMES L. KELLEY,

7  on behalf of themselves

8  and a similarly situated class,

9            Plaintiffs,

10      vs.         Case No. 09-cv-10918

11                Hon. Paul D. Borman

12                Magistrate Mona K. Majzoub

13  BORGWARNER, INC., BORGWARNER

14  FLEXIBLE BENEFITS PLANS and

15  BORGWARNER DIVERSIFIED

16  TRANSMISSION PRODUCTS, INC.,

17            Defendants.

18  _____

19

20     The Deposition of MICHELLE DUFOUR,

21     Taken at 400 Galleria Officentre, Suite 117,

22     Southfield, Michigan,

23     Commencing at 1:31 p.m.,

24     Thursday, January 12, 2012,

25     Before Denise M. Kizy, CSR-2466, RPR, CRR.

```
 1    APPEARANCES:

 2

 3    DAVID R. RADTKE

 4    Klimist, McKnight, Sale, McClow & Canzano, P.C.

 5    500 Galleria Officentre

 6    Suite 117

 7    Southfield, Michigan 48034

 8    248.354.9650

 9        Appearing on behalf of the Plaintiffs.

10

11    BOBBY R. BURCHFIELD

12    JOSHUA D. ROGACZEWSKI

13    McDermott Will & Emery LLP

14    600 Thirteenth Street, N.W.

15    Washington, D.C. 20005

16    202.756.8003

17        Appearing on behalf of the Defendants.

18

19    ALSO PRESENT:

20    Marlene D. Fischer

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3      WITNESS                                          PAGE

4      MICHELLE DUFOUR

5

6      EXAMINATION

7      BY MR. RADTKE                                      5

8

9                            EXHIBITS

10

11     EXHIBIT                                          PAGE

12     (Exhibits attached to transcript.)

13

14     DEPOSITION EXHIBIT 86                             21

15     DEPOSITION EXHIBIT 87                             23

16     DEPOSITION EXHIBIT 88                             35

17     DEPOSITION EXHIBIT 89                             40

18     DEPOSITION EXHIBIT 90                             42

19     DEPOSITION EXHIBIT 91                             43

20     DEPOSITION EXHIBIT 92                             44

21     DEPOSITION EXHIBIT 93                             45

22     DEPOSITION EXHIBIT 94                             48

23     DEPOSITION EXHIBIT 95                             51

24     DEPOSITION EXHIBIT 96                             57

25     DEPOSITION EXHIBIT 97                             59

1    DEPOSITION EXHIBIT 98                          60

2    DEPOSITION EXHIBIT 99                          62

3    DEPOSITION EXHIBIT 100                         63

4    DEPOSITION EXHIBIT 101                         65

5    DEPOSITION EXHIBIT 102                         66

6    DEPOSITION EXHIBIT 103                         67

7    DEPOSITION EXHIBIT 104                         68

8    DEPOSITION EXHIBIT 105                         68

9    DEPOSITION EXHIBIT 106                         70

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Southfield, Michigan

2    Thursday, January 12, 2012

3    1:31 p.m.

4

5                    MICHELLE DUFOUR,

6        was thereupon called as a witness herein, and after

7        having first been duly sworn to testify to the truth,

8        the whole truth and nothing but the truth, was

9        examined and testified as follows:

10                   EXAMINATION

11   BY MR. RADTKE:

12   Q.    Hi, Michelle.

13   A.    Hi.

14   Q.    Could you state your name for the record.

15   A.    Michelle DuFour.

16   Q.    And what is your work address?

17   A.    3850 Hamlin Road.

18   Q.    Auburn Hills?

19   A.    Auburn Hills, 48326.

20   Q.    We've met previously and I'm going to take your

21        deposition today.

22              I'm going to ask you a series of questions

23        and I'm going to show you some documents.  If I have a

24        question that is confusing or you don't understand,

25        just let me know and I'll try to fix it for you, and

**Michelle DuFour - January 12, 2012**                                    6

1       I'm going to give you some documents and you can take

2       as long as you would like to review them.  If you need

3       to take a break, let me know, we could take a break.

4       I would like it if you didn't take a break as I asked

5       you a question you haven't answered yet.

6    A.  Okay.

7    Q.  And other than that we can get started, which I guess

8       we already did.

9               What's your current position?

10   A.  I'm the senior manager of global benefits for

11      BorgWarner, Inc.

12   Q.  How long have you held that position?

13   A.  Since 2005.

14   Q.  Did you hold any position prior to that with

15      BorgWarner?

16   A.  No.

17   Q.  Were you employed prior to that?

18   A.  Yes.

19   Q.  By whom were you employed?

20   A.  Takata, Incorporated also known as TK Holdings here in

21      the U.S.

22   Q.  And for how long were you employed by Takata,

23      Incorporated?

24   A.  From 1993 to end of 2004, until the time I

25      transitioned to BorgWarner.

**Michelle DuFour - January 12, 2012**   7

1   Q.   And what was your position at Takata, Incorporated?

2   A.   The director of benefits.

3   Q.   How long did you hold that position?

4   A.   It's approximately 12 years.

5   Q.   So the whole time you were there?

6   A.   Yes.

7   Q.   Is Takata, Incorporated unionized in the United

8        States?

9   A.   No.

10  Q.   Where was it located?

11  A.   Auburn Hills, Michigan.

12  Q.   Did you have any jobs before Takata?

13  A.   Yes, I worked for a variety of brokerage firms.

14  Q.   And where were they located?

15  A.   Money management, that type of thing.  In the

16       Southfield and Bloomfield Hills area.

17  Q.   And did you have a similar position with those money

18       manager brokerage firms?

19  A.   No.  I was responsible for overall office

20       administration, executive assistant to the CEO, and in

21       communications.

22  Q.   And how long did you work for brokerage firms?

23  A.   Oh, gosh.  Approximately 10 years.

24  Q.   So what, 1983 or so?

25  A.   Mm-hmm.

**Michelle DuFour - January 12, 2012**

8

1  Q.  Did you engage in any collective bargaining or work

2      with any unions during that time period?

3  A.  No.

4  Q.  Where were you employed prior to that?

5  A.  I wasn't.  I was in high school.

6  Q.  Okay.  When did you graduate from high school?

7  A.  1983.

8  Q.  And where did you graduate from?

9  A.  From Troy High School.

10 Q.  Do you have any degrees?

11 A.  Mm-hmm.  I have a bachelor of science in human

12     resource development with a minor in general business

13     in labor relations.

14 Q.  And where did you get that degree from?

15 A.  From Oakland University.

16 Q.  What was the year you achieved that degree?

17 A.  Let me think.  1994.

18 Q.  Any other degrees?

19 A.  No.

20 Q.  Have you ever had any legal training?

21 A.  Yes.  I took a course in paralegal.

22 Q.  When did you do that?

23 A.  Let's see, about 1986.

24 Q.  Did you ever work as a paralegal?

25 A.  No, I did not.

1   Q.   Were you ever in contract negotiations with UAW Local

2        287?

3   A.   Could you clarify what you mean by contract

4        negotiations.

5   Q.   Negotiations for any type of collectively bargained

6        agreement, be it a collective bargaining agreement, a

7        health insurance agreement, a pension agreement,

8        subplan agreement.

9   A.   I presented to them, but I was not part of the

10       collective bargaining team.

11   Q.   So you made presentations to them?

12   A.   Yes.

13   Q.   And when did you do that?

14   A.   In 2005, and during the effects bargaining shutdown

15       negotiation.

16   Q.   What was your presentation that you made in 2005?

17   A.   It was regarding the active health care plan strategy

18       and a proposal to reduce cost by moving the hourly

19       active employees over to the plan designs that were

20       provided to the salaried employees at that time.

21   Q.   Was that the only subject that you presented on?

22   A.   Yes.

23   Q.   How did you make your presentation?

24   A.   Via PowerPoint.

25   Q.   And where you were physically present in Muncie?

**Michelle DuFour - January 12, 2012**                    10

1    A.    Yes.

2    Q.    Do you recall when that was in 2005?

3    A.    March of '05.

4    Q.    Do you recall who else was present for the company

5          side during your presentation?

6    A.    Bill Banton.  Connie Stair.  Barb Thornell.  I'm

7          thinking.  Perhaps Tom McGill.

8    Q.    Were you just there for one session?

9    A.    I did two sessions; the first one presenting solely to

10         the union committee, and then the second time doing

11         the same presentation, but with a representative from

12         the UAW solidarity house present.

13   Q.    Who was that person if you remember?

14   A.    I believe that was Sarah Doyle.

15   Q.    Was it the same presentation that you made twice?

16   A.    Yes.

17   Q.    So one time you made it without Ms. Doyle and one time

18         you made the same presentation with Ms. Doyle present?

19   A.    Yes.

20   Q.    Were they close in time to each other, these

21         presentations?

22   A.    Yes.

23   Q.    Within days?

24   A.    No.

25   Q.    Weeks?

1   A.   Yeah, I'd say weeks.

2   Q.   Do you know why you were asked to make two

3        presentations?

4   A.   For clarification purposes as to how a -- how the plan

5        designs would work.

6   Q.   And who asked you to make the first presentation?

7   A.   The VP of HR at that time, Angela D'Aversa, at the

8        request of the company HR team down in Muncie.

9   Q.   And who did Ms. D'Aversa work for at that time?

10  A.   BorgWarner, Inc.

11  Q.   Okay.  And what was her job title with BorgWarner,

12       Inc.?

13  A.   Vice president of human resources.

14  Q.   And she had received a request from whom?

15  A.   From the local HR Muncie management team.

16  Q.   And who was that at that time, do you recall?

17  A.   Tony Behrman.  Bill Banton.

18  Q.   Okay.  How long did your presentations last?

19  A.   One hour.  About one hour.

20  Q.   Were you involved in any meetings with the union

21       negotiators after those presentations were completed?

22  A.   Not that I can recall.

23  Q.   And were you present for any -- were you present when

24       the contract in 2005, the negotiations, came to a

25       conclusion?

1    A.    No.

2    Q.    Do you know whether the union and the company agreed

3          upon the health care proposal for actives that you

4          presented?

5    A.    Yes.

6    Q.    They did?

7    A.    Yes.

8    Q.    And that was for active employees?

9    A.    Yes.

10   Q.    Do you recall who was present during your

11         presentations other than Ms. Doyle for the union?

12   A.    Jerry French.  During 2005; correct?

13   Q.    Yes.  I'm talking 2005 now, yes.

14   A.    I don't recall the other committee members' names

15         offhand.

16   Q.    And this presentation that you made was shortly after

17         you began at BorgWarner?

18   A.    Correct.

19   Q.    Do you remember what month you began your employment

20         at BorgWarner?

21   A.    January.

22   Q.    And the presentation that you made was on the active

23         health care plan for salary employees at the Muncie

24         facility?

25   A.    Yes.

1    Q.    And how did you become familiar with that plan?

2    A.    Through my time from January to March at BorgWarner.

3    Q.    Did you familiarize yourself with the plan that was in

4          place for active hourly employees as of 2005?

5    A.    Yes.  There was a comparison of the plan designs of

6          what the salary had in place and were moving to to

7          what the existing hourly plan was.

8    Q.    And how did you find the information necessary to make

9          that comparison with respect to the active employee

10         plan?

11   A.    I received that information from the local Muncie

12         hourly -- or, I'm sorry, Muncie HR team on the hourly

13         plans.

14   Q.    And do you remember what form that information came

15         in?

16   A.    E-mail and a copy of the summary plan description,

17         summary highlight sheets of the plans in place.

18   Q.    Did you review any health insurance agreements to come

19         up with your comparison?

20   A.    No, just the plan documents that would have been

21         prepared by the vendor and distributed to the

22         employees enrolled in those plans.

23   Q.    Okay.  Who was the vendor at that time, do you recall?

24   A.    It would have been Cigna.

25   Q.    Ms. DuFour, what are your current job duties?

1   A.   I am responsible for the management of our U.S. as

2        well as nonU.S. health care and retirement plans.

3   Q.   When you say you're responsible, what does that mean?

4   A.   The management, the making sure that we maintain

5        compliance, working with our actuaries and internal

6        finance team in providing them the information that

7        they need to make financial determination, helping

8        to -- comparing the programs that we provide to

9        outside market data.

10  Q.   Anything else?

11  A.   Not really.

12  Q.   And can you explain the structure of BorgWarner, Inc.?

13  A.   Sure.

14  Q.   Okay.

15  A.   As it relates to HR?

16  Q.   Yeah.

17  A.   Okay.  We have at the world headquarters, we have the

18       VP of HR that reports to our CEO, and then there's a

19       team of HR employees within the corporate office as

20       well, a director of comp and benefits that I report

21       to.  There's a director of organizational development,

22       and then there's a compensation manager, and a variety

23       of specialists in the areas of benefits, compensation

24       and HRIS.

25  Q.   Okay.

1    A.    So that's the corporate level.

2    Q.    And you report to the director of compensation and

3          benefits?

4    A.    Correct.

5    Q.    And who is that person?

6    A.    Rich Greb.

7    Q.    How long have you reported to Mr. Greb?

8    A.    Oh, it's been -- let me think.  It will be two years

9          in April.

10   Q.    Who was Mr. Greb's predecessor?

11   A.    Jan McAdams.

12   Q.    How long was Ms. McAdams the director of compensation

13         and benefits?

14   A.    2005 until 2009 is my estimate.

15   Q.    Did you report to Ms. McAdams' predecessor?

16   A.    No.

17   Q.    She came in --

18   A.    She came in about the same time I did.

19   Q.    Did you report to anyone else other than the director

20         of compensation and benefits?

21   A.    No.

22   Q.    Now BorgWarner, Inc. -- is it true that BorgWarner,

23         Inc. has a number of divisions?

24   A.    Yes.

25   Q.    Okay.  And what divisions does BorgWarner, Inc.

1        currently have?

2   A.   There's an engine group and a drive train group.

3   Q.   So there's two divisions?

4   A.   Yes.

5   Q.   How many facilities are in the engine group?

6                   MR. BURCHFIELD:  Object; foundation.

7                   THE WITNESS:  I don't know that detail.

8   BY MR. RADTKE:

9   Q.   Can you estimate?  Is it more than 10?

10  A.   I would have to reference something to be certain, so,

11       no, I can't estimate that 10 would be accurate.

12  Q.   What about the drive train division, do you know how

13       many facilities the drive train division has?

14                  MR. BURCHFIELD:  Same objection.

15                  THE WITNESS:  Same response.

16  BY MR. RADTKE:

17  Q.   Do you have any responsibility as it relates to the

18       engine division and the drive train division?

19  A.   The engine division and the drive train division have

20       VPs of HR that report into their presidents, and they

21       look to the corporate team for guidance.

22  Q.   And what kind of guidance?

23  A.   Market trend, compliance.  We are responsible for

24       reviewing those areas, and they're responsible for the

25       day-to-day operations and rollout of what's needed to

**Michelle DuFour - January 12, 2012**                          17

1              administer programs such as benefits.

2    Q.    With respect to specific facilities within these two

3          divisions, do those facilities have HR representatives

4          on site as well?

5    A.    Yes.  Each division has an HR team, and the -- and a

6          vice president of HR would be responsible for one

7          and/or more facilities within their business unit.

8    Q.    And do you interact with those?

9    A.    Yes.

10   Q.    In the same way that you've described previously?

11   A.    Yes.

12   Q.    Are any of BorgWarner's current facilities unionized?

13   A.    Yes.

14   Q.    Have you been involved in contract negotiations with

15         any of those facilities?

16   A.    In the same manner that I have been with the Local

17         287.

18   Q.    In that you make a presentation?

19   A.    Yes.

20   Q.    But you're not there for the back and forth of

21         negotiations?

22   A.    I do not sit at the negotiating table.

23   Q.    Do you have any role as it relates to the Muncie

24         employees' and retirees' benefits?

25                    MR. BURCHFIELD:  Object to form.

