UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, and JAMES L. KELLEY,
on behalf of themselves and a similarly
situated class,

             Case No. 09-cv-10918
             Hon. Paul D. Borman
    Plaintiffs,     Magistrate Mona K. Majzoub

v.               **Class Action**

BORGWARNER, INC., BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

    Defendants.
_____/

# EXHIBIT 21

# TO

# PLAINTIFFS' MOTION
# FOR SUMMARY JUDGMENT
# AS TO LIABILITY

<u>PLANT SHUTDOWN AGREEMENT</u>

between

BORGWARNER DIVERSIFIED TRANSMISSION PRODUCTS INC.,
MUNCIE PLANT

and

INTERNATIONAL UNION, UNITED AUTOMOTIVE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) AND ITS
LOCAL NO. 287

DTP017176

## PREAMBLE

This Plant Shutdown Agreement sets forth the terms of the agreement (hereinafter referred to as the "Plant Shutdown Agreement") entered into on Feb. 26 , 2009, between BorgWarner Diversified Transmission Products Inc. for its Muncie Plant operations located at 5401 Kilgore Avenue, Muncie, Indiana  47304 (hereinafter referred to as the "Company") and the International Union, United Automotive, Aerospace and Agricultural Implement Workers of America (UAW) and its Local No. 287 (hereinafter referred to as the "Union").

WHEREAS, the Company and the Union are parties to a Collective Bargaining Agreement entered into on or about April 25, 2005 (hereinafter referred to as the "2005 Agreement") for the employees in the Bargaining Unit as defined by Article I, Recognition of the 2005 Agreement, and

WHEREAS, the Company has informed the Union of its intention to permanently close the Company's Muncie plant on April 24, 2009, or such other date as may be determined by the Company and communicated to the Union, and

WHEREAS, the Company and the Union have concluded their discussions about the Company's decision to permanently close the Plant and the effects of that decision on bargaining unit employees, and

WHEREAS, the Company and the Union are interested in providing an orderly and efficient termination of the Muncie plant and have reached agreement concerning all subject matters related to the Muncie plant closing, which agreement is set forth below,

NOW THEREFORE, for good and sufficient consideration, the parties hereto mutually agree as follows:

1

# ARTICLE I

## Modification and Termination of UAW Agreements

A.     The current Collective Bargaining Agreement, the Health Insurance Agreement, the Pension Agreement, the Supplemental Unemployment Benefit Agreement and all other agreements between the Company and Union, any exhibits, appendices, understandings, letters, memoranda of agreement (collectively "UAW Agreements"), except as provided by this Plant Shutdown Agreement, shall terminate with respect to Company operations and the Muncie Plant at midnight, April 24, 2009, or such other date as may be determined by the Company and communicated to the Union. This Article I(A) shall modify and supersede the notice provision set forth in any of the current agreements between the Company and the Union regarding termination. The termination of UAW Agreements shall not affect any rights to pension benefits that have vested under the terms of the Pension Agreement or Pension Plan or as a matter of law. The termination of the UAW Agreements shall likewise not terminate the Retirement Income Program of BorgWarner Diversified Transmission Products, Inc. Muncie Plant. The termination of UAW Agreements also shall not affect any rights to weekly sickness and accident benefits that have accrued as of the plant closing, but the continued receipt of such benefits shall not constitute service with the Company.

B.     If any provision of any of the current agreements between the Company and the Union are inconsistent with any of the provisions of this Plant Shutdown Agreement, the provisions of this Plant Shutdown Agreement shall govern.

C.     The term "Permanent Layoff" as used in this Agreement shall mean the status given to an employee covered under this Plant Shutdown Agreement by the Company on the date when the Company releases him/her from further employment obligations with the

2

DTP017178

Company. The term "Permanent Layoff Date" as used in this Plant Shutdown Agreement shall mean the date on which the employee was placed on Permanent Layoff. The Permanent Layoff Date shall be the employee's termination date of employment from the Company, thereby terminating his/her seniority with the Company. An employee who is placed on Permanent Layoff and receives plant closing benefits in accordance with Article IV of this Plant Shutdown Agreement shall have no recall rights and shall not continue to earn credited service for purposes of pension benefits.

D.      Prior to the termination of the UAW Agreements at midnight on April 24, 2009, such UAW Agreements shall be modified as follows:

1.      The business commitment letter to the Union dated April 12, 2005, and signed by Doug Owenby and Cynthia Niekamp shall be rescinded effective October 1, 2007, and shall be of no legal force or effect.

