UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, JAMES L. KELLEY,
on behalf of themselves and a similarly
situated class,

                    Plaintiffs,

v.

BORGWARNER, INC., BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

                    Defendants.

Case No. 09-cv-10918
Hon. Paul D. Borman
Magistrate Mona K. Majzoub

**Class Action**

_____/

David R. Radtke (P47016)
Roger J. McClow (P27170)
Patrick J. Rorai (P65091)
KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI 48034
248-354-9650; fax 248-354-9656
dradtke@kmsmc.com
rmcclow@kmsmc.com
prorai@kmsmc.com

Bobby R. Burchfield
Joshua D. Rogaczewski
McDERMOTT WILL & EMERY
Attorneys for Defendants
600 Thirteenth St., N.W.
Washington, D.C. 20005
202-756-8000; fax 202-756-8087
bburchfield@mwe.com
jrogaczewski@mwe.com

Elisa Angeli Palizzi (P52088)
MILLER, CANFIELD, PADDOCK
& STONE, P.L.C.
Attorneys for Defendants
150 W. Jefferson Avenue, Suite 2500
Detroit, MI 48226
313-496-7635; fax 313-963-6420
angeli@millercanfield.com

_____/

**PLAINTIFFS' RESPONSE BRIEF
IN OPPOSITION TO
BORGWARNER'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Self-Serving "Agreements to Disagree" Do Not Negate The Plain
        Language of Article VIII of the HIAs.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    A General Durational Clause Does Not Defeat Specific Language of Vesting. . . . . . . . 6

IV.     Under Controlling Precedent, SPDs Cannot Modify Vested Benefits. . . . . . . . . . . . . 7

V.      The Parties' Negotiated Increases in Deductibles and Stop-loss for
        Category A PPO Retirees Does Not Indicate Non-Vesting of Benefits. . . . . . . . . . . . . 8

VI.     Plaintiffs' Vested Benefits Cannot be Changed. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VII.    Defendants' 2009 Changes in the Class' Health Care Benefits Are
        Not Reasonably Commensurate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VIII.   The Benefits Other Employers Provide Their Retirees is Irrelevant. . . . . . . . . . . . . . 14

IX.     The Incidental Damages Sought By Plaintiffs are Recoverable
        on a Class-Wide Basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

X.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## <u>TABLE OF AUTHORITIES</u>

*Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bender v. Newell Window Furnishings,* 2012 U.S. App. LEXIS 9003
(6th Cir. May 3, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 11

*Bobbie Brooks, Inc. v. Garment Workers,* 835 F.2d 1164 (6th Cir. 1987) . . . . . . . . . . . . . . . 5, 6

*Chemical Workers v. Pittsburgh Plateglass Co.,*
404 U.S. 157, 181 n. 20, 92 S. Ct. 383 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cole v. Arvin Meritor, Inc.,* 549 F.3d 1064 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
509 U.S. 579, 113 S.Ct. 2786 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kentucky Speedway, LLC v. NASCAR,* 588 F.3d 908 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . 16

*Mack Trucks, Inc. v. UAW,* 856 F.2d 579 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Maurer v. Joy Technologies, Inc.,* 212 F.3d 907 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 12

*McCoy v. Meridian Automobile Systems, Inc.,* 390 F.3d 417 (6th Cir. 2004) . . . . . . . . . . . . . . . 8

*Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398 (6th Cir. 2006) . . . . . . . . . . . . . . . . 16

*NLRB v. Insurance Agents Union,* 361 U.S. 477, 80 S.Ct. 419 (1960) . . . . . . . . . . . . . . . . . . . 15

*Paperworkers v. Champion International Corp.,* 908 F.2d 1252 (5th Cir. 1990) . . . . . . . . . . . . 6

*Phoenix Engineering, Inc. v. MK-Ferguson of Oak Ridge Co.,*
966 F.2d 1513 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Prater v. Ohio Education Association,* 505 F.3d 437 (6th Cir. 2007) . . . . . . . . . . . . . . . . 8, 9, 10

*Reese v. CNH America LLC,* 574 F.3d 315 (6th Cir. 2009) . . . . . . . . . . . . . . . . 8, 10, 11, 13, 15

*UAW v. General Motors, Inc.,* 497 F.3d 615 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*UAW v. Yard-Man,* 716 F.2d 1476 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Yolton v. El Paso Tennessee Pipeline Co.,* 435 F.3d 571 (6th Cir. 2006) . . . . . . . . . . . . . 6, 7, 10

*Zielinski v. Pabst Brewing Co.,* 463 F.3d 615 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 11, 13

## I.     Introduction

Plaintiffs file this Response Brief in Opposition to Defendants' Motion for Summary Judgment.  For the reasons stated herein, Defendants' Motion should be denied and Plaintiffs' Motion for Summary Judgment as to Liability should be granted.

Defendants' Motion for Summary Judgment is unique in a contract interpretation case because it largely ignores the relevant contract provision that the parties are asking the Court to interpret.  Article VIII of the parties' HIAs describes DTP's obligation to provide health insurance benefits for retirees and surviving spouses, but in Defendants' Motion it merits only a passing reference.  The reason is simple.  Similar contract provisions have been interpreted by the Sixth Circuit Court of Appeals as providing lifetime, vested unalterable health care benefits for retirees and surviving spouses going back to *UAW v. Yard -Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983).

