UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| WILLARD L. SLOAN, EUGENE J. WINNINGHAM, and JAMES L. KELLEY,<br><br>                Plaintiffs,<br><br>  v.<br><br>BORGWARNER INC., BORGWARNER DIVERSIFIED TRANSMISSION PRODUCTS INC., and BORGWARNER FLEXIBLE BENEFITS PLANS,<br><br>                Defendants. | Case 2:09-cv-10918-PDB-MKM<br><br>U.S. District Judge Paul D. Borman<br><br>U.S. Mag. Judge Mona K. Majzoub |

**BORGWARNER'S NOTICE OF SUPPLEMENTAL AUTHORITY**

BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and BorgWarner Flexible Benefits Plans—referred to collectively as "BorgWarner"—hereby notify the Court of *Tackett v. M & G Polymers USA, LLC*, Nos. 12-3329, 12-3407, 2013 WL 4045989, at *1 (6th Cir. Aug 12, 2013) (attached), a supplemental authority relevant to BorgWarner's pending motion for summary judgment. The motion is fully briefed and was argued before this Court on November 7, 2012.

BorgWarner has argued that it is entitled to summary judgment for either of two independent reasons. *First*, as a matter of law, Plaintiffs cannot prove an

agreement between the UAW and BorgWarner to vest their retiree health benefits because, among other things, the parties "agreed to disagree" about whether benefits were vested. (R. 95, Defs.' Mot. 12–16.) *Second*, even if the benefits were vested, the changes BorgWarner made to Plaintiffs' health benefits in May 2009 were reasonable and permissible under *Reese v. CNH America LLC*, 574 F.3d 315, 324–27 (6th Cir. 2009). (R. 95, Defs.' Mot. 16–19.) Plaintiffs responded to the *Reese* argument by complaining that the changes increased their share of the costs too much. (R. 112, Pls.' Opp'n 13–14.)

*Tackett* speaks directly to the second issue and confirms that plan changes that increase costs to retirees can satisfy the *Reese* standard. In *Tackett*, the Sixth Circuit affirmed the district court's determination that the retirees' health benefits vested. 2013 WL 4045989, at *9. The district court, however, "ordered retirees and dependents enrolled in the pre-2007 Comprehensive Plan to be enrolled in the current Comprehensive Plan instead of being reinstated to the pre-2007 plan." *Id.* The district court found the 2007 changes—which increased co-payments, deductibles, and stop-loss limitations—reasonable under *Reese*. *Id.* The changes were not de minimis. For example, the stop-loss limit increased eightfold, from $500 per family to $4,000 per family. *Id.* The Sixth Circuit affirmed the district court's assessment. *Id.*

*Tackett* provides an additional yardstick against which to measure BorgWarner's 2009 changes.

| | |
|---|---|
| Dated: August 21, 2013 | Respectfully submitted, |
| | s/Joshua David Rogaczewski |
| Elisa Angeli Palizzi (P52088) | Bobby R. Burchfield |
| (angeli@millercanfield.com) | (bburchfield@mwe.com) |
| Miller, Canfield, Paddock and Stone, P.L.C. | Joshua David Rogaczewski (jrogaczewski@mwe.com) |
| 150 West Jefferson, Suite 2500 | McDermott Will & Emery LLP |
| Detroit, Michigan 48226 | 600 13th Street, Northwest |
| 313.496.7635 | Washington, D.C. 20005 |
| 313.963.6420 fax | 202.756.8000 |
| | 202.756.8087 fax |

*Attorneys for BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and BorgWarner Flexible Benefits Plans*

3

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2013, I electronically filed the foregoing **BorgWarner's Notice of Supplemental Authority** with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants.

                                                       s/Joshua David Rogaczewski
                                                     Joshua David Rogaczewski
                                                     (jrogaczewski@mwe.com)
                                                     McDermott Will & Emery LLP
                                                     600 13th Street, Northwest
                                                     Washington, D.C. 20005
                                                     202.756.8000
                                                     202.756.8087 fax

--- F.3d ----, 2013 WL 4045989 (C.A.6 (Ohio))
**(Cite as: 2013 WL 4045989 (C.A.6 (Ohio)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Sixth Circuit.
Hobert Freel TACKETT, Woodrow K. Pyles, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, and Harlan B. Conley, Plaintiffs–Appellees/Cross–Appellants,
v.
M & G POLYMERS USA, LLC, M & G Polymers USA, LLCComprehensive Medical Benefits Program for Employees and their Dependents, M & G Catastrophic Medical Plan, M & G Medical Necessity Benefits Program of Hospital, Surgical, Medical, and Prescription Drug Benefits for Employees and their Dependents, and M & G Major Medical Benefits Plan, Defendants–Appellants/Cross–Appellees.

Nos. 12–3329, 12–3407.
Argued: March 15, 2013.
Decided and Filed: Aug. 12, 2013.

