

**JOSEPH ZINO, JR., et al., Plaintiffs, v. WHIRLPOOL CORPORATION, et al., Defendants.**

**CASE NO. 5:11CV01676**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2013 U.S. Dist. LEXIS 121750*

**August 27, 2013, Decided**
**August 27, 2013, Filed**

**PRIOR HISTORY:** *Zino v. Whirlpool Corp., 2012 U.S. Dist. LEXIS 150632 (N.D. Ohio, Oct. 19, 2012)*

**COUNSEL:** [*1] For George Watts, Ruth Wade, Plaintiffs: Stephen M. Pincus, LEAD ATTORNEY, Ellen M. Doyle, Pamina G. Ewing, William T. Payne, Stember Feinstein Doyle Payne & Kravec, Pittsburgh, PA; Brian L. Zimmerman, Canton, OH; Allen Schulman, Jr., Schulman & Zimmerman, Canton, OH.

For Joseph Zino, Jr., on behalf of himself and all other persons similarly situated, Donald R. Hiner, on behalf of himself and all other persons similarly situated, Roger N. Knop, on behalf of himself and all other persons similarly situated, Plaintiffs: Stephen M. Pincus, William T. Payne, LEAD ATTORNEYS, Ellen M. Doyle, Pamina G. Ewing, Stember Feinstein Doyle Payne & Kravec, Pittsburgh, PA; Brian L. Zimmerman, Canton, OH; Allen Schulman, Jr., Schulman & Zimmerman, Canton, OH.

For Whirlpool Corporation, Defendant: Andray K. Napolez, LEAD ATTORNEY, PRO HAC VICE, Baker & McKenzie - Chicago, Chicago, IL; Douglas A. Darch, Meagan C. LeGear, Miriam B. Geraghty, Baker & McKenzie - Chicago, Chicago, IL; Gust Callas, Gust Callas, Canton, OH; James M. Wherley, Jr., Black, McCuskey, Souers & Arbaugh, Canton, OH.

For Whirlpool Corporation Group Benefit Plan for Retirees, originally named as, Whirlpool Corporation Group Benefit Plan, [*2] Defendant: Andray K. Napolez, LEAD ATTORNEY, PRO HAC VICE, Baker & McKenzie - Chicago, Chicago, IL; Douglas A. Darch, Meagan C. LeGear, Miriam B. Geraghty, Baker & McKenzie - Chicago, Chicago, IL; Gust Callas, Gust Callas, Canton, OH; James M. Wherley, Jr., Black, McCuskey, Souers & Arbaugh, Canton, OH; William T. Payne, Stember Feinstein Doyle Payne & Kravec, Pittsburgh, PA.

For Does, 1 through 20: Defendant: James M. Wherley, Jr., Black, McCuskey, Souers & Arbaugh, Canton, OH.

For William B. Gore, Interested Party: Timothy R. Piatt, Macala & Piatt, North Canton, OH.

**JUDGES:** Benita Y. Pearson, United States District Judge.

**OPINION BY:** Benita Y. Pearson

**OPINION**

**MEMORANDUM OF OPINION AND ORDER**
[Resolving ECF Nos. 107, 154]



EXHIBIT
1

2013 U.S. Dist. LEXIS 121750, *2

## TABLE OF CONTENTS

| I. FACTUAL AND PROCEDURAL BACKGROUND |
| --- |
| A. Factual Background |
| B. Procedural Posture |
| II. LEGAL STANDARD |
| III. DISCUSSION |
| A. The Parties' Arguments |
| B. Vesting Law |
| C. Subclass A: 1980-1983 Retirees |
| D. Subclass B: 1983-1992 Retirees |
| E. Subclass C: 1993-2003 Retirees |
| 1. Relevant CBA Provisions |
| 2. Evaluation of Relevant CBA Provisions Under Our Vesting Law |
| 3. Evaluation of Extrinsic Evidence |
| F. Subclass D: 2003-2007 Retirees |
| G. Whirlpool's Remaining Defenses |
| 1. Proper Analytical Standard |
| 2. "Vitality" of Sixth Circuit Precedent |
| 3. Retirees' Enrollment in PPO Plan |
| 4. Authorization Forms |
| 5. Reservation of Rights in GIPs and SPDs |
| 6. Yard-Man Inference |
| 7. Healthcare Benefits Limited to Term of CBA |
| 8. Statute of Limitations |
| 9. ERISA's "Written Instrument" Requirement |
| 10. Reasonable Modifications Under Reese |
| H. Breach of Fiduciary Duty Claim |
| IV. CONCLUSION |

This [*3] class action is calibrated to determine the fate of company-paid health benefits for more than two thousand retired workers (and their spouses) who produced vacuum cleaners for Hoover, Maytag, and Whirlpool, in the Canton, Ohio, area. The lawsuit is brought by Plaintiffs Joseph Zino, Donald Hiner, Roger Knop, George Watts, and Ruth Wade, who represent a class of these individuals (collectively "Retirees"), against Defendants Whirlpool Corporation and Whirlpool Corporation Group Benefit Plan for Retirees (collectively "Whirlpool"), under § 301 of the Labor Management Relations Act ("LMRA"), *29 U.S.C. § 185*, and provisions of the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001 et seq*. Retirees and Whirlpool have filed cross-motions for summary judgment, ECF Nos. 107 and 154, calling on the Court to

decide, among many contentions, the question at the heart of the controversy: Did the relevant collective bargaining agreements ("CBAs") promise Retirees lifetime, unalterable health benefits to be paid by their employer upon retirement? The Court concludes that genuine issues of material fact exist with respect to the claims of the majority of Retirees. Those claims will [*4] proceed to trial. For the reasons that follow, the Court denies summary judgment, in part, and grants summary judgment, in part.

## I. Factual and Procedural Background

### A. Factual Background

The following undisputed facts help establish the background of this litigation. Retirees are former hourly employees of the Hoover Company and its successor entities, Maytag Corporation and Whirlpool Corporation (each, in the alternative, "the Company"), who retired between 1980 and 2007. ECF No. 146 at 13-14.[1] During their years of employment, Retirees built Hoover-brand floor care products at manufacturing plants in the Canton, Ohio, area. ECF No. 162 at 2. Retirees were unionized and represented by the International Brotherhood of Electrical Workers Local No. 1985 ("the Union"). ECF No. 162 at 2.

> 1    When the Court cites to the docket, the pinpoint citation refers to the page number of the electronic document.

Beginning at least in 1971 and in two-, three-, or five--year intervals thereafter, the Union and the Company entered into a series of CBAs. ECF No. 137-2. In general, each CBA was similarly formatted and included the following negotiated documents, see ECF No. 123-40 at 24-25: (1) a Basic Labor [*5] Agreement ("BLA") that set forth the parties' essential rights and obligations with respect to their employment relationship; see ECF Nos. 108-4 and 137-2; (2) an Exhibit A-1 Welfare Plan for Hourly-Rated Employees ("Welfare Plan") that described the insurance coverages provided to hourly employees; see ECF No. 123-2; and (3) an Exhibit A-2 Pension Plan for Hourly-Rated Employees ("Pension Plan") that established the terms under which hourly employees may receive pension benefits upon retirement; see ECF No. 135-4. Prior to 1992, each Welfare Plan explicitly provided that company-sponsored healthcare benefits will end upon retirement, that is, either they will "terminate" or retirees may continue medical coverage "at

their own expense." ECF No. 123-2 at 15, 23-25, 34-36, 41-43. In 1992, however, a new Welfare Plan was negotiated that extended to qualified retiring employees the "opportunity" to receive company-paid healthcare after retirement. ECF No. 123-7 at 32. From 1992 through 2007, every Welfare Plan formally recognized such an opportunity. ECF No. 123-2 at 88, 99, 108, 116-117. Notwithstanding the differences between the pre- and post-1992 Welfare Plans, every Retiree in this [*6] lawsuit has continued to receive company-sponsored healthcare benefits. ECF Nos. 146 at 13-14; 108 at 17; 155 at 35; 162 at 7.

Significantly, Company and Union negotiations occurred in conjunction with several key organizational changes. In 1989, Hoover was purchased by Maytag and became a division of that company. ECF No. 162 at 5-6. Years later, in 2006, Maytag merged into Whirlpool. ECF No. 162 at 6. Not long after the merger, on January 31, 2007, Whirlpool sold the Hoover floor-care business to Techtronic Industries Co., Ltd. ("TTI"), a Hong Kong company that shut down most of the Hoover manufacturing operations in the Canton area. ECF Nos. 162 at 6; 123-40 at 12. As part of the sale agreement with TTI, Whirlpool retained the liabilities associated with retirement health benefits for Hoover employees who retired prior to the January 31, 2007 sale. ECF No. 162 at 6-7. Every Retiree in this action retired from employment before January 31, 2007. ECF No. 146 at 13-14.

In May, 2011, Whirlpool delivered notices to Retirees announcing its plans to reduce their health benefits effective January 1, 2013 (this date was later extended to January 1, 2014). ECF No. 162 at 19. Specifically, Whirlpool [*7] notified Medicare-eligible Retirees that company-paid supplemental health benefits will no longer be provided and that any supplemental health coverage will have to be individually purchased from private insurance companies. ECF No. 108-20 at 3. Whirlpool also informed Retirees who were not Medicare-eligible that their health coverages will "transition" to the same plan as that provided to the majority of Whirlpool retirees who are not eligible for Medicare. ECF No. 108-20 at 2. Together with these planned reductions, Whirlpool declared "the right, at its discretion, to change or terminate all or any part of the benefits offered at any time and in any manner." ECF No. 108-20 at 5. Also, in 2011, Whirlpool took the step of unilaterally increasing co-payments for prescription drug benefits for Medicare-eligible Retirees. ECF No. 162 at

19. Whirlpool does not dispute that the actual and planned reductions will decrease the estimated present value of Retirees' current health benefits from $169 million to $43 million, resulting in an approximately 75% decrease in estimated present value. ECF No.134 at 23-24; *see* ECF Nos. 108-3 at 2; 108-31; 108-33; 108-34.

## B. Procedural Posture

In the Third [*8] Amended Complaint, Retirees allege that the applicable CBAs entitle them "to receive specified retiree health benefits that are not subject to unilateral reduction or termination during retirement." ECF No. 146 at 16. According to Retirees, Whirlpool's actual and planned reduction of their health benefits violates the relevant CBAs and welfare benefit plans, and is therefore actionable under § 301 of the LMRA[2] (Count I) and § 502(a)(1)(B) of ERISA[3] (Count II), respectively. ECF No. 146 at 16-17. Retirees also bring a breach of fiduciary duty claim in accordance with §§ 404 and 502(a)(3) of ERISA[4] (Count III). ECF No. 146 at 18. For relief, Retirees request that the Court (1) declare that their retirement health benefits may not be unilaterally modified or terminated by Whirlpool; (2) permanently enjoin Whirlpool from modifying or terminating their benefits; and (3) award damages as well as other remedies. ECF No. 146 at 20-21.

2   Section 301(a) of the LMRA provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in [*9] any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." *29 U.S.C. § 185(a).*

3   Section 502(a)(1)(B) of ERISA provides: "A civil action may be brought--(1) by a participant or beneficiary-- . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." *29 U.S.C. § 1132(a)(1)(B).*

4   Section 502(a)(3) of ERISA provides: "A civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to

obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ." *29 U.S.C. § 1132(a)(3).* Section 404 of ERISA, in turn, provides in relevant part that an ERISA fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . ." *29 U.S.C. § 1104(a)(1).*

Class certification [*10] was granted by the Court on December 12, 2011. ECF No. 24. Later, in accordance with a compromise reached by the parties, *see* ECF No. 136, the Court ordered the creation of four subclasses. ECF No. 145. Each subclass shares the same core characteristic in that they are comprised of former employees of Hoover, Maytag, or Whirlpool, who were represented by the Union in collective bargaining and who, after retirement, received health care benefits, as well as their spouses and surviving spouses. ECF No. 145 at 2-3. The subclasses are distinguished by the following time periods under which the former employees retired: After April 18, 1980, but before April 19, 1983 (Subclass A); after April 18, 1983, but before January 1, 1993 (Subclass B); after December 31, 1992, but before December 8, 2003 (Subclass C); and after December 7, 2003, but before January 31, 2007 (Subclass D).[5] ECF No. 145 at 2-3.

