UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| WILLARD L. SLOAN, EUGENE J. WINNINGHAM, and JAMES L. KELLEY, | |
| Plaintiffs, | Case 2:09-cv-10918-PDB-MKM |
| v. | U.S. District Judge Paul D. Borman |
| BORGWARNER INC., BORGWARNER DIVERSIFIED TRANSMISSION PRODUCTS INC., and BORGWARNER FLEXIBLE BENEFITS PLANS, | U.S. Mag. Judge Mona K. Majzoub |
| Defendants. | |

**BORGWARNER'S NOTICE OF SUPPLEMENTAL AUTHORITY**

BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and BorgWarner Flexible Benefits Plans—referred to collectively as "BorgWarner"—hereby notify the Court of *Witmer v. Acument Global Techs., Inc.*, 694 F.3d 774 (6th Cir. 2012) (attached), a supplemental authority relevant to BorgWarner's pending motion for summary judgment. The motion is fully briefed and was argued before this Court on November 7, 2012.

BorgWarner has argued that it is entitled to summary judgment for either of two independent reasons. *First*, as a matter of law, Plaintiffs cannot prove an agreement between the UAW and BorgWarner to vest their retiree health benefits

because, among other things, the parties "agreed to disagree" about whether benefits were vested. (R. 95, Defs.' Mot. 12–16.) *Second*, even if the benefits were vested, the changes BorgWarner made to Plaintiffs' health benefits in May 2009 were reasonable and permissible under *Reese v. CNH America LLC*, 574 F.3d 315, 324–27 (6th Cir. 2009). (R. 95, Defs.' Mot. 16–19.)

*Witmer* confirms the propriety of summary judgment in BorgWarner's favor on the question of vesting. In *Witmer*, the Sixth Circuit affirmed a ruling by Judge Duggan that the retiree health benefits were not vested when the contract reserved the company's right to alter or cancel the benefits even though it also provided for "continuous health insurance." 694 F.3d at 775–76. *Witmer* makes clear that, even if the CBA contains features that may lead courts to find vesting (e.g., tying health benefits to pensions), those features do not evince an intent to vest when the CBA also disclaims vesting. *Id.* The same is true in this case, as the CBAs contain an agreement to disagree on vesting and a reservation of rights, which defeats any inference that BorgWarner may have agreed to vesting in other parts of the CBAs.

*Witmer* provides further support for the entry of summary judgment in BorgWarner's favor.

| | |
|---|---|
| Dated: November 26, 2013 | Respectfully submitted, |
| | s/Joshua David Rogaczewski |
| Elisa Angeli Palizzi (P52088) | Bobby R. Burchfield |
| (angeli@millercanfield.com) | (bburchfield@mwe.com) |
| Miller, Canfield, Paddock and Stone, P.L.C. | Joshua David Rogaczewski (jrogaczewski@mwe.com) |
| 150 West Jefferson, Suite 2500 | McDermott Will & Emery LLP |
| Detroit, Michigan 48226 | 600 13th Street, Northwest |
| 313.496.7635 | Washington, D.C. 20005 |
| 313.963.6420 fax | 202.756.8000 |
| | 202.756.8087 fax |

*Attorneys for BorgWarner Inc., BorgWarner Diversified Transmission Products Inc., and BorgWarner Flexible Benefits Plans*

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2013, I electronically filed the foregoing **BorgWarner's Notice of Supplemental Authority** with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants.

s/Joshua David Rogaczewski
Joshua David Rogaczewski
(jrogaczewski@mwe.com)
McDermott Will & Emery LLP
600 13th Street, Northwest
Washington, D.C. 20005
202.756.8000
202.756.8087 fax

**774** **694 FEDERAL REPORTER, 3d SERIES**

the majority opinion "restrictions threaten to reduce diversity and competition in the marketplace of ideas." *Id.* The majority opinion undermines our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." The majority opinion once again prefers the corporate or establishment side of the case against the iconoclastic individual on his soap box in Hyde Park. I have no idea what Jolivette might do or propose, but he should be given his shot rather than be indentured to the Republican Party because he used to be a Republican.



**Kenneth WITMER; Joseph Olex; Ralph W. Williamson; Edward Pfannes; Raymond Owens, Plaintiffs–Appellants,**

v.

**ACUMENT GLOBAL TECHNOLOGIES, INC.; Platinum Equity; Textron, Inc., Defendants–Appellees.**

**No. 11–1793.**

United States Court of Appeals, Sixth Circuit.

