UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, JAMES L. KELLEY,
on behalf of themselves and a similarly                    Case No. 09-cv-10918
situated class,

                                                           Paul D. Borman
                    Plaintiffs,                            United States District Judge

v.


BORGWARNER, INC., BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

                    Defendants.
_____/

OPINION AND ORDER
(1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON THE ISSUE OF VESTING AND
(2) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
ON THE ISSUE OF VESTING

This matter is before the Court on the parties' cross-motions for summary judgment.

Defendants filed a Motion for Summary Judgment with Appendices (ECF Nos. 95-101), Plaintiffs

filed a response (ECF No. 112) and Defendants filed a Reply with Appendix (ECF Nos. 113-114).

Plaintiffs filed a Motion for Summary Judgment as to Liability with Appendices (ECF Nos. 102-

105), Defendants filed a Response with Appendices (ECF Nos. 108-111) and Plaintiffs filed a Reply

(ECF No. 115). The Court heard oral argument on November 7, 2012. Following the hearing, the

parties were provided the opportunity to consider whether or not they wished the Court to proceed

first with a determination as to the reasonableness of Defendants' changes to Plaintiffs' health care

benefits before addressing the issue of whether or not Plaintiffs' health care benefits were vested.

1

After learning on August 22, 2013, that both parties did not agree to have the Court proceed with the reasonableness determination and hold the vesting issue in abeyance, the Court agreed to issue its ruling on vesting, but permitted the parties to update or supplement their original summary judgment briefs with supplemental briefs, which both parties filed with the Court on September 16, 2013. (ECF Nos. 124, 125.) In addition, on November 26, 2013, Defendants filed a Notice of Supplemental Authority. (ECF No. 126.)

Having considered all of the above materials, and having heard oral argument, the Court, viewing the facts in the light most favorable to the non-moving party on these cross-motions for summary judgment, denies both parties' motions for summary judgment. "'For cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party.'" *Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005) (quoting *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)). "'The filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate.'" *Id*. (alteration omitted). Accordingly, this case shall proceed to trial on Plaintiffs' claim that their healthcare benefits were lifetime vested.[1]

**INTRODUCTION**

This action involves a contractual claim to lifetime inalterable healthcare benefits for a

---

[1] The parties also filed supplemental authority relating to the issue, relevant only if this Court finds that Plaintiffs' health care benefits were vested, of whether those benefits could nonetheless be unilaterally altered. Because the Court concludes that genuine issues of material fact exist on the underlying issue of vesting, it does not address this secondary issue at this stage of the proceedings.

certified class of Borg Warner[2] retirees and their spouses.  This Court previously certified a class of 1,750 retirees and surviving spouses of retirees who retired from Borg Warner on or after October 27, 1989 and before February 23, 2009, who had been represented by the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America in collective bargaining.  (ECF No. 56, Opinion and Order Granting Class Certification.)  Presently before the Court are the parties' cross-motions for summary judgment on the class members' claimed contractual right to vested (lifetime inalterable) healthcare benefits.  In this Opinion and Order, the Court addresses the issue of whether Plaintiffs' healthcare benefits were vested for life or whether the benefits could be terminated at the expiration of each collectively bargained healthcare agreement.[3]

## I.    BACKGROUND

Borg Warner manufactured transfer cases for four wheel drive vehicles for the automotive industry at its plant in Muncie, Indiana beginning as early as 1908.  (ECF No. 100, Defs.' Mot. Ex. 24, Deposition of Richard Nuerge, October 25, 2011, 9-10.)  The Muncie Plant hourly workers were represented by the International Union and Local 287 ("UAW").  *Id.*  As relevant to this litigation, Borg Warner provided health care benefits to its employees through a series of Collective Bargaining Agreements ("CBAs") and Health Insurance Agreements ("HIAs") for the years 1989-2009.  The health benefits program consists of the CBAs (ECF No. 97, Defs.' Mot. Ex. 15, May 4,

---

[2] "Borg Warner" refers to the Defendants, BorgWarner, Inc., BorgWarner Diversified Transmission Products, Inc. and BorgWarner Flexible Benefits Plans.

[3] The parties' summary judgment motions also address the issue of whether, assuming that the benefits were vested, Defendants' alteration of those benefits is reasonably commensurate with the previously provided benefits.  Only the issue of vesting is addressed in this Opinion and Order.

2012 Declaration of Anthony Behrman, Exs. 1-5) and the HIAs that supplement the CBAs (ECF No. 96, Defs.' Mot. Exs. 1, 4, 5.)  In addition, on September 27, 1990, Borg Warner and the UAW executed an Agreement to modify and extend the 1989 CBA, and on November 30, 1992, Borg Warner and the UAW executed an Agreement to modify and extend the 1989 HIA and the 1990 extension.  (ECF No. 96, Defs.' Mot. Exs. 2, 3.)

Although the Plaintiffs retired under different CBAs and HIAs, the parties appear to agree that the relevant language concerning health care coverage was consistent among each of the CBAs and HIAs.  The parties also do not appear to contest the applicability of the provisions of any of the HIAs at any point in time, despite the fact that some of the HIAs were in fact executed long after the parties began to perform according to their terms.

The instant dispute began with the negotiation of the 1989 CBA, which brought an end to a seven-week strike, a labor dispute that the parties agree was driven largely by disputes related to rising health care costs.  A significant factor driving Borg Warner's desire to reduce its retiree benefit liabilities was a new set of accounting standards promulgated by the Financial Accounting Standards Board ("FASB") that required for the first time that publicly traded companies, like Borg Warner, report their unfunded contractual benefit commitments as a liability.  (ECF No. 98, Defs.' Mot. Ex. 19, Deposition of Laura Champagne, January 13, 2012, 29-31.)  These new FASB regulations created an enormous balance sheet liability for Borg Warner, and for the majority of publicly traded companies, threatening their ability to attract new business and to obtain financing.[4]

---

[4]  *See Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 428-29 (6th Cir. 2010) (noting the FASB regulations "required companies to recognize a liability for the present value of all of their future payments for retiree health care expenditures immediately, rather than including these costs on the company's balance sheet on a pay-as-you-go basis," and if implemented without a change to Detroit Diesel's CBA "could have bankrupted the company by rendering it unable to obtain capital.").

4

During the relevant time frame, 1989-2009, the parties operated under a series of collective bargaining agreements which varied to some degree but each of which contained similar language relevant to the vesting issue.  Article Sixteen of the 1989 CBA, in language that continued unchanged (except as to the relevant termination date) through each of the successive agreements, dictates the duration of the CBA and provides as follows:

> This agreement shall remain in full force and effent [sic] until September 12, 1992 and thereafter from year to year, unless either party shall give notice in writing at least sixty (60) days in advance of September 12, 1992, or any anniversary thereafter of its desire to terminate the Agreement.

ECF No. 97, Defs.' Mot. Ex. 15,  Ex. 1, 1989 CBA, Article Sixteen, p. 142.

Similarly, in language that remained unchanged in pertinent part, Article VIII of the  1989 HIA, executed by Borg Warner and the UAW in conjunction with the 1989 CBA, defines eligibility for retiree health care benefits and provides in pertinent part that:

> Section 1. Presently retired employees and an employee who retires under the Retirement Income Program Agreement on or after December 1, 1989, . . . shall be entitled to the life insurance, Managed Care, basic hospitalization/surgical/medical, prescription drug, major medical, substance abuse, vision, human organ/tissue transplant, and Medical Case Management coverages and procedures, as set forth in Exhibits A, C, D, E, F and H.  Art. VIII, Sec. 1(A).
>
> Section 2.  An employee who terminates employment with the Company on or after January 1, 1991 while participating in the Muncie Retirement Savings Plan shall be entitled to the . . . coverages and procedures as set forth in Exhibits A, C, D, E, F and H.  Art. VIII, Sec. 1(B).
>
> Employees presently or hereafter retired under the Total and Permanent Disability provisions of the Retirement Income Program Agreement . . . shall be entitled to the coverages and procedures set forth in Exhibits A, C, D, E, F and H. Art. VIII, Sec. 2.
>
> Section 3.  The Company will provide the medical coverages and procedures set forth under the provisions of Exhibits A, C, D, E, F and H and will pay the monthly premium for such coverage for:

A.  A surviving spouse and the eligible dependent(s) of a retired employee . . . who is receiving a monthly retirement benefits under Article Eight, Section 3, of the Retirement Income Program Agreement, and

B.  An eligible surviving spouse . . . and the eligible dependents of an employee who terminated employment with the Company while participating in the Muncie Retirement Savings Plan . . .

C. The surviving spouse and the eligible dependents of an employee who was eligible to retire at the time of death under . . . the Retirement Income Program Agreement or . . . the Muncie Retirement Savings Plan . . .

The medical coverages and procedures provided under this Article VIII, Section 3 shall terminate if the surviving spouse or Eligible surviving spouse remarries.

(ECF No. 96, Defs.' Mot. Ex. 1, 1989 HIA, pp. 7-9.)

Also surviving through each iteration of the parties' health care agreements (with modified relevant dates), Article XII of the 1989 HIA contains the following language:

This Agreement and the Plan embodied herein shall become effective as of October 27, 1989, and continue in full force and effect until September 12, 1992.  During the term of this Agreement neither the Company nor the Union shall demand any change in this Agreement nor shall either party be required to bargain with respect to this Agreement . . . .  On September 12, 1992 this Agreement may be terminated, modified, changed or continued in the same manner as provided in Article Sixteen of the aforesaid Collective Bargaining Agreement between the parties hereto dated October 27, 1989.

ECF No. 96, Defs.' Mot., Ex. 1, October 27, 1989 HIA 15.

In Exhibit A to the 1989 HIA, in language that remained unchanged through each iteration of the HIAs from 1989 through 2009, the "Schedule of Benefits," Section II setting forth "Basic Hospital, Surgical and Medical Benefits," the parties agreed, specifically with reference to retiree health care benefits, as follows:

Termination of Coverages Provided Under Exhibit A:  The coverages provided under this Exhibit A terminate on the date that:

(a) the eligible active employee leaves the employment of the Company (see the

6

Agreement and Appendix for the applicable continuation provisions regarding layoff, disability, retirement, or COBRA);

(b) the eligible active employee/dependent or the eligible retiree/dependent is no longer eligible for coverage;

(c) the required monthly premium contribution, if applicable is not made;

(d) the eligible active employee or eligible retiree dies (see the Agreement or Appendix A for the applicable continuation provisions, if any); or

(e) the Agreement is terminated.

(ECF No. 96, Defs.' Mot. Ex. 1, 1989 HIA, Appendix A, Ex. A, § 2(M)(2), p. 65-66.)

The Summary Description of the Plan of Insurance, included within the consecutively-paginated 1989 HIA and before the signature page on that document, and remaining in each successive version of the HIA, states as follows:

FUTURE OF THE PLAN

Although Borg-Warner Automotive Diversified Transmission Products Corporation, Muncie Plant expects and intends to continue the Plan indefinitely, it reserves the right to modify, amend, suspend or terminate the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement.

*Id.* at p. 121.

