RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0084p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC; RONALD D. STRAIT; DANNY O. STEVENS,
*Plaintiffs-Appellees,*

*v.*

KELSEY-HAYES COMPANY; TRW AUTOMOTIVE, INC.; TRW AUTOMOTIVE HOLDINGS CORPORATION,
*Defendants-Appellants.*

No. 13-1717

---

Appeal from the United States District Court
for the Eastern District of Michigan at Flint
No. 4:11-cv-15497—Gershwin A. Drain, District Judge.

Argued: March 12, 2014

Decided and Filed: April 22, 2014

Before: MERRITT, SUTTON, and GRIFFIN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Gregory V. Mersol, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellants. Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees. **ON BRIEF:** Gregory V. Mersol, Todd A. Dawson, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellants. Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees.

GRIFFIN, J., delivered the opinion of the court, in which MERRITT, J., joined, and SUTTON, J., joined in part. MERRITT, J. (pg. 20), delivered a separate concurring opinion. SUTTON, J. (pp. 21–24), delivered a separate opinion concurring in part and dissenting in part.



1

---

**OPINION**

---

GRIFFIN, Circuit Judge.  This is an action under the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185 *et seq*., and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*.  Defendants are Kelsey-Hayes Company and its parent company, TRW Automotive.  Plaintiffs are a class of 400 retired union workers from the now-closed Kelsey-Hayes automobile-manufacturing plant in Jackson, Michigan.  Defendants appeal the district court's grant of summary judgment, injunctive relief, and attorney fees in favor of plaintiffs.  We affirm.

I.

Plaintiffs worked at the Jackson plant until July 2006, when it shut down.  All plaintiffs retired under one of three CBAs that were negotiated in 1995, 1999, and 2003; each of those CBAs contained identical language with regard to the issues pertinent to this appeal.  Specifically, the CBAs provided, in a supplement, that Kelsey-Hayes would establish a health insurance plan, "either through a self-insured plan or under a group insurance policy or policies issued by an insurance company . . . ."  Article III, Section 1 outlined specific types of health care services to which employees were entitled.  Article I, Sections 3(b)(7) and 3(b)(8) provided:

[Section 3(b)](7)  For Retired Employees and Certain Former Employees

The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 5, for:

(i)      A retired employee and his eligible dependents, if any, provided such retired employee is eligible for benefits under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan and;

(ii)     An employee and his eligible dependents, if any, terminating at age 65 or older for any reason other than a discharge for cause with insufficient credited service to entitle him to a benefit under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan.

[Section 3(b)](8)  For Surviving Spouses

> (i)    The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 6(b) on behalf of a surviving spouse . . . and the eligible dependents of any such spouse . . . .

In turn, Article III, Section 5 provided, in relevant part:

> The health care coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older for any reason other than a discharge for cause . . . shall be continued thereafter provided that suitable arrangements for such continuation[] can be made with the carrier(s). Contributions for such coverages so continued shall be in accordance with Article I, Section 3(b)(7).

Finally, Article I, Section I contained what the parties have termed a "mutual agreement clause." That clause provided:

> In the event the initiation of any benefit or benefits described in Article III of the Program does not prove practicable or is not permitted by the plans under which coverages are now provided on the dates stipulated in such Article III, the Company in agreement with the Union will provide new benefits and/or coverages as closely related as possible and of equivalent value to those not provided.

Consistent with the commitments set forth in the CBAs, Kelsey-Hayes provided health care for plaintiffs and their families both before and after the Jackson plant closed. This health care took the form of group insurance plans provided by private insurance companies, occasionally supplemented by available government benefits, such as Medicare Parts A and B. For example, after 2003, plaintiffs were initially enrolled in group coverage from Blue Cross Blue Shield of Michigan. The group coverages were changed twice after 2003—Blue Cross Blue Shield of Michigan was replaced with Meritan, and later Meritan was replaced with Humana.

In late 2011, however, things changed. In September 2011, TRW (which had purchased Kelsey-Hayes) sent a letter to plaintiffs indicating that it would be discontinuing group health care coverages beginning in 2012. Instead of group coverages, defendants would be providing plaintiffs with "Health Reimbursement Accounts" (HRAs). The HRAs were designed to function, essentially, as a health care voucher system; according to the letter, TRW would make a "one-time contribution [into the HRAs] of $15,000 for each eligible retiree and his or her

eligible spouse" in 2012, and "beginning in 2013, TRW [would] provide a $4,800 credit [into the HRAs] . . . for each eligible retiree and eligible spouse." The notion was that plaintiffs would then use these funds to purchase their own insurance from among a variety of providers.

The HRAs differed from the prior group coverages in that they shifted risk—and potentially costs—off of defendants and on to plaintiffs. At the deposition of TRW Benefit Director Shelly Iacobelli, it was established that, under the HRAs, plaintiffs "bear[] the risk of expenses that exceed the company contribution[.]" For example, as Iacobelli confirmed, if a retiree spent $20,000 in 2012, the retiree would be responsible for the $5,000 spent in excess of the $15,000 in his or her HRA. Iacobelli admitted that in this way, the HRAs "shifted [the risk of excess costs] to the retiree[s,]" as "that risk used to be borne by the insurance company" under the prior group coverages. Similarly, TRW's Vice-President of Compensation and Benefits, Steve Kiwicz, at his deposition agreed that, under the HRAs, it was "the retirees who bear the risk of excessive costs" beyond the level that the HRAs were funded; therefore, Kiwicz testified, the company had "limited its expenses" to the amount it had agreed to place into each HRA.

