UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD L. SLOAN, EUGENE J.
WINNINGHAM, and JAMES L. KELLEY,
on behalf of themselves and a similarly
situated class,

                Plaintiffs,

v.

BORGWARNER, INC. BORGWARNER
FLEXIBLE BENEFITS PLANS and
BORGWARNER DIVERSIFIED
TRANSMISSION PRODUCTS, INC.,

                Defendants.

Case No. 09-cv-10918

Paul D. Borman
United States District Judge



FILED
DEC 05 2016
CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 147)

This action involves a contractual claim to lifetime inalterable healthcare benefits by a certified class of BorgWarner[1] retirees and their spouses. On August 7, 2015, in light of the Supreme Court's ruling in *M&G Polymers USA v. Tackett*, 135 S. Ct. 926 (2015), which abrogated long-standing Sixth Circuit precedent of central importance to the Plaintiffs' claims for vested lifetime healthcare benefits, this Court issued an Order vacating its February 27, 2014 Opinion and Order denying the parties' cross-motions for summary judgment in this vesting dispute.[2] (ECF No. 145,

_____

[1] "BorgWarner" refers to the Defendants, BorgWarner, Inc., BorgWarner Diversified Transmission Products, Inc. and BorgWarner Flexible Benefits Plans.

[2] In vacating its February 27, 2014 Opinion and Order denying the parties' cross-motions for summary judgment, the Court exercised its "inherent power to reopen part of a case prior to entry of the final judgment." *In re Saffady*, 524 F.3d 799, 802-03 (6th Cir. 2008) (noting that "district courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment," and concluding that "district court had the power to vacate the summary

1

Order Vacating 2/27/14 Summary Judgment Order.)  The Court gave the parties the option to file new summary judgment motions under the new interpretive standards decreed in *Tackett* or, alternatively, to agree to revisit the possibility of a settlement of the matter in light of the *Tackett* ruling.

The parties declined the Court's invitation to return to the settlement table and BorgWarner, but not Plaintiffs, did file a motion seeking summary judgment under the mandate of *Tackett* and relevant Sixth Circuit precedent interpreting the *Tackett* decision.  The Court held a hearing on BorgWarner's motion on February 12, 2016 and received post-hearing supplemental materials from BorgWarner on March 2, 2016, responding to an issue raised by the Court at the February 12, 2016 summary judgment hearing.  (ECF No. 157, Supplemental Memorandum.)

Because a petition for certiorari to the United States Supreme Court remained pending in a potentially outcome-determinative Sixth Circuit opinion on the issue of vesting post-*Tackett*, *see, e.g. Gallo v. Moen, Inc.*, 813 F.3d 265 (6th Cir. 2016), this Court withheld issuing an opinion in this matter until the Sixth Circuit issued its mandate in *Gallo*.  The Sixth Circuit issued its mandate on November 3, 2016, following the Supreme Court's denial of the plaintiffs' petition for certiorari. For the reasons that follow, the Court now GRANTS BorgWarner's motion for summary judgment.

## I.    BACKGROUND

### A.    Factual Background

BorgWarner manufactured transfer cases for four wheel drive vehicles for the automotive industry at its plant in Muncie, Indiana beginning as early as 1908. (ECF No. 100, Ex. 24, Deposition

---

judgment because a final judgment had not yet been entered in the case.")

of Richard Nuerge, October 25, 2011, 9–10.)[3] The Muncie Plant hourly workers were represented

by the International Union of the United Auto Workers and Local 287 ("UAW"). *Id.* As relevant

to this litigation, BorgWarner provided health care benefits to its employees through a series of

Collective Bargaining Agreements ("CBAs") and Health Insurance Agreements ("HIAs") for the

years 1989–2009. The health benefits program consists of the CBAs (ECF No. 97, Ex. 15, May 4,

2012 Declaration of Anthony Behrman, Exs. 1–5) and the HIAs that supplement the CBAs (ECF No.

96, Exs. 1, 4, 5.)  In addition, on September 27, 1990, BorgWarner and the UAW executed an

Agreement to modify and extend the 1989 CBA, and on November 30, 1992, BorgWarner and the

UAW executed an Agreement to modify and extend the 1989 HIA and the 1990 extension. (ECF No.

96, Exs. 2, 3.)

Although the Plaintiffs retired under different CBAs and HIAs, the parties appear to agree

that the relevant language concerning health care coverage was consistent among each of the CBAs

and HIAs. The parties also do not appear to contest the applicability of the provisions of any of the

HIAs at any point in time, despite the fact that some of the HIAs were in fact executed long after the

parties began to perform according to their terms.

---

[3]   The Court repeats here the relevant language of the operative agreements as set forth in its
February 27, 2014 vacated Opinion and Order.  Neither party objected to the Court's presentation
of the relevant contractual language and bargaining history and neither party appears to dispute these
historical facts. *See* ECF No. 147, Defs.' Mot. at 3 ("The undisputed material facts are correctly set
forth in the Court's earlier opinion, *Sloan [v. BorgWarner]*, 1 F. Supp. 3d [743] at 747-52 [(E.D.
Mich. 2014]").
    Additionally, the Court permitted the parties, if they opted to file new summary judgment
motions, to cite to the voluminous materials that had been submitted as appendices in support of the
original summary judgment motions rather than refile those voluminous exhibits to correspond to
a newly-filed motion.  Accordingly, the Court cites in this Opinion and Order to the Appendices and
Exhibits as they were filed in support of the parties' original summary judgment briefs, *e.g.* ECF
Nos. 96-100, 103-104, 108-112.