```
 1                      THE WITNESS:  I'm sorry, what?
 2   BY MR. RADTKE:
 3   Q.   He objected to the form of my question.
 4                      MR. BURCHFIELD:  Yeah, you can answer.
 5                      THE WITNESS:  I would need you to be more
 6        specific I think to answer your question.
 7   BY MR. RADTKE:
 8   Q.   Does any part of your job relate to the provision of
 9        benefits to former employees that worked in the Muncie
10        facility?
11   A.   Yes.  I am not involved in the day-to-day
12        administration of that, but I have overarching
13        responsibility in analyzing the cost associated with
14        the plans that are provided to former retirees or
15        former employees.
16   Q.   That worked at the Muncie facility?
17   A.   Yes.
18   Q.   And you analyzed the cost; is that what you said?
19   A.   Mm-hmm.
20   Q.   Anything else that you do with respect to those
21        plants?
22   A.   Review the plan design for market competitiveness and
23        ensure vendor management.
24   Q.   Who hires vendors?
25   A.   They are approved through our employee benefits
```

**Michelle DuFour - January 12, 2012**                    19

```
 1        committee.
 2   Q.   Who is on the employee benefits committee?
 3   A.   Tim Manganello, Jan McAdams, Robin Adams, and Ron
 4        Hundzinski.
 5   Q.   That committee, is it part of BorgWarner, Inc. or is
 6        it part of one of the divisions of BorgWarner?
 7   A.   That is part of BorgWarner, Inc.
 8   Q.   You stated that you're not involved in the day-to-day
 9        administration of the benefits of the former Muncie
10        employees; correct?
11   A.   Correct.
12   Q.   Who is involved in that activity?
13   A.   The local Muncie HR team.
14   Q.   So the Muncie plant is closed; correct?
15   A.   Yes.
16   Q.   And so who would be responsible?
17   A.   Janice Long.  We still have a small office in Muncie.
18   Q.   Do you interact with Ms. Long as it relates to those
19        benefits that she is involved with on a day-to-day
20        basis?
21   A.   Periodically.
22   Q.   For the reasons that you stated previously?
23   A.   Yes.
24   Q.   Right now there are retirees and spouses, dependents,
25        surviving spouses, former employees, who receive
```

1           retiree health care benefits from BorgWarner; correct?

2    A.     Yes.

3    Q.     And who decides what vendor will be used for that

4           group?

5    A.     The vendor approval is done at the EBC level based on

6           analysis.

7    Q.     And a vendor would be like a third party

8           administrator?

9    A.     Like a Blue Cross Blue Shield or a Cigna as an

10          example.

11   Q.     Are you familiar with an entity called BorgWarner

12          Flexible Benefits Plan?

13   A.     That would be the rep plan document, yes.

14   Q.     That would be what, I'm sorry?

15   A.     Our rep plan document for our health and welfare

16          benefits.

17   Q.     What do you mean by rep plan?

18   A.     All of the benefit programs that we provide in the

19          U.S. are within the BorgWarner Flexible Benefits Plan.

20   Q.     Okay.  And is that Flexible Benefits Plan housed in a

21          certain spot?

22   A.     We have a copy of it at headquarters as well as on our

23          employee Web site.

24   Q.     Are there people who work specifically for the plan

25          itself?

1   A.   No.

2   Q.   They work for BorgWarner, Inc.?

3   A.   Yes.

4                    MARKED FOR IDENTIFICATION:

5                    DEPOSITION EXHIBIT 86

6                    1:56 p.m.

7   Q.   Ms. DuFour, you've been handed a document marked as

8        Exhibit 86 entitled BorgWarner Flexible Benefits Plan

9        Amended and Restated as of January 1, 2009.

10                   Have you ever seen this document before?

11  A.   Yes.

12  Q.   Is this the plan that you were referring to

13       previously?

14  A.   Yes.

15  Q.   Is this the latest version of the benefits plan?

16  A.   No.   There is an amended and restated document for

17       2010 or 2011.

18  Q.   At the time that this plan was in place, was this plan

19       related to the benefits provided to the Muncie

20       retirees?

21  A.   Yes.

22  Q.   And did this plan cover people who worked in other

23       BorgWarner facilities as well?

24  A.   Yes.

25  Q.   Other facilities in the United States?

1    A.    Yes.

2    Q.    Prior to the most recent changes in retiree health

3          care benefits that were made to the Muncie hourly

4          retirees on May 1, 2009, was this plan applicable to

5          them?

6    A.    Yes.

7    Q.    Were the benefits contained in this plan applicable to

8          them?

9    A.    There would be modifications as needed to be in

10         compliance and be representative of the plans in place

11         each year, but a version of this would have been in

12         place from 2005 forward.  I can't speak to plan years

13         prior to 2005.

14   Q.    Because you weren't present during that time?

15   A.    Correct.

16   Q.    So even when there was a facility that was running in

17         Muncie and there were benefits that were negotiated

18         collectively, collectively bargained for actives and

19         retirees, this plan had authority over their benefits?

20   A.    This would be substantive to the rules as required to

21         provide for pretax deduction as example, but this plan

22         document does not provide for all the details of the

23         plan levels of coverage, as an example, provided to

24         members as negotiated.

25   Q.    Okay.  Where is the BorgWarner Flexible Benefits Plan

1        administered out of?

2   A.   BW, Inc.

3   Q.   In Auburn Hills?

4   A.   In Auburn Hills.

5   Q.   At some point in time was it located at a different

6        place?

7   A.   Our corporate headquarters was in Chicago, so this

8        plan would have been perhaps administered out of

9        Chicago.

10  Q.   I was wondering since 2009.

11  A.   Since 2009?  No, it would be -- been Auburn Hills.

12  Q.   Are there trustees on this plan?

13  A.   No.

14  Q.   It's a plan that's governed by ERISA; is that correct?

15  A.   Correct.

16                  MARKED FOR IDENTIFICATION:

17                  DEPOSITION EXHIBIT 87

18                  2:02 p.m.

19  Q.   Ms. DuFour you've been handed a document marked as

20       Exhibit 87.  It's BorgWarner Flexible Benefits Plan,

21       Summary Plan Description 2009.

22                  Have you seen this document before?

23  A.   Yes.

24  Q.   What is this document?

25  A.   It's the summary plan description of the BorgWarner

**Michelle DuFour - January 12, 2012**                    24

```
 1          Flexible Benefits Plan.
 2    Q.    Has there been a -- is there an updated copy from
 3          2009?
 4    A.    Yes.  The summary plan description would be updated I
 5          believe it's either in 2010 or effective 2011 for
 6          changes due to health care reform.
 7    Q.    Okay.  Do you have any role in putting together this
 8          summary plan description?
 9    A.    Yes.
10    Q.    Is that part of your job?
11    A.    Yes.
12    Q.    What about the plan itself that has been marked as
13          Exhibit 86?
14    A.    Yes.
15    Q.    And it's true that this plan covers employees who work
16          for BorgWarner engine division employees and drive
17          train employees?
18    A.    In the U.S., yes.
19    Q.    There's no distinction; there's not a separate plan
20          for one division to another?
21    A.    No.  That's what in essence this does is all those
22          plans are combined within this plan document.
23    Q.    And then the details are negotiated or implemented on
24          a local level?
25    A.    Yes.
```

```
 1   Q.   Have you ever heard of BorgWarner Diversified
 2        Transmission Products?
 3   A.   Yes.
 4   Q.   Does that entity still exist?
 5   A.   Yes.
 6   Q.   Does it operate any facilities?
 7   A.   It used to operate Muncie, Indiana.
 8   Q.   But the Muncie plant has been closed since 2009;
 9        correct?
10   A.   Correct.
11   Q.   Is it still a legal entity?
12   A.   Yes.
13   Q.   And is there a relationship between BorgWarner DTP, if
14        I can use that as initials rather than say Diversified
15        Transmission Products, is there a relationship between
16        BorgWarner DTP and BorgWarner TorquTransfer Systems?
17                MR. BURCHFIELD:   Object; foundation.
18                THE WITNESS:   I don't know how to -- how I
19        could answer that question.
20   BY MR. RADTKE:
21   Q.   Are you familiar with the entity called BorgWarner
22        Torque Transmission Systems?
23   A.   Yes.
24   Q.   And how do you know about that entity?
25   A.   It's one of our business units under drive train.
```

1  Q.   Are there other business units under drive train other

2       than TorquTransfer Systems?

3  A.   Yes.  Our transmission systems division.

4  Q.   At one point was BorgWarner DTP separate from

5       BorgWarner Torque Transmission Systems --

6       TorquTransfer Systems, I'm sorry?

7  A.   I don't know.

8  Q.   Do you recollect that in this lawsuit there was a

9       request for production of documents to BorgWarner,

10      Inc., BorgWarner DTP and the BorgWarner Flexible

11      Benefits Plan?

12                  MR. BURCHFIELD:  Objection; foundation.

13                  You may answer.

14                  THE WITNESS:  I'm not sure to what extent

15      or to what level within the organization that the

16      document request was produced.

17  BY MR. RADTKE:

18  Q.   Okay.  Did you undertake any search for documents that

19       were requested by the plaintiffs in this case?

20  A.   Yes.

21  Q.   And what documents did you produce?

22                  MR. BURCHFIELD:  Object to form.

23                  THE WITNESS:  Could you be more specific.

24  BY MR. RADTKE:

25  Q.   Was there a type of documents that you were charged

1  with gathering and providing to BorgWarner's attorney?

2 A. I would be responsible for documents that are now

3  Exhibits 87 and 86, for producing those as well as

4  information pertaining to the communications I would

5  have had with the plant location, and that particular

6  subject matter of the Muncie hourly retiree changes

7  that took place.

8 Q. Were all those documents located in the Auburn Hills

9  headquarters?

10 A. No.

11 Q. Where were they located beyond that?

12 A. I produced what was located within my offices, but I

13  did not produce documents that were located elsewhere.

14 Q. But you searched within your offices?

15 A. Yes.

16 Q. And your office is in Auburn Hills?

17 A. Yes.

18 Q. There may have been other documents produced outside

19  of Auburn Hills; is that what you're saying?

20 A. Yes.

21 Q. And you weren't in charge of that, gathering that

22  information?

23 A. No.

24 Q. In your search for documents, did you run across any

25  contract bargaining notes from the Muncie facility?

1   A.   I have a copy as presented to me from the Muncie HR

2        team of what was agreed to.  I am familiar with that,

3        but bargaining notes, no.

4   Q.   So you had a copy of the agreements that were reached

5        by the parties in Muncie?

6   A.   Yes.

7   Q.   And how would you receive those?

8   A.   They would be sent to me via e-mail typically from the

9        director of HR or HR manager at the plant location.

10  Q.   And did they send that to you as they were being

11       negotiated or did they send it to you after the plant

12       closed?

13  A.   They sent that to me after negotiations were concluded

14       and then final copies after signature.

15  Q.   Were you involved in formulating bargaining proposals

16       for the Muncie facility on behalf of management?

17                  MR. BURCHFIELD:  Object to form.

18                  You may answer.

19                  THE WITNESS:  To what -- to specifically

20       2005 or what year?

21  BY MR. RADTKE:

22  Q.   I believe there was only two sets of bargaining since

23       you've been employed at BorgWarner.  One was 2005

24       which you mentioned you presented a proposal; correct?

25  A.   Mm-hmm.

```
1    Q.    And then there was also the bargaining over the

2          effects of the plant closing?

3    A.    Right.

4    Q.    And were you involved in -- I believe you testified

5          earlier that you were involved in some way with that

6          negotiation?

7    A.    Yes.

8    Q.    What was your involvement in the plant closing

9          negotiations?

10   A.    For the plant closing?

11                   MR. BURCHFIELD:  Object to form.

12                   You may answer.

13                   THE WITNESS:  I was responsible for the

14         information on the value of -- or valuing of the

15         retiree health care benefit obligation for those

16         active employees terminating under the effects

17         bargaining agreement as well as working with our

18         actuaries on some additional pension options requested

19         by the union committee.

20   BY MR. RADTKE:

21   Q.    Did you make a presentation during the plant closing

22         negotiations to the union committee?

23   A.    Yes, I did.

24   Q.    And do you recall when that was?

25   A.    The fall prior to the plant shutdown, I believe.
```

1    Q.    So fall of 2008?

2    A.    Mm-hmm.

3    Q.    And you went down to Muncie and made a presentation?

4    A.    Yes.

5    Q.    And how long was that presentation approximately?

6    A.    Approximately an hour.

7    Q.    Were you involved in any contract negotiations after

8          that?

9    A.    No.

10   Q.    Was there any -- while you were present were there any

11         negotiations that occurred?

12   A.    No.

13   Q.    Who requested that you make that presentation?

14   A.    The Muncie HR management team.

15   Q.    Did you make -- did your presentation relate to

16         retiree health care benefits for current retirees as

17         of that time?

18   A.    No.

19   Q.    It was all for prospective retirees?

20   A.    Yes.

21   Q.    Did you only go down to Muncie one time and make a

22         presentation in the plant closing agreement?

23   A.    I went two times:  One on the options available if

24         they lose coverage, once their coverage with

25         BorgWarner would be eliminated; then the second

1        presentation was on the pension benefit.

2    Q.  So the first one was about active employees' health

3        care?

4    A.  Yes.

5    Q.  And then the second one was about what was the nature

6        of the pension benefits that you were discussing?

7    A.  They wanted to accelerate pension benefit vesting for

8        certain actives with a future pension benefit, so we

9        reviewed along with our actuaries the cost associated

10       with doing that and options associated with providing

11       them with a lump sum benefit.

12   Q.  And that was a separate time that you went to Muncie?

13   A.  Yes.

14   Q.  Who was the -- who were the actuaries that you worked

15       with in making those presentations?

16   A.  Towers Watson.

17   Q.  Both times?

18   A.  The pension was with Towers Watson.  The health care

19       was with UnitedHealthcare.

20   Q.  Who contracted with UnitedHealthcare to provide the

21       information?

22   A.  UnitedHealthcare is the vendor that is responsible for

23       our retiree reimbursement accounts that we provide to

24       all other BorgWarner retirees that had a -- had a

25       benefit, retiree health care benefit, and they

```
 1        presented to the group as to what individual options
 2        are available in the marketplace.
 3   Q.   And with respect to UnitedHealthcare are they paid by
 4        BorgWarner, Inc for their services?
 5   A.   They're technically paid by BorgWarner, by each one of
 6        the business units that have retirees in the program.
 7        They're responsible for their own costs.
 8   Q.   So the BorgWarner DTP was supposed to be responsible
 9        for the UnitedHealthcare cost related to their
10        activities in Muncie?
11   A.   Yes.  That's why -- you had asked about BorgWarner DTP
12        and its existence.  BorgWarner DTP is still an entity
13        and that has costs associated with retirees of
14        BorgWarner DTP, Inc.
15   Q.   So pension and health care?
16   A.   Yes.
17             I'd love a Diet Coke.  Can I get Diet Coke?
18             MR. RADTKE:  Off the record.
19             (Off the record at 2:16 p.m.)
20             (Back on the record at 2:17 p.m.)
21   BY MR. RADTKE:
22   Q.   Do you recall that in 2008, BorgWarner announced
23        changes for retiree health care benefits for hourly
24        retirees beginning in May of 2009?
25   A.   Yes.
```

1   Q.   Were you involved in the decision to make those

2        changes?

3   A.   I presented options relative to those decisions, but I

4        was not a final -- I don't have the authority to make

5        the final decision.

6   Q.   Who did you present options to?

7   A.   To our employee benefits committee.

8   Q.   And who made the decision to make the changes in those

9        benefits?

10  A.   The employee benefits committee.

11  Q.   Who you've described previously?

12  A.   Yes.

13  Q.   And that employee benefits committee decided to make

14       benefit changes effective May 1, 2009; correct?

15  A.   Yes.

16  Q.   And that decision was made unilaterally; correct?

17  A.   Yes.

18  Q.   It was not bargained with the union?

19  A.   No.

20  Q.   At the same -- were there any retiree health care

21       changes made to anyone else in May 1, 2009, with

22       respect to BorgWarner units?

23  A.   The changes in 2009 for other groups were made January

24       1st of 2009, and all other nonunion salaried and

25       hourly employees have the same design changes that

1        were effective May of 2009 with the Muncie group.

2   Q.   In making your presentation did you review any of the

3        health insurance agreements that were negotiated for

4        the Muncie group?

5   A.   No.

6   Q.   Did you seek a legal opinion as to the legality of

7        making the changes?

8   A.   I did not, no.

9   Q.   Did others?

10               MR. BURCHFIELD:  Object; foundation.

11               THE WITNESS:  I don't know.

12  BY MR. RADTKE:

13  Q.   It is my understanding that the changes that were made

14       to retiree health care benefits for the Muncie group

15       affected those retirees who retired after October 27,

16       1989.

17               Is that your understanding as well?

18  A.   Yes.

19  Q.   And that the retiree health care benefits that were in

20       place for the preOctober '89 retirees were left

21       unchanged?

22  A.   Correct.

23  Q.   So that not all BorgWarner retirees have the same

24       benefits that are currently in place for the class

25       that is involved in this lawsuit; correct?

1   A.   Correct.

2   Q.   And do you know why the benefits were not changed for

3        the preOctober 27, 1989 hourly retirees?

4   A.   My understanding is that the majority of the costs

5        associated with having those plans would be on the

6        post-1989 group.

7   Q.   It was not based on contract language, as far as you

8        know?

9   A.   I don't know.

10                      MARKED FOR IDENTIFICATION:

11                      DEPOSITION EXHIBIT 88

12                      2:22 p.m.

13  Q.   Ms. DuFour, you've been handed a document that's been

14       marked DuFour Deposition Exhibit 88.

15                Have you ever seen this document before?

16  A.   Yes.

17  Q.   When did you see this document?

18  A.   I prepared this document.

19  Q.   Okay.  So you saw it right from the beginning?

20  A.   Mm-hmm.

21  Q.   Yes?  Just to remind you, and I didn't remind you

22       before because we'll catch you, but you have to say

23       yes or no.

24  A.   Sorry.

25  Q.   It's okay.  You're doing good.

```
1                  And so after you prepared this document

2        what did you do with it?

3   A.   It was reviewed by the Muncie HR team, and it was then

4        distributed to all those retirees that would be

5        impacted by the change.

6   Q.   Do you recall about how many retirees were impacted by

7        the change?

8   A.   Approximately a thousand.

9   Q.   And in accordance with this document changes were made

10       for both preMedicare retirees and Medicare retirees;

11       correct?