2.      Article One, Recognition, Section 1(b), Removal or Acquisition of Plants, and Section 1(c), Relocation Allowance of the 2005 Agreement, shall be rescinded effective October 1, 2007, and shall be of no legal force or effect.

3.      All restrictions in the 2005 Agreement and existing Memoranda of Understanding on the Company's ability to outsource work for cost, efficiency and/or quality considerations shall be eliminated effective October 1, 2007. This includes, but is not necessarily limited to, the Memorandum of Understanding on Outsourcing of Non-Skilled Work and the Memorandum of Understanding on Outsourcing of Skilled Work. Except in the case of emergency or temporary outsourcing, the Company agrees to give the Union not less than thirty (30) days advance notice of an outsourcing of work from the Muncie Plant and such notice will satisfy the Company's obligations to the Union and employees regarding the decision and effects of any act of

3

DTP017179

outsourcing.  The Union agrees to withdraw all pending grievances regarding outsourcing and will not grieve any future outsourcing so long as the Company provides the advance notice specified above.

4.    Overtime restrictions in the 2005 Agreement shall be modified as follows:

Article Nine, Section 5:  Eliminate the following language:  "Any overtime worked under the above paragraph must be mutually agreed to between the Union and Diversified Transmission Products (Muncie Plant)."

During the 2000-2001 negotiations, the parties agreed to establish a form to be utilized to ensure the proper administration of Article Nine, Section 5. This form must be filled out before any provisions of Article Nine, Section 5 are administered.  The intent of this form is to ensure proper administration of this Article and Section.  It is not intended to otherwise alter either party's rights under Article Nine, Section 5.

The remaining sections of Article Nine are unchanged.

5.    Article Fourteen, Stoppage of Work, in the 2005 Agreement shall be amended to read as follows:

### SECTION 1 – STRIKES AND LOCKOUTS

The Union will not cause or permit its members to cause, nor will any member of the Union take part in any strike, either sit-down, slow-down, stay-in, or any other kind of strike or stoppage of work or other interference with any of the Company's operations for any reason whatsoever.   Any violations of this provision shall be brought to the attention of the Union representatives by the Company. The Union representatives shall be obligated to make every reasonable effort to curb or stop any such violation.  Any interference with the Company's operations, as described above, shall be deemed a violation of this Section.  Any employee involved in any violation of this Section shall be subject to discharge. The Company agrees that there shall be no lockout of its employees during the term of this Agreement.  In addition to the above, when another outside union is on strike and may have a picket line in front of the Company's Muncie Plant, the Union agrees not to request or encourage its members to participate in a sympathy strike nor will any member take part in any sympathy strike.

### SECTION 2 – DUTY TO COOPERATE

Current language to remain unchanged

DTP017180

6.    For grievances arising after the effective date of this Plant Closure Agreement, Article Three, Grievance Procedure, of the 2005 Agreement is modified as follows:

    a.    All new grievances must be filed within ten (10) days of the date the Union or affected employee or group of employees first had knowledge of the circumstances giving rise to the grievance.

    b.    Within ten (10) days of the filing of a grievance, a Step 3 meeting will be conducted. All other steps of the grievance procedure before arbitration are eliminated.

    c.    The Company will not be required to arbitrate any grievance that is not submitted by the Union to the American Arbitration Association within thirty (30) days after receipt of the Company's Step 3 response. Grievances not timely submitted to arbitration will be deemed settled.

7.    Post-retirement health care benefits are eliminated for all employees who were actively at work, on leave or laid off as of February 23, 2009. All individuals otherwise eligible for such benefits will be entitled to the amounts outlined in Article IV(B) below in exchange for relinquishing them. Neither this provision nor anything else in this Plant Shutdown Agreement affects the rights, if any, of employees who retired before February 23, 2009, to post-retirement benefits. This provision does not apply to any life insurance benefits employees or retirees are entitled to under the terms of the existing plan.

8.    The Company will retain any surplus funding in the Supplemental Unemployment Benefit Plan as of the plant shutdown date determined by the Company. In 2009, retiree bonuses and any balance will be paid in accordance with the terms of the 2005 Agreement.