In Article VIII of the 1989 HIA, the parties set forth their agreement on the duration of retiree health care benefits for hourly retirees, which explicitly ties eligibility for fully paid lifetime health care benefits to eligibility for a lifetime pension benefit.  The only durational limit on the contractual entitlement to health care benefits is if a surviving spouse remarries.

It is undisputed that the durational language in Article VIII of the 1989 HIA continued unchanged for Class Members in subsequent HIAs negotiated by the parties through the Muncie plant's closing in 2009.  Therefore, because Article VIII of the 1989 HIA provided for lifetime, vested health care benefits for hourly retirees and their surviving spouses, all of the subsequent agreements did so as well.

## II.     Self-Serving "Agreements to Disagree" Do Not Negate The Plain Language of Article VIII of the HIAs.

The 1989 HIA was reached at the conclusion of a seven week strike by the UAW at the Muncie plant.  (P. MSJ Ex. 1 p. 20)[1]  In 1990, the parties signed an Agreement on Modification and Extension of Existing Labor Contract ("ACME Agreement") which extended the 1989 CBA, HIA and Pension Plan until 1995.  (P. Res. Ex. 1)   The ACME Agreement included various exhibits on issues that the parties agreed to investigate and make recommendations upon.   The ACME Agreement did not change any of the substantive provisions of the 1989 HIA.  *Id.* at DTP 005354-56

Exhibit 3 to the 1990 ACME Agreement was a Joint Letter of Agreement on Post-Retirement Benefit Liabilities in which the parties agreed to establish a joint task force to attempt to seek a solution for DTP's PRB's liability issues which was acceptable to both parties and which was intended to reduce the projected total of ***future*** PRB liabilities.[2]  (*Id.* at DTP 005359) The task force was to develop alternatives for solving the PRB liability issue that did ***not affect current retirees.***[3] *Id.*

Paragraph 6 of Exhibit 3 stated:

> This agreement ***does not prejudice the Union's position that current retirees have life-time vested benefits*** nor the DTP Muncie plant's position that current retirees do not have lifetime vested benefits. (emphasis supplied)[4]  *Id.*

---

[1] Exhibits to Plaintiffs' Motion for Summary Judgment will be referred to as "P. MSJ Ex. __." Exhibits to Defendants' Motion for Summary Judgment will be referred to as "D. MSJ Ex. __." Exhibits to Plaintiffs' Response Brief in Opposition to BorgWarner's Motion for Summary Judgment will be designated as "P. Res. Ex. __."

[2] Any task force solutions had to be ratified by the membership of Local 287 and approved by the International UAW.  (P. Res. Ex. 1 DTP 005359)

[3] In July 1992, the Joint Task Force on Health Care and Post-Retirement Benefits issued a Joint Report.  (P. Res. Ex. 2) The Report set forth a number of options, but no recommendations.  The options were not binding on the parties.  *Id.* at p. 6.

[4] Similar language is also in the parties' 2009 Shutdown Agreement. (P. MSJ Ex. 21 p.16)

In the Indiana lawsuit filed by DTP against the UAW over the 2006 changes in retiree health care benefits, former BorgWarner lawyer Regis Trenda testified about paragraph 6 in Exhibit 3 to the 1990 ACME Agreement as follows:

A.    Jack Reesing [sic] sent back to me Exhibit 3, which had the sixth paragraph, the new paragraph.  And it wasn't this paragraph.  It was a paragraph -- the paragraph said, to my recollection, the company acknowledges and agrees the post retirement benefits are guaranteed for the lifetime of the retiree.

Q.    What did you do in response to that new draft of the document?

A.    Well, I talked to Mr. Reesing and, of course, made him aware of our position, which he well knew there is no guaranteed lifetime post-retirement benefits.

(P. Res. Ex. 3 Tr. 151)

Trenda testified that he re-drafted paragraph 6 to read as it appears in the 1990 ACME Agreement.  *Id.*  Reising was DTP's negotiator in 1989.  (P. Res. Ex. 4 Tr. 16) BorgWarner management officials Turczynowsky and Trenda were not in bargaining in 1989.  (P. MSJ Ex. 11 Tr. 13; P. Res. Ex. 3 Tr. 139-140) The parties' original paragraph 6 of Exhibit 3 to the ACME Agreement, in which the parties to the HIA agreed the post-retirement benefits were guaranteed for the lifetime of the retiree, is strong evidence that the DTP bargainers in Muncie believed the HIA provided for vested, lifetime retiree health care benefits.  It was only the corporate parent, BorgWarner, a non-signatory to the HIAs, that had a different "position."

Defendants allege Trenda's version of paragraph 6 of Exhibit 3 to the 1990 ACME Agreement nullified the plain language of Article VIII in the 1989 HIA and all subsequent HIAs. This claim is without support.  Exhibit 3 to the 1990 ACME Agreement did not change Article VIII of the 1989 HIA.  (P. Res. Ex. 1 DTP 005354-56)  In fact, Exhibit 3 of the ACME Agreement specifically stated the recommendations of the Joint Task Force could not affect current retirees. (*Id.*

at DTP 005359)  Exhibit 3 also specifically stated that the ACME Agreement did not prejudice the Union's position that current retirees had life-time vested benefits.  (*Id.*)  But now, in 2012, 22 years later, Defendants argue the ACME Agreement *did* prejudice the Union's position.