**Background:** Retirees, their spouses, and their dependents brought class action against employer, asserting claims under Labor Management Relations Act (LMRA) and Employee Retirement Income Security Act (ERISA) arising from employer's alleged violation of various collective bargaining agreement (CBA) provisions granting them lifetime contribution-free health care benefits. The district court dismissed the action. Plaintiffs appealed. The Court of Appeals, 561 F.3d 478, affirmed in part and reversed in part and remanded. On remand, the district court made a finding for plaintiffs on issue of liability during a bench trial. The United States District Court for the Southern District of Ohio, Gregory L. Frost, J., 853 F.Supp.2d 697, granted plaintiffs' motion for permanent injunction. Parties appealed.

**Holdings:** The Court of Appeals, Cole, Circuit Judge, held that:

(1) district court did not clearly err in finding that side letters that "capped" employer's contribution toward cost of retiree health care benefits were not part of prior CBA;

(2) any portions of CBA affecting retirees' benefits had not been lawfully implemented by employer's unilateral action after impasse had been reached in bargaining;

(3) district court did not clearly err by declining to find summary plan description (SPD) persuasive as to whether retiree benefits had been capped;

(4) district court did not clearly err in finding that prior retirees had vested right to receive contribution-free lifetime health care benefits; and

(5) district court did not clearly err in finding that increased prescription drug costs and annual deductibles for retirees were not severe and unreasonable under comprehensive health care plan.

Affirmed.

West Headnotes

**[1] Federal Courts 170B** ⬉0

170B Federal Courts
  After a bench trial, the Court of Appeals reviews a district court's factual findings for clear error and its legal conclusions de novo.

**[2] Federal Courts 170B** ⬉0

170B Federal Courts
  The scope of a permanent injunction is reviewed for an abuse of discretion.

**[3] Federal Courts 170B** ⬉0

170B Federal Courts
  A district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law.

**[4] Labor and Employment 231H ⚷0**

231H Labor and Employment

A health care plan is an ERISA welfare benefit plan which, unlike a pension plan, does not vest automatically, but only if the parties so intended when they executed the applicable labor agreements; to vest, in this context, means to remain binding beyond the expiration of the collective bargaining agreement. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[5] Labor and Employment 231H ⚷0**

231H Labor and Employment

Substantive federal law governs the analysis of whether the parties intended for an ERISA health care plan to vest under a collective bargaining agreement (CBA). Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[6] Labor and Employment 231H ⚷0**

231H Labor and Employment

District court did not clearly err in finding that side letters that "capped" employer's contribution toward cost of retiree health care benefits were not part of prior collective bargaining agreement (CBA); although "internal union conversations" appeared to indicate that at least some union representatives believed that cap letters applied, those representatives did not participate in local bargaining and parties with authority to bind employer and union rejected or disputed cap letter applicability.

**[7] Federal Courts 170B ⚷0**

170B Federal Courts

Credibility determinations are a matter of fact and a district court's determination regarding them receives great deference.

**[8] Labor and Employment 231H ⚷0**

231H Labor and Employment

Employers may lawfully implement portions of a final offer after an impasse is reached in bargaining for a collective bargaining agreement (CBA).

**[9] Labor and Employment 231H ⚷0**

231H Labor and Employment

Any portions of collective bargaining agreement (CBA) affecting retirees' benefits had not been lawfully implemented by employer's unilateral action after impasse had been reached in bargaining, since ability of employer to take unilateral action post-impasse applied only to mandatory topics of bargaining, while retiree benefits were permissive topic.

**[10] Labor and Employment 231H ⚷0**

231H Labor and Employment

District court did not clearly err by declining to find summary plan description (SPD) persuasive as to whether retiree benefits had been capped, when determining whether retirees had vested right to receive contribution-free health care benefits; although court was permitted to consider SPD as extrinsic evidence, SPDs were not legally binding, nor parts of the benefit plans themselves. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[11] Labor and Employment 231H ⚷0**

231H Labor and Employment

District court did not clearly err in finding that prior retirees had vested right to receive contribution-free lifetime health care benefits, since intent to vest was in accordance with collective bargaining agreement (CBA) language promising a "full contribution" to qualifying employees; although union subsequently made concessions, union could not modify them without retirees' permission.

**[12] Labor and Employment 231H ⚷0**

231H Labor and Employment

The interpretation of a collective bargaining agreement (CBA) is a matter of law only when the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

parties rely wholly on the terms of the CBA and do not present any extrinsic evidence of intent.

**[13] Labor and Employment 231H ⚷0**

231H Labor and Employment

In the interpretation of a collective bargaining agreement (CBA) where the parties present extrinsic evidence of intent, the determination of intent becomes a mixed question of both law and fact, for which the standard of review is clear error.

**[14] Labor and Employment 231H ⚷0**

231H Labor and Employment

A court determines whether the parties to a collective bargaining agreement (CBA) intended benefits to vest by applying traditional rules of contract interpretation, as long as doing so is consistent with federal labor policies.