5   According to a declaration submitted by Retirees' counsel, data obtained from Whirlpool during discovery discloses that the entire class is comprised of 2,187 individuals. ECF No. 136-1 at 4. In particular, 31 class members comprise Subclass A; 418 class members comprise Subclass B; 1104 class [*11] members comprise Subclass C; and 634 class members comprise Subclass D. ECF No. 136-1 at 4.

Presently before the Court is Retirees' motion for partial summary judgment with respect to Count I, the CBA violation claim, and Count II, the welfare benefit plan violation claim. ECF No. 107. In support of their motion, Retirees have filed a memorandum of law and numerous exhibits. ECF No. 108. Pending, too, is Whirlpool's cross-motion for summary judgment as to the entirety of the Third Amended Complaint, including Count III, the breach of fiduciary duty claim. ECF No. 154. That motion is supported by Whirlpool's memorandum of law and voluminous exhibits. ECF Nos.

2013 U.S. Dist. LEXIS 121750, *11

123 and 155. The parties have filed responsive and supplemental briefs. ECF Nos. 113; 134; 135; 137; 156; 175; 180. Now fully advised, the Court is prepared to rule upon these motions.

## II. Legal Standard

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action rather than a disfavored procedural shortcut." *F.D.I.C. v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009)* (quotations omitted). "Summary judgment is appropriate [*12] only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *EJS Properties, LLC v. City of Toledo, 698 F.3d 845, 855 (6th Cir. 2012)* (quoting Fed. R. Civ. P. 56(a)). "'A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the nonmoving party.'" *U.S. ex rel. Wall v. Circle C Construction, LLC, 697 F.3d 345, 351 (6th Cir. 2012)* (quoting *Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir. 2006))*. A court deciding a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Kuhn v. Washtenaw County, 709 F.3d 612, 620 (6th Cir. 2013)*. "Where the moving party carries its initial burden, the nonmoving party 'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of East Cleveland, 689 F.3d 549, 552 (6th Cir. 2012)* (quoting *Moldowan v. City of Warren, 578 F.3d 351, 374 (6th Cir. 2009))*; *see Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012)* ("a [*13] mere 'scintilla' of evidence in support of the nonmoving party's position is insufficient to defeat summary judgment").

Cross-motions for summary judgment are examined under the usual *Rule 56* standards, and a district court "'must evaluate each motion on its own merits and view all the facts and inferences in the light most favorable to the nonmoving party.'" *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrecoverable Trust, 410 F.3d 304, 309 (6th Cir. 2005)*.

## III. Discussion

### A. The Parties' Arguments

The substantive issues presented by the cross-motions are vigorously litigated. Retirees' fundamental claim is that the negotiated CBAs created "vested" rights to certain health benefits. ECF No. 108 at 7. Stated another way, Retirees argue that they were promised, through the collective bargaining procedure, "forever unalterable" lifetime rights to receive the health benefits set out in the particular CBA in effect at retirement. ECF No. 108 at 19. Although, as Retirees seem to acknowledge, the CBAs lack a straightforward statement of an intent to vest such benefits; see ECF Nos. 108 at 19; 134 at 12; they assert that the language of the negotiated documents and the contextual [*14] clues contained therein, when evaluated in accordance with Sixth Circuit precedent, "unambiguously" demonstrate vesting. ECF No. 108 at 15. Retirees specifically point to (1) provisions that tie the eligibility to receive retirement health benefits to the eligibility to receive pension benefits; (2) the absence of specific duration limits in retirement health provisions in comparison with the presence of such limits in other provisions; (3) language stating that Retirees "shall have the opportunity to continue" health benefits during retirement; and (4) the principle, established in the groundbreaking case of *UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), cert. denied, 465 U.S. 1007, 104 S. Ct. 1002, 79 L. Ed. 2d 234 (1984)*, that the context in which labor negotiations occur may give rise to an inference that retirement benefits are vested. ECF No. 108 at 19-29. Retirees further maintain that their right to vested benefits is supported beyond the CBAs by the extrinsic evidence. ECF No. 108 at 30. This evidence includes records from past negotiations, the testimonies of Company and Union negotiators, and Whirlpool's continued provision of healthcare benefits to Retirees notwithstanding [*15] the expiration of every relevant CBA in this case. ECF No. 108 at 15-17.

Whirlpool disputes much of Retirees' legal and factual assertions and responds with a formidable volley of defenses. Chief among Whirlpool's contentions are that (1) the Sixth Circuit authorities cited by Retirees are of "questionable continuing vitality"; ECF No. 155 at 37; (2) any intent to vest retirement health benefits must be stated in "clear and express language"; ECF No. 155 at 19; (3) eligibility for retirement health benefits has never been tied to pension eligibility; ECF No. 155 at 33, 38-39; (4) Retirees' health benefits are limited to the term of the CBA in effect when they retired; ECF No. 155 at 21; (5) every Welfare Plan from 1971 to 1992 lacked references to company-paid retirement health benefits; ECF No. 156 at 7; (6) Retirees who retired between 1993

and 2007 signed authorization forms upon separation from employment acknowledging that retirement health benefits are "subject to change"; ECF No. 155 at 17-18; (7) since 1980, the Company distributed benefits summaries explicitly reserving the right to amend or terminate benefits; ECF No. 155 at 20; (8) presently, most of the class members are [*16] enrolled in a PPO plan that carries no concomitant right to vested benefits; ECF No. 155 at 17; (9) Retirees fail to proffer a written instrument satisfying the "minimum standards" required of an ERISA employee benefit plan; ECF No. 155 at 36; (10) the bargaining history shows that the *Yard-Man* inference does not apply; ECF No. 155 at 20; (11) the LMRA and ERISA claims of every Retiree are barred by the statute of limitations; ECF No. 155 at 27-28; (12) the lack of vesting is evidenced by the Company's unilateral and adverse changes to Retirees' benefits after the date of retirement; ECF No. 155 at 23; and (13) the Union never formally challenged the language of numerous company publications stating that the Company may modify or terminate retirement health benefits; ECF No. 155 at 25. Whirlpool argues, in the alternative, that even if the benefits are vested, the benefit levels may nonetheless be reasonably modified in accordance with two recent Sixth Circuit cases, *Reese v. CNH America, LLC, 574 F.3d 315 (6th Cir. 2009)* ("*Reese*"), and *Reese v. CNH America, LLC, 694 F.3d 681 (6th Cir. 2012)* ("*Reese II*").

The [*17] Court examines the foregoing arguments in view of the governing legal authorities.

**B. Vesting Law**

There are two types of employee benefit plans: pension plans and welfare benefit plans. *Cole v. ArvinMeritor, Inc., 549 F.3d 1064, 1069 (6th Cir. 2008)*. Although pension plans are subject to mandatory vesting under ERISA, welfare benefit plans--which include retirement benefit plans--are not. *Id.; see In re White Farm Equipment Co.., 788 F.2d 1186, 1193 (6th Cir. 1986)* ("Congress expressly exempted employee welfare benefit plans from stringent vesting, participation, and funding requirements"). Rather, retirement benefits typically vest "only if the parties so intended when they executed the applicable labor agreements." *Cole, at 1069.*

An employer is "free to terminate any unvested welfare benefits upon the expiration of the relevant CBA." *Noe v. PolyOne Corp., 520 F.3d 548, 552 (6th Cir. 2008)*. "An employer that contractually obligates itself to provide vested healthcare benefits [however]

renders that promise 'forever unalterable.'" *Moore v. Menasha Corp., 690 F.3d 444, 450 (6th Cir. 2012), cert. denied, ___ U.S. ___, 133 S. Ct. 1643, 185 L. Ed. 2d 618 (2013)*. Thus, if a welfare benefit has [*18] vested, the employer's unilateral reduction of that benefit breaches the CBA, creating a right of action under the LMRA. *Yolton v. El Paso Tennessee Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006), cert. denied, 549 U.S. 1019, 127 S. Ct. 554, 166 L. Ed. 2d 410 (2006)*. In such an instance, ERISA is violated, as well. *See Armistead v. Vernitron Corp., 944 F.2d 1287, 1298 (6th Cir. 1991)* ("if it is the intention of the parties to confer on retirees vested rights in medical insurance benefits under a CBA, it is also their intention to confer the same rights under the 'welfare benefit plan' protected by ERISA"); *see also Moore, at 450* ("the LMRA claim also creates a derivative ERISA claim, because the disputed healthcare benefits were agreed upon pursuant to a union-negotiated contract")

"Significantly, in this circuit, a court may find vested welfare benefits under a CBA even if the intent to vest has not been explicitly set out in the agreement." *Bender v. Newell Furnishings, Inc., 681 F.3d 253, 261 (6th Cir.), cert. denied, ___ U.S. ___, 133 S. Ct. 436, 184 L. Ed. 2d 260 (2012)*. And, in this circuit, any discussion of whether benefits vested under a CBA must begin with the analytical [*19] framework articulated in *Yard-Man*. As summarized by one Sixth Circuit panel:

> Under *Yard-Man*, basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest. [*Yard-Man, 716 F.2d at 1479*.] Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and 'the relative positions and purposes of the parties.' *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id. at 1480*. Our decision in *Yard-Man* also explained that 'retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.' *Id. at 1482*. With regard to the '*Yard-Man* inference,' later decisions of this court have clarified that *Yard-Man* does not

create a legal presumption that retiree benefits are interminable. *Yolton, 435 F.3d at 579*. Rather, *Yard-Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id.*

*Noe, 520 F.3d at 552*. *Yard-Man* explained that [*20] the "inference" makes sense because employees are aware that the union owes no obligations to bargain for continued benefits for retirees, and, if they forego wages now in expectation of retiree benefits, which are typically understood as a form of delayed compensation or reward for past services, "they will want assurances that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements." *716 F.2d at 1482*. While the precise weight of the *Yard-Man* inference has been characterized as "elusive"; *Reese, 574 F.3d at 321*; recent cases have "described the inference as acting like a 'thumb on the scales' or 'nudge' in favor of vesting." *Bender, 681 F.3d at 262*; *see Moore, 690 F.3d at 450* (inference "requires 'a nudge in favor of vesting' in close CBA cases").

*Yard-Man* has also been influential for its instruction to "look to other provisions of the agreement for guidance" when the explicit language is ambiguous as to intent. *Golden v. Kelsey-Hayes Co., 73 F.3d 648, 654 (6th Cir.), cert. denied, 519 U.S. 807, 117 S. Ct. 49, 136 L. Ed. 2d 13 (1996)*. Thus, post-*Yard-Man* cases have recognized, for example, that an intent to vest health [*21] benefits may be discerned where the CBA ties the eligibility to receive retirement health benefits to the eligibility to receive a pension, which is a lifetime benefit. *See Witmer v. Acument Global Technologies, Inc., 694 F.3d 774, 776 (6th Cir. 2012)* ("[l]anguage tying health care benefits to retirement-income benefits, we have held, demonstrates the parties' intent to create vested healthcare benefits"); *Noe, 520 F.3d at 553* ("provisions in the [CBAs] expressly tie eligibility to retiree health benefits to eligibility for a pension, which we have repeatedly held evinces an intent to vest"); *Yolton, 435 F.3d at 584-85* ("[t]he language tying health care benefits to pension benefits and the context of the bargaining demonstrate an intent to provide lifetime benefits"); *McCoy v. Meridian Automotive Systems, Inc., 390 F.3d 417, 422 (6th Cir. 2004)* ("[b]ecause the Supplemental Agreement ties eligibility for retirement-health benefits to eligibility for a pension . . . there is little room for debate that the retirees' health

benefits vested upon retirement"); *Golden, at 656* ("[s]ince retirees are eligible to receive pension benefits for life," tying retirement health benefits to pension [*22] eligibility indicates "that the parties intended that the company provide lifetime health benefits as well").