Argued: July 17, 2012.

Decided and Filed: Sept. 17, 2012.

Rehearing and Rehearing En Banc Denied Oct. 22, 2012.*

**Background:** Retired employees filed action alleging that employer violated collective bargaining agreement (CBA) in violation of Employee Retirement Income Security Act (ERISA) and Labor Management Relations Act (LMRA) in not providing lifetime, unchangeable healthcare benefits. The United States District Court for the Eastern District of Michigan, Patrick J. Duggan, J., 2011 WL 2111899, granted summary judgment for employer. Employees appealed.

**Holding:** The Court of Appeals, Sutton, Circuit Judge, held that employer did not promise lifetime, unchangeable healthcare benefits to its retired employees.

Affirmed.

David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation, filed dissenting opinion.

**1. Labor and Employment ⚖1280**

Employer did not promise lifetime, unchangeable healthcare benefits to its retired employees under collective bargaining agreement (CBA), where employer expressly reserved right to modify or terminate benefits.

**2. Labor and Employment ⚖549(1), 1280**

A claim to entitlement to health benefits under a collective bargaining agreement (CBA) is a matter of contract, rather than an issue under ERISA or the LMRA. Labor Management Relations Act, 1947, § 301(a), 29 U.S.C.A. § 185(a); Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**3. Labor and Employment ⚖549(2), 1280**

When retirement-income benefits have not vested due to a reservation of rights, language tying health care benefits to retirement-income benefits demonstrates that the employer did not promise lifetime, unchangeable benefits.

---

**ARGUED:** John R. Canzano, Klimist, McKnight, Sale, McClow & Canzano, P.C., Southfield, Michigan, for Appellants. Donald A. Van Suilichem, Van Suilichem & Associates, P.C., Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** John R.

---

* Judge Dowd would grant rehearing for the reasons stated in his dissent.

**WITMER v. ACUMENT GLOBAL TECHNOLOGIES, INC.** 775
Cite as 694 F.3d 774 (6th Cir. 2012)

Canzano, Klimist, McKnight, Sale, McClow & Canzano, P.C., Southfield, Michigan, for Appellants. Donald A. Van Suilichem, Kelly A. Van Suilichem, Van Suilichem & Associates, P.C., Bloomfield Hills, Michigan, for Appellees.

Before: SUTTON and GRIFFIN, Circuit Judges; DOWD, District Judge.**

SUTTON, J., delivered the opinion of the court in which, GRIFFIN, J., joined. DOWD, D.J. (pp. 780–81), delivered a separate dissenting opinion.

**OPINION**

SUTTON, Circuit Judge.

At stake is whether Acument Global Technologies promised lifetime, unchangeable healthcare benefits to its retired employees. Because the company expressly reserved the right to modify or terminate benefits, we agree with the district court that no such promise was made.

I.

A collective bargaining agreement governs the relationship between Acument Global Technologies and its retired employees. Prior to 2008, the company paid healthcare and life-insurance benefits to qualified retirees. When Acument ended these benefits in 2008, a class of sixty-four retirees claimed that the company had violated the CBA in violation of the Employee Retirement Income Security Act and the Labor Management Relations Act. The district court granted Acument's motion for summary judgment, and the plaintiffs appealed.

II.

[1, 2] Although the plaintiffs bring this claim under ERISA and the LMRA, their entitlement to health benefits is "a matter of contract." *Reese v. CNH America, LLC*, 574 F.3d 315, 321 (6th Cir.2009). The contractual question is this: Did the governing CBA create unalterable lifetime—"vested"—healthcare and life-insurance benefits? The contractual answer is no. The CBA reserved Acument's right to modify or terminate future benefits.

The relevant language appears in "Appendix E" to the CBA, R.98–1 at 22–24, reprinted as its own appendix to this opinion. It starts by saying that "the Company will revise the pension plan established in 1955, hereinafter referred to as the 'Plan,' as follows." It then contains five numbered paragraphs. The first three deal with the use of an insurance company to manage the pension fund and with the company's lack of responsibility for the insurance company's treatment of contributions and pay outs. Paragraph four contains a reservation-of-rights clause. "The Company," it says, "reserves the right to amend, modify, suspend, or terminate the Plan." The fifth paragraph introduces the benefits provided under the Plan, saying that the "[p]rincipal provisions of the pension plan are shown below." What follows are several listed retirement benefits: retiree medical coverage; retirement income; disability income; and life insurance. In addition to describing the benefits, this section of the Appendix identifies the minimum years of service needed to obtain each benefit as well as other eligibility requirements and qualifications.