Both the 1989 CBA and HIA were expressly set to terminate on September 12, 1992, barring a further modification of, or agreement to extend, their terms. Although both sides to the 1989 CBA and HIA performed their obligations under the terms of the agreements, the 1989 HIA was not formally executed by Borg Warner and the UAW until December 10, 1992. (ECF No. 96, Defs.' Mot. Ex. 1, p. 16, 16-B.)

On September 27, 1990, while the parties were performing under the terms of the 1989 CBA and HIA, they negotiated and executed an Agreement on Modification and Extension of Existing

7

Labor Contract (the "ACME Contract"), which extended the 1989 CBA and HIA to March 11, 1995. (ECF No. 96, Defs.' Mot. Ex. 2, 1990 ACME Contract.)  In the ACME Contract, Borg Warner and the Union agreed to certain "Letters of Understanding" that were attached to the ACME Contract, including one entitled "Joint Letter of Agreement on Post-Retirement Benefit Liabilities."  (*Id*. Ex. 3.)  In this Letter of Agreement, Borg Warner and the Union addressed the very vesting issue presented to this Court, setting forth their "agreement to disagree" on the vesting issue as follows:

> The parties . . . hereby acknowledge that medical insurance and life insurance benefits payable to the hourly retirees of DTP Muncie Plant (PRB Liabilities) pose a serious threat to the financial value and competitive status of the DTP Muncie Plant.  The parties further recognize that a significant increase in the PRB Liabilities will occur over the next decade and beyond.
>
>    *      *      *
>
> The parties hereby agree to establish a joint task force in an attempt to seek a solution to the PRB Liabilities issue which is acceptable to both parties and which is intended to reduce the projected total 1999 PRB Liabilities.
>
>    *      *      *
>
> This agreement does not prejudice the union's position that current retirees have life-time vested benefits nor the DTP Muncie Plant's position that current retirees do not have lifetime vested benefits.

(ECF No. 96, Defs.' Mot. Ex. 2, p. 7, Ex. 3.)  In July, 1992, the Joint Task Force issued a report setting forth certain options that the Committee had considered, none of which was binding on the parties.  (ECF No. 112, Pls.' Resp. Ex. 2, July 1992 Summary of the Joint Task Force.)

  Subsequent to executing the 1990 ACME Contract, the parties again extended the HIA on December 10, 1992 and then negotiated and adopted changes to the HIA in March 1995, March 1998, December 2000, and April 2005.  (ECF No. 97, Ex. 15, Exs. 2, 3, 4, 5.)  None of these subsequent HIAs altered any of the language regarding termination of benefits or addressed directly the vesting issue or the 1990 ACME Contract "agreement to disagree" on the subject.  The 1989 HIA was the last completed, signed HIA.

8

Under the 1992 HIA, a new category of retirees was created, Category B Retirees, those hired after December 31, 1992. (ECF No. 96, Defs.' Mot. Ex. 4, 1992 HIA, 9.) Borg Warner agreed to create a Retiree Health Account ("RHA") for Category B retirees to which the company made hourly contributions. (ECF No. 96, Defs.' Mot. Ex. 4, 1992 HIA, 2-3, 9-10.) Category B retirees are not part of the instant lawsuit or the certified class. (ECF No. 102, Pls.' Mot. 3, n.3.)

Under the 1992 HIA, and later the 1995 HIA, Category A Retirees, those future retirees hired prior to January 1, 1993, were divided into subclasses, some of whom were required to participate in a PPO program and some of whom were subject to annual increases in deductibles and stop-loss amounts. (ECF No. 96, Defs.' Mot. Ex.4, 1992 HIA 5, 65, 80; Ex. 5, 1995 HIA 66-67, 82.) There were three subgroups of Category A retirees created under the 1992 HIA, depending upon whether the retiree participated in a new Preferred Provider Option ("PPO") that became effective on January 1, 1993: (1) pre-1993 retirees who were not covered by the PPO because they retired before it came into existence; (2) elective retirees who retired between January 1, 1993 and March 11, 1995, who were given the option of either electing PPO coverage or coverage under the pre-1993 retiree program; and (3) post-March 11, 1995 retirees who were obligated to elect coverage under the PPO. (ECF No. 96, Defs.' Mot. Ex. 4, 5-9; Ex. 5, 5-9; ECF No. 103, Pls.' Mot. Ex. 3, July 17, 2007 Declaration of Jerry French in *Borgwarner v. UAW*, No. 06-0058 (S.D. Ind. 2006), ¶ 14.) Class Representative Winningham and Kelley were subject, as post-March 11, 1995 retirees, to the PPO participation requirement and to these annual deductible and stop loss increases. (ECF No. 100, Defs.' Mot. Ex. 23, Kelley Dep. 11:17-20 (retired in 2001); Ex. 25, Winningham Dep. 9:18-20 (retired in 1996).)

In 1995, the parties entered into a new CBA which carried forward the terms of the 1992

9

HIA, with a term until March 12, 1998.  (ECF No. 97, Defs.' Mot. Ex. 15, Ex. 2, 1995 CBA art. 16, sec. 1, p. 124.)  In 1998, they entered into a new CBA and negotiated a new HIA with terms until March 12, 2001.  (ECF No. 97, Defs.' Mot. Ex. 15, Ex. 3, 1998 CBA art. 16 sec. 1, p. 69; ECF No. 96, Defs.' Mot. Ex. 6, 1998 Tent. HPW Agmt. 1-3; ECF No. 98, Ex. 19, Champagne Dep. 99:15-100:7.)[5]  The 1998 HIA increased certain existing retirees' co-payments for prescription drugs by forty percent for generic drugs and twenty percent for branded ones.  (ECF No. 96, Defs.' Mot. Ex. 6, 1998 HPW Tent. Agmt. 1; Ex. 7, 1998 Health Bens. Summ. 3; ECF No. 100, Ex. 24, Nuerge Dep. 89:24-90:25.)  Class Representative Winningham was subject to this increase.

In 2000 the parties entered into a new CBA and HIA with terms ending March 12, 2006.  (ECF No. 97, Ex. 15, Ex. 4, 2000 CBA art. 16 sec. 1; ECF No. 96, Ex. 8, 2000 Tent. Agmt. 1-2.)  The only relevant change was an increase in deductible and stop loss maximums of 5% for the years 2002-2005.  (ECF No. 96, Ex. 8, p. 2.)  In 2005 they entered into the most recent CBA and HIA which expired on April 24, 2009.  (ECF No. 97, Ex. 15, Ex. 5, 2005 CBA art. 15, sec. 1, p. 117; ECF No. 96, Ex. 9, 2005 Tent. Agmt. 1; Ex. 10, 2005 Tent. Agmt. Clarifications 1-2; ECF No. 98, Ex. 18 Campbell Dep. 48:23-50:14, 63:7-64:1.)  The 2005 HIA included a reduction in health care benefits and monthly contributions for future retirees and included a provision that hourly retirement-eligible employees who were hired before January 1, 1993, could elect to retire on some

---

[5]  The parties never fully drafted 1998 or 2000 HIAs that encompassed the changes to which they agreed.  *See* Declaration of Jerry French, Pls.' Mot. Ex. 3, ¶¶ 11,  22-25.  There is no dispute between the parties of significance to this litigation regarding the changes to the HIA that resulted from the 1998, 2000 and 2005 negotiations.  These issues were relevant, and indeed the French Declaration was prepared, in connection with the separate Indiana litigation which concluded that Borg Warner could not change health care benefits during the term of the then-existing HIA, which did not expire until February 26, 2009.  *See Borgwarner Diversified Transmission Products, Inc. v. UAW*, No. 06-cv-058, 2008 WL 4274476, at *1 (S.D. Ind. Sept. 12, 2008).

date between April 2005 and May 1, 2006, and preserve the same benefits that were available under the 2000 HIA.  (ECF No. 103, Pls.' Mot. Exs. 13, 14.)

In 2006, Borg Warner modified its health insurance coverages, aligning retiree benefits with those of current employees and filed an action in the United States District Court for the Southern District of Indiana seeking a declaration that it was permitted to unilaterally alter its health insurance plan prior to the expiration of the term of the operative HIA.  *Borgwarner Diversified Transmission Products, Inc. v. UAW*, No. 06-cv-058, 2008 WL 4274476, at *1 (S.D. Ind. Sept. 12, 2008).  The changes included requiring payment of monthly premiums, increasing annual deductibles, and increasing co-pays for drugs.  *Id*.  The district court held that Articles V and XII of the 2005 HIA prevented Borg Warner from unilaterally altering retiree benefits during the contract period.  *Id*. at *3.  In a subsequently issued opinion denying Borg Warner's request for a finding on the issue of lifetime vesting, the district court explained that: "[T]he lifetime benefits issue is not properly before the Court because the retirees have a contractual guarantee of benefits until the current collective bargaining agreements expire and the retirees do not seek a declaration of their rights to lifetime benefits."  *Borgwarner Diversified Transmission Products, Inc. v. UAW*, No. 06-cv-058, 2008 WL 4724283, at *3 (S.D. Ind. Oct. 24, 2008).

On February 26, 2009, when the April 2005 HIA expired by its terms, the parties executed a Plant Shutdown Agreement, permanently closing the Muncie Plant and reiterating the "agreement to disagree" contained in the 1990 ACME Contract:

> The Company and the Union have a dispute with respect to the nature of the Company's obligation to provide post-retirement health care benefits to employees who retired prior to February 23, 2009 and their dependents.  Nothing in this Plant Shutdown Agreement affects the parties' rights or positions with regard to that dispute.

(ECF No. 97, Defs.' Mot. Ex. 11, Plant Shutdown Agreement, art. 9, sec. B(2).)

On May 1, 2009, Borg Warner shuttered the Muncie Plant and unilaterally implemented modifications to the health care benefits of all persons who had retired from the Muncie Plant after October 27, 1989, the effective date of the 1989 HIA. Plaintiffs are approximately 1,750 retirees and surviving spouses of retirees who retired from Borg Warner's Muncie Plant under a number of different CBAs and HIAs between October 27, 1989 and February 23, 2009, and now challenge Borg Warner's unilateral modification of their health care benefits.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

(quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." *Pucci v. Nineteenth*

13

*Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

"In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party." *Id.* (alteration in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). "For cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Spectrum Health*, 410 F.3d at 309 (internal quotation marks and citation omitted).

## III. ANALYSIS

### A. Vesting of Collectively Bargained Health Care Benefits - The Analytical Framework

#### 1. Vesting of health care benefits is a matter of contractual agreement.

"A retiree health care insurance benefit plan is a welfare benefit plan under ERISA." *Yolton*

14

*v. El Paso Tennessee Pipeline Co*., 435 F.3d 571, 578 (2006).  Unlike pension plans, which are subject to mandatory statutory vesting requirements, health care benefit plans are creatures of contract, with rights to coverage arising only by virtue of the parties' agreement:

> Unlike pension plans, there is no statutory right to lifetime health benefits.  If lifetime health care benefits exist for the plaintiffs, it is because the UAW and the defendants agreed to vest a welfare benefit plan.  If a welfare benefit has not vested, after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA.

*Yolton*, 435 F.3d at 578 (internal citations and quotation marks omitted).  "If lifetime health care benefits exist for [these Plaintiffs], it is because the UAW and [Borg Warner] agreed to vest a welfare benefit plan."  *Id.*  (citing *Golden v. Kelsey-Hayes Co*., 73 F.3d 648, 654 (6th Cir. 1996)).