Although TRW pledged to fund each HRA with $15,000 in 2012 and $4,800 in 2013, TRW and Kelsey-Hayes failed to commit to any funding of the HRAs beyond 2013. In this regard, Kiwicz testified that no commitments had been made past 2013, and Iacobelli testified that she did not know "what the plans are for 2014 and beyond" as to retiree health care. In fact, TRW claimed the right to unilaterally terminate the HRAs entirely—in the September 2011 letter, TRW indicated that it "retain[ed] the right to amend or terminate the HRA[s]" altogether. In a pamphlet sent to plaintiffs explaining the HRAs, TRW asserted that it had the right to "at any time, increase, decrease, or eliminate the amount that is allocated to [the HRAs] each year," and that, in TRW's view, plaintiffs were "neither vested in [their] retiree healthcare benefits, nor [does] TRW intend to vest [plaintiffs] in retiree healthcare benefits. . . . TRW Automotive reserve[s] the right to amend, modify, suspend, replace or terminate any of its plans, policies or programs (including the HRA[s]) . . . ."

Following the implementation of the HRAs, plaintiffs filed this action, claiming that the health plan change to HRAs breached the CBAs, in violation of Section 301 of the LMRA and ERISA. The district court allowed plaintiffs to proceed as a class and granted their motion for

summary judgment on all claims, ruling that the CBAs established a commitment to lifetime health care benefits for plaintiffs and their families, and that defendants' unilateral implementation of the HRAs constituted a breach of the CBAs. In granting summary judgment and a permanent injunction, the district court ordered defendants to reinstate the "status quo," that is, the health coverages that had been in effect up until 2012. The district court also awarded attorney fees to plaintiffs. Defendants timely appealed.

## II.

### A.

This court reviews de novo a district court's grant of summary judgment. *Parsons v. City of Pontiac*, 533 F.3d 492, 499 (6th Cir. 2008). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether the movant has met this burden, this court views the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

### B.

Before turning to the facts of this case, we first address a threshold legal issue. Specifically, it is necessary for us to correct defendants' misapprehension regarding a pair of our prior cases: *Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009) (*Reese I*) and *Reese v. CNH Am. LLC*, 694 F.3d 681 (6th Cir. 2012) (*Reese II*). In this regard, a brief overview of this court's admittedly complex case law on retiree benefits is instructive.

Our leading case on retiree benefits is *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). The issue in *Yard-Man* was whether the right to collectively-bargained-for insurance benefits survived the expiration of the agreement in which they were bargained. In other words, did the retirement insurance benefits vest? The court explained that "whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends on the intent of the parties," and that "traditional rules of contractual interpretation are applied" to determine whether the parties so intended. *Id*. at 1479. The first place to look in discerning the parties' intent is the explicit language of the collective bargaining agreement. *Id*. "[E]ach

provision should be construed consistently with the entire document," and the terms "must be construed so as to render none nugatory and avoid illusory promises." *Id*. at 1479–80. If the language of the CBA is ambiguous, courts may refer to extrinsic evidence in addition to the CBA to discern the parties' intent. *Id*. at 1480; *see also Moore v. Menasha Corp*., 690 F.3d 444, 451 (6th Cir. 2012); *Cole v. ArvinMeritor, Inc*., 549 F.3d 1064, 1069–70 (6th Cir. 2008).

In *Yard-Man*, the "key provision" of the CBA stated:

"When the former employee has attained the age of 65 years then:

(1) The Company will provide insurance benefits equal to the active group benefits . . . for the former employee and his spouse."

*Id*. at 1480. The court ultimately concluded that, based on the language of the CBA and in the context of surrounding CBA provisions, the parties intended for the insurance benefits to vest. *Id*. at 1481–82.

In reaching its conclusion, the *Yard-Man* court reasoned that "the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for the retirees [beyond the expiry of the CBA] were intended." *Id*. at 1482. The court reasoned that "it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Id*. Additionally, "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained." *Id*. Accordingly, "*when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree*." *Id*. (emphasis added). This rule has come to be known as the "*Yard-Man* inference."

In subsequent years, we continued to refine and clarify the scope both of the *Yard-Man* inference and vested retiree benefit rights more generally. Among other things, these cases clarified that the *Yard-Man* inference was not a legal presumption that shifted the burden to the employer to disprove that benefits vested. *See, e.g., Yolton v. El Paso Tenn. Pipeline Co*., 435 F.3d 571, 580–81 (6th Cir. 2006); *Maurer v. Joy Tech., Inc*., 212 F.3d 907, 915 (6th Cir. 2000) ("Although there is an inference that the parties to a CBA intended for retiree benefits to

vest, the burden of proof does not shift to the employer, and it is not required that specific anti-vesting language be used before a court can find that the parties did not intend benefits to vest."). Rather, the *Yard-Man* inference simply "requires 'a nudge in favor of vesting' in close CBA cases." *Moore*, 690 F.3d at 450 (quoting *Reese I*, 574 F.3d at 321). In other words, under *Yard-Man*, in close cases, "[a] court may find vested rights 'under a CBA even if the intent to vest has not been explicitly set out in the agreement.'" *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008) (quoting *Maurer*, 212 F.3d at 915). However, this court has repeatedly held that, above all, the CBA's language governs. Indeed, "[w]hen other contextual factors so indicate, *Yard–Man* simply provides another inference of intent. All that *Yard–Man* and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation." *Yolton*, 435 F.3d at 580.