The instant dispute began with the negotiation of the 1989 CBA, which brought an end to a seven-week strike, a labor dispute that the parties agree was driven largely by disagreements related to rising health care costs. A significant factor driving BorgWarner's desire to reduce its retiree benefit liabilities was a new set of accounting standards promulgated by the Financial Accounting Standards Board ("FASB") that required for the first time that publicly traded companies, like BorgWarner, report their unfunded contractual benefit commitments as a liability. (ECF No. 98, Ex. 19, Deposition of Laura Champagne, January 13, 2012, 29–31.)  These new FASB regulations created an enormous balance sheet liability for BorgWarner, and for the majority of publicly traded companies, threatening their ability to attract new business and to obtain financing. During the relevant time frame, 1989–2009, the parties operated under a series of collective bargaining agreements which varied to some degree but each of which contained similar language relevant to the vesting issue. Article Sixteen of the 1989 CBA, in language that continued unchanged (except as to the relevant termination date) through each of the successive agreements, dictates the duration of the CBA and provides as follows:

> This agreement shall remain in full force and effent [sic] until September 12, 1992 and thereafter from year to year, unless either party shall give notice in writing at least sixty (60) days in advance of September 12, 1992, or any anniversary thereafter of its desire to terminate the Agreement.

ECF No. 97, Ex. 15, Ex. 1, 1989 CBA, Article Sixteen, p. 142.

Similarly, in language that remained unchanged in pertinent part, Article VIII of the 1989 HIA, executed by BorgWarner and the UAW in conjunction with the 1989 CBA, defines eligibility for retiree health care benefits and provides in pertinent part that:

> Section 1. Presently retired employees and an employee who retires under the Retirement Income Program Agreement on or after December 1, 1989, ... shall be

4

entitled to the life insurance, Managed Care, basic hospitalization/surgical/medical, prescription drug, major medical, substance abuse, vision, human organ/tissue transplant, and Medical Case Management coverages and procedures, as set forth in Exhibits A, C, D, E, F and H. Art. VIII, Sec. 1(A).

Section 2. An employee who terminates employment with the Company on or after January 1, 1991 while participating in the Muncie Retirement Savings Plan shall be entitled to the ... coverages and procedures as set forth in Exhibits A, C, D, E, F and H. Art. VIII, Sec. 1(B).

Employees presently or hereafter retired under the Total and Permanent Disability provisions of the Retirement Income Program Agreement ... shall be entitled to the coverages and procedures set forth in Exhibits A, C, D, E, F and H. Art. VIII, Sec. 2.

Section 3. The Company will provide the medical coverages and procedures set forth under the provisions of Exhibits A, C, D, E, F and H and will pay the monthly premium for such coverage for:

> A. A surviving spouse and the eligible dependent(s) of a retired employee ... who is receiving a monthly retirement benefits under Article Eight, Section 3, of the Retirement Income Program Agreement, and

> B. An eligible surviving spouse ... and the eligible dependents of an employee who terminated employment with the Company while participating in the Muncie Retirement Savings Plan ...

> C. The surviving spouse and the eligible dependents of an employee who was eligible to retire at the time of death under ... the Retirement Income Program Agreement or ... the Muncie Retirement Savings Plan ...

The medical coverages and procedures provided under this Article VIII, Section 3 shall terminate if the surviving spouse or Eligible surviving spouse remarries.

(ECF No. 96, Ex. 1, 1989 HIA, pp. 7–9.)

Also surviving through each iteration of the parties' health care agreements (with modified relevant dates), Article XII of the 1989 HIA contains the following language:

This Agreement and the Plan embodied herein shall become effective as of October

27, 1989, and continue in full force and effect until September 12, 1992. During the term of this Agreement neither the Company nor the Union shall demand any change in this Agreement nor shall either party be required to bargain with respect to this Agreement .... On September 12, 1992 this Agreement may be terminated, modified, changed or continued in the same manner as provided in Article Sixteen of the aforesaid Collective Bargaining Agreement between the parties hereto dated October 27, 1989.

ECF No. 96, Ex. 1, October 27, 1989 HIA 15.

In Exhibit A to the 1989 HIA, in language that remained unchanged through each iteration of the HIAs from 1989 through 2009, the "Schedule of Benefits," Section II setting forth "Basic Hospital, Surgical and Medical Benefits," the parties agreed, specifically with reference to retiree health care benefits, as follows:

> *Termination of Coverages Provided Under Exhibit A*: The coverages provided under this Exhibit A terminate on the date that:
>
> (a) the eligible active employee leaves the employment of the Company (see the Agreement and Appendix for the applicable continuation provisions regarding layoff, disability, retirement, or COBRA);
>
> (b) the eligible active employee/dependent or the eligible retiree/dependent is no longer eligible for coverage;
>
> (c) the required monthly premium contribution, if applicable is not made;
>
> (d) the eligible active employee or eligible retiree dies (see the Agreement or Appendix A for the applicable continuation provisions, if any); or
>
> (e) the Agreement is terminated.

(ECF No. 96, Ex. 1, 1989 HIA, Appendix A, Ex. A, § 2(M)(2), pp. 65–66.)

The Summary Description of the Plan of Insurance, included within the consecutively-paginated 1989 HIA and before the signature page on that document, and remaining in each successive version of the HIA, states as follows:

FUTURE OF THE PLAN

Although Borg–Warner Automotive Diversified Transmission Products Corporation, Muncie Plant expects and intends to continue the Plan indefinitely, it reserves the right to modify, amend, suspend or terminate the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement.

*Id.* at p. 121.

Both the 1989 CBA and HIA were expressly set to terminate on September 12, 1992, barring a further modification of, or agreement to extend, their terms. Although both sides to the 1989 CBA and HIA performed their obligations under the terms of the agreements, the 1989 HIA was not formally executed by BorgWarner and the UAW until December 10, 1992. (ECF No. 96, Ex. 1, p. 16, 16–B.)

On September 27, 1990, while the parties were performing under the terms of the 1989 CBA and HIA, they negotiated and executed an Agreement on Modification and Extension of Existing Labor Contract (the "ACME Contract"), which extended the 1989 CBA and HIA to March 11, 1995. (ECF No. 96, Ex. 2, 1990 ACME Contract.) In the ACME Contract, BorgWarner and the Union agreed to certain "Letters of Understanding" that were attached to the ACME Contract, including one entitled "Joint Letter of Agreement on Post–Retirement Benefit Liabilities." (*Id.* Ex. 3.) In this Letter of Agreement, BorgWarner and the Union addressed the very vesting issue presented to this Court, setting forth their "agreement to disagree" on the vesting issue as follows:

The parties . . . hereby acknowledge that medical insurance and life insurance benefits payable to the hourly retirees of DTP Muncie Plant (PRB Liabilities) pose a serious threat to the financial value and competitive status of the DTP Muncie Plant. The parties further recognize that a significant increase in the PRB Liabilities will occur over the next decade and beyond.