12  A.   Correct.

13  Q.   And there were different plans based on whether you

14       were Medicare eligible or not; correct?

15  A.   Correct.

16  Q.   And about when did this document get distributed to

17       retirees?

18  A.   February of 2009.

19  Q.   That's the date that's on the top; right?

20  A.   Yes.

21  Q.   And was it mailed to them?

22  A.   Yes.

23  Q.   And then it looks like there were some meetings held

24       in the Muncie area in March.

25  A.   Yes.
```

1  Q.   Did you attend those meetings?

2  A.   No.

3  Q.   Do you know who attended those meetings?

4  A.   Janice Long is the representative of the Muncie HR

5       team, and Dave Campbell, and representatives from

6       UnitedHealthcare responsible for administering the

7       plans.

8  Q.   And this document describes some of the changes -- the

9       changes that were being made as of May 1, 2009; is

10      that accurate?

11 A.   Yes.

12 Q.   And were these the changes that were actually made

13      effective May 1, 2009?

14 A.   Yes.

15 Q.   And as of May 1, 2009, for preMedicare retirees, was

16      their health insurance company Anthem?

17 A.   Yes.

18 Q.   And was that the case prior to May 1, 2009?

19 A.   Yes.

20 Q.   And if you look at the back of this document, there's

21      a description summary of the benefits; is that

22      accurate?

23 A.   Mm-hmm.

24 Q.   And that's what was implemented?

25 A.   Yes.

1  Q.  And what was the benefit provided to Medicare eligible
2      retirees?
3  A.  A retiree reimbursement account where they could
4      submit the expense of premium costs for Medicare plans
5      of their choice against the retiree reimbursement
6      account as well as their out-of-pocket expenses for
7      health care.
8  Q.  And if there were expenses beyond the amount in the
9      retiree reimbursement account who was responsible for
10     that?
11 A.  The retiree.
12 Q.  And at that point BorgWarner stopped providing a plan
13     of benefits for the 65 -- the Medicare eligible
14     retirees?
15 A.  Correct.
16 Q.  And also a prescription drug plan; correct?
17 A.  Correct.
18 Q.  And what was the amount that Medicare retirees were
19     going to receive as of May 1, 2009?
20 A.  The monthly credit on the annual amount in 2009 would
21     be 1900.
22 Q.  $1,900 per year?
23 A.  Mm-hmm.  They received a pro rata of that because of
24     the May effective date.
25 Q.  So would they -- how would they get that money?

1   A.   That money is credited to their UnitedHealthcare

2        retiree reimbursement account and they would submit

3        claim forms against that account to receive tax free

4        reimbursement.

5   Q.   And did they have a UnitedHealthcare account prior to

6        May 1, 2009?

7   A.   No, they did not.

8   Q.   So that was established as part of the change?

9   A.   Correct.

10  Q.   If a retiree was married and they were not -- their

11       spouse was not Medicare eligible, how was that

12       treated?

13  A.   Then the spouse would remain in the preMedicare

14       benefit plan and then transition when they were

15       Medicare eligible to the retiree reimbursement

16       account.

17  Q.   And what would happen if the spouse was Medicare

18       eligible?

19  A.   Then they both would receive a retiree reimbursement

20       account.

21  Q.   Of this $1,900 apiece?

22  A.   Yes.

23  Q.   Now I know that there was a monthly cost for pre65

24       retirees; right?

25  A.   Could you clarify monthly cost?

1   Q.   There was a monthly contribution for health insurance

2        for pre65 retirees; correct?

3   A.   Yes.

4   Q.   And if a spouse was less than 65, nonMedicare let's

5        just say, and they decided not to participate in the

6        pre65 benefits, and the other person was Medicare

7        eligible, how would that work?

8   A.   You would be responsible for paying your premium in

9        order to maintain eligibility for the preMedicare

10       plan.

11  Q.   What if the preMedicare person opted out, would the

12       Medicare person get the $1,900?

13  A.   Yes.

14  Q.   Once that preMedicare person reached Medicare

15       eligibility could they opt back in?

16  A.   No.  You had to maintain your coverage over that

17       period of years by making your premium contribution

18       share in order to maintain eligibility for the plan.

19  Q.   Do you know how many people decided against retaining

20       their retiree health care coverage?

21  A.   Eight.

22  Q.   Eight out of the hourly group?

23  A.   Yes.

24                   MARKED FOR IDENTIFICATION:

25                   DEPOSITION EXHIBIT 89

```
 1                        2:29 p.m.
 2    Q.    Ms. DuFour, you've been handed a document that's been
 3          marked as DuFour Exhibit 89.  It's a document that's
 4          titled Important Notice From BorgWarner DTP, Inc.
 5          About Your Prescription Drug Coverage and Medicare.
 6                        Have you ever seen this document before?
 7    A.    Let me review it.
 8    Q.    Sure.  Take your time.
 9    A.    Yes.
10    Q.    When did you see this document?
11    A.    In early 2009, but when specifically I don't recall.
12    Q.    Were you involved in drafting this document?
13    A.    I reviewed this language.
14    Q.    Who drafted it, do you recall?
15    A.    The Muncie HR location.
16    Q.    Did you approve this before it went out?
17    A.    Yes.
18                        MR. BURCHFIELD:  Object to form.
19    BY MR. RADTKE:
20    Q.    And it was mailed to retirees who were Medicare
21          eligible; is that accurate?
22    A.    Yes.
23    Q.    Because prior to May 1, 2009, those retirees had
24          prescription drug coverage through BorgWarner;
25          correct?
```

1    A.    Correct.

2    Q.    And this was some kind of a -- this was a legal notice

3          that was required to be sent?

4    A.    Correct.

5                        MARKED FOR IDENTIFICATION:

6                        DEPOSITION EXHIBIT 90

7                        2:32 p.m.

8    Q.    Ms. DuFour, you've been handed a document marked as

9          DuFour Exhibit 90.

10                       Have you ever seen this document before?

11   A.    Yes.

12   Q.    And what is this document?

13   A.    It is a communication for the 5 of '09 changes,

14         retiree changes.

15   Q.    Did you draft this document as well?

16   A.    Yes.

17   Q.    And this is different than Exhibit 88 in one way that

18         I can tell which is this is targeted -- number 90 is

19         targeted at preMedicare retirees.

20   A.    Correct.

21   Q.    So did preMedicare retirees get both Exhibit 88 and

22         Exhibit 90?

23   A.    Yes.

24   Q.    And did Medicare retirees receive more than one Travel

25         Guide?

1    A.   Medicare age retirees?

2    Q.   Yes.

3    A.   No, they did not receive Exhibit 90.

4    Q.   So they just received Exhibit 88 and then the

5         preMedicare got both?

6    A.   Correct.

7    Q.   Why did the company do two to the preMedicare group?

8    A.   Because the preMedicare group would age into Medicare

9         benefits, so it's important that they understand what

10        would be available to them in the future, and the

11        meetings were for both groups.

12                   MARKED FOR IDENTIFICATION:

13                   DEPOSITION EXHIBIT 91

14                   2:34 p.m.

15   Q.   Ms. DuFour, you've been handed a document that's been

16        marked as DuFour Exhibit 91.

17                   Have you ever seen this document before?

18   A.   Yes.

19   Q.   When did you see this document?

20   A.   In early 2009.

21   Q.   Were you involved in drafting this document?

22   A.   Yes.

23   Q.   Did you draft this document?

24   A.   In conjunction with the HR at the Muncie facility.

25   Q.   And was this the document that was sent to preMedicare

```
 1              retirees?
 2   A.    Yes.
 3   Q.    And this explains -- or this is their enrollment form
 4         in '09; correct?
 5   A.    Correct.
 6   Q.    Was there any enrollment form for the Medicare
 7         eligible group?
 8   A.    Not that I recall.
 9   Q.    They just were -- they just had a UHC RRA established
10         for them?
11   A.    Correct.
12   Q.    Because they didn't have to pay anything to get that
13         amount; correct?
14   A.    Correct.
15   Q.    So there was nothing to fill out for them to get the
16         $1,900?
17   A.    Correct.
18                        MARKED FOR IDENTIFICATION:
19                        DEPOSITION EXHIBIT 92
20                        2:37 p.m.
21   Q.    Ms. DuFour, you've been handed a document marked as
22         DuFour Exhibit 92.
23                        Have you ever seen this document before?
24   A.    Yes.
25   Q.    What is it?
```

1   A.   It is the summary plan highlights produced by Anthem.

2   Q.   And who is this summary plan description applicable

3        to?

4   A.   The preMedicare population effective May 1 of '09.

5   Q.   So at that point the plant in Muncie was closed;

6        correct?

7   A.   Yes.

8   Q.   And it would be accurate to say that this summary plan

9        description was not negotiated with the union;

10       correct?

11  A.   No.

12  Q.   It --

13  A.   Yes, it would be accurate.

14  Q.   Was this provided to the union prior to the

15       implementation?

16  A.   No.

17  Q.   Did you have any role in drafting this SPD?

18  A.   No.

19  Q.   That was done solely by Anthem?

20  A.   It's an Anthem document.

21                  MARKED FOR IDENTIFICATION:

22                  DEPOSITION EXHIBIT 93

23                  2:38 p.m.

24  Q.   Ms. DuFour, you've been handed a document that's been

25       marked DuFour Exhibit 93.

1                      Have you ever seen this document before?

2    A.   Yes.

3    Q.   Did you draft this document as well?

4    A.   No.   Janice Long would have used the 2009 version and

5         made the necessary changes to it and it was provided

6         to me for information.

7    Q.   Did you review it prior to it going out?

8    A.   Yes.

9    Q.   So she used the template that you had done in 2009 to

10        make this?

11   A.   Yes.

12   Q.   And this is the information regarding the 2010

13        preMedicare retiree health care provided by

14        BorgWarner; is that accurate?

15   A.   Yes.

16   Q.   It's similar obviously to the 2009 Travel Guide;

17        correct?

18   A.   Yes.

19   Q.   Was there a Travel Guide in 2010 that was aimed at

20        either both the Medicare eligible and the preMedicare

21        or just solely at the Medicare eligibles?

22   A.   Solely at the Medicare eligibles?

23   Q.   Yes.   In 2009, there was one that was aimed at

24        everybody, every retiree, and then there was a

25        separate one that was just for preMedicare, and this

```
 1          one is aimed at preMedicare it looks like, and what
 2          I'm asking was there a similar 2010 Travel Guide that
 3          was aimed at all or both groups?
 4    A.    No.
 5    Q.    So if you were Medicare eligible you did not receive
 6          another Travel Guide in 2010?
 7    A.    Not from us.  You would receive information from
 8          UnitedHealthcare.
 9    Q.    Okay.  And because UnitedHealthcare continued to
10          administer the RRA plan for Medicare?
11    A.    Correct.
12    Q.    And did the Medicare eligible group receive any
13          increase in the RRA in 2010?
14    A.    Yes.
15    Q.    Do you know how much it went up?
16    A.    $75.
17    Q.    So it went from about 1900 to $1,975 a year?
18    A.    Yes.
19    Q.    And were there changes in the retiree health care
20          benefits for the preMedicare group for '09?
21    A.    No.
22    Q.    The same coverages?
23    A.    Yes.
24    Q.    And same monthly contribution?
25    A.    I believe so.
```

1    Q.   And there was an enrollment form in 2010 as well for

2         the preMedicare group?

3    A.   Yes, it would be the same form as mirroring the 2009.

4                   MARKED FOR IDENTIFICATION:

5                   DEPOSITION EXHIBIT 94

6                   2:42 p.m.

7    Q.   Ms. DuFour, you've been handed a document marked as

8         DuFour Exhibit 94.

9                   Have you ever seen this document before?

10   A.   Yes.

11   Q.   And did you prepare this document?

12   A.   Again, the changes year over year are marked up by

13        Janice Long from the local Muncie facility.  We review

14        it and it gets mailed.  It gets distributed.

15   Q.   And this was again aimed at the preMedicare retirees;

16        correct?

17   A.   Yes.

18   Q.   And if the Medicare retirees received something it

19        was --

20   A.   -- from UnitedHealthcare.

21   Q.   And they would not have received something from

22        BorgWarner; correct?

23   A.   Correct, because this is not relevant information for

24        Medicare age retiree.

25   Q.   In 2011, did the RRA increase from $1,975?

1   A.   To $2,035.

2   Q.   Were there any changes in 2011 for preMedicare

3        retirees?

4   A.   No.

5   Q.   Has a 2012 enrollment form gone out yet?

6   A.   Yes.

7   Q.   Are there any -- is it a similar nature as the prior

8        Travel Guides?

9   A.   Yes.

10  Q.   Same enrollment form as previous years?

11  A.   Yes.

12  Q.   And any changes in preMedicare retiree health care

13       benefits in 2012?

14  A.   No.

15  Q.   Does that begin, the enrollment period, begin in May

16       of 2012?

17  A.   No.  It's on an annual basis.  After the May of '09

18       change it then is on an annual basis.  So the process

19       begins in the October/November time frame with a

20       January 1st effective date.

21  Q.   With respect to the RRA, did that change calendar-wise

22       at some point?

23  A.   That changes, if there is a change, it changes January

24       1st.

25  Q.   So the first year in May 1 of 2009, people who are

1          Medicare eligible receive $1,900, and when did the

2          monthly increase go into effect for that group?

3    A.    January 1st of the following year.

4    Q.    So they received a little bit more in their monthly

5          amount in January 1st of 2010?

6    A.    Yes.

7    Q.    And then the increase in January of 2011, there was an

8          additional amount; correct?

9    A.    Yes.

10   Q.    And was there an increase in January of 2012?

11   A.    No.

12   Q.    So it stayed at 1,000 --

13   A.    $2,035.

14   Q.    $2,035 in 2012, just like it was in 2011?

15   A.    Yes.

16   Q.    Why did the company decide not to have an increase

17         this year?

18   A.    Looking at the information that we get provided

19         through Towers Watson on trends going on in the

20         Medicare marketplace, it was determined that the

21         $2,035 was ample enough to cover premium costs

22         associated with the plans that had actually been

23         decreased as well as looking at the spending pattern

24         of those people participating in the RRA.

25   Q.    Do you look at that pattern company-wide or

1          Muncie-wide?

2    A.    Company-wide.

3    Q.    What does $2,035 buy a Medicare eligible retiree?

4    A.    It gives them a choice of a variety of plans between

5          Medigap, Medicare Advantage Plans and Medicare Part D

6          plans.

7                        MARKED FOR IDENTIFICATION:

8                        DEPOSITION EXHIBIT 95

9                        2:47 p.m.

10   Q.    Ms. DuFour, you've been handed a document marked

11         Exhibit 95.

12                   Have you ever seen this document before?

13         It's dated February 2, 2009, and it's titled 2009

14         Retiree Health Care Changes, Leader Talking Points,

15         Muncie Hourly Current Retirees.

16   A.    Yes.

17   Q.    Were you involved in putting this document together?

18   A.    Yes.

19   Q.    Did you put it together?

20   A.    Yes, with some assistance from our -- an outside

21         communications consultant.

22   Q.    And what was this document used for?

23   A.    It was to provide our management team with information

24         ahead of the changes so they would be better educated

25         to answer questions should they receive questions from

1        retirees.

2    Q.  And what management team are you referring to that

3        would use this, these talking points?

4    A.  The local Muncie management team as well as the VP of

5        HR for that business unit and the business unit

6        president associated with the Muncie facility.

7    Q.  On page two of this document under talking points, the

8        first paragraph, could you read that to yourself.

9    A.  Yes.

10   Q.  Were you responsible for writing that paragraph?

11   A.  Yes, and this information comes from other

12       communication pieces relative to the company's

13       reservation of rights to amend, modify or terminate

14       like the plan designs.

15   Q.  Where did you receive that information?

16   A.  In prior management communications that have been

17       provided to me.

18   Q.  From whom?

19   A.  From a variety of people within the Muncie HR team as

20       well as our senior management team at headquarters.

21   Q.  Do you remember any of the people in particular?

22   A.  Specific to this language?

23   Q.  Yes.

24   A.  No.

25   Q.  Did you ever see any document that supported the

1        statement in paragraph one?

2   A.   I believe there's a document associated with the

3        changes that occurred for 2006 from our corporate

4        communications department that has very similar

5        language.

6   Q.   Because in 2006 changes were made to retiree health

7        care for this same group; correct?

8   A.   Yes.

9   Q.   And then there was a lawsuit over those changes;

10       correct?

11  A.   Yes.

12  Q.   And is it accurate to say that the judge found that

13       the changes could not be made?

14  A.   No.

15  Q.   Okay.  What is your understanding of the results of

16       that lawsuit?

17  A.   That the judge found that those changes were made

18       prematurely because there was a collective bargaining

19       agreement in place at the time that the changes were

20       made.

21  Q.   Okay.  Did the company restore the benefits that were

22       in place before the changes in 2006?

23  A.   Yes.

24  Q.   And did they do that in 2009?

25  A.   No.

1    Q.   When did they restore the --

2    A.   Oh, I'm sorry, effective 1-1 of 2009, yes, they did.

3    Q.   And then the company went and changed it again on May

4         1, 2009?

5    A.   Yes.  We subsequently announced that at the close of

6         the effects -- or, I'm sorry, collective bargaining

7         agreement that was in place through April of '09, that

8         those benefits would be reinstated, and then effective

9         May 1st of '09 that they would be changed.

10   Q.   Okay.  So the information that you relied upon to

11        draft that first paragraph on page two was based on

12        what was sent out to people when the changes happened

13        in 2006?

14   A.   Yes.

15   Q.   Any other documents that you reviewed in order to

16        draft that or did you just rely on the previous

17        communication?

18   A.   I relied on information from senior management

19        including the documents from 2006 and the information

20        from the corporate communications department.

21   Q.   Have you ever seen a document that stated where

22        BorgWarner DTP has expressly reserved the right to

23        make changes or even eliminate coverage at its sole

24        discretion?

25   A.   Seen a document?

1   Q.   Yes.

2   A.   Yes.

3   Q.   Have you ever seen a health insurance agreement that

4        says that?

5   A.   I've not read all our health insurance agreements.

6   Q.   So nothing negotiated between the union and the

7        company, you've never seen anything that said that?

8   A.   No.

9   Q.   You saw the 2006 document communication; correct?

10  A.   Yes.

11  Q.   And you had conversations with BorgWarner officials?

12  A.   Yes.

13  Q.   Any other source for that statement in paragraph one

14       there?

15  A.   Not that I'm aware of.

16  Q.   The next sentence says:  Changes have been made to

17       various plan provisions in the past and will continue

18       to be made as determined to be appropriate by

19       BorgWarner DTP.

20            What changes were made to plan provisions

21       in the past?

22  A.   It's my understanding that there were changes to the

23       benefit design.  Specifically, I can't speak to that

24       because they were made before my employment with

25       BorgWarner, but after my employment with BorgWarner we

1      did change network providers as an example.  There was

2      probably other changes.  I just don't -- I can't off

3      the top of my head think of those examles.

4   Q.  Okay.  When you say network providers, what do you

5      mean by that?

6   A.  For example, we moved the medical and prescription

7      from Cigna to Anthem to provide the company as well as

8      the retirees with improved network discounts.

9   Q.  So there was a change made -- that was a bad question

10     obviously.  I'll try and make a better one.

11              So when did that change from Cigna to

12     Anthem occur?

13  A.  2007.

14  Q.  Okay.  Was that during the time period that BorgWarner

15     had implemented the change that was later found to be

16     premature?

17  A.  I have to think of my timing.

18  Q.  Okay.

19  A.  Yes, it was in the middle of that process.

20  Q.  So that was -- is that what you're referring to in

21     that sentence is that changes were made previously and

22     you're talking about changing prescription drug

23     providers in 2007?

24  A.  Again, it's my understanding by being told by

25     management that we had also made prior changes to the