9.    Vested Basic Pension Payout Options: Employees who will not meet eligibility requirements to retire by April 24, 2009, or who do meet the eligibility requirements to retire but who choose not to retire at that time, may elect one of the following options to receive their earned pensions based on actuarially determined amounts that are cost neutral to the plan:

DTP017181

1.   No change. Begin drawing fully earned pension upon retirement as currently defined under the agreement.

2.   Early Distribution. Receive an actuarially determined reduced pension annuity amount based at any age. This amount would be determined in such a way that the accrued benefit would be actuarially reduced to provide for the fact that the earlier pension will be paid for a longer period of time. For example someone not meeting the 30 years of service, 85 points, or age 60 & 10 would still be able to apply for their pension as of the plant close date. However the benefit would be reduced appropriately to reflect the longer payout of benefits.

3.   Early Distribution Option Over 15 Years. When the Muncie Plan is determined by its actuaries to be 80% funded (measured by reference to the Plan's AFTAP) as determined under the Pension Protection Act (deeming the Act to apply to the Muncie Plan on the date of this Agreement), to the extent allowed by law from time to time, participants will become eligible to receive an actuarially determined pension annuity amount based at any age and paid for a period of 15 years at an amount that is actuarially neutral to the earned benefit. This amount would be determined in such a way that the accrued benefit would be actuarially adjusted to provide for the earlier pension age and payments over a capped period of 15 years. The Company is under no obligation to fund the Muncie Plan to any degree greater than required by law from time to time in order to achieve or maintain 80% funded status.

4.   Lump Sum Payout. When the Muncie Plan is determined by its actuaries to be 80% funded (measured by reference to the Plan's AFTAP) as determined under the Pension Protection Act (deeming the Act to apply to the Muncie Plan on the date of this Agreement), to the extent allowed by law from time to time, participants will become eligible for lump sum payments at an amount that is actuarially neutral to the earned benefit. The Company is under no obligation to fund the Muncie Plan to any degree greater than required by law from time to time in order to achieve or maintain 80% funded status.

The Company agrees to waive the one year marriage stipulation in the pension agreement.

6

## ARTICLE II

### Resumption of Operations

If the Company resumes manufacturing of any product at the Muncie Plant within five (5) years of the Closing Date, it will provide advance notice to the Union of its plans and, on written request of the Union, the Company will recognize the Union, to the extent permitted by the National Labor Relations Act, as amended, and enter into negotiations for a new collective bargaining agreement. Any such request by the Union must be received by the Company on or before May 1, 2014. In the event of resumption of operations, employees will be recalled according to the seniority list of July 1, 2007, prior to any new hires.

## ARTICLE III

### Procedure for a Permanent Layoff From Employment and Letter of Recommendation

A.      Any layoffs under this Plant Shutdown Agreement will be preceded by at least five (5) calendar days' notice to the Union. The notice will list the name of the employee laid off, the classification and department to be affected, and whether the layoff is temporary with recall rights or a Permanent Layoff. If the notice is for a Permanent Layoff, the Company will follow the layoff procedures set forth in the 2005 Agreement. Employees need not be placed on temporary layoff before being placed on Permanent Layoff.

B.      If an employee on a temporary layoff (not designated as being on Permanent Layoff) is recalled to work, the employee must decide whether or not to return to work within five (5) calendar days of his/her recall notice and must be available, unless otherwise eligible to be absent at that specific time for an approved leave, to begin work on the next shift following the expiration of that five (5) calendar day period.

7

DTP017183

C.     An employee who has been on temporary layoff status for sixty (60) consecutive days will be placed on Permanent Layoff on the effective date of this Agreement. After the effective date of this Agreement, all other employees who remain on temporary layoff status for sixty (60) consecutive days without recall being offered will be placed on Permanent Layoff on the sixty-first (61st) day from the individual employee's layoff.

D.     At the time that the employee is placed on Permanent Layoff, the Company will provide the employees with a standard format letter that will set forth basic employment information regarding such individual's date of hire, date of termination, job classifications held in the past five (5) years and any identifiable skills. The letter will also indicate that the employee participated in the smooth phase down of operations and that he/she worked as required by the Company. The Company will provide the Union with a copy of the letter given to the employee within twenty-four (24) hours after it is given to the employee.

E.     If there are no employees on temporary layoff with recall rights, the Company, in order to meet production and maintenance requirements, may on a daily/weekly basis assign salaried or third-party agency employees or hire temporary employees to perform the jobs covered under the 2005 Agreement. Such persons will not be eligible for any benefits or rights provided by the agreements between the Company and the Union or this Plant Shutdown Agreement.