The fact that both parties made self-serving statements on whether retiree health care benefits were vested in 1990, and again in 2009 in the Plant Shutdown agreement, is immaterial. (P. MSJ Ex. 21 p. 16)  Apparently, in 1990, the parties agreed to disagree as to the meaning of the HIAs and "kicked the can down the road" in the hope that the issue would go away or be decided later.  Now is the time for the Court to make the decision.  To allow any party to nullify an agreement based on an after-the-fact self-serving claim would end contract law as we know it.

If DTP believed that the retiree health care benefits were not lifetime, vested benefits in 1990, it could have changed the benefits for retirees after the 1989 HIA expired in 1992 (or 1995).  It did not do so.  It also could have sought a declaratory judgment to determine the HIA's meaning.  Instead, DTP waited until 2006 -- sixteen years after the ACME Agreement was reached -- to first change retiree health care benefits.

DTP also could have negotiated contract language that clearly limited its obligation to provide retiree health care benefits to the Class.  In fact, DTP did limit its retiree health care obligations in 1992, when the parties agreed that for employees hired *after* December 31, 1992, DTP has "no liability for health expenses, including but not limited to premiums for health care coverage for such employees upon their termination... ." (P. MSJ Ex. 5 p. 2) Instead, the parties agreed that these future employees (referred to as "Category B Retirees") would participate in a retiree health account ("RHA") in which DTP deposited money on an hourly basis which could be used to pay some of the costs of retiree health care benefits.[5]  (*Id.* at pp. 2-3, 9-10)  Surviving spouses of

---

[5] DTP did agree in Article VIII, Section B.1. of the 1992 HIA that it would make available one health care plan for Category B retirees to buy into which continued the exact same terms or conditions as the 1992

Category B Retirees could participate in the health care plan made available by DTP, under certain circumstances, if they paid the full cost of coverage. (*Id.* at pp. 9-10) The fact that there are no similar limitations on Class Members' benefits illustrates the vested nature of their retiree health care benefits here.

DTP's argument also is illogical in light of the concerns expressed in the 1990 ACME Agreement. If retiree health care benefits were not vested, DTP could have changed or eliminated the benefits whenever the HIA under which an employee retired under expired. If that was true, retiree health care benefit costs did not "pose a serious threat to the financial value and competitive status of the DTP Muncie Plant" as is stated in Exhibit 3 to the ACME Agreement. (P. Res. Ex. 1 DTP 005359) But, DTP knew it did not have the right to change or terminate retiree health care benefits. It was this obligation that caused the concern over post-retirement benefits liability, the formation of the Joint Task Force and the parties' 1992 agreement for RHAs for Category B Retirees.

To the extent Defendants argue there was no meeting of the minds, it should be rejected. The concept of "meeting of the minds" or a "manifestation of mutual assent" does not apply to discerning the intent of the parties under an otherwise binding CBA. It is relevant to determine whether a CBA was ***formed*** in the first place. *Bobbie Brooks, Inc. v. Garment Workers,* 835 F.2d 1164, 1168 (6th Cir. 1987) ("A meeting of the minds of the parties must occur before a labor contract is created."); *Paperworkers v. Champion International Corp.,* 908 F.2d 1252, 1258 (5th Cir. 1990) ("meeting of the minds" goes "to question of whether there is a contract at all, rather than to . . . a particular contingency arising under that agreement."); *Mack Trucks, Inc. v. UAW,* 856 F.2d 579, 591 (3d Cir.

---

PPO Plan as set forth in Exhibits A, C, D, E, F and H of the 1992 HIA. (P. MSJ Ex. 5, p. 9) DTP also guaranteed that if a Category B retiree reached 100 years of age, and met certain conditions, DTP would agree to pay the cost of the health care plan for that retiree. *Id.*

1988) (union ratification is generally considered to be the last act necessary to create meeting of the minds and enforceable labor agreement).

If, as here, there is a binding HIA, the intent of the parties is determined through application of federal common law developed under Section 301. In other words, in this case, "basic rules of contract interpretation apply, meaning that the courts must first examine the CBA language for clear manifestations of an intent to vest." *Yolton,* 435 F.3d at 578-79; *Golden*, 73 F.3d at 654; *Yard-Man*, 716 F.2d at 1479.

In *Cole v. Arvin Meritor, Inc.*, 549 F.3d 1064, 1075 (6th Cir. 2008), the defendant claimed that there was no "meeting of the minds" on retiree health care benefits because the employer believed the benefits were not vested. The court rejected the defendant's contention because the parties expressed their intent in unambiguous contract language that the benefits were lifetime, vested benefits. Here, the salient facts are no different. The parties reached agreement on the duration of retiree health care benefits and it is up to this Court to interpret those HIAs as to their meaning. Self-serving after-the-fact claims do not mean the parties did not have a meeting of the minds.