**[15] Labor and Employment 231H ⚷0**

231H Labor and Employment

To interpret the language of a collective bargaining agreement (CBA), a court must: (1) look to the explicit language, (2) evaluate that language in light of the context that led to its use, (3) interpret each provision as part of the integrated whole, (4) construe each provision consistently with the entire document and the relative positions and purposes of the parties, (5) construe the terms so as to render none nugatory and to avoid illusory promises, (6) look to other words and phrases in the document to resolve ambiguities, and (7) review the interpretation for consistency with federal labor policy.

**[16] Labor and Employment 231H ⚷0**

231H Labor and Employment

District court did not clearly err in finding that increased prescription drug costs and annual deductibles for retirees who had vested right under collective bargaining agreement (CBA) to receive contribution-free lifetime health care benefits were not severe and unreasonable under comprehensive health care plan, in light of changes in health care, where co-pay for generic drugs went from $4 to $10, annual prescription drug deductible went from $175 to $250, and maximum out-of-pocket limit went from $500 to $4,000 per family.

Appeal from the United States District Court for the Southern District of Ohio at Columbus. No. 2:07–cv–126— Gregory L. Frost, District Judge. **ARGUED:** Philip A. Miscimarra, Morgan, Lewis & Bockius LLP, Chicago, Illinois, for Appellants/Cross–Appellees. David M. Cook, Cook & Logothetis, LLC, Cincinnati, Ohio, for Appellees/Cross–Appellants. **ON BRIEF:** Philip A. Miscimarra, Morgan, Lewis & Bockius LLP, Chicago, Illinois, Christopher A. Weals, Morgan, Lewis & Bockius LLP, Washington, D.C., for Appellants/Cross–Appellees. David M. Cook, Jennie G. Arnold, Claire W. Bushorn, Cook & Logothetis, LLC, Cincinnati, Ohio, for Appellees/Cross–Appellants.

Before KEITH, MARTIN, and COLE, Circuit Judges.

## OPINION

COLE, Circuit Judge.

***1** Defendants–Appellants Cross–Appellees M & G Polymers USA, LLC ("M & G") and associated health plans appeal the permanent injunction granted by the district court in favor of Plaintiffs–Appellees Cross–Appellants, retirees and dependents of retirees from an M & G plant and the union that currently represents plant employees.[FN1] Plaintiffs brought a class action suit against Defendants after M & G announced that Plaintiffs would be required to make health care contributions. After a bench trial, the district court found Defendants liable for violating both a labor agreement and an employee welfare benefit plan. The district court issued a permanent injunction ordering Defendants to reinstate Plaintiffs to the current versions of the benefits plans they were enrolled in until 2007 to receive health care for life without contributions.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

While Defendants ask this Court to reverse the liability determination and injunction, Plaintiffs request this Court to reinstate certain Plaintiffs to the pre–2007 versions of their benefits plan. Defendants argue that the district court clearly erred when it found that (1) certain letters requiring retiree contributions to health care costs were not a part of Plaintiffs' labor agreements; and (2) Plaintiffs' right to lifetime health care vested at retirement. Plaintiffs cross-appeal, arguing that, although the district court correctly held that their right to lifetime contribution-free benefits vested, the district court erred by restoring them to the current versions of their benefits plan, as opposed to the pre–2007 versions. We affirm the judgment of the district court.

I.

The named plaintiffs are Ohio residents and retirees from the Apple Grove, West Virginia Point Pleasant Polyester Plant ("Apple Grove"), which M & G has owned since 2000. From 1992 to 2000, Apple Grove was owned by Shell Chemical Company ("Shell"). Prior to 1992, it was owned by The Goodyear Tire & Rubber Company ("Goodyear").

Plaintiffs and similarly situated retirees belong to Local Union 644 ("Local 644") of the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL–CIO ("USW"), which currently represents Apple Grove employees. Prior to 1995, Local 644 belonged to the United Rubber Workers ("URW"), which merged with the USW in 1995. Over the years that Apple Grove was owned by Goodyear, Shell and M & G, Local 644 entered into a number of labor agreements.

Typically, the union as a whole—first the URW and later the USW—would negotiate a "master" agreement with the employer. Individual plants would adopt an agreement in one of three ways: (1) some plants directly participated in the "master bargaining" with the employer and entered into the master agreement itself; (2) some plants separately adopted "me-too" agreements that were the same as the master agreement; and (3) some plants, including Apple Grove according to Plaintiffs, negotiated "me-too with exceptions" agreements, meaning that they adopted agreements based on the master agreement, but with certain exceptions or differences. M & G, however, claims that Apple Grove was a " 'me-too' location[ ]" that "had a consistent practice of applying the 'master agreement' settlement year-after-year."