Differences in the way duration limits are written in an agreement may also create a vesting footprint. *Yard-Man* explained that "[v]ariations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous." *716 F.2d at 1480*. Therefore, "[t]he Sixth Circuit has consistently held that the inclusion of specific durational limitations in some provisions, but not others, suggests that benefits 'not so specifically limited, were intended to survive.'" *Moore, 690 F.3d at 457*; *see Reese, 574 F.3d at 322* (applying principle to find that retirees were given right to lifetime health benefits); *Noe, 520 F.3d at 562* ("[t]he presence of specific durational language in other provisions and its absence in the retiree health benefits provisions suggests an intent to vest under our case law."); *Yolton, 435 F.3d at 582* (specific duration limits regarding benefits for workers on lay-off and on maternity leave, but not for benefits for retirees, indicates vesting of retirement benefits). [*23] Other clues within the agreement may be significant, as well. *See, e.g., Yolton, at 581* (similarity in duration language for pension benefits and health benefits supports finding that latter is vested).

If an ambiguity remains in the provisions of a CBA, a court may resort to extrinsic evidence to ascertain whether the parties intended for the benefits to survive the agreement. *UAW v. BVR Liquidating, Inc., 190 F.3d 768, 774 (6th Cir. 1999), cert. denied, 529 U.S. 1067, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)*. If an examination of the extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, summary judgment is improper. *Cole, 549 F.3d at 1070*.

## C. Subclass A: 1980-1983 Retirees

Benefits for Retirees who retired between April 18, 1980, and April 19, 1983, are governed by the 1980-1983 CBA. Notably, no new Welfare Plan was negotiated for that term. As explained by an internal Hoover memorandum entitled "Benefit Agreement," Hoover and the Union decided that "[t]here will be no attempt to write a single document for the 1980-83 Agreement but

rather we will utilize the 1977 document together with the signed amendments . . . ." ECF No. 123-43. Read in context, [*24] the "1977 document" is the 1977-1980 Welfare Plan. No party disputes that the 1977-1980 Welfare Plan did not promise company-paid retirement health benefits. ECF No. 108 at 9. Rather, that Welfare Plan specified that, upon retirement, health insurance benefits will terminate or employees may convert to an individual policy and continue medical coverage "at their own expense." ECF No. 123-2 at 25.

Although the 1977-1980 Welfare Plan did not provide retirement health benefits, in 1980, Hoover and the Union signed a Contract Settlement amending the 1977-1980 CBA and specifying that the amendments will be carried forward to the 1980-1983 term. ECF No. 108-12 at 2. The amendments included, *inter alia*, various changes to employee life insurance, pension, and health benefits. ECF No. 108-12. Of relevance is Item 6 of the Contract Settlement, which provides:

6. Pension - Effective April 19, 1980

> a. Monthly pension benefits will increase as follows:
>
> First 15 years of Erisa pension credit = $11.50 for each year of pension credit.
>
> Second 15 years of Erisa pension credit = $12.50 for each year of pension credit.
>
> Over 30 years of Erisa pension credit = $14.00 for each year of pension credit.
>
> b. Life insurance [*25] for all future retirees will be increased from $3,000 to $5,000.
>
> c. Future Retirees
>
> *The Hoover Company assumes responsibility for paying premiums to the insurance carrier for future*

> *retiree's medical insurance in accordance with the terms and conditions of the Plan.*

ECF No. 108-12 at 4 (emphasis added). According to Timothy Schiltz, the Pension and Benefits Administrator for Hoover during the 1980 negotiations; ECF No. 123-7 at 9; "the Plan" referenced in Item 6(c) is the 1977-1980 Welfare Plan. ECF No. 123-7 at 30.

The language of Item 6(c), when viewed in context with the extrinsic evidence, supports Retirees' argument that, as to the 1980-1983 Retirees, "Hoover assumed responsibility for paying for the continued medical coverage provided for by the 1977 [Welfare Plan] that had previously been provided only at the retirees' 'own expense.'" ECF No. 108 at 10. Yet, even so, Retirees fail to present language showing that these benefits vested for the 1980-1983 Retirees. Item 6(c) does not say that Hoover will pay the medical insurance premiums for life without change. Moreover, Item 6(c) does not tie eligibility to receive health benefits during retirement to eligibility to receive a pension, [*26] which is one of Retirees' primary vesting arguments. The Sixth Circuit has never held that such language may, on its own, unambiguously communicate an intent to vest. To demonstrate vesting independent of other evidence, the contract language must be definitive. *See Policy v. Powell Pressed Steel Co., 770 F.2d 609, 614 (6th Cir. 1985)* (finding vesting occurred when CBA required company to provide retirement health insurance coverage "during the life of the pensioner at no cost to the pensioner"), *cert. denied, 475 U.S. 1017, 106 S. Ct. 1202, 89 L. Ed. 2d 315 (1986); Weimer v. Kurz-Kasch, Inc., 773 F.2d 669, 674 (6th Cir. 1985)* (concluding health benefits vested when CBA obligated company to pay insurance premiums "so long as . . . Employees are, in fact, retired and remain unemployed").

On the other hand, Whirlpool fails to establish that it lacks any continuing obligation to the 1980-1983 Retirees. Whirlpool first argues that any such obligation under the 1980 Contract Settlement ended in 1983. ECF No. 155 at 22. As support for this claim, Whirlpool cites the preamble to the Contract Settlement, which states that the "following changes and amendments will be contained in a new [CBA] [*27] to be effective from

April 19, 1980 through April 18, 1983, at midnight, unless otherwise noted." ECF No. 108-12 at 2. Under Whirlpool's reading of the preamble, "[t]here is no indication" that these Retirees' health benefits were to last beyond April 18, 1983. ECF No. 155 at 22. This interpretation is incorrect. The Sixth Circuit "requires that a durational limitation must include a specific mention of retiree benefits in order to apply to such benefits."[6] *Cole, 549 F.3d at 1074*; *see Yolton, 435 F.3d at 581* ("[a]bsent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits"). The "April 19, 1980 through April 18, 1983" limitation does not mention retiree benefits. Therefore, it refers only to the term of the Contract Settlement, not the duration of the retiree health benefits described therein. In other words, the limitation works to bar the application of the Contract Settlement to employees who retire after April 18, 1983, but it cannot constrain the health benefits of someone who retired between April 19, 1980, and April 18, 1983, and was granted a right to receive such [*28] benefits under the Contract Settlement.

6   Section III, Subsection G(7) of this decision discusses the rule more extensively.

Whirlpool next argues that, in accordance with the 1980 Contract Settlement, any responsibility to pay premiums for a retiree's medical insurance was subject to "the terms and conditions of the Plan." ECF No. 155 at 22. Whirlpool refers to the 1983 termination date of the 1980-1983 CBA as such a term or condition. ECF No. 155 at 22. This argument is again unavailing because that durational limitation does not specifically refer to retirement health benefits. Whirlpool also argues that Item 6(c) "does not provide retirees information about the benefits provided." ECF No. 156 at 11. This is untrue. Item 6(c) refers to the 1977-1980 Welfare Plan, which describes the benefits that the Contract Settlement in turn gave to the 1980-1983 Retirees. Finally, Whirlpool disputes that Item 6(c) incorporates the benefits from the 1977-1980 Welfare Plan. ECF No. 155 at 32. Whirlpool contends that Schiltz is not qualified to testify that "the Plan" referenced in Item 6(c) is the 1977-1980 Welfare Plan because he was not involved in the 1980 negotiations. ECF No. 155 at 32. Whirlpool [*29] suggests that "the Plan" actually refers to the Pension Plan, because Item 6(c) is listed under the heading, "Pension." ECF No. 155 at 32. The Court is unimpressed with Whirlpool's claims. First, Schiltz was involved in

the negotiations as part of the support staff. ECF No. 123-7 at 30. Second, his testimony coheres with the understanding that the 1977-1980 Welfare Plan was extended to 1980-1983 and was the instrument that governed health benefits for that term. Third, Whirlpool's interpretation is illogical. It is true that the Contract Settlement, like much of the collective bargaining instruments in this case, is not a model of clarity. The suggestion, however, that the Contract Settlement incorporated the benefits from the Pension Plan does not comport with the fact that the Pension Plan controlled pension benefits, not health insurance benefits.

Discerning no clear answer in the negotiated documents, the Court turns to the extrinsic evidence and finds that it points in both directions. The 1980-1983 Retirees' continued receipt of company-paid health benefits beyond the expiration of the 1980-1983 CBA is evidence of their lifetime right to receive such benefits. *See Weimer, 773 F.2d at 676 n.6*; [*30] *Yard-Man, 716 F.2d at 1481*. Schiltz also testified in his deposition that he believed the 1980 Contract Settlement created a contractual obligation on the part of the Company to fund health benefits for these Retirees. ECF No. 123-7 at 33. But Whirlpool also presents evidence that supports its claim that the benefits are mutable, even terminable. Hoover published a summary booklet in 1980 entitled "Group Insurance Plan" ("GIP") that "describes the insurance program provided to hourly-rated employees of The Hoover Company." ECF No. 123-4 at 26-28. The 1980 GIP contains a Reservation of Rights ("ROR") provision with the following qualification: "This program has been developed during the course of Union-Company negotiations. The Hoover Company intends to continue the program indefinitely, but, as with all group plans, the program may be changed or discontinued." ECF No. 123-4 at 28. Although the 1980 GIP was published by Hoover and was not a collectively bargained document, such "summaries nonetheless serve as extrinsic evidence regarding the extent of the employer's promise of future healthcare benefits and whether the parties intended the benefits to vest." *Bender, 681 F.3d at 267*. [*31] Additionally, during the 1983 negotiations, the Union proposed to enter into an updated version of the 1980 Contract Settlement, which proposal specified, "Group insurance for *past and* future retirees to remain the same." ECF No. 123-16 at 3 (emphasis added). The Union's proposal was rejected. That the Union desired to memorialize an agreement in 1983 to maintain the retirement benefits given to the 1980-1983 Retirees

creates a genuine issue as to whether the Union, back in 1980, had intended those benefits to vest in the first place.[7]

> 7 It may also be the case that the Union sought to memorialize that which it believed already existed.

In view of the conflicting evidence, the claims of the 1980-1983 Retirees (Subclass A) should not be resolved through summary adjudication. Rather, they should proceed to trial.

## D. Subclass B: 1983-1992 Retirees

Retirees who retired after April 18, 1983, but before January 1, 1993, were not promised company-paid health benefits under any of the applicable Welfare Plans. There is no dispute that every controlling Welfare Plan during this period--including the 1983-1986, 1986-1989, and 1992-1995 Welfare Plans[8] --provides that company health insurance will terminate [*32] for employees who retire and that such employees may convert to an individual policy and continue medical coverage only at "their own expense." ECF Nos. 134 at 26; 156 at 7; *see* ECF No. 123-2 at 36, 43, 87.

> 8 The parties did not submit a Welfare Plan for the 1989-1992 term.

Despite the 1983-1992 Retirees' lack of entitlement to company-funded healthcare under the Welfare Plans, Retirees nonetheless claim that these class members "gain[ed] their rights through" the 1980 Contract Settlement. ECF No. 108 at 10. Retirees provide no explanation as to how the Contract Settlement conferred such rights. Whirlpool, on its end, asserts that the Contract Settlement did not survive the termination of the 1980-1983 CBA. ECF No. 156 at 7.

Whirlpool's position is supported by the language of the 1980 Contract Settlement. As noted earlier, that document limited the term of the "changes and amendments" contained therein to "April 19, 1980 through April 18, 1983, at midnight, *unless otherwise noted*." ECF No. 108-12 (emphasis added). The durational limitation is clear. Unless otherwise noted, every item listed in the Contract Settlement expired on April 18, 1983. Item 6(c) is the only provision within the [*33] Contract Settlement conferring the right to post-retirement health insurance. Retirees do not point to

anything within or outside that document that extends the sunset date of Item 6(c) past April 18, 1983. Nor has the Court, on its own, uncovered anything that does so. Indeed, there could be no such extension, because every governing Welfare Plan from 1983 through 1992 expressly disclaimed that employees will not receive company-sponsored health benefits after they retire.