==The key problem for plaintiffs is that the same document that contains the promise on which they rely ("continuous health insurance" at retirement) contains a reservation-of-rights clause ("reserv[ing] the right==

---

** The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

to amend ... or terminate the Plan"). Their claim for benefits gets nowhere without Appendix E, and yet Appendix E broadly reserves the company's right to change the Plan benefits, using language that is incompatible with a promise to create vested, unchangeable benefits. *See Maurer v. Joy Techs., Inc.,* 212 F.3d 907, 919 (6th Cir.2000).

The language and structure of Appendix E show that the reservation-of-rights clause applies to all benefits listed there, not just to some of them. After describing the company's reservation of rights in paragraph four, paragraph five says that the "[p]rincipal provisions of the pension plan are shown below." Below that are provisions for "retiree medical coverage" and "continued life insurance" alongside retirement-income and disability-income provisions. What Appendix E broadly gives in the form of a wide range of retirement benefits it thus broadly reserves the right to take away or modify.

[3] Nor is the mingling of healthcare and retirement-income provisions an unusual thing to find in a CBA. In point of fact, several of our decisions in this area rely on the tying of eligibility for and vesting of healthcare benefits to the same requirements for retirement-income benefits. *See Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 585 (6th Cir.2006); *see also Tackett v. M & G Polymers, USA, LLC,* 561 F.3d 478, 490 (6th Cir.2009); *Reese,* 574 F.3d at 322–23; *Noe v. PolyOne Corp.,* 520 F.3d 548, 558–59 (6th Cir.2008); *McCoy v. Meridian Auto. Sys., Inc.,* 390 F.3d 417, 422 (6th Cir.2004); *Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 656–57 (6th Cir.1996). "[L]anguage tying health care benefits" to retirement-income benefits, we have held, demonstrates the parties' intent to create vested healthcare benefits as well. *Yolton,* 435 F.3d at 584. If that is true, so too is the opposite: When retirement-income benefits have not vested due to a reservation of rights, "language tying health care benefits" to retirement-income benefits demonstrates that the employer did not promise lifetime, unchangeable benefits. *Id.* Just so here. To rule otherwise would alter the neutral premise of our decisions: by using tying as a relevant benchmark when it shows vesting but treating it as an irrelevant benchmark when it shows lack of vesting. That cannot be.

That particularly cannot be here. This plan not only generally ties eligibility requirements for retirement-income benefits and healthcare benefits together, but it also explicitly provides for them in the same plan and with the same reservation-of-rights clause. More than that, Appendix E provides that some funding for the two benefits may come from the same source. In providing that the company will reimburse the retiree for the monthly cost of Medicare Part B as part of the "retiree medical coverage," the plan says that the company will pay for the benefit "either directly or from the pension fund." The company and the employees thus had one more reason to provide all of these benefits under the same Appendix E umbrella: Some of the healthcare benefits could be funded by the pension fund.

The plaintiffs respond that the "pension plan established in 1955" did not originally cover retiree healthcare benefits. That is true but irrelevant. When the company and the union modified Appendix E to the CBA in the 1970s, they added healthcare benefits and did so by expanding the benefits provided under the pension plan—making healthcare benefits a "[p]rincipal provision of the pension plan." Nothing prevents the parties from defining "the Plan" however they wish and above all from changing it from time to time. That the 1955 plan has been continuously revised is borne out by the preamble to

**WITMER v. ACUMENT GLOBAL TECHNOLOGIES, INC.** 777
Cite as 694 F.3d 774 (6th Cir. 2012)

Appendix E, which explains that "the Company will *revise* the pension plan established in 1955 ... as follows." (Emphasis added.)

The plaintiffs also claim that the "formal pension plan documents" support their position. Br. at 27. Nothing in those documents covers retiree healthcare benefits, they point out, meaning that "the Plan" mentioned in Appendix E must not do so either. That is backwards. The "retirement income plan" documents do not define the scope of Appendix E; Appendix E defines the scope of the relevant plan documents and how and when they can be modified. Because Appendix E contains a healthcare provision, the underlying healthcare documents together with the underlying retirement-income documents provide a complete picture of the "pension plan." The retirement-income documents tell half of the story, and the words of Appendix E require us to consider all of it.