The threshold issue, then is whether Plaintiffs and Defendants agreed that retiree health care benefits would vest, i.e. that they would last a lifetime without alteration.  The starting point for this inquiry is the collective bargaining agreement:

> [W]hether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties. Clearly the parties to a collective bargaining agreement may provide for rights which will survive termination of their collective bargaining relationship. The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement.  Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement.

*UAW v. Yard-Man, Inc*., 716 F.2d 1476, 1479 (6th Cir. 1983) (internal citations omitted).  In *Yard-man*, the Sixth Circuit enunciated the important guiding principles of statutory construction that must be applied to determine whether the parties' intent to provide for lifetime vested benefits can be learned by reference to the CBA alone:

> Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit

15

language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

716 F.3d at 1479-80 (internal citations and quotation marks omitted).

The Sixth Circuit recently reaffirmed that *Yard-Man* continues to guide the inquiry into whether the parties to a CBA intended health care benefits to vest:

[C]ourts must first examine the CBA language for clear manifestations of an intent to vest. [*Yard–Ma*n, 716 F.2d at 1479]. Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id*. The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id*. at 1480. Our decision in *Yard–Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id*. at 1482. With regard to the "*Yard–Man* inference," later decisions of this court have clarified that *Yard–Man* does not create a legal presumption that retiree benefits are interminable. *Yolto*n, 435 F.3d at 579. Rather, *Yard–Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id*.

*Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 261 (6th Cir. 2012) (quoting *Noe v. PolyOne Corp*., 520 F.3d 548, 552 (6th Cir. 2008) (modifications in original). Only if the parties' intent cannot be discerned from examining and attempting to harmonize all relevant provisions of the governing CBA is resort to extrinsic evidence appropriate:

16

> When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest. [*UAW*] *v. BVR Liquidating,* Inc., 190 F.3d 768, 774 (6th Cir.1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. [*United Mine Workers*] *v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003).

*Bender*, 681 F.3d at 261-62 (quoting *Noe*, 520 F.3d at 552) (modifications in original). *See also Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1070 (6th Cir. 2008) ("If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper.") (citing *Apogee Coal*, 330 F.3d at 744). "If the issue cannot be resolved by summary judgment, it is now settled that there would be no right to a jury trial of these claims." *Bender*, 681 F.3d at 262 (citing *Reese v. CNH Am., LLC*, 574 F.3d 315, 327–28 (6th Cir. 2009) ("*Reese I*")).

Throughout, Plaintiffs bear the burden of establishing that vesting has occurred. *Bender*, 681 F.3d at 262 ("plaintiffs continue to bear the burden of proving that vesting has occurred"). While *Yard-Man* creates an inference or a "thumb on the scales" in favor of vesting, it does not shift the burden to the Defendant. *Golden*, 73 F.3d at 656 ("*Yard-Man* does not shift the burden of proof to the employer, nor does it require specific anti-vesting language before a court can find that the parties did not intend benefits to vest."). The Sixth Circuit in *Bender* observed that *Yard-Man* suggests an inference in favor of vesting based upon the fact that retiree benefits are "status" benefits which carry with them an inference that they were intended to continue as long as the "status," i.e. that of a retiree, continues to exist. The Sixth Circuit cautioned, however, that the "*Yard-Man* inference" does not alter Plaintiffs' "burden of proving that vesting has occurred," but only acts like "a thumb on the scales" or a "nudge" in favor of vesting where the court first finds either explicit contractual language or extrinsic evidence indicating an intent to vest:

17

> Although no legal presumption arises and plaintiffs continue to bear the burden of
> proving that vesting has occurred, this court will apply the *Yard-Man* inference "so
> long as we can find either explicit contractual language or extrinsic evidence
> indicating an intent to vest."

*Bender*, 681 F.3d at 262 (quoting *Reese I*, 574 F.3d at 321).  Significantly, as neither the union nor

the company is obligated to represent the interests of retirees in future negotiations, and because

healthcare benefits are often considered to be a form of deferred compensation, the *Yard-Man*

inference also serves to support the realization that retired workers likely would not choose to leave

the future of their entitlement to compensation for work performed to the vagaries of future

bargaining units. *See Yolton*, 435 F.3d at 581 n.6, n.8.  *See also Yard-Man*, 716 F.2d at 1482 ("The

employees are presumably aware that the union owes no obligation to bargain for continued benefits

for retirees.  If they forego wages now in expectation of retiree benefits, they would want assurance

that once they retire they will continue to receive such benefits regardless of the bargain reached in

subsequent agreements.").

In the face of express, unambiguous contractual language disclaiming an intent to vest, the

inferences suggested by *Yard-Man* and its progeny cannot be invoked to contradict the explicit

language of the negotiated contracts.  *Linville v. Teamsters Misc. and Indus. Workers Union, Local

284*, 206 F.3d 648, 651 (6th Cir. 2000) ("The *Yard–Man* inference, however, cannot be used to

contradict the express text of the agreement or plan documents.").  In *Linville*, the plan provided

"that '[c]overage ceases when the individual reached age 65.'"  *Id.*  (Alteration in original).  In the

face of such explicit contractual terms cutting off benefits, not present in the CBAs or HIAs in this

case, the Sixth Circuit concluded that "the district court was incorrect in applying the *Yard-Man*

inference . . . ."  *Id.*

2.    **The significance of certain contractual language as evidence of intent.**

In the absence of express contractual language disclaiming an intent to vest, the Sixth Circuit has recognized that the incorporation of certain language in collectively bargained health care agreements can serve as an indicia of an intent to vest health care benefits. All provisions of the controlling collectively bargained agreements, here the CBAs and the HIAs, must be considered in such an endeavor, and construed harmoniously if possible, to arrive at the parties' intent. As *Yard-Man* instructs: "The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion . . . [and a] court should also interpret each provision in question as part of the integrated whole." 716 F.2d at 1479.

a.    **Tying of pension and health care eligibility.**

The Sixth Circuit has repeatedly recognized that language in a CBA that ties eligibility for retiree health care benefits to eligibility for pension benefits manifests an intent to create lifetime health care benefits:

> According to this court, language in an agreement that ties eligibility for retiree health benefits to eligibility for a pension indicates an intent to vest the health benefits. *See McCoy v. Meridian Auto. Sys., Inc*., 390 F.3d 417, 422 (6th Cir. 2004); *see also Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996). In *McCoy*, the agreement between the parties stated: "The Company shall contribute the full premium or subscription charge for Health Care ... for (i) a retired employee (including any eligible dependents) provided such retired employee is eligible for benefits under Article II of the Company's Hourly-Rate Employees Pension Plan." *McCoy*, 390 F.3d at 419. After outlining the applicable law under *Yard-Man* and its progeny, the *McCoy* court held that because the CBA provision "ties eligibility for retirement-health benefits to eligibility for a pension . . . there is little room for debate that retirees' health benefits vested upon retirement." *Id*. at 422. Likewise, the *Golden* court found an intent to vest retiree health benefits because there were "provisions in each of the CBAs ... which tie retiree and surviving spouse eligibility for health insurance coverage to eligibility for vested pension benefits." *Golden*, 73 F.3d at 656; *see also Yolton*, 435 F.3d at 580 (citing *Golden* for the proposition that tying eligibility for retiree health benefits to eligibility for pension benefits indicates an intent to vest).

19

*Noe v. PolyOne Corp.*, 520 F.3d 548, 558 (6th Cir. 2008) (footnote omitted).

In *Noe*, the Sixth Circuit concluded that the following "tying" language served as evidence of an intent to vest health care benefits: "'Employees who retire and who are eligible under the 1979 Employee Benefit Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits described in this Article;'" and also in the language providing that "[e]mployees who retire and who are eligible under this Agreement for a pension (other than a Deferred Vested Pension), shall receive the Major Medical Benefits described in this Paragraph 12.7...."  *Id.* at 559 (quoting the parties' bargaining agreement).  Criticizing the district court for disregarding such tying language, the Sixth Circuit concluded:

> It is evident that the district court failed to appreciate that by tying the eligibility for retiree health benefits to the eligibility for a pension, the EBAs were actually speaking to the duration of the benefits. As we explained in *Golden*, "[s]ince retirees are eligible to receive pension benefits for life," the act of tying retiree health benefits to pension eligibility indicates "that the parties intended that the company provide lifetime health benefits as well." *Golde*n, 73 F.3d at 656 (explaining why the district court in *Golden* correctly focused on the presence of tying language). Here, the EBAs undoubtedly tie eligibility for retiree health coverage to eligibility for a pension, which is evidence of an intent to vest.

*Noe*, 520 F.3d at 559.

**b.    General durational clauses cannot trump a contractual promise for lifetime, vested benefits.**

Several employers have attempted to rely on durational clauses in the parties' collective bargaining agreements as evidence that the parties similarly intended to limit retiree health benefits to the duration of the CBA.  In *Yolton*, *supra*, the Sixth Circuit addressed the relevance of general durational provisions in a CBA to the vesting of retiree health care benefits.  Language in a CBA which contains a general provision stating that the agreement terminates on a specific date will not necessarily demonstrate that the health care benefits provided for in that agreement also terminate

when the CBA expires by its terms.

In *Yolton*, the Sixth Circuit held that the district court did not abuse its discretion in rejecting defendant's argument that a provision in the CBA stating that the health care plan would "run concurrently with [the CBA] and is hereby made part of this Agreement," clearly indicated an intent not to vest health care benefits. The Sixth Circuit rejected the defendant's suggestion that the parties intended that "every time a CBA expires, the company would be free to modify benefits until another CBA is agreed to. Stated another way, retiree's health insurance coverage is subject to change every few years based on new bargaining agreements." 435 F.3d at 580. Similarly, in *Yard–Man*, the Sixth Circuit held that "the inclusion of specific durational limitations in other provisions of the ... collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties' contemplated long term relationship." *Yard–Ma*n, 716 F.2d at 1481–82.

In *Bender*, *supra*, the court found a general durational limitation to be insufficient to create ambiguity regarding an intent for lifetime vesting for retirees:

> Defendants argued in the district court that there was no vesting because each of the CBAs provided that "[t]he insurance program as set forth in Exhibit A is agreed to for the *duration of this contract*." (Emphasis added.)

> However, "[a]bsent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Noe*, 520 F.3d at 554. Unlike the specific limitation on the duration of health insurance for those retiring on or after January 1, 1994, this language was general in nature and did not create ambiguity regarding the intention that medical insurance benefits continue for those who had already retired. *See Maurer*, 212 F.3d at 917–18.