Additionally, this court has clarified that "[a]n employer that contractually obligates itself to provide vested healthcare benefits renders that promise 'forever unalterable.'" *Moore*, 690 F.3d at 450 (quoting *Sprague v. GMC*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc)). A breach of a CBA creates a federal right of action under Section 301 of the LMRA, which prohibits "violation[s] of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185(a). In such an instance, there is also a derivative ERISA violation. *See Maurer*, 212 F.3d at 914.

This brings us to the *Reese* cases. In *Reese I*, we drew a distinction between the vesting of retirement benefits and "the *scope* of those benefits" under the facts at issue in that case. 574 F.3d at 318. There, a CBA was entered into in 1971 and renewed periodically in substantially the same form until 1995 in which CNH (formerly Case Corporation) agreed to provide health insurance for retirees and their spouses. *Id.* In 1998, the parties entered into a new CBA which stated that:

> Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group benefits as described in the following paragraph.

*Id.* A letter of understanding about the cost of health care coverage supplemented the 1998 CBA which specified that Case/CNH could "terminate a provider giving inadequate coverage and

adopt a replacement plan that will provide comparable benefits and access to the type of plan it replaces." *Id*. at 319 (quotation marks and brackets omitted). In 2004, retirees sued, seeking, among other things, a declaration that they were entitled to lifetime health care benefits. *Id*. The district court entered judgment in favor of the retirees, and CNH appealed. *Id*.

On appeal, this court explained that the issues presented were: (1) "[d]id the employees' right to lifetime health-care benefits vest upon retirement[?]" and (2) [w]hat does vesting mean in this context?" *Id*. at 322, 324. As for the first question, the court concluded that the rights did vest, and that therefore retiree health care could not be "unilateral[ly] . . . terminate[d]." *Id*. at 323.

Turning to the second question—the scope of the benefits—our court concluded that the benefits could be "reasonably alter[ed]" unilaterally by CNH. *Id*. at 327. Consistent with this court's precedent, the *Reese I* court relied on the CBA's language and extrinsic evidence—the parties' conduct—in reaching its conclusion. The court explained:

> no party to this case—the union, the employer, the retirees—viewed the benefits [as unalterable]. The 1998 CBA not only set the rules for employees who retired during the next six years of that CBA; it also *reset* the rules for employees who retired after July 1, 1994, which is inconsistent with the notion that the 1990 and 1995 CBAs . . . created unalterable, irreducible health benefits. The 1994–1998 retirees were not asked to consent to this change, and they did not consent to it.

*Id*. at 324. We also noted that, despite the fact that the 1998 CBA "reset the rules" for the 1995–1998 retirees in a way that actually hurt those retirees, they never complained about the changes. The court further reasoned that the letter of understanding, which circulated contemporaneously with the 1998 CBA, "show[ed] that the parties . . . contemplated replacing some managed care providers with others at some point in the future." *Id*. at 325. We reasoned that the letter of understanding was an indication that the parties had contemplated

> the realities of managed care, in which a new plan may fail to cover providers or services that an old plan had covered, such that the retirees had no basis for assuming that each replacement plan would at best improve, or at worst precisely maintain, the level of care provided to each individual retiree.

*Id*. at 325–26. Ultimately, this court remanded to the district court. This court wrote:

> CNH, in short, cannot terminate all health-care benefits for retirees, but it may reasonably alter them. With this guidance, we leave it to the district court to decide how and in what circumstances CNH may alter such benefits—and to decide whether it is a matter amenable to judgment as a matter of law or not.

*Id*. at 327.

Three years later, *Reese* returned to this court after remand. In *Reese II*, 694 F.3d at 683–85, this court noted—as it did in *Reese I*—that the evidence, both from the CBA and from the parties' conduct, indicated that the parties contemplated an evolving health care delivery system and that the scope of the vested health care benefit could change in light of that agreement. *Id*. at 683–85. Concluding that the district court on remand had failed to answer the second question from *Reese I* (what does vesting mean in this context?), the court again remanded the case to the district court, this time with a set of specific factors to guide the district court in its determination as to what would constitute a "reasonable" alteration in health care benefits in that case. *Id*. at 685–86.

Underpinning many of defendants' arguments on appeal is a characterization of the *Reese* cases as a major sea-change in Sixth Circuit retiree benefits case law. *See* Defendants' Reply Br. at 2 (claiming that "*Reese II* represented a significant change" in the *Yard-Man* line of cases; *see also* Defendants' Brief at 38-44; 44-47). Specifically, defendants characterize *Reese*'s conclusion that CNH could unilaterally alter the retirees' health care benefits to mean that all CBAs in the Sixth Circuit are always unilaterally alterable, regardless of a CBA's specific language. For example, defendants claim that *Reese II* "stated that, as a matter of law, an employer can make reasonable changes to retiree health insurance" once the right has vested. Defendants' Br. at 38.