\* \* \*

7

The parties hereby agree to establish a joint task force in an attempt to seek a solution to the PRB Liabilities issue which is acceptable to both parties and which is intended to reduce the projected total 1999 PRB Liabilities.

* * *

This agreement does not prejudice the union's position that current retirees have lifetime vested benefits nor the DTP Muncie Plant's position that current retirees do not have lifetime vested benefits.

(ECF No. 96, Ex. 2, p. 7, Ex. 3.) In July, 1992, the Joint Task Force issued a report setting forth certain options that the Committee had considered, none of which was binding on the parties. (ECF No. 112, Ex. 2, July 1992 Summary of the Joint Task Force.)

Subsequent to executing the 1990 ACME Contract, the parties again extended the HIA on December 10, 1992 and then negotiated and adopted changes to the HIA in March 1995, March 1998, December 2000, and April 2005. (ECF No. 97, Ex. 15, Exs. 2, 3, 4, 5.) None of these subsequent HIAs altered any of the language regarding termination of benefits or addressed directly the vesting issue or the 1990 ACME Contract "agreement to disagree" on the subject. The 1989 HIA was the last completed, signed HIA.

Under the 1992 HIA, a new category of retirees was created, Category B Retirees, those hired after December 31, 1992. (ECF No. 96, Ex. 4, 1992 HIA, 9.) BorgWarner agreed to create a Retiree Health Account ("RHA") for Category B retirees to which the company made hourly contributions. (ECF No. 96, Ex. 4, 1992 HIA, 2–3, 9–10.) Category B retirees are not part of the instant lawsuit or the certified class. (ECF No. 102 at 3, n. 3.)

Under the 1992 HIA, and later the 1995 HIA, Category A Retirees, those future retirees hired prior to January 1, 1993, were divided into subclasses, some of whom were required to participate in a PPO program and some of whom were subject to annual increases in deductibles and stop-loss

8

amounts. (ECF No. 96, Ex. 4, 1992 HIA 5, 65, 80; Ex. 5, 1995 HIA 66–67, 82.) There were three subgroups of Category A retirees created under the 1992 HIA, depending upon whether the retiree participated in a new Preferred Provider Option ("PPO") that became effective on January 1, 1993: (1) pre–1993 retirees who were not covered by the PPO because they retired before it came into existence; (2) elective retirees who retired between January 1, 1993 and March 11, 1995, who were given the option of either electing PPO coverage or coverage under the pre–1993 retiree program; and (3) post-March 11, 1995 retirees who were obligated to elect coverage under the PPO. (ECF No. 96, Exs. 4, 5–9; Exs. 5, 5–9; ECF No. 103, Ex. 3, July 17, 2007 Declaration of Jerry French in *Borgwarner v. UAW*, No. 06–0058 (S.D. Ind. 2006), ¶ 14.) Class Representatives Winningham and Kelley were subject, as post-March 11, 1995 retirees, to the PPO participation requirement and to these annual deductible and stop loss increases. (ECF No. 100, Ex. 23, Kelley Dep. 11:17–20 (retired in 2001); Ex. 25, Winningham Dep. 9:18–20 (retired in 1996)).

In 1995, the parties entered into a new CBA which carried forward the terms of the 1992 HIA, with a term until March 12, 1998. (ECF No. 97, Ex. 15, Ex. 2, 1995 CBA art. 16, sec. 1, p. 124.) In 1998, they entered into a new CBA and negotiated a new HIA with terms until March 12, 2001. (ECF No. 97, Ex. 15, Ex. 3, 1998 CBA art. 16 sec. 1, p. 69; ECF No. 96, Ex. 6, 1998 Tent. HPW Agmt. 1–3; ECF No. 98, Ex. 19, Champagne Dep. 99:15–100:7.)[4] The 1998 HIA increased

---

[4] The parties never fully drafted 1998 or 2000 HIAs that encompassed the changes to which they agreed. *See* ECF No. 103, Ex. 3, Declaration of Jerry French ¶¶ 11, 22–25. There is no dispute between the parties of significance to this litigation regarding the changes to the HIA that resulted from the 1998, 2000 and 2005 negotiations. These issues were relevant, and indeed the French Declaration was prepared, in connection with the separate Indiana litigation which concluded that BorgWarner could not change health care benefits during the term of the then-existing HIA, which did not expire until February 26, 2009. *See Borgwarner Diversified Transmission Products, Inc. v. UAW*, No. 06–cv–058, 2008 WL 4274476, at *1 (S.D. Ind. Sept. 12, 2008).

certain existing retirees' co-payments for prescription drugs by forty percent for generic drugs and twenty percent for branded ones. (ECF No. 96, Ex. 6, 1998 HPW Tent. Agmt. 1; Ex. 7, 1998 Health Bens. Summ. 3; ECF No. 100, Ex. 24, Nuerge Dep. 89:24–90:25.) Class Representative Winningham was subject to this increase.

In 2000 the parties entered into a new CBA and HIA with terms ending March 12, 2006. (ECF No. 97, Ex. 15, Ex. 4, 2000 CBA art. 16 sec. 1; ECF No. 96, Ex. 8, 2000 Tent. Agmt. 1–2.) The only relevant change was an increase in deductible and stop loss maximums of 5% for the years 2002–2005. (ECF No. 96, Ex. 8, p. 2.) In 2005 they entered into the most recent CBA and HIA which expired on April 24, 2009. (ECF No. 97, Ex. 15, Ex. 5, 2005 CBA art. 15, sec. 1, p. 117; ECF No. 96, Ex. 9, 2005 Tent. Agmt. 1; Ex. 10, 2005 Tent. Agmt. Clarifications 1–2; ECF No. 98, Ex. 18 Campbell Dep. 48:23–50:14, 63:7–64:1.) The 2005 HIA included a reduction in health care benefits and monthly contributions for future retirees and included a provision that hourly retirement-eligible employees who were hired before January 1, 1993, could elect to retire on some date between April 2005 and May 1, 2006, and preserve the same benefits that were available under the 2000 HIA. (ECF No. 103, Exs. 13, 14.)