```
 1              plans.   Specifically what those were, prior to my
 2              employment with BorgWarner, I can't speak to them.
 3       Q.     Okay.  And the plan change that you are aware of is
 4              that the company went from using Cigna for
 5              prescription drugs to Anthem; is that correct?
 6       A.     Correct.
 7       Q.     Was there a change in prescription drug copays when
 8              that switch occurred?
 9       A.     We provided in conjunction with the BorgWarner Family
10              Pharmacy a discount opportunity for people to use the
11              pharmacy versus the Anthem prescription drug benefit.
12       Q.     So that it was a better benefit for people?
13       A.     Yes.
14                      MR. RADTKE:  It's five to three.  Can we
15              take about 10 minutes?
16                      MR. BURCHFIELD:  Sure.
17                      (Recess taken at 2:55 p.m.)
18                      (Back on the record at 3:10 p.m.)
19                      MARKED FOR IDENTIFICATION:
20                      DEPOSITION EXHIBIT 96
21                      3:10 p.m.
22    BY MR. RADTKE:
23       Q.     Michelle -- or Ms. DuFour, you've been handed a
24              document marked as DuFour Exhibit 96.
25                      Have you ever seen this document before?
```

1    A.    Yes.

2    Q.    Do you know what this document is?

3    A.    It is a copy of the old plan design for a certain

4          class of Medicare retirees enrolled in Medicare

5          Indemnity Plan 2 with Cigna HealthCare.

6    Q.    Do you know when these benefits were in place?

7    A.    No.  This plan would have been put in place prior to

8          my employment with BorgWarner.

9    Q.    And do you know -- it says base -- part of the title

10         says Base Major Medical Plan With 2004 Upgrades, MIND

11         2.

12               Do you know what that means?

13   A.    MIND 2 is Medicare Indemnity Plan.  What they're

14         referring to for 2004 upgrades, I don't know.

15   Q.    That was before your time?

16   A.    Mm-hmm.

17   Q.    But do you think that this is the description of the

18         plan that was in place in 2004?

19   A.    In my opinion, yes.

20   Q.    Because it's got the 2004 upgrades, whatever they are?

21   A.    Correct.

22   Q.    You're not familiar with what upgrades were made in

23         2004?

24   A.    No, I'm not.

25               MARKED FOR IDENTIFICATION:

```
 1                    DEPOSITION EXHIBIT 97

 2                         3:13 p.m.

 3   Q.   You've been handed what's been marked as DuFour

 4        Exhibit 97, which is a Cigna HealthCare Benefit

 5        Summary BorgWarner, Inc., Muncie Hourly Pre-65

 6        Retirees.

 7                    Have you ever seen this document before?

 8   A.   Yes, I have.

 9   Q.   And how did you come across this document?

10   A.   These would have been provided to me from the Muncie

11        HR team.

12   Q.   And when would they provide those to you?

13   A.   When I onboarded with BorgWarner.

14   Q.   So this is something -- would the same have been true

15        with Exhibit 96?

16   A.   Yes.

17   Q.   So when you started at BorgWarner in January of 1995,

18        you received documents 96 and 97 from the BorgWarner

19        Muncie plant?

20   A.   Yes.

21   Q.   And that was to show you the benefits that were in

22        place for different groups of retirees?