## ARTICLE IV

### Negotiated Plant Closing Benefits

A.     As described in this Article IV, the Company agrees to provide plant closing benefits to employees who are actively employed or on layoff or any form of leave with recall rights on February 23, 2009. These benefits are paid to prevent the disruptive, unplanned exodus

8

of employees prior to closure and promote the orderly closing of the plant by inducing employees to remain employed until released by the Company. As the purpose of the pay is to induce employees to stay employed prior to the closing, the pay is properly allocated to the period prior to the closing even though paid thereafter. Active employees must continue work until permanently laid off due to the plant shutdown, or continue working and retire between February 23, 2009 and the plant closing date, in order to receive benefits under this Article. Any employee who quits, or is terminated for cause, will not be eligible to receive these benefits. The aggregate payout in plant closing benefits will not exceed $34,000,000.

   B.   <u>Plant Closing Benefits Schedule</u>.   Plant closing benefits will be provided to eligible individual employees in a combination of closing pay and tax-sheltered contributions to a Healthcare Reimbursement Account (HRA). Plant closing benefits for eligible employees will be provided according to the following schedule:

| Level | Description | Per Person | | |
|-------|-------------|------------|-----|-------------|
| | | Total | HRA | Closing Pay |
| 1A | Retiree Health Care (HC) Eligible w/30 or More Years of Service | 100,000 | 10,000 | 90,000 |
| 1B | Retiree Health Care Eligible w/27 Years Seniority but Less Than 30 Years | 100,000 | 10,000 | 90,000 |
| 1C | Retiree Health Care Eligible w/25 Years Seniority but Less Than 27 Years | 91,500 | 10,000 | 81,500 |
| 1D | Retiree Health Care Eligible w/20 Years Seniority but Less Than 25 Years | 84,500 | 10,000 | 74,500 |
| 1E | Retiree Health Care Eligible w/15 Years Seniority but Less Than 20 Years | 73,000 | 10,000 | 63,000 |
| 2 | Seniority Date on or Before 12/31/81 - Not Eligible for Retiree Health Care | 50,000 | | 50,000 |
| 3 | 25 Years of Service but Less Than 27- Not Eligible for Retiree Health Care | 41,500 | | 41,500 |
| 4 | 20 Years of Service but Less Than 25- Not Eligible for Retiree Health Care | 34,500 | | 34,500 |
| 5 | 15 Years of Service but Less Than 20- Not Eligible for Retiree Health Care | 23,000 | | 23,000 |
| 6 | 10 Years of Service but Less Than 15 | 12,750 | | 12,750 |

9

DTP017185

| 7 | 5 Years of Service but Less Than 10 | 7,750 | 7,750 |

In the event individuals with return rights elect not to return to the bargaining unit by February 23, 2009, amounts allocated to such individuals for plant closing benefits will be reallocated to levels 1 through 7 in the same proportions as set for above, but in no event will the amount paid by the Company exceed $34,000,000.

C.      Any closing pay paid by the Company to employees under this Plant Shutdown Agreement will be made in equal monthly installments (less applicable withholding taxes) over a 12-month period commencing on May 1, 2009.

D.      All individual payments of plant closing benefits will be conditioned upon the individual employee signing a comprehensive release of claims against the Company and the Union in a form acceptable to the Company and the Union.

E.      Individual payments under this Article will be made after the employee has been afforded at least forty-five (45) days to consider the required release agreement and has had seven (7) days within which to revoke signed consent to such agreement.

F.      In the event an eligible employee dies before receiving all monthly closing pay payments under this Article, the remaining unpaid monthly payments will be paid to the employee's estate. In the event of death, any balance in an employee's HRA will be transferred to the employee's designated beneficiary subject to the requirements that (1) the beneficiary must be a dependent of the employee and (2) the HRA funds are used to reimburse qualified medical expenses.

G.      The Company and the Union agree that other than as set forth in this Plant Closing Agreement, there are no other agreements, memorandums, understandings or practices which would require the Company to pay severance or any other form of plant closing

DTP017186

compensation to employees represented by the Union. To the extent that this Plant Shutdown Agreement addresses eligibility for post-retirement health care for those who retire after February 1, 2009, it is intended to amend and supersede the parties' current Health Insurance Agreement. The HRA provided in this Article IV will be the sole retiree medical benefit plan provided to any employee who retires after February 1, 2009 or is terminated from employment as of the plant closing date.