## III.   A General Durational Clause Does Not Defeat Specific Language of Vesting.

Defendants cite the HIAs' general duration clause in an effort to show that the retiree health care benefits terminated when the HIAs expired. This argument has been repeatedly rejected by this Court and the Sixth Circuit. See *Bender v. Newell Window Furnishings,* 2012 U.S. App. LEXIS 9003 (6th Cir. May 3, 2012); *Cole v. Arvin Meritor,* 549 F.3d 1064, 1071 (6th Cir. 2008); *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006). The HIAs at issue here contain a

general durational clause that does not limit the duration of retiree health care benefits.[6]  (P. MSJ Ex. 2 p. 15; Ex. 5 p. 14; Ex. 6 p. 14)

Defendants also claim the Termination of Coverages provision in Exhibit A, Section M.2 to the HIAs means retiree health care benefits terminate when the HIA terminates.  Defendants' reading of that provision turns its actual meaning on its head.  In fact, Exhibit A, Section M.2 of the HIAs supports Plaintiffs' position because it states when an active employee retires or an active employee or retiree dies, you must refer to the continuation provision of the HIAs to determine retiree or surviving spouse coverage.   (P. MSJ Ex. 2 p. 65-66; Ex. 5 p. 72-73; Ex. 6 p. 74-75)  The continuation provision for a retiree and a surviving spouse is Article VIII of the HIA, which provides that health care benefits continue as long as the retiree or surviving spouse receives a pension.

## IV.     Under Controlling Precedent, SPDs Cannot Modify Vested Benefits.

Defendants claim that the Company-issued SPDs provide it with a unilateral right to terminate, change or modify retiree health care benefits.  This contention is contradicted by the SPD's plain language.  Here, the SPDs specifically provide that the health care plan is maintained pursuant to a CBA and an HIA.  (P. MSJ Ex. 2 p. 121; Ex. 5 p. 130; Ex. 6 p. 132)  The SPD also explicitly states that the termination individual insurance coverage must be in accordance with the HIA.  *Id.*  Therefore, the SPDs are specifically qualified by the parties' collectively bargained HIAs and the provisions of the HIAs govern all coverages and exclusions.[7]

---

[6] A nearly identical general duration clause is found in the parties' 1989 and 1995 Retirement Income Agreements.  (P. MSJ Ex. 22 pp. 42-43, 50; Ex. 23 p. 43) Defendants cannot credibly argue the pension benefits expire upon the expiration of the Pension Agreements.  The same holds true for retiree health care benefits in the HIA. See *Yolton*, 435 F.3d at 581.

[7] Plaintiffs discussed the SPD issue in their Motion for Summary Judgment. (Dkt. # 102, pp. 16-18)

In *Bender, Reese, Prater* and *McCoy*, the Sixth Circuit found that similar reservation of rights language in SPDs were not sufficiently unqualified to vitiate collectively bargained language to the contrary. The same is true here.

DTP's claim that the UAW negotiated the SPD language is contradicted by BorgWarner Benefits Manager George Turczynowsky, who testified that the 1989 SPD was written by DTP in Muncie and then reviewed by BorgWarner, its corporate parent. (P. MSJ Ex. 11, Tr. 53-54)

## V.    The Parties' Negotiated Increases in Deductibles and Stop-Losses for Category A PPO Retirees Does Not Indicate Non-Vesting of Benefits.

The 1992 HIA included a 5% escalator for deductibles and stop-loss for the PPO program through December 31, 2002 -- more than four years after the 1992 HIA expired. (P. MSJ Ex. 5 pp. 65, 80) It also included specific negotiated increases in prescription drug deductibles for Category A PPO Retirees. (*Id.* at p. 68) Article XII, Section 2 in the 1992 HIA provided:

> Any provision in this Agreement or any Exhibit attached hereto relating to deductibles and stop-loss limits shall survive termination of this Agreement. Such provisions shall terminate on December 31, 2002 ***unless previously modified and/or extended***. (emphasis added) *Id.* at p. 14.

This provision gave the parties the right to negotiate the modification or extension or deductibles and stop-loss limits for PPO retirees until December 31, 2002.

In 1998, the parties negotiated an improved prescription drug plan for Category A PPO Retirees. (P. MSJ Ex. 3 French Dec. Ex. A p. 3; Ex. D) The mail order program was changed from mandatory to non-mandatory and prescription drug providers were expanded. *Id.* There was a $2 increase in prescription drug deductibles for retirees who used retail pharmacies. *Id.* Both parties characterized the 1998 prescription drug changes as "an improved benefit." *Id.* These negotiated changes were in keeping with Article XII, Section 2, which stated that the parties could modify deductibles before December 31, 2002.

-8-

In 2000, the parties agreed to modify and extend the PPO deductibles and stop-losses by continuing the 5% escalator until 2005.  (P. MSJ Ex. 9)  This negotiated change was also in keeping with Article XII, Section 2.  Category A PPO Retirees understood that their deductibles and stop-loss amounts were subject to negotiated changes until December 31, 2002.

In 2005, the parties negotiated a new HIA and no changes were made to benefits, deductibles or stop-losses for past Category A Retirees. (P. Res. Ex. 5 ¶11) The parties did agree that employees who retired prior to May 1, 2006 (a 13 month window period) would participate in the PPO Plan with the same benefits and costs as the 2000 HIA.  (P. MSJ Exs. 13, 14)  For employees who retired *after* May 1, 2006, the parties negotiated retiree health care benefits which included higher deductibles and stop-losses, reduced benefits, and for the first time, monthly retiree contributions. *Id.*

It is undisputed that prior to the litigated changes in 2006, DTP *never* unilaterally changed retiree health care benefits for the Class.    (D. MSJ Ex. 6 DuFour Dec. ¶¶3-9, Exs. 1-12) In *Prater v. Ohio Education Association,* 505 F.3d 437, 443 (6th Cir. 2007), Judge Sutton stated:

> As a general rule, 'an existing contract cannot be unilaterally modified.'  (Citations omitted.)  Were it otherwise, the option of either party to modify a contract unilaterally would defeat the essential purpose of reaching an agreement in the first place - to bind the parties prospectively.
>
> This principle applies with equal force to collective-bargaining agreements, where employers are statutorily barred from effectuating 'unilateral modification[s] of ... existing collective bargaining agreement[s].' *NLRB v. Ford Brothers, Inc*., 786 F.2d 232, 233 (6th Cir. 1986) (per curiam) Even when an employer enters bankruptcy, the law 'prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement.' *In re Unimet Corp.*, 842 F.2d 879, 884 (6th Cir.1988) (emphasis in original)

That holding is directly applicable in this case.

## VI.    Plaintiffs' Vested Benefits Cannot be Changed.

Here, the parties negotiated HIAs which contained specific benefits that were to be provided to the retirees and surviving spouses as "set forth in Exhibits A, C, D, E, F and H... ."[8]  (P. MSJ Ex. 2 p. 8; Ex. 5 pp. 5-6; Ex. 6 pp. 5-6)   In 2000, the parties agreed to require DTP to provide supplemental coverage for prescription drug benefits for retirees if there was government-provided coverage in the future -- such as Medicare Part D.  (P. Res. Ex. 6)[9]

DTP argues that the agreed-upon benefits set forth in the collectively bargained HIAs may be changed unilaterally, even if the agreements provided for vested, lifetime benefits.  This argument is directly contrary to the above-cited holding in *Prater*.  505 F.3d at 443.

DTP's argument is based on *Reese v. CNH America LLC,* 574 F.3d 315 (6th Cir. 2009), where the court focused on a unique historical feature which had no parallel in *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006) or any other case cited by the Sixth Circuit.[10] According to the court in *Reese,* the unique fact was the parties agreed to a 1998 collective

---

[8] BorgWarner Benefits Manager George Turczynowsky testified that the 1989 HIA was a comprehensive document that reflects all of the provisions of the benefit programs negotiated and agreed to by the parties, including the operation of the plan, its terms and provisions and the level of benefits.  (P. MSJ Ex. 11 Tr. 52-53)

[9] This November 11, 2000 Letter of Understanding also supports Plaintiffs' position that the health care benefits did not expire when the HIAs expired because it states, "The Company submits that the commitment to supplement such a change is already covered in the March 12, 1995 Health Care Agreement (Section 7, p. 13 see attached)."  (P. Res. Ex. 5) This is an admission that retiree health care benefits did not expire when the 1995 HIA expired in 1998 because DTP asserted the issue had been previously addressed in the 1995 HIA and need not be addressed again in November 2000.

[10] In Judge Sutton's concurrence of the denial of a petition for rehearing in *Reese,* he emphasized the uniqueness of the facts in *Reese* when he stated, "There was something about this case -- something that implicated the distinct question of what 'vesting' means in this context."  583 F.3d 955, 956 (6th Cir. 2009)

-10-

bargaining agreement which established a managed care program that was applicable to prior retirees going back to 1994.[11]

Here, employees who retired prior to the 1992 PPO did not have their plan or benefits changed.  In 2005, when the parties negotiated a reduction in retiree health care benefits for employees who retired on or after May 1, 2006, those changes were not applied to past retirees.

In the 1992 and 1995 HIAs, the parties agreed the parties could extend or modify deductibles and stop-losses prior to December 31, 2002.  Category A PPO Retirees understood that could occur under the 1992 HIA up to December 31, 2002.  That agreement is inapposite to the unique facts in *Reese,* where the parties negotiated a new managed care plan and applied it to past retirees.

In *Bender*, a case decided subsequent to *Reese*, the Sixth Circuit did not allow unilateral changes to benefits when it found the benefits vested.  (P. MSJ Ex. 33)

## VII.   Defendants' 2009 Changes in the Class' Health Care Benefits Are Not Reasonably Commensurate.

Defendants claim the May 1, 2009 changes are reasonably commensurate with negotiated benefits.  The *Reese* panel lifted the three factor test for reasonably commensurate cited by Defendants from *Zielinski v. Pabst Brewing Co.,* 463 F.3d 615, 619, 620 (7th Cir. 2006), which addressed an employer's obligation arising from a 35 year old Shutdown Agreement where the underlying benefit agreements were lost, so the court claimed it needed to fill "gaps." *Id.* at 619-20. The court reversed entry of summary judgment for Pabst and remanded with instruction from the court to adjust benefits "to the extent possible without wild conjecture - for changes to which the parties to the agreement would have agreed had they focused at the outset on the duration of the commitment made by the employers."  *Id.* at 621.  Here, there are no "gaps" to fill because the

---

[11] On remand, Judge Duggan found the issues raised by the Sixth Circuit did not amount to a material change in benefits, so the benefits could not be unilaterally modified. Judge Duggan also found that one party to a CBA cannot unilaterally alter benefits.  2011 U.S. Dist. LEXIS 21543 (March 3, 2011) (P. Res. Ex. 7)

parties to the agreement negotiated, in great detail, the benefits, costs and coverages to be provided to the Class.