**\*2** While Apple Grove was owned by Goodyear, Goodyear and Local 644 entered into a collective bargaining agreement ("1991 CBA") effective November 6, 1991, to November 6, 1994, and a collectively bargained Pension, Insurance and Service Award Agreement effective May 15, 1991, to May 15, 1994, ("1991 Master P & I Agreement"). The 1991 Master P & I Agreement described, among other things, the health care benefits that retirees could expect to receive. A "side letter" ("1991 Letter G") was part of the 1991 Master P & I Agreement for certain URW locals, but not necessarily all. The 1991 Letter G stated:

> If the average annual cost of health care benefits [per retiree who retires on or after May 1, 1991, including his/her spouse] exceeds [$10,500 for retirees (including surviving spouses) under age 65 and $4200 for retirees (including surviving spouses) over age 65], the cost in excess ... shall be allocated evenly to all retired employees (including surviving spouses) in such group.

The 1991 Letter G also specified that the required contributions would not begin until July 1, 1997.

Also, a Summary Plan Description ("SPD"), effective as of May 15, 1991, stated that the "Company has established a required maximum average annual company cost per retiree for medical coverage," and set this maximum at $10,500 per year for each retiree under age 65 and $4,200 per year for each retiree over age 65 (surviving spouses included). It provided that the cost of any excess above the maximums would be allocated among all

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

members of the group of retirees evenly, and that contributions would not begin until at least July 1, 1997.

In 1992, Shell bought Apple Grove and, in 1993, formally adopted the Goodyear benefit plans previously in effect at the plant. In 1994, Shell and the URW and some URW locals entered into the "1994 Master P & I Agreement" which, for some URW locals, included a side letter: "1994 Letter G." The same year, Shell and Local 644 entered into another collective bargaining agreement, the "1994 CBA," effective November 6, 1994 to November 6, 1997.

On May 9, 1997, Shell and the USW (the current union) entered into the "1997 Goodyear Master P & I Agreement," which was effective until May 9, 2003. This agreement included, for some USW locals, a side letter: "1997 letter H." On November 6, 1997, Shell and the USW and Local 644 entered into the "1997 CBA," effective until November 6, 2000.

M & G bought Apple Grove in 2000. In September 2000, M & G and the USW and Local 644 entered into the "2000 CBA." A P & I Agreement, effective on Nov, 6, 2000, accompanied the 2000 CBA. In 2003, M & G and the USW, acting on behalf of Local 644, began bargaining over the next collective bargaining agreement. The bargaining continued through August 2005, and included more than sixty days of negotiations. On August 9, 2005, M & G and the USW on behalf of Local 644 entered the "2005 CBA," to be effective August 9, 2005 to November 5, 2008. The 2005 CBA included Letter of Understanding 2003–6 ("LOU 2003–6"). All Plaintiffs were, prior to retirement, active employees under one or more of the above CBAs.

*3 The 2000 P & I contained the following language:

Employees who retire on or after January 1, 1996 and who are eligible for and receiving a monthly pension under the 1993 Pension Plan ... whose full years of attained age and full years of attained continuous service ... at the time of retirement equals 95 or more points will receive a full Company contribution towards the cost of [health-care] benefits .... Employees who have less than 95 points at the time of retirement will receive a reduced Company contribution. The Company contribution will be reduced by 2% for every point less than 95. Employees will be required to pay the balance of the health care contribution, as estimated by the Company annually in advance, for the [health care] benefits .... Failure to pay the required medical contribution will result in cancellation of coverage.

The 1994 and 1997 P & I Agreements contained similar language.[FN2] Each P & I Agreement, once reached, was printed as a booklet and distributed to local union members.

The side letters were also known as "cap letters" because they "capped" the company's contribution towards the cost of retiree health care benefits. 1991 Letter G was the first such letter. 1994 Letter G, 1997 Letter H and LOU 2003–6 were also "cap letters," similar to 1991 Letter G, specifying various coverage maximums and "bite dates" when required contributions would begin. The letters were not reproduced in P & I booklets and allegedly not ratified as part of the local agreement.

In December 2006, M & G announced that it would begin requiring retirees to contribute to the cost of their medical benefits. *See Tackett v. M & G Polymers, USA, LLC (Tackett I),* 561 F.3d 478, 480 (6th Cir.2009) (per curiam). At the time, each Plaintiff was enrolled in either (1) the Medical Necessity Plan; (2) the Catastrophic Plan; or (3) the Comprehensive Plan. Some Plaintiffs refused to pay premiums and were dropped from coverage. Other Plaintiffs paid premiums, even if under protest, and remained enrolled in their plans.

Plaintiffs filed suit on February 9, 2007. Plaintiffs contended that the promise of a "full

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Company contribution towards the cost of [health care] benefits" in the CBAs provided them with a vested right to receive health care benefits in retirement without making any contributions. *Tackett I,* 561 F.3d at 482. Defendants contended that various other agreements between Local 644 and the successive employers, specifically the cap letters, limited that promise.