In a footnote, Retirees refer to two documents that they claim "reflect a contractual commitment to pay retiree health benefits for those retiring between 1980 and 1992." ECF No. 108 at 10. The first document, the 1984 Pension Plan, allows pensioners to deduct from their monthly pension the cost of health insurance coverage "made available by the Company under its insurance program for its hourly rated Employees . . . ." ECF No. 108-14 at 4. The second document, Attachment #1 to the 1986-1989 Welfare Plan, provided supplemental prescription drug coverage for employees who retired on or after May 5, 1986. ECF No. 108-15 at 26. Neither of these documents reveal an *obligation* on the part of the Company to provide the [*34] health benefits at issue. As importantly, neither document extends the life of Item 6(c) past its stated expiration date.

Retirees also claim that Schiltz testified during his deposition that the Company paid for the healthcare benefits of employees who retired between 1980 and 1992 because it had agreed to do so in the 1980 Contract Settlement. ECF No. 108 at 10. The transcript, however, allows for a different reading: Although Schiltz testified that the Company had a contractual obligation to pay for retirement health benefits, he was referring to the benefits for the 1980-1983 Retirees, not for the 1983-1992 Retirees. ECF No. 123-7 at 33.

Based on the above, the plain language of the CBAs did not obligate Hoover or Maytag, and does not obligate Whirlpool, to provide health insurance benefits for the 1983-1992 Retirees. Whirlpool's motion for summary judgment is granted with respect to the claims of these Retirees.

## E. Subclass C: 1993-2003 Retirees

Health benefits for Retirees who retired after December 31, 1992, but before December 8, 2003, are governed by the 1992-1995, 1995-2000, and 2000-2003[9] CBAs. These CBAs, unlike their predecessors, formally established the opportunity to continue [*35] company-paid health benefits during retirement. ECF No.

123-2 at 88, 99, 108, 116-117. The question is whether these CBAs also created vested, lifetime rights to such benefits.

> 9   The original term of the CBA negotiated in 2000 was from 2000 to 2005. *See* ECF Nos. 137-2 at 76; 108-8 at 34. The parties, however, elected to enter into the next round of negotiations early, and negotiated a superseding CBA with a term of 2003 to 2008. *See* ECF Nos. 137-2 at 78; 108-9 at 2.

### 1. *Relevant CBA Provisions*

Section 3.01(c)(iii) of the 1992-1995, 1995-2000, and 2000-2003 Welfare Plans provides in relevant part:

> In the case of an employee who retires on or after January 1, 1993, under the terms of the Pension Plan for Hourly-Rated Employees and who has at least ten years of pension credit accumulated after attaining the age of 45 (or was born prior to December 31, 1937), and who had active employee coverage in effect on the day immediately preceding retirement, such employee shall have the opportunity to continue elements of the medical insurance in accordance with the following principles:
>
> (A) A monthly contribution shall be required as follows for coverage prior to the covered person's attainment of age [*36] 65:

| Years of Pension Credit at Retirement | Per Person Contribution | Family Maximum Contribution |
|---|---|---|
| More than 30 | $0 | $0 |
| 20-30 | $10 | $20 |
| 10-20 | $15 | $30 |

> (B) Eligible retired employees who were hired prior to July 8, 1988, will be eligible to retain Basic and Major Medical coverage, provided that the Major Medical lifetime maximum benefit shall be $50,000.[10] . . .
>
> (C) Eligible retired employees who were hired after July 8, 1988, will be eligible to retain the Comprehensive Plan.

ECF Nos. 108-6 at 31-32; 108-7 at 33-34; 108-8 at 28-29. The coverage provided by the Basic and Major Medical Plan and the Comprehensive Plan are described more fully in § 2.06 of the Welfare Plans and need not be recounted here. ECF Nos. 108-6 at 9-25; 108-7 at 9-25; 108-8 at 5-21.

> 10   The $50,000 amount was set forth in the 1992-1995 Welfare Plan. That figure was increased to $60,000 in the 1995-2000 Welfare Plan, and increased again to $70,000 in the 2000-2003 Welfare Plan.

Without question, the eligibility of the 1993-2003 Retirees to receive company-paid health benefits was tied to their receipt of pension benefits. In order to continue company insurance coverage during retirement, these Retirees must have retired "under the terms of the [*37]

2013 U.S. Dist. LEXIS 121750, *37

Pension Plan" and have had "at least ten years of pension credit accumulated after attaining the age of 45 (or [have been] born prior to December 31, 1937) . . . ." The language of § 3.01(c)(iii) conveys that employees meeting the criteria "shall have the opportunity" to receive health insurance benefits after retirement.

In comparison with the absence of any durational limitation with respect to retirement health benefits, other types of benefits provided under the 1992-1995, 1995-2000, and 2000-2003 Welfare Plans have clearly defined durational limits. For example:

o life insurance coverage "terminates thirty-one days after the date of separation from active employment" unless otherwise provided;

o in the case of employees who are laid off, life insurance "will be continued for a period of three (3) months following the month of layoff";

o Accidental Death and Dismemberment Insurance "will automatically terminate upon separation from active employment";

o health insurance will terminate after separation from employment "provided that coverage shall be extended for an additional month in the case of a layoff";

o if an employee or a dependent is totally disabled at the time insurance terminates, [*38] the Basic Medical Expense Plan, the Prescription Drug Plan, Dental Insurance, and Vision Care Plan "will be extended for up to three (3) months" and the Major Medical Benefits will continue to be available during the time of disability "for a maximum period of twelve (12) months beyond the date on which insurance terminates";

o in the event of an employee's death, the Company will provide health insurance coverage to eligible dependents, and such coverage will continue for different specified periods depending upon the amount of pension credit earned by the deceased employee;

o if an employee is absent for longer than two weeks due to an illness or injury, Accidental Death and Dismemberment Insurance coverage will continue in effect "until the end of the sixth policy month following the policy month in which disability occurred," and Sickness and Accident benefits will be payable "up to the maximum of 26 weeks";

o if an employee is absent for longer than two weeks due to illness or injury, health insurance coverage "will continue during a period of six (6) months following the month in which the disability occurred for non-occupational illness or injury and eighteen (18) months following [*39] the month in which disability occurred for occupational illness or injury . . . ."

ECF Nos. 108-6; 108-7; 108-8.

Another factor is relevant to the analysis. Section 3.01(c)(iii)(F) of the 2000-2003 Welfare Plan gave Retirees the option of enrolling in an Alternative Medical Plan instead of receiving coverage through the Basic and Major Medical Plan or the Comprehensive Plan. ECF No. 108-8 at 30. Alternative Medical Coverage provides coverage through Health Maintenance Organizations ("HMOs") and Preferred Provider Organizations ("PPOs"). ECF No. 108-8 at 22. The 2000-2003 Welfare Plan explicitly states that "the Company may cease offering the Alternative Medical Coverage on the annual re-enrollment date." ECF No. 108-8 at 22. In contrast, there is no language in the 1992-1995, 1995-2000, and 2000-2003 CBAs stating that the Basic and Major Medical and Comprehensive coverages for Retirees may be terminated by the Company.

2. *Evaluation of Relevant CBA Provisions Under Our Vesting Law*

Retirees argue that Sixth Circuit precedent supports the conclusion that the foregoing factors demonstrate a clear intent to vest benefits. Specifically, in *Yolton*, the district court found that "the [retirees] [*40] were likely to succeed on the merits of their claim that they were entitled to fully funded lifetime healthcare benefits." *435 F.3d at 584*. Accordingly, the district court granted a preliminary injunction ordering the employer to continue paying for the benefits. *Id. at 574*. On appeal, the Sixth Circuit observed that the CBAs provided that the employer "shall pay the full premium cost" of the retiree benefits at issue. *Id. at 575*. Observing, further, that the CBAs tied eligibility for these healthcare benefits to eligibility for pension benefits, and noting that this factor had played a "key" role in a vesting determination in an earlier case; *id. at 580*; *see Golden, 73 F.3d at 656*; the panel concluded that "[t]he language tying health care benefits to pension benefits and the context of the bargaining demonstrate an intent to provide lifetime benefits." *Yolton, at 584-85*. In addition, the panel acknowledged the presence of durational limitations

applicable to other types of benefits listed in the CBAs, and the lack thereof with respect to retirement health benefits. *Id. at 581-82.* Based on these factors, the Sixth Circuit concluded that "the plain language of the CBAs requires us [*41] to conclude that the district court did not abuse its discretion by issuing the injunction . . . ." *Id. at 583.*

*Yolton* involved a preliminary injunction, in which the retirees' *likelihood* of success on the merits, not their actual success on the merits, as in a case involving a motion for summary judgment, was at issue. Nevertheless, a district court in another case, *Reese,* granted summary judgment in favor of the retirees after concluding that the CBA "unambiguously granted lifetime health-care benefits to the retirees." *574 F.3d at 319.* The Sixth Circuit, relying on the principles delineated in *Yolton,* agreed with the district court's determination:

> *Yolton* supports the district court's conclusion that the 1998 agreement granted retirees a right to lifetime health benefits. Like *Yolton:* this case involves a CBA; it involves a health-care benefits plan with identical language concerning entitlement to benefits upon retirement; it ties eligibility for health benefits to eligibility for a pension; it does not contain a specific durational clause while other benefits provisions in the CBA contain such clauses . . . and above all it concerns employees who worked in virtually identical circumstances [*42] . . . to the *Yolton* employees before each group retired.

*Id. at 323.* While the Court cannot say that Retirees worked in "virtually identical circumstances" as the employees in *Yolton* and *Reese,* the vesting principles at work in those cases apply in similar fashion to this case and inform the Court's analysis of the issues.[11] As importantly, the panel in *Reese* was unencumbered by the fact that *Yolton* was a preliminary injunction decision, because the CBAs in the two cases shared "identical language"[12] and because of "the centrality of the tying rationale in *Yolton's* merits determination and in cases before and since . . . ." *Id.*

11  Despite the Sixth Circuit's agreement with the

district court that the CBA granted the retirees a right to lifetime health benefits, it nevertheless held, based on the particular facts of that case, that the defendant was entitled to make reasonable modifications to the benefits. *Reese, 574 F.3d at 326.* This aspect of the Sixth Circuit's determination will be discussed in Section III, Subsection G(10) of this decision.
12  *See Reese v. CNH Global N.V., No. 04-70592, 2007 U.S. Dist. LEXIS 63670, 2007 WL 2484989 at *6 n.9 (E.D. Mich. 2007 August 29, 2007).*

Lower court decisions within the Sixth [*43] Circuit provide additional guidance. The district court in *Pringle v. Continental Tire North America, Inc., 541 F. Supp.2d 924, 930 (N.D. Ohio 2007),* granted summary judgment in favor of the retirees in that case after concluding that "the unambiguous language of the agreement" demonstrated that the parties intended for the CBA-provided health benefits to vest. The court based its determination on the following factors: (1) language in the CBAs stating that "eligible employees 'shall . . . receive' the described medical benefits after retirement"; (2) the CBAs' tying of retiree medical benefits to pension eligibility; (3) the absence of durational limits for medical benefits to retirees "whereas specific durational limits existed for medical benefits to non-retirees"; and (4) the *Yard-Man* inference. *Id.* Similarly, the district court in *Cheatham v. R.C.A. Rubber Co. of America, No. 1:11-00006, 2012 U.S. Dist. LEXIS 68263, 2012 WL 1745524 at *8-9 (M.D. Tenn. May 16, 2012),* concluded that the retirees in that case were "entitled to lifetime healthcare benefits" because (1) the CBA provided that employees who retired under the company's pension program "shall receive the benefits" at issue; (2) the retiree health [*44] benefits were tied to the receipt of pension benefits; (3) the CBA included "a number of specific durational limitations for benefits other than retiree health care"; (4) the company continued funding the health benefits for the retirees even after the closing of the plant; and (5) the *Yard-Man* inference applied.

Whirlpool, in response, introduces a host of arguments as to why the tying of health benefits to pension benefits does not indicate vesting in this case. First, Whirlpool argues that the following groups did not receive health benefits upon retirement: (1) employees who received deferred vested pensions; (2) employees who retired without having health insurance in effect; and

(3) employees who retired without having attained at least ten years of pension credit accumulated after attaining the age of 45. ECF No. 155 at 33. Second, Whirlpool points out that Hoover employees had the option of selecting a pension term that lasted for ten years rather than for life. ECF No. 156 at 17. Third, Whirlpool claims that Retirees' pension benefits are not actually vested. ECF No. 156 at 17.