Observing that the healthcare provision grants "[c]ontinous health insurance" to retirees and their spouses "during the life of the retiree," plaintiffs reason that this language creates vested, unchangeable benefits. But this thinking chases the tail of the inquiry. Surely a company can promise "continuous health insurance" *and* reserve the right to modify or end that coverage if it becomes unaffordable. That is all the reservation-of-rights clause does. The continuous-coverage clause at all events serves another purpose: It shows that benefits do not automatically terminate when the CBA expires.

Plaintiffs' invocation of durational layoff benefits submits to the same answer. The CBA gives laid-off employees healthcare benefits "for one year." R.98–1 at 16, 18. Comparing this language to Appendix E's "continuous health insurance" language, the plaintiffs reason that the company must have meant to make retiree medical benefits survive indefinitely. Retiree healthcare benefits, true enough, do not automatically terminate after one year or upon expiration of the CBA. But this adds nothing to what we already know. Appendix E grants lifetime ("continuous") healthcare to retirees, unless, as Appendix E also provides, the company later modifies or ends the benefit.

The plaintiffs make much of the fact that the first three paragraphs of Appendix E speak only in terms of traditional pension (read retirement-income) benefits, suggesting (as they see it) that the reservation-of-rights clause in paragraph four applies only to traditional pension benefits. That might be true in some settings, but it is not true here. The heading the parties gave to Appendix E itself contains this traditional reference, as it is labeled in bold in capital letters: "**PENSION PLAN.**" Yet plaintiffs must agree that this phrase covers non-traditional pension benefits—namely the retiree healthcare and life-insurance benefits listed in Appendix E. Otherwise, they have no claim. The unvarnished reality is that the pension plan, started as a traditional pension plan but over time, and most especially through the revision in the 1970s, the company and the union extended the plan to other benefits. In contracts, as in statutes, it is not unusual for language over time to cover new technologies and new benefits not contemplated when the language first came into being. *See OfficeMax, Inc. v. United States,* 428 F.3d 583, 593 (6th Cir.2005). Unless the parties provide otherwise in the agreement, the original language and reservation of rights travels with the plan through each revision. That is all that happened.

Nor does it make a difference that Appendix E sometimes refers to the "pension plan" and sometimes to the "Plan." As the first sentence of the document indicates, the "pension plan" will be thereafter re-

ferred to as the "Plan." That there is a later mention of "pension plan" in paragraph five, where the parties describe all of the retirement benefits, does not create a material ambiguity. The short-hand term and the two-word phrase cover the same thing. Indeed, there is no other coherent way to read the document. Surely the parties did not mean the "Plan" to refer only to traditional pension benefits and the "pension plan" only to refer to non-traditional pension benefits, thereby omitting "pension" when they meant to refer to pensions and adding "pension" when they meant to refer to other benefits. All benefits are covered by both terms, and the reservation of rights necessarily applies to all of them.

Everything else raised by the plaintiffs—a declaration from Acument's former general counsel, CBA drafting history, plant-closure agreements, retiree letters—amounts to extrinsic evidence. Such extra-contractual intimations of meaning cannot alter the straightforward meaning of the language found within the four corners of Appendix E.

### III.

For these reasons, we affirm.

### APPENDIX "E"

PENSION PLAN

Subject to approval of the Board of Directors and Stockholders, the Company will revise the pension plan established in 1955, hereinafter referred to as the "Plan", as follows:

1. An insurance Company shall be designated by the Company, and a contract executed between the Company and such insurance company, under the terms of which, a pension fund shall be established to receive and hold contributions payable by the Company, interest, and other income, and to pay the pensions provided by the Plan.

APPENDIX "E"—Continued

2. The Company by payment of the contributions or amounts provided in the above mentioned insurance company contract shall be relieved of any further liability, and pensions shall be payable only from the insurance fund.

3. In the event of termination of the Plan, there shall be no liability or obligation on the part of the Company to make any further contributions to the pension fund. No liability for the payment of pension benefits under the Plan shall be imposed upon the Company, the Officers, Directors, or Stockholders of the Company.