*Bender*, 681 F.3d at 263. In *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907 (6th Cir. 2000), relied on by the Sixth Circuit in *Bender*, the court distinguished general durational clauses that do not

expressly refer to retiree benefits:

> According to Joy, the CBAs' language clearly terminated retiree insurance benefits along with the rest of the CBA provisions by providing that " [t]he basic [CBA], the Pension Agreement, the Group Insurance Agreement, and the Supplemental Unemployment Benefit Agreement, shall remain in full force and effect until midnight [expiration date]," and that "[t]his [CBA] when signed shall supersede all previous supplements and agreements made between the parties except as provided for under the terms of this [CBA]." These clauses are general durational provisions for the entire agreement, and are not clearly meant to include retiree benefits. *See Yard-Man*, 716 F.2d at 1482-83 (general durational clause not necessarily meant to include retiree benefits). Even though the clause makes clear that the insurance agreement terminates after three years, caselaw indicates that the termination of the agreement does not indicate the termination of benefits created by it, if the benefits are intended to vest. *See id. If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees.*

212 F.3d at 917-18 (emphasis added).

In *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064 (6th Cir. 2008), the Sixth Circuit recognized that general durational limits in a CBA, that do not refer specifically to retiree health care benefits, cannot operate to undo contractual promises of lifetime health care benefits:

> [T]he rule in this circuit [is] that general durational clauses cannot trump contractual promises of lifetime retiree healthcare benefits. "[G]eneral durational provisions only refer to the length of the CBAs and not the period of time contemplated for retiree benefits. Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Yolto*n, 435 F.3d at 580-81 (citations and internal quotation marks omitted).

549 F.3d at 1071.

Similarly, in *Noe, supra*, the Sixth Circuit held that the following language in an employee benefit plan was a general durational clause and did not manifest an intent to limit retiree health benefits to the duration of the CBA: "Effective as of April 21, 1979 and for the duration of this Agreement, the Company will provide the following plan of hospital expense benefits,

22

hospital-medical benefits, surgical benefits, prescription drug benefits, dental benefits and major medical benefits...." 520 F.3d at 556. Finding the language indistinguishable from that found to be generally durational in *Yolton*, the Sixth Circuit in *Noe* concluded: "[T]he language in § 12.1 does not specifically refer to retiree benefits; rather, it refers generically to the benefits available for all employees as well as retirees. Hence, the district court incorrectly held that § 12.1 indicates an intent not to vest retiree health benefits." 520 F.3d at 556. Thus, absent contractual language referring to the duration specifically of retiree health care benefits, general durational clauses will not be interpreted as evincing an intent not to vest.

### c.   The significance of specific durational clauses in some provisions but not others.

"The Sixth Circuit has consistently held that the inclusion of specific durational limitations in some provisions, but not others, suggests that benefits 'not so specifically limited, were intended to survive.'" *Moore v. Menasha Corp.*, 690 F.3d 444, 458 (6th Cir. 2012) (quoting *Yolton*, 435 F.3d at 581-82). In *Yard-Man*, the Sixth Circuit acknowledged the interpretive significance of specific limitations on the duration of benefits for other categories of insureds, such as surviving spouses or dependents, as inferring the absence of such limitations on benefits for retirees themselves:

> [T]he insurance provisions limit health insurance coverage for a retiree's spouse and dependent children in case of the retiree's death to expiration of the collective bargaining agreement. While this limitation does not preclude an intent to also terminate the retiree's benefits with the expiration of the collective bargaining agreement in any event, it is more reasonable to infer that the spouse-dependent child provision was meant as an exception to the anticipated continuation of benefits beyond the life of the collective bargaining agreement.

716 F.3d at 1481. *See also Noe*, 520 F.3d at 562-63 (noting that "[t]he presence of specific durational language in other provisions and its absence in the retiree health benefits provisions suggests an intent to vest under our case law" and finding that specific durational language limiting

entitlement to health care benefits in the case of employees on layoff or on leave indicated an intent to vest).

### 3.    The language of an SPD as bearing on intent.

As the Supreme Court cautioned in *CIGNA Corp v. Amara*, __U.S.__, 131 S.Ct. 1866 (2011), provisions of a separately issued SPD generally cannot be enforced as terms of the CBA.  "[W]e cannot agree that the terms of statutorily required plan summaries (or summaries of plan modifications) necessarily may be enforced (under § 502(a)(1)(B)) as the terms of the plan itself." 131 S.Ct. at 1877.  As the Sixth Circuit recognized in *Bender*, acknowledging the Supreme Court's cautionary language in *CIGNA*, "a plan summary cannot vitiate contractually vested or bargained-for-rights."  681 F.3d at 265 (internal quotation marks and citation omitted).  It is well accepted that, in the event of ambiguity in the language of the CBA, an SPD may be considered as extrinsic evidence of intent.  However, the Sixth Circuit has also recognized certain limited circumstances in which it may be appropriate to consider the language of the SPD "'alongside the CBA before reaching the ambiguity issue.'"  *Bender*, 681 F.3d at 264 (quoting "dicta" from *Schreiber v. Phillips Display Components Co*., 580 F.3d 355, 365 n. 12 (6th Cir. 2009)).

First, language in the CBA that explicitly and unequivocally incorporates the terms of the SPD into the CBA may support the Court's consideration of the language of the SPD along with the provisions of the CBA.  *Schreiber*, 580 F.3d at 365 n.12.  In *Bender*, the Sixth Circuit clarified that any such "incorporation by reference" could only occur based upon "explicit incorporation language" in the CBA, leaving no room for doubt that the SPD should be considered on par with the language of the CBA.  681 F.3d at 264-65 (finding that CBAs reference to a "booklet and policy" without any "explicit language of incorporation" was insufficient to support incorporation by

24

reference).

Secondly, the Sixth Circuit has recognized that in limited circumstances, explicit and unqualified language in an SPD that reserves the employer's right to unilaterally terminate or modify benefits can preclude a finding of an intent to vest:

> If an employer includes "unqualified reservation-of-rights language" in an SPD to the effect that the employer has a "unilateral right ... to terminate coverage," and if a union fails to grieve or object to such language, then such reservation-of-rights language "prevent[s] retiree benefits from vesting" even if the SPD was distributed after the effective date of the CBA. *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir.2007); *see Maurer*, 212 F.3d at 919. But there is an exception. No divesting occurs when the SPD contains language reminding readers that "the contracts represent the full commitments between the parties" because a union cannot fairly be expected to protest when the SPD makes it clear that the CBA, not the SPD, controls a conflict. *See Prater*, 505 F.3d at 444-45.

*Reese I*, 574 F.3d at 323.   The touchstone for deciding the weight to be given such language is whether the contested "reservation of rights [is] sufficiently unqualified so as to fairly be expected to prompt an immediate protest by the union." *Bender*, 681 F.3d at 265.   In *Bender*, the Sixth Circuit again recalled this same conclusion from *Prater*, explaining that "the prohibition on unilateral modification in the CBA meant that the union could not be required to protest the SPD as long as 'the summary does not explicitly renounce the CBA.'" 681 F.3d at 266 (quoting *Prater*, 505 F.3d at 455).  *See also Moore*, 690 F.3d at 458-59 ("Only where the SPD states 'an unqualified assertion of a unilateral right to end retiree medical insurance benefits without regard for existing or future CBAs,' do we allow a later-issued SPD to trump the terms of a bargained-for CBA.") (quoting *Bender*, 681 F.3d at 266); *McCoy v. Meridian Automotive Sys.*, *Inc*., 390 F.3d 417, 425 (6th Cir. 2004) (holding that an SPD that seeks to terminate benefits but refers to the underlying CBA, which the union believed vested health care benefits, would not prompt a union protest and cannot vitiate benefits guaranteed under the CBA).

25

4.      The significance of an ROR within the negotiated agreement.

The Sixth Circuit also recently found no inherent incompatibility between a promise of continuous healthcare coverage and a reserved right to discontinue those same promised benefits in the same negotiated agreement.  In *Witmer v. Acument Global Tech., Inc.*, 694 F.3d 774 (6th Cir. 2012), the Sixth Circuit affirmed the ruling of the district court, which had concluded that Acument had not promised lifetime, unchangeable healthcare benefits to its retired employees where it granted lifetime benefits but in the same CBA, reserved the right to amend, modify, suspend or terminate plan benefits:

The contractual question is this: Did the governing CBA create unalterable lifetime—"vested"—healthcare and life-insurance benefits? The contractual answer is no. The CBA reserved Acument's right to modify or terminate future benefits.

The relevant language appears in "Appendix E" to the CBA, R.98–1 at 22–24, reprinted as its own appendix to this opinion. It starts by saying that "the Company will revise the pension plan established in 1955, hereinafter referred to as the 'Plan,' as follows." It then contains five numbered paragraphs. The first three deal with the use of an insurance company to manage the pension fund and with the company's lack of responsibility for the insurance company's treatment of contributions and pay outs. Paragraph four contains a reservation-of-rights clause. "The Company," it says, "reserves the right to amend, modify, suspend, or terminate the Plan." The fifth paragraph introduces the benefits provided under the Plan, saying that the "[p]rincipal provisions of the pension plan are shown below." What follows are several listed retirement benefits: retiree medical coverage; retirement income; disability income; and life insurance. In addition to describing the benefits, this section of the Appendix identifies the minimum years of service needed to obtain each benefit as well as other eligibility requirements and qualifications.

The key problem for plaintiffs is that the same document that contains the promise on which they rely ("continuous health insurance" at retirement) contains a reservation-of-rights clause ("reserv[ing] the right to amend ... or terminate the Plan"). Their claim for benefits gets nowhere without Appendix E, and yet Appendix E broadly reserves the company's right to change the Plan benefits, using language that is incompatible with a promise to create vested, unchangeable benefits. *See Maurer v. Joy Techs., Inc*., 212 F.3d 907, 919 (6th Cir. 2000).

The language and structure of Appendix E show that the reservation-of-rights clause

26

applies to all benefits listed there, not just to some of them. After describing the company's reservation of rights in paragraph four, paragraph five says that the "[p]rincipal provisions of the pension plan are shown below." Below that are provisions for "retiree medical coverage" and "continued life insurance" alongside retirement-income and disability-income provisions. What Appendix E broadly gives in the form of a wide range of retirement benefits it thus broadly reserves the right to take away or modify.

694 F.3d at 775-76.  The Sixth Circuit found nothing inconsistent in the promise of "continuous health insurance" for the "life of the retiree," and the reservation of the right to take those lifetime benefits away: "Surely a company can promise 'continuous health insurance' and reserve the right to modify or end that coverage if it becomes unaffordable. That is all the reservation-of-rights clause does. The continuous-coverage clause at all events serves another purpose: It shows that benefits do not automatically terminate when the CBA expires." *Id.* at 777.

As *Witmer* makes clear, an important distinction must be maintained between a decision to continue health care benefits beyond the life of an existing agreement and a promise to provide those benefits for a lifetime, without change.  While a promise of lifetime benefits may be made, and while that promise may continue through successive iterations of the parties' agreements, conduct on the part of the employer choosing to continue those benefits, or stated otherwise the employer's choice not to exercise its option to discontinue them, cannot negate an original clearly expressed intent to reserve the right to do so.  The District Court in *Witmer,* Judge Duggan, noted this important distinction:

> Plaintiffs contend that extrinsic evidence confirms the parties' intent to vest benefits. Plaintiffs cite the continuation of benefits by Ring Screw and Acument after termination of the relevant CBAs, arguing that this conduct is evidence that the parties understood the CBAs to have vested retirees' health care and life insurance benefits. Acument's conduct fails to establish vesting, as it is entirely consistent with a reservation of rights. Acument did not exercise its right to amend, modify, suspend, or terminate retirees' benefits until late 2007, but the Court cannot presume that Acument's continued provision of benefits waived this right, and Plaintiffs have

27

failed to cite any legal authority holding that delay in exercising one's contractual right constitutes waiver.