We disagree with defendants and reject their interpretation of the *Reese* cases. Contrary to defendants' characterization, the *Reese* decisions are not a "significant change" in Sixth Circuit case law, but are entirely consistent with other Sixth Circuit retiree benefits cases insofar as the *Reese* courts simply examined the language of the CBA and the parties' conduct in reaching their conclusions. *See Yard-Man*, 716 F.2d at 1479 (the plain language of the contract is the first place to look when discerning the parties' intent); *id*. at 1479–80 (courts can look to

extrinsic evidence to discern the parties' intent); *see also Moore*, 690 F.3d at 451 (same); *Cole*, 549 F.3d at 1069–70 (same).

In other words, the *Reese* cases simply did what "*Yard-Man* and subsequent cases instruct[,]" which is to "apply ordinary principles of contract interpretation" to CBAs. *Yolton*, 435 F.3d at 580; *see also Yard-Man*, 716 F.2d at 1479. Specifically, the *Reese* courts based their analysis on, among other things: (1) the fact that the language of the 1998 CBA purported to retroactively change the benefits structure for workers who had retired prior to 1998; (2) the letter of understanding sent out contemporaneously with the 1998 CBA; and (3) the absence of any other contemporaneous evidence that might lead to a contrary conclusion. Indeed, a thorough reading of *Reese* reveals that each *Reese* opinion takes pains to repeatedly ground its rationale in the language and conduct of the parties. In sum, the *Reese* courts concluded that there, the scope of the vested right to health care could be unilaterally altered because that is what the evidence indicated the parties intended in that case, not because all vested health care rights in all CBAs are subject to unilateral alteration as a matter of law.

C.

Having clarified the role of the *Reese* cases among the rest of our retiree benefits case law, we now turn to the primary issue in this case: What did the parties in this case intend with regard to retiree health care benefits?

To discern the parties' intent, we start—as our case law instructs—with the "explicit language of [the CBA.]" *Yard-Man*, 716 F.3d at 1479. Under the CBAs at issue here, Kelsey-Hayes agreed to include certain medical services in their employees' health care coverages. Article III, Section 5(a) of the CBAs provided that, once an employee retired, Kelsey-Hayes promised the now-retiree the "continuance" of "[t]he healthcare coverages [that he or she] ha[d] . . . at the time of retirement." And, Kelsey-Hayes agreed to pay the "full premium or subscription charge for health care coverages continued in accordance with Article III, Section 5" for retirees. We find this language unambiguous and hold that this CBA language alone, when construed in light of the *Yard-Man* inference, created a vested lifetime right to health care benefits.

We also hold that the unilateral implementation of the HRAs breached the CBAs, not because HRAs are "unreasonable" under the *Reese* cases, but because the HRAs are simply not what the parties bargained for in the first instance. Again, upon the commencement of their retirement, plaintiffs were entitled to the continuation of the same coverages they had as employees. Upon retirement, they all had company-provided group health insurance coverage, with Kelsey-Hayes paying the full premium for that insurance. The HRAs are not company-provided group insurance; they are health care vouchers—essentially cash. According to Kelsey-Hayes' own representatives, far from the company paying the full premium, the HRAs shift significant risks, including the potential costs of medical care, from the company to plaintiffs. Moreover, not only did defendants refuse to fund the HRAs past 2013, they failed to even acknowledge that the right to health care was vested in the first place;[1] the pamphlet sent to plaintiffs about the HRAs indicated that, so far as TRW was concerned, the HRAs were not vested and could be terminated at any time. For these reasons, we conclude that the implementation of the HRAs violated the CBAs. *See Moore,* 690 F.3d at 450 ("An employer that contractually obligates itself to provide vested healthcare benefits renders that promise 'forever unalterable.'" (quoting *Sprague v. GMC*, 133 F.3d at 400)).

Plaintiffs make much of the "mutual agreement clause" in Article I, Section 1 of the CBAs' health care supplement. That clause provides that in the event that "the initiation of any [health care] benefit or benefits . . . does not prove practicable or is not permitted by the plans under which coverages are provided[,]" those coverages may be replaced with "new benefits or coverages as closely related as possible and of equivalent value" to those they replace; however, such a change can only be made with the agreement of the union. Plaintiffs argue that this clause is dispositive as to whether defendants could unilaterally implement the HRAs. We acknowledge that case law from this circuit has relied, to varying degrees, on the presence or absence of similar "mutual agreement" language. *See, e.g., Moore*, 690 F.3d at 459 ("By offering vested healthcare coverage to the retired employees . . . and by agreeing that the CBAs

---

[1]Defendants have apparently changed their position on this point. In their briefs on appeal, defendants appeared to concede that the right to health care vested, but argued that the district court should be reversed because HRAs were reasonable modifications of the existing health care structure under the *Reese* cases. At oral argument, however, defendants' counsel refused to concede that the right to health care vested in the first place, despite repeated questioning on the subject.

could only be modified on the signed, mutual consent of the parties, Defendant waived its ability to unilaterally alter . . . Plaintiffs' healthcare coverage."); *Reese I*, 574 F.3d at 326 (the CBA there "unless it says otherwise" should be construed to permit unilateral modification); *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir. 2007) ("When a contract contains formal procedures requiring mutual, written assent to amend, that language preempts future unilateral termination of rights."). However, this court has squarely held that

> [a]s a general rule, an existing contract cannot be unilaterally modified. Were it otherwise, the option of either party to modify a contract unilaterally would defeat the essential purpose of reaching an agreement in the first place—to bind the parties prospectively. . . . This principle applies with equal force to collective-bargaining agreements, where employers are statutorily barred from effectuating unilateral modifications of existing collective bargaining agreements.