In 2006, BorgWarner modified its health insurance coverages, aligning retiree benefits with those of current employees and filed an action in the United States District Court for the Southern District of Indiana seeking a declaration that it was permitted to unilaterally alter its health insurance plan prior to the expiration of the term of the operative HIA. *Borgwarner Diversified Transmission Products, Inc. v. UAW*, No. 06–cv–058, 2008 WL 4274476, at *1 (S.D. Ind. Sept. 12, 2008). The changes included requiring payment of monthly premiums, increasing annual deductibles, and increasing co-pays for drugs. *Id.* The district court held that Articles V and XII of the 2005 HIA

10

prevented BorgWarner from unilaterally altering retiree benefits during the contract period. *Id.* at *3. In a subsequently issued opinion denying BorgWarner's request for a finding on the issue of lifetime vesting, the district court explained that: "[T]he lifetime benefits issue is not properly before the Court because the retirees have a contractual guarantee of benefits until the current collective bargaining agreements expire and the retirees do not seek a declaration of their rights to lifetime benefits." *Borgwarner Diversified Transmission Products, Inc. v. UAW*, No. 06–cv–058, 2008 WL 4724283, at *3 (S.D. Ind. Oct. 24, 2008).

On February 26, 2009, when the April 2005 HIA expired by its terms, the parties executed a Plant Shutdown Agreement, permanently closing the Muncie Plant and reiterating the "agreement to disagree" contained in the 1990 ACME Contract:

> The Company and the Union have a dispute with respect to the nature of the Company's obligation to provide post-retirement health care benefits to employees who retired prior to February 23, 2009 and their dependents. Nothing in this Plant Shutdown Agreement affects the parties' rights or positions with regard to that dispute.

(ECF No. 97, Ex. 11, Plant Shutdown Agreement, art. 9, sec. B(2).)

On May 1, 2009, BorgWarner shuttered the Muncie Plant and implemented modifications to the health care benefits of all persons who had retired from the Muncie Plant after October 27, 1989, the effective date of the 1989 HIA. Plaintiffs are approximately 1,750 retirees and surviving spouses of retirees who retired from BorgWarner's Muncie Plant under a number of different CBAs and HIAs between October 27, 1989 and February 23, 2009, and now challenge BorgWarner's unilateral modification of their health care benefits.

**B.      Procedural Background and the Intervening *Tackett* Decision**

In reaching its now-vacated decision that the governing CBAs and HIAs were ambiguous on

11

the issue of lifetime vested inalterable health care benefits, this Court premised its analysis on the analytical framework set forth in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), and relied on numerous Sixth Circuit decisions that also invoked *Yard-Man* as the fundamental analytical framework on the vesting issue. *Sloan v. BorgWarner, Inc.*, 1 F. Supp. 3d 743, 754-59 (E.D. Mich. 2014) (setting forth the "analytical framework," and acknowledging the necessary "inferences" in favor of vesting decreed by *Yard-Man* and faithfully applied in its wake). *Yard-Man* and its progeny, as discussed in greater detail *infra*, figured heavily in the Court's original and now-vacated analysis of the parties' cross-motions for summary judgment. Specifically, the Court expressly applied the following *Yard-Man*-derived interpretive principles to "infer" evidence of an intent to vest from the relevant language of the controlling CBAs and HIAs:

> (1) Language tying eligibility for pension benefits to eligibility for receipt of health care benefits, *i.e.* provisions stating that "employees who retire under the Retirement Income program Agreement . . . shall be entitled to" the benefits set forth in the HIAs which, under *Yard-Man* and its progeny, suggest "the inference that retirees would receive health care benefits as long as they retained the "status" of a retiree." 1 F. Supp. 3d at 765-66;

> (2) A general durational clause that sets the date on which the agreement will terminate, *i.e.* three-year agreements in this case, says nothing about the duration of health care benefits in the absence of a specific durational clause expressly limiting health care benefits. 1 F. Supp. 3d at 766-67;

> (3) Specific durational clauses relating to benefits for spouses and other non-retired employees, *i.e.* specific limitations on a surviving spouse's entitlement to benefits in the event of remarriage, "[u]nder the interpretive principles applied in this Circuit . . . [suggest] an inference of vesting of retiree health care benefits." 1 F. Supp. 3d at 767-68.

This Court concluded in part:

> In summary, several of the indicia recognized by the Sixth Circuit as indicative of an intent to vest are present here, *i.e.* (1) tying of pension and healthcare eligibility, (2) specific durational language as to certain non-retirees, (3) negotiation of less

12

favorable benefits for future retirees while leaving existing retiree's benefits unchanged. However, there are also indicia of an intent to not vest. . . . [T]he termination provisions of the HIA specifically refer to retiree benefits, *i.e.* specifically section 2(M)(2)(e), and each of the Exhibits of the HIA, many of which address specifically retiree healthcare benefits, incorporate this same termination provision. . . . Further, despite Plaintiffs' protestation that the language of the ROR was not negotiated, the ROR in this case appears in the HIA, as part of the formally executed agreement and before the final signature page.

1 F. Supp. 3d at 775. Ultimately, the Court denied both parties' motions for summary judgment, concluding that, under *Yard-Man's* interpretive principles, the agreements were ambiguous and that the extrinsic evidence did little to resolve that ambiguity. *Id.* at 776.