23   A.   Yes.

24   Q.   And this group is, according to this document, is

25        pre-65 retirees between 1990 and '92, passive PPO
```

1          coinsurance plan with 2004 upgrades, MPO -- MPPO3.

2                    Do you know what that information means?

3    A.    Yes.

4    Q.    Okay.

5    A.    Pre-65 or under age 65 retirees for anyone who retired

6          between January of 1990 through December of 1992.

7          It's a passive PPO plan meaning that if there was an

8          in-network provider that would be available, the

9          in-network provider discounts would be applied.  Out

10         of network would be -- it's the same benefit level as

11         in network, perhaps an issue with network availability

12         at that point in time.  With 2004 upgrades, I don't

13         know what those are, and then the acronym would be

14         Muncie PPO Plan 3.

15   Q.    Okay.  And would it be your understanding that these

16         were the benefits in place for that group of retirees

17         as of 2004?

18   A.    Yes.

19                    MARKED FOR IDENTIFICATION:

20                    DEPOSITION EXHIBIT 98

21                    3:15 p.m.

22   Q.    You've been handed DuFour Exhibit 98.

23                    Could you describe what this document

24         contains?

25   A.    It's the Cigna Benefit Summary for the Muncie hourly

1              retirees age 65 and older or Medicare eligible that

2              retired 1 of '93 forward.  It's a PPO plan.  I don't

3              know what they mean by 2004 upgrades, and the acronym

4              was the insurance carrier would be Muncie PPO5.

5     Q.      And so the MPP05 is a different plan than the MPP03?

6     A.      Yes.

7     Q.      Do you know what the distinction is between PPO3

8              versus PPO5?

9     A.      I would have to compare the two plan designs.  Is that

10             what you're asking me to do?

11    Q.      No.  It would be because they're two different plan

12             designs?

13    A.      Yes.

14    Q.      And is it your opinion that these were the benefits in

15             place for the retirees described in this document --

16             these are the benefits in place for the retirees

17             described in this benefits summary as of 2004?

18    A.      Yes.

19    Q.      Between the time you started in 2005 and the changes

20             that were implemented in 2006, are you aware of any

21             changes that were made to any of the hourly retirees

22             in Muncie as far as their plans go?

23    A.      There's a five percent incremental that gets applied

24             to the plans each year to the deductible and

25             out-of-pocket, so that would be a change to the plan.

1        We did some changes to add network providers.

2  Q.   Adding new people into the network?

3  A.   Mm-hmm.

4  Q.   New doctors?

5  A.   New doctors.  I believe there was an issue on vision

6        coverage that was addressed through adding --

7        providing a vision network of doctors in the area.

8  Q.   Okay.  So that would be something that would be

9        helpful for retirees, they would have more options;

10       correct?

11  A.   Yes.

12  Q.   And when did BorgWarner change from Cigna to Anthem?

13  A.   2007, I believe.

14  Q.   Did BorgWarner change -- or stay with Cigna when the

15       original changes were made in '06?

16  A.   Yes.

17  Q.   And then they switched to Anthem shortly thereafter?

18  A.   1-1 of '07.

19             MARKED FOR IDENTIFICATION:

20             DEPOSITION EXHIBIT 99

21             3:19 p.m.

22  Q.   Ms. DuFour, you've been handed a document marked

23        DuFour Exhibit 99, that's a Cigna Health Care Benefit

24        Summary, BorgWarner, Inc., for Muncie Hourly Medicare

25        Retirees After January 1, 1993, PPO Coinsurance Plan

**Michelle DuFour - January 12, 2012**

| | |
|---|---|
| 1 | with 2004 Upgrades MOA2M. |
| 2 | Have you ever seen this document before? |
| 3 | A.   Yes. |
| 4 | Q.   And what is this document? |
| 5 | A.   It is the Cigna summary benefit plan for the Medicare |
| 6 | age retirees retired after 1 of '93, and it is the |
| 7 | Muncie out-of-area Medicare plan. |
| 8 | Q.   And that is designated by that MOA2M; is that how you |
| 9 | know that? |
| 10 | A.   Yes. |
| 11 | Q.   So if someone did not live within the PPO near Muncie |
| 12 | this would be the plan that would be applicable to |
| 13 | that group? |
| 14 | A.   Yes. |
| 15 | Q.   And that was in place as of 2004 for that group of |
| 16 | retirees? |
| 17 | A.   Yes. |
| 18 | MARKED FOR IDENTIFICATION: |
| 19 | DEPOSITION EXHIBIT 100 |
| 20 | 3:21 p.m. |
| 21 | Q.   You've been handed a document numbered DuFour Exhibit |
| 22 | 100, and it's another Cigna HealthCare Benefit |
| 23 | Summary, BorgWarner, Inc., Muncie Hourly.  This is for |
| 24 | pre-65 retirees retired between January 1990 and |
| 25 | December 1992, PPO Coinsurance Plan with 2004 |

1          Upgrades, MPPO3.

2                    Have you ever seen this document before?

3     A.   Yes.

4     Q.   And when did you see this document?

5     A.   At the same time I received all these others.

6     Q.   Okay.  And this was also provided by the Muncie HR

7          group?

8     A.   Correct.

9     Q.   And this is for pre-65 retirees retired between

10         January '90 and December 1992, and this says PPO

11         Coinsurance Plan with 2004 Upgrades PPO3.

12                   I know that you are unfamiliar with what

13         the upgrades mean, but what does MPPO3 mean?

14    A.   The Muncie PPO version 3.

15    Q.   This one unlike Exhibit 97 is not passive.

16                   Do you know what that means?

17    A.   You didn't ask me a question.

18    Q.   I know.  I'm sorry.  I've been at this a long time.

19         I've asked a lot of questions.  I thought maybe you

20         wanted to ask one.

21                   MR. BURCHFIELD:  I think that's kind of

22         psychologically your message to yourself that you're

23         one too many questions.

24                   MR. RADTKE:  I'm just trying to keep track

25         of all these words that look almost exactly the same,

1          except for this one.

2     BY MR. RADTKE:

3     Q.   This is an aggressive one I think because it's not

4          passive, so what is the difference between the passive

5          PPO and the nonpassive PPO?

6     A.   I wouldn't want to speculate.

7     Q.   You're not sure?

8     A.   I'm not sure.

9     Q.   What does passive mean?

10    A.   Passive would mean that there is like an underlying

11         out-of-network benefit would be relatively similar to

12         the in-network benefit due to network contracting

13         issues in the area.

14    Q.   And this summary would have been in place for that

15         group of retirees as of 2004; correct?

16    A.   Yes.

17                    MARKED FOR IDENTIFICATION:

18                    DEPOSITION EXHIBIT 101

19                    3:24 p.m.

20    Q.   DuFour Exhibit 101 which you've just been handed is a

21         benefit summary.  This is for preMedicare retirees

22         after January 1, 1993, PPO Coinsurance Plan MOOA2.

23                    Are you familiar with what those words

24         mean?

25    A.   Yes.  It's a PPO plan that is administered through the

1   Cardinal Hospital Network which is basically the local

2   network in the Muncie area.

3   Q.   Okay.   And that would have been the plan that was in

4   place for certain preMedicare retirees as of 2004?

5   A.   Yes.

6   Q.   How do you know it's Cardinal?

7   A.   Because it says in-network includes Cardinal Hospital

8   Network.

9                   MARKED FOR IDENTIFICATION:

10                  DEPOSITION EXHIBIT 102

11                  3:25 p.m.

12  Q.   You've been handed DuFour Exhibit 102.   It's another

13  Cigna benefit summary for preMedicare retirees after

14  January '93.   This is a PPO Coinsurance Plan with 2004

15  upgrades, MOOA2.

16            It looks like the same title as the

17  previous one except for this one contains the 2004

18  upgrades.

19  A.   Yes.

20  Q.   And this would have been in place in 2004 for this

21  group of retirees?

22  A.   Yes.

23  Q.   You're still not recalling what the 2004 upgrades

24  were?

25  A.   No.

1                    MARKED FOR IDENTIFICATION:

2                    DEPOSITION EXHIBIT 103

3                    3:26 p.m.

4   Q.   Ms. DuFour, you've been handed DuFour Exhibit 103.

5        This is a benefit summary for pre-65 retirees, retired

6        January '93 plus, PPO Coinsurance Plan MPPO4.

7                    Can you describe what that means?

8   A.   It's a preMedicare plan, Muncie hourly retirees,

9        retired after 1 of '93, and the PPO coinsurance plan

10       has an in-and-out-of-network benefit level within the

11       Cardinal Hospital Network.

12  Q.   Okay.  This would have been in place as of 2004?

13  A.   2004.

14  Q.   Ms. DuFour, when you first arrived at your job at

15       BorgWarner, if you wanted to determine what were the

16       benefits for the retirees that retired out of the

17       Muncie plant, would this be the best evidence of what

18       their benefits were?

19                    MR. BURCHFIELD:  Object to form.

20                    THE WITNESS:  Yes.

21  BY MR. RADTKE:

22  Q.   These summaries?

23  A.   Yes.

24  Q.   And did you ever find out that any of these summaries

25       that I've shown you were inaccurate in any way?

1   A.   Not substantively inaccurate.  I mean we may have had

2        a small wording change, but nothing of substance.

3   Q.   Okay.

4                    MARKED FOR IDENTIFICATION:

5                    DEPOSITION EXHIBIT 104

6                    3:28 p.m.

7   Q.   Ms. DuFour, you've been handed what's when marked as

8        DuFour Exhibit 104, which is the same description as

9        Exhibit 103, correct me if I'm wrong, except that it

10       contains the 2004 upgrades?

11  A.   I would agree.

12  Q.   And that would have been what was in place for that

13       group of retirees in 2004; correct?

14  A.   Yes.

15                   MARKED FOR IDENTIFICATION:

16                   DEPOSITION EXHIBIT 105

17                   3:30 p.m.

18  Q.   Ms. DuFour, you've been handed a document that's been

19       marred as DuFour Exhibit 105, and it's a document

20       entitled Muncie Hourly Health Plans Effective 1-1-93,

21       and it contains a chart with different benefits and a

22       description of their benefits.

23                   Have you ever seen this document before?

24  A.   No.

25  Q.   Have you ever seen a similar document?

1          MR. BURCHFIELD:  Object to form.

2          THE WITNESS:  No, I don't believe so.

3   BY MR. RADTKE:

4   Q.   Going back to the numerous benefit summaries that

5        we've gone through today, do you know why there were

6        all those different plans for retirees that were in

7        place?

8          MR. BURCHFIELD:  Object to foundation.

9          THE WITNESS:  I wouldn't know that.

10  BY MR. RADTKE:

11  Q.   Did you ever ask anybody?

12  A.   Yes.

13  Q.   Who did you ask?

14  A.   The Muncie HR team benefits administrator.

15  Q.   Who was that?

16  A.   At that time Laura Bowles.

17  Q.   And about when did you ask Ms. Bowles about this?

18  A.   Upon receipt of the variety of summary plan

19       descriptions at my arrival at BorgWarner.

20  Q.   And do you recall her response?

21  A.   Yes.

22  Q.   What was that?

23  A.   That a variety of plans are in place due to the

24       changes in the health care environment in the Muncie

25       area as well as the various contract periods in which

**Michelle DuFour - January 12, 2012**                    70

1        active employees would transition to retirement.

2   Q.   So it based on the various health insurance agreements

3        and their benefits that were negotiated?

4   A.   Yes.

5                    MR. BURCHFIELD:   Object to form.

6                    MARKED FOR IDENTIFICATION:

7                    DEPOSITION EXHIBIT 106

8                    3:33 p.m.

9   Q.   Ms. DuFour, you've been handed a document marked

10       DuFour Exhibit 106.

11                   Have you ever seen this document before?

12       It's an April 26, 2010 letter to Louis Marshall, Jr.

13  A.   Yes.

14  Q.   Were you involved in drafting this document?

15  A.   No.

16  Q.   Who drafted it?

17  A.   Judy Hanley, our retiree specialist.

18  Q.   And it says on the top of the first page BorgWarner,

19       Inc. Retiree Benefits with an address on Hamlin Road

20       in Auburn Hills.

21                   Is that where the retiree benefits

22       department was located in 2010?

23  A.   Yes, with the exception of the day-to-day

24       administration for the Muncie facility.

25  Q.   And so was there a reason that certain matters were

1       responded to by the retiree benefits department in

2       Auburn Hills rather than in Muncie?

3   A.  In order to follow the appeals process to the employee

4       benefits committee, we have standard language in which

5       to apply, and that language is with Judy Hanley at the

6       world headquarters, and so that would be used to

7       draft -- to formulate this response for the Muncie

8       retiree.

9   Q.  So is it accurate to say that the BorgWarner Flexible

10      Benefit Plans have an appeal procedure?

11  A.  Yes.

12  Q.  Is that what this letter is a part of, that appeal

13      procedure?

14  A.  Yes.

15  Q.  And when you talk about the BorgWarner benefit plan,

16      I'm referring back to DuFour Exhibit 86; is that

17      correct?

18  A.  Yes.

19  Q.  Is this following statement true:  Defendant

20      BorgWarner Flexible Benefit Plans is an employee

21      welfare benefit plan whose headquarters is in Auburn

22      Hills, Michigan?

23  A.  And it's the defendant -- what's the name of the plan?

24  Q.  BorgWarner Flexible Benefit Plans.

25  A.  That would be accurate.

1              MR. RADTKE:  If you'd give me a few minutes

2       here I can go through my notes and see if there's

3       anything left that I'd like to ask Ms. DuFour.

4              MR. BURCHFIELD:  Okay.

5              (Recess taken at 3:38 p.m.)

6              (Back on the record at 3:45 p.m.)

7    BY MR. RADTKE:

8    Q.   Michelle, were you ever involved in a discussion about

9         whether the benefits for this group of retirees were

10        vested or lifetime?

11   A.   Yes.

12              MR. BURCHFIELD:  Objection.  Well, go

13        ahead.

14              THE WITNESS:  Yes, involved in the

15        discussion.

16   BY MR. RADTKE:

17   Q.   And who else was involved in that discussion?

18              MR. BURCHFIELD:  In the event that you've

19        had discussions of this nature with lawyers, you may

20        identify the lawyers, but please do not disclose the

21        topics that were discussed.

22              THE WITNESS:  Our senior management team,

23        and that reservation of rights to amend, modify or

24        terminate was a discussion point not whether we had

25        the right, but the ability to make these changes was

1        because we had that right.  It was a company

2        philosophy that we retained that right.  That's what

3        the discussion was in regard to vesting.

4   BY MR. RADTKE:

5   Q.   Who else was on the senior management team?

6   A.   It would be our employee benefits committee along with

7        a local Muncie HR management.

8   Q.   And you said it was based on a company philosophy that

9        BorgWarner reserved those rights?

10  A.   History prior to my coming to BorgWarner that we had

11       that right to make those changes.

12  Q.   Okay.  So it was based on things that occurred before

13       you were present working at BorgWarner?

14  A.   Yes.

15  Q.   Was there any mention of what those items were that

16       they were relying upon?

17  A.   No.

18  Q.   Did you ever hear any union official state that the

19       benefits were vested or lifetime?

20  A.   My direct conversation between me and a union

21       official?

22  Q.   Yes.

23  A.   No, it wasn't in my role to have those types of direct

24       conversations with them.

25  Q.   I don't have anything further for you, Ms. DuFour.

1          Thank you for your time.  I appreciate it.

2     A.    Okay.   Thank you.

3                    MR. BURCHFIELD:  She would like to read and

4     sign and we have no questions.

5                    (Deposition concluded at 3:47 p.m.

6               Signature of the witness was requested.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   WILLARD L. SLOAN, EUGENE J. WINNINGHAM, JAMES L. KELLEY, on

2   behalf of themselves and a similarly situated class,

3                         Plaintiffs,

4              vs.                          Case No. 09-cv-10918

5   BORGWARNER, INC., BORGWARNER FLEXIBLE BENEFITS PLANS and

6   BORGWARNER DIVERSIFIED TRANSMISSION PRODUCTS, INC.,

7                         Defendants.

8

9

10                     VERIFICATION OF DEPONENT

11

12              I, having read the foregoing deposition

13      consisting of my testimony at the aforementioned time

14      and place, subject to any changes in the attached

15      errata sheet, do hereby attest to the correctness and

16      truthfulness of the transcript.

17

18

19                     _____

20                     MICHELLE DUFOUR

21                     Dated:

22

23

24

25

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                     ) SS

4    COUNTY OF OAKLAND )

5

6              I, DENISE M. KIZY, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing questions

9    and answers were recorded by me stenographically and

10   reduced to computer transcription; that this is a

11   true, full and correct transcript of my stenographic

12   notes so taken; and that I am not related to, nor of

13   counsel to, either party nor interested in the event

14   of this cause.

15

16

17

18

19

20

21

22              DENISE M. KIZY, CSR-2466

23              Notary Public,

24              Oakland County, Michigan.

25   My Commission expires:  July 28, 2013

Borgwarner, Inc., et al

**$**

**$1,900 (5)**
38:22;39:21;40:12;
44:16;50:1
**$1,975 (2)**
47:17;48:25
**$2,035 (5)**
49:1;50:13,14,21;51:3
**$75 (1)**
47:16

**0**

**05 (1)**
10:3
**06 (1)**
62:15
**07 (1)**
62:18
**09 (7)**
42:13;44:4;45:4;
47:20;49:17;54:7,9
**09-cv-10918 (1)**
75:4

**1**

**1 (19)**
21:9;22:4;33:14,21;
37:9,13,15,18;38:19;
39:6;41:23;45:4;49:25;
54:4;61:2;62:25;63:6;
65:22;67:9
**1,000 (1)**
50:12
**1:31 (1)**
5:3
**1:56 (1)**
21:6
**10 (4)**
7:23;16:9,11;57:15
**100 (3)**
4:3;63:19,22
**101 (3)**
4:4;65:18,20
**102 (3)**
4:5;66:10,12
**103 (4)**
4:6;67:2,4;68:9
**104 (3)**
4:7;68:5,8
**105 (3)**
4:8;68:16,19
**106 (3)**
4:9;70:7,10
**1-I (2)**
54:2;62:18
**1-1-93 (1)**
68:20
**12 (2)**
5:2;7:4

**1900 (2)**
38:21;47:17
**1983 (2)**
7:24;8:7
**1986 (1)**
8:23
**1989 (2)**
34:16;35:3
**1990 (3)**
59:25;60:6;63:24
**1992 (3)**
60:6;63:25;64:10
**1993 (3)**
6:24;62:25;65:22
**1994 (1)**
8:17
**1995 (1)**
59:17
**1st (6)**
33:24;49:20,24;50:3,
5;54:9

**2**

**2 (4)**
51:13;58:5,11,13
**2:02 (1)**
23:18
**2:16 (1)**
32:19
**2:17 (1)**
32:20
**2:22 (1)**
35:12
**2:29 (1)**
41:1
**2:32 (1)**
42:7
**2:34 (1)**
43:14
**2:37 (1)**
44:20
**2:38 (1)**
45:23
**2:42 (1)**
48:6
**2:47 (1)**
51:9
**2:55 (1)**
57:17
**2004 (25)**
6:24;58:10,14,18,20,
23;60:1,12,17;61:3,17;
63:1,15,25;64:11;65:15;
66:4,14,17,20,23;67:12,
13;68:10,13
**2005 (14)**
6:13;9:14,16;10:2;
11:24;12:12,13;13:4;
15:14;22:12,13;28:20,
23;61:19
**2006 (7)**
53:3,6,22;54:13,19;

**1900 (2)**
55:9;61:20
**2007 (3)**
56:13,23;62:13
**2008 (2)**
30:1;32:22
**2009 (36)**
15:14;21:9;22:4;
23:10,11,21;24:3;25:8;
32:24;33:14,21,23,24;
34:1;36:18;37:9,13,15,
18;38:19,20;39:6;41:11,
23;43:20;46:4,9,16,23;
48:3;49:25;51:13,13;
53:24;54:2,4
**2010 (11)**
21:17;24:5;46:12,19;
47:2,6,13;48:1;50:5;
70:12,22
**2011 (6)**
21:17;24:5;48:25;
49:2;50:7,14
**2012 (6)**
5:2;49:5,13,16;50:10,
14
**21 (1)**
3:14
**23 (1)**
3:15
**26 (1)**
70:12
**27 (2)**
34:15;35:3
**287 (2)**
9:2;17:17

**3**

**3 (2)**
60:14;64:14
**3:10 (2)**
57:18,21
**3:13 (1)**
59:2
**3:15 (1)**
60:21
**3:19 (1)**
62:21
**3:21 (1)**
63:20
**3:24 (1)**
65:19
**3:25 (1)**
66:11
**3:26 (1)**
67:3
**3:28 (1)**
68:6
**3:30 (1)**
68:17
**3:33 (1)**
70:8
**3:38 (1)**
72:5

**3:45 (1)**
72:6
**3:47 (1)**
74:5
**35 (1)**
3:16
**3850 (1)**
5:17

**4**

**40 (1)**
3:17
**42 (1)**
3:18
**43 (1)**
3:19
**44 (1)**
3:20
**45 (1)**
3:21
**48 (1)**
3:22
**48326 (1)**
5:19

**5**

**5 (2)**
3:7;42:13
**51 (1)**
3:23
**57 (1)**
3:24
**59 (1)**
3:25

**6**

**60 (1)**
4:1
**62 (1)**
4:2
**63 (1)**
4:3
**65 (5)**
4:4;38:13;40:4;60:5;
61:1
**66 (1)**
4:5
**67 (1)**
4:6
**68 (2)**
4:7,8

**7**

**70 (1)**
4:9

**8**

**86 (6)**

**3:14;21:5,8;24:13;
27:3;71:16**
**87 (4)**
3:15;23:17,20;27:3
**88 (6)**
3:16;35:11,14;42:17,
21;43:4
**89 (4)**
3:17;34:20;40:25;41:3

**9**

**90 (7)**
3:18;42:6,9,18,22;
43:3;64:10
**91 (3)**
3:19;43:13,16
**92 (4)**
3:20;44:19,22;59:25
**93 (8)**
3:21;45:22,25;61:2;
63:6;66:14;67:6,9
**94 (3)**
3:22;48:5,8
**95 (3)**
3:23;51:8,11
**96 (5)**
3:24;57:20,24;59:15,
18
**97 (5)**
3:25;59:1,4,18;64:15
**98 (3)**
4:1;60:20,22
**99 (3)**
4:2;62:20,23

**A**

**ability (1)**
72:25
**accelerate (1)**
31:7
**accordance (1)**
36:9
**according (1)**
59:24
**account (8)**
38:3,6,9;39:2,3,5,16,
20
**accounts (1)**
31:23
**accurate (10)**
16:11;37:10,22;41:21;
45:8,13;46:14;53:12;
71:9,25
**achieved (1)**
8:16
**acronym (2)**
60:13;61:3
**across (2)**
27:24;59:9
**active (9)**
9:17,19;12:8,22;13:4,

2:09-cv-10918-PDB-MKM   Doc # 104-1   Filed 05/14/12   Pg 80 of 88   Pg ID 5526
Sloan et al v.
Borgwarner, Inc., et al
Michelle DuFour
January 12, 2012

9;29:16;31:2;70:1

**actives (3)**
12:3;22:18;31:8

**activities (1)**
32:10

**activity (1)**
19:12

**actually (2)**
37:12;50:22

**actuaries (4)**
14:5;29:18;31:9,14

**Adams (1)**
19:3

**add (1)**
62:1

**Adding (2)**
62:2,6

**additional (2)**
29:18;50:8

**address (2)**
5:16;70:19

**addressed (1)**
62:6

**administer (2)**
17:1;47:10

**administered (3)**
23:1,8;65:25

**administering (1)**
37:6

**administration (4)**
7:20;18:12;19:9;70:24

**administrator (2)**
20:8;69:14

**Advantage (1)**
51:5

**appeal (1)**
34:15

**aforementioned (1)**
75:13

**Again (4)**
48:12,15;54:3;56:24

**against (3)**
38:5;39:3;40:19

**age (4)**
43:1,8;48:24;60:5;
61:1;63:6

**aggressive (1)**
65:3

**agree (1)**
68:11

**agreed (2)**
12:2;28:2

**agreement (10)**
9:6,6,7,7,8;29:17;
30:22;53:19;54:7;55:3

**agreements (5)**
13:18;28:4;34:3;55:5;
70:2

**ahead (2)**
51:24;72:13

**aimed (5)**
46:19,23;47:1,3;48:15

**almost (1)**

64:25

**along (2)**
31:9;73:6

**amend (2)**
52:13;72:23

**Amended (2)**
21:9,16

**amount (6)**
38:8,18,20;44:13;
50:5,8

**ample (1)**
50:21

**analysis (1)**
20:6

**analyzed (1)**
18:18

**analyzing (1)**
18:13

**and/or (1)**
17:7

**Angela (1)**
11:7

**announced (2)**
32:22;54:5

**annual (3)**
38:20;49:17,18

**answered (1)**
6:5

**Anthem (10)**
37:16;45:1,19,20;
56:7,12;57:5,11;62:12,
17

**apiece (1)**
39:21

**appeal (2)**
71:10,12

**appeals (1)**
71:3

**applicable (4)**
22:4,7;45:2;63:12

**applied (2)**
60:9;61:23

**apply (1)**
71:5

**appreciate (1)**
74:1

**appropriate (1)**
55:18

**approval (1)**
20:5

**approve (1)**
41:16

**approved (1)**
18:25

**approximately (5)**
7:4,23;30:5,6;36:8

**April (3)**
15:9;54:7;70:12

**area (6)**
7:16;36:24;62:7;
65:13;66:2;69:25

**areas (2)**
14:23;16:24

arrival (1)
69:19

**arrived (1)**
67:14

**assistance (1)**
51:20

**assistant (1)**
7:20

**associated (8)**
18:13;31:9,10;32:13;
35:5;50:22;52:6;53:2

**attached (2)**
3:12;75:14

**attend (1)**
37:1

**attended (1)**
37:3

**attest (1)**
75:15

**attorney (1)**
27:1

**Auburn (12)**
5:18,19;7:11;23:3,4,
11;27:8,16,19;70:20;
71:2,21

**authority (2)**
22:19;33:4

**availability (1)**
60:11

**available (4)**
30:23;32:2;43:10;60:8

**aware (3)**
55:15;57:3;61:20

## B

**bachelor (1)**
8:11

**back (8)**
17:20;32:20;37:20;
40:15;57:18;69:4;71:16;
72:6

**bad (1)**
56:9

**Banton (2)**
10:6;11:17

**Barb (1)**
10:6

**bargained (3)**
9:5;22:18;33:18

**bargaining (12)**
8:1;9:6,10,14;27:25;
28:3,15,22;29:1,17;
53:18;54:6

**base (2)**
58:9,10

**based (7)**
20:5;35:7;36:13;
54:11;70:2;73:8,12

**basically (1)**
66:1

**basis (3)**
19:20;49:17,18

become (1)
13:1

**began (2)**
12:17,19

**begin (2)**
49:15,15

**beginning (2)**
32:24;35:19

**begins (1)**
49:19

**behalf (2)**
28:16;75:2

**Behrman (1)**
11:17

**benefit (32)**
20:18;29:15;31:1,7,8,
11,25,25;33:14;38:1;
39:14;55:23;57:11,12;
59:4;60:10,25;62:23;
63:5,22;65:11,12,21;
66:13;67:5,10;69:4;
71:10,15,20,21,24

**benefits (69)**
6:10;7:2;14:20,23;
15:3,13,20;17:1,24;18:9,
25;19:2,9,19;20:1,12,16,
19,20;21:8,15,19;22:3,7,
17,19,25;23:20;24:1;
26:11;30:16;31:6;32:23;
33:7,9,10,13;34:14,19,
24;35:2;37:21;38:13;
40:6;43:9;47:20;49:13;
53:21;54:8;58:6;59:21;
60:16;61:14,16,17;
67:16,18;68:21,22;
69:14;70:3,19,21;71:1,4;
72:9;73:6,19;75:5

**best (1)**
67:17

**better (3)**
51:24;56:10;57:12

**beyond (2)**
27:11;38:8

**Bill (2)**
10:6;11:17

**bit (1)**
50:4

**Bloomfield (1)**
7:16

**Blue (2)**
20:9,9

**BorgWarner (82)**
6:11,15,25;11:10,11;
12:17,20;13:2;14:12;
15:22,22,25;19:5,6,7;
20:1,11,19;21:2,8,23;
22:25;23:20,25;24:16;
25:1,13,16,16,21;26:4,5,
9,10,10;28:23;30:25;
31:24;32:4,5,8,11,12,14,
22;33:22;34:23;38:12;
41:4,24;46:14;48:22;
54:22;55:11,19,25,25;

56:14;57:2,9;58:8;59:5,
13,17,18;62:12,14,24;
63:23;67:15;69:19;
70:18;71:9,15,20,24;
73:9,10,13;75:5,5,6

**BorgWarner's (2)**
17:12;27:1

**Both (8)**
31:17;36:10;39:19;
42:21;43:5,11;46:20;
47:3

**Bowles (2)**
69:16,17

**break (3)**
6:3,3,4

**brokerage (3)**
7:13,18,22

**BURCHFIELD (21)**
16:6,14;17:25;18:4;
25:17;26:12,22;28:17;
29:11;34:10;41:18;
57:16;64:21;67:19;69:1,
8;70:5;72:4,12,18;74:3

**business (7)**
8:12;17:7;25:25;26:1;
32:6;52:5,5

**buy (1)**
51:3

**BW (1)**
23:2

## C

**calendar-wise (1)**
49:21

**called (3)**
5:6;20:11;25:21

**came (1)**
11:24;13:14;15:17,18

**Campbell (1)**
37:5

**can (12)**
6:1,7;11:22;14:12;
16:9;18:4;25:14;32:17;
42:18;57:14;67:7;72:2

**Cardinal (4)**
66:1,6,7;67:11

**care (26)**
9:17;12:3,23;14:2;
20:1;22:3;24:6;29:15;
30:16;31:3,18,25;32:15,
23;33:20;34:14,19;38:7;
40:20;46:13;47:19;
49:12;51:14;53:7;62:23;
69:24

**carrier (1)**
61:4

**case (2)**
26:19;37:18;75:4

**catch (1)**
35:22

**CEO (2)**
7:20;14:18

**certain (6)**
16:10;20:21;31:8;
58:3;66:4;70:25
**change (16)**
36:5,7;39:8;49:18,21,
23;56:1,9,11,15;57:3,7;
61:25;62:12,14;68:2
**changed (3)**
35:2;54:3,9
**changes (50)**
22:2;24:6;27:6;32:23;
33:2,8,14,21,23,25;34:7,
13;36:9;37:8,9,12;42:13,
14;46:5;47:19;48:12;
49:2,12,23,23;51:14,24;
53:3,6,9,13,17,19,22;
54:12,23;55:16,20,22;
56:2,21,25;61:19,21;
62:1,15;69:24;72:25;
73:11;75:14
**changing (1)**
56:22
**charge (1)**
27:21
**charged (1)**
26:25
**chart (1)**
68:21
**Chicago (2)**
23:7,9
**choice (2)**
38:5;51:4
**Cigna (14)**
13:24;20:9;56:7,11;
57:4;58:5;59:4;60:25;
62:12,14,23;63:5,22;
66:13
**claim (1)**
39:3
**clarification (1)**
11:4
**clarify (2)**
9:3;39:25
**class (3)**
34:24;58:4;75:2
**close (2)**
10:20;54:5
**closed (4)**
19:14;25:8;28:12;45:5
**closing (5)**
29:2,8,10,21;30:22
**coinsurance (8)**
60:1;62:25;63:25;
64:11;65:22;66:14;67:6,
9
**Coke (2)**
32:17,17
**collective (5)**
8:1;9:6,10;53:18;54:6
**collectively (2)**
9:5;22:18,18
**combined (1)**
24:22

**coming (1)**
73:10
**committee (12)**
10:10;12:14;19:1,2,5;
29:19,22;33:7,10,13;
71:4;73:6
**communication (4)**
42:13;52:12;54:17;
55:9
**communications (6)**
7:21;27:4;51:21;
52:16;53:4;54:20
**comp (1)**
14:20
**company (13)**
10:4;11:8;12:2;37:16;
43:7;50:16;53:21;54:3;
55:7;56:7;57:4;73:1,8
**company's (1)**
52:12
**company-wide (2)**
50:25;51:2
**compare (1)**
61:9
**comparing (1)**
14:8
**comparison (3)**
13:5,9,19
**compensation (5)**
14:22,23;15:2,12,20
**competitiveness (1)**
18:22
**completed (1)**
11:21
**compliance (3)**
14:5;16:23;22:10
**concluded (2)**
28:13;74:5
**conclusion (1)**
11:25
**confusing (1)**
5:24
**conjunction (2)**
43:24;57:9
**Connie (1)**
10:6
**consisting (1)**
75:13
**consultant (1)**
51:21
**contained (1)**
22:7
**contains (4)**
60:24;66:17;68:10,21
**CONTENTS (1)**
3:1
**continue (1)**
55:17
**continued (1)**
47:9
**contract (8)**
9:1,3;11:24;17:14;
27:25;30:7;35:7;69:25

**contracted (1)**
31:20
**contracting (1)**
65:12
**contribution (3)**
40:1,17;47:24
**conversation (1)**
73:20
**conversations (2)**
55:11;73:24
**copays (1)**
57:7
**copies (1)**
28:14
**copy (6)**
13:16;20:22;24:2;
28:1,4;58:3
**corporate (6)**
14:19;15:1;16:21;
23:7;53:3;54:20
**correctness (1)**
75:15
**cost (7)**
9:18;18:13,18;31:9;
32:9;39:23,25
**costs (5)**
32:7,13;35:4;38:4;
50:21
**course (1)**
8:21
**cover (2)**
21:22;50:21
**coverage (5)**
22:23;30:24,24;40:16,
20;41:5,24;54:23;62:6