### ARTICLE V

### Vacations

Each employee will receive vacation pay and vacation bonus in accordance with the 2005 Agreement. Any deferred vacation not used prior to the employee's Permanent Layoff Date will be paid at the time of Permanent Layoff. No further accruals of vacation or vacation bonus shall occur subsequent to an employee's Permanent Layoff Date.

### ARTICLE VI

### Continuation of Insurance

A.     Employees who were covered by the Company's actives health insurance plan on their Permanent Layoff Date or temporarily laid off employees who are recalled to work and become eligible for coverage under the Company's health insurance plan prior to their Permanent Layoff Date shall be eligible to have such coverage continued in accordance with the Consolidated Omnibus Budget Reconciliation Act, as amended ("COBRA"), following their Permanent Layoff Date, subject to paragraph B below.

B.     The Company will continue to pay its share of the premium cost for health insurance coverage for six (6) months following the month of an employee's layoff date consistent with the provisions of the Health Insurance Agreement referenced in Article I(A)

DTP017187

above. Once this coverage ends, employees will be entitled to insurance continuation benefits for the full period provided under COBRA.

C.     The Company will pay the premiums for the employee's life insurance coverage through the end of the month in which the employee retires or is permanently laid off. Thereafter, the employee shall be offered the opportunity to purchase a conversion policy.

### ARTICLE VII

#### Miscellaneous

A.     It is expected that the final shutdown date of the Muncie Plant will be at midnight on April 24, 2009, or such other date as may be determined by the Company and communicated to the Union. The plant shutdown could be sooner than April 24, 2009. Employees will not be expected to work beyond the date of shutdown to be eligible for any benefits negotiated in conjunction with the plant shutdown, unless otherwise agreed to between the Union and the Company.

B.     The Company agrees not to contest unemployment insurance claims filed by employees terminated as a result of the plant shutdown. Employees who quit or who are discharged for cause prior to the shutdown date will have their unemployment claims contested.

C.     Notwithstanding the termination of the UAW Agreements, grievances filed after the effective date of this Plant Shutdown Agreement and pending at the time of the expiration of the 2005 Agreement, or filed within ten days of the expiration date, will continue to be processed pursuant to the grievance and arbitration procedure of the 2005 Agreement as modified by Article I. D. 6. above.

D.     In order to assist in the wind down of final production, orderly disconnection, removal and clean up of equipment, the removal of materials and other activities associated with

12

DTP017188

the shutdown of plant operations, the Company may offer temporary employment through a temporary services agency following the announced shutdown date to a limited number of employees as exclusively determined by the Company upon the following terms and conditions.

1.  The acceptance of the Company's offer of temporary work will be entirely voluntary on the part of an employee, and will have no impact on his/her eligibility for benefits under this Plant Closure Agreement. The terms of the current collective bargaining agreement shall not have application to temporary employees except as provided below.

2.  Seniority will be given consideration in offering temporary work to maintenance and production employees through the temporary services agency, provided, however, that employees offered temporary work shall have the ability to perform the work required.

3.  Employees offered work by the Company after April 24, 2009, shall be paid at the New Hire rates of the 2005 Agreement.

4.  The Permanent Layoff Date for employees working in this temporary status will not be affected by this temporary employment with the Company.

5.  The Company has the exclusive right to direct the workforce employed pursuant to this provision, including, but not limited to, the right to schedule working hours, to assign work, to relieve workers from duty because of lack of work or other causes, and to subcontract work.

E.  The Company will provide all current and retired employees with all necessary contact information for insurance, pension and any and all benefits prior to the Plant Closing Date. Additionally, the Union and employees past and present will be given notice within thirty (30) days of any changes relative to the changing of the name, address, telephone number or person responsible for the administration of such plans.

13

DTP017189

## ARTICLE VIII

### Dispute Resolution

Any alleged violation of the 2005 Agreement, its changes or this Plant Shutdown Agreement will be subject to the grievance procedures of the 2005 Agreement as modified by Article I. D. 6. above.

## ARTICLE IX

### Complete Agreement

A.   <u>Collective Bargaining</u>

The Company and the Union agree that this Plant Shutdown Agreement constitutes a full, final and complete resolution of all issues regarding the termination of the production operations of the Muncie Plant and the effects of such termination upon the employees and that neither party has a claim against the other regarding such matter. Further, the Company and the Union agree that during the negotiations, which resulted in this Plant Shutdown Agreement, each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that all the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Plant Shutdown Agreement. Therefore, the Company and the Union, each voluntarily and unqualifiedly waive the right, and each agrees that except as provided in this Plant Shutdown Agreement the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered in this Plant Shutdown Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this Plant Shutdown Agreement.