In 2005, DTP sought early negotiations with the UAW and proposed to negotiate changes in health care benefits for past retirees.  (P. Res. Ex. 6 ¶¶6-11)  In response, the UAW threatened to end the negotiations. *Id.* Later in 2005, the parties began negotiations again with DTP's agreement that retiree benefits for past retirees were not a subject of negotiations.  *Id.*

Now, after DTP failed to get the UAW to negotiate to reduce health care benefits for past retirees in 2005, it is asking this Court to approve what it could not obtain in bargaining.  Permitting DTP to obtain here what it could not obtain through bargaining with the UAW would eviscerate the vested benefits of the Class Members and, in the process, federal labor law.

In *Chemical Workers v. Pittsburgh Plateglass Co.,* 404 U.S. 157, 181 n. 20, 92 S. Ct. 383 (1971), the Supreme Court stated that the vested health care benefits for retirees cannot be altered without the retirees' consent.  In *Maurer v. Joy Technologies, Inc.,* 212 F.3d 907, 918 (6th Cir. 2000), the Sixth Circuit stated: "If benefits have vested, then retirees must agree before the benefits can be modified, even in a subsequent CBA between the employer and active employees."  Here, DTP seeks the approval of this Court to modify the vested benefits of retirees without either the consent of the retirees or the agreement of the UAW.  Defendants' claim is devoid of merit and must be denied.

Because Defendants do not, and cannot, establish that they are entitled to the relief they seek, even if Plaintiffs do not win as a matter of law, there must be a trial on the merits as to the propriety of any proposed modification to their health care benefits.

Defendants' Motion also does not include any discussion of what the concept of "reasonably commensurate" could possibly mean where there are no gaps to fill.  This term was originally used

in *Zielinski* in the context of lost agreements where there **were** gaps to fill. The Court need not reach this issue, however, because (1) the Plaintiffs are entitled to summary judgment; and (2) the unilaterally imposed reductions in health care benefits in 2009 are unlike any benefits the parties historically bargained for the Class.

If the Court was to consider any analysis of the term "reasonably commensurate," that analysis would begin with the undisputed fact that Plaintiffs are retirees living on fixed incomes whose health will deteriorate as they age. Because the pensions of retirees and surviving spouses will not increase in the future, any changes to their benefits that would substantially increase the amount they must spend on health care cannot be considered "reasonably commensurate" with the benefits they had upon retirement. At the very most, to past muster, under the *Reese* panel standard "reasonably commensurate" changes must be of the type and nature similar to the changes which DTP and the UAW agreed to in the past. As stated previously, the only changes the UAW ever agreed to for Category A PPO Retirees was a 5% escalator and major medical deductibles and stop-losses.[12]

Here, Defendants completely eliminated health care coverage for Medicare-eligible retirees, including prescription drug coverage. DTP currently provides Medicare-eligible Class Members with an RRA of $169.58 per month. (D. MSJ Ex. 16 ¶14) This amount does not cover the cost of equivalent coverage that was in place prior to the changes. A Medigap Plan F costs between $97 and $189 per month and a Medigap Plan L costs between $76 and $158 per month. (P. Res. Ex. 8) These Medigap policies do not cover prescription drugs. According to the Center for Medicare and Medicaid Services, an individual enrolled in a Medicare Part D Plan in 2012 may pay as much as $4700 for prescription drugs, plus a monthly premium. (P. Res. Ex. 9) DTP's May 1, 2009 changes

---

[12] The UAW never agreed to any changes for the Category A non-PPO Retirees.

leave Medicare-eligible Class Members with significantly higher medical expenses than was the case before the changes.  Plaintiff Willard Sloan paid $6,755.50 in additional health care costs between May 2009 and November 2011.  Eugene Winningham paid $3,870.00 and James Kelley paid $6,491.63 during the same time period.[13]  (P. Res. Ex. 10)

The changes for pre-Medicare retirees are just as devastating.  Pre-Medicare retirees are now required to make a monthly contribution of up to $104.25 *per individual.*  (D. MSJ Ex. 16 ¶12)  For Category A Retirees who retired before May 1, 2006, there was never a monthly contribution for retiree health care coverage.  The prescription coverage was a *maximum* of $12 for brand names for Category A PPO Retirees and $7 for Category A non-PPO Retirees.  Now, brand name drugs are grouped into formulary and non-formulary and a retiree may have to pay 50% of the cost of the drug.  (*Id.* at ¶13)  There have also been increased deductibles, stop-losses and increased co-insurance costs for pre-Medicare Category A Retirees.[14]  (*Id.* at ¶¶9, 11)

## VIII.   The Benefits Other Employers Provide Their Retirees is Irrelevant.

Defendants rely heavily on the Declaration of Scott Macey who purports to describe agreements between the UAW and other employers, as well as the "relative value" of plans provided non-UAW employers.  (P. MSJ Ex. 17)  None of this, even if true, is relevant.  In 2005, the UAW *refused* to agree when DTP proposed reductions in health care benefits for past retirees.[15]  (P. Res.

---

[13] The Plaintiffs are Medicare-eligible, Kelley's wife is not Medicare-eligible.

[14] The declaration of Michelle DuFour states pre-Medicare Class Members had annual deductibles of approximately $300 in-network and $550 out-of-network.  (D. MSJ Ex. 16 ¶4) This is inaccurate.  The actual amounts were the negotiated amounts of $285 in-network and $572 out-of-network.  She also claims that family deductibles were approximately $850 in-network and $1700 out-of-network.  (*Id.*)  The actual costs were the negotiated amounts of $857 in-network and $1716 out-of-network.