Plaintiffs' amended complaint stated three claims: (1) violation of labor agreements under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a); (2) violation of an employee welfare benefit plan under §§ 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B); and (3) breach of fiduciary duty under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

The district court granted Defendants' motion to dismiss on all three counts and Plaintiffs appealed to this Court. We affirmed the dismissal of the breach of fiduciary duty claim, but reversed the dismissals of and remanded the first two claims. *Tackett I,* 561 F.3d at 493. Then, the district court conducted a bench trial on the issue of liability.

**\*4** Eight witnesses testified at the bench trial. For Plaintiffs: two Apple Grove retirees (Woodrow Pyles and Hobert Tackett), and four former union negotiators (Ron Hoover, Randall Moore, Karen Shipley, and Brian Wedge). For Defendants: M & G's Human Resources director for Apple Grove (Kimm Korber), and a former M & G negotiator (Robert Long). The district court opinion amply summarizes their testimonies. *See Tackett v. M & G Polymers USA, LLC,* 853 F.Supp.2d 697, 703–09 (S.D.Ohio 2012).

After the trial, the district court found in favor of Plaintiffs on both remaining claims. Plaintiffs moved for a permanent injunction to reinstate their lifetime contribution-free health care benefits. The district court ordered that Plaintiffs be reinstated, but to the post–2007 versions of their plans.

Defendants appeal the liability ruling and, accordingly, seek to have the permanent injunction dissolved. Plaintiffs appeal the portion of the permanent injunction that orders retirees and dependents previously enrolled in the pre–2007 Comprehensive Plan or Catastrophic Plan to be enrolled in the current Comprehensive Plan instead of being reinstated to the pre–2007 Comprehensive Plan.[FN3]

II.

[1][2][3] After a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.,* 210 F.3d 672, 683 (6th Cir.2000) (citation omitted). We review the scope of a permanent injunction for an abuse of discretion. *Lee v. City of Columbus,* 636 F.3d 245, 249 (6th Cir.2011) (citation omitted). "The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *See United States v. Lawrence,* 555 F.3d 254, 261 (6th Cir.2009) (quotation omitted).

[4][5] The liability determination in this case hinges on whether the collectively bargained agreements between Plaintiffs and Defendants vested in Plaintiffs a right to lifetime no-contribution health care benefits. A health care plan is a welfare benefit plan which, unlike a pension plan, does not vest automatically, but only "if the parties so intended when they executed the applicable labor agreements." *See Noe v. Polyone Corp.,* 520 F.3d 548, 552 (6th Cir.2008). To vest, in this context, means to remain binding "beyond the expiration of the collective bargaining agreement." *See UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983). Substantive federal law governs the analysis. *See id.*

A.

In *Tackett I,* we said that the P & I language indicated a desire to vest benefits:

First, the "full Company contribution" language suggests that the parties intended the em-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ployer to cover the full cost of health-care benefits for those employees meeting the age and term-of-service requirements. Keeping in mind the context of the labor-management negotiations identified in Yard–Man, [716 F.2d 1476 (6th Cir.1983) ] we find it unlikely that Plaintiff USW would agree to language that ensures its members a "full Company contribution," if the company could unilaterally change the level of contribution. The CBA has no limitation on the amount of a company contribution and if the Defendants' argument were accepted, the company presumably could lower the contribution to zero without violating this language. Such a promise would be illusory.

**\*5** Second, the limiting language, "[e]mployees will be required to pay the balance of the health care contribution," follows the provision requiring contributions by those retirees who had not attained the requisite seniority points. From the placement of this language, we can reasonably infer that it did not apply to all retirees, but only to those retirees who had not attained the requisite seniority points.

Third, the collective bargaining agreement tied eligibility for health-care benefits to pension benefits. This is another factor indicating that the parties intended the health care benefits to vest upon retirement.

561 F.3d at 490. Subsequently, we described this analysis as "[t]he determination above that the parties intended health care benefits to vest [which] carries over to the ERISA § 502(a)(1)(B) claim." Id. at 491. According to the district court, "[b]y presenting the intended vesting as a fact leading to the result that Plaintiffs had presented a plausible claim, the appellate court pointedly issued a conclusion instead of merely recognizing a credible possibility."

Although we applied general principles of contract interpretation in Tackett I, see 561 F.3d at 489–90, we did not apply them to a complete factual record as would have been necessary for a conclusive determination of the vesting issue. For example, it was a matter of factual dispute whether the side letters were part of the CBA. If part of the CBA, they would have been relevant to the issue of vesting. However, this Court found them to be "extrinsic" to the Rule 12(b)(6) analysis because they were not part of the pleadings. See id. at 487 n. 6 (citing approvingly the district court's "note[ ]" that the " 'unusual' procedural posture of the case ... allowed the court to consider the Letter Agreements in a [Rule] 12(b)(1) motion but not in the [Rule] 12(b)(6) motion.").