Whirlpool's attempt to generate exceptions to the tying inference finds no succor. Whirlpool's first [*45] argument seems to imply that unless *all* pensioners receive healthcare benefits during retirement, there can be no inference that healthcare benefits are provided for life. This logic is flawed. The basis for the tying inference is the idea that because pension benefits are vested for life, "the act of tying retiree health benefits to pension eligibility indicates 'that the parties intended that the company provide lifetime health benefits as well.'" *Noe, 520 F.3d at 559 (quoting Golden, 73 F.3d at 656)*. Not everyone who draws a pension need receive health benefits for this inference to be true. That is, the exclusion of some pensioners from the health benefits program does not preclude the inference, for *those* pensioners who do receive health benefits as a result of their pension eligibility, that *their* health benefits are for life. Whirlpool's second argument also lacks merit. Although some pensioners may choose to receive an earlier payout of their pension benefits, such benefits are nonetheless recognized as lifetime benefits. *See* EMPLOYEE BENEFITS LAW 2-8 (Jeffrey Lewis *et al.*, eds., 3d ed. 2012) ("pension plan generally provides for a benefit stated in the form of a life annuity"). [*46] The Court also rejects Whirlpool's third argument. It is well-established that pension benefits are vested benefits under ERISA law. *See Tackett v. M&G Polymers, USA, LLC, 561 F.3d 478, 490 (6th Cir. 2009)* ("health-care benefits, *as opposed to pension benefits*, do not mandatorily vest" [emphasis added]); *Schreiber v. Philips Display Components Co., 580 F.3d 355, 366 (6th Cir. 2009)* ("pension benefits . . . do vest"); *Sengpiel v. B.F. Goodrich Co., 156 F.3d 660, 667 (6th Cir. 1998)* ("ERISA requires pension benefits to vest upon employees' retirement"), *cert. denied, 526 U.S. 1016, 119 S. Ct. 1249, 143 L. Ed. 2d 347 (1999)*.

Whirlpool next argues that the 2000-2003 Welfare Plan modified benefits for past retirees, thereby proving that such retirees were not granted health benefits at vested levels. ECF No. 156 at 20. In support of this argument, Whirlpool directs the Court to § 3.01(c)(iii) of the 2000-2003 Welfare Plan, and points out that the benefits provision applies to employees who retired "on or after January 1, 1993 . . . ." Whirlpool notes, moreover, that § 3.01(c)(iii) of the 2000-2003 Welfare Plan contains changes to retirement health benefits that do not appear in the 1992-1995 [*47] and 1995-2000 Welfare Plans. In Whirlpool's view, this means that the new changes negotiated for the 2000-2003 term were also applied to employees who retired before 2000, specifically, between 1993 and 2000.

It is true that the 2000-2003 Welfare Plan, like the 1992-1995 and 1995-2000 Welfare Plans, contains the requirement that employees must retire on or after January 1, 1993, in order to qualify for retirement health benefits. If indeed the 2000-2003 Welfare Plan was intended to govern health benefits only for the employees who retired during that term, one might have expected the parties to have written in a retirement date occurring no earlier than 2000. But even if the 2000-2003 Welfare Plan did impose changes to past retirees, those changes did not *reduce* healthcare benefits. In particular, the 2000-2003 Welfare Plan (1) raised the Major Medical lifetime benefit from $60,000 to $70,000; (2) gave retirees the option to select an Alternative Medical Plan as an alternative to the Basic and Major Medical and Comprehensive Plans; and (3) granted Medicare-eligible retirees the option to enroll in Medicare HMOs in place of coverages offered by the Basic and Major Medical, Comprehensive, [*48] and Alternative Medical Plans. ECF No. 108-8 at 29-30; *compare* ECF Nos. 108-7 at 33-34; 108-6 at 31-32. The foregoing changes improved healthcare benefits by providing a higher lifetime benefit amount and greater coverage options. As recognized by the Sixth Circuit, "the resetting of health-care benefits for previously retired employees might not concern anyone if each change *upgraded* the existing package of benefits. That sort of change would not break any promises to provide irreducible benefits for life." *Reese, 574 F.3d at 325* (emphasis in original). Therefore, even if the 2000 changes were applied to past retirees, they do not defeat Retirees' vesting claims.

The Court is also unpersuaded by Whirlpool's claim that none of the Welfare Plans after 1992 "have ever provided for coverage once the retiree reached age 65 or otherwise becomes Medicare eligible." ECF No. 155 at 11. Whirlpool does not direct the Court to any language expressing this limitation, nor does the Court locate any.

Whirlpool suggests only that because § 3.01(c)(iii)(A) requires retirees to pay monthly premiums to the age of 65, any obligation on the part of the Company to provide benefits ended after that age. [*49] This claim is simply not supported by the CBAs or by the history of the parties' conduct. Indeed, Retirees have continued to receive health insurance benefits past the age of 65. *See* ECF No. 108-20. Also unavailing is Whirlpool's contention that even though the post-1992 Welfare Plans permit eligible retirees to continue "elements of the medical insurance," those documents do not specify which "elements" will be provided. ECF No. 156 at 11. To the contrary, the Welfare Plans expressly state that "[e]ligible retired employees who were hired prior to July 8, 1988, will be eligible to retain Basic and Major Medical coverage," and "[e]ligible retired employees who were hired after July 8, 1988, will be eligible to retain the Comprehensive Plan." ECF Nos. 108-6 at 31-32; 108-7 at 33-34; 108-8 at 29.

Based on the foregoing, the authorities cited by Retirees provide a measure of support for their vesting argument. Nevertheless, the Court observes that the cases do not squarely apply to the facts of this case in at least one important way. In *Pringle* and *Cheatham*, the governing CBAs promised eligible retirees that they shall receive the health benefits described therein. In *Yolton* and *Reese*, [*50] the CBAs promised eligible retirees that their employer shall pay for the cost of their benefits. This type of mandatory language is noticeably absent in the 1992-1995, 1995-2000, and 2000-2003 Welfare Plans. Instead, the Welfare Plans promise something less--namely, that eligible retirees shall have the "opportunity" to continue medical insurance coverage during retirement. ECF Nos. 108-6 at 31; 108-7 at 33; 108-8 at 28. The ordinary meaning of "opportunity" is "a combination of circumstances, time, and place suitable or favorable for a particular activity or action." Webster's Third New International Dictionary (1993). The word suggests that those retirees meeting the eligibility requirements received, at most, the promise of being placed in a "suitable or favorable" position to receive healthcare benefits, not an absolute promise of the benefits themselves. Retirees, recognizing this hurdle, contend that eligible retirees became entitled to healthcare benefits upon paying the monthly contributions required under § 3.01(c)(iii)(A). ECF No. 134 at 28. This interpretation is a reasonable one. The paragraph setting forth the contributions requirement follows directly after the paragraph [*51] describing the

opportunity to continue healthcare benefits, creating an inference that payment will result in entitlement. Yet, that is not the only permissible, reasonable interpretation. Because no language clearly obligates the Company to provide or pay for the cost of the healthcare benefits at issue, a reasonable argument could be made that a retiree's payment of contributions is merely another necessary, but not sufficient, condition to receiving those benefits. If true, that would support Whirlpool's claim that it may discontinue retiree benefits if it chooses.

"Where a contractual provision is subject to two reasonable interpretations . . . that provision is deemed ambiguous and the court may look to extrinsic evidence--additional evidence that reflects the intent of the contracting parties--to help construe it." *In re AmTrust Financial Corp.*, 694 F.3d 741, 750 (6th Cir. 2012) (quotations omitted). The Court therefore turns to the extrinsic evidence.

3. *Evaluation of Extrinsic Evidence*

The Court's review of the record discloses ample extrinsic support for Retirees' vesting claim. First, there is no dispute that the 1993-2003 Retirees have continued to receive company-paid benefits [*52] to the present date. Second, during the May 26, 1992 contract negotiations, Schiltz, who by that time had been promoted by the Company to assume a more prominent role in contract negotiations, declared: "Everybody in this room, we made a promise that when you retire, you're going to have retiree medical insurance. So we have to estimate what the value of that is." ECF No. 108-16 at 3. Schiltz's statement is significant because it was made one week prior to the effective date of the 1992-1995 Welfare Plan, which, as discussed, was the first to formally provide the opportunity to continue company-funded healthcare during retirement. ECF No. 108-6. As importantly, Schiltz *drafted* the retirement healthcare provision for that Welfare Plan. ECF No. 123-7 at 21. Schiltz also testified in his deposition that the Company's chief negotiator "presented" to the Union that retirees would "have what they have when they went out . . . ." ECF No. 123-7 at 27. Similarly, the record includes an email from Schiltz to a Company employee explaining, as to eligible retired hourly employees, that their benefits may not be altered in the future because they were given "that which was defined as retiree coverage [*53] in the contract which was in effect at the time of retirement." ECF No. 108-19 at 2. Schiltz did not recall ever conveying to the

Union that benefits for past retirees could later be cut. ECF No. 123-7 at 26. Consistent with the Company's representations, James Repace, the Union negotiator, testified that it was his understanding that "what [retirees] went out with is what they have for life." ECF No. 123-40. All of the above comports with Retirees' interpretation of the 1992-1995, 1995-2000, and 2000-2003 Welfare Plans.

Although Whirlpool cites to a portion of Schiltz's deposition in which he testified that he could not "imagine" telling the Union that the Company could never cut past retirees' benefits; *see* ECF No. 123-7 at 15; this testimony, in the Court's view, is of meager value in comparison with what the Company actually represented to the Union during the negotiations. *See Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814 (7th Cir. 1987)* (Easterbrook, J.) ("[s]ecret hopes and wishes count for nothing. The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves")

Whirlpool also attempts to sterilize [*54] the effect of Schiltz's May 26, 1992 declaration by pointing out that it was made in the context of Company and Union discussions regarding how much liability the Company will incur pursuant to Financial Accounting Standard ("FAS") 106. ECF Nos. 155 at 41-42; 108-16 at 4. FAS 106 is a standard that requires companies listed in the New York Stock Exchange to calculate and "book" their liability for retiree healthcare benefits. ECF No. 155 at 41-42. Whirlpool insists that, in this context, "promise" did not really mean promise; rather, it took on another meaning in the accounting sense. ECF Nos. 155 at 42; 180 at 1-2.

Whirlpool's claim rings hollow. Whirlpool does not inform the Court what "promise" should really mean. Rather, it mentions only that "promise" is a term used by the Financial Accounting Standards Board in its Summary of FAS 106. ECF No. 108 at 2. Notably, that Summary states:

> The Board's conclusions in this Statement result from the view that a defined postretirement benefit plan sets forth the terms of an exchange between the employer and the employee. In exchange for the current services provided by the employee, the employer *promises*

to provide, in addition to current [*55] wages and other benefits, health and other welfare benefits after the employee retires. It follows from that view that postretirement benefits are not gratuities but are part of an employee's compensation for services rendered. Since payment is deferred, the benefits are a type of deferred compensation. The employer's obligation for that compensation is incurred as employees render the services necessary to earn their post retirement benefits.

ECF No. 108 at 2 n.2 (emphasis added).[13] If this is the context in which Whirlpool believes the word should be understood, and the Court finds it an appropriate context, then it bolsters Retirees' claim that their benefits are vested and that the *Yard-Man* inference is particularly appropriate here.

> 13 *See* Financial Accounting Standards Board, Summary of Statement No. 106, http://www.fasb.org/summary/stsum106.sht ml (last visited August 27, 2013).

Notwithstanding the strength of Retirees' evidence, the record also reveals substantial facts supporting Whirlpool's claims that healthcare benefits for the 1993-2003 Retirees are alterable and terminable. In 1988, 1993, 1997, 1998, 1999, and 2002, the Company published GIPs describing the health insurance [*56] programs offered to hourly employees. Like the 1980 GIP, they each contain a Reservation of Rights ("RORs") disclaimer that provides as follows: "The program has been developed during the course of Union-Company negotiation . . . . It is the intention of the Company to continue the program indefinitely, but as with all group plans, they may be changed or discontinued." ECF No. 123-4 at 34-87. Although the GIPs were not collectively bargained, there is no dispute that the Union regularly received drafts of the GIPs before they were published. ECF No. 156 at 12. In addition, the 1993-2003 Retirees signed Hourly Medical Insurance Authorization forms ("Authorization Forms") when they retired. ECF No. 155 at 13. The Authorizations Forms permitted these Retirees to choose various medical coverages to continue during retirement, to list dependents, or to waive coverage altogether. ECF No. 123-28. These forms, much like the GIPs, contain text stating: "The premium cost, share of

premium cost, and the medical coverage are all subject to change." ECF No. 123-28. The Company's open and consistent position over the years in regard to retirement health benefits, as communicated through the GIPs [*57] and the Authorization Forms, supports the inference that although the Company had hoped to continue the retirement healthcare program indefinitely, it had also intended to preserve the right to modify or terminate the benefits. This evidence counsels in favor of Whirlpool's interpretation of the Welfare Plans.