4. The Company reserves the right to amend, modify, suspend, or terminate the Plan by action of its Board of Directors provided, however, that no such action shall alter the Plan or its operation, except as may be required by the Internal Revenue Service for the purpose of meeting conditions for qualification and tax deductions under Sections 401, 404, and 501(a) of the Internal Revenue Code in respect of employees who are represented under a collective bargaining agreement in contravention of the provisions of any such agreement pertaining to pension benefits as long as any such agreement is in effect.

5. Principal provisions of the pension plan are shown below, but the individual booklets which will be furnished each participant contain full information and will be based on the contract entered into with the insurance company.

Effective Date

January 5, 2000

ELIGIBILITY

All employees who will have completed five (5) or more years of continuous credited service at retirement.

APPENDIX "E"—Continued

NORMAL RETIREMENT DATE

The normal retirement of all employees will be age sixty-five (65). All employees will be retired on the first day of the month following their 70th birthday or later if required by Federal law.

EARLY RETIREMENT

If you have completed at least five (5) years of credited service, you may retire between age sixty (60) and sixty-five (65). You may elect to receive:

(a) A pension at age sixty-five (65) based on your credited service up to your early retirement date.

(b) A pension beginning at your early retirement date based on your credited service up to that date but reduced in accordance with the early retirement table as detailed in the master pension contract as amended effective January 5, 2000 to provide a new reduction schedule as follows:

    100% at age 62
    85% at age 61
    75% at age 60

RETIREE MEDICAL COVERAGE

Continuous health insurance and prescription drug coverage will be provided to current retirees and those who elect early retirement with fifteen (15) years of service at age sixty two (62) or twenty five (25) years of service at age sixty (60) and regular retirement with fifteen (15) years of service who are sixty-five (65) years of age or older. This coverage is provided for the spouse of retirees only during the life of the retiree, except as provided below. In order to receive this payment, retirees may not be employed full time when Medical/RX coverage is available.

Retirees will be required to apply for Medicare parts (A) and (B). The Company will reimburse the retiree for the maximum of the current monthly cost of Medi-

APPENDIX "E"—Continued

care part (B) coverage either directly or from the pension fund at the option of the company. Eligible employees hired after 12/31/99 will be ineligible to receive company funded retiree medical benefits, except the reimbursement for Medicare part (B) which will be capped at the monthly rate of $45.50. Employees hired before 12/31/99 who retire will be covered for health insurance through (HMO), (PPO), SelectCare Gold, Care Choice Gold or similar plan available at the option of the Company. Benefits will be coordinated with Medicare and all benefits will cease upon death of retiree, unless retiree's spouse is under 65 years of age, in which case benefits for the spouse and dependents children of the retiree, will not cease until spouse remarries or reaches age 65.

RETIREMENT INCOME

Pensions will be in the amounts set forth below per month for each year of credited service at retirement with a maximum of thirty-eight (38) years. Current retirees 1985 through 1987 thirty-seven (37) years maximum 1980 through 1984 thirty-five (35) years maximum, 1974 through '1979 thirty-three (33) years maximum, 1973 and prior thirty (30) years maximum.

An employee retiring with less than five (5) years of credited service is not eligible for benefits.

BENEFIT effective January 5, 2000

  $32.43 times each credited service year 0 thru 9
    Plus
  $34.75 times each credited service year 9.1 thru 14
    Plus
  $42.75 times each credited service year 14.1 thru 19
    Plus
  $43.20 times each credited service year 19.1 thru 24

APPENDIX "E"—Continued

Plus

$43.2 times each credited service year 24.1 thru 38

PAST RETIREE BENEFIT

*Retirees' increased benefits if applicable as set forth in the company proposal will be payable as soon as the program can be revised but not later than May 1, 2000.

VESTED PENSION RIGHTS

Minimum continuous Credited Service–5 years

DISABILITY INCOME

Employees with at least fifteen (15) years of service who are between the ages of 40 and 65 will be eligible for a pension of $30.00 per month for each year of service in the event of total and permanent disability. At age 65, the employee will receive the regular retirement income based on service at disability date. The maximum payment shall be 25 years of service, less workmen's compensation benefits or any other disability payments as provided in the master pension contract, exclusive of social security disability payments. Subject to Internal Revenue Service approval.

No matter respecting the plan or any differences arising hereunder shall be subject to the grievance procedure established in the collective bargaining agreement between the Company and the Union.

CONTINUED LIFE INSURANCE

Continued life insurance shall be provided for employees who are retired under the pension plan in the amount of $12,000.00.