*Witmer v. Acument Global Tech., Inc.*, No. 08-12795, 2011 WL 2111899, at *6 (E.D. Mich. May 26, 2011).

### 5.    Consideration of extrinsic evidence.

Only if the parties' intent still cannot be discerned from examining and attempting to harmonize all relevant provisions of the governing CBA is resort to extrinsic evidence appropriate. "When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest." *Bender*, 681 F.3d at 261-62 (quoting *Noe*, 520 F.3d at 552) (citation omitted).   As discussed *infra*, when consideration of extrinsic evidence is appropriate, the company's totality of conduct with regard to its retirees' right to benefits is relevant to whether a promise of lifetime benefits has been made and whether an SPD, or even a CBA, clearly establishes the company's right to unilaterally end retiree medical insurance benefits.

### B.    Borg Warner's Contention That the Parties Never Agreed to Vested Retiree Health Care Benefits

Borg Warner relies on what it asserts is the explicit and unambiguous language of the CBAs and HIAs, and the 1990 ACME Agreement, to support its vesting argument.  It asserts that the Court need not invoke the tools of contractual interpretation suggested by Plaintiffs, i.e. it need not examine and attempt to harmonize various the provisions of these contract documents that Plaintiffs assert support an inference of tying because, in Borg Warner's view, the contract language is unambiguous on the issue of vesting. Borg Warner asserts that it agreed to provide health care benefits to retirees only during the term of each respective HIA, not for the life of the retiree (or the

28

life of the retiree's spouse).  Defendants argue that each HIA had a termination date and that all benefits guaranteed thereunder, including specifically retiree benefits, were terminable at that time. Each HIA gave either party the right to terminate, modify or continue the health care agreement and the benefits thereunder in accordance with the terms of the CBA, which allowed either party to terminate the CBA upon written notice given sixty days' prior to its date of expiration.  Between 1989 and 2005, each HIA that expired was replaced with a subsequent HIA that continued coverage with certain alterations. The final HIA, the 2005 HIA, was terminated according to its terms in the Plant Shutdown agreement.

Defendants contend that each HIA specifically stated that the health care benefits provided in that particular HIA, including expressly retiree benefits, also terminated.  Defendants contend that language contained in each HIA distinguishes this case from the many cases in which the Sixth Circuit has concluded that durational language that does not specifically refer to retirees's healthcare benefits is not sufficient to prove an intent not to vest retiree benefits.  In support of this important distinction, Borg Warner relies on § 2(M)(2) of the 1989 (and successive) HIAs, which expressly refers to retiree benefits and provides that the health care coverages described in the HIA terminate on the date that: (1) the employee leaves employment, i.e. retires, is laid off, is disabled; (2) the employee/dependent is no longer eligible for coverage; (3) fails to make any applicable premium payments; (4) the employee/retiree dies; *or* (5) the HIA is terminated.  (ECF No. 96, Defs.' Mot. Ex. 1, 1989 HIA, Appendix A, Ex. A, § 2(M)(2), pp. 65-66.) (Emphasis added).  Thus, Defendants argue, when Borg Warner chose to terminate the 2005 HIA in 2009, retiree benefits, that had been continued at Borg Warner's option through extensions of successive HIAs from 1989-2005, had expired.

Borg Warner also contends that the 1990 ACME Agreement, along with similar language in the 2009 Plant Shutdown Agreement, expressed a clear and unambiguous refusal on the part of Borg Warner to agree to provide lifetime inalterable benefits for its retirees.  In the 1990 ACME Agreement, an Agreement signed by both Borg Warner and the UAW that modified and extended the parties' 1989 CBA, the parties executed a Letter of Understanding that provided:

> The parties . . . hereby acknowledge that medical insurance and life insurance benefits payable to the hourly retirees of DTP Muncie Plant (PRB Liabilities) pose a serious threat to the financial value and competitive status of the DTP Muncie Plant.  The parties further recognize that a significant increase in the PRB Liabilities will occur over the next decade and beyond.
>
>       *            *            *
>
> The parties hereby agree to establish a joint task force in an attempt to seek a solution to the PRB Liabilities issue which is acceptable to both parties and which is intended to reduce the projected total 1999 PRB Liabilities.
>
>       *            *            *
>
> This agreement does not prejudice the union's position that current retirees have life-time vested benefits nor the DTP Muncie Plant's position that current retirees do not have lifetime vested benefits.

(ECF No. 96, Defs.' Mot. Ex. 2, Ex. 3.)

Borg Warner also relies on Article XII of the 1989 HIA (and each successive HIA), which provides for termination of the HIA pursuant to Article Sixteen, i.e. on 60 days notice prior to its expiration, and also on the Reservation of Rights Clause ("ROR") contained in the Summary Description Information ("SDI") incorporated into the 1989 HIA (and each successive HIA).  The ROR language, which is included within the SDI and was not objected to by the UAW during negotiations that preceded execution of the 1989 HIA in 1992, clearly reserved the right to modify, amend, suspend or terminate the Plan "in accordance with the provisions of the [HIA]."  (ECF No. 96, Ex. 1, 1989 HIA, 121; ECF No. 98, Ex. 19, Champagne Dep. 120.) The HIA, in turn, limits the right to terminate, modify or change the terms of the HIA to the manner provided in Article Sixteen

of the CBA.  The CBA, in turn, permits either party to give notice that the CBA is terminated at least

sixty (60) days in advance of September 12, 1992, or any anniversary thereafter.  Defendants argue

that the UAW's agreement to this reservation of rights language in the HIA itself distinguishes this

case from *Prater* and it progeny because the UAW agreed to this durational limitation on benefits

in a signed contract, not in a separate company-issued SPD.  (Defs. Mot. 15, n. 7.)  Borg Warner

argues that if the ROR was part of the HIA, its reference back to that same contract does nothing to

defeat the express language reserving to Borg Warner the right to modify, amend, suspend or

terminate the Plan in accordance with the sixty day notice provision of the CBA.  *See Witmer*, 694

F.3d at 775-76 (finding nothing inconsistent in promising continuous health insurance for the life

of the retiree but reserving the right at the same time to take those benefits away).

Finally, Defendants submit that by agreeing to changes over the years modifying, and in

some instances decreasing, the healthcare benefits of existing retirees, the parties confirmed that

those benefits were not vested.  Borg Warner points to the 1998 HIA agreements to increase

prescription drug costs for existing retirees who were participating in the network plan and the 2000

HIA agreement to extend, for both existing and future retirees, the annual five-percent increase of

deductibles and stop losses.  As then-current retirees, some Plaintiffs were subject to these annual

increases. Defendants argue that imposition and acceptance of these changes clearly demonstrates

that the parties did not perceive retiree health care benefits to be lifetime inalterable.  Plaintiffs

respond that these changes were negotiated but Borg Warner argues that because existing retirees

were not represented by the Union these changes, as to them, were in effect unilaterally imposed by

Borg Warner.

Defendants submit that their argument, based on the unambiguous language of the negotiated

31

agreements themselves, leaves no room for doubt as to the parties' intent: retiree benefits were guaranteed for the duration of each successive HIA, and never for the life of the retiree.  They contend that the clearly stated "agreement to disagree," coupled with equally clear termination of benefits language in the CBA and HIA, specifically section 2(M)(2) that expressly addresses the termination of retiree health benefits, defeats any effort by the Plaintiffs to prove intent to vest and is fatal to the claims of this post-October 27,1989 class of retirees that Borg Warner agreed to provide them with lifetime unchangeable health care benefits.  Defendants argue that in light of such a clear expression of intent in the plain language of the CBAs and HIAs themselves that retiree benefits *not* vest, the Court need not invoke the interpretive principles developed in *Yard-Man* and its progeny and need not look to extrinsic evidence to divine a contrary intent.  The UAW and Borg Warner retirees, Defendants argue, have been on notice for over two decades that the company denied an intent for their health care benefits to be lifetime, inalterable benefits.  Defendants submit that these facts distinguish this case from cases in which the Sixth Circuit has inferred an intent to vest from harmonizing ambiguous provisions of the governing contract or divined an intent to vest from extrinsic evidence where it found the governing contract language to be ambiguous.

### C.    Plaintiffs' Arguments for Vesting

Plaintiffs characterize the 1990 ACME agreement as a self-serving, "after-the-fact" effort on the part of Borg Warner to deny what it had promised in the parties' agreements.  Although it is undisputed that the 1990 ACME agreement was a negotiated instrument, executed by both Borg Warner and the Union, Plaintiffs assert that the Letter of Understanding containing the "agreement to disagree" language that was part of the 1990 ACME agreement did not change any of the

32

underlying provisions of the collectively bargained 1989 HIA.  Plaintiffs argue that the "agreement to disagree" was nothing more than an agreement to "kick the can down the road" and leave the competing interpretations of the parties' collectively bargained contract language as to vesting for another day.  Plaintiffs assert that the day has now come. Plaintiffs argue that if Borg Warner believed that retiree health care benefits were not lifetime vested under the terms of the 1989 HIA, they could have changed them when the HIA expired in 1992 or 1995.  That Borg Warner did not do so until 2006, Plaintiffs argue, is in and of itself evidence of vesting.

Plaintiffs argue that Borg Warner is trying to accomplish now what it could not accomplish through collective bargaining.  Plaintiffs point to the fact that in 1992, Borg Warner and the UAW did agree to limit retiree health care coverage - but not for these class members.  In 1992 the parties agreed to create a second category of retirees, those hired after December 31, 1992, for whom the company would pay no health care expenses but for whom the company would create a retiree health account ("RHA").   None of these Category B Retirees is a class member and Plaintiffs urge the Court to conclude that because no similar restrictions were negotiated for then-existing employees or retirees (current class members), this is evidence by contrast of an intent that the class members' benefits were vested.

Plaintiffs deny that the contract language unambiguously expresses an intent not to vest retiree health care benefits.  As discussed *infra*, Plaintiffs deny the anti-vesting significance attributed by Borg Warner to the 1990 ACME "agreement to disagree" and they dispute Borg Warner's interpretation of § 2(M)(2) of the HIAs.  Plaintiffs urge the Court to find a promise of lifetime retiree medical benefits through an examination of other provisions of the CBA and HIA that they argue suggest an intent to vest health care benefits under the interpretive principles

33

discussed above that have been developed and applied in the Sixth Circuit. *Yard-Man* instructs that the Court "should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent," but cautions that "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." 716 F.2d at 1479.

### 1.     Tying eligibility for health care benefits to eligibility for pension benefits.

Plaintiffs rely principally on the language of Article VIII of the HIA, which they argue unconditionally ties eligibility for receipt of health care benefits to eligibility for pension benefits in multiple different contexts. Because pension benefits are vested (lifetime inalterable), Plaintiffs reason, then so are the health care benefits, for which pension benefit recipients become eligible under the HIA. Plaintiffs urge the Court to focus on Article VIII of the HIA, which Plaintiffs argue controls the issue of eligibility for health care benefits and evidences the parties' intent to create lifetime, inalterable health care benefits because it ties pension benefits (lifetime) to health care benefits (therefore by inference also lifetime).