*Prater*, 505 F.3d at 443 (citations, quotation marks, and alterations omitted). Here, the mutual agreement clause simply reiterates this basic principle of contract interpretation. Accordingly, although the mutual agreement clause provides an additional piece of evidence that defendants could not unilaterally modify the CBAs by implementing the HRAs, we need not rely on the mutual agreement clause to reach that conclusion. We would reach the same result regardless of the presence of the mutual agreement clause.

However, although we need not rely on it to conclude that defendants could not unilaterally implement the HRAs, the mutual agreement clause is useful to our analysis in a different way. The mutual agreement clause stipulates that, in the event that replacement benefits are agreed upon, those replacement benefits must be "as closely related as possible and of equivalent value" to those originally provided. By including this language in the CBAs, the parties have removed any doubt not only that they intended that the right to retirement health care vest, but that they intended a particular kind of coverage to vest (namely, the type of coverage the employee had upon the commencement of his or her retirement, per Article III, Section 5(a)). Our approach in examining the mutual agreement clause for evidence of the parties' intent with regard to other CBA provisions is consistent with *Yard-Man*, which instructed that "[t]he intended meaning of even the most explicit language can . . . only be understood in light of the context which gave rise to its inclusion." *Yard-Man*, 716 F.2d at 1479.

For these reasons, we disagree with defendants that the result warranted here is the same as the one in the *Reese* cases. To that end, we note that this case is factually different from the *Reese* cases as well. First, it was critical to the *Reese I* court that the 1998 CBA there "reset the rules" for employees who had retired under the previous CBA. *Reese I*, 574 F.3d at 324. By contrast, here, there was no resetting of the rules—each CBA here contained identical language to its predecessor with regard to retiree health care benefits. Unlike in the *Reese* cases, the parties here were playing by the same set of rules all along. Second, unlike in *Reese*—where the plaintiffs waited six years to sue—plaintiffs here did not wait idly by to take action; as soon as they received notice of defendants' intent to implement the HRAs, plaintiffs sued. Third, unlike in *Reese*, where CNH simply "replac[ed] some managed care providers with others," *id.* at 325, the HRAs not only were not what was bargained for (in that they are vouchers, not group coverage), but the HRAs also shifted the risk of excess cost from defendants to plaintiffs. Indeed, this case contains none of the indicia of intent present in *Reese* that led those courts to conclude that the parties intended for the health care benefits to be unilaterally modifiable.

In sum, we conclude that the CBAs established a vested right to lifetime health care benefits, and that the unilateral implementation of the HRAs breached the CBAs.

Defendants raise a number of arguments as to why the implementation of the HRAs was permissible. None has merit.

First, defendants argue that the coverage the HRAs provided to employees is better for the retirees than the group coverages they replaced. Defendants made some version of this argument in both their brief on appeal and at oral argument. More specifically, defendants point to the fact that under the HRAs, retirees can pick from a variety of plans to meet the retirees' individualized needs. Defendants also argue that, based on their own internal accounting, the average amount a retiree spent per year on health care costs was $3,000, and the HRAs are funded well in excess of that amount.

We find defendants' claim that the HRAs will provide better coverage than the prior group coverages dubious. First, as noted above, defendants have refused to commit to continue funding the HRAs beyond two years. Second, it does not follow that no retirees will in the future exceed the level of HRA funding simply because no retiree has done so in the past. The cost of

health insurance premiums increases every year, and this growth shows no signs of slowing. *See, e.g.,* Susan Adler Channick, *Health Care Cost Containment: No Longer an Option But a Mandate*, 13 Nev. L.J. 792, 794–95 (2013) ("A new study by the Kaiser Family Foundation that tracks employer-sponsored health insurance shows the average annual premium for family coverage in 2011 reached $15,073, an increase of nine percent over the previous year. The study indicates that the cost of family coverage has almost doubled in just one decade. As private insurers raise premium rates to meet the projected costs of health care, the burden of rising premiums falls on employers who often shift the rise in costs to employees. It is projected that rising private health insurance premiums will have an adverse effect on wage growth as well as the standard of living that individuals will be able to afford."). Under the HRAs, if—or, more likely, when—the cost of a retiree's annual health insurance exceeds the amount of money in his or her HRA, the retiree would be forced to incur the excess. By defendants' own admission, this was not the case under the prior group coverages. Accordingly, we are skeptical of defendants' claims that the HRAs provide better coverage for the retirees than did their previous health care coverages.

In any event, whether the HRAs are "better" or "worse" than the prior group coverages is immaterial as a legal matter. As described above, the HRAs were simply not what was collectively bargained.[2] The parties agreed in the CBAs that the retirees would get the same type of coverage they had upon retirement, which in the case of these retirees was group coverages with the full premium paid by the company.

Next, defendants argue that because plaintiffs did not sue when the group coverages were replaced with new group coverages—for example, when Blue Cross Blue Shield of Michigan was replaced with Meritan, and later when Meritan was replaced with Humana—plaintiffs have assented to unilateral changes and have waived their ability to challenge the HRAs. We disagree. Unlike the HRAs, the prior changes in group coverage did not violate the CBAs—in each case one group plan was replaced with another, with the company paying the full premium.

---

[2]For this reason, to the extent that this opinion relies on the potential cost-shifting features of the HRAs, the fact that the retirees had group coverages upon retirement, etc., we do so to illustrate that the HRA structure is different from what the parties intended, not to opine about the relative quality of the HRAs compared to the prior group coverages.