In *Tackett*, the Supreme Court abrogated the Sixth Circuit's decision in *Yard-Man* and repudiated the interpretive principles espoused in *Yard-Man* and its progeny, expressly rejecting many of the interpretive principles on which this Court relied in finding contractual ambiguity on the issue of an intent to vest. The Court in *Tackett* prefaced its repudiation of these inferences with the observation that "*Yard-Man* violated ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements. That rule has no basis in ordinary principles of contract law." 135 S. Ct. at 935. The Court then specifically rejected, as contrary to ordinary contract principles, the following *Yard-Man*-derived "rules" for interpreting collectively bargained health care benefit agreements: (1) the notion that tying eligibility for health care benefits to the eligibility for pension benefits suggests an intent to vest, *see* 135 S. Ct. at 935, 937; (2) the suggestion that we should divine an intent to vest from the presence of specific duration clauses in certain provisions but not in others, *see* 135 S. Ct. 934; and (3) the presumption that parties "would not leave retiree benefits to the contingencies of future negotiations," and that therefore we should refuse to apply the CBA's general durational clause to retiree benefits unless the

contract specifically limits the duration of retire health care benefits, *see* 135 S. Ct. at 936.   The

*Tackett* Court found these interpretive principles at odds with ordinary principles of contract

interpretation and specifically to be inconsistent with "the traditional principle that courts should not

construe ambiguous writings to create lifetime promises:"

> The Court of Appeals also failed even to consider the traditional principle that courts
> should not construe ambiguous writings to create lifetime promises. . . . Similarly,
> the Court of Appeals failed to consider the traditional principle that "contractual
> obligations will cease, in the ordinary course, upon termination of the bargaining
> agreement." *Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*,
> 501 U.S. 190, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). That principle does not
> preclude the conclusion that the parties intended to vest lifetime benefits for retirees.
> Indeed, we have already recognized that "a collective-bargaining agreement [may]
> provid[e] in explicit terms that certain benefits continue after the agreement's
> expiration." *Ibid*. But when a contract is silent as to the duration of retiree benefits,
> a court may not infer that the parties intended those benefits to vest for life.

135 S. Ct. at 936-37 (internal quotation marks and citation omitted) (alterations in original).   The

Supreme Court remanded to the Sixth Circuit "to review the agreements at issue under the correct

legal principles." *Id*. at 937.

On remand from the Supreme Court in *Tackett*, the Sixth Circuit summarized its

interpretation of the *Tackett* mandate and ultimately remanded the case to the district court with

instruction to "use ordinary principles of contract law" to determine whether the governing

agreements vested lifetime benefits – "without a 'thumb on the scale' in favor of either party."

*Tackett v. M&G Polymers USA, LLC*, 811 F.3d 204, 210 (6th Cir. 2016).[5]

---

[5] Upon remand, the district court in *Tackett* issued an Order acknowledging, as this Court has, that
the Sixth Circuit's decision in *Gallo v. Moen, Inc.*, 813 F.3d 265 (6th Cir. 2016), potentially could
have an effect on any dispositive motion practice in that case on the issue of vesting post-*Tackett*,
and stayed the case pending the Sixth Circuit's issuance of the mandate in *Gallo*. *Tackett v. M&G
Polymers USA, LLC*, No. 07-cv-126 (ECF No. 147) (S.D. Ohio February 24, 2016). The parties in
*Tackett* ultimately stipulated in the district court to a postponement of the setting of any deadlines
in the district court proceedings until after the mandate issued in *Gallo*. *Id*. (ECF No. 249). The

In its now-vacated summary judgment ruling, this Court determined, applying the now-repudiated *Yard-Man* interpretive principles, that the language of the relevant CBAs under which Plaintiffs retired were ambiguous on the issue of vesting and that consideration of the extrinsic evidence cited by the parties did not conclusively resolve the issue. *Sloan*, 1 F. Supp. 3d at 776. The Court determined that the issue of whether Plaintiffs' health care benefits were intended to be lifetime vested would proceed to trial. *Id.* The question now for the Court in light of *Tackett* is whether, without an interpretive thumb on the scales in favor of vesting, discarding all of the *Yard-Man* interpretive principles and applying ordinary contract principles, this Court still finds the governing contractual language in this case to be ambiguous on the issue of lifetime vesting.

For the reasons that follow, the Court concludes that *Tackett*, and the binding Sixth Circuit opinion in *Gallo* issued post-*Tackett* expressly interpreting and applying *Tackett's* mandate on the vesting issue based on language largely indistinguishable from that employed in the agreements at issue here, require the conclusion that there is no genuine issue of material fact that the governing agreements in this case do not promise lifetime inalterable healthcare benefits.

## II.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate when "the movant shows that there is no genuine dispute

---

district court subsequently issued an Order to that effect. *Id.* (ECF No. 251). As of the writing of this Opinion and Order, the only activity reflected on the docket in *Tackett* in the district court is the scheduling of a status conference for December 13, 2016 and an unopposed motion to continue and reschedule that status conference. (ECF No. 253, Unopposed Motion to Continue/Reschedule).

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Of

course, [the moving party] always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also*

*Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

   A fact is "material" for purposes of a motion for summary judgment where proof of that fact

"would have [the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

(quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48. Conversely, where a

reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for

trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation,

the court must examine the evidence and draw all reasonable inferences in favor of the non-moving

party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir. 1984). "'The central issue is

whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640,

646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

   If this burden is met by the moving party, the non-moving party's failure to make a showing

that is "sufficient to establish the existence of an element essential to that party's case, and on which

16

that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322–23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

"In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255). "Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party." *Id.*

17

(alteration in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) and *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).

## III.   ANALYSIS

In response to BorgWarner's renewed motion for summary judgment, Plaintiffs argue that BorgWarner's motion is based on "an over-broad misreading" of *Tackett* and urge the Court to focus on Justice Ginsburg's concurrence in *Tackett*, which identified "additional ordinary principles of contract law" including: (1) that "no rule requires 'clear and express' language in order to show that the parties intended health-care benefits to vest," and (2) that constraints on an employer after expiration of a CBA may be implied from the terms of the expired agreement. 135 S. Ct. at 937-38.[6] Plaintiffs suggest that Justice Ginsburg's concurrence confirms that the majority opinion in *Tackett* did not purport to effect the sea change that BorgWarner ascribes to the decision and that this Court should continue to consider the very same "interpretive principles" repudiated by the majority in *Tackett* as nonetheless "relevant" to discerning the intent of the parties. Plaintiffs then direct the Court's attention, as if *Tackett* has changed nothing, to these very same *Yard-Man* inference-based