**coverages (1)**
47:22
**covers (1)**
24:15
**credit (1)**
38:20
**credited (1)**
39:1
**Cross (1)**
20:9
**current (5)**
6:9;13:25;17:12;
30:16;51:15
**currently (2)**
16:1;34:24

---

**D**

**data (1)**
14:9
**date (3)**
36:19;38:24;49:20
**dated (2)**
51:13;75:21
**Dave (1)**
37:5
**D'Aversa (2)**
11:7,9

**days (1)**
10:23
**day-to-day (5)**
16:25;18:11;19:8,19;
70:23
**December (3)**
60:6;63:25;64:10
**decide (1)**
50:16
**decided (3)**
33:13;40:5,19
**decides (1)**
20:3
**decision (4)**
33:1,5,8,16
**decisions (1)**
33:3
**decreased (1)**
50:23
**deductible (1)**
61:24
**deduction (1)**
22:21
**Defendant (2)**
71:19,23
**Defendants (1)**
75:7
**degree (2)**
8:14,16
**degrees (2)**
8:10,18
**department (4)**
53:4;54:20;70:22;71:1
**dependents (1)**
19:24
**DEPONENT (1)**
75:10
**DEPOSITION (46)**
3:14,15,16,17,18,19,
20,21,22,23,24,25;4:1,2,
3,4,5,6,7,8,9;5:21,21;5;
23:17;35:11,14;40:25;
42:6;43:13;44:19;45:22;
48:5;51:8;57:20;59:1;
60:20;62:20;63:19;
65:18;66:10;67:2;68:5,
16;70:7;74:5;75:12
**describe (2)**
60:23;67:7
**described (4)**
17:10;33:11;61:15,17
**describes (1)**
37:8
**description (11)**
13:16;23:21,25;24:4,
8;37:21;45:2,9;58:17;
68:8,22
**descriptions (1)**
69:19
**design (4)**
18:22;33:25;55:23;
58:3
**designated (1)**

**63:8**
**designs (6)**
9:19;11:5;13:5;52:14;
61:9;12
**detail (1)**
16:7
**details (2)**
22:22;24:23
**determination (1)**
14:7
**determine (1)**
67:15
**determined (2)**
50:20;55:18
**development (2)**
8:12;14:21
**Diet (2)**
32:17,17
**difference (1)**
65:4
**different (8)**
23:5;36:13;42:17;
59:22;61:5,11;68:21;
69:6
**direct (2)**
73:20,23
**director (7)**
7:2;14:20,21;15:2,12,
19;28:9
**disclose (1)**
72:20
**discount (1)**
57:10
**discounts (2)**
56:8;60:9
**discretion (1)**
54:24
**discussed (1)**
72:21
**discussing (1)**
31:6
**discussion (5)**
72:8,15,17,24;73:3
**discussions (1)**
72:19
**distinction (2)**
24:19;61:7
**distributed (4)**
13:21;36:4,16;48:14
**Diversified (3)**
25:1,14;75:6
**division (10)**
16:12,13,18,18,19,19;
17:5;24:16,20;26:3
**divisions (5)**
15:23,25;16:3;17:3;
19:6
**doctors (3)**
62:4,5,7
**document (75)**
20:13,15;21:7,10,16;
22:22;23:19,22,24;
24:22;26:16;35:13,15,

2:09-cv-10918-PDB-MKM    Doc # 104-1    Filed 05/14/12   Pg 82 of 88    Pg ID 5528
Sprague, et al vs
Borgwarner, Inc., et al

Michelle DuFour
January 12, 2012

17,18;36:1,9,16;37:8,20;
41:2,3,6,10,12;42:8,10,
12,15;43:15,17,19,21,23,
25;44:21,23;45:20,24;
46:1,3;48:7,9,11;51:10,
12,17,22;52:7,25;53:2;
54:21,25;55:9;57:24,25;
58:2;59:7,9,24;60:23;
61:15;62:22;63:2,4,21;
64:2,4;68:18,19,23,25;
70:9,11,14
**documents (15)**
5:23;6:1;13:20;26:9,
18,21,25;27:2,8,13,18,
24;54:15,19;59:18
**done (3)**
20:5;45:19;46:9
**down (3)**
11:8;30:3,21
**Doyle (2)**
10:14,17,18;12:11
**draft (6)**
42:15;43:23;46:3;
54:11,16;71:7
**drafted (2)**
41:14;70:16
**drafting (4)**
41:12;43:21;45:17;
70:14
**drive (8)**
16:2,12,13,18,19;
24:16;25:25;26:1
**drug (6)**
38:16;41:5,24;56:22;
57:7,11
**drugs (1)**
57:5
**DTP (11)**
25:13,16;26:4,10;
32:8,11,12,14;41:4;
54:22;55:19
**due (3)**
24:6;65:12;69:23
**DUFOUR (43)**
3:4;5:5,15;13:25;21:7;
23:19;35:13,14;41:2,3;
42:8,9;43:15,16;44:21,
22;45:24,25;48:7,8;
51:10;57:23,24;59:3;
60:22;62:22,23;63:21;
65:20;66:12;67:4,4,14;
68:7,8,18,19;70:9,10;
71:16;72:3;73:25;75:20
**duly (1)**
5:7
**during (8)**
8:2;9:14;10:5;12:10,
12;22:14;29:21;56:14
**duties (1)**
13:25

---

## E

earlier (1)
29:5
**early (2)**
41:11;43:20
**EBC (1)**
20:5
**educated (1)**
51:24
**effect (1)**
50:2
**effective (10)**
24:5;33:14;34:1;
37:13;38:24;45:4;49:20;
54:2,8;68:20
**effects (4)**
9:14;29:2,16;54:6
**Eight (2)**
40:21,22
**either (2)**
24:5;46:20
**eligibility (3)**
40:9,15,18
**eligible (15)**
36:14;38:1,13;39:11,
15,18;40:7;41:21;44:7;
46:20;47:5,12;50:1;
51:3;61:1
**eligibles (2)**
46:21,22
**eliminate (1)**
54:23
**eliminated (1)**
30:25
**else (7)**
10:4;14:10;15:19;
18:20;33:21;72:17;73:5
**elsewhere (1)**
27:13
**E-mail (2)**
13:16;28:8
**employed (5)**
6:17,19,22;8:4;28:23
**employee (10)**
13:9;18:25;19:2;
20:23;33:7,10,13;71:3,
20;73:6
**employees (17)**
9:19,20;12:8,23;13:4,
22;14:19;18:9,15;19:10,
25;24:15,16,17;29:16;
33:25;70:1
**employees' (2)**
17:24;31:2
**employment (5)**
12:19;55:24,25;57:2;
58:8
**end (1)**
6:24
**engage (1)**
8:1
**engine (5)**
16:2,5,18,19;24:16
**enough (1)**

50:21
**enrolled (2)**
13:22;58:4
**enrollment (6)**
44:3,6;48:1;49:5,10,
15
**ensure (1)**
18:23
**entitled (2)**
21:8;68:20
**entity (6)**
20:11;25:4,11,21,24;
32:12
**environment (1)**
69:24
**ERISA (1)**
23:14
**errata (1)**
75:15
**essence (1)**
24:21
**established (2)**
39:8;44:9
**estimate (3)**
15:14;16:9,11
**EUGENE (1)**
75:1
**even (2)**
22:16;54:23
**event (1)**
72:18
**everybody (1)**
46:24
**evidence (1)**
67:17
**exactly (1)**
64:25
**EXAMINATION (2)**
3:6;5:10
**examined (1)**
5:9
**example (5)**
20:10;22:21,23;56:1,6
**examples (1)**
56:3
**except (3)**
65:1;66:17;68:9
**exception (1)**
70:23
**executive (1)**
7:20
**EXHIBIT (74)**
3:11,14,15,16,17,18,
19,20,21,22,23,24,25;
4:1,2,3,4,5,6,7,8,9;21:5,
8;23:17;20;24:13;35:11,
14;40:25;41:3;42:6,9,17,
21,22;43:3,4,13,16;
44:19,22;45:22,25;48:5,
8;51:8,11;57:20,24;59:1,
4,15;60:20,22;62:20,23;
63:19,21;64:15;65:18,
20;66:10,12;67:2,4;68:5,

8,9,16,19;70:7,10;71:16
**EXHIBITS (3)**
3:9,12;27:3
**exist (1)**
25:4
**existence (1)**
32:12
**existing (1)**
13:7
**expense (1)**
38:4
**expenses (2)**
38:6,8
**explain (1)**
14:12
**explains (1)**
44:3
**expressly (1)**
54:22
**extent (1)**
26:14

---

## F

facilities (10)
16:5,13;17:2,3,7,12,
15;21:23,25;25:6
**facility (10)**
12:24;18:10,16;22:16;
27:25;28:16;43:24;
48:13;52:6;70:24
**fall (2)**
29:25;30:1
**familiar (6)**
13:1;20:11;25:21;
28:2;58:22;65:23
**familiarize (1)**
13:3
**Family (1)**
57:9
**far (2)**
35:7;61:22
**February (2)**
36:18;51:13
**few (1)**
72:1
**fill (1)**
44:15
**final (3)**
28:14;33:4,5
**finance (1)**
14:6
**financial (1)**
14:7
**find (2)**
13:8;67:24
**firms (1)**
7:13,18,22
**first (9)**
5:7;10:9;11:6;31:2;
49:25;52:8;54:11;67:14;
70:18
**five (2)**

57:14;61:23
**fix (1)**
5:25
**Flexible (12)**
20:12,19,20;21:8;
22:25;23:20;24:1;26:10;
71:9,20,24;75:5
**follow (1)**
71:3
**following (2)**
50:3;71:19
**follows (1)**
5:9
**foregoing (1)**
75:12
**form (16)**
13:14;17:25;18:3;
26:22;28:17;29:11;
41:18;44:3,6;48:1,3;
49:5,10;67:19;69:1;70:5
**former (5)**
18:9,14,15;19:9,25
**forms (1)**
39:3
**formulate (1)**
71:7
**formulating (1)**
28:15
**forth (1)**
17:20
**forward (2)**
22:12;61:2
**found (3)**
53:12,17;56:15
**foundation (5)**
16:6;25:17;26:12;
34:10;69:8
**frame (1)**
49:19
**free (1)**
39:3
**French (1)**
12:12
**further (1)**
73:25
**future (2)**
31:8;43:10

---

## G

gathering (1)
27:1,21
**general (1)**
8:12
**gets (3)**
48:14,14;61:23
**gives (1)**
51:4
**global (1)**
6:10
**good (1)**
35:25
**gosh (1)**

7:23
governed (1)
23:14
graduate (2)
8:6,8
Greb (2)
15:6,7
Greb's (1)
15:10
group (27)
16:2,2,5;20:4;32:1;
34:1,4,14;35:6;40:22;
43:7,8;44:7;47:12,20;
48:2;50:2;53:7;59:24;
60:16;63:13,15;64:7;
65:15;66:21;68:13;72:9
groups (4)
33:23;43:11;47:3;
59:22
guess (1)
6:7
guidance (2)
16:21,22
Guide (5)
42:25;46:16,19;47:2,6
Guides (1)
49:8

**H**

Hamlin (2)
5:17;70:19
handed (21)
21:7;23:19;35:13;
41:2;42:8;43:15;44:21;
45:24;48:7;51:10;57:23;
59:3;60:22;62:22;63:21;
65:20;66:12;67:4;68:7,
18;70:9
Hanley (2)
70:17;71:5
happen (1)
39:17
happened (1)
54:12
head (1)
56:3
headquarters (7)
14:17;20:22;23:7;
27:9;52:20;71:6,21
health (36)
9:7,17;12:3,23;13:18;
14:2;20:1,15;22:2;24:6;
29:15;30:16;31:2,18,25;
32:15,23;33:20;34:3,14,
19;37:16;38:7;40:1,20;
46:13;47:19;49:12;
51:14;53:6;55:3,5;
62:23;68:20;69:24;70:2
HealthCare (3)
58:5;59:4;63:22
hear (1)
73:18

heard (1)
25:1
held (2)
6:12;36:23
helpful (1)
62:9
helping (1)
14:7
hereby (1)
75:15
herein (1)
5:6
Hi (2)
5:12,13
high (3)
8:5,6,9
highlight (1)
13:17
highlights (1)
45:1
Hills (13)
5:18,19;7:11,16;23:3,
4,11;27:8,16,19;70:20;
71:2,22
hires (1)
18:24
History (1)
73:10
hold (2)
6:14;7:3
Holdings (1)
6:20
Hospital (3)
66:1,7;67:11
hour (3)
11:19,19;30:6
hourly (19)
9:18;13:4,7,12,12;
22:3;27:6;32:23;33:25;
35:3;40:22;51:15;59:5;
60:25;61:21;62:24;
63:23;67:8;68:20
house (1)
10:12
housed (1)
20:20
HR (26)
11:7,8,15;13:12;
14:15,18,19;16:20;17:3,
5,6;19:13;28:1,9,9;
30:14;36:3;37:4;41:15;
43:24;52:5,19;59:11;
64:6;69:14;73:7
HRIS (1)
14:24
human (2)
8:11;11:13
Hundzinski (1)
19:4

**I**

IDENTIFICATION (21)

21:4;23:16;35:10;
40:24;42:5;43:12;44:18;
45:21;48:4;51:7;57:19;
58:25;60:19;62:19;
63:18;65:17;66:9;67:1;
68:4,15;70:6
identify (1)
72:20
impacted (2)
36:5,6
implementation (1)
45:15
implemented (4)
24:23;37:24;56:15;
61:20
Important (2)
41:4;43:9
improved (1)
56:8
inaccurate (2)
67:25;68:1
in-and-out-of-network (1)
67:10
Inc (21)
6:11;11:10,12;14:12;
15:22,23,25;19:5,7;21:2;
23:2;26:10;32:4,14;
41:4;59:5;62:24;63:23;
70:19;75:5,6
includes (1)
66:7
including (1)
54:19
Incorporated (4)
6:20,23;7:1,7
increase (6)
47:13;48:25;50:2,7,
10,16
incremental (1)
61:23
Indemnity (2)
58:5,13
Indiana (1)
25:7
individual (1)
32:1
information (20)
13:8,11,14;14:6;27:4,
22;29:14;31:21;46:6,12;
47:7;48:23;50:18;51:23;
52:11,15;54:10,18,19;
60:2
initials (1)
25:14
in-network (1)
60:8,9;65:12;66:7
insurance (9)
9:7;13:18;34:3;37:16;
40:1;55:3,5;61:4;70:2
interact (2)
17:8;19:18
internal (1)
14:5

into (4)
16:20;43:8;50:2;62:2
involved (19)
11:20;17:14;18:11;
19:8,12,19;28:15;29:4,5;
30:7;33:1;34:25;41:12;
43:21;51:17;70:14;72:8,
14,17
involvement (1)
29:8
issue (2)
60:11;62:5
issues (1)
65:13
items (1)
73:15

**J**

JAMES (1)
75:1
Jan (2)
15:11;19:3
Janice (4)
19:17;37:4;46:4;48:13
January (19)
5:2;12:21;13:2;21:9;
33:23;49:20,23;50:3,5,7,
10;59:17;60:6;62:25;
63:24;64:10;65:22;
66:14;67:6
Jerry (1)
12:12
job (5)
11:11;13:25;18:8;
24:10;67:14
jobs (1)
7:12
Jr (1)
70:12
judge (2)
53:12,17
Judy (2)
70:17;71:5

**K**

keep (1)
64:24
KELLEY (1)
75:1
kind (3)
16:22;42:2;64:21
known (1)
6:20

**L**

labor (1)
8:13
language (6)
35:7;41:13;52:22;
53:5;71:4,5

last (1)
11:18
later (1)
56:15
latest (1)
21:15
Laura (1)
69:16
lawsuit (4)
26:8;34:25;53:9,16
lawyers (2)
72:19,20
Leader (1)
51:14
left (2)
34:20;72:3
legal (4)
8:20;25:11;34:6;42:2
legality (1)
34:6
less (1)
40:4
letter (2)
70:12;71:12
level (6)
15:1;20:5;24:24;
26:15;60:10;67:10
levels (1)
22:23
lifetime (2)
72:10;73:19
little (1)
50:4
live (1)
63:11
Local (10)
9:1;11:15;13:11;
17:16;19:13;24:24;
48:13;52:4;66:1;73:7
located (8)
7:10,14;23:5;27:8,11,
12,13;70:22
location (3)
27:5;28:9;41:15
long (15)
6:2,12,22;7:3,22;
11:18;15:7,12;19:17,18;
30:5;37:4;46:4;48:13;
64:18
look (4)
16:21;37:20;50:25;
64:25
Looking (2)
50:18,23
looks (3)
36:23;47:1;66:16
lose (1)
30:24
lot (1)
64:19
Louis (1)
70:12
love (1)

32:17
**lump (1)**
31:11

## M

**mailed (3)**
36:21;41:20;48:14
**maintain (4)**
14:4;40:9,16,18
**Major (1)**
58:10
**majority (1)**
35:4
**making (5)**
14:4;31:15;34:2,7;
40:17
**management (17)**
7:15;11:15;14:1,4;
18:23;28:16;30:14;
51:23;52:2,4,16,20;
54:18;56:25;72:22;73:5,
7
**manager (4)**
6:10;7:18;14:22;28:9
**Manganello (1)**
19:3
**manner (1)**
17:16
**many (5)**
16:5;13;36:6;40:19;
64:23
**March (3)**
10:3;13:2;36:24
**MARKED (38)**
21:4,7;23:16,19;
24:12;35:10,14;40:24;
41:3;42:5,8;43:12,16;
44:18,21;45:21,25;48:4,
7,12;51:7,10;57:19,24;
58:25;59:3;60:19;62:19,
22;63:18;65:17;66:9;
67:1;68:4,7,15;70:6,9
**market (3)**
14:9;16:23;18:22
**marketplace (2)**
32:2;50:20
**marred (1)**
68:19
**married (1)**
39:10
**Marshall (1)**
70:12
**matter (1)**
27:6
**matters (1)**
70:25
**May (25)**
22:4;26:13;27:18;
28:18;29:12;32:24;
33:14,21;34:1;37:9,13,
15,18;38:19,24;39:6;
41:23;45:4;49:15,17,25;

54:3,9;68:1;72:19
**maybe (1)**
64:19
**McAdams (3)**
15:11,12;19:3
**McAdams' (1)**
15:15
**McGill (1)**
10:7
**mean (11)**
9:3;14:3;20:17;56:5;
61:3;64:13,13;65:9,10,
24;68:1
**meaning (1)**
60:7
**means (4)**
58:12;60:2;64:16;67:7
**medical (2)**
56:6;58:10
**Medicare (38)**
36:10,14;38:1,4,13,18;
39:11,15,17;40:6,12,14;
41:5,20;42:24;43:1,8;
44:6;46:20,21,22;47:5,
10,12;48:18,24;50:1,20;
51:3,5,5;58:4,4,13;61:1;
62:24;63:5,7
**Medigap (1)**
51:5
**meetings (5)**
11:20;36:23;37:1,3;
43:11
**members (1)**
22:24
**members' (1)**
12:14
**mention (1)**
73:15
**mentioned (1)**
28:24
**message (1)**
64:22
**met (1)**
5:20
**MICHELLE (7)**
3:4;5:5,12,15;57:23;
72:8;75:20
**Michigan (3)**
5:1;7:11;71:22
**middle (1)**
56:19
**MIND (2)**
58:10,13
**minor (1)**
8:12
**minutes (2)**
57:15;72:1
**mirroring (1)**
48:3
**Mm-hmm (10)**
7:25;8:11;18:19;
28:25;30:2;35:20;37:23;
38:23;58:16;62:3

**MOA2M (2)**
63:1,8
**modifications (1)**
22:9
**modify (2)**
52:13;72:23
**Money (4)**
7:15,17;38:25;39:1
**month (1)**
12:19
**monthly (7)**
38:20;39:23,25;40:1;
47:24;50:2,4
**MOOA2 (2)**
65:22;66:15
**more (7)**
16:9;17:7;18:5;26:23;
42:24;50:4;62:9
**most (1)**
22:2
**moved (1)**
56:6
**moving (2)**
9:18;13:6
**MPO (1)**
60:1
**MPP03 (1)**
61:5
**MPP05 (1)**
61:5
**MPPO3 (3)**
60:1;64:1,13
**MPPO4 (1)**
67:6
**much (1)**
47:15
**Muncie (65)**
9:25;11:8,15;12:23;
13:11,12;17:23;18:9,16;
19:9,13,14,17;21:19;
22:3,17;25:7,8;27:6,25;
28:1,5,16;30:3,14,21;
31:12;32:10;34:1,4,14;
36:3,24;37:4;41:15;
43:24;45:5;48:13;51:15;
52:4,6,19;59:5,10,19;
60:14,25;61:4,22;62:24;
63:7,11,23;64:6,14;66:2;
67:8,17;68:20;69:14,24;
70:24;71:2,7;73:7
**Muncie-wide (1)**
51:1

## N

**name (2)**
5:14;71:23
**names (1)**
12:14
**nature (3)**
31:5;49:7;72:19
**near (1)**
63:11

**necessary (2)**
13:8;46:5
**need (3)**
6:2;14:7;18:5
**needed (2)**
16:25;22:9
**negotiated (8)**
22:17,24;24:23;28:11;
34:3;45:9;55:6;70:3
**negotiating (1)**
17:22
**negotiation (2)**
9:15;29:6
**negotiations (11)**
9:1,4,5;11:24;17:14,
21;28:13;29:9,22;30:7,
11
**negotiators (1)**
11:21
**network (14)**
56:1,4,8;60:10,11,11;
62:1,2,7;65:12;66:1,2,8;
67:11
**new (3)**
62:2,4,5
**next (1)**
55:16
**nonMedicare (1)**
40:4
**nonpassive (1)**
65:5
**nonunion (1)**
33:24
**nonUS (1)**
14:2
**notes (3)**
27:25;28:3;72:2
**Notice (2)**
41:4;42:2
**number (2)**
15:23;42:18
**numbered (1)**
63:21
**numerous (1)**
69:4

## O

**Oakland (1)**
8:15
**Object (12)**
16:6;17:25;25:17;
26:22;28:17;29:11;
34:10;41:18;67:19;69:1,
8;70:5
**objected (1)**
18:3
**objection (3)**
16:14;26:12;72:12
**obligation (1)**
29:15
**obviously (2)**
46:16;56:10

**occur (1)**
56:12
**occurred (2)**
30:11;53:3;57:8;73:12
**October (1)**
34:15
**October/November (1)**
49:19
**Off (3)**
32:18,19;56:2
**offhand (1)**
12:15
**office (3)**
7:19;14:19;19:17;
27:16
**offices (2)**
27:12,14
**official (2)**
73:18,21
**officials (1)**
55:11
**old (1)**
58:3
**older (1)**
61:1
**onboarded (1)**
59:13
**once (2)**
30:24;40:14
**one (32)**
10:8,9,17,17;11:19,19;
17:6;19:6;24:20;25:25;
26:4;28:23;30:21,23;
31:2,5;32:5;42:17,24;
46:23,25;47:1;53:1;
55:13;56:10;64:15,20,