14

DTP017190

B. <u>Releases</u>

1. The International Union, UAW and Local No. 287, on behalf of themselves and the members of the bargaining unit, hereby release and discharge fully and forever the Company, BorgWarner, Inc., BorgWarner Torq Transfer Systems, Inc., their related corporations and their respective directors, officers, employees, stockholders and agents from and against all claims, whether pending or not, including, without limitation, those related in any way to the decision to close, the closing of, the notice of the closing of and the work assigned to the Muncie Plant. The International Union, UAW and Local No. 287 further covenant that they will file no grievances and commence no litigation concerning the decision to close, the closing of, the notice of the closing of and the work assigned to the Muncie Plant. The Company hereby releases and discharges, fully and forever, the International Union, UAW and Local No. 287 and their respective officers, directors, employees and agents from and against all claims, whether pending or not, which the Company may have against them, including without limitation, those in connection with bargaining over the effects of the closing of the Company's Muncie Plant. The Company further covenants that it will commence no litigation against the International Union, UAW or Local No. 287 concerning bargaining over the effects of the closing of the Muncie Plant. The foregoing releases by the Union apply to claims in the lawsuit presently pending in the United States District Court for the Southern District of Indiana under Case No. 1:07cv00262, which the Union agrees will be dismissed with prejudice, each party bearing their own costs, within ten (10) days of the effective date of this Plant Shutdown Agreement. The foregoing releases by the Union also apply to any claims related to the arbitrator's award in American Arbitration Association Case 52 300 00043 06 (Input Shaft Outsourcing Gr. 17142), as well as any pending grievance(s) based on the business commitment letter referenced in

15

DTP017191

Article D.1. above or Section 1.B of the 2005 Agreement. The foregoing releases also apply to any grievances pending as of the effective date of this Plant Shutdown Agreement, which grievances will be withdrawn with prejudice. These releases do not apply to grievances that arise after the effective date of this Plant Shutdown Agreement.

2.     The Company and the Union have a dispute with respect to the nature of the Company's obligation to provide post-retirement health care benefits to employees who retired prior to February 23, 2009 and their dependents. Nothing in this Plant Shutdown Agreement affects the parties' rights or positions with regard to that dispute. The Company also agrees that the foregoing releases do not apply to pension rights of active and retired employees that are vested as of the effective date of the Plant Shutdown Agreement.

C.     Savings and Assignment

In the event that any provision of this Plant Shutdown Agreement is declared invalid or unenforceable by a decision of a federal or state court, the remaining provisions shall remain in full force and effect. This Plant Shutdown Agreement and all rights and obligations thereunder may be assigned by the Company in its sole discretion to an affiliate corporation of the Company or to any other corporation(s) organized for the purpose of continuing the business of the Company.

D.     Authority to Execute

1.     The Union warrants that this Plant Shutdown Agreement has been executed by its duly authorized representatives.

2.     The Company warrants that this Plant Shutdown Agreement has been executed by its duly authorized officials.

16

3.     This Plant Shutdown Agreement shall be effective on the date it is ratified by employees in the bargaining unit provided such ratification must occur before February 28, 2009.

IN WITNESS WHEREOF, the Company and the Union have signed this Plant Shutdown Agreement on Feb. 26, 2009.

Local Union No. 287, International Union,
United Automotive, Aerospace and
Agricultural Implement Workers of America
(UAW)

By: _Todd Gardner_

Printed: _TODD Gardner_

Title: _Chairman UAW Local 287_

BorgWarner Diversified Transmission
Products Inc. for its Muncie Plant

By: _____

Printed: _DOUGLAS OWENBY_

Title: _VICE PRESIDENT TTS OPERATIONS_

International Union, United Automotive,
Aerospace and Agricultural Implement
Workers of America (UAW)

By: _Michael Ailes_

Printed: _Michael Ailes_

Title: _Service Rep. International UAW_

By: _____

Printed: _Douglas J. Czerwonka_

Title: _Director, Human Resources DTF_

By: _Barbara J. Thornell_

Printed: _Barbara J. Thornell_

Title: _H.R. Generalist_

7048570.1 (OGLETREE)

17

DTP017193