[15] Ironically, in each situation involving the UAW, Macey asserts that the UAW *agreed* to changes in retiree health care benefits. (D. MSJ Ex. 17 ¶¶14-19)  The fact that the UAW has *not* agreed to any changes here must be a dispositive difference here.

Ex. 6 ¶¶6-11)  Defendants cannot obtain here what it could not obtain from the UAW through negotiations.

Free and fair collective bargaining is the cornerstone of the structure of labor management relations.  *Phoenix Engineering, Inc. v. MK-Ferguson of Oak Ridge Co.*, 966 F.2d 1513, 1519 (6th Cir. 1992)  Every CBA is the product of widely varying conditions, depending on the economy, the relative strengths of the employer and union at the time, the goals of the employees who ratify the contract at hand, the willingness of the parties to use whatever economic weapons they have at the time and a host of other factors too complex to summarize.  *See generally, NLRB v. Insurance Agents Union*, 361 U.S. 477, 489-90, 80 S.Ct. 419 (1960).  Federal labor law does not countenance governmental interference with the results of free and fair collective bargaining.  As the Supreme Court stated in the *Insurance Agents* decision:

> It must be realized that collective bargaining, under a system where the Government does not attempt to control the results of negotiations, cannot be equated with an academic search for truth - or even with what might be thought to be the ideal of one.

361 U.S. at 489.

What the UAW did or did not do, in other situations, under different pressures, with different employers, in negotiations involving bargaining units having different concerns, is irrelevant here.  The *Reese* panel did not mean, and could not have meant, that  courts can look to what the UAW did elsewhere to justify the imposition of a benefit changes.  Otherwise, the *Reese* panel would have, *sub silentio*, turned the labor law policy on its head.

Having said that, the more mundane fact is that Macey's Declaration is entirely inadmissible.  Because Defendants' claim that it may unilaterally reduce benefits is based largely on Macey's Declaration, Defendants' Motion must be denied for that reason as well.

First, Macey has not been qualified as an expert under Fed. R. Evid. 702 or the standards enunciated in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1996). Unless and until he has been ***qualified*** as an expert, he cannot ***testify*** as an expert. Under *Daubert*, the district court is the gate keeper of purported expert testimony, and must assess not only the qualifications of the purported expert but, *inter alia*, whether the proffered evidence "both rests on a reliable basis and is relevant to the task at hand" and "whether the reasoning or methodology underlying the testimony is scientifically valid." *Kentucky Speedway, LLC v. NASCAR*, 588 F.3d 908, 915 (6th Cir. 2009) (*quoting Daubert*); *see also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006)(setting forth *Daubert* factors that district court must consider in determining if the reliability of "expert" testimony). This Court has not qualified Macey an expert witness under the *Daubert* standards. Therefore, his Declaration is inadmissible.

Second, Macey's Declaration contains, almost exclusively, hearsay and multiple hearsay. Rule 56(e) states that a supporting affidavit "must be made on personal knowledge [and] set out facts that would be admissible in evidence." Macey's declaration contains his "understanding" of events, information related to him by others, analyses on "relative value" of health care plans performed by others using undisclosed methodologies, "estimates" made by other persons, data collected by other persons and information obtained from various articles. Although it is obvious from the statements in the Declaration, Macey concedes that his declaration is based on "information" and "belief," as well as personal knowledge. (D. MSJ Ex. 17 Intro ¶9)  Macey's declaration is entirely inadmissible under Rule 56(e)(1) to support a motion for summary judgment.

Finally, Macey's assertions of facts are, not only irrelevant, but also incomplete or so distorted that they bear no relationship to actual record facts. Because Defendants rely on them to

-16-

support its Motion, Plaintiffs will address a few of the more flagrant examples which undermine Macey's claim of "expertise."

Macey states that "[t]he UAW and the auto companies have agreed to participant premium sharing (as well as increasing participant costs for plan usage)." (D. MSJ. Ex. 17 ¶15)  According to Macey, "[t]his is a relevant consideration in assessing the reasonableness of BorgWarner DTP's changes." *Id.*  Macey then summarizes what, based on information he claims to have  gained from others, what he claims those "agreed" upon changes to be. (*Id.*  ¶¶15-17)

The actual facts are, of course, exceedingly more complex and entirely different than Macey relates. The facts surrounding the attempts of GM, Chrysler and Ford to survive financially are the subject of well publicized and prolonged class action litigation, which was followed by Chapter 11 bankruptcy proceedings and then by a complex federal bailout closely supervised by federally appointed overseers.  Macey fails to mention ***any*** of these events.

In *UAW v. General Motors, Inc.*, 497 F.3d 615, 621-22 (6th Cir. 2007), the Sixth Circuit recited the facts leading up to the ***class action*** settlements at GM.  According to the Sixth Circuit, the UAW and the Plaintiff Class sued GM ***because*** the UAW had ***no*** authority to reach an agreement with GM by itself.  Nevertheless, certain retirees objected to the proposed class action settlement, claiming that the UAW had impaired their rights without their consent by entering into an agreement with GM to reduce their vested benefits.  The Sixth Circuit flatly rejected this contention. "The UAW had no such authority and never purported to exercise it." *Id.* at 627.  Because Macey states as a fact the allegation of the objectors, the Sixth Circuit has necessarily rejected Macey's version of the facts as well.