Tackett I also limited its "determination[s]" to the Rule 12(b)(6) context in two other ways. First, prior to embarking on the Rule 12(b)(6) analysis, which contains the language relied on by the district court, the Tackett I panel pointedly declined to convert Defendants' Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See id. at 487–88. The panel concluded that it "w[ould] not consider matters extrinsic to the pleadings and [would] proceed to review the district court's Rule 12(b)(6) analysis." Id. at 488. Second, the panel acknowledged the possibility that the district court might determine on remand that Plaintiffs did not have vested benefits. See id. at 493 n. 11. For these reasons, Tackett I did not conclusively determine that Plaintiffs' retirement benefits had vested.

B.

[6] Fortunately, the district court's determination that benefits had vested did not rest solely on a misinterpretation of Tackett I. The district court also performed its own analysis of the facts, which led it to conclude that the cap letters were not part of the Apple Grove CBA and that vesting occurred. The district court considered the following evidence, in addition to the P & I agreement: (1) documents indicating an agreement between the union and the employers to "cap" health benefits, several "side" letters and the SPD, which were part of the "master" agreements; (2) P & I booklets circulated to Apple Grove employees that described, among

other things, retiree benefits, and did not contain any "capping" documents; (3) testimony from individuals involved in "master" negotiations, Apple Grove local negotiations or both. *See Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater,* 173 F.3d 1033, 1036 (6th Cir.1999) (citing *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)) (holding that an appellate court can affirm district court on alternate grounds supported by the record).

**\*6** Whether the cap letters were part of Apple Grove's CBAs is an issue of fact, reviewable only for clear error. *See Thomasville Furniture Indus., Inc. v. JGR, Inc.,* 3 F. App'x 467, 473 (6th Cir.2001) ("Whether a given document is part of a written contract is a question of fact." (citing *Greenberg v. The Life Ins. Co. of Va.,* 177 F.3d 507, 516 (6th Cir.1999) (additional citation omitted))). The district court did not clearly err in finding the cap agreements inapplicable to Apple Grove.

M & G argues that the conduct of union representatives from 1991 to 2005 was inconsistent with the district court's interpretation of the CBAs and P & Is as not including the cap letters. M & G claims that even the testimony of Plaintiffs' witnesses demonstrates that union representatives did not believe there was a vested right to lifetime no-contribution benefits for Apple Grove retirees. The most persuasive evidence cited by M & G is the "internal union conversations" that appear to indicate that at least some union representatives believed the cap letters to apply. Moore testified that he had been told by some local committee members that the 1997 Letter H applied, but that, despite "seach[ing] extensively," he could not find "any document indicating it had been adopted or ratified by the local." Hoover advised Moore and Shipley that "if" they used "a letter like Goodyear," they should "move the damn dates out or your retirees are going to get hit with a premium." Moore testified that Shipley told him that she was told "to be aware that there was a Letter H."

Although these statements certainly have the potential to imply that cap agreements were applicable, they need not be dispositive. Hoover participated in the master bargaining, which undisputedly included cap letters. However, he did not participate in local bargaining for Apple Grove, and the fact that he told some Apple Grove negotiators about the cap letters in the master agreement does not demonstrate that they applied to Apple Grove, especially since he qualified his advice with the word "if." At best, Hoover and Moore acknowledged the possibility that the cap letters applied to Apple Grove, but neither had any firm knowledge or documentation of the letters' applicability. In the face of such ambiguity, the district court did not clearly err by concluding that the letters did not apply to Apple Grove.

In sorting through conflicting recollections of negotiations, the district court noted that several parties with authority to bind M & G and the union rejected or disputed cap letter applicability. M & G objects to the district court's "focus on what union entity can 'bind' the union" as an error of law. M & G argues that "[q]uestions regarding who can 'bind' the union ... are unrelated to the probative value of evidence regarding what local bargaining committee members have done or said about past bargaining or past agreements."

[7] The district court did not, as M & G claims, treat statements of those with "binding authority" as dispositive, but it did appear to weigh these statements more heavily than statements from those without binding authority. Credibility determinations are a matter of fact and the district court's determination receives great deference. *See United States v. Esteppe,* 483 F.3d 447, 452 (6th Cir.2007). It is not unreasonable to infer that a party with authority to bind would be more likely to be informed regarding important documents.

**\*7** M & G describes the district court as "find[ing] that the collective bargaining agreement was enforceable only as to specific items described during ratification votes," and cites *Teamsters Loc-*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

*al 589 (Jennings Dist., Inc.),* 349 NLRB 124, 128 (2007) for its argument that such a "deficiency" does not void union ratification of an agreement. The district court did not, as M & G suggests, use the non-presentation of the cap letters as an "escape mechanism" from an otherwise-ratified agreement. Rather, Apple Grove employees' lack of knowledge regarding the cap letters was cited as an example of absence of evidence of the letters' inclusion in the Apple Grove agreements. As Plaintiffs point out, this was "but one piece of evidence among many."