Whirlpool also points out, and Retirees do not dispute, that on several occasions the Company unilaterally modified healthcare benefits for past retirees. ECF Nos. 155 at 23-25; 134 at 18-19. These changes include: (1) the imposition in 1986 of a mandatory precertification requirement for hospital admissions and a requirement for second surgical opinions; (2) a 1992 generic prescription drug requirement; and (3) a 1995 rule imposing a $50 deductible for retail drugs and requiring that certain drugs be mail-ordered. ECF Nos. 155 at 24; 134 at 18. Whirlpool asserts that its practice of modifying benefits for past retirees "on multiple occasions" provides additional confirmatory evidence that Retirees' benefits are not vested. ECF No. 155 at 23. Retirees counter that these modifications did not reduce, but rather improved, their healthcare, and, in any event, only the 1995 change [*58] has any bearing on the

post-1992 Retirees. ECF No. 134 at 18. Because the Court has not been given any helpful guidance or basis to determine whether these changes should be categorized as improvements or reductions, the Court does not reach any conclusions at this time.

Based on the Court's examination of the totality of the evidence, including extrinsic evidence, which, depending on whose motion is being considered, is viewed in the light most favorable to the nonmoving party, genuine issues of material fact exist as to the question of intent. Summary judgment is therefore improper. The claims of the members of Subclass C shall be resolved at trial.

F. Subclass D: 2003-2007 Retirees

In 2003, the Union and the Company negotiated a new Welfare Plan with different language controlling the distribution of retiree health benefits. Section 3.01(c)(iv) of the 2003-2008 Welfare Plan provides: "With regard to qualifying employees who retire subsequent to December 9, 2003, the available medical benefits shall be those summarized in Exhibit 5." ECF No. 108-9 at 23.

Exhibit 5 is reproduced as follows:

RETIREMENT HEALTH CARE

|  | Eligibility | Benefit |
|---|---|---|
| Group #1 | Age 55 or more with at | o Retiree health. |
|  | least 10 years of pension | No change if |
|  | credit as of 12/31/03 | retired by |
|  |  | 12/31/04 |
| Group #2 | Age 55 or more and 10 or | o Retiree health: |
|  | more years of pension | No change |
|  | credit by 6/5/05, but not |  |
|  | in Group #1, or in Group |  |
|  | 1 and not retired by |  |
|  | 1/31/04 |  |
| Group #3 | 85 points and 30 or more | o Access only to |
|  | years of pension credit by | retiree health |
|  | 6/29/05, but not in Group | care. $10,000 |
|  | #1 or #2 | lump sum |

2013 U.S. Dist. LEXIS 121750, *58

|  |  | payment |
|---|---|---|
|  |  | o Or, if qualified |
|  |  | by 6/5/05, may |
|  |  | retire after |
|  |  | 6/5/05 upon |
|  |  | reaching |
|  |  | eligibility |
|  |  | requirements |
|  |  | (e.g., 55 with 10 |
|  |  | years) with the |
|  |  | following health |
|  |  | care: |
|  |  | - Cost share of 20% (of |
|  |  | 80/20 plan) |
|  |  | -No change in current |
|  |  | coverage |
|  |  | -Pre-65 coverage only |
| Group #4 | Pension credit as | Pension Credit (Years) |
|  | described to the right as |  |
|  | of 12/31/03 | 30 or more |
|  |  | 29 |
|  |  | 28 |
|  |  | 27 |
|  |  | 26 |
|  |  | 25 |
|  |  | 24 |
|  |  | 23 |
|  |  | 22 |
|  |  | 21 |
|  |  | 20 |
| Group #5 | Not eligible under Group | o Access only to |
|  | #1, #2, #3 or Group #4 | pre-65 retiree |
|  | above as of 12/31/03 | healthcare |
| Group #6 | Employees hired after | o Access only to |

2013 U.S. Dist. LEXIS 121750, *58

| 1/1/04 | pre-65 retiree |
| | healthcare |

| | Comments |
|---|---|
| Group #1 | Window Closes 1/31/04 |
| Group #2 | o Regular |
| | Retirement |
| | o Grandfathered to |
| | 6/29/08 |
| Group #3 | o Window until |
| | 6/29/05, pension |
| | only (no retiree |
| | health care) |
| | - or - |
| | If qualified by |
| | 6/5/05 and |
| | retiring after |
| | 6/5/05, 20% cost |
| | share for |
| | medical to age |
| | 65. |
| Group #4 | Retiree Health Cost Share |
| | 20% |
| | 23% |
| | 26% |
| | 29% |
| | 32% |
| | 35% |
| | 38% |
| | 41% |
| | 44% |

2013 U.S. Dist. LEXIS 121750, *58

| | |
|---|---|
| | 47% |
| | 50% |
| | |
| o No window | |
| o Retiree health | |
| care is $200 | |
| 80/20, pre-65 | |
| only | |
| o Retiree Rx drug | |
| is Maytag Model | |
| Group #5 | |
| Group #6 | |

ECF [*59] No. 108-9 at 23. Directly below the table, the document mentions that "Medicare shall always be primary payer for post 65 benefits" and "Medicare supplement plan will be available at full cost to retirees who do not qualify for post-65 medical coverage." ECF No. 108-9 at 23.

The parties devote remarkably little attention to Exhibit 5 even though it governs the health benefits for all of the class members in Subclass D, the 2003-2007 Retirees. As far as the Court can discern, the entirety of the parties' briefing as to Exhibit 5, specifically, is a one-sentence summary in Retirees' supporting memorandum. ECF No. 108 at 14. Yet, this table raises a host of issues separate and apart from those that govern the other Subclasses that require further analysis.

Some observations are warranted. It would appear that the Court's analysis with respect to the 1993-2003 Retirees (Subclass C) should apply with equal force to Groups 1 and 2. In fact, Schiltz testified that Groups 1 and 2 were inserted at the "impetus" of the Union, which "wanted to make sure that people who were on the verge of retirement had the opportunity to essentially get out under the old rules." ECF No. 123-7 at 25. According [*60] to Schiltz, if these retirees retired by the appropriate windows they "would basically get the entire pre-December 9, 2003 program available to them . . . ." ECF No. 123-7 at 26. The same cannot be said, however, for the remaining groups. It appears that the other groups are given "access" to "retiree healthcare" only up to the age of 65. Certainly, their benefits cannot be said to be vested. Members of Groups 5 and 6, moreover, seem to be given health benefits without regard to whether they are eligible for pension benefits. Finally, Exhibit 5 is written using informal shorthand expressions, rendering it difficult if not impossible for the Court to properly evaluate the language and terms in the absence of a more complete record. For example, it is unclear what "access" to "retiree healthcare" means. Should the Court interpret the language with reference to the preceding Welfare Plans, or is the Court to give fresh review of the terms of Exhibit 5? The parties do not inform the Court one way or another.

The Court has not been given an opportunity to engage in a proper evaluation of the issues as they pertain to this subclass. Although different rules ostensibly apply to different groups [*61] within the subclass, the parties do not provide the Court with any means to make the appropriate distinctions or to assess the less-than-lucid terms. The claims of the 2003-2007 Retirees will not, therefore, be resolved through summary adjudication.

G. Whirlpool's Remaining Defenses

The Court now addresses the remaining claims and defenses raised by Whirlpool.

1. Proper Analytical Standard

Whirlpool, citing to the case of *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir.), cert. denied, 524 U.S. 923, 118 S. Ct. 2312, 141 L. Ed. 2d 190 (1998), argues that any intent to vest retirement benefits "must be stated in clear and express language." ECF No. 155 at 15. If this were the correct statement of the law, then Whirlpool would likely be entitled to summary judgment on all of Retirees' vesting claims.

But Whirlpool misappropriates *Sprague* and supplies the Court with an erroneous standard with which to evaluate the CBAs. The welfare plan in *Sprague* was not collectively bargained. *133 F.3d at 393.* "When the health plan was not collectively bargained, we require a clear statement before we will infer that an employer meant to promise health benefits for life." *Reese, 574 F.3d at 321.* "When [*62] the health plan stems from a CBA, by contrast, we apply 'ordinary principles of contract interpretation' to determine whether benefits have vested . . . ." *Id.* As discussed, "in this circuit, a court may find vested welfare benefits under a CBA even if the intent to vest has not been explicitly set out in the agreement." *Bender, 681 F.3d at 261.* The proper analytical framework is the one the Court has set forth in this decision, not the one Whirlpool offers.

## 2. "Vitality" of Sixth Circuit Precedent

Whirlpool claims, without support, that the cases of *Yolton, Noe, Golden,* and *Yard-Man* are of "questionable continuing vitality." ECF No. 155 at 37. The Court's research indicates otherwise. *Yolton* was followed by *Reese,* which was decided in 2009. *Noe* was decided in 2008. As recently as 2012, the Sixth Circuit in *Bender* rejected the defendants' argument that *Yard-Man* should be abandoned. *681 F.3d at 262 n.7* ("Defendants ask this court to abandon adherence to *Yard-Man* in order to preserve the issue for en banc or Supreme Court review, but offer no basis for this panel to overrule *Yard-Man*"). *Witmer* and *Moore,* which the Court has cited, follow the same principles as do the foregoing cases and [*63] they were both decided in 2012. None of these cases have been overruled, superseded, or reversed. As of the date of this decision, they constitute the law of this circuit that the Court is bound to follow.

## 3. Retirees' Enrollment in PPO Plan

Whirlpool contends that most Retirees "do not have viable claims" because they are currently enrolled in a PPO Plan, which is part of the Alternative Medical Coverage provided under § 2.07 of the Welfare Plans. *See, e.g.,* ECF No. 108-8 at 22. The Welfare Plans state that "the Company may cease offering the Alternative Medical Coverage on the annual re-enrollment date." *See, e.g.,* ECF No. 108-8 at 22. Because such coverage is terminable, Whirlpools claims it is entitled to judgment as a matter of law on the claims of these Retirees. ECF No. 155 at 17.

This claim is unavailing. There is no dispute that this litigation concerns Retirees' rights to health benefits under the Basic and Major Medical Plan, or the Comprehensive Plan. ECF No. 134 at 8. If a retiree has vested rights to certain medical coverage, then those rights are not lost merely because he or she is currently enrolled in a different plan. "Such rights, once vested upon the employee's retirement, [*64] are interminable . . . ." *Yard-Man, 716 F.2d at 1482 n.8.* Furthermore, Schiltz testified that the Company permitted retirees to switch from the PPO Plan back to the Basic and Major Medical Plan, or the Comprehensive Plan, when they so desired. ECF No. 123-7 at 24.

## 4. Authorization Forms

The 1993-2003 and 2003-2007 Retirees signed Authorization Forms when they retired; ECF No. 155 at 13; which, as discussed, permitted them to choose from among various medical coverages to continue during retirement, to list dependents, or to waive coverage; and which, moreover, contain text stating: "The premium cost, share of premium cost, and the medical coverage are all subject to change." ECF No. 123-28. Whirlpool claims that even if these Retirees had vested rights to healthcare benefits, they waived them by signing these forms. ECF Nos. 155 at 17; 156 at 21.