Retired employees will be permitted to purchase additional insurance by buying an individual policy up to a maximum of $38,000 currently without a medical examination at the insurance company's rates.

DOWD, District Judge, dissenting.

Whether the language of a contract is ambiguous is a question of law for the court. Appendix E is at the core of that question in this case.

Appendix E begins by creating a defined term—"Plan"—and uses that defined term consistently in paragraphs 1–4, which includes the reservation of rights clause. Paragraph 5 then switches to the generic undefined term—"pension plan"—below which is listed the "principal provisions of the pension plan."

Following numbered paragraph 5 are three pages of titled, but unnumbered sections. Among those sections is a provision for "RETIREE MEDICAL COVERAGE," which provides "[c]ontinuous health insurance and prescription drug coverage will be provided to current retirees ... This coverage is provided for the spouse retirees only during the life of the retiree, except as provided below.... (Benefits will be coordinated with Medicare and all benefits will cease upon death of retiree, unless retiree's spouse is under 65 years of age, in which case benefits for the spouse and dependents [sic] children of the retiree, will not cease until spouse remarries or reaches age 65.[) ]"

Also following paragraph 5 are two unnumbered sections addressing eligibility and vesting. The vesting section is titled "VESTED PENSION RIGHTS," and requires minimum continuous credited service of 5 years.

The language of Appendix E is poorly drafted and not a model of clarity. At the summary judgment stage, ambiguities and inferences are to be drawn in favor of the nonmoving party. In this judge's view, when that standard is applied to Appendix E, its references to "Plan" and "pension plan" and "continuous health insurance and prescription drug coverage

**GOODYEAR TIRE & RUBBER v. NATIONAL UNION FIRE INS.** 781
Cite as 694 F.3d 781 (6th Cir. 2012)

[for] current retirees and . . . spouses of retirees . . ." and "vested pension rights" are subject to more than one plausible interpretation on the question of whether the benefits at issue are vested or subject to termination.

As a consequence, I would remand this case to the district court for consideration of extrinsic evidence to determine the intent of the parties on the issue of vesting.

For these reasons, I respectfully dissent.



**GOODYEAR TIRE AND RUBBER COMPANY, Plaintiff–Appellant,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Defendant,**

**Federal Insurance Company, Defendant–Appellee.**

No. 11–4145.

United States Court of Appeals, Sixth Circuit.

Argued: July 17, 2012.

Decided and Filed: Sept. 17, 2012.

**Background:** Corporation brought action against first insurer and second insurer, alleging breach of directors and officers liability policies, and seeking reimbursement of legal and accounting costs incurred in defending numerous securities class action and derivative lawsuits and Securities and Exchange Commission (SEC) investigation. Following corporation's settlement with second insurer, the United States District Court for the Northern District of Ohio, Christopher A. Boyko, J., 2011 WL 5024823, entered summary judgment for first insurer. Corporation appealed.

**Holding:** The Court of Appeals, Kethledge, Circuit Judge, held that policy with first insurer did not provide coverage for reimbursement of legal and accounting costs incurred by corporation, absent second insurer's full payment of policy limit.

Affirmed.

1. Insurance ⟳1806, 1807

Under Ohio law, courts construe insurance agreements in accordance with the same rules as other written contracts; that means courts will not rewrite the contract when the intent of the parties is evident, i.e., if the language of the policy's provisions is clear and unambiguous.

2. Insurance ⟳2396

Under Ohio law, terms of exhaustion clause in corporation's excess insurance policy with insurer, which stated that coverage would attach only after second insurer had paid full amount of second insurer's policy limit of $15 million, did not provide coverage for reimbursement of legal and accounting costs incurred by corporation in defending numerous securities class action and derivative lawsuits, absent second insurer's full payment of $15 million.

**ARGUED:** Mark J. Andreini, Jones Day, Cleveland, Ohio, for Appellant. Daniel J. Standish, Wiley Rein LLP, Washington, D.C., for Appellee. **ON BRIEF:** Mark J. Andreini, Jones Day, Cleveland, Ohio, for Appellant. Daniel J. Standish, Cara Tseng Duffield, M. Addison Draper, Wiley Rein LLP, Washington, D.C., for Appellee. Paul A. Rose, Lucas M. Blower, Brouse McDowell, L.P.A., Akron, Ohio, Kevin Drummond Eiber, Caroline L. Marks, Brouse McDowell, L.P.A., Cleveland, Ohio, for Amici Curiae.