In support of this argument, Plaintiffs rely on *Golden*, *Noe* and similar cases, discussed *supra*, in which the Sixth Circuit has recognized that language in a CBA that ties eligibility for retiree healthcare benefits to eligibility for pension benefits manifests an intent to create lifetime benefits. It is undisputed that several provisions of Article VIII, which governs eligibility for retiree health care benefits under the HIA, do contain "tying language" that is largely indistinguishable from that found by the Sixth Circuit in *Golden*, *Yolton*, *Noe* and other cases to indicate an intent to vest health benefits. Article VIII defines who shall be entitled to the health care and other benefits set forth in various exhibits attached to and made a part of the HIA and on what conditions. These

34

provisions are set forth *supra*, but by way of summary, they generally provide that employees "who retire under the Retirement Income Program Agreement [or other company retirement programs]. . . shall be entitled to" the benefits set forth in the HIA. In Section VIII, the company agrees to provide medical coverage for surviving spouses and dependents of retired employees who are "receiving a monthly retirement benefit[]," or who were "eligible to retire at the time of death under" the company retirement programs. Such contractual provisions, in the absence of a finding of express anti-vesting contractual language, suggest the inference that retirees would receive health care benefits as long as they retained the "status" of a retiree.

### 2.    The significance of general durational clauses.

Plaintiffs argue that the absence of a specific durational clause relating expressly to retirees puts the instant HIAs squarely within the line of cases holding that general durational clauses, those that purport to limit medical insurance benefits to the duration of the operative contract, do not manifest an intent not to vest retiree health care benefits. "These clauses are general durational provisions for the entire agreement, and are not clearly meant to include retiree benefits." *Maurer*, 212 F.3d at 918. *See* discussion *supra* at section IIIA2b. Borg Warner does not dispute the proposition that general durational clauses will not, standing alone, preclude vesting. Borg Warner argues, however, that this case is to be distinguished from the *Maurer/Bender* line of authority because here retiree health care benefits are specifically set to terminate with the expiration of each HIA in Exhibit A, Section 2(M)(2)(e). Defendants argue that this section of the HIA, which expressly addresses the termination of health care benefits for both active employees and retirees, provides the specific durational limitation that the Sixth Circuit found lacking in cases such as *Yolton*, *Maurer*, *Noe* and *Bender*. As Borg Warner points out, this termination provision controls

35

each type of benefit specified in the Exhibits to the HIA, many of which specifically define retiree benefits.  (HIA Exs. A, C, D, E, F and H.)

Plaintiffs respond that subsections (a) and (d) of § 2(M)(2) specifically refer to the applicable coverage continuation provisions for retirees and dependents "in the Agreement and/or Exhibit A," which in turn refer to Article VIII of the HIA, in which eligibility for pension and health care benefits are tied together and therefore such benefits do not terminate but continue as set forth in the HIA.  Plaintiffs do not deny that § 2(M)(2) specifically refers to retiree benefits – rather they urge the Court to disregard subsection (e).  At oral argument, Plaintiffs' counsel argued that the Court need never "get to" subsection (e) because "if a person retires, then you look at [a], and if a person, a retiree, dies, then you look at [d]."  (ECF No. 119, Transcript of November 7, 2012 Hearing at 56.)  Plaintiffs argue that "if the coverages end when the agreement is terminated, then there's no reason for [a, b, c, or d]."  (*Id.*)  Borg Warner reads this section differently.  They assert that subsections a-d do have force and effect and will govern – when the HIA is in effect.  In other words, if a person dies or retires during the term of the HIA, then the continuation provisions of the HIA apply, etc.

The parties have presented the Court with reasonable competing interpretations of this contractual provision, leading the Court to conclude, at this stage, that the provision is ambiguous. As the district court noted in *Zino v. Whirlpool Corp.*, No. 11-cv-01676, 2013 WL 454418 (6th Cir. Aug. 27, 2013), in finding the language of the CBAs there to be subject to competing reasonable interpretations:  "'Where a contractual provision is subject to two reasonable interpretations . . . that provision is deemed ambiguous and the court may look to extrinsic evidence - additional evidence that reflects the intent of the contracting parties - to help construe it.'" 2013 WL 4544518, at *16

36

(quoting *In re AmTrust Fin. Corp.*, 694 F.3d 741, 750 (6th Cir. 2012)).

### 3.    Specific limitations in some provisions but not others.

"The Sixth Circuit has consistently held that the inclusion of specific durational limitations in some provisions, but not others, suggests that benefits 'not so specifically limited were intended to survive.'" *Moore*, 690 F.3d at 458 (quoting *Yolton*, 435 F.3d at 581-82). *See* discussion *supra* at section IIIA2c.  Plaintiffs cite several sections of the HIAs in which the parties agreed to specific durational limitations on health care benefits for non-retirees, such as in the case of active employees on leave or surviving spouses who remarry.  (ECF No. 102, Pls.' Mot. Summ. Judg. 14-15.) Significantly, Article VIII grants benefits to surviving spouses as defined by their eligibility for a lifetime pension but also limits the surviving spouse's right to continue receiving benefits upon his or her remarriage.  This specific limitation on a surviving spouse's continued receipt of benefits suggests, Plaintiffs argue, that the absence of such limitation elsewhere evidences an intent to vest in the absence of remarriage.  By implication, Plaintiffs argue, no limitation is intended barring the occurrence of remarriage.  Plaintiffs argue that it would be an untenable construction of the HIA to find that surviving spouses were entitled to lifetime benefits (i.e. coverage defined by eligibility to receive a monthly pension, which is lifetime inalterable) but that retirees were not – that spouses were granted greater coverage than the retirees themselves.  (ECF No. 102, Pls.' Mot. 12-13.)

Plaintiffs also point to provisions that have specific durations for the specified benefits, such as 24 month transition survivor benefits and bridge income benefits that are specified to last until the recipient reaches the age of 62 or remarries.  (*See, e.g.* Pls.' Ex. 7, pp. 29, 31.)  Plaintiffs argue that under *Yard-Man*, *Golden* and *Bender*, these specific limitations on the benefits available to "non-retirees" indicate that benefits provided to retirees were vested and unlimited.  They also argue

that the provision for these benefits, which in many cases will last longer than the HIA which govern them, would be entirely illusory if the benefits ceased upon termination of the HIA.  (ECF No. 115, Pls.' Reply 2.)

Borg Warner responds that the express limitation on particular benefits for certain categories of beneficiaries, i.e. spouses, dependents and laid off employees, cannot trump what it interprets as the specific durational clause (2(M)(2)) that it interprets as specifically limiting retiree benefits. However, as the Court has already concluded, the plain language of 2(M)(2) is ambiguous.  Under the interpretive principles applied in this Circuit, these specific limitations on benefits for spouses and other non-retired employees, in the absence of a finding of express anti-vesting contractual language, suggest an inference of vesting of retiree health care benefits.

### 4.    The SDI and reservation of rights language within the HIA.

Both parties agree that in this Circuit, separately issued SPDs that conflict with the language of the governing CBA are not binding.  In this case, language reserving the right to Borg Warner to terminate the retiree health care benefits at the termination of the contract that created them appeared in each iteration of the HIA itself.  Beginning with the 1989 HIA, each HIA contained a section entitled Summary Description Information ("SDI") containing a reservation of rights ("ROR") clause stating Borg Warner's intention to continue benefits but expressly reserving the right to modify or  discontinue those benefits. (*See, e.g.,* ECF No. 96, Defs.' Mot. Ex. 1, 1989 HIA, p. 121-23 of 129.)

The SDI provides that the Borg Warner Plan is "maintained pursuant to a Collective Bargaining Agreement and a Health Insurance Agreement."  (ECF No. 102, Pls.' Mot. Summ. Judg. Ex. 2 p. 121, Ex. 5 p. 130, Ex. 6 p. 132.)  The reservation of rights provision states as follows:

38

FUTURE OF THE PLAN

> Although Borg-Warner Automotive Diversified Transmission Products Corporation, Muncie Plant expects and intends to continue the Plan indefinitely, it reserves the right to modify, amend, suspend or terminate the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement.

(*Id*.)  This language appearing as it does within the HIA distinguishes this case from others, such as *Bender* and *Prater*, where an SPD is referred to generically in the negotiated agreement and later distributed to employees and the union, who would then have the onus of reviewing and objecting to the SPD separate and apart from the negotiated agreement.

Plaintiffs argue, however, that the SDI and specifically the ROR, although concededly "in the HIA," were not actually "negotiated" by the parties.  (ECF No. 102, Pls.' Mot. 17; ECF No. 112, Pls.' Resp. Summ. Judg. 7-8; ECF No. 115, Pls. Reply.)  Plaintiffs assert that "SPDs are not negotiated instruments," and that the ROR that appears in the SDI that is part of the HIA was drafted by Borg Warner and was not mutually negotiated.  *Id*.  Plaintiffs do not deny that the SDI and ROR appear within the HIA but insist that, although appearing as part of the HIA, the SDI containing the ROR was prepared by Borg Warner and merely "appended" to the end of the 1989 HIA.

Plaintiffs argue that even if the SDI language had been negotiated and agreed to by the Union, it is by its terms "subject to" the provisions of the HIA, which Plaintiffs interpret as providing lifetime, inalterable medical benefits.  But the ROR language would be rendered entirely illusory under this interpretation as it reserves a right to take action, i.e. modification, amendment or termination of health care benefits, allegedly forbidden by the same negotiated instrument in which it appears.  As Judge Sutton recognized in *Witmer*, it is possible to construe such competing provisions appearing in the same negotiated contract harmoniously:

39

> Observing that the healthcare provision grants "[c]ontinuous health insurance" to retirees and their spouses "during the life of the retiree," plaintiffs reason that this language creates vested, unchangeable benefits. But this thinking chases the tail of the inquiry. Surely a company can promise "continuous health insurance" and reserve the right to modify or end that coverage if it becomes unaffordable. That is all the reservation-of-rights clause does. The continuous-coverage clause at all events serves another purpose: It shows that benefits do not automatically terminate when the CBA expires.

*Witmer*, 694 F3d at 777. Given that Borg Warner and the Union both "acknowledge[d]" in the 1990 ACME Agreement that "medical insurance and life insurance benefits payable to the hourly retirees of DTP Muncie Plant (PRB Liabilities) pose a serious threat to the financial value and competitive status of DTP Muncie," it would be possible under the logic of *Witmer* to construe the ROR in this case consistently with a simultaneous grant of lifetime retiree medical benefits.

This SDI presents a novel question. Here, the SDI and ROR provision appeared within the formally executed HIA, located among the consecutively numbered pages of the HIA. This supports Borg Warner's argument that this was not a standard subsequently-issued SPD and supports the argument that the reservation of rights was part of the HIA. Since the language appears within the HIA that was executed by the parties, Borg Warner argues, it is part of that binding contract and, under the logic of the Sixth Circuit's decision in *Witmer,* what the HIA may give it may also take away. This HIA, Borg Warner argues, does just that.