Defendants also argue that Article III, Section 1, Subsection (h) of the health care supplement unambiguously gives defendants the right to unilaterally modify plaintiffs' retirement benefits. That subsection states that "[i]f in its judgment the Company considers it advisable in the interest of the employees, another arrangement may be substituted for all or part of the coverages" described in the supplement. We disagree with defendants' interpretation of Subsection(h). Subsection (h), by its plain language, applies only to "employees." Under the plain text of the CBAs, an employee is a "person regularly employed on a full time basis . . . by the Company on an hourly-rate basis . . . ." A provision that clearly applies only to current employees is immaterial to a determination regarding retirees' health care.

One more issue remains regarding the district court's grant of summary judgment. Defendants argue that because the TRW defendants were not parties to the CBAs, they are improper defendants and that, therefore, summary judgment in favor of plaintiffs was improper "on this basis alone." We disagree.

Initially, we note that defendants have not cited any legal authority in support of their position on this issue, despite simultaneously asserting that this issue is dispositive. Nor do defendants point to any record evidence in support of their position. Instead, defendants merely refer to plaintiffs' evidence and assert that it is deficient. For these reasons, defendants have arguably forfeited appellate review of this issue. *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007) (where a party only addresses issues "in a perfunctory manner," it waives its arguments on those issues). Even assuming, however, that defendants have not waived this issue, their argument is unpersuasive.

Generally, a successor corporation is not liable for its predecessors' liabilities unless expressly assumed. *Yolton,* 435 F.3d at 586 (citing *NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 279, 286–88 (1972)). However, this rule is "not absolute . . . as the [Supreme] Court has held that a CBA might remain in force 'in a variety of circumstances involving a merger, stock acquisition, reorganization or assets purchase.'" *Id.* (quoting *NLRB*, 406 U.S. at 291). To determine whether a successor corporation is responsible for its predecessors' liabilities, courts examine "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Nelson Electric v.*

*NLRB*, 638 F.2d 965, 968 (6th Cir. 1981).  This analysis is "flexible," and "no one element" is itself dispositive; rather, "all the relevant factors must be considered together."  *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986).

Plaintiffs have introduced sufficient evidence that TRW is liable for Kelsey-Hayes' obligations.  Specifically, plaintiffs have introduced the following evidence:  (1) Iacobelli testified that Kelsey-Hayes was acquired by TRW in 2003, at which point Kelsey-Hayes "became TRW," and that the term "the company" was properly understood to "encompass both Kelsey-Hayes and TRW[;]" (2) open-enrollment documents for the 2011 enrollment season sent to Jackson retirees explained that Jackson retirees were covered under a "TRW Automotive provided medical plan[;]" (3) TRW, and not its Kelsey-Hayes subsidiary, implemented the HRAs, and in the pamphlet sent to retirees, it was TRW, and not Kelsey-Hayes, that reserved the right to modify benefits under the new HRAs; and (4) the collectively-bargained-for 2005 plant shutdown agreement named "Kelsey-Hayes (TRW)" as a party, drawing no distinction between the two entities.

Accordingly, defendants' position that Kelsey-Hayes had merely a "bookkeeping" relationship with TRW is belied by the evidence.  The TRW defendants are proper parties to this litigation.

III.

Having resolved the issues relevant to the district court's grant of summary judgment, we turn to its grant of a permanent injunction.

When evaluating a district court's grant of a permanent injunction, this court reviews the district court's factual findings for clear error and its legal conclusions de novo.  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) (citations omitted).  However, "[t]he scope of injunctive relief is reviewed under an abuse of discretion standard."  *Id.*

The Supreme Court has held that a plaintiff seeking a permanent injunction must "satisfy a four-factor test[.]"  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Specifically,

[a] plaintiff must demonstrate:   (1) that it has suffered an irreparable injury;
(2) that remedies available at law, such as monetary damages, are inadequate to
compensate for that injury; (3) that, considering the balance of hardships between
the plaintiff and defendant, a remedy in equity is warranted; and (4) that the
public interest would not be disserved by a permanent injunction.

*Id.*  We conclude that plaintiffs have satisfied these factors.  Ultimately, compensating plaintiffs
monetarily will not remedy the breaches of the CBAs—rather, the appropriate remedy is to
require defendants to do what they agreed to do in the CBAs.  This is all the injunction requires.

Defendants raise two arguments in opposition to the permanent injunction.  Neither has
merit.  First, defendants argue that "to the extent the District Court's injunction order requires
coverage for any of the expenses not expressly described in . . . Article III § 1 [of the health care
supplement to the CBAs], it was in error."  We disagree.  As described above, the parties
intended to create a vested right to lifetime health care for the retirees within the strictures
established by the CBAs in terms of coverage (i.e. group coverage, with defendants paying the
full premium).  All the injunction requires is performance consistent with the plain text of the
CBA; indeed, by its very terms, the injunction simply requires a return to the "status quo ante."
Contrary to defendants' argument, we do not interpret the injunction as requiring any more than
was already required by the plain text of the CBAs.  Accordingly, remand is unnecessary.

Second, defendants argue that the permanent injunction should be rewritten to
specifically instruct that future changes to retiree health care benefits are permissible with the
consent of both parties.  Again, this is a condition already clearly spelled out in the CBAs.
Accordingly, a remand to include what is already unambiguously contained in the CBAs is
unnecessary.