---

[6] In the Sixth Circuit's remand order, Chief Judge Cole noted the "ordinary principles of contract law" outlined by both the majority opinion in *Tackett* and by Justice Ginsburg in her concurrence. Judge Cole noted that "[r]eliance on Justice Ginsburg's concurrence is appropriate in this instance because it identifies other principles of contract law." 811 F.3d at 208 n. 2. Chief Judge Cole observed the Supreme Court's admonition in *Alexander v. Sandoval*, 532 U.S. 275, 285 n. 5 (2001), that "a concurrence that is merely "consistent with" the majority, but not "coextensive," cannot "force the majority to address a point they found it unnecessary (and did not wish) to address, under compulsion of [a] new principle that silence implies agreement."). *Id.* Chief Judge Cole found *Sandoval* distinguishable because the majority opinion in *Tackett* "did not purport to disregard or disavow all other principles of ordinary contract law that it did not identify," and Justice Ginsburg's concurrence merely identified "other ordinary principles of contract law." *Id.*

18

principles as manifesting an intent to vest, *i.e.* that the agreements tie eligibility for health care and pension benefits, that the parties agreed to specific durational limitations for non-retirees, that the parties negotiated less favorable benefits for future retirees while leaving existing retiree benefits unchanged and that the general durational clause says nothing about the duration of health care benefits.    (ECF No. 151, Pls.' Resp. 8-14.)    The Court rejects Plaintiffs' reliance on Justice Ginsburg's concurrence, which had no impact on the majority opinion.  This Court disagrees with Plaintiffs' interpretation of *Tackett* as applied here.  The Court concludes that *Tackett*, as recognized by the Sixth Circuit in *Gallo*, *does* represent  a fundamental shift in the analytical paradigm in this Circuit for determining the vesting (or not) of lifetime, inalterable retiree health care benefits under a time-limited CBA.  When applied to the facts of this case, that new analytical framework requires the entry of summary judgment in favor of BorgWarner.

In *Gallo*, the Sixth Circuit closely examined the Supreme Court's opinion in *Tackett* and divined the following:

> *M & G Polymers USA, LLC v. Tackett*, —— U.S. ——, 135 S.Ct. 926, 190 L.Ed.2d 809 (2015), orients this appeal. In reversing a decision from our court, the Supreme Court instructed us to interpret collective bargaining agreements "according to ordinary principles of contract law." *Id.* at 933. The Court then instructed us what not to do in applying these principles. It repudiated *Yard–Man* and its heirs, directing us not to "plac[e] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." *Id.* at 935. It rejected our prior "inferences" in favor of vesting healthcare benefits for life as "too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention." *Id.* It rejected our prior assumption that "retiree health care benefits are not subjects of mandatory collective bargaining," pointing out that parties frequently "voluntarily agree" to bargain about retiree healthcare. *Id.* at 936. It rejected our "premise that retiree benefits are a form of deferred compensation," reminding us that Congress has rejected that premise. *Id.*; see 29 U.S.C. § 1002(1), (2)(A)(ii). It directed us to consider the general durational clauses in the CBAs (usually three years) in deciding how long a company has committed to provide healthcare benefits to retirees. 135 S.Ct. at 936. It told us that "courts should not construe ambiguous writings to create lifetime promises." *Id.* And it explained that, "when a contract is

silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 937; *see generally Tackett v. M & G Polymers USA, LLC*, No. 12–3329, 811 F.3d 204, 208, 2016 WL 240414, at *4 (6th Cir. Jan. 21, 2016).

The Court offered one more piece of guidance. At the same time it rejected *Yard–Man*, it endorsed our decision in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc). *Sprague* rejected the application of *Yard–Man* in the context of noncollectively bargained contracts about retiree healthcare benefits and refused to infer from silence and ambiguous contracts a commitment to unalterable healthcare benefits to retirees for life. *Id.* at 400. *Tackett* thus directed us to treat collectively and noncollectively bargained contracts about retiree healthcare benefits similarly—to apply the same basic rules of contract interpretation to both sets of contracts. *See* 135 S.Ct. at 936–37.

813 F.3d at 268. The Sixth Circuit also noted that "in overruling *Yard-Man*, in short, *Tackett* does not create a clear-statement rule in the other direction. It instead eliminates the use of inferences and implications not grounded in "ordinary principles of contract law" and explains the kinds of tools properly deployed in this setting." *Id.* at 274.

The Sixth Circuit in *Gallo* described the tying inference as "a relic of a misdirected frame of reference," especially where, as here, the tie lacks a specific durational linkage that connects the duration of health care benefits to the duration of pension benefits, rather than just eligibility for pension benefits to the eligibility to receive health care benefits. *Gallo*, 813 F.3d at 272. Absent language that specifies "that retirees will get [health care benefits] *for as long as* they earn a pension," the tying analysis sheds no light on the parties' intent with regard to vesting of health care benefits. *Id.* (Emphasis in original). No such "as long as" language was used in the CBAs and HIAs under scrutiny here. *See* 1989 HIA, Article VIII Section 1 ("Presently retired employees and an employee who retires under the Retirement Income Program Agreement on or after December 1, 1989, . . . *shall be entitled to* the [coverages] set forth in Exhibits A, C, D, E, F and H."); Article VIII Section 2 ("An employee who terminates employment with the Company on or after January 1, 1991

while participating in the Muncie Retirement Savings Plain *shall be entitled to* the . . . coverages and procedures set forth in Exhibits A, C, D, E, F, and H.").