23;65:1,3;66:17,17
**only (3)**
9:21;28:22;30:21
**operate (2)**
25:6,7
**operations (1)**
16:25
**opinion (3)**
34:6;58:19;61:14
**opportunity (1)**
57:10
**opt (1)**
40:15
**opted (1)**
40:11
**options (7)**
29:18;30:23;31:10;
32:1;33:3,6;62:9
**order (4)**
40:9,18;54:15;71:3
**organization (1)**
26:15
**organizational (1)**
14:21
**original (1)**
62:15
**others (2)**

34:9;64:5

**out (12)**
23:1,8;40:11,22;
41:16;44:15;46:7;49:5;
54:12;60:9;67:16,24
**out-of-area (1)**
63:7
**out-of-network (1)**
65:11
**out-of-pocket (2)**
38:6;61:25
**outside (3)**
14:9;27:18;51:20
**over (6)**
9:19;22:19;29:1;
40:16;48:12;53:9
**overall (1)**
7:19
**overarching (1)**
18:12
**own (1)**
32:7

**P**

**PAGE (5)**
3:3,11;52:7;54:11;
70:18
**paid (2)**
32:3,5
**paragraph (5)**
52:8,10;53:1;54:11;
55:13
**paralegal (2)**
8:21,24
**part (10)**
9:9;18:8;19:5,6,7;
24:10;39:8;51:5;58:9;
71:12
**participate (1)**
40:5
**participating (1)**
50:24
**particular (2)**
27:5;52:21
**parties (1)**
28:5
**party (1)**
20:7
**passive (7)**
59:25;60:7;64:15;
65:4,4,9,10
**past (2)**
55:17,21
**pattern (2)**
50:23,25
**pay (1)**
44:12
**paying (1)**
40:8
**pension (8)**
9:7;29:18;31:1,6,7,8,
18;32:15

**people (11)**
20:24;21:22;40:19;
49:25;50:24;52:19,21;
54:12;57:10,12;62:2
**per (1)**
38:22
**percent (1)**
61:23
**Perhaps (3)**
10:7;23:8;60:11
**period (4)**
8:2;40:17;49:15;56:14
**Periodically (1)**
19:21
**periods (1)**
69:25
**person (6)**
10:13;15:5;40:6,11,
12,14
**pertaining (1)**
27:4
**Pharmacy (2)**
57:10,11
**philosophy (2)**
73:2,8
**physically (1)**
9:25
**pieces (1)**
52:12
**place (29)**
13:4,6,17;21:18;
22:10,12;23:6;27:7;
34:20,24;53:19,22;54:7;
58:6,7,18;59:22;60:16;
61:15,16;63:15;65:14;
66:4,20;67:12;68:12;
69:7,23;75:14
**plaintiffs (2)**
26:19;75:3
**plan (90)**
9:17,19;11:4;12:23;
13:1,3,5,7,10,16,20;
18:22;20:12,13,15,17,
19,20,24;21:8,12,15,18,
18,22;22:4,7,12,19,21,
23,25;23:8,12,14,20,21,
25;24:1,4,8,12,15,19,22;
26:11;38:12,16;39:14;
40:10,18;45:1,2,8;47:10;
52:14;55:17,20;57:3;
58:3,5,7,10,13,18;60:1,7,
14;61:2,5,9,11,25;62:25;
63:5,7,12,25;64:11;
65:22,25;66:3,14;67:6,8,
9;69:18;71:15,21,23
**plans (25)**
13:13,17,22;14:2;
18:14;22:10;24:22;35:5;
36:13;37:7;38:4;50:22;
51:4,5,6;57:1;61:22,24;
68:20;69:6,23;71:10,20,
24;75:5
**plant (14)**

19:14;25:8;27:5;28:9,
11;29:2,8,10,21,25;
30:22;45:5;59:19;67:17
**plants (1)**
18:21
**please (1)**
72:20
**plus (1)**
67:6
**pm (29)**
5:3;21:6;23:18;32:19,
20;35:12;41:1;42:7;
43:14;44:20;45:23;48:6;
51:9;57:17,18,21;59:2;
60:21;62:21;63:20;
65:19;66:11;67:3;68:6,
17;70:8;72:5,6;74:5
**point (7)**
23:5;26:4;38:12;45:5;
49:22;60:12;72:24
**Points (3)**
51:14;52:3,7
**population (1)**
45:4
**position (6)**
6:9,12,14;7:1,3,17
**post-1989 (1)**
35:6
**PowerPoint (1)**
9:24
**PPO (16)**
59:25;60:7,14;61:2;
62:25;63:11,25;64:10,
14;65:5,5,22,25;66:14;
67:6,9
**PPO3 (2)**
61:7;64:11
**PPO5 (2)**
61:4,8
**pre65 (3)**
39:23;40:2,6
**Pre-65 (6)**
59:5,25;60:5;63:24;
64:9;67:5
**predecessor (2)**
15:10,15
**premature (1)**
56:16
**prematurely (1)**
53:18
**preMedicare (26)**
36:10;37:15;39:13;
40:9,11,14;42:19,21;
43:5,7,8,25;45:4;46:13,
20,25;47:1,20;48:2,15;
49:2,12;65:21;66:4,13;
67:8
**premium (4)**
38:4;40:8,17;50:21
**preOctober (2)**
34:20;35:3
**prepare (1)**
48:11

**prepared (3)**
13:21;35:18;36:1
**prescription (8)**
38:16;41:5,24;56:6,
22;57:5,7,11
**present (11)**
9:25;10:4,12,18;
11:23,23;12:10;22:14;
30:10;33:6;73:13
**presentation (18)**
9:16,23;10:5,11,15,18;
11:6;12:16,22;17:18;
29:21;30:3,5,13,15,22;
31:1;34:2
**presentations (7)**
9:11;10:21;11:3,18,
21;12:11;31:15
**presented (7)**
9:9,21;12:4;28:1,24;
32:1;33:3
**presenting (1)**
10:9
**president (3)**
11:13;17:6;52:6
**presidents (1)**
16:20
**pretax (1)**
22:21
**previous (3)**
49:10;54:16;66:17
**previously (6)**
5:20;17:10;19:22;
21:13;33:11;56:21
**prior (17)**
6:14,17;8:4;22:2,13;
29:25;37:18;39:5;41:23;
45:14;46:7;49:7;52:16;
56:25;57:1;58:7;73:10
**pro (1)**
38:23
**probably (1)**
56:2
**procedure (2)**
71:10,13
**process (3)**
49:18;56:19;71:3
**produce (2)**
26:21;27:13
**produced (4)**
26:16;27:12,18;45:1
**producing (1)**
27:3
**production (1)**
26:9
**Products (3)**
25:2,15;75:6
**program (1)**
32:6
**programs (3)**
14:8;17:1;20:18
**proposal (3)**
9:18;12:3;28:24
**proposals (1)**

28:15
**prospective (1)**
30:19
**provide (9)**
14:8;20:18;22:21,22;
31:20,23;51:23;56:7;
59:12
**provided (13)**
9:20;18:14;21:19;
22:23;38:1;45:14;46:5,
13;50:18;52:17;57:9;
59:10;64:6
**provider (2)**
60:8,9
**providers (4)**
56:1,4,23;62:1
**providing (5)**
14:6;27:1;31:10;
38:12;62:7
**provision (1)**
18:8
**provisions (2)**
55:17,20
**psychologically (1)**
64:22
**purposes (1)**
11:4
**put (2)**
51:19;58:7
**putting (2)**
24:7;51:17

**R**

**RADTKE (26)**
3:7;5:11;16:8,16;18:2,
7;25:20;26:17,24;28:21;
29:22;33:20;37:12,14;
41:19;57:14,22;64:24;
65:2;67:21;69:3,10;
72:1,7,16;73:4
**rata (1)**
38:23
**rather (2)**
25:14;71:2
**reached (2)**
28:4;40:14
**read (4)**
52:8;55:5;74:3;75:12
**really (1)**
14:11
**reason (1)**
70:25
**reasons (1)**
19:22
**recall (14)**
10:2,4;11:16,22;
12:10,14;13:23;29:24;
32:22;36:6;41:11,14;
44:8;69:20
**recalling (1)**
66:23
**receipt (1)**

2:09-cv-10918-PDB-MKM    Doc # 104-1    Filed 05/14/12    Pg 86 of 88    Pg ID 5532
Sharp, et al. v.
Borgwarner, Inc., et al
Michelle DuFour
January 12, 2012

69:18
**receive (13)**
19:25;28:7;38:19;
39:3,19;42:24;43:3;
47:5,7,12;50:1;51:25;
52:15
**received (9)**
11:14;13:11;38:23;
43:4;48:18,21;50:4;
59:18;64:5
**recent (1)**
22:2
**Recess (2)**
57:17;72:5
**recollect (1)**
26:8
**record (6)**
5:14;32:18,19,20;
57:18;72:6
**reduce (1)**
9:18
**reference (1)**
16:10
**referring (5)**
21:12;52:2;56:20;
58:14;71:16
**reform (1)**
24:6
**regard (1)**
73:3
**regarding (2)**
9:17;46:12
**reimbursement (8)**
31:23;38:3,5,9;39:2,4,
15,19
**reinstated (1)**
54:8
**relate (2)**
18:8;30:15
**related (2)**
21:19;32:9
**relates (4)**
14:15;16:17;17:23;
19:18
**relations (1)**
8:13
**relationship (2)**
25:13,15
**relative (2)**
33:3;52:12
**relatively (1)**
65:11
**relevant (1)**
48:23
**relied (2)**
54:10,18
**rely (1)**
54:16
**relying (1)**
73:16
**remain (1)**
39:13
**remember (4)**

10:13;12:19;13:14;
52:21
**remind (2)**
35:21,21
**rep (3)**
20:13,15,17
**report (5)**
14:20;15:2,15,19;
16:20
**reported (1)**
15:7
**reports (1)**
14:18
**representative (3)**
10:11;12:10;37:4
**representatives (2)**
17:3;37:5
**request (4)**
11:8,14;26:9,16
**requested (4)**
26:19;29:18;30:13;
74:6
**required (2)**
22:20;42:3
**reservation (2)**
52:13;72:23
**reserved (2)**
54:22;73:9
**resource (1)**
8:12
**resources (1)**
11:13
**respect (6)**
13:9;17:2;18:20;32:3;
33:22;49:21
**responded (1)**
71:1
**response (3)**
16:15;69:20;71:7
**responsibility (2)**
16:17;18:13
**responsible (16)**
7:19;14:1,3;16:23,24;
17:6;19:16;27:2;29:13;
31:22;32:7,8;37:6;38:9;
40:8;52:10
**Restated (2)**
21:9,16
**restore (2)**
53:21;54:1
**results (1)**
53:15
**retained (1)**
73:2
**retaining (1)**
40:19
**retired (9)**
34:15;60:5;61:2;63:6,
24;64:9;67:5,9,16
**retiree (34)**
20:1;22:2;27:6;29:15;
30:16;31:23,25;32:23;
33:20;34:14,19;38:3,5,9,

11;39:2,10,15,19;40:20;
42:14;46:13,24;47:19;
48:24;49:12;51:3,14;
53:6;70:17,19,21;71:1,8
**retirees (66)**
18:14;19:24;21:20;
22:4,19;30:16,19;31:24;
32:6,13,24;34:15,20,23;
35:3;36:4,6,10,10,17;
37:15;38:2,14,18;39:24;
40:2;41:20,23;42:19,21,
24;43:1;44:1;48:15,18;
49:3;51:15;52:1;56:8;
58:4;59:6,22,25;60:5,16;
61:1,15,16,21;62:9,25;
63:6,16,24;64:9;65:15,
21;66:4,13,21;67:5,8,16;
68:13;69:6;72:9
**retirees' (1)**
17:24
**retirement (2)**
14:2;70:1
**review (7)**
6:2;13:18;18:22;34:2;
41:7;46:7;48:13
**reviewed (4)**
31:9;36:3;41:13;54:15
**reviewing (1)**
16:24
**Rich (1)**
15:6
**Right (10)**
19:24;29:3;35:19;
36:19;39:24;54:22;
72:25;73:1,2,11
**rights (3)**
52:13;72:23;73:9
**Road (2)**
5:17;70:19
**Robin (1)**
19:3
**role (4)**
17:23;24:7;45:17;
73:23
**rollout (1)**
16:25
**Ron (1)**
19:3
**RRA (6)**
44:9;47:10,13;48:25;
49:21;50:24
**rules (1)**
22:20
**run (1)**
27:24
**running (1)**
22:16

**S**

**salaried (2)**
9:20;33:24
**salary (2)**

12:23;13:6
**same (22)**
10:11,15,18;15:18;
16:14,15;17:10,16;
33:20,25;34:23;47:22,
24;48:3;49:10;53:7;
59:14;60:10;64:5,25;
66:16;68:8
**Sarah (1)**
10:14
**saw (2)**
35:19;55:9
**saying (1)**
27:19
**school (3)**
8:5,6,9
**science (1)**
8:11
**search (2)**
26:18;27:24
**searched (1)**
27:14
**second (3)**
10:10;30:25;31:5
**seek (1)**
34:6
**send (2)**
28:10,11
**senior (5)**
6:10;52:20;54:18;
72:22;73:5
**sent (5)**
28:8,13;42:3;43:25;
54:12
**sentence (2)**
55:16;56:21
**separate (4)**
24:19;26:4;31:12;
46:25
**series (1)**
5:22
**services (1)**
32:4
**session (1)**
10:8
**sessions (1)**
10:9
**sets (1)**
28:22
**share (1)**
40:18
**sheet (1)**
75:15
**sheets (1)**
13:17
**Shield (1)**
20:9
**shortly (2)**
12:16;62:17
**show (2)**
5:23;59:21
**shown (1)**
67:25

**shutdown (2)**
9:14;29:25
**side (1)**
10:5
**sign (1)**
74:4
**signature (2)**
28:14;74:6
**similar (7)**
7:17;46:16;47:2;49:7;
53:4;65:11;68:25
**similarly (1)**
75:2
**sit (1)**
17:22
**site (2)**
17:4;20:23
**situated (1)**
75:2
**SLOAN (1)**
75:1
**small (2)**
19:17;68:2
**sole (1)**
54:23
**solely (4)**
10:9;45:19;46:21,22
**solidarity (1)**
10:12
**someone (1)**
63:11
**sorry (8)**
13:12;18:1;20:14;
26:6;35:24;54:2,6;64:18
**source (1)**
55:13
**Southfield (2)**
5:1;7:16
**SPD (1)**
45:17
**speak (3)**
22:12;55:23;57:2
**specialist (1)**
70:17
**specialists (1)**
14:23
**specific (4)**
17:2;18:6;26:23;52:22
**specifically (5)**
20:24;28:19;41:11;
55:23;57:1
**speculate (1)**
65:6
**spending (1)**
50:23
**spot (1)**
20:21
**spouse (4)**
39:11,13,17;40:4
**spouses (2)**
19:24,25
**Stair (1)**
10:6

Min-U-Script®

2:09-cv-10918-PDB-MKM   Doc # 104-1   Filed 05/14/12   Pg 87 of 88   Pg ID 5533
Shuget al v.
Borgwarner, Inc., et al

Michelle DuFour
January 12, 2012

**standard (1)**
71:4
**started (3)**
6:7;59:17;61:19
**state (2)**
5:14;73:18
**stated (3)**
19:8,22;54:21
**statement (3)**
53:1;55:13;71:19
**States (2)**
7:8;21:25
**stay (1)**
62:14
**stayed (1)**
50:12
**still (3)**
19:17;25:4,11;32:12;
66:23
**stopped (1)**
38:12
**strategy (1)**
9:17
**structure (1)**
14:12
**subject (3)**
9:21;27:6;75:14
**submit (1)**
38:4;39:2
**subplan (1)**
9:8
**subsequently (1)**
54:5
**substance (1)**
68:2
**substantive (1)**
22:20
**substantively (1)**
68:1
**sum (1)**
31:11
**summaries (3)**
67:22,24;69:4
**summary (21)**
13:16,17;23:21,25;
24:4,8;37:21;45:1,2,8;
59:5;60:25;61:17;62:24;
63:5,23;65:14,21;66:13;
67:5;69:18
**supported (1)**
52:25
**supposed (1)**
32:8
**sure (7)**
14:4,13;26:14;41:8;
57:16;65:7,8
**surviving (1)**
19:25
**switch (1)**
57:8
**switched (1)**
62:17
**sworn (1)**

5:7
**Systems (6)**
25:16,22;26:2,3,5,6

**T**

**TABLE (1)**
3:1;17:22
**Takata (5)**
6:20,22;7:1,7,12
**talk (1)**
71:15
**talking (5)**
12:13;51:14;52:3,7;
56:22
**targeted (2)**
42:18,19
**tax (1)**
39:3
**team (22)**
9:10;11:8,15;13:12;
14:6,19;16:21;17:5;
19:13;28:2;30:14;36:3;
37:5;51:23;52:2,4,19,20;
59:11;69:14;72:22;73:5
**technically (1)**
32:5
**template (1)**
46:9
**terminate (2)**
52:13;72:24
**terminating (1)**
29:16
**testified (2)**
5:9;29:4
**testify (1)**
5:7
**testimony (1)**
75:13
**thereafter (1)**
62:17
**thereupon (1)**
5:6
**thinking (1)**
10:7
**third (1)**
20:7
**Thornell (2)**
10:6
**thought (1)**
64:19
**thousand (1)**
36:8
**three (1)**
57:14
**Thursday (1)**
5:2
**Tim (1)**
19:3
**times (2)**
30:23;31:17
**timing (1)**
56:17

**title (3)**
11:11;58:9;66:16
**titled (2)**
41:4;51:13
**TK (1)**
6:20
**today (2)**
5:21;69:5
**together (3)**
24:7;51:17,19
**told (1)**
56:24
**Tom (1)**
10:7
**Tony (1)**
11:17
**took (2)**
8:21;27:7
**top (3)**
36:19;56:3;70:18
**topics (1)**
72:21
**Torque (2)**
25:22;26:5
**TorquTransfer (3)**
25:16;26:2,6
**Towers (3)**
31:16,18;50:19
**track (1)**
64:24
**train (8)**
16:2,12,13,18,19;
24:17;25:25;26:1
**training (1)**
8:20
**transcript (2)**
3:12;75:16
**transition (2)**
39:14;70:1
**transitioned (1)**
6:25
**Transmission (6)**
25:2,15,22;26:3,5;
75:6
**Travel (6)**
42:24;46:16,19;47:2,
6;49:8
**treated (1)**
39:12
**trend (1)**
16:23
**trends (1)**
50:19
**Troy (1)**
8:9
**true (4)**
15:22;24:15;59:14;
71:19
**trustees (1)**
23:12
**truth (3)**
5:7,8,8
**truthfulness (1)**

75:16
**try (2)**
5:25;56:10
**trying (1)**
64:24
**twice (1)**
10:15
**two (2)**
10:9;11:2;15:8;16:3;
17:2;28:22;30:23;43:7;
52:7;54:11;61:9,11
**type (3)**
7:15;9:5;26:25
**types (1)**
73:23
**typically (1)**
28:8

**U**

**UAW (2)**
9:1;10:12
**UHC (1)**
44:9
**unchanged (1)**
34:21
**under (5)**
25:25;26:1;29:16;
52:7;60:5
**underlying (1)**
65:10
**undertake (1)**
26:18
**unfamiliar (1)**
64:12
**unilaterally (1)**
33:16
**union (12)**
10:10;11:20;12:2,11;
29:19,22;33:18;45:9,14;
55:6;73:18,20
**unionized (2)**
7:7;17:12
**unions (1)**
8:2
**unit (3)**
17:7;52:5,5
**United (2)**
7:7;21:25
**UnitedHealthcare (11)**
31:19,20,22;32:3,9;
37:6;39:1,5;47:8,9;
48:20
**units (4)**
25:25;26:1;32:6;33:22
**University (1)**
8:15
**unlike (1)**
64:15
**up (3)**
13:19;47:15;48:12
**updated (2)**
24:2,4

75:16
**Upgrades (15)**
58:10,14,20,22;60:1,
12;61:3;63:1;64:1,11,
13;66:15,18,23;68:10
**upon (4)**
12:3;54:10;69:18;
73:16
**use (3)**
25:14;52:3;57:10
**used (6)**
20:3;25:7;46:4,9;
51:22;71:6
**using (1)**
57:4

**V**

**value (1)**
29:14
**valuing (1)**
29:14
**variety (6)**
7:13;14:22;51:4;
52:19;69:18,23
**various (3)**
55:17;69:25;70:2
**vendor (7)**
13:21,23;18:23;20:3,
5,7;31:22
**vendors (1)**
18:24
**VERIFICATION (1)**
75:10
**version (4)**
21:15;22:11;46:4;
64:14
**versus (2)**
57:11;61:8
**vested (2)**
72:10;73:19
**vesting (2)**
31:7;73:3
**Via (2)**
9:24;28:8
**Vice (2)**
11:13;17:6
**vision (2)**
62:5,7
**VP (3)**
11:7;14:18;52:4
**VPs (1)**
16:20
**vs (1)**
75:4

**W**

**Watson (3)**
31:16,18;50:19
**way (4)**
17:10;29:5;42:17;
67:25
**Web (1)**

20:23
**Weeks (2)**
  10:25;11:1
**welfare (2)**
  20:15;71:21
**weren't (2)**
  22:14;27:21
**What's (5)**
  6:9;16:25;59:3;68:7;
  71:23
**whole (2)**
  5:8;7:5
**whose (1)**
  71:21
**WILLARD (1)**
  75:1
**WINNINGHAM (1)**
  75:1
**Within (12)**
  10:23;14:19;17:2,7;
  20:19;24:22;26:15;
  27:12,14;52:19;63:11;
  67:10
**without (1)**
  10:17
**WITNESS (18)**
  3:3;5:6;16:7,15;18:1,
  5;25:18;26:14,23;28:19;
  29:13;34:11;67:20;69:2,
  9;72:14,22;74:6
**wondering (1)**
  23:10
**wording (1)**
  68:2
**words (2)**
  64:25;65:23
**work (10)**
  5:16;7:22;8:1,24;11:5,
  9;20:24;21:2;24:15;40:7
**worked (5)**
  7:13;18:9,16;21:22;
  31:14
**working (3)**
  14:5;29:17;73:13
**world (2)**
  14:17;71:6
**writing (1)**
  52:10
**wrong (1)**
  68:9

## Y

**year (11)**
  8:16;22:11;28:20;
  38:22;47:17;48:12,12;
  49:25;50:3,17;61:24
**years (6)**
  7:4,23;15:8;22:12;
  40:17;49:10