Next, Macey states: "In the VEBA created by Dana and the UAW, it was agreed that the VEBA could make future changes -- including cutbacks -- to existing retiree benefits." (BW Ex. 17

-17-

¶18) Again, Macey takes significant liberties with the truth.  The actual facts about Dana, of course, cannot possibly be reduced to a single sentence.[16]  Dana filed for Chapter 11 bankruptcy protection on March 3, 2006, a notable fact not mentioned by Macey.   On January 31, 2007, the Debtor (Dana) filed a Section 1114 motion to modify retiree health care benefits.[17]  Under Section 1114, the UAW was the presumptive "authorized representative" of UAW retirees.[18]  Section 1114 litigation began on March 2, 2007 and ended on April 3, 2007.  Before the bankruptcy court issued a decision on whether, how and how much Dana could reduce retiree benefits, the Debtor, the UAW and others reached a global settlement on all outstanding issues.

The Dana Section 1114 litigation and the terms of the settlement are extraordinarily complex. The process involved due diligence investigations, complex financing arrangements and investment details which are far beyond any summary here.  The Debtor's motion to approve the settlement agreement was itself 50 pages long.  One aspect of the settlement was that  Dana would contribute about *$800 million* to a VEBA which would provide medical insurance benefits for Dana hourly retirees in the future, another fact that escapes Macey's attention.

## IX.    The Incidental Damages Sought By Plaintiffs are Recoverable on a Class-Wide Basis.

In 2009, Plaintiffs filed a Motion for Class Certification under Rules 23(b)(1) and (b)(2). Defendants opposed Plaintiffs' attempt to certify the class under those rules based on Plaintiffs' request for monetary damages.  In the Opinion and Order granting Plaintiffs' Motion for Class

---

[16] Plaintiffs rely of the Debtor's motion for approval of the global settlement for their recitation of facts.  A copy is attached as P. Res. Ex. 11.

[17] Section 1114 of the Bankruptcy Code provides the procedural for Chapter 11 debtors to seek bankruptcy court approval for modifications to retiree health care benefits. 29 U.S.C. §1114.

[18] A union is the presumptive Section 1114 "authorized representative" of retirees receiving benefits under a collective bargaining agreement. 29 U.S.C. §1114(c)(1).

Certification, the Court rejected Defendants' argument that the incidental monetary relief sought by Plaintiffs defeated certification under Rule 23(b)(1) and (b)(2). (Dkt. #56, pp. 8-13)

Now, Defendants' claim that Plaintiffs cannot recover class-wide damages in this class action because of the holding in *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011). Defendants' claim is wrong. In *Dukes,* the plaintiffs sought a judgment against Wal-Mart for back pay, injunctive and declaratory relief and punitive damages on behalf of themselves and a nationwide class of 1.5 million female employees because of Wal-Mart's alleged discrimination against women in violation of Title VII of the Civil Rights Act of 1964. The Court held that the certification of the plaintiff class was not consistent with Rule 23(a) of the Federal Rules of Civil Procedure. The Court also found that the employees' claims for back pay was improperly certified because where monetary relief was not incidental to injunctive or declaratory relief, so Rule 23(b)(2) was not appropriate because the certification failed to comply with the Due Process Clause. The Court explicitly stated it was not deciding whether there were any forms of "incidental" monetary relief that were consistent with the interpretation of Rule 23(b)(2). 131 S. Ct. at 2560. The Court specifically cited *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir. 1998) in stating that it was not deciding whether any forms of incidental monetary relief were consistent with Rule 23(b)(2). *Id.* Here, this Court relied, in part, on *Allison* in granting Plaintiffs' Motion for Class Certification. *Allison* is still good law and the Class Certification is proper.

Defendants' claim that Plaintiffs and the Class are not entitled to class-wide damages as a matter of law in a Motion for Summary Judgment is inappropriate. This Court has certified the Class with the understanding of all the relief that Plaintiffs seek.

**X.**     **Conclusion**

For all the reasons set forth above, Defendants' Motion for Summary Judgment must be denied.  Plaintiffs are entitled to Summary Judgment as to liability for the reasons set in their Motion.

Respectfully submitted,

KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.


By: /s/ David R. Radtke
   DAVID R. RADTKE (P47016)
   ROGER J. McCLOW (P27170)
   PATRICK J. RORAI (P65091)
   Attorneys for Plaintiffs
   400 Galleria Officentre, Suite 117
   Southfield, MI  48034
   (248) 354-9650
   dradtke@kmsmc.com
   rmcclow@kmsmc.com
Dated: June 14, 2012   prorai@kmsmc.com

-20-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2012, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will serve it upon:

Bobby R. Burchfield                                   Elisa Angeli Palizzi
Joshua D. Rogaczewski


Respectfully submitted,

KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.


By:   /s/ David R. Radtke
    DAVID R. RADTKE (P47016)
    ROGER J. McCLOW (P27170)
    PATRICK J. RORAI (P65091)
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI 48034
(248) 354-9650     Fax: (248) 354-9650
dradtke@kmsmc.com
rmcclow@kmsmc.com
prorai@kmsmc.com

P:\RHC Cases\BorgWarner\2009 MI Lawsuit\Pleadings\PLs Response toDEFs MSJ.wpd