Similarly, the district court did not err by considering the lack of awareness of the cap letters on the part of Shell's accountants and M & G's actuaries. The district court merely noted the absence of the type of evidence of the cap letters' applicability to Apple Grove that one would expect to see if Defendants' account of events was credible. The district court properly treated such lack of awareness as circumstantial, not "dispositive," evidence that the cap letters did not apply to Apple Grove.

[8] M & G argues that LOU 2003–6, which permitted collecting contributions from retirees whose insurance costs exceeded the caps set forth in the 2001 Letter H, was applicable to all Plaintiffs, including those who retired prior to August 9, 2005, because employers may lawfully implement portions of a final offer after an impasse is reached in bargaining. *See United Paperworkers Int'l Union v. NLRB,* 981 F.2d 861, 866 (6th Cir.1992) (per curiam).

[9] In early 2004, when LOU 2003–6 was unilaterally implemented by M & G, any portions affecting then-retirees' rights were not lawfully implemented because the ability to take unilateral action post-impasse only applies to mandatory topics of bargaining, *see Taylor Warehouse Corp. v. NLRB,* 98 F.3d 892, 902 (6th Cir.1996), while retiree benefits are a permissive topic. *See Yard–Man,* 716 F.2d at 1482. Furthermore, in August of 2005, when LOU 2003–6 became part of the 2005 CBA, it could not be applied to pre-August 9, 2005 retirees because their benefits had already vested, as described below.

[10] Finally, M & G cites the SPD as evidence that retiree benefits were capped. However, SPDs "are not legally binding, nor parts[ ] of the benefit plans themselves." *Engleson v. Unum Life Ins. Co. of Am.,* ––– F.3d ––––, No. 12–4049, 2013 WL 3336741, at *7 (6th Cir.2013) (quotation marks and citations omitted). Although the district court was permitted to consider the SPD as "extrinsic evidence," *see Moore v. Menasha Corp.,* 690 F.3d 444, 456 (6th Cir.2012), we cannot say that the district court clearly erred by declining to find it persuasive.

C.

[11][12][13] Given that the district court did not clearly err in finding that the cap letters were not part of the pre–2005 CBAs, the district court also did not clearly err in interpreting the pre–2005 CBAs as vesting a right to lifetime contribution-free benefits in the pre-August 9, 2005 retirees. Interpretation of a CBA is a matter of law only when the parties rely wholly on the terms of the CBA and do not present any extrinsic evidence of intent. *See Yard–Man,* 716 F.2d at 1480 n. 1. In this case, the determination of intent becomes a mixed question of both law and fact, for which the standard of review is clear error. *See id.*

***8** [14][15] We must determine whether the parties intended benefits to vest by applying traditional rules of contract interpretation, as long as doing so is consistent with federal labor policies. *Id.* at 1479. To interpret the language of a CBA, we must:

(1) "look to the explicit language," (2) evaluate that language "in light of the context" that led to its use, (3) "interpret each provision ... as part of the integrated whole," (4) construe each provision "consistently with the entire document and the relative positions and purposes of the parties," (5) construe the terms "so as to render none nugatory" and to "avoid illusory promises," (6) look to other words and phrases in the docu-

--- F.3d ----, 2013 WL 4045989 (C.A.6 (Ohio))
**(Cite as: 2013 WL 4045989 (C.A.6 (Ohio)))**

ment to resolve ambiguities, and (7) "review the interpretation ... for consistency with federal labor policy."

Tackett I, 561 F.3d at 489 n. 7 (quoting Yard–Man, 716 F.2d at 1479–80).

Though *Tackett I* was not conclusive on the vesting issue as a whole, it is conclusive on a narrower question: that of whether the quoted "explicit language" of the CBA, in the absence of "other words and phrases in the document" such as the cap letters, indicates an intent to vest. *Tackett I* interpreted the quoted language of the CBA, standing alone, as indicating intent to vest and this interpretation bound the district court, while leaving it free to make its own conclusion about the ultimate question of vesting based on other portions of the document, extrinsic evidence or both. *See, e.g.* Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 579 (6th Cir.2006) ( "When ambiguities exist, courts may look to other provisions of the document and other extrinsic evidence.") (citation omitted). The qualifying language in *Tackett I* implied that the CBA language, though indicating intent to vest, contained enough ambiguity to permit examination of such additional evidence.