The Court is not persuaded. Whirlpool does not cite to any authorities holding that collectively bargained rights may be divested by forms such as these. The case law supplied by Whirlpool stands only for the proposition that "'vested retirement rights may not be altered without the pensioner's consent.'" *John Morrell & Co. v. United Food & Commercial Workers Int'l Union, 37 F.3d 1302, 1306 n.8 (8th Cir. 1994)* [*65] (quoting *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n.20, 92 S. Ct. 383, 30 L. Ed. 2d 341 (1971)),* cert. denied, 515 U.S. 1105, 115 S. Ct. 2251, 132 L. Ed. 2d 259 (1995). The Authorization Forms do not show that these Retirees consented to surrender their right to receive health benefits. Rather, most executed these

forms for precisely the opposite purpose-to receive health benefits. The existence of language purporting to limit a retiree's rights, embedded within a document ostensibly facilitating those rights, surely cannot be counted as a waiver or consent in this context. 13 WILLISTON ON CONTRACTS, § 39:14 (4th ed.) ("the waiver of a contractual provision must be clearly established and will not be inferred from equivocal acts or language"). To hold otherwise, moreover, would be offensive to federal labor policy. This Court will not ratify a procedure that permits a company to wrest away collectively bargained rights in this manner, that is, by forcing employees to give up such rights through the act of electing to receive them. *See W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 771, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983)* (recognizing [*66] "federal labor policy that parties to a collective bargaining agreement must have reasonable assurances that their contract will be honored"); *Gilbert v. Doehler-Jarvis, Inc., 87 F. Supp.2d 788, 794 (N.D. Ohio 2000)* (rejecting "rule that could permit a company to unilaterally take away contractually bargained-for rights").

Nor does *Cunningham v. Osram Sylvania, Inc., 221 Fed. Appx. 420 (6th Cir. 2007),* an unpublished decision, carry any precedential or persuasive value. In that case, the Sixth Circuit affirmed the district court's "functional equivalent of a grant of summary judgment" against the retirees in that case (the district court had dismissed the case under *Rule 12(b)(6)* but had considered evidence outside the pleadings). *Id. at 423.* In so affirming, the Sixth Circuit observed that the CBAs in question lacked any "language that could be interpreted to vest . . . benefits for life" and that the company had produced uncontested evidence that it had rejected the union's proposal to vest healthcare benefits. *Id. at 422.* Although noting that the district court had also considered certain health insurance applications signed by the retirees, and that these applications contained [*67] disclaimers stating that coverages are "subject to change"; *id.*; the Sixth Circuit did not reveal what value it attributed to this evidence and, indeed, did not even endorse it as an appropriate consideration in the vesting analysis. Given the significance and weight of the other evidence, it is unlikely that the executed application forms made any difference in the panel's decision.

## 5. Reservation of Rights in GIPS and SPDs

Whirlpool next contends that the Company's

publication of GIPs and another type of benefits summary known as Summary Plan Descriptions ("SPDs")-both which contain ROR language limiting the Company's obligation to provide health benefits-are "fatal" to Retirees' claims. ECF No.155 at 19. According to Whirlpool, "[i]t is settled law in this Circuit that where plan documents unambiguously and unqualifiedly reserve a company's right to terminate or amend a welfare plan, that alone is sufficient to defeat a claim for vested benefits." ECF No. 155 at 20.

Again, Whirlpool misstates the law. Unilaterally[14] published summaries "are not considered to be 'legally binding' nor are they 'parts' of the benefit plan themselves . . . [although] they may be used as extrinsic evidence [*68] to resolve ambiguities latent in the contractual language." *Moore, 690 F.3d at 455-56* (citation omitted). At most, the GIPs and SPDs may serve as extrinsic evidence. They are not, however, part of the CBAs, and the RORs are not contractually binding provisions.

> 14    The Court rejects Whirlpool's claim that because the Union could review drafts and propose revisions, the GIPs and SPDs were not unilaterally drafted. ECF No. 156 at 12. The Company published the documents as company literature and had no obligation to accept the Union's proposals, if indeed there were any. ECF Nos. 123-4; 123-5.

The Court rejects Whirlpool's next contention that the GIPs were "explicitly incorporated" into the CBAs. ECF No. 156 at 10. Whirlpool rests its claim upon a provision that appears in § 2.0 in each of the Welfare Plans. The provision reads: "Individual certificates of insurance and descriptive booklets will be furnished to each covered employee." ECF No. 123-2 at 63. This provision does not, however, incorporate the descriptive booklets. It only states that they will be "furnished." The Sixth Circuit has held that descriptive booklets may be incorporated into a CBA only by "explicit [*69] language of incorporation." *Bender, 681 F.3d at 264* (rejecting incorporation argument where, as here, "the CBAs refer to a 'booklet and policy,' but do not include any explicit language of incorporation"). In addition, the case cited by Whirlpool as support for its incorporation argument was rejected in *Bender* for reasons that are appropriate here:

defendants' reliance on *United*

*Steelworkers of America v. Commonwealth Aluminum, 162 F.3d 447, 449 (6th Cir. 1998)* is misplaced. . . . [T]he CBA in that case expressly stated that the group insurance booklets '*are incorporated herein* and made a part of this Labor Agreement by such reference.' *Id.* (emphasis added). No similar explicit incorporation language has been identified in this case.

*Bender, at 265*. Therefore, Whirlpool's incorporation argument fails.[15]

> 15   Whirlpool asserts that if the GIPs are not incorporated into the CBAs, Retirees have no viable vesting claims because "[t]he GIPs (and SPDs when issued) are the only documents containing a written description of the specific" healthcare benefits. ECF Nos. 155 at 19; 156 at 8, 11-12. This claim is inaccurate. Retirement healthcare benefits are described in § 2.06 of the Welfare Plans [*70] under the heading "Medical Insurance." *See* ECF Nos. 108-6 at 9-25; 108-7 at 9-25; 108-8 at 5-21; 108-9 at 8-15. Though the GIPs describe the health insurance benefits with greater detail than do the Welfare Plans, which provide a general description of what retirees may receive, they need not be incorporated into the CBAs in order for Retirees' to have valid contractual claims. Furthermore, the GIPs may provide extrinsic evidence of the specific levels of Retirees' benefits.

Other cases cited by Whirlpool purporting to show that Retirees' vesting claims are defeated by the RORs are inapposite. The Sixth Circuit in *Witmer, 694 F.3d at 775-76*, gave effect to a ROR because it was located in the same CBA document that provided for retirement health insurance. In contrast, *none* of the collectively-bargained instruments in this case, including the BLAs and the Welfare Plans, contain ROR provisions. Furthermore, *Winnett v. Caterpillar, Inc., 553 F.3d 1000, 1010 (6th Cir. 2009)* stands for nothing more than the proposition that a ROR within a SPD may serve as extrinsic evidence, a principle no party contests.

Whirlpool's reliance on *Maurer v. Joy Techs., Inc., 212 F.3d 907 (6th Cir. 2000)* [*71] requires greater discussion. *Maurer* held that a ROR contained in a

booklet insert published by a company was effective against the retirees in that case because "the Union was obligated to grieve or enter suit over the reservation of rights clause as the clause was conspicuously contained in the . . . insert and [retirees] did not dispute it until the filing of this lawsuit . . . ." *Id. at 919* (quotations omitted). Whirlpool argues that because the Union regularly received draft GIPs and SPDs, and, yet, never grieved the attendant RORs, Retirees must be held to those RORs in accordance with *Maurer*. ECF No. 156 at 12-13.

Subsequent panels of the Sixth Circuit, recognizing that a broad reading of *Maruer* would "run headlong into the rule that a plan summary cannot vitiate contractually vested or *bargained-for-rights*"; *Bender, 681 F.3d at 265* (emphasis in original; quotations omitted); *see Prater v. Ohio Education Assn., 505 F.3d 437, 444 (6th Cir. 2007)* ("[a]s a general rule, 'an existing contract cannot be unilaterally modified.'"); have sharply limited *Maurer's* holding. *See id.* ("[t]o our knowledge, no court of appeals has forced unions to file grievances in the face of a summary plan description [*72] that purported to remove a promise of lifetime health benefits"). Therefore, panels of this circuit have distinguished *Maurer* where (1) the summary did not "explicitly represent[] to the retirees that existing medical treatment could be cut off, as the summary in *Maurer* did";[16] *id.*; (2) the CBA states "that it is the fully integrated commitment of the parties or that it cannot be amended without signed mutual consent"; *Moore, 690 F.3d at 458*; or (3) the summary acknowledges that any modifications would be subject to the CBA, or that any conflict between the summary and the CBA would be governed by the latter. *Bender, at 265-66*.

> 16   It is instructive to compare the RORs in *Prater* with the ROR in *Maurer*, which *Prater* distinguished. The RORs in *Prater* stated, "[w]hile the employer expects retiree coverage to continue, the employer reserves the right to modify or discontinue retiree coverage at any time"; and, the employer reserves the right to "change or eliminate benefits under the plan and . . . terminate the entire plan or any portion of it . . . ." *505 F.3d at 444*. In *Maurer*, the ROR was only slightly different in that it stated that ongoing medical treatment could be discontinued: "Joy [*73] reserves the right to amend or terminate any of the plans. The right to amend includes the right

2013 U.S. Dist. LEXIS 121750, *73

to curtail or eliminate coverage for any treatment, procedure, or service *regardless of whether you are receiving treatment for an injury, illness, or disease contracted prior to the effective date of the amendment*." *212 F.3d at 913* (emphasis added).

*Maurer* does not subject Retirees to the RORs. The RORs in the present case do not explicitly say that existing medical treatment may be discontinued. Furthermore, § XIV(I)(2) in each BLA makes clear that "[t]his Agreement as written expresses the entire contract between the parties." Also, § XIV(E) requires that "[c]hanges in, or amendments to, the terms of this Agreement may be made at any time by mutual consent of the Company and the Union." ECF No. 137-2 at 61-62.

Whirlpool claims that the mutual consent provision applies only to the BLAs, and not the Welfare Plans. This claim lacks merit. The BLAs clearly recognize that Welfare Plans are part of the "Agreement" referenced in the mutual consent provision. Section XIV(I)(2) in the BLAs provides that "[t]his Agreement" represents the "entire" contract between the parties. Moreover, the term "Group [*74] Insurance" is conspicuously featured in the heading of § XIII of each BLA, which section goes on to mention that a Welfare Plan will be covered in a separate set of documents. ECF No. 137-2 at 59. And, on occasions when the Company and the Union have made amendments involving employee healthcare benefits, they have referred to those amendments as changes to the "Agreement." *See, e.g.*, ECF No. 123-23 at 2.

### 6. Yard-Man Inference

Whirlpool urges the Court to refrain from applying the *Yard-Man* inference because, in Whirlpool's view, Retirees did not earn or accrue healthcare benefits and therefore those benefits do not represent deferred compensation. ECF No. 155 at 20. Whirlpool argues that because not all employees between 1980 and 2007 qualified for retirement healthcare, and because eligibility requirements varied throughout this period, such benefits should not be seen as a deferred reward. The Court is not persuaded. According to Whirlpool's logic, the *Yard-Man* inference may apply only when every retiree of a company is subject to the same eligibility standards and receives the same benefits. Whirlpool fails to recognize that collective bargaining may not produce consistent results [*75] every term, for numerous reasons, including changes in economic conditions and the parties' relative

bargaining positions. This does not mean, however, that the health benefits secured for a particular group of retirees during a particular CBA term is not compensation for past services.

### 7. Healthcare Benefits Limited to Term of CBA

Whirlpool claims that none of Retirees who retired between 1993 and 2007 are entitled to retirement healthcare because such benefits were made available only during the term of each applicable CBA. ECF No. 155 at 21-22. Whirlpool repeatedly cites to the restrictions in the 1992-1995, 1995-2000, 2000-2003, and 2003-2008 Welfare Plans that state, "[a]ny extended benefits provided are subject to the provisions and limitations of the Plan . . . ." ECF No. 155 at 39; *see* ECF Nos. 108-6 at 32; 108-7 at 34; 108-8 at 30; 108-9 at 24. In Whirlpool's view, the term "limitations" includes the durational clause contained in each Welfare Plan. ECF Nos. 155 at 39; 156 at 18. For example, the 1992-1995 Welfare Plan specifies: "This Welfare Plan shall continue in force until and including June 4, 1995, at midnight, or thereafter in accordance with the terms and conditions [*76] of the termination clause of the [BLA] between the Company and the Union dated June 2, 1992, if such [BLA] is extended." ECF No. 108-6 at 36. Subsequent Welfare Plans feature similar clauses.