Sidestepping this argument somewhat, Plaintiffs argue that the ROR language should be analyzed as a standard separately issued SPD and assert that a reservation of rights clause in such an SPD must "include an unqualified assertion of a unilateral right to end retiree medical insurance benefits without regard for existing or future CBAs" in order to effectively vitiate an intent to vest. *Bender*, 681 F.3d at 267. Plaintiffs argue that this ROR contains no such unqualified assertion, asserting in their reply brief that "the SPDs also specifically provide that Defendants' ability to

40

modify, suspend or terminate the Plan or policies is *subject to* the provisions of the HIAs." (ECF No. 115, Pls.' Reply 2.) (Emphasis added.) This is not what the ROR states. The ROR states that Borg Warner "reserves the right to modify, amend, suspend or terminate the Plan or the Group Policies therein *in accordance with* the provisions of the Health Insurance Agreement." (Pls.' Mot. Ex. 2, p. 121; Ex. 5, p. 130; Ex. 6, p. 132.) (Emphasis added.)

Even if the Court were to disregard the fact that the SDI and ROR appear in the negotiated and formally executed HIA and were to analyze the SDI under principles applicable to a standard, separately issued SPD, whether this ROR constitutes an "unqualified reservation-of-rights" made "without regard for existing or future CBAs," presents another contractual ambiguity. Plaintiffs suggest that the language employed in this reservation of rights, i.e. "in accordance with" the provisions of the HIA, is "nearly identical" to the language used in *Bender*, *Prater* and other cases, i.e. "subject to the provisions of" the HIA. But "in accordance with" as used in this ROR does not necessarily carry the same connotation as "subject to the provisions of." To be enforceable, a reservation of rights must identify a procedure for termination, modification or amendment. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 79-80 (1995). In this case, the ROR provides that modification or termination must be "in accordance with" the provisions of the HIA. The HIA, in turn, limits the right to terminate, modify or change the terms of the HIA to the manner provided in Article Sixteen of the CBA. Article Sixteen of the CBA, in turn, permits either party to give notice that the CBA is terminated at least sixty (60) days in advance of September 12, 1992, or any anniversary thereafter. By specifying that termination or modification must be "in accordance with" the provisions of the HIA, the reservation of rights reasonably could have been specifying only the procedure by which such changes must be made. Nor does the SDI contain separate language, found

41

controlling in other cases like *Reese*, that reminds readers that the CBA is the governing agreement and that in the event of a conflict, the CBA controls. *Reese*, 574 F.3d at 323. Were the Court called upon to reach the issue of whether this ROR constitutes an "unqualified reservation-of-rights" made "without regard for existing or future CBAs," it would face another contractual ambiguity.

Viewing the facts as the Court must in the light most favorable to the non-moving party, genuine issues of material fact exist as to whether or not the language of the SDI, although appearing within the HIA, should nonetheless be analyzed under principles applicable to a standard company-generated, non-negotiated SPD. Borg Warner argues that the SDI in this case was part of the HIA and that, under *Witmer*, Borg Warner could take away with one hand what it granted with the other. But this is an unusual presentation of a summary description and the facts of this case are not as clear as those before the court in *Witmer*, where there was no dispute that the ROR, which did not appear in the context of a "summary description," was a negotiated provision the parties' CBA. Plaintiffs point to witness testimony in this case that the SDI was not negotiated, that it was drafted by Borg Warner and was placed at the end of the HIA without input from the Union. This of course does not answer the question why the Union proceeded to execute a contract containing this language. But the Court concludes that these ambiguities and questions of fact preclude a finding at this stage, based on the HIA language alone, that the SDI was a negotiated provision of the HIA itself or that the ROR reserved a unilateral right to terminate without regard to the existing CBA.[6]

---

[6] Even if the exception for unqualified reservation of rights does not apply, it is well accepted that the summaries and their creation nonetheless 'serve as extrinsic evidence regarding the extent of the employer's promise of future healthcare benefits and whether the parties intended the benefits to vest.'" *Bender*, 681 F.3d at 267 (quoting *Prater*, 505 F.3d at 445). In this case, it is undisputed that Laura Champagne, the head negotiator for the UAW, reviewed the 1989 HIA, provided the Union with her comments on the entire agreement, including the SDI provisions, and registered no specific objection to the ROR language, indicating that the SDI language was acceptable to the UAW. This

**5.      Miscellaneous provisions relating to an intent to vest.**

Plaintiffs argue that the negotiation of a less generous benefits structure in the 1992 HIA for

"Category B Retirees," i.e. those who were hired after 1992, and the creation of a window of

opportunity in the 2005 HIA for active employees to retire and maintain the more favorable benefits

available under the 2000 HIA, indicates that healthcare benefits for Category A retirees in the

Plaintiff class, whose benefits were untouched and continued, were vested and untouchable.  (Pls.'

Mot. Summ. Judg. 15-17.)  Plaintiffs rely again on *Bender*, where the court found that negotiated

changes providing less favorable benefits for future retirees were relevant because they "contrast

with the simultaneous continuation of health insurance benefits for employees retiring *prior* to the

change."  681 F.3d at 263 (emphasis in original).  The court found that "the prospective reduction

of post-retirement healthcare benefits offered an obvious incentive for employees to retire" early so

that they could take advantage of the promise of the more favorable healthcare benefits that were

offered pre-1986. *Id*.  Importantly, the court in *Bender* had already found that pre-1986 the benefits

were vested.  Borg Warner responds that in this case, the benefit structure under which the

employees were offered early retirement, i.e. the 2000 HIA benefits, were already subject to the

agreement to disagree and were non-vested benefits.  So, from Borg Warner's perspective, these

arguments have no traction where the "more favorable" benefit package was itself not vested.  Yet,

---

review by the Union was done in October, 1992, before the parties actually executed the 1989 HIA
in December, 1992 and after the parties had expressed their disagreement over the vesting issue in
the 1990 ACME Agreement. (ECF No. 98, Defs.' Mot. Ex. 19, Champagne Dep. 119-120; ECF No.
109, Defs.' Resp. Exs. 29, 30, 31, Communications from Laura (then Hess) to Borg Warner.)
Testimony of Ms. Champagne, as discussed *infra*, demonstrates that this reservation of rights
language, although accepted in 1992 as part of the 1989 HIA, was problematic for the Union and
was believed by Ms. Hess to be inconsistent with a promise of lifetime vested benefits.

as Plaintiffs point out, in creating the Category B retirees in the 1992 HIA, Borg Warner used specific nonvesting language that is conspicuous by its absence from prior explanations of benefits as they relate to Category A retirees: "The company shall have no liability for providing health care coverage or paying health care expenses after such employees [Category B retirees] terminate employment."  That language, say Plaintiffs, explicitly disclaims an intent to vest, but not as to Category A retirees, the Plaintiffs in this action.

Plaintiffs also argue that the parties' agreement in 1992 to a ten-year schedule of deductibles and stop losses that would outlive the 1992 and 1995 HIAs demonstrates an intent to vest benefits. Plaintiffs rely on *Cole v. ArvinMeritor, Inc.*, 515 F. Supp. 2d 791, 801 (E.D. Mich. 2006), where the court found that cost sharing of premium increases for retiree benefits that were scheduled to govern retiree health costs "decades after expiration of the agreements in which they appear," were "future oriented" and indicated an intent to vest underlying retiree healthcare benefits.  In this case, Borg Warner argues that while it was under no obligation to continue providing benefits after the expiration of the 1995 HIA in 1998, it also had no intention in 1992 of not doing so.  Therefore, making a ten year commitment was not inconsistent with also having the ability to chose *not* to continue to provide benefits.  Borg Warner's delay in exercising their termination rights after the expiration of each HIA cannot amount to a waiver of that right.  *Witmer*, 2011 WL 2111899, at *6.

The Court concludes that these provisions cut both ways.  While future oriented promises of benefits can indicate an underlying intent to vest, Borg Warner is correct that making such promises is not inherently inconsistent with reserving the right to retract that promise, as *Witmer* demonstrates.

44

### D.        Extrinsic Evidence on The Issue of Vesting

If an intractable ambiguity persists after the Court has carefully examined the provisions of the collectively bargained agreements, the Court must turn to extrinsic evidence in an effort to discern an intent to vest.  Plaintiffs offer the testimony of some former Borg Warner employees who testified to their belief that their health care benefits were guaranteed to remain unchanged for life. *See* ECF No. 109, Defs.' Resp. Ex. 33, Jan. 6, 2012 Deposition of LaRue Cross, 56-60; ECF No. 99, Defs.' Mot. Ex. 21, Dec. 16, 2011 Deposition of Michael Ailes, 113-115; ECF No. 100, Defs.' Mot. Ex. 23, Feb. 14, 2012 Deposition of James Kelley, 17-18; ECF No. 100, Defs.' Mot. Ex. 25, Feb. 14, 2012 Deposition of Eugene Winningham, 33-36.  Most of these witnesses could not recall seeing such a promise in writing but believed it to be the case.  Some recalled seeing a pamphlet that stated as much, but no such pamphlet was ever produced.  Some recalled statements by Borg Warner personnel informing them that their medical benefits were guaranteed to continue unchanged for their lifetime.

Plaintiffs also offer the testimony of Laura Champagne (formerly Hess), the head negotiator for the UAW of the 1992 HIA and also a consultant in 1995, who testified to her belief that because the CBA tied pension benefits to health care benefits, the latter were guaranteed for life.  (ECF No. 98, Defs.' Mot. Ex. 19, Champagne Dep. 43-45.)  Ms. Champagne testified to her belief that the language of the HIA tying eligibility for healthcare benefits to eligibility pension benefits was proof that retiree healthcare benefits were lifetime vested.  Plaintiffs argue that even though Ms. (Hess) Champagne reviewed and approved the SDI reservation of rights language in the 1989 HIA, there was no reason for her to object to this language because it was clear that the right to modify or terminate circled back to the HIA and to the promise of vesting contained therein.  Plaintiffs state

45

that: "The UAW had no reason to object to the SPDs because they did not undermine or negate the HIA's vesting language for health care benefits for retirees and surviving spouses." (ECF No. 115, Pls.' Reply 4.)  In *Bender*, it was this "qualified" aspect of the reservation of rights language in that case, circling directly back to the CBA, that led the court to conclude that it did not preclude vesting.

In order for a reservation of rights clause to preclude the finding of an intent to vest, it must be "sufficiently unqualified so as to fairly be expected to prompt an immediate protest by the union." *Bender*, 681 F.3d at 265.  In this case, Plaintiffs' suggestion that the reservation of rights language was of no concern to the Union because it clearly circled back to the HIA is undercut by Ms. Champagne's testimony regarding her comments on a 1995 draft of the HIA.  Although Ms. Champagne approved the reservation of rights language in 1992, in fact she believed that the language directly contravened an intent to vest.  In her comments on a draft of the 1995 HIA, which contained identical reservation of rights language, Ms. Champagne registered a staunch protest to the very same language that she had passed on in 1992:

> Q:    Can you turn to page 103? At the bottom there's a section, "Future of the Plan," section.  Why does the first paragraph have lines running through it?
>
> A:    Because – one of the things that I was trying to do in this document was totally clean it up . . . [a]nd what this says in terms of the future of the plan, is that it reserves the right to modify, amend, suspend or terminate the plan – or the group policies therein in accordance with provisions of the Health Insurance Agreement.  And my thing is saying the Company must replace terminated because benefits must be continued.
>
> And, again, it's a question of getting away from the language. They just can't terminate a policy and leave it go. They have to have some provision for continuing the benefits.
>
> Q:    Can I ask you to get out Exhibit 19 again and turn to page 121? My question is how does the Future of the Plan section

46

in the signed 1989 document differ from the language in the
draft '92 Agreement?