IV.

Finally, defendants challenge the district court's award of attorney fees to plaintiffs.

This court reviews a district court's award of attorney fees and expenses for abuse of
discretion.  *Geier v. Sundquist,* 372 F.3d 784, 789 (6th Cir. 2004) (citing *Perotti v. Seiter,*
935 F.2d 761, 763 (6th Cir.1991)).  "An abuse of discretion is defined as a definite and firm

conviction that the trial court committed a clear error of judgment." *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 773 (6th Cir. 2007) (quotation marks omitted).

Ultimately, an attorney fee award must be "reasonable." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). To determine a reasonable fee award, the district court looks at "the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate." *Id.* This court uses the "lodestar" approach to determine the reasonableness of attorney fees. *Barnes v. Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005). Under that approach, the reasonableness of hours and the lawyer's rate are determined by considering the following factors:

> (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases."

*Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005) (citations omitted).

Here, in the district court, defendants did not argue that plaintiffs' counsel's hourly rate was excessive, opting instead to focus on the number of hours worked. The district court agreed with defendants that the number of hours claimed by plaintiffs' counsel was unreasonably excessive and imposed an across-the-board reduction in the number of hours by 10%. *See Auto Alliance Intern., Inc. v. U.S. Customs Serv.*, 155 F. App'x 226, 228 (6th Cir. 2005) ("This Court has recognized the propriety of an across the board reduction based on excessive or duplicative hours." (citing *Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986)). Defendants' argument on appeal is that the district court did not reduce the number of hours enough. In light of our deferential standard of review, we cannot agree.

Ultimately, defendants' assertion as to what constitutes a reasonable number of hours is itself arbitrary. For example, defendants argue that plaintiffs' cited 353.25 hours spent briefing for summary judgment should be reduced to 75. However, defendants offer no evidence that plaintiffs' counsel spent only 75 hours briefing for summary judgment, nor do they offer any

reason why 75 hours is a reasonable amount of time for such a complex case.  Accordingly, defendants have left us no reason to question the district court's award, particularly in light of the highly deferential standard of review.  Indeed, ultimately,

> [t]he trial court's exercise of discretion [in an attorney fee case] is entitled to substantial deference because the rationale for the award is predominantly fact driven.  This deference is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.

*Imwalle v. Reliance Med. Prod., Inc*., 515 F.3d 531, 551 (6th Cir. 2008) (citations and quotation marks omitted).  Finding no abuse of discretion, we affirm the district court's attorney fee award.

## V.

For these reasons, we affirm the judgment of the district court.

———————————

## CONCURRENCE

———————————

MERRITT, Circuit Judge, concurring. The dissenting opinion in this case reads much more into the court's opinion than I recognize. It mischaracterizes the opinion and then rebuts a new and different opinion. It says that the opinion binds the parties forever to provide health benefits "in the same way." My reading is the opinion only holds that the present proposal by the company violates the agreement of the parties in the present circumstances. There are many, many ways the circumstances could change in the future. The parties might reach a new agreement. The law might change as to requirements of employer health plans. The employer might propose a new insurer, etc. We are not "tying the hands" or "handcuffing" the company to one mode of providing retiree benefits, or presenting a "straight jacket view" of health care in the future. Paragraph after paragraph in different language repeats the refrain that the opinion is "an advisory opinion." I do not see the opinion as an "advisory opinion" about anything but an opinion that affirms the district court's opinion that the company proposal blatantly violates the contract between the parties.

At the end the dissenting opinion would remand the case — presumably to allow the parties to renegotiate and the company to present to the court (presumably unilaterally) a new plan of health reimbursement accounts so that the district court can redetermine on that new record whether the company's new plans are a "reasonable equivalent" of what the company has provided before. Our obligation is to decide the case on the present record based on the judgment of the district court, not to make up a new case, the outcome of which would be more favorable to the employer. On the present record the employer clearly violated its legal obligations and should be required to pay the price of its recalcitrance.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

SUTTON, Circuit Judge, concurring in part and dissenting in part.  Our precedent compels the conclusion that Kelsey-Hayes promised to provide retirees health-insurance coverage for life.  And our precedent compels the conclusion that Kelsey-Hayes violated that promise (1) when it created Health Reimbursement Accounts—employer-provided funds that employees may spend on health insurance and other healthcare-related expenses as they wish— that it promised to fund only for two more years (2012 and 2013), and (2) when it reserved the right to eliminate all retiree healthcare coverage after that.  On this record, there is no need to get into whether the company had the right to make *other* reasonable modifications to coverage for years not yet at issue—2014 and beyond.  A decision to fund an alternative form of coverage for two years does not deliver on a *lifetime* commitment.  And a reservation of rights to end all coverage is the antithesis of a *lifetime* commitment.  That should end the discussion.  And, to that extent, I agree with the majority in full.

But the majority proceeds to resolve whether, *if* Kelsey-Hayes had agreed to fund the Health Reimbursement Accounts for life, that would satisfy the company's obligations.  This advisory opinion runs into the customary problems associated with "ghosts that slay."  Felix Frankfurter, *A Note on Advisory Opinions*, 37 Harv. L. Rev. 1002, 1008 (1924).  The opinion offers advice about Health Reimbursement Accounts in 2014, when the company has made no promise of providing any Account for any retiree.  It offers advice about such Accounts when the record is silent about the amount, if any, by which the company would fund each Account.  And it does all of this on summary judgment, when we have no consensus on how these Health Reimbursement Accounts would work.  Indeed, given the direction the inferences must run and given the evidence in *this* record, we must assume that the Accounts will provide *better* healthcare coverage than the old system and that the administrative burdens on retirees will be *minor* once the new system is in place.