The surviving spouse provision, Article VIII Section 3, is worded slightly differently, and contains a termination clause in the event of remarriage. ("The Company will provide medical coverages . . . for [a] surviving spouse . . . of a retired employee . . . who is receiving a monthly retirement benefit[] . . ."). Plaintiffs argue that this surviving spouse provision employs the "receiving" language that Justice Ginsburg indicated in her concurrence is "relevant" to an examination of the parties' intent. First, the Sixth Circuit in *Gallo* rejected the argument that the agreements' invocation of the future tense, *i.e.* coverage "will be continued," or "will be provided," or future retirees "will be covered," creates an inference of a lifetime promise. Such language, the Sixth Circuit held, means only that the coverage will continue "until *some point* in the future," that point being the expiration of the three-year CBA. 813 F.3d at 271 (emphasis in original). "If *Tackett* tells us anything," the Sixth Circuit explained, "it is that the use of the future tense without more – without words committing to retain the benefit for life – does not guarantee lifetime benefits." *Id.* Second, it would be an odd result indeed if the retirees were only entitled to receive medical coverages during the life of the three-year agreement but their spouses were to receive them for life. The language of Article VIII that sets forth the continuation provisions and defines entitlement to medical benefits with reference to entitlement to pension benefits does not contain the requisite durational, or "as long as," linkage language. *Gallo*, 813 F.3d at 272 ("It is not surprising that CBAs address pension and healthcare benefits for retirees. And it is not surprising that CBAs make pensioner status a condition of receiving healthcare benefits. But neither one of these features of the CBAs means that retirees will get those benefits *for as long as* they earn a pension, particularly since

the pension provisions use vesting language and the healthcare provisions do not.") (Emphasis in original). The Sixth Circuit explained: "The CBAs general durational clauses provide a baseline or default rule, a point at which the agreements expire *absent more specific limits* relevant to a particular term. In the absence of specific language in the retiree healthcare provisions, the general durational clause controls." 813 F.3d at 271-72 (emphasis in original).

Gallo also rejected the argument pressed by Plaintiffs here that the inferences that favored lifetime vesting and that governed these health care vesting disputes in the Sixth Circuit for so many years became a part of the fabric of the collective bargaining environment and therefore would have been assumed by the parties to have applied to these CBAs and HIAs: "[N]othing in *Tackett* (or the concurrence) hints at the idea that *Yard-Man* would linger, vest as it were, as a precedent that would bind future interpretations of such agreements. . . . Nor is it fair to assume that all parties who entered such CBAs were certain about the fate of *Yard-Man*. . . . [Such] uncertainty was not misplaced." 813 F.3d at 272-73 (alteration added). This observation perhaps gives context to the 1990 ACME Agreement, in which BorgWarner clearly stated its position that the CBAs and HIAs did not promise lifetime vested health care benefits and the Union stated its position that they did, the retirees relying on the survival of *Yard-Man* and BorgWarner perhaps less "certain about [its] fate." In short, the Sixth Circuit explains in *Gallo*, *Tackett's* firm rejection of *Yard-Man* and its progeny finally brings the Sixth Circuit in line with the majority of its sister circuits that have never embraced such interpretive principles: "No court to our knowledge has found, or would find, a promise of lifetime unalterable healthcare benefits based on CBA language of this sort in a time-limited agreement." 813 F.3d at 271. Noting that the Sixth Circuit has expressly refused to apply these presumptions in the context of non-collectively bargained agreements, *Gallo* finally put to rest

22

what it described as "a strangely inverted regime that favored employees who had the benefit of union representation over those without it." *Id.* at 273.

Ultimately the Sixth Circuit concluded in *Gallo* that, as applied to the set of contracts before it, ordinary principles of contract law "require[d] the conclusion that no vesting occurred." *Id.* at 274. Guided by *Gallo* and the similarity of the contract language at issue there to the provisions of the CBAs and HIAs under review here, this Court is similarly compelled to conclude that no vesting occurred. As discussed below, each of the observations deemed important in *Gallo* is equally applicable, and indeed controlling, here.

"*First and foremost*, nothing in this or any of the other CBAs says that Moen committed to provide unalterable healthcare benefits to retirees and their spouses for life." 813 F.3d at 269 (emphasis in original). So too here. Nothing in the CBAs or HIAs states that healthcare benefits will be provided for retirees and their spouses *for life*. To make this observation is not to *require* that the agreements must contain such express language but it is significant to the analysis to note that they do not.

"*Second*, not only do the CBAs fail to say that Moen committed to provide unalterable healthcare benefits for life to retirees, everything they say about the topic was contained in a *three-year* agreement." *Id.* (emphasis in original). So too here. Each of the CBAs and HIAs was for a three-year term. Heeding the Supreme Court's admonition in *Tackett* that "we should not expect to find lifetime commitments in time-limited agreements," *Gallo* observes that terms such as "will be provided," or "will be covered," when read in conjunction with the three-year durational clause, "*guarantee* benefits until the agreement expires." 813 F.3d at 269 (emphasis in original). The Sixth Circuit instructs that "[a]bsent a longer time limit in the context of a specific provision, the general

23

durational clause supplies a final phrase to every term in the CBA." *Id.* Construed under this directive, this Court must conclude that the language of Article VIII, Sections 1-3, which provides that retired employees "shall be entitled" to certain medical coverages and that the "Company "will provide" those medical coverages, guarantees that employees who retire during the three-year term of a particular CBA are guaranteed to receive those "benefits until the agreement expires, nothing more." *Id.* Understood in this context, the proviso in Article VIII that the medical coverages defined therein "shall terminate if the surviving spouse or Eligible surviving spouse remarries," does have meaning and dictates that remarriage during the three-year term of the CBA will result in a termination of the benefits otherwise guaranteed for that three-year term. "Any other approach, *Tackett* explained, 'distort[s] the text' of CBAs by 'refus[ing] to apply general durational clauses to provisions governing retiree benefits.'" *Gallo*, 813 F.3d at 270 (quoting *Tackett*, 135 S. Ct. at 936) (alterations in original).

"*Third*, each of the last three CBAs says that "*[c]ontinued* hospitalization, surgical and medical coverage will be provided without cost to *past pensioners and their dependents* prior to March 1, 1996." *Gallo*, 813 F.3d at 270 (emphasis in original). The Sixth Circuit observed that there "would be no need to "continue" such benefits if prior CBAs had created vested rights to such benefits." *Id.* Similarly here, the 1992 and the 1995 HIAs reiterated, and in some cases redefined, the health care benefits that would be available going forward for "pre-1993 retires," i.e. those who retired under the 1989 HIA.

"*Fourth*, while the authors of the CBAs opted not to say that retiree healthcare benefits were vested for life, they explicitly vested pension benefits for qualifying retirees," using "life" language in both the CBAs and the pension plan." *Gallo*, 813 F.3d at 270 (emphasis in original). In this case,

24

at the hearing on BorgWarner's motion for summary judgment, the Court inquired whether the governing pension plan in this case utilized "life" language. Although neither party had a copy of the pension plan with them at the hearing, BorgWarner supplied the Court after the hearing with an unsigned version of the 1995 Pension Plan, which does explicitly state that retirement benefits would be paid "during" or "over" the life of the participant and eligible spouses. Plaintiffs did not respond or object to this submission and the Court assumes that this language does appear in the relevant pension plan documents.

"*Fifth*, the agreements contain reservation-of-rights clauses that evidence an intent not to vest and that apply to employees and retirees." *Gallo*, 813 F.3d at 270 (emphasis in original). "How," the Sixth Circuit asked, "can one simultaneously say that healthcare benefits are vested but may be "cancel[ed]" by the employer?" *Id.* Similarly here, a reservation of rights clause appears within a Summary Plan Description that is found within the HIA, appearing as part of the paginated HIA and before the final signature page. The clause states that that BorgWarner "expects and intends to continue the Plan indefinitely [but] reserves the right to modify, amend, suspend or terminate the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement." As this Court discussed in its now-vacated summary judgment Opinion and Order, *see Sloan*, 1 F. Supp. 3d at 763-64, 768-69, the Sixth Circuit has explained that such provisions can be harmoniously construed because "[s]urely a company can promise "continuous health insurance" and reserve the right to modify or end that coverage if it becomes unaffordable." *Witmer v. Acument Global Tech., Inc.*, 694 F.3d 774, 777 (6th Cir. 2012).

Once the now-repudiated *Yard-Man* inferences are removed, and applying instead ordinary principles of contract interpretation to these time-limited agreements as directed in *Tackett* and

25

*Gallo*, it is clear that these CBAs and HIAs did not unambiguously promise to provide retirees with lifetime, inalterable health care benefits. But what further sets this case apart is that the HIAs under scrutiny here *did* contain a termination of coverage provision that related expressly to the duration of the health care benefits provided under those agreements which purported to limit health care benefits to the duration of each individual HIA. Beginning with the 1989 HIA, and in every iteration of the HIA thereafter, Appendix A, Ex. A § 2(M)(2), provided as follows:

> *Termination of Coverages Provided Under Exhibit A*: The coverages provided under this Exhibit A terminate on the date that:
>
> (a) the eligible active employee leaves the employment of the Company (see the Agreement and Appendix for the applicable continuation provisions regarding layoff, disability, retirement, or COBRA);
>
> (b) the eligible active employee/dependent or the eligible retiree/dependent is no longer eligible for coverage;
>
> (c) the required monthly premium contribution, if applicable is not made;
>
> (d) the eligible active employee or eligible retiree dies (see the Agreement or Appendix A for the applicable continuation provisions, if any); or
>
> (e) the Agreement is terminated.

(ECF No. 96, Ex. 1, 1989 HIA, Appendix A, Ex. A, § 2(M)(2), p. 65–66.)

This provision further distinguishes this case from those cases that lacked specific durational clauses relating to health care benefits because here retiree health care benefits are specifically set to terminate with the expiration of each HIA under Section 2(M)(2)(e). Plaintiffs assert that this Court already determined, in its now-vacated summary judgment Opinion and Order, that this provision is ambiguous because it is susceptible to "two competing interpretations." Although the Court did reach this conclusion, it did so based on its determination that the inferences required under *Yard-Man* and it progeny supported Plaintiffs' proffered interpretation of the underlying CBA

26

and HIA as suggesting an intent to vest.  Specifically the Court observed:

> Plaintiffs respond that subsections (a) and (d) of § 2(M)(2) specifically refer to the applicable coverage continuation provisions for retirees and dependents "in the Agreement and/or Exhibit A, *which in turn refer to Article VIII of the HIA, in which eligibility for pension and health care benefits are tied together and therefore such benefits do not terminate but continue as set forth in the HIA.* Plaintiffs do not deny that § 2(M)(2) specifically refers to retiree benefits—rather they urge the Court to disregard subsection (e).  At oral argument, Plaintiffs' counsel argued that the Court need never "get to" subsection (e) because "if a person retires, then you look at [a], and if a person, a retiree, dies, then you look at [d]." (ECF No. 119, Transcript of November 7, 2012 Hearing at 56.) Plaintiffs argue that "if the coverages end when the agreement is terminated, then there's no reason for [a, b, c, or d]." (*Id.*) BorgWarner reads this section differently. They assert that subsections a-d do have force and effect and will govern—when the HIA is in effect. In other words, if a person dies or retires during the term of the HIA, then the continuation provisions of the HIA apply, etc.

1 F. Supp. 3d at 766-67 (emphasis added).

The Court credited Plaintiffs' "competing" interpretation only because the Court had previously applied the now-repudiated *Yard-Man* tying inference to find some evidence of an intent to vest.  Plaintiffs' argument that § 2(M)(2) was at least ambiguous circled directly back to, and relied on, those provisions that they argued supported the now-prohibited inference of an intent to vest.  Absent that inference, Plaintiffs' interpretation of § 2(M)(2) simply fails and BorgWarner's interpretation, which is consistent with the ordinary interpretive principles respecting durational limits applied in *Gallo*, must prevail.  Thus, the health care benefit agreements under scrutiny here *do* contain a specific durational limitation on health care benefits and that duration is co-extensive with the term of the governing HIA.  There is thus no ambiguity in this provision and no reason to proceed further to an examination of the extrinsic evidence.

## IV.   CONCLUSION

The Sixth Circuit in *Gallo* interpreted *Tackett* to prohibit reliance on each of the interpretive

27

principles on which this Court relied in previously concluding that the CBAs and HIAs in this case were ambiguous. The Sixth Circuit demands instead that courts apply ordinary principles of contract interpretation shorn of the *Yard-Man* derived inferences. Here, as in *Gallo*, ordinary principles of contract interpretation "require the conclusion that no vesting occurred." 813 F.3d at 274.

Accordingly, the Court GRANTS BorgWarner's motion for summary judgment and DISMISSES Plaintiffs' Complaint.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated: DEC 0 5 2016