The district court's presumption that, in the absence of extrinsic evidence to the contrary, the agreements indicated an intent to vest lifetime contribution-free benefits was in accordance with both *Tackett I* and the CBA language promising a "full contribution" to qualifying employees. To the extent that vesting was presumed, it was not the district court that, *sua sponte,* shifted the burden of proof, but rather the language of the CBA and its linkage of health care benefits to pension benefits, *see* Reese v. CNH America LLC, 574 F.3d 315, 322 (6th Cir.2009), that led to the conclusion that retirees had a vested right to health care benefits and, in the absence of evidence to the contrary, a vested right to contribution-free health care benefits. Having reached the conclusion that benefits were vested, it was then reasonable for the district court to conclude that those benefits could not be bargained away without retiree permission.

M & G points out that we have previously said that vesting of contribution-free health care benefits should not be presumed "simply ... because none of the CBA documents provided that retirees 'would be required' to pay premium contributions." Wood v. Detroit Diesel Corp., 213 F. App'x 463, 466 (6th Cir.2007). But in this case, the 2000 CBA, and the others with similar language, specifically promised a "full Company contribution" towards health care benefits. Furthermore, in *Detroit Diesel,* there were applicable "Supplemental Agreements" advising retirees that they " 'may be required to make monthly contributions' " and that "rates of payment, coverages, and terms and conditions of the program were all subject to change by Detroit Diesel at any time on reasonable notice." *Id.* at 467. In the present case, the analogous capping agreements are not applicable. Finally, even in *Detroit Diesel,* where there was weaker evidence of affirmative intent to vest and stronger anti-vesting evidence, this Court still concluded that the plaintiffs had sufficient likelihood of success on the merits, even though it "[might] not [have been] a 'strong' likelihood," to warrant preliminary injunctive relief. *See id.* at 471. The district court's analysis does not conflict with that in *Detroit Diesel.*

**\*9** M & G also contends that, because the USW recently agreed that retirees must make medical contributions, Apple Grove retirees cannot possibly have a vested right to lifetime contribution-free health care. However, if benefits are vested, then subsequent concessions by the union cannot modify them without retirees' permission. *See* Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div., 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

Given the inapplicability of the capping agreements, the district court did not clearly err in finding that pre-August 9, 2005 retirees had a vested right to receive contribution-free health care benefits.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

D.

[16] Plaintiffs cross-appeal the scope of the permanent injunction. They contend that the district court abused its discretion when it ordered retirees and dependents previously enrolled in the pre–2007 Comprehensive Plan to be enrolled in the current Comprehensive Plan instead of being reinstated to the pre–2007 plan.

Plaintiffs argue that the district court misapplied *Reese v. CNH America.* In *Reese,* we held that retirees whose lifetime health care benefits had vested could nonetheless be subject to "reasonable changes" in their health care benefits, as long as the changes were "reasonable in light of changes in health care" and "roughly consistent with the kinds of benefits provided to current employees." 574 F.3d at 326 (citations omitted). However, this was only the case because the CBA did not contain any statements to the contrary. *See id.*

Plaintiffs argue that the P & I agreements specify the precise benefits provided to retirees. They cite, for example, the 2000 P & I stating that "[a]fter the date of the Employee's retirement, the deductible ... shall be limited to $175 per person, $350 per family ...." However, they do not explain why these plan specifics, unlike those in *Reese,* are vested for life. Plaintiffs argue that vested no-cost medical coverage would be illusory if the Comprehensive Plan is "allowed to be whittled away under the guise of 'plan design changes' until no shred ... remained," but that is a red herring because our reasonableness requirement does not permit such an extreme "whittling."

The 2007 changes to the Comprehensive Plan that Plaintiffs point to were not unreasonable. Plaintiffs cite increased prescription drug costs and annual deductibles that do not appear to be severe and unreasonable (e.g., co-pay for generic drugs going from $4 to $10, annual prescription drug deductible going from $175 to $250). The increase in the maximum out-of-pocket limit from $500 to $4,000 per family is the most significant change cited, but not so large that the district court clearly erred in finding it to be "reasonable in light of changes in health care." *Id.* at 326 (quotation marks omitted).

III.

For the above reasons, we affirm the judgment of the district court.

FN1. Hobert Freel Tackett; Woodrow K. Pyles; Harlan B. Conley; and United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union.

FN2. The 1994 and 1997 Master P & Is contain nearly identical language, except instead of referencing the "1993 Pension plan," they reference the "1950 Pension Plan." The 1991 P & I states:

> Employees who retire with 10 or more years of continuous service and who are eligible and receiving a monthly pension under the 1950 Pension Plan for a pension (other than a deferred vested pension), shall receive the benefits described in this [section]; provided, however, that each Employee eligible under the 1950 Pension Plan for a deferred vested pension whose employment with the Employer is terminated during or subsequent to the month in which he attained age 60 shall also receive such benefits effective as of the first day of the month for which he receives a deferred vested pension.

FN3. Plaintiffs previously enrolled in the Medical Necessity Plan do not object to being enrolled in the current version.

C.A.6 (Ohio),2013.
Tackett v. M & G Polymers USA, LLC
--- F.3d ----, 2013 WL 4045989 (C.A.6 (Ohio))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.