The Court rejects this argument. These durational clauses do not specifically refer to retiree health benefits. "[A] durational limitation must include a specific mention of retiree benefits in order to apply to such benefits." *Cole, 549 F.3d at 1074*. There is good reason for this rule. A durational limitation that does not mention retiree benefits may be ambiguous because it could refer to either the duration of the agreement or the duration of the benefits described in that agreement. The Sixth Circuit has resolved this ambiguity by requiring that a durational clause must explicitly reference retiree benefits before it may limit the duration of such benefits.

Whirlpool attempts to distinguish this principle by asserting that, here, the durational clause is present in a separate insurance agreement rather than solely in a master agreement. ECF No. 156 at 18. It makes no difference, however, where the durational clause is located; the ambiguity persists whether it is contained in a master agreement [*77] or an insurance agreement. Whirlpool's invocation of *Yolton* offers no aid. ECF No. 156 at 18-19. Although *Yolton* discussed an unpublished decision, *UAW v. Cleveland Gear Corp., No. C83-947,*

*1983 U.S. Dist. LEXIS 20400, 1983 WL 2174 (N.D. Ohio October 20, 1983)*, which provides some support for Whirlpool's view, *Yolton* never endorsed *Cleveland Gear*, but, rather, only summarized the district court's attempts to distinguish it. *435 F.3d at 582*. Indeed, Whirlpool's argument is squarely defeated by the Sixth Circuit's later decision in *Cole*. In that case, the Sixth Circuit held that a general durational provision located within a *separate* "Insurance Agreement" did not apply to retiree benefits because "it simply [did] not include such a specific mention" of those benefits. *Cole, 549 F.3d at 1074*. Although *Cole* recognized the existence of *Cleveland Gear, see id. at 1072*, the panel nonetheless subscribed to the principle that a general duration clause "only affects *future* retirees-that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits . . . *but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration* [*78] *of the agreement itself." Id. at 1071* (quoting *Yolton, at 581*) (emphases in original).

For these reasons, Whirlpool's defense fails.

### 8. Statute of Limitations

According to Whirlpool, the LMRA and ERISA claims of Retirees who retired before August 11, 2005--six years prior to date of this lawsuit-are time-barred. ECF No. 155 at 28. Whirlpool reasons that the statute of limitations for both acts is governed by Ohio's six-year time limitation for liability created by a statute, and the claims of these Retirees accrued on the date of their retirement when they were asked to sign Authorization Forms informing them that their health benefits were "subject to change." ECF No. 155 at 28. Whirlpool maintains that the claims of Retirees who retired after August 11, 2005 are time-barred, as well, because the Company's position regarding healthcare benefits was "open and notorious." ECF No. 155 at 28.

Whirlpool's contentions are incorrect as a matter of law. "Because Congress did not provide a statute of limitations for [the LMRA and ERISA], courts must borrow from the forum state's most analogous cause of action." *Bender, 681 F.3d at 272*. The Sixth Circuit has held, and common sense dictates, that [*79] the most analogous cause of action in Ohio is one for breach of contract. *See id. at 272* (Michigan's time limitation for breach-of-contract claims governed retirees' LMRA and ERISA suit alleging that CBAs promised vested

healthcare benefits); *Winnett v. Caterpillar, Inc., 609 F.3d 404, 408 (6th Cir. 2010)* (Tennessee's statute of limitations for breach-of-contract actions applied to retirees' LMRA and ERISA claims asserting vested healthcare benefits). The applicable statute of limitations for breach of contract in Ohio was, at the time this lawsuit was filed, fifteen years. *O.R.C. § 2305.06* (2011).17 The case relied upon by Whirlpool, which adopted Kentucky's time limitation for statutory liability, is inapposite because, as explained by the case itself, it "[arose] more specifically from ERISA's statutory protections than from an independent contract between the [parties]." *Redmon v. Sud-Chemie, Inc. Retirement Plan for Union Employees, 547 F.3d 531, 537 (6th Cir. 2008)*. This case, in contrast, arises from a set of CBAs and depends upon "basic rules of contract interpretation" to ascertain what was promised in those contracts. *Noe, 520 F.3d at 552*.

> 17 *Section 2305.06 of the 2011 Ohio Revised Code* [*80] provided that "[e]xcept as provided in *sections 126.301* and *1302.98* of the Revised Code, an action upon a specialty or an agreement, contract, or promise in writing shall be brought within fifteen years after the cause thereof accrued." Ohio amended the statute of limitations in 2012 by reducing it from fifteen years to eight years. *O.R.C. § 2305.06*.

The Court further rejects Whirlpool's assertion that Retirees' claims accrued when they signed the Authorization Forms. "In the context of this contractual claim--the refusal to honor a promise of free, unalterable lifetime healthcare benefits-- . . . *the clock starts when the breach becomes 'clear and unequivocal.'" Bender, 681 F.3d at 272* (quoting *Winnett, 609 F.3d at 408-09*) (emphasis in original; quotations omitted). The Authorization Forms' disclaimer that healthcare benefits were "subject to change"; ECF No. 123-28; does not present a "clear and unequivocal" breach or repudiation. Indeed, those forms were given to Retirees *so that they could select the benefits they wished to continue during retirement*, and there is no dispute that they thereafter received the selected benefits. The Court's examination of the record discloses [*81] only one act that qualifies as an unequivocal breach or repudiation of the CBAs: Whirlpool's May, 2011, announcement to all Retirees that it will reduce Retirees' healthcare benefits, together with its declaration that it could "change or terminate all or any part of the benefits offered at any time and in any

manner." ECF No. 108-20 at 5. Because Retirees' LMRA and ERISA claims accrued in May, 2011, and are governed by a fifteen-year time limitation, Whirlpool's defense fails.

### 9. *ERISA's "Written Instrument" Requirement*

Whirlpool contends that Retirees fail to produce written instruments evidencing satisfaction with the "minimum standards" required of employee welfare benefit plans under ERISA. ECF No. 155 at 36. Whirlpool specifically cites *29 U.S.C. § 1102(b)*, which requires that every employee benefit plan shall (1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan; (2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan; (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan; [*82] and (4) specify the basis on which payments are made to and from the plan. ECF No. 155 at 36. Whirlpool maintains that because the 1980 Contract Settlement and the Welfare Plans lack the foregoing information, Retirees may not prevail on their ERISA claims alleging that Whirlpool violated the relevant employee benefit plans. ECF No. 155 at 36.

The Court finds Whirlpool's argument disingenuous and irrelevant to the merits of this case. In *Moore*, as here, "the LMRA claim also creates a derivative ERISA claim, because the disputed healthcare benefits were agreed upon pursuant to a union-negotiated contract." *690 F.3d at 450*; *see Armistead, 944 F.2d at 1298* ("if it is the intention of the parties to confer on retirees vested rights in medical insurance benefits under a CBA, it is also their intention to confer the same rights under the 'welfare benefit plan' protected by ERISA"). The record contains extensive evidence disclosing that Hoover, Maytag, and Whirlpool all maintained employee welfare benefit plans pursuant to ERISA. This evidence includes the SPDs published by the Company over the years describing its employee benefit plans in detail. *See* ECF No. 123-5. That the record, according [*83] to Whirlpool, insufficiently demonstrates that the Company's own employee benefit plans satisfied certain statutory requirements, has nothing to do with whether the plans were violated and in no way divests Retirees of their ERISA claims.

### 10. *Reasonable Modifications Under Reese*

Whirlpool argues, in the alternative, that even were the Court to conclude that Retirees' right to healthcare benefits are vested, it is "settled law in this Circuit that 'vested' retiree health benefits may be reasonably modified." ECF No. 155 at 28. As support for this proposition, Whirlpool relies on the Sixth Circuit's decision in *Reese*, which applied this circuit's vesting law and held that the CBA at issue granted retirees a lifetime right to health benefits. *574 F.3d at 322-24*. Instead of concluding that the CBA promised *unalterable* benefits, however, *Reese* permitted the employer to make reasonable modifications in accordance with a three-factor test. *See id. at 326* ("the CBA . . . should be construed to permit modifications to benefits plans that are 'reasonably commensurate' with the benefits provided in the 1998 CBA, 'reasonable in light of changes in health care' and roughly consistent with the kinds [*84] of benefits provided to current employees"); *see also Reese II, 694 F.3d at 685-86* (revisiting *Reese* and setting forth more specific factors).

Whirlpool reads *Reese* more liberally than is warranted. It is not a case of general application. Central to its reasoning was the presence of compelling evidence that "the parties did not perceive the relevant CBAs as establishing fixed, unalterable benefits . . . ." *Reese II, 694 F.3d at 684*. In particular, the Sixth Circuit noted that the CBA at issue, although it was similarly worded in comparison with past CBAs, imposed "material alterations" not just to future retirees' benefits but also to *past* retirees' benefits. *Reese, 574 F.3d at 323*. The alterations included the imposition of a "managed care" program upon all retirees, past and future, which not only "represented a reduction in the effective choices of coverage available for all retirees and the coverage actually provided to many, if not most, of them"; *id. at 325*; but also "envision[ed] making tradeoffs in the future that may negatively impact some retirees, if not all retirees . . . ." *Id. at 326*. *Reese* also did not mention the existence of any CBA provision, such as the one in the [*85] present case, requiring changes to be made with the mutual assent of both parties. Thus, the Sixth Circuit concluded that even though our vesting jurisprudence required the conclusion that the CBA promised healthcare benefits to retirees for life, neither the CBA nor the extrinsic evidence supported the finding, under the particular facts of *Reese*, that those benefits were irreducible. *Id. at 324*.

*Reese* is, therefore, wedded to the facts of that case.

2013 U.S. Dist. LEXIS 121750, *85

Judge Sutton, who authored *Reese*, wrote a concurrence denying a rehearing of that case in which he explained that "there was something different about *this case*--something that implicated the distinct question of what 'vesting' means in *this context.*" *Reese v. CNH America, LLC, 583 F.3d 955, 956 (6th Cir. 2009)* (Sutton, J., concurring) (emphases added). Whether the facts of *Reese* are analogous to the facts of this case is a question for another day. Because the Court cannot resolve, at this juncture, the threshold question of whether most Retirees were promised lifetime benefits, it will not proceed to the next questions (and their attendant complexities) of whether those benefits may be reasonably reduced by Whirlpool, and, if so, whether [*86] the actual and proposed reductions are in fact reasonable.

### H. Breach of Fiduciary Duty Claim

Whirlpool also moves for summary judgment with respect to Count III of the Third Amended Complaint, Retirees' breach of fiduciary duty claim. ECF No. 155 at 30. This claim arises from the Authorization Forms executed by the 1993-2003 and 2003-2007 Retirees, and its disclaimer that "[t]he premium cost, share of premium cost, and the medical coverage are all subject to change." ECF Nos. 146 at 18; 155 at 13. Retirees allege that "[e]ven if the Court were to conclude that [the Authorization Forms] . . . could supersede collectively bargained obligations, could be 'binding' on Retirees, and should be interpreted to apply" to the healthcare benefits at issue, then the Authorization Forms would "still nevertheless fail to divest Retirees of their rights" because Whirlpool failed to adequately disclose to Retirees that their execution of these forms would subject their health benefits to unilateral reduction or termination. ECF No. 146 at 18-19.

Because the Court has held that the disclaimer within the Authorization Forms cannot waive or supersede any vested rights, Count III is moot, and Court need [*87] not address its merits.

### IV. Conclusion

Based upon the preceding discussion, the Court issues the following orders with respect to Counts I and II of the Third Amended Complaint:

(1) Retirees' and Whirlpool's motions for summary judgment are each denied as they pertain to the members of Subclass A;

(2) Retirees' motion for summary judgment is denied, and Whirlpool's motion for summary judgment is granted, as they pertain to the members of Subclass B; and

(3) Retirees' and Whirlpool's motions for summary judgment are each denied as they pertain to the members of Subclass C and Subclass D.

Furthermore, Count III of the Third Amended Complaint is moot, requiring no decision as to Whirlpool's corresponding motion for summary judgment.

IT IS SO ORDERED.

August 27, 2013

Date

*/s/ Benita Y. Pearson*

Benita Y. Pearson

United States District Judge