A:    It's the same.

(ECF No. 98, Defs.' Mot. Ex. 19, Champagne Dep. 130-31.)

Here, the Union representative, who was firmly of the belief that Borg Warner promised
healthcare benefits that were vested for life, interpreted this language as directly contradicting that
guarantee. Yet, despite Hess's belief that this language was inconsistent with an intent to vest, the
language remained in every iteration of the HIA, supporting Borg Warner's position that it reserved
the right in the HIA to "terminate" benefits at the expiration of each HIA. This extrinsic evidence
demonstrates that this language prompted a protest from the Union, but the Union never obtained
a modification of this language.

Plaintiffs also submit that the testimony of Borg Warner lawyer Regis Trenda about the
drafting of the last paragraph of Exhibit 3 to the 1990 ACME Agreement, i.e. the "agreement to
disagree," supports their contention that Borg Warner believed that the retiree health care benefits
vested for life. Trenda testified that before the language ultimately adopted was agreed to, Jack
Reising, the Borg Warner Human Resources Manager involved in negotiation of the 1989 HIA, sent
Trenda language that acknowledged and agreed that the post-retirement benefits are guaranteed for
the lifetime of the retiree. (ECF No. 112, Pls.' Resp. Ex. 3, Trenda Dep. 151.) Trenda testified that
he talked to Mr. Reising and made him aware of the company's position that there is no guaranteed
lifetime post retirement health care benefits. *Id.* In his deposition, Mr. Reising testified that he
never believed that the company had agreed to lifetime vested benefits and that he may have
provided Trenda with a Union proposal that sought to have that language adopted as part of the
process of trying to move the discussions of the task force forward but that he, Reising, never

47

believed that the company had ever agreed to vested lifetime benefits. (ECF No. 112, Pls. Resp. Ex. 4, Reising Dep. 98-104.) Indeed, on August 4, 1989, Reising sent a letter to Allan Dulaney, the chairman of the negotiating committee for the Union, that the "Company is not obligated to continue health insurance coverage for retirees and their dependents. However, the Company will continue through September, 1989 all coverages applicable to retirees, except prescription drug coverage . . . ." (ECF No. 109-1, Defs.' Resp. Ex. 26, Aug. 4, 1989 Letter from Reising to Dulaney.)

Shortly thereafter, Reising wrote a letter explaining the Company's position on retiree health care benefits to retirees and surviving spouses:

> The Union has said that your insurance coverages are a lifetime benefit which may not be unilaterally eliminated or discontinued. Our attorneys have advised the UAW and us that the Union's position is not supported by either the insurance agreement or the most recent court decisions.

ECF No. 109-1, Defs.' Resp. Ex. 27, Sept. 14, 1989 Letter from Reising to Retirees/Survivors. This extrinsic evidence is equivocal on the issue of Reising's understanding as to whether retiree health care benefits were lifetime vested.

Plaintiffs also submit that the Retirement Summaries provided to employees when they applied for retirement are "replete with references to the tie" between the survivor pension option and entitlement to health care benefits and generally suggested the continuing nature of fully paid retiree health insurance. For example, the 1989 Retirement Income Booklet provided:

> Group Insurance at Retirement
>
> Hospital and Medical Insurance Benefits - Your hospital and medical expense coverage will be continued after your retirement pursuant to the Health Insurance Agreement between [Borg Warner] and [the Union]. The Company pays the full cost of such coverage for "retirees and their eligible dependents" according to the terms of the Health Insurance Agreement.

ECF No. 104, Pls.' Mot. Ex. 22, p. 17.)

48

The 1990 and 1995 Retirement Summary Booklets provided that, with regard to Health Insurance:

> After retirement, you will no longer be eligible for dental or hearing aid insurance coverage.
>
> Hospital, medical, surgery, diagnostic and prescription drug will convert to the Retiree Health Plan. At age 65 you will be eligible for Medicare. Your health agreement has automatic integration with Medicare. You will continue to have the group insurance, however, the Medicare payments will be deducted from our normal allowance.

ECF No. 104, Pls.' Mot. Exs. 22-26. Plaintiffs suggest that for an employee who retired at age 55, the promise of health care benefits at the time of Medicare eligibility would be illusory if benefits did not survive the expiration of each HIA.

Plaintiffs also rely on the letters that were sent to surviving spouses informing them that their company-paid health insurance would continue without an end-date, after the death of their spouse, unless they remarried. These spouse letters explained the various benefits that the surviving spouse would receive, including a monthly pension amount for a "lifetime," and health insurance benefits that would "continue at no cost unless you remarry." Upon remarriage, coverage "would be cancelled." (Pls.' Mot. Ex. 28.)

Plaintiffs suggest that this extrinsic evidence confirms an intent to continue health care benefits for life. Borg Warner replies that none of this evidence specifically promises that health care benefits would continue to be provided "until death" or "forever" or would be "inalterable." While several of the Plaintiffs and the UAW negotiators testified to their belief and understanding that retiree health care benefits were guaranteed inalterable for a lifetime, in fact Plaintiffs have not produced a document generated in connection with the 1989 CBA or HIA, or any subsequent iteration thereof, where such an explicit promise was made. Former employee LaRue Cross

testified that he believed, and was told at the time he retired, that his benefits would remain unchanged for the rest of his life.  (ECF No. 109, Defs.' Resp. Ex. 34, Deposition of LaRue Cross, 56-59.)  However, the insurance checklist that Mr. Cross signed when he retired in June, 2005 expressly stated that "[c]urrently the premiums" for his health care benefits were being paid by the Company but that his health care "[b]enefits [were] subject to future contract negotiations."  (ECF No. 109, Defs.' Resp. Ex. 32.)

Notably, "lifetime" language does appear in a draft (not an executed copy) of a 1986 insurance booklet:  "Section VII - Termination of Insurance: Your health insurance is continued until your death - unless you request termination of insurance."  (ECF No. 103, Pls.' Mot. Ex. 30, 1986 Draft of Insurance Booklet.)  No such "until death" language appears in the 1989 CBA or HIA or in subsequent HIAs.  Indeed, a contrary intent was made known to the UAW and to retirees long before agreement was reached in the October 27, 1989 CBA and HIA.  *See* September 14, 1989 Letter from Jack Reising, Borg Warner's Vice President of Human Resources, informing retirees and survivors that the cost of health care was spiraling out of control and that if the trend continued, the company would no longer be able to provide retirees and survivors with any  health benefits. (ECF No. 109, Defs.' Resp. Ex. 27, Sept. 14, 1989 Letter.)

In the 1990 ACME Agreement, executed by both the UAW and Borg Warner, which expressly modified and continued the 1989 CBA and which was in fact executed before the parties actually signed the 1989 CBA (an event that did not occur until December, 1992 although the parties performed under the 1989 CBA prior to that date), the parties unambiguously utilized "language that is incompatible with a promise to create vested, unchangeable benefits."  *Witmer*, 694 F.3d at 776. Plaintiffs characterize the 1990 ACME agreement as an after-the-fact attempt to undo a promise that

50

had been made in the 1989 CBA and HIA.  They accuse Borg Warner of trying to accomplish in this lawsuit what they could not accomplish in bargaining.  At a minimum, the "agreement to disagree" that became a part of the 1990 ACME Agreement clarifies that neither party conceded the other parties' interpretation of the provisions of the CBAs and the HIAs.  Through that agreement, Borg Warner clearly communicated its intention not to vest retirees's healthcare benefits, leaving to another day the question of whether the language to which they agreed in 1989, and which continued in each subsequent iteration of the HIA, in fact made such a promise.  The parties did "kick the can down the road," leaving to another day the fight over which parties' interpretation would prevail.

In summary, several of the indicia recognized by the Sixth Circuit as indicative of an intent to vest are present here, i.e. (1) tying of pension and healthcare eligibility, (2) specific durational language as to certain non-retirees, (3) negotiation of less favorable benefits for future retirees while leaving existing retirees's benefits unchanged.  However, there are also indicia of an intent to not vest.  First, the termination provisions of the HIA specifically refer to retiree benefits, i.e. section 2(M)(2)(e), and each of the Exhibits of the HIA, many of which address specifically retiree healthcare benefits, incorporate this same termination provision.  But the parties offer reasonable competing interpretations of this provision, which the extrinsic evidence does little clarify.  Thus, unlike *Golden*, *Yard-Man*, *Bender* and *Prater*, this case has the potential to present the exception hypothesized by those cases in which the durational language would apply not just to the agreement but specifically to retiree health care benefits under that agreement.

Further, despite Plaintiffs' protestation that the language of the ROR was not negotiated, the ROR in this case appears in the HIA, as part of the formally executed agreement and before the final signature page.  If not negotiated, at the very least it is undisputed that the SDI was reviewed and

not objected to by the Union prior to the formal execution of the HIA in which it appears.  And the reservation of rights contained in the SDI, reasonably interpreted, could be deemed sufficient to have put the Union on notice that if it believed its benefits to be vested, it ought to have registered a significant protest.  Not only could this language "fairly be expected to prompt an immediate protest," *see Bender*, 681 F.3d at 265, but in fact years after it was reviewed and approved by the Union in 1992, it did prompt such a protest.  Ms. Champagne's objection to this language in her review of the 1995 HIA on behalf of the Union demonstrates her concern that the reservation of rights language could be construed as directly at odds with a promise of vested benefits.

Finally, the Court concludes that a reading of the plain language of the 1990 ACME "agreement to disagree" is not dispositive of either side's claim in this fight.  The "agreement to disagree" is an unequivocal statement by Borg Warner beginning in 1989, over two decades before the shutdown of the Muncie plant, denying that the 1989 CBA and HIA obligated it to provide health care benefits to these Plaintiffs for life and an equally strong statement by the Union that it interpreted the 1989 the controlling collectively bargained language differently.  Again, the extrinsic evidence does little to clarify the parties' intent in executing the 1990 ACME Agreement, necessitating further development of these facts at trial.

## IV.    CONCLUSION

Given the intractable ambiguity of the contract language, and viewing the facts on these cross motions for summary judgment in the light most favorable to each of the non-moving parties, including a close examination of the extrinsic evidence, the Court concludes that genuine issues of material fact exist on the question of the parties' intent to vest (or not) retiree health care benefits. Here, as in *Zino*, viewing the facts in the light most favorable to each of the cross-moving parties,

ambiguity regarding the parties' intent remains after an examination of the relevant CBA and HIA language, including the 1990 ACME Agreement. 2013 WL 4544518, at *7-9 ("[d]iscerning no clear answer in the negotiated documents" and turning to an examination of extrinsic evidence). Also, as in *Zino*, the Court has examined the extrinsic evidence "and finds that it points in both directions." *Id.* at *9. Accordingly, summary judgment is not appropriate for either party and the issue of whether Plaintiffs' health care benefits were intended to be lifetime vested must proceed to trial.

Accordingly, the Court DENIES Plaintiffs' Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: February 27, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 27, 2014.

s/Deborah Tofil
Case Manager

53