The court's dictum also purports to answer a difficult question, one that will grow in importance as the legal and policy imperatives of health insurance continue to evolve.  The one

constant in healthcare is change.  No health-insurance program remains fixed, and no company offers the same plan year in year out.  That puts companies not only in the business of making what they make but also of constantly making adjustments to coverage to provide employees (and retirees) with basic benefits in a reasonable and reasonably cost effective way.  Binding a company to provide lifetime benefits may be feasible; binding it to provide benefits *in the same way* for the duration of a retiree's life is not.  The national healthcare law indeed recently ushered in an assortment of new requirements for health insurance plans and companies providing healthcare insurance.  In the context of this moving target, we should be careful about tying the hands of companies, employees and retirees.  Nor at any rate would an unchangeable healthcare plan favor retirees.  "Retirees, quite understandably, do not want lifetime eligibility for the medical-insurance plan in place on the day of retirement, even if that means they would pay no premiums for it.  They want eligibility for up-to-date medical-insurance plans, all with access to up-to-date medical procedures and drugs."  *Reese v. CNH America LLC* (*Reese II*), 694 F.3d 681, 683–84 (6th Cir. 2012).

This case highlights the perils of handcuffing a company to one mode of providing retiree benefits.  By prematurely rejecting Health Reimbursement Accounts for all companies and all retirees in the circuit, the majority denies many Kelsey-Hayes retirees (and who knows how many others) *better* and *more flexible* coverage.  For 2012 and 2013, the record establishes, the Health Reimbursement Accounts gave retirees more than enough money to purchase equivalent coverage, guaranteed them access to an individual insurance plan, provided them with a broker to select and obtain an insurance package, and allowed them to pick the most useful combination of benefits for their family's situation.  The majority counters that 2014 and 2015 might look different, because healthcare costs could go up.  Yes, they could, but so could the size of the Accounts.  The summary judgment record, remember, says nothing about how much money the company would contribute to the Accounts after 2013.  The majority's assumption that the Accounts will not grow fast enough to keep up with healthcare costs, *see* Maj. Op. at 13–14, fits uncomfortably with—indeed contradicts—its reassurance that it has looked at the evidence "in the light most favorable to [the employer]," *id.* at 5.

There is more to these Accounts than money in any event.  Instead of a one-size-fits-all group insurance plan, the Accounts allow retirees to customize coverage to their needs and to access far larger insurance-risk pools at lower costs than one company's plan could allow. Under this new system, a retiree could elect to purchase an individual insurance program that covers the same services as the prior Kelsey-Hayes group-insurance plan.  Or he could select another package that omits some previously covered services and adds others.  Excess funds (and there were many) could be used to pay medical bills—such as premiums for Medicare Part B, co-payments for out-of-network or out-of-area treatment and the cost of specialty drugs or medical products—that the company insurance never covered before.  Yes, this is not the same coverage.  But who wants the *same* thing when he can get something *better*?  Under the majority's reasoning, the same thing is the only thing; "whether the HRAs are 'better' . . . is immaterial."  Maj. Op. at 14.

Aside from the irony of hurting many people the majority purports to help (surely some of the 400 retirees in this case would prefer fully funded HRAs), I cannot resist remarking on an irony in the majority's straitjacket view of what does, and does not, amount to reasonably equivalent healthcare coverage.  In deciding that healthcare benefits could "vest," our case law has long relied heavily on an analogy between pensions and healthcare benefits.  *Reese v. CNH America LLC* (*Reese I*), 574 F.3d 315, 324 (6th Cir. 2009).  We now have a company that has taken us at our word.  It has taken its prior healthcare packages for retirees, determined what they are worth, committed to provide that money directly to retirees, and allowed them to purchase healthcare coverage (with assistance from the company's consultant) on their own.  If one were to design a vested healthcare pension program, this is exactly what it would look like—so long as it is fully funded into the future.  Yet in the absence of a record as to how this plan would work in later years, in the absence of any factfinding about its impact (pro or con) on retirees, indeed in the absence of any plan at all for 2014 and beyond, the majority purports to hold as a matter of law that no such plans may ever satisfy our "vesting" case law.  So what would always work for pensions will never work for healthcare.  Perhaps, as this case shows, the analogy was not such a good idea in the first place.  If an analogy to pensions does not support this decision, what does?  Surely not the contract.  Nothing in this contract, or any of the relevant contracts in our cases, dictates the *method* of providing retiree healthcare coverage in the future.

Instead of issuing an advisory opinion about Health Reimbursement Accounts not before us, I would take a different path.  I would hold that the company undertook a commitment to provide lifetime healthcare coverage, and it breached that commitment by not committing to provide care beyond 2013.  I would then remand the case to the district court to determine whether the company is willing to fund the Health Retirement Accounts beyond 2013 and, if so, at what amounts.  With this evidence in hand, I would ask the district court to determine how any such plans would affect the 400 or so retirees, for better or worse, and determine *on that record* whether the company's method of providing healthcare coverage amounted to a reasonable equivalent of